**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DETROIT INTERNATIONAL BRIDGE COMPANY,
    a Michigan corporation
12225 Stephens Road
Warren, Michigan 48089

        and

THE CANADIAN TRANSIT COMPANY,
    a Canadian special act corporation
4285 Industrial Drive
Windsor, Ontario N9C 3R9
Canada

                      Plaintiffs,

        - vs. -

THE GOVERNMENT OF CANADA,

THE UNITED STATES FEDERAL HIGHWAY
    ADMINISTRATION,

VICTOR MENDEZ, in his official capacity as
    Administrator of the United States Federal Highway
    Administration,

RAY LAHOOD, in his official capacity as Secretary of
    Transportation,

THE UNITED STATES COAST GUARD,

ADM. THAD W. ALLEN, in his official capacity as
    Commandant of the United States Coast Guard,

JANET NAPOLITANO, in her official capacity as
    Secretary of Homeland Security, and

THE UNITED STATES OF AMERICA,

                      Defendants.

RECEIVED
2010 MAR 22  P 5: 14
CLERK
U.S. DISTRICT &
BANKRUPTCY COURTS

**FILED**
**MAR 2 2 2010**
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Docket No.

Case: **1:10-cv-00476**
**Assigned To : Collyer, Rosemary M.**
**Assign. Date : 3/22/2010**
**Description: Admin. Agency Review**

## COMPLAINT

    1.    For over 80 years, the plaintiffs have held and exercised a perpetual right to

construct, own, operate and maintain the toll bridge franchise across the Detroit River between

Detroit, Michigan, and Windsor, Ontario, to collect tolls from vehicles crossing the bridge, and

to exercise other specified powers in connection with these rights.  Plaintiffs' bridge, known as

the Ambassador Bridge, carries more than one quarter of the total commercial traffic between the United States and Canada.

2.     The Ambassador Bridge has been and continues to be recognized as one of the best-run crossings between the United States and Canada, serving as a model for other crossings.

3.     The Government of Canada has long wanted to take for itself the Canadian half of the Ambassador Bridge and the profitable toll-collection rights that go with it.  Plaintiffs, however, own the rights to operate and maintain the international crossing, including the toll-collection rights, by contract and treaty, and in particular by the terms of reciprocal legislation enacted by Congress and Parliament under the 1909 Boundary Waters Treaty.

4.     Lacking any lawful means to achieve its goal of taking ownership of the Ambassador Bridge for its own commercial advantage, the Government of Canada, with the cooperation of officials within the U.S. Federal Highway Administration ("FHWA"), has engaged in a series of breaches of plaintiffs' rights.  These breaches are designed to undermine the value of plaintiffs' property interests and thereby coerce plaintiffs to surrender their rights in their franchise and the Ambassador Bridge crossing to Canada on terms dictated by Canada—or, failing that, to put the Ambassador Bridge out of business so that Canada, together with U.S. governmental entities, can operate its own toll bridge in the same border-crossing corridor (the "Central Corridor") without competition.

5.     Among other things, Canada and FHWA have proceeded toward the construction of their own commercial venture—a new toll bridge (the "DRIC Bridge") to be owned by the Canadian and U.S. governments—directly adjacent to the Ambassador Bridge, and located in the same Central Corridor, without any public need, and with the intention of diverting substantially all traffic from, and ultimately replacing, the Ambassador Bridge.  Canada and FHWA also have

taken further steps designed to prevent plaintiffs and the Ambassador Bridge from competing with the DRIC Bridge and to drive plaintiffs and the Ambassador Bridge out of business in the absence of an agreement to transfer the Ambassador Bridge to Canada. These further steps have included obstructing and delaying plaintiffs' construction and operation of a new span and other modernizations and attempting to impose new restrictions on the operation of the Ambassador Bridge that are inconsistent with the plaintiffs' rights under the governing legal instruments.

6.      Canada and FHWA have also interfered in the process of approval by the United States Coast Guard for completion of the Ambassador Bridge's expansion plans. Because of opposition by Canada and FHWA, the Coast Guard has unreasonably and without good cause refused to process plaintiffs' application for environmental approval and a bridge permit.

7.      Canada has taken these steps because Canada wishes to own a proprietary stake in the major commercial crossing between Detroit and Windsor, including the associated toll-collection rights, which it sees as a potential source of revenue, and in particular to prevent those rights from being wholly owned by American investors. FHWA has willingly participated in and cooperated with Canada in this scheme, either out of a misplaced desire to accommodate Canada's strongly held wishes or because, for reasons similar to Canada, it wants the U.S. half of the bridge and associated toll-collection rights to be owned by the government. In doing so, FHWA has failed to heed either plaintiffs' established legal rights or Congressional policy supporting the continued use and expansion of the Ambassador Bridge in the Central Corridor.

8.      Prior to Canada's recent campaign against the Ambassador Bridge, the United States Congress appropriated over US$230 million for upgrading the highway connections to support the continued use and expansion of the Ambassador Bridge, including accommodation of a second span. Most of that money has now been spent. Canada also promised to spend

3

C\$300 million on improving the access of the Ambassador Bridge to Ontario Highway 401, creating an end-to-end solution giving the Ambassador Bridge direct highway access on both sides of the border.  In reliance on these promises, plaintiffs have invested over US\$250 million into improvements to the Ambassador Bridge designed to take advantage of the promised improvements.  But Canada then refused to spend the money that it had promised for improving the highway and access route to the Ambassador Bridge.

9.     Despite the substantial expenditure of U.S. taxpayers' funds in reliance on Canada's reciprocal promise, despite Congress's expressed intention to support the Ambassador Bridge crossing, and despite the U.S. government's longstanding policy of protecting the legal rights and legitimate expectations of American investors abroad, FHWA has unlawfully cooperated with, acted in concert with, aided and conspired with Canada in its scheme to undermine plaintiffs' property rights.

10.     The plaintiffs have suffered, and will continue to suffer, serious and irreparable harm to their property interests as a result of the unlawful conduct by Canada, FHWA and the Coast Guard, which is designed to achieve the improper purposes of (a) depriving plaintiffs of their legal rights, including their rights to operate, maintain and charge tolls on the Ambassador Bridge, and (b) bestowing benefits, at the Ambassador Bridge's expense, on the new commercial venture that Canada and FHWA are now in the process of setting up.  For these reasons, as further set forth below, plaintiffs respectfully seek damages against Canada and declaratory, injunctive and other relief against all the defendants to protect plaintiffs' property and enforce their legal rights.

## PARTIES

11.     Plaintiff Detroit International Bridge Company is a corporation incorporated under the laws of the State of Michigan, having its principal place of business at 12225 Stephens Road, Warren, Michigan 48089.

12.     Detroit International Bridge Company is a privately held company, which is owned, through another company, by United States citizens.

13.     Plaintiff Detroit International Bridge Company is the successor in interest to the American Transit Company and an earlier company also called Detroit International Bridge Company. This Complaint refers to plaintiff Detroit International Bridge Company, together with these two predecessors, as "DIBC." The American Transit Company and the Canadian Transit Company were the original grantees, in 1921, of the rights to build and operate a toll bridge across the Detroit River, together with the associated toll-collection and other rights. Pursuant to statutory authorization, the American Transit Company transferred all its rights to the first Detroit International Bridge Company in 1927. That company merged into the current Detroit International Bridge Company in 1979.

14.     Plaintiff The Canadian Transit Company ("CTC") is a Canadian Special Act corporation having its principal place of business at 4285 Industrial Drive, Windsor, Ontario N9C 3R9, Canada.

15.     CTC is a wholly owned subsidiary of DIBC.

16.     DIBC and CTC, respectively, own the United States and Canadian sides of the Ambassador Bridge. They operate the Ambassador Bridge in cooperation with each other pursuant to a joint operating agreement.

17.     Defendant The Government of Canada ("Canada" or "Government of Canada"), as sued herein, should be understood to mean and include the Canadian federal government and

Crown, which is customarily sued in Canadian practice under the name Her Majesty the Queen

in Right of Canada. Canada is a foreign state.

18.     The United States of America is also named as a defendant in this action.

19.     Defendant Federal Highway Administration (defined above as "FHWA") is an

agency of the United States Department of Transportation. Defendant Victor Mendez is the

Administrator of FHWA. Defendant Ray LaHood, also known as Raymond H. LaHood, is the

United States Secretary of Transportation. Defendants Mendez and LaHood are sued in their

official capacities. This Complaint refers to defendants the United States of America, FHWA,

Mendez and LaHood collectively as the "FHWA Defendants."

20.     Defendant United States Coast Guard (the "Coast Guard") is an agency of the

United States Department of Homeland Security. Defendant Admiral Thad W. Allen is the

Commandant of the Coast Guard. Defendant Janet Napolitano is the United States Secretary of

Homeland Security. Defendants Allen and Napolitano are sued in their official capacities. This

Complaint refers to defendants the United States of America, the Coast Guard, Allen and

Napolitano as the "Coast Guard Defendants." The FHWA Defendants and the Coast Guard

Defendants together are referred to as the "U.S. Defendants."

## JURISDICTION AND VENUE

21.     As against defendant Canada, this action is based upon (a) a commercial activity

carried on in the United States by Canada, and/or (b) an act or acts outside the territory of the

United States in connection with a commercial activity of Canada within the territory of Canada,

causing a direct effect in the United States. For these reasons, under 28 U.S.C. § 1605(a)(2),

Canada is not immune from the jurisdiction of the Court. Because this is a nonjury civil action

against a foreign state with respect to which the foreign state is not entitled to immunity, this

Court has jurisdiction over the subject matter under 28 U.S.C. § 1330(a) and, upon service of process, jurisdiction over the person of defendant Canada under 28 U.S.C. § 1330(b).

22.     As against the U.S. Defendants, this is an action by persons suffering legal wrong or aggrieved or adversely affected because of agency action, seeking relief other than money damages, and based on an agency, officer or employee of the United States acting or failing to act in an official capacity or under color of legal authority.  For these reasons, under 5 U.S.C. § 702, the U.S. Defendants are not immune from the jurisdiction of the Court.  The claims against the U.S. Defendants arise under the Constitution, laws and treaties of the United States and seek to compel the U.S. Defendants to comply with their legal duties.  This Court has jurisdiction over the subject matter of those claims under 28 U.S.C. §§ 1331 and 1361.

23.     Defendant Canada is a foreign state.  Venue is therefore proper in this District under 28 U.S.C. § 1391(f)(4).

24.     As federal agencies, defendants FHWA and Coast Guard are deemed to reside in the District of Columbia.  Defendants Mendez, LaHood, Allen and Napolitano perform their official duties in the District of Columbia and are therefore deemed to reside in the District when sued in their official capacities.  Venue is therefore proper in this District under 28 U.S.C. § 1391(e)(2).

25.     In addition and in the alternative, a substantial part of the events or omissions giving rise to the claim occurred in the District of Columbia.  Venue is therefore proper in this District under 28 U.S.C. § 1391(e)(1) and (f)(1).

## FACTUAL BACKGROUND

### A.  The Special Agreement

26.     In 1909, the United States and the United Kingdom of Great Britain and Ireland,

which at the time was responsible for Canada's foreign affairs, signed and ratified a treaty

regulating, among other things, the construction of bridges and other impediments to navigation

across the waters separating the United States and Canada.  Treaty Relating to Boundary

Between the United States and Canada, U.S.-U.K., Jan. 11, 1909, 36 Stat. 2448 (the "Boundary

Waters Treaty").

27.     The Boundary Waters Treaty included a provision for "special agreements"

authorizing construction of bridges and other impediments to navigation upon the boundary

waters.  *Id.* art. III.  The Boundary Waters Treaty further specified that reciprocal legislation by

the United States Congress and the Canadian Parliament would constitute such a "special

agreement."  *Id.* art. XIII.

28.     In 1921, the Canadian Parliament and the U.S. Congress adopted such a special

agreement (the "Special Agreement"), in the manner contemplated by the Boundary Waters

Treaty, by passing reciprocal legislation granting to CTC and to DIBC, respectively, a perpetual

right to collect tolls for operating an international bridge between Detroit, Michigan and

Sandwich (now part of Windsor), Ontario.  Act of Mar. 4, 1921, 66th Cong., ch. 167, 41 Stat.

1439 ("1921 DIBC Act," and, with subsequent amending legislation, the "U.S. Act"); Act of

May 3, 1921, 11-12 Geo. V ch. 57 (Can.) ("1921 CTC Act," and, with subsequent amending

legislation, the "Canadian Act").

29.     The effectiveness of the U.S. Act was expressly conditioned on the passage of

reciprocal legislation by Canada, and the effectiveness of the Canadian Act was expressly

conditioned on the passage of reciprocal legislation by the U.S. Congress.

30.     From 1922 to 1927, both the U.S. and Canada amended the Acts to expand and clarify DIBC's and CTC's rights. *See* Act of June 28, 1922, 12-13 Geo. V ch. 56 (Can.) ("1922 CTC Amendment"); Act of April 17, 1924, 68th Cong., ch. 125, 43 Stat. 103 ("1924 DIBC Amendment"); Act of Mar. 3, 1925, 68th Cong., ch. 448, 43 Stat. 1128 ("1925 DIBC Amendment"); Act of May 13, 1926, 69th Cong., ch. 292, 44 Stat. 535 ("1926 DIBC Amendment"); Act of Mar. 31, 1927, 17 Geo. V ch. 81 (Can.) ("1927 CTC Amendment").

31.     In April 1927, the U.S. Department of State recognized that the U.S. Act and Canadian Act constituted a special agreement under the Boundary Waters Treaty, and that this special agreement directly gave DIBC and CTC permission to construct and operate the Ambassador Bridge without the need for approval by the International Joint Commission established by the Boundary Waters Treaty.

32.     In July 1927, the Department of External Affairs Canada similarly advised that no approval of the International Joint Commission was required under the Boundary Waters Treaty.

33.     As an agreement between nations, consented to in the manner specified in the previously ratified Boundary Waters Treaty, the Special Agreement itself constitutes a binding international agreement. This international agreement has the force of a treaty as a matter of international law and has been incorporated into U.S. and Canadian domestic law by virtue of the U.S. Act and the Canadian Act. The rights granted by the Special Agreement cannot be abrogated or diminished without, at a minimum, an amendment to the agreement by the party states.

34.     By the terms of the U.S. Act, the rights of DIBC were subject to the requirements of the 1906 act to regulate the construction of bridges across navigable waters. 1921 DIBC Act, § 1; *see* Act of Mar. 23, 1906, ch. 1130, 34 Stat. 84 (the "1906 Bridges Act").

35.     By the terms of the Canadian Act, the rights of CTC were subject to (a) the Railway Act, 1919, except to the extent inconsistent with the 1921 CTC Act and the 1922 CTC Amendment, and (b) the Navigable Waters' Protection Act.  1921 CTC Act §§ 8, 20; 1922 CTC Amendment § 6.

36.     The U.S. Act granted DIBC the right to sell, assign, transfer or mortgage all its assets.  *See* 1926 DIBC Amendment § 3.  The assets of DIBC referenced in the U.S. Act include DIBC's rights in the bridge and all other rights and franchises granted to DIBC under the U.S. Act.

37.     The Canadian Act granted CTC the right to unite with any Canadian, Michigan or other U.S. company in building, working, managing, maintaining and using the bridge and its terminals and approaches; and to convey or lease to such company all or part of its interest in the bridge, and to mortgage, pledge or hypothecate all its assets, alone or in conjunction with such other company.  1921 CTC Act § 14; 1922 CTC Amendment § 4.  The assets of CTC referenced in the Canadian Act include CTC's rights in the bridge and all other rights and franchises granted to CTC under the Canadian Act.

**B.    Plaintiffs' Agreement to Build and Operate the Ambassador Bridge for the United States and Canada in Exchange for Perpetual Rights under the Special Agreement.**

38.     The Special Agreement is not only a special agreement under the Boundary Waters Treaty, an international agreement in its own right, and a pair of reciprocal statutes, but also a contract.

39.     Both the U.S. Act and the Canadian Act were conditioned on the commencement and completion of construction of the bridge by certain deadlines.  *See* 1921 DIBC Act § 2; 1921 CTC Act § 17.  Those deadlines were extended by subsequent amendments.  *See* 1924 DIBC

Amendment § 1; 1925 DIBC Amendment § 1; 1926 DIBC Amendment § 1; 1927 CTC

Amendment § 2.

40.     At the time of the Special Agreement, building a span the length of the

Ambassador Bridge crossing was an extraordinary technical feat, and it was uncertain whether it

could even be accomplished.  For a time after its construction, the Ambassador Bridge was the

longest suspension bridge in the world.

41.     Both Canada and the United States recognized that a bridge crossing between

Detroit and what is now Windsor would help the economy of the region, and that inducing a

private party to undertake the expense and risk of building such a bridge would be for the benefit

of the public in both countries.  The Canadian Act expressly declared "[t]he works and

undertaking of [CTC] … to be for the general advantage of Canada."  1921 CTC Act § 2.

42.     To induce DIBC and CTC to undertake the risk and expense of constructing and

operating the bridge, the United States and Canada passed the legislation constituting the Special

Agreement, which granted DIBC and CTC a perpetual right and franchise to operate and collect

tolls on the bridge, subject to the conditions specified in the Special Agreement, provided that

they successfully constructed the bridge in accordance with requirements and timetables

specified in the Special Agreement (as amended).

43.     In 1927, DIBC acquired 100% ownership of CTC's stock.

44.     In reliance on the perpetual rights granted to it and to CTC by the Special

Agreement, and having obtained all required approvals, DIBC raised money by selling bonds,

acquired the necessary land, and constructed the Ambassador Bridge and its accompanying

facilities.

45.     The Ambassador Bridge first opened for traffic on November 11, 1929.  As the Michigan Supreme Court explained in 1930, the Ambassador Bridge and its approaches formed "a union of highways of Michigan and of Ontario and convert[ed] them into one uninterrupted public road."

46.     As a result of the Special Agreement and DIBC's and CTC's acceptance of the offer contained therein, DIBC and CTC acquired certain contractual, statutory, treaty and property rights, including the perpetual right to own, operate, maintain and charge tolls on the Ambassador Bridge, subject only to the requirements set forth in the Special Agreement and the other legislation made applicable by the Special Agreement.

47.     The Ambassador Bridge fell victim to the Great Depression.  The bonds that financed its construction went into default, and DIBC and CTC went into bankruptcy in 1938. Under the companies' Plan of Reorganization, approved in 1939, bondholders converted their bond debt to stock equity.  The stock of DIBC, and therefore the equity ownership of its wholly owned subsidiary CTC, was publicly traded in the over-the-counter market for 50 years.

48.     Over the years, DIBC has invested hundreds of millions of dollars into building, maintaining, operating and upgrading the Ambassador Bridge, in reliance on the rights that the United States and Canada granted to DIBC and CTC under the Special Agreement.

49.     The tangible value of the physical bridge facility (including the bridge span and its approaches and associated buildings and plazas) is only a small part of the value of DIBC's and CTC's rights under the Special Agreement.  The principal value in DIBC's and CTC's rights under the Special Agreement comes from the right to collect tolls from vehicles that cross the bridge at the Central Corridor across the Detroit River between the Cities of Detroit and Windsor.

**C.   Canada's First Attempt, in the 1970s, to Breach DIBCs and CTC's Rights under the Special Agreement**

50.     Despite its initial enthusiasm for attracting a private owner to build, operate and collect tolls on the Ambassador Bridge, Canada has more recently become hostile to the idea that a private, American-owned company has a perpetual right to operate the most important trade corridor between Canada and the United States, and has recognized that ownership by Canada of the bridge or its Canadian half would provide a source of toll revenues for Canada.

51.     Canada has recognized that it lacks the authority simply to take the toll bridge franchise rights from DIBC and CTC directly.  Instead, officials of the Government of Canada and its provincial and local governments have periodically sought to use their purported regulatory and other powers inappropriately to coerce DIBC and CTC into surrendering their rights to Canada on Canada's terms.

52.     Canada's first concerted efforts to interfere with the rights of DIBC and CTC took place beginning in 1973, immediately after Central Cartage Co., a company owned by the current owners of DIBC, advised Canada by letter that it was interested in acquiring ownership of DIBC.

53.     In response to Central Cartage's letter, Canada issued a *Statement by the Secretary of State for External Affairs, the Honourable Mitchell Sharp, on the Government's Policy on International Bridges, with Particular Reference to the Ambassador Bridge*.  This policy statement (the "Sharp Policy") stated that the Canadian government "would expect" any "change in the status of the CTC," or any mortgaging of the Canadian portion of the bridge, to meet certain conditions, including, among others:

(a)     a reduction of tolls;

(b)     a requirement that the Canadian portion of the bridge would be conveyed without

cost to Canadian or Ontario governmental authorities within 25 years after

acquisition; and

(c)     immediate conveyance, without cost, of land not required for the operation of the

bridge to a body designated by the Canadian government.

54.     In 1974, Canada enacted Part I of the Foreign Investment Review Act ("FIRA"),

which demanded that acquisitions of control of a Canadian business or establishment could

proceed only if the Government of Canada had determined that such acquisitions were of

"significant benefit to Canada." FIRA was a protectionist enactment designed to discourage

foreign ownership by adopting discriminatory policies and to place Canadians in control of

foreign investments on Canadian soil.

55.     In 1977, Canada revised the Sharp Policy to make it even more draconian. The

revised policy, titled *Policy on International Bridges* (the "Amended Sharp Policy"), purported

to require that the Canadian portion of the bridge be conveyed without cost to Canadian or

Ontario governmental authorities immediately upon a change in status, subject to a 25-year

lease-back.

56.     The Sharp Policy, the Amended Sharp Policy and the application of FIRA to CTC

were all intended to defeat the acquisition of ownership and control of DIBC by Central Cartage,

even though anyone could have purchased control of DIBC by purchasing stock in the United

States in the over-the-counter market.

57.     In 1979, Central Cartage acquired a controlling interest in the stock of DIBC by

market purchases and a purchase from an unrelated American investor. Central Cartage received

approval from the United States Securities and Exchange Commission (the "SEC") to pay the

minority shareholders for their shares and return the publicly traded DIBC to being a privately

held company, as it had been prior to its bankruptcy in the 1930s. Only 0.8% of DIBC stock was

owned by Canadians in 1979, following 50 years of the opportunity for anyone, including the

Canadian government, to purchase the stock of DIBC in the publicly traded over-the-counter

market.

58.     The Government of Canada immediately brought suit in Canada seeking to block

this transaction, claiming that Central Cartage's acquisition of DIBC, which owned CTC,

violated FIRA by not being "of significant benefit" to Canada.

59.     In view of the purported requirements of FIRA, Central Cartage's acquisition of

DIBC had been structured so that DIBC would transfer ownership of CTC to an unrelated third-

party Canadian owner.  However, in 1979 Canada obtained a preliminary injunction in the

Federal Court of Canada that made it impossible to carry out the Canadian portion of the

transaction but disclaimed any extraterritorial effect that would block the underlying acquisition

of DIBC in the United States.

60.     The acquisition of DIBC by Central Cartage thus proceeded in accordance with

Central Cartage's filings with the SEC, but DIBC was unable to transfer its stock of CTC to the

unrelated third-party Canadian investor that was part of the plan for acquiring DIBC.

61.     In 1980, Central Cartage and DIBC sued Canada and a number of Canadian

officials in the United States, asserting that Canada's attempts to enforce FIRA against them

constituted an expropriation, breach of contract, and other violations of law.

62.     Litigation before the Federal Court of Canada raged for more than a decade.

Canada, Central Cartage, DIBC and CTC settled the litigation by agreement in 1990.  The

settlement agreement provided that both the Canadian and U.S. litigations would be dismissed with prejudice.

63.     As agreed by the parties, both the Canadian and U.S. litigations were dismissed pursuant to the 1990 agreement with prejudice.

64.     The result of the dismissal with prejudice of the Canadian litigation was that Canada permitted the change of control of DIBC and the continued ownership of CTC by DIBC, without the need to comply with the onerous conditions that Canada had previously demanded in the Sharp Policy, the Amended Sharp Policy, or FIRA.  This dismissal reflected the Canadian government's acceptance that the operation and ownership issues raised by the litigation were settled, and that DIBC's continued ownership of CTC and the Ambassador Bridge was of significant benefit to Canada.

65.     The dismissal with prejudice of the U.S. litigation reflected that Canada's acknowledgement that it could not apply FIRA to the Ambassador Bridge removed the basis for DIBC's claims that FIRA constituted an expropriation or breach of contract as alleged in the U.S. litigation.

66.     By a subsequent 1992 agreement, CTC and Canada agreed to cooperate with regard to customs facilities and other construction projects in connection with the Ambassador Bridge for at least five years.  Unlike the 1990 agreement, the 1992 agreement did not include DIBC and Central Cartage as parties.  The 1992 agreement recited that "Canada and CTC each desire to make the CTC facilities at Windsor, Ontario a model border crossing facility between Canada and the United States."

67.     The settlement agreement and 1992 agreement ushered in a period of cooperation between Canada and DIBC and CTC with respect to the Ambassador Bridge.  More recently,

however, Canada has renewed its efforts to deprive DIBC and CTC of their rights, as discussed below.

**D.   The Proposed Ambassador Bridge New Span.**

68.    Because no bridge can last forever, the Special Agreement's provision of a perpetual right to maintain a bridge across the Detroit River necessarily includes the right to build a replacement span as needed.

69.    The aging of the Ambassador Bridge, which is now in its 81st year, has made it necessary to "twin" the bridge by building a second span (the "New Span") directly alongside the original span to ensure the continued operation of the bridge.

70.    Opening a New Span would permit the original Ambassador Bridge span to be taken out of service and would expand the capacity of the crossing from four to six traffic lanes.

71.    The existing Ambassador Bridge span is listed on the National Historic Register in the United States and will not be demolished.  The existing Ambassador Bridge span will be maintained, rehabilitated and kept available for emergency purposes.  Additionally, both spans can be opened in the future in the event that ten lanes of traffic capacity are ever required, which is currently not the case and is not anticipated in the current planning horizon.

72.    The approach ramps for the New Span have already been constructed on both the U.S. side and the Canadian side of the river.  CTC already owns all the land between the ramp and the Detroit River on the Canadian side, and DIBC is in the process of acquiring the final parcel of land needed on the U.S. side.  The ramps for the New Span connect directly to the Ambassador Bridge's existing toll and customs plazas on both the U.S. side and the Canadian side.  The existing plazas have ample capacity to handle the expected traffic from the New Span. Thus, all that remains is to construct the actual bridge span connecting the two approach ramps.

73.     DIBC and CTC intend to complete construction of the New Span entirely with private funds.

74.     DIBC has committed to replacing its current span because it is nearly 81 years old.  The cost of maintenance of an actively used 81-year-old bridge span is substantially higher than that of a new bridge.  Building the New Span and taking the old span out of service will dramatically reduce the cost of maintenance and materially improve the facilitation of traffic.

**E.     The Ambassador Bridge Gateway Project.**

75.     Because the Ambassador Bridge predated modern limited access highways, additional road construction (the "Ambassador Bridge Gateway Project") is needed to provide a direct freeway connection to the U.S. Interstate Highway and State Highway Systems in Michigan and to major highway routes in Ontario, Canada.  On the Canadian side, in particular, it is still necessary to travel over a local road, known as Huron Church Road, which has numerous unnecessary traffic lights, to reach the freeway system from the Ambassador Bridge.

76.     Both the U.S. and Canada initially expressed support for the Ambassador Bridge Gateway Project.

77.     In 1995, the United States Congress designated the Ambassador Bridge as part of the national highway system.  Commencing in 1998, Congress authorized and appropriated more than $230 million for the U.S. part of the Ambassador Bridge Gateway Project, i.e., a highway expansion to connect the Ambassador Bridge directly to the Interstate Highway and State Highway Systems in Michigan.  The 2003 House Appropriations Committee report identified that this project was intended, among other things, to alleviate congestion between the bridge and the highway system and "protect plans identified by the Ambassador Bridge, including a second span of the Ambassador Bridge."  The U.S. part of the Ambassador Bridge Gateway Project is

now nearing completion, with the result that the Ambassador Bridge now has direct highway connections to I-75 and I-96, with an indirect connection to I-94.

78.     In January 1999, the government of the Province of Ontario and several Canadian municipalities, including the Cities of Windsor and Sarnia, supported the projects developed by MDOT and submitted to the United States government under the Transportation Equity Act for the 21st Century, Pub. L. 105-178, 112 Stat. 107.  Canada took the position that the projects submitted by the MDOT, specifically including the Ambassador Bridge Gateway Project, "are of significant national importance to the Canadian side of the border."

79.     In September 2002, the Canadian government and the Ontario government signed a memorandum of understanding expressing an intent to spend C$300 million for the Canadian part of the project, to improve highway connections to the Ambassador Bridge on the Canadian side and create an end-to-end solution linking the U.S. Interstate Highway System to major Canadian highways across the Ambassador Bridge.  Canada publicly announced that it had secured funding for this project in a news release in May 2003.

80.     In reliance on the promise of improved road connections to support the continued use and expansion of the Ambassador Bridge, DIBC and CTC have invested hundreds of millions of dollars into improvements to the Ambassador Bridge designed to take advantage of the Ambassador Bridge Gateway Project, including improvements to water, sewer, power generation and lighting systems, expanded customs inspection facilities, and road connections on the Ambassador Bridge property.

81.     Canada has reneged on its support of the Ambassador Bridge Gateway Project, and has determined that unless it could own all or part of the Ambassador Bridge itself, it wanted to eliminate the Ambassador Bridge as a viable crossing.

**F.    Canada's and FHWA's Proposed DRIC Bridge.**

82.    In December 2000, Transport Canada (which is part of the Canadian Ministry of Transport, Infrastructure and Communities), FHWA, the Michigan Department of Transportation ("MDOT"), and the Ontario Ministry of Transportation (together the "DRIC Proponents") formed an Ontario-Michigan Border Transportation Partnership, which led to the Detroit River International Crossing ("DRIC") Partnership, in order to study transportation needs in the area. The building of the Ambassador Bridge New Span and the completion of the Canadian portion of the Gateway Project to the Ambassador Bridge had initially been on the DRIC Partnership's agenda as a way to improve traffic flow and commerce in the Detroit-Windsor area.

83.    Within a few years after the DRIC working group was formed, Canada realized that the DRIC study project created a new opportunity to attempt to force the transfer of the Ambassador Bridge to ownership and control by Canada, this time by proposing to build a new bridge (the "DRIC Bridge") between Detroit and Windsor, designed to take nearly all the traffic revenue from the Ambassador Bridge.

84.    The U.S. members of the DRIC Partnership were initially willing to consider the Ambassador Bridge as part of or an alternative to the project; in fact, the U.S. rated the Ambassador Bridge very high in its assessment of alternatives.  Canada, however, refused to consider any alternative that included any use of or upgrades to the Ambassador Bridge and insisted that it would only support a crossing in which Canada or its political subdivisions owned a proprietary stake.

85.    In 2008, having been pressured by Canada to reject any solution that made use of the existing Ambassador Bridge or the planned Ambassador Bridge New Span, FHWA and the other DRIC Proponents acceded to Canada's demands as to the location for the new DRIC Bridge.  On the U.S. side, the new customs and toll plaza for the DRIC Bridge is planned to

20

nearly abut the existing plaza for the Ambassador Bridge and to utilize the highway connections that were built for the Ambassador Bridge Gateway Project. On the Canadian side, the planned site for the DRIC Bridge is less than two miles from the Ambassador Bridge.

86.     As described below, to ensure that the DRIC Bridge succeeds at the expense of the Ambassador Bridge, Canada and FHWA have manipulated regulatory and other processes to speed the construction of the DRIC Bridge, delay or prevent the construction of the Ambassador Bridge New Span, and impede the flow of traffic to the Ambassador Bridge. By the DRIC Proponents' own estimate, the objective of the DRIC Bridge is to divert from the Ambassador Bridge to the DRIC Bridge up to 75% of the Ambassador Bridge's truck traffic and up to 39% of its passenger traffic.

## G.   Canada's and FHWA's Stated Reasons for Favoring the DRIC Bridge.

87.     Each of the reasons cited by Canada and FHWA for pursuing the DRIC Bridge and refusing to support the Ambassador Bridge New Span is merely a pretext and lacks any reasonable or rational basis.

### (1)   *Alleged Traffic Needs for a Second Bridge*

88.     Traffic levels in Southeast Michigan and Southwest Ontario transportation corridor are not sufficient to support two bridges within the same Central Corridor. For that reason, if the DRIC Proponents build the DRIC Bridge, at least one of the two bridges—the Ambassador Bridge or the DRIC Bridge—is destined for economic failure. As Canada and FHWA knew or should have known, a large portion of the traffic across the Detroit River consists of trucks transporting automobile parts between factories in Ontario and Michigan. Over many years, as the American auto industry has continued to decline, so has traffic across the Ambassador Bridge and other crossings. At its height in 1999, traffic crossing the existing

Central Corridor crossings (the Ambassador Bridge and the Detroit-Windsor Tunnel) reached a maximum of approximately 22 million vehicle crossings per year (12.3 million vehicles at the Ambassador Bridge and 9.5 million vehicles at the Detroit-Windsor Tunnel). Today, the traffic volume is less than half that: only about 10.5 million vehicle crossings per year (6.5 million vehicles at the Ambassador Bridge and 3.9 million vehicles at the Detroit-Windsor Tunnel). Canada, FHWA and the other DRIC Proponents have not articulated any rational reasons to expect that this trend would reverse or traffic would increase.

89.     Nonetheless, Canada, FHWA and the other DRIC Proponents took the position in the Planning/Needs Feasibility Study ("P/NF Study") issued in January 2004 that the DRIC Bridge was needed to serve increased traffic needs, based on a projection that crossings would rapidly increase, rising to 23.5 million vehicle crossings in 2009. To attempt to justify this conclusion, the DRIC Proponents in the P/NF Study adopted a conclusion from a report that had been prepared outside the public consultation process and that drew a straight line extrapolating upward from a brief, small increase in traffic around the time of the study, ignoring what was otherwise a general downward trend in traffic patterns. The P/NF Study offers no economic or other reasons to expect that such an increase would occur.

90.     Actual events have proved the P/NF Study wrong: traffic data in the intervening six years since the P/NF Study show a continual decline in traffic in accordance with the general trend, not the sharp increase suggested by the P/NF Study. As noted, there were only about 10.5 million crossings in 2009, not the nearly 23.5 million that the P/NF Study predicted. Nonetheless, a 2008 environmental impact statement submitted by FHWA, Canada and the other DRIC Proponents continued to rely, without analysis, on the outdated and demonstrably

22

erroneous conclusions and assumptions from the P/NF Study in an attempt to establish need for the new DRIC Bridge.

91.     Canada's and FHWA's projection of increased traffic ignores the loss of manufacturing in the American Midwest to low-cost Asian manufacturers, the loss of U.S. market share of American automobile manufacturers and hence their suppliers, the general downturn in the auto industry, and the loss of formerly significant numbers of Americans traveling to Caesar's Windsor Casino to gamble before the explosion of casinos operating in Michigan and Ohio. These economic changes continue to have a major adverse affect on bridge traffic today. FHWA and the other DRIC proponents have no reasonable basis for their conclusion that, contrary to actual experience and long-term economic trends, bridge traffic will grow at the rates predicted in the P/NF Study.

92.     Even if additional bridge capacity were needed, it could be served more cheaply and efficiently—and consistently with DIBC and CTC's legal rights—by twinning the Ambassador Bridge with the goal of keeping both spans open after renovations on the original span.

### (2)     *Alleged Community Impacts of Ambassador Bridge Improvements on the Canadian Side of the River*

93.     Canada, FHWA and the other DRIC Proponents argued that any expansion of the Ambassador Bridge is inappropriate because of the Ambassador Bridge's alleged impacts on the surrounding community.

94.     In particular, one of the reasons that Canada, FHWA and the other DRIC Proponents gave for refusing to agree to inclusion of the Ambassador Bridge in the DRIC project was the allegation that an expanded toll and customs plaza to accommodate the Ambassador Bridge New Span would cause disruption to communities in Windsor, Ontario.

95. However, as Canada and FHWA know or should know, there is no need for an expanded Ambassador Bridge plaza, and DIBC's and CTC's plans to connect the New Span to the existing plaza do not require any expansion of the plaza.

96. DIBC and CTC have already constructed the ramps that would connect the New Span to the existing plazas on the U.S. and Canadian sides.

97. All the land between the connection ramps and the river on the Canadian side, and all the land but one abandoned parcel on the U.S. side, already is owned by DIBC and CTC, so no additional land acquisition would be required to complete the New Span and connect it to the existing plaza.

98. Canada and FHWA have argued that an expanded plaza will nonetheless be necessary, on the ground that their prediction of increased traffic (which, as discussed above, is baseless) means that future traffic needs will strain customs capacity at the existing plaza. The existing Ambassador Bridge plaza, however, already has ample excess capacity, as Canadian customs regularly staffs only a small fraction of the booths. The predicted lack of customs-processing capacity identified by Canada and FHWA is due to unrealistic traffic projections combined with the lack of adequate staffing of the existing facilities by Customs officials, not to any inadequacy of the physical facilities.

99. Moreover, DIBC and CTC have introduced substantial technological improvements to reduce customs delay. These include recently constructed state-of-the-art facilities in Canada where trucks headed toward the Ambassador Bridge can transmit their customs paperwork electronically to U.S. customs inspectors hours before the trucks even arrive at the bridge. DIBC and CTC plan to construct similar facilities in the United States for trucks planning to cross the Ambassador Bridge into Canada. These improvements, paid for by DIBC's

and CTC's private funds, have greatly improved the speed of customs clearance across the border and have served as a model that customs border officials have made a future requirement for all international crossings.

100.    David Jacobson, the U.S. Ambassador to Canada, recently acknowledged in a speech delivered in Ottawa on Tuesday, March 9, 2010, that border crossings between the United States and Canada are faster today than they were before the terrorist attacks of September 11, 2001, despite greatly heightened security requirements, because of technological improvements. It was reported that on the day of Jacobson's speech, the Canadian Border Services Agency was reporting only a 10-minute delay for vehicles crossing into Canada at the Blue Water Bridge (located 60 miles north of the Ambassador Bridge) and no delay at all at any other border crossing, which would include the Ambassador Bridge.

101.    Canada also has claimed that Ambassador Bridge Expansion is inappropriate because of the absence of a direct highway connection from the Ambassador Bridge to Highway 401 in Canada, and that such a connection should not be built because it would allegedly cause disruption to communities in Windsor, Ontario.  However, after insisting that the Ambassador Bridge New Span would cause unacceptable community impacts, and using that argument in an attempt to diminish support for the Ambassador Bridge and garner support for the DRIC Bridge, Canada then proceeded with the approval of the DRIC, resulting in numerous community and environmental impacts.

### (3)    *Alleged Need for Redundancy*

102.    Canada, FHWA and the other DRIC Proponents have also cited "physical redundancy" as a reason for building the new DRIC Bridge, meaning that having two bridges

(the DRIC Bridge and the Ambassador Bridge) would avoid traffic interruption in the event that a natural or manmade disaster or other incident shut down one of the bridges.

103.   However, once the decision was made to site the new DRIC Bridge directly adjacent to the existing Ambassador Bridge, Canada's claim that the new bridge would produce "physical redundancy" ceased to apply.  Building a new bridge in immediate proximity to the existing Ambassador Bridge would not provide materially greater physical redundancy than would a second Ambassador Bridge span, because a problem at one bridge would almost certainly affect the other.

104.   Moreover, in addition to the Ambassador Bridge, several other border crossings are already in operation between eastern Michigan and southwestern Ontario.

105.   The Detroit-Windsor Tunnel, operated by the cities of Detroit and Windsor, has been in operation since 1930, providing a second road connection for cars and trucks less than three miles from the Ambassador Bridge.  The twin Blue Water Bridges, which connect Port Huron, Michigan with Sarnia, Ontario across the St. Clair River about 60 miles north of the Ambassador Bridge, provide a third road connection for cars and trucks.  The publicly owned Blue Water Bridge has been open since 1938 and was twinned in 1997 with public funds from Canada and the U.S. to increase its traffic capacity without objection by Canada or FHWA.

106.   The Detroit-Windsor Truck Ferry, operating since 1990, provides another alternative for trucks just two miles from the Ambassador Bridge.  Twenty miles south of the Blue Water Bridge, the St. Clair River ferries provide connections for cars and trucks between Marine City, Michigan and Sombra, Ontario, and between Algonac, Michigan and Walpole Island, Ontario.

107.    Moreover, there are two railway connections in the area:  the Canadian Pacific Railroad has a tunnel between Detroit and Windsor, built in 1910 and located a mile from the Ambassador Bridge, which is currently being modified to allow double-stacked railcars; and the Canada National Rail Tunnel provides a railway connection between Port Huron and Sarnia.

108.    Each of these crossings would provide an additional means of transportation between the United States and Canada in the greater Detroit-Windsor area in the event that traffic is ever interrupted at the existing Ambassador Bridge span, the proposed Ambassador Bridge New Span, or both.

## H.    Canada's and FHWA's Obstruction of the Ambassador Bridge New Span and Interference with the Coast Guard Approval Process.

109.    By the terms of the Special Agreement, the Ambassador Bridge's New Span is exempt from most permit requirements.  Nonetheless, Canada and FHWA have delayed and obstructed the construction of the New Span by delaying approval under the Canadian Environmental Assessment Act, refusing to consider properly the Ambassador Bridge New Span as a valid option under the DRIC Environmental Assessment, and interfering with DIBC's application to the United States Coast Guard for a 1906 Bridges Act permit for the New Span.

110.    DIBC and CTC submitted an environmental impact statement to Transport Canada for the Ambassador Bridge New Span on December 4, 2007.  As the New Span will be constructed directly alongside the existing span, any environmental impact will be insignificant or nonexistent.  However, no decision has been received to this date, over two years later.

111.    By way of contrast, the DRIC Proponents submitted their Ontario Environmental Assessment Report in December 2008, and received a Notice of Approval from the Ontario Minister of the Environment in August 2009, just nine months later, despite serious concerns about the impact of the DRIC Bridge on the surrounding community, wetlands and species-at-

risk in Canada. The Federal Screening Report under the Canadian Environmental Assessment Act for the DRIC Bridge and Plaza was released in July 2009 and approved four months later in December 2009.

112.    To obstruct the construction of the Ambassador Bridge New Span further, Canada has permitted the City of Windsor, Ontario, a political subdivision of Canada, to interfere with the progress of the New Span by passing seven bylaws freezing the demolition of houses on land owned by the Ambassador Bridge. None of the buildings has any heritage or landmark value; most were used as student rental housing prior to acquisition by CTC, and many are currently boarded up and unfit for human habitation. Windsor also designated the area around the existing Ambassador Bridge plaza as a "Heritage Conservation District and Community Improvement Area" in order to prohibit any further construction there.

113.    On the U.S. side, the Coast Guard is the only agency that might have any relevant permitting authority, because DIBC is building the Ambassador Bridge New Span without public funds. The Coast Guard's permitting authority is limited, under the 1906 Bridges Act, to determining whether the New Span would negatively affect navigation on the Detroit River.

114.    The Coast Guard's approval of the navigation permit should have been a quick, routine process because the New Span will not create any new obstructions to navigation at all: it will be placed directly next to the old Ambassador Bridge span, it will be at the same height as the old Ambassador Bridge span, and it will not have any piers in the water. Nonetheless, Canada and FHWA have intervened with the Coast Guard to cause it to delay the issuance of the permit without good cause. DIBC first applied for such a permit for the Ambassador Bridge New Span in 2004. To date, however, the permit has not been issued.

115.   On July 28, 2006, the Coast Guard issued public notice 09-03-06, which took the initial position that the Ambassador Bridge New Span was entitled to a Categorical Exclusion from the National Environmental Policy Act.  However, the Coast Guard then reversed course and took the position that an Environmental Assessment was required, which would lead to either a Finding of No Significant Impact ("FONSI") or a full-blown Environmental Impact Statement.

116.   The Environmental Assessment commissioned by the Coast Guard found no reason to deny a FONSI and was accompanied by a proposed FONSI dated February 27, 2009. The Coast Guard scheduled a public hearing on the proposed FONSI, and heard nothing that would change its view.  Nonetheless, the Coast Guard did not issue the FONSI, despite the completion of the 30-day review period.  Rather, the Coast Guard took the extraordinary step of scheduling a new public hearing, at which the opponents of the Ambassador Bridge had been organized to appear, while supporters of the Ambassador Bridge New Span were not given a fair opportunity to be heard, and then claimed that the concerns raised at that second public hearing justified refusal to issue the FONSI.

117.   The Coast Guard has attempted to justify the delays in permitting the Ambassador Bridge New Span largely based on erroneous claims by FHWA and MDOT that the Ambassador Bridge used the wrong air-quality measures.  In direct contradiction to the position that FHWA is now taking with the Coast Guard, DIBC had no difficulties receiving environmental approval from FHWA for its construction projects supporting the Ambassador Bridge New Span before Canada had enlisted FHWA in its campaign against the Ambassador Bridge.  Between 1997 and 2004, FHWA had issued an environmental assessment and three FONSIs for the Ambassador Bridge Gateway Project, based on FHWA's projected traffic volumes of 18 million vehicles a

29

year across the Ambassador Bridge.  As discussed above, the Ambassador Bridge Gateway

Project was the project to create direct connections to the U.S. highway systems and to

accommodate the New Span to the Ambassador Bridge.  The alleged air-quality impacts of

bridge traffic were not a concern to FHWA then; yet once FHWA had joined Canada in opposing

the New Span, FHWA raised alleged air-quality impacts with the Coast Guard in opposition to

the New Span.

118.    By contrast, FHWA granted expedited environmental approval for its own DRIC

Bridge.  Any air-quality concerns applicable to the U.S. side of the Ambassador Bridge would

also apply to the DRIC Bridge, which will have a plaza in the United States directly adjacent to

the Ambassador Bridge plaza, and for which new highway connections would have to be built at

taxpayer expense adjacent to the existing highway connections for the Ambassador Bridge.

Indeed, after the DRIC Project's Final Environmental Impact Statement was released on

November 26, 2008, FHWA issued its Record of Decision in just over six weeks, on January 15,

2009.  Upon the release of the Record of Decision, FHWA bragged about its own haste,

announcing that the entire review process for the DRIC Bridge was completed in "about half the

time needed for similar projects of this size."  FHWA gave its approval despite serious adverse

community impacts of the DRIC Bridge in the Detroit area, which according to FHWA's own

study include the displacement of 257 residential dwelling units, 43 active businesses, and 9 non-

profit entities in Detroit's only majority-Hispanic neighborhood.  The entire set of approvals for

the DRIC Bridge is subject to an interagency "streamlining agreement" designed to speed the

project through the U.S. approval process and to prevent the agencies from revisiting key issues

about the DRIC Bridge even in the face of public opposition.

119.    The Environmental Protection Agency ("EPA") has confirmed that it had reviewed and was satisfied with the Ambassador Bridge's air-quality modeling, that the additional testing that FHWA insisted that DIBC perform is not required, and that any additional recommended mitigation measures are purely voluntary.  The EPA also has confirmed that the DRIC Bridge proponents, including the FHWA, did not perform the additional testing for the DRIC Bridge that FHWA now insists on for the Ambassador Bridge New Span, prior to FHWA's issuance of the Record of Decision granting environmental approval for the DRIC Bridge.

120.    In addition, the Coast Guard took the position that it should not proceed to issue either a FONSI or a bridge permit for the New Span because the Coast Guard was advised by Canada that Canada did not want the New Span to be built.  The Coast Guard indicated that it would not proceed with U.S. approval until it received assurances from its Canadian counterparts that there were no impediments to Canadian approval.

121.    The Coast Guard also attempted to justify its refusal to proceed because of a need for DIBC to acquire property on the U.S. side of the river to build the Ambassador Bridge New Span.  However, property ownership is not and has never been a requirement to proceed under the National Environmental Policy Act.  FHWA granted environmental approval for the DRIC Bridge despite the fact that it and MDOT had not yet acquired all the necessary land.  And on multiple previous occasions, before Canada and FHWA began their campaign against the Ambassador Bridge, DIBC received environmental approvals for its improvements on the Ambassador Bridge before it had acquired the necessary land.  Indeed, obtaining approval before spending the money to buy the land for a project is a sensible and common approach.  In any

event, the Coast Guard has no basis to conclude that the property issue that it has cited, which is the subject of pending litigation in Michigan state court, will not be promptly resolved.

122.     DIBC complained to the Department of Homeland Security ("DHS"), of which the Coast Guard is a part, that the Coast Guard was refusing to process DIBC's Environmental Assessment for inappropriate reasons.  Janet Lesher, then Chief of Staff for Secretary Napolitano, chaired a meeting in December 2009 between the Coast Guard and DIBC and instructed that a follow up meeting be held one week thereafter at which the parties should resolve their differences.  The Coast Guard caused the second meeting to be cancelled because the Coast Guard claimed that it needed additional time to prepare for a meeting.  The holidays then intervened, and in February 2010, Ms. Lesher resigned from DHS.  DIBC repeatedly sought further meetings through DHS to no avail.  Although the cancellation of the meetings was the result of the Coast Guard's own inaction, the Coast Guard advised DIBC by letter on March 2, 2010, that it was discontinuing consideration of DIBC's applications for a bridge permit and a FONSI for the Ambassador Bridge New Span, claiming that there had been "no movement" by DIBC or its related entities on the supposed "issues" that FHWA and the other proponents of the DRIC Bridge had raised in an attempt to derail the construction of the Ambassador Bridge New Span.

## I.     The International Bridges and Tunnels Act

123.     In 2007, Canada enacted the International Bridges and Tunnels Act, S.C. 2007, ch. 1 (the "IBTA").

124.     The IBTA provides that it supersedes the 1921 CTC Act, which is part of the Special Agreement, to the extent of any inconsistency. *See* IBTA § 4 & Schedule item 31.

125.   In 2009, Canada adopted the International Bridges and Tunnels Regulations, P.C. 2009-117, which listed the Ambassador Bridge in a schedule of bridges and tunnels subject to the IBTA.

126.   In November 2009, Canada filed an application in Ontario Superior Court seeking a declaration that the 1990 agreement settling the FIRA litigation and the subsequent 1992 facilities agreement did not bar the application of the IBTA to the Ambassador Bridge.

127.   The IBTA seeks to throw another obstacle in the way of the Ambassador Bridge's operations or its ability to compete with the new DRIC Bridge.

128.   The IBTA, like the Sharp Policy and Amended Sharp Policy, purports to give the Canadian government authority to set tolls on privately owned international bridges. The IBTA establishes new requirements for approval for alterations of existing bridges, even if proposals were submitted to departments and agencies before the passage of the IBTA. If alteration occurs without such approval, the owner may be ordered to "remove and destroy the bridge" or to forfeit ownership to Canada.

129.   The IBTA also purports to limit the change of ownership over international bridges, requiring government approval to purchase, operate or acquire control of an entity that owns and operates an international bridge.

130.   In each of these respects, the IBTA, if applicable, would have extraterritorial effects in the United States.

131.   In effect, by enacting the IBTA and seeking to apply it to the Ambassador Bridge, Canada is attempting to resurrect the dispute over the Sharp Policy and the Amended Sharp Policy, which was settled in the FIRA litigation in 1990.

132.    Canada has taken the position that the IBTA applies to the Ambassador Bridge, and it apparently enacted the IBTA with the Ambassador Bridge in mind.

133.    Canada has enacted the IBTA for the purpose of limiting the value of CTC's and DIBC's rights in order to coerce CTC and DIBC to transfer their rights in the Ambassador Bridge only to Canada or its designee, and on Canada's terms.

## COMMERCIAL ACTIVITY BY CANADA
## AND ITS NEXUS TO THE UNITED STATES

134.    The DRIC Bridge and the steps taken toward its construction constitute commercial activity.

135.    The DRIC Bridge, like the Ambassador Bridge, will generate toll revenues.

136.    As DIBC's and CTC's construction and operation of the Ambassador Bridge demonstrates, the construction and operation of a toll bridge is an activity that private parties as well as governments can carry out.

137.    The other activities by Canada described above were undertaken in connection with the DRIC Bridge project and for the purpose of eliminating or impeding any competition to the DRIC Bridge by the Ambassador Bridge, or for the purpose of coercing the commercial sale of the Ambassador Bridge and its associated rights to Canada or its designee.

138.    Canada's commercial activity in proceeding toward construction of the DRIC Bridge together with the other members of the DRIC Partnership, and in obstructing improvements or competition by the Ambassador Bridge, is taking place both in the United States and Canada.

139.    Canada's commercial activity in the United States in connection with the subject matter of this action includes (a) the planned construction, and preparation for construction, of the DRIC Bridge, approximately one-half of which will be within the territory of the United

States, and its associated plaza and other structures within the territory of the United States, and

(b) meetings with FHWA and others and other preparatory activities that have taken place in the

United States in connection with the planned construction and operation of the DRIC Bridge.

140.    In addition, Canada's acts within Canada in connection with the commercial

activity of constructing and operating the DRIC Bridge have direct effects in the United States.

The direct effects include (a) the planned construction of the DRIC Bridge connecting directly to

the territory of the United States, (b) the prevention of construction of the Ambassador Bridge

New Span, connecting to the United States, in order to favor the commercial interests of the

DRIC Bridge, and (c) resulting actions by FHWA and others in the United States to facilitate the

planning and construction of the DRIC bridge, or to prevent the construction of the Ambassador

Bridge New Span, in concert with or at the instance of Canada.

141.    Indeed, both the Ambassador Bridge and the proposed DRIC Bridge are designed

to allow traffic to pass from Canada to the United States or from the United States to Canada.

Traffic must pass over both the Canadian and U.S. ends of the bridge to cross the bridge. The

completion of either the proposed DRIC Bridge or the Ambassador Bridge New Span will

require construction in both the United States and Canada. For these reasons, any actions by

Canada affecting traffic or construction at the Canadian end of either the Ambassador Bridge or

the proposed DRIC Bridge will necessarily have a direct effect on the United States.

## AVAILABILITY OF DECLARATORY AND
## INJUNCTIVE RELIEF AND JUDICIAL REVIEW

142.    An actual controversy exists between the parties as to the subject matter of this

litigation.

143.    DIBC and CTC have no adequate remedy at law and will suffer irreparable harm

if an injunction is not granted.

144.    The actions of FHWA and the Coast Guard alleged herein, including but not limited to FHWA's decision to proceed with a new bridge and the approval of the new DRIC Bridge site and the Coast Guard's decision to discontinue consideration of the application for a FONSI and a permit for the Ambassador Bridge New Span, constitute final agency action.

145.    DIBC and CTC have exhausted their administrative remedies, if any, to the extent required.

146.    Defendants Mendez and LaHood or their successors in office are the officers who would be responsible for compliance with any judgment of this Court against FHWA in this action. Defendants Allen and Napolitano or their successors in office are the officers who would be responsible for compliance with any judgment of this Court against the Coast Guard in this action. They are therefore properly joined as defendants.

**FIRST CLAIM**
**(Violation of Treaty and Statute – DRIC Bridge)**
**(Against Canada and the FHWA Defendants)**

147.    The allegations of paragraphs 1 through 146 are incorporated by reference as if fully set forth herein.

148.    As set forth above, Canada and FHWA have been proceeding toward the construction of the DRIC Bridge while simultaneously interfering with the construction of the Ambassador Bridge New Span and imposing new conditions on the operation of the bridge beyond those permitted by the Special Agreement.

149.    Canada's reasons for favoring the DRIC Bridge are pretextual and intended to justify breaching Canada's obligations to DIBC and CTC under the Special Agreement.

150.   FHWA has agreed to Canada's demands, and aided Canada in its breaches of its obligations to DIBC and CTC, by accepting Canada's explanations without adequate review and acting to facilitate the completion of the DRIC Bridge without adequate justification.

151.   The construction of the DRIC bridge within two miles of the existing DIBC bridge does not serve any useful public purpose, but was intended solely to eliminate the profitability of DIBC's and CTC's rights.  While the DRIC Bridge ostensibly would be a competing commercial venture to the Ambassador Bridge, they cannot both operate in a manner that remains commercially viable.

152.   Under the Special Agreement, DIBC and CTC have a right to operate and maintain, and set and collect tolls on, the Ambassador Bridge in perpetuity, including the right to construct a new span to replace an older span that requires substantial maintenance to extend its useful life, subject only to the conditions set forth in the Special Agreement.

153.   The acts of Canada and FHWA to construct the DRIC Bridge across the Detroit River within two miles of the Ambassador Bridge, without legitimate need, for the purpose of destroying the economic value of DIBC's and CTC's rights, is a violation of DIBC's and CTC's rights under the U.S. and Canadian legislation constituting the Special Agreement and the Boundary Waters Treaty.

154.   FHWA and Canada have cooperated, acted in concert and/or conspired with each other and with others to deprive DIBC and CTC, through these actions, of their rights.

155.   Plaintiffs are entitled to damages against Canada and declaratory and injunctive relief against Canada and the FHWA Defendants for their violation of plaintiffs' statutory and treaty rights.

## SECOND CLAIM
### (Violation of Treaty and Statute – Abuse of Regulatory Processes)
### (Against All Defendants)

156.    The allegations of paragraphs 1 through 155 are incorporated by reference as if fully set forth herein.

157.    The acts of Canada, the FHWA Defendants and the Coast Guard Defendants in manipulating the U.S. and Canadian regulatory processes to attempt to ensure, without lawful justification, that the DRIC Bridge receives rapid approval, and that any improvements to the Ambassador Bridge are delayed or prevented is a violation of DIBC's and CTC's rights under the U.S. and Canadian legislation constituting the Special Agreement and the Boundary Waters Treaty.

158.    FHWA and Canada have cooperated, acted in concert and/or conspired with each other and with others to deprive DIBC and CTC, through these actions, of their rights.

159.    Plaintiffs are entitled to damages against Canada and declaratory and injunctive relief against all defendants for their violation of plaintiffs' statutory and treaty rights.

## THIRD CLAIM
### (Violation of Treaty and Statute – IBTA)
### (Against Canada)

160.    The allegations of paragraphs 1 through 159 are incorporated by reference as if fully set forth herein.

161.    Under the Special Agreement, the right of DIBC and CTC to transfer their assets or change owners cannot be restricted except to the extent specified in the Special Agreement.

162.    Canada has violated DIBC's and CTC's rights under the U.S. and Canadian legislation constituting the Special Agreement and the Boundary Waters Treaty, by enacting and seeking to apply the IBTA so as to limit rights that DIBC and CTC enjoy by the terms of the

Special Agreement, including (1) the right to set and collect tolls on the Ambassador Bridge,

(2) the right to transfer their property or change their corporate ownership, and (3) the right to

perform necessary and appropriate maintenance on the Ambassador Bridge.

163.    Plaintiffs are entitled to damages and declaratory and injunctive relief against

Canada for Canada's violation of plaintiffs' statutory and treaty rights.

## FOURTH CLAIM
### (Violation of Treaty and Statute – Building Restrictions)
### (Against Canada)

164.    The allegations of paragraphs 1 through 163 are incorporated by reference as if

fully set forth herein.

165.    Canada has violated DIBC's and CTC's rights under the U.S. and Canadian

legislation constituting the Special Agreement and the Boundary Waters Treaty, by encouraging

and permitting the City of Windsor, Ontario, to impede and obstruct the maintenance and

operations of the Ambassador Bridge by enacting by-laws that purport to restrict the demolition

of structures on owned by CTC that are necessary to the Ambassador Bridge New Span.

166.    Plaintiffs are entitled to damages and declaratory and injunctive relief against

Canada for Canada's violation of plaintiffs' statutory and treaty rights.

## FIFTH CLAIM
### (Breach of Contractual Rights under the Special Agreement)
### (Against Canada)

167.    The allegations of paragraphs 1 through 166 are incorporated by reference as if

fully set forth herein.

168.    In addition to being reciprocal legislation and an international agreement pursuant

to the Boundary Waters Treaty, the Special Agreement constitutes a contract among Great

Britain, Canada, the United States, DIBC and CTC for the construction and operation of the bridge.

169.    DIBC and CTC have performed or substantially performed their obligations under the contract.

170.    All conditions to Canada's obligations under the contract have been satisfied.

171.    The actions alleged above, singly or in combination, constitute a breach of Canada's contractual duties to DIBC and CTC under the Special Agreement, including the implied contractual duty of good faith and fair dealing.

172.    Plaintiffs are entitled to damages and declaratory and injunctive relief against Canada for Canada's breach of contract.

## SIXTH CLAIM
### (Breach of Contractual Rights Under the 1990 Settlement Agreement)
### (Against Canada)

173.    The allegations of paragraphs 1 through 172 are incorporated by reference as if fully set forth herein.

174.    By the 1990 agreement settling the FIRA litigation, Canada agreed not to interfere with DIBC's rights to own CTC, to own and operate its toll bridge franchise, and to change its ownership or the ownership of CTC.

175.    The 1990 settlement of the FIRA litigation both confirmed the existence of these rights under the Special Agreement and created new obligations as a matter of contract.

176.    DIBC and CTC have performed or substantially performed their obligations under the 1990 settlement agreement.

177.    All conditions to Canada's obligations under the 1990 settlement agreement have been satisfied.

178.    Canada's actions in enacting the IBTA and seeking to apply it to DIBC and CTC violate the 1990 Settlement Agreement.

179.    Plaintiffs are entitled to damages and declaratory and injunctive relief against Canada for Canada's breach of contract.

### SEVENTH CLAIM
### (Violation of Procedural and Substantive Due Process)
### (Against the U.S. Defendants)

180.    The allegations of paragraphs 1 through 179 are incorporated by reference as if fully set forth herein.

181.    DIBC and CTC have a vested property interest in the rights granted to them under the Special Agreement.

182.    The U.S. Defendants have failed to give DIBC and CTC reasonable notice and an opportunity to be heard in regard to actions by FHWA and the Coast Guard that deprive DIBC and CTC of their property rights.

183.    The U.S. Defendants have acted arbitrarily and capriciously in taking actions that deprive DIBC and CTC of their property rights.

184.    The acts and omissions of FHWA and the Coast Guard alleged herein have deprived DIBC and CTC, and unless enjoined will further deprive DIBC and CTC, of property without due process of law, in violation of the Fifth Amendment to the United States Constitution.

185.    Plaintiffs are entitled to declaratory and injunctive relief against the U.S. Defendants to protect their constitutional rights.

## EIGHTH CLAIM
### (Violation of Statute and Congressional Policy)
### (Against the U.S. Defendants)

186.    The allegations of paragraphs 1 through 185 are incorporated by reference as if fully set forth herein.

187.    FHWA and the Coast Guard, without statutory authority, have ignored Congress's decision, in the legislation authorizing funds for the Ambassador Bridge Gateway Project, to promote the continued use and expansion of the Ambassador Bridge, including the construction of the Ambassador Bridge New Span.

188.    In refusing or failing to give effect to an Act of Congress or congressional policy, FHWA and the Coast Guard have exceeded their statutory authority and acted contrary to law or, at a minimum, have abused their discretion.

189.    Plaintiffs are entitled to appropriate declaratory, injunctive and other relief against the U.S. Defendants for their improper actions.

## NINTH CLAIM
### (Violation of the Compacts Clause)
### (Against the FHWA Defendants)

190.    The allegations of paragraphs 1 through 189 are incorporated by reference as if fully set forth herein.

191.    FHWA has been promoting and pursuing the DRIC Bridge, the construction of which depends on a compact among the State of Michigan, Canada, and the Province of Ontario, which has not been approved by Congress as required by Article I, § 10 of the United States Constitution.  Although Congress in the 1972 International Bridges Act authorized states to make agreements with Canada and its provinces in furtherance of international bridge construction, *see*

33 U.S.C. § 535a, the Detroit River crossing is governed by a more specific statute, namely the 1921 DIBC Act and its amendments, and the more general 1972 Act therefore does not apply.

192.    In promoting and pursuing the unauthorized DRIC Bridge, FHWA has acted and is acting contrary to law.

193.    Plaintiffs are entitled to appropriate declaratory, injunctive and other relief against the FHWA Defendants for their improper actions.

## TENTH CLAIM
### (Violation of Administrative Procedure Act)
### (Against the FHWA Defendants)

194.    The allegations of paragraphs 1 through 193 are incorporated by reference as if fully set forth herein.

195.    FHWA has decided, without valid justification, to proceed with and promote the construction of the DRIC Bridge.

196.    FHWA has decided, without valid justification, to join with Canada in insisting on locating the DRIC Bridge in close proximity to the Ambassador Bridge.

197.    FHWA has decided, without valid justification, to join with Canada in refusing to cooperate with any transportation solution involving the expansion of the Ambassador Bridge.

198.    Further, as discussed above, FHWA's actions are inconsistent with plaintiffs' due process rights under the U.S. Constitution, plaintiffs' rights under the Special Agreement, and Acts of Congress supporting the continued use and expansion of the Ambassador Bridge, including the Ambassador Bridge New Span, and authorizing and appropriating funds to facilitate that expansion.

199.    The actions and decisions of FHWA alleged in this Complaint, singly or in combination, are (a) arbitrary, capricious, an abuse of discretion or otherwise not in accordance

with law; (b) contrary to constitutional right, power, privilege or immunity; (c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (d) without observance of procedure required by law, and/or (e) unsupported by substantial evidence or unwarranted by the facts.

200.    FHWA has proceeded, is proceeding or intends to proceed to implement its improper decisions.

201.    No other adequate procedure for judicial review or adequate remedy in a court is available.

202.    Plaintiffs are therefore entitled to a judgment against the FHWA Defendants pursuant to 5 U.S.C. § 706(2) setting aside FHWA's approval of a site and plan for the DRIC Bridge, and granting plaintiffs other appropriate declaratory and injunctive relief.

### ELEVENTH CLAIM
**(Violation of Administrative Procedure Act)**
**(Against the Coast Guard Defendants)**

203.    The allegations of paragraphs 1 through 202 are incorporated by reference as if fully set forth herein.

204.    The Coast Guard has refused to process the Ambassador Bridge's application for a permit and a FONSI for the Ambassador Bridge New Span based on improper reasons. Among other things, the Coast Guard has relied on opposition from Canadian officials and FHWA rather than the statutory criteria for issuing a permit to build the bridge under the 1906 Bridges Act or a FONSI under the National Environmental Policy Act.

205.    The Coast Guard has no legitimate reasons for denying or delaying a FONSI for the Ambassador Bridge New Span.

206.   The Coast Guard has no valid reasons for denying or delaying a 1906 Bridges Act permit for the Ambassador Bridge New Span.

207.   The Coast Guard has unlawfully withheld or unreasonably delayed agency action.

208.   Further, for the reasons detailed above, the actions and decisions of the Coast Guard in failing or refusing to issue a FONSI or a 1906 Bridges Act permit are (a) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; (b) contrary to constitutional right, power, privilege or immunity; (c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (d) without observance of procedure required by law, and/or (e) unsupported by substantial evidence or unwarranted by the facts.

209.   No other adequate procedure for judicial review or adequate remedy in a court is available.

210.   Plaintiffs are therefore entitled to a judgment against the Coast Guard Defendants pursuant to 5 U.S.C. § 706(2) setting aside the Coast Guard's decision to discontinue consideration of the FONSI and the bridge permit, a declaratory judgment that plaintiffs have satisfied the requirements for a FONSI and a bridge permit, and a judgment in the nature of mandamus pursuant to 5 U.S.C. § 706(1) directing the Coast Guard to proceed without delay to consideration of the bridge permit and FONSI and directing the Coast Guard to grant such bridge permit and FONSI, together with any other appropriate relief.

## DEMAND FOR RELIEF

WHEREFORE, plaintiffs respectfully request judgment against defendants for the following relief:

(1)     A declaratory judgment against the FHWA Defendants and Canada under 28 U.S.C. §§ 2201-2202 that the construction and operation of the planned DRIC

Bridge across the Detroit River would violate the obligations of Canada and the
United States to DIBC and CTC;

(2)     A declaratory judgment against the FHWA Defendants, the Coast Guard
        Defendants and Canada under 28 U.S.C. §§ 2201-2202 that DIBC and CTC have
        a right to continue to own and operate the Ambassador Bridge, and a right to build
        a second span of the Ambassador Bridge across the Detroit River without
        interference by Canada or the United States, subject only to the conditions set
        forth in the Special Agreement;

(3)     A declaratory judgment against the Coast Guard Defendants under 28 U.S.C.
        §§ 2201-2202 that DIBC has satisfied all the requirements for a Finding of No
        Significant Impact and a bridge permit for the Ambassador Bridge New Span;

(4)     A declaratory judgment against Canada under 28 U.S.C. §§ 2201-2202 that
        (a) DIBC and CTC have a right to determine the level of tolls to be charged on the
        Ambassador bridge, subject only to the conditions set forth in the Special
        Agreement, and (b) DIBC and CTC have a right to transfer their corporate
        ownership or ownership of any of their property or rights;

(5)     A judgment against the FHWA Defendants under 5 U.S.C. § 706(2) setting aside
        all decisions by the FHWA to proceed with the construction of the DRIC bridge
        or to select its location;

(6)     A judgment against the Coast Guard Defendants under 5 U.S.C. § 706(2) setting
        aside the Coast Guard's decision to terminate consideration of DIBC's
        applications for a permit to construct the Ambassador Bridge New Span and a
        Finding of No Significant Impact;

(7)     A judgment in the nature of mandamus against the Coast Guard Defendants under

        5 U.S.C. § 706(1), directing them (<u>a</u>) to process promptly DIBC's application for

        a permit to construct the Ambassador Bridge New Span and, if necessary, a

        Finding of No Significant Impact, and (<u>b</u>) to grant such permit and, if necessary,

        Finding of No Significant Impact;

(8)     An injunction against the FHWA Defendants and Canada prohibiting each such

        defendant from taking any steps to construct, prepare for construction of, or

        arrange for construction of the planned DRIC Bridge or any other bridge across

        the Detroit River between Canada and the United States;

(9)     Damages against Canada in an amount to be determined at trial;

(10)    Costs, attorneys' fees and expenses of this litigation to the extent permitted by law

        or rule;

(11)    Interest on all amounts awarded; and

(12)    Any other appropriate relief.

Dated: March 22, 2010

Respectfully submitted,

John B. Missing (D.C. Bar. No. 425469)
jmissing@debevoise.com
DEBEVOISE & PLIMPTON LLP
555 13th Street, N.W.
Washington, DC 20004
(202) 383-8000

Donald Francis Donovan
Carl Micarelli
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000

Attorneys for Plaintiffs Detroit International
Bridge Company and The Canadian Transit
Company