UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————

DETROIT INTERNATIONAL BRIDGE
COMPANY, a Michigan corporation,

and

THE CANADIAN TRANSIT COMPANY, a
Canadian special act corporation,

   Plaintiffs,

v.

THE GOVERNMENT OF CANADA,
Transit Canada
330 Sparks Street
Ottawa, Ontario
K1A 0N5

THE UNITED STATES FEDERAL HIGHWAY
ADMINISTRATION,
VICTOR MENDEZ, in his official capacity as
Administrator of the United States Federal Highway
Administration,
RAY LAHOOD, in his official capacity as Secretary
of Transportation,
THE UNITED STATES COAST GUARD,
ADM. THAD W. ALLEN, in his official capacity as
Commandant of the United States Coast Guard,
JANET NAPOLITANO, in her official capacity as
Secretary of Homeland Security, and
THE UNITED STATES OF AMERICA,

   Defendants.

_____/

Case No. 1:10-cv-00476(RMC)

Hon. Rosemary M. Collyer

**ORAL HEARING
REQUESTED**

# HER MAJESTY THE QUEEN IN RIGHT OF CANADA'S
# MOTION TO DISMISS
# AND STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................iii

GLOSSARY ....................................................................................viii

INTRODUCTION .............................................................................1

BACKGROUND ..............................................................................2

    *History of the Ambassador Bridge*.................................................3

    *History of the DRIC*...................................................................4

    *Litigation history* .......................................................................5

ARGUMENT ...................................................................................7

I.    This Court lacks subject-matter jurisdiction because Canada is immune from Plaintiffs' claims under 28 U.S.C. § 1604 ...................................7

    A.    The Court lacks jurisdiction over Count I because it is based on Canada's sovereign, non-commercial decision to locate an international border crossing near the Ambassador Bridge......................8

    B.    The Court lacks jurisdiction over the remaining Counts II through VI because they are based on regulatory and legislative acts, which are clearly sovereign and not commercial in nature................................12

    C.    Plaintiffs' claims do not establish a sufficient nexus to the United States .........................................................................................13

II.    Plaintiffs' complaint fails to state a claim against Canada on which relief may be granted ...........................................................................16

    A.    Plaintiffs' claims should be dismissed because they are not justiciable under the act-of-state doctrine................................16

        1.    Overview of the act-of-state doctrine .........................................17

        2.    Plaintiffs' claims directly challenge the Canadian government's acts of state within its own borders and therefore fail to state a claim as a matter of law under the act-of-state doctrine ...................................................18

Page

3.  Adjudication of Plaintiffs' claims would be a serious insult to the sovereign dignity of Canada and embarrass the Executive Branch of the United States in its conduct of foreign relations with Canada ...................................................... 22

B.  Plaintiffs fail to state a claim for violation of the Treaty or of the Ambassador Bridge acts ........................................................................ 23

1.  The Treaty cannot be a basis for Counts I through IV ................ 24

2.  The DIBC Act cannot be a basis for Counts I through V ............. 25

3.  The CTC Act cannot be a basis for Counts I through V .............. 25

CONCLUSION ....................................................................................................... 28

# TABLE OF AUTHORITIES

Page

## Federal Cases

*Abourezk v. Reagan*,
785 F.2d 1043 (D.C. Cir. 1986) ............................................................................................. 20

\* *Alexander v. Sandoval*,
532 U.S. 275 (2001) ................................................................................................................ 25

*Alfred Dunhill of London, Inc. v. Republic of Cuba*,
425 U.S. 682 (1976) ................................................................................................................ 21

*Arango v. Guzman Travel Advisors Corp.*,
621 F.2d 1371 (5th Cir. 1980) ........................................................................................... 16, 20

*Argentine Republic v. Amerada Hess Shipping Corp.*,
488 U.S. 428 (1989) ............................................................................................................. 7, 24

*Atkin v. Kansas*,
191 U.S. 207 (1903) ................................................................................................................ 10

*Banco Nacional de Cuba v. Sabbatino*,
376 U.S. 398 (1964) ................................................................................................................ 18

\* *BPA Int'l, Inc. v. Kingdom of Sweden*,
281 F. Supp. 2d 73 (D.D.C. 2003) .......................................................................................... 15

\* *Braka v. Bancomer, S.N.C.*,
762 F.2d 222 (2d Cir. 1985) ............................................................................................ 16, 18, 20

*Butler v. Perry*,
240 U.S. 328 (1916) ................................................................................................................ 10

*Callejo v. Bancomer, S.A.*,
764 F.2d 1101 (5th Cir. 1985) ........................................................................................... 17, 23

*Cicippio v. Islamic Republic of Iran*,
30 F.3d 164 (D.C. Cir. 1994) .................................................................................................. 14

*City of S. Pasadena v. Goldschmidt*,
637 F.2d 677 (9th Cir. 1981) .................................................................................................. 19

*Clark v. Feder Semo and Bard, P.C.*,
634 F. Supp. 2d 99 (D.D.C. 2009) ............................................................................................ 2

Page

*Commissioner of Internal Revenue v. Harlan,*
    80 F.2d 660 (9th Cir. 1935) ............................................................................... 10

\* *County Commissioners v. Chandler,*
    96 U.S. 205 (1878) ............................................................................................ 10

*Daliberti v. Republic of Iraq,*
    97 F. Supp. 2d 38 (D.D.C. 2000) ........................................................................ 7

\* *Dayton v. Czechoslovak Socialist Republic,*
    834 F.2d 203 (D.C. Cir. 1987) .......................................................................... 21

*E.E.O.C. v. St. Francis Xavier Parochial School,*
    117 F.3d 621 (D.C. Cir. 1997) ............................................................................ 2

*Ernest K. Lehmann & Assocs. of Montana, Inc. v. Salazar,*
    602 F. Supp. 2d 146 (D.D.C. 2009) .................................................................... 4

*Fed. Ins. Co. v. Richard I. Rubin & Co.,*
    12 F.3d 1270 (3d Cir. 1993) ............................................................................... 8

\* *First Nat'l City Bank v. Banco Nacional de Cuba,*
    406 U.S. 759 (1972) .......................................................................................... 17

*Ge v. Peng,*
    201 F. Supp. 2d 14 (D.D.C. 2000) .................................................................... 15

*Glen v. Club Mediterranée, S.A.,*
    450 F.3d 1251 (11th Cir. 2006) ........................................................................ 17

*Gregorian v. Izvestia,*
    871 F.2d 1515 (9th Cir. 1989) .......................................................................... 15

*Grendel's Den, Inc. v. Goodwin,*
    662 F.2d 88 (1st Cir. 1981) .............................................................................. 13

*Hart v. Bridgeport,*
    11 Fed. Cas. 681 (C.C. Conn. 1876) ................................................................ 10

*Haven v. Rzeczpospolita Polska,*
    215 F.3d 727 (7th Cir. 2000) ............................................................................ 24

*Honduras Aircraft Registry, Ltd. v. Gov't of Hond.,*
    129 F.3d 543 (11th Cir. 1997) .......................................................................... 17

iv

Page

*Int'l Ass'n of Machinists & Aerospace Workers, (IAM) v. Organization
    of Petroleum Exporting Countries (OPEC),*
    649 F.2d 1354 (9th Cir. 1981) ............................................................. 17

*Kansas City Bridge Co. v. Alabama State Bridge Corp.,*
    59 F.2d 48 (5th Cir. Ala. 1932) ........................................................... 11

*Latin Ams. for Soc. & Econ. Dev. v. Adm'r of the Fed. Highway Admin,*
    No. 1:09-CV-897 (D.D.C.) ............................................................... 5, 22

*Macharia v. United States,*
    334 F.3d 61 (D.C. Cir. 2003) ................................................................. 7

\* *McKesson Corp. v. Islamic Republic of Iran,*
    539 F.3d 485 (D.C. Cir. 2008) ............................................................. 24

*Medellín v. Texas,*
    552 U.S. 491 (2008) ............................................................................. 24

*Mich. Dep't of Ttrans. v. DIBC,*
    No. 2:10-CV-12234-PJD-MKM (E.D. Mich) ......................................... 6

\* *O'Bryan v. Holy See,*
    556 F.3d 361 (6th Cir. 2009) ........................................................... 8, 12

*Oetjen v. Cent. Leather Co.,*
    246 U.S. 297 (1918) ............................................................................. 23

*Okusami v. Psychiatric Institute of Washington, Inc.,*
    959 F.2d 1062 (D.C. Cir. 1992) ............................................................. 2

*Republic of Argentina v. Weltover, Inc.,*
    504 U.S. 607 (1992) ................................................................... 9, 13, 15

\* *Republic of Philippines v. Marcos,*
    806 F.2d 344 (2d Cir. 1986) .......................................................... 18, 20

*Republic of Philippines v. Marcos,*
    818 F.2d 1473 (9th Cir. 1987). ...................................................... 19, 20

\* *Saudi Arabia v. Nelson,*
    507 U.S. 349 (1993) ............................................................... 7, 8, 9, 14

*Strategic Techs PTE, Ltd. v. Republic of China (Taiwan),*
    2007 WL 1378492 (D.D.C. May 10, 2007) ........................................ 7, 8

Page

*Underhill v. Hernandez,*
    168 U.S. 250 (1897)...................................................................................................18

*United States v. King County, Wash.,*
    281 F. 686 (9th Cir. 1922), overruled on other grounds by *U.S. v. Washington Toll Bridge*
    *Authority,* 307 F.2d 330, 333 (9th Cir. 1962)........................................................10

\*   *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l,*
    493 U.S. 400 (1990)...................................................................................................16

*Warner-Lambert Co. v. F.T.C.,*
    562 F.2d 749 (D.C. Cir. 1977)......................................................................................4

*Wheaton v. Golden Gate Bridge,*
    559 F.3d 979 (9th Cir. 2009)......................................................................................10

\*   *World Wide Minerals, Ltd. v. Republic of Kazakhstan,*
    296 F.3d 1154 (D.C. Cir. 2002)............................................................................18, 21

\*   *Youming Jin v. Ministry of State Sec.,*
    475 F. Supp. 2d 54 (D.D.C. 2007)...........................................................................7, 9

\*   *Zedan v. Kingdom of Saudi Arabia,*
    849 F.2d 1511 (D.C. Cir. 1988)..................................................................................13

## State Cases

*Foley v. State ex rel. King,*
    157 Okla. 202 (1932)..................................................................................................11

*Mich. Dep't of Transp. v. Detroit Int'l Bridge Co.,*
    No. 09-015581-CK (Mich. 3d Cir. Ct. Feb. 1, 2010) ..................................................6

## Canadian Cases

*Multiform Mfg. Co. v. Her Majesty the Queen,*
    [1990] 2 S.C.R. 425 (Can.).....................................................................................25, 27

## Federal Statutes

28 U.S.C. § 1602...............................................................................................................7

28 U.S.C. § 1604...............................................................................................................7

28 U.S.C. § 1605(a)(1).....................................................................................................24

28 U.S.C. § 1605(a)(2).......................................................................................................8

Page

28 U.S.C. §§ 1330(a), 1602–1611 ..................................................................7

Act of Mar. 4, 1921, 66th Cong., ch. 167, 41 Stat. 1439 ................................ 11, 23, 25

## Federal Rules

Fed. R. Civ. P. 7(b) .........................................................................................1

Fed. R. Civ. P. 12(b)(1).............................................................................. 1, 2, 7

Fed. R. Civ. P. 12(b)(6)........................................................................ 1, 2, 7, 16, 23

Fed. R. Civ. P. 56.........................................................................................2

## Other Authorities

Act of May 3, 1921, 11-12 Geo. V. ch. 51 (Can.) .................................. 11, 19, 23, 25, 26, 27, 28

Boundary Waters Treaty, U.S.–U.K., Jan. 11, 1909, 36 Stat. 2448 ......................... 12, 23, 24, 28

Constitution Act, 1867 .....................................................................................11

International Bridges and Tunnels Act, S.C. 2007, ch.1 (Can.) ......................... 1, 6, 11, 12, 19, 27

Restatement (Third) of Foreign Relations Law of the United States § 443 (1986)................ 20, 21

# GLOSSARY

| | |
|---|---|
| Canada-U.S. Partnership | A multi-government partnership consisting of Transport Canada, the Ministry of Transportation of Ontario, the Michigan Department of Transportation, and the Federal Highway Administration |
| CTC | The Canadian Transit Company |
| CTC Act | An Act to Incorporate the Canadian Transit Company (May 3, 1921) |
| DIBC | Detroit International Bridge Company |
| DIBC Act | An Act to Authorize the Construction and Maintenance of a Bridge Across Detroit River (March 4, 1921) |
| DRIC | Detroit River International Crossing |
| FHWA | Federal Highway Administration |
| FSIA | Foreign Sovereign Immunities Act |
| IBTA | International Bridges and Tunnels Act |
| MDOT | Michigan Department of Transportation |
| NAFTA | North American Free Trade Agreement |
| Treaty | Boundary Waters Treaty |

Defendant Her Majesty the Queen in Right of Canada ("Canada"), pursuant to Federal Rules of Civil Procedure 7(b), 12(b)(1), and 12(b)(6), respectfully moves the Court for an order dismissing Plaintiffs' claims against Canada for lack of subject matter jurisdiction and for failure to state a claim.

## INTRODUCTION

The question presented in this motion is whether a foreign sovereign may be sued in a U.S. court based entirely on sovereign acts. Because the Foreign Sovereign Immunities Act ("FSIA") and the act-of-state doctrine unequivocally answer that question "no," Canada respectfully requests that this Court dismiss Counts I through VI as they relate to Canada.

Plaintiffs—one of whom is a Canadian corporation—have sued Canada, alleging violations caused by and arising under Canadian law. Plaintiffs seek to stop the Government of Canada from passing legislation, "cooperating" with U.S. agencies, and taking other sovereign actions to promote a new international bridge crossing between Windsor, Ontario, and Detroit, Michigan, known as the Detroit River International Crossing ("DRIC"). Plaintiffs' claims against Canada turn on the following alleged acts:

- Approving the location in Canada of a second international bridge for transportation and trade in the Windsor-Detroit region (First and Fifth Claims, Compl. ¶¶ 153, 168);[1]

- "[M]anipulating the U.S. and Canadian regulatory processes . . . ." (Second Claim, Compl. ¶¶ 157–58);

- Enacting and applying the International Bridges and Tunnels Act, S.C. 2007, ch.1 (Can.) (hereafter the "IBTA")[2] (Third Claim, Compl. ¶ 162, Sixth Claim, Compl., ¶ 178); and

- "[E]ncouraging and permitting" the City of Windsor to enact zoning legislation (Fourth Claim, Compl. ¶ 165).

---

[1] The provisions of Plaintiffs' complaint cited in this brief are attached as Exhibit A.

[2] The IBTA is attached as Exhibit B.

Each of these claims is a challenge to Canada's sovereign exercise of its police power to protect and control its borders.  None properly may be brought in a U.S. court.  Accordingly, Canada moves to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) based on the FSIA.  In addition, the Court should dismiss Plaintiffs' claims against Canada under Federal Rule of Civil Procedure 12(b)(6) because the claims are barred by the act-of-state doctrine, and because even a cursory review of Plaintiffs' claims reveals that they have no legal basis since they are based on international treaties between the United States and Canada, or U.S. or Canadian statutes, which provide no private right of action.[3]

## BACKGROUND

"In determining whether a complaint fails to state a claim, [this court] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice."  *E.E.O.C. v. St. Francis Xavier Parochial School*, 117 F.3d 621, 624, 326 (D.C. Cir. 1997).  To give a fair context for some of the events that gave rise to this litigation, Canada has cited to the public internet source for two public reports which are both incorporated in Plaintiffs' complaint and therefore subject to this Court's consideration.  *Clark v. Feder Semo and Bard, P.C.*, 634 F. Supp. 2d 99, 106 n.3 (D.D.C. 2009) (when a defendant's exhibit is specifically referenced in the plaintiff's complaint, "reference to it does not convert this motion from a motion to dismiss under Fed. R. Civ. P. 12(b)(6) to a motion for summary judgment under Fed. R. Civ. P. 56."); *see also Okusami v. Psychiatric Institute of Washington, Inc.*, 959 F.2d 1062, 1066 (D.C. Cir. 1992) (holding that "the bylaws are

---

[3] Canada anticipates that the United States will also file a motion to dismiss and for change of venue.  Canada agrees that the United States District Court for the Eastern District of Michigan is the most appropriate venue for litigating this dispute; however, it is appropriate to defer briefing and a decision on venue until after resolution of the threshold sovereign-immunity issues framed in this motion and in the United States' motion to dismiss.

adequately incorporated into the complaint" because the complaint contained references to them).  Still, this Court may generally assume Plaintiffs' allegations to be true for purposes of this motion.  While Canada does not concede Plaintiffs' allegations, Plaintiffs' Complaint fails on its allegations.

### *History of the Ambassador Bridge*

The Ambassador Bridge is currently the only bridge spanning the Detroit River between Windsor, Ontario, and Detroit, Michigan.  It carries more than a quarter of all commercial traffic between Canada and the United States.  (Compl. ¶ 1.)  While it is widely recognized that Canada is a key U.S. ally, many do not know that Canada is also the United States' largest trading partner, with imports and exports ranging from $430 to $600 billion annually in recent years.[4] Detroit-Windsor is the busiest international crossing in North America.[5]

Predecessor entities of Plaintiff Detroit International Bridge Company ("DIBC") constructed the Ambassador Bridge under legislative authorizations from the United States and Canada, and the Bridge has carried traffic between Windsor and Detroit since 1929.  (Compl. ¶ 45.)  Investors publicly traded stock in the Ambassador from 1939 until 1979, when a Detroit-area businessman and his companies purchased a controlling interest in Plaintiffs and obtained SEC approval to buy out minority shareholders, making the Bridge privately held.  (*Id.* ¶ 47, 57.)

---

[4] U.S. Census Bureau, Foreign Trade Statistics, http://www.census.gov/foreign-trade/balance/ c1220.html#2009.

[5] Windsor's crossingmadeeasy.com, http://www.crossingmadeeasy.com/ambassador-bridge.htm.

### *History of the DRIC*

Since 2000, Canada—through Transport Canada[6]—has worked with the Ministry of

Transportation of Ontario,[7] the Michigan Department of Transportation, and the Federal

Highway Administration (the "Canada-U.S. Partnership") to study and develop plans to meet

anticipated transportation needs in the Detroit-Windsor region.  (Compl. ¶ 82); *see generally*

Detroit River International Crossing Study, http://www.partnershipborderstudy.com (providing a

comprehensive set of background materials, history, and current status of the DRIC project).[8]  In

2001, the Canada-U.S. Partnership commissioned a planning/need and feasibility study, which

was completed in 2004, to determine whether there was a long-term need for another border

crossing in the Windsor-Detroit corridor.[9]  (*Id.*)  The study confirmed the need.  (*Id.*)

The Canada-U.S. Partnership then undertook a coordinated environmental assessment

process in the United States and Canada to identify a preferred location for a new crossing and

for access roads that would connect directly to existing Highway 401 in Canada and Interstate 75

in the United States.  (January 2009 Environmental Assessment Report, http://www.partnership

borderstudy.com/pdf/EA-Report/EAReport_FullDocument.pdf.)[10]  Initially, the Canada-U.S.

---

[6] Transport Canada is the department within the Canadian government responsible for transportation regulations, policies, and services.  It is Canada's equivalent of the U.S. Department of Transportation.

[7] The Ministry of Transportation of Ontario, or MTO, is the Ontario government ministry responsible for transport infrastructure and law in Ontario.

[8] Incorporated by reference in Plaintiffs' complaint (Compl. ¶¶ 89–91) and subject to judicial notice as a public record, *see Warner-Lambert Co. v. F.T.C.*, 562 F.2d 749, 754 n.15 (D.C. Cir. 1977) ("Petitioner's motion requesting that the court take judicial notice of the FDA study is hereby granted.").

[9] Canada-US-Ontario-Michigan Border Transportation Partnership, Reports & Papers, http:// www. partnershipborderstudy.com/stage1frame.html.

[10] Incorporated by reference in Plaintiffs' complaint (Compl. ¶ 111) and subject to judicial notice as a public record, *see Ernest K. Lehmann & Assocs. of Montana, Inc. v. Salazar*, 602 F. Supp. 2d 146, 160 (D.D.C. 2009) (accepting an administrative appeals board's judicial notice of a draft environmental impact statement); *Cf. Warner-Lambert Co*, 562 F.2d at 754 n.15.

4

Partnership considered 15 "end-to-end" alternatives (linking Highway 401 to Interstate 75), in-

cluding alternatives requiring construction of a new bridge crossing immediately adjacent to the

existing Ambassador Bridge.  (*Id.* at vii.)  The Canada-U.S. Partnership eventually rejected alter-

natives involving construction of a new bridge adjacent to the Ambassador, primarily because of

environmental, community impact and system redundancy concerns.  (*Id.* at 6-30, 6-34, 6-35.)

The technically and environmentally preferred alternatives for the DRIC and its location, among

other things, involve the construction of a new bridge crossing located approximately two miles

south of the existing Ambassador Bridge.  (*Id.* at viii to xi.)  At present, neither Canada nor any

other government or entity has begun construction on the DRIC.  However, based on the

planning and environmental studies undertaken, all government partners support the DRIC,

including the United States, the State of Michigan, and the Province of Ontario.

## *Litigation history*

The present dispute is one of many U.S. lawsuits, two North American Free Trade

Agreement ("NAFTA") arbitration claims, and a Canadian legal proceeding that all relate to the

DRIC and/or the Ambassador Bridge.  Significantly, the instant lawsuit is the first and only one

where Plaintiffs have attempted to sue Canada in a U.S. court, and it is the first to raise questions

under the FSIA:

- Last year, Plaintiffs and six organizations filed a lawsuit in this Court against various U.S. government defendants.[11]  That suit alleges defects in the U.S. environmental review process for DRIC.  The United States moved to transfer the case from the District of Columbia to the Eastern District of Michigan, and this Court, through Judge Sullivan, granted that motion.  The case is currently pending before Judge Cohn in the U.S. District Court for the Eastern District of Michigan.[12]

- On December 31, 2009, Plaintiffs filed an application for judicial review before the Federal Court in Canada seeking, among other things, an order that the decision by

---

[11] *Latin Ams. for Soc. & Econ. Dev. v. Adm'r of the Fed. Highway Admin.*, originally filed in the D.C. District Court as No. 1:09-CV-897.

[12] Case No. 2:10-CV-82.

Canadian authorities under the Canadian Environmental Assessment Act relating to the DRIC is invalid or unlawful. That order by Canadian authorities determined that the DRIC is not likely to cause significant environmental effect, and is one step in the Canadian Government's approval process.

- On January 25, 2010, Plaintiff DIBC delivered a Notice of Intent to file a claim in arbitration against Canada under Chapter Eleven of NAFTA. The allegations in the NAFTA notice are substantially similar to Plaintiffs' allegations in counts three and six against Canada in this case, challenging Canada's enactment of the IBTA. (DIBC NAFTA Arb. Claim.) Specifically, DIBC alleges in the NAFTA notice that the IBTA violates NAFTA's provisions relating to national treatment, the international law minimum standard of treatment and expropriation. (*Id.*) Plaintiffs seek damages of at least $1.5 billion. (*Id.* at 17.)

- On March 23, 2010, Plaintiff DIBC delivered a second Notice of Intent to file a claim in arbitration against Canada under NAFTA. The allegations in this second NAFTA notice are substantially similar to allegations in counts one and five against Canada in this case, which focus primarily on allegations that Canada has improperly located the DRIC. (2d Notice of Intent to Submit Arb.) Specifically, DIBC alleges in this NAFTA notice that Canada actions allegedly relating to where to locate the DRIC violate NAFTA's provisions relating to national treatment, most-favored nation treatment, and the international law minimum standard of treatment. (*Id.* ¶¶ 48–50.) Plaintiffs seek damages in excess of $3.5 billion. (*Id.* ¶ 51(b).)

- A contractual dispute indirectly involving the IBTA is also pending before Canadian courts. Canada takes the position that Plaintiffs repeatedly misconstrue the 1990 Settlement Agreement. On November 18, 2009, Canada filed a notice of application before the Ontario Superior Court of Justice seeking the equivalent of a U.S. declaratory judgment that: (1) the 1990 Settlement Agreement does not preclude the application of the IBTA to Plaintiffs, and (2) Canada has no ongoing obligations under the 1990 Settlement Agreement.

- Finally, Plaintiffs recently lost a lawsuit in a Michigan state court involving the Michigan Department of Transportation. (Order, *Mich. Dep't of Transp. v. Detroit Int'l Bridge Co.*, No. 09-015581-CK (Mich. 3d Cir. Ct. Feb. 1, 2010).) In that litigation, the state court ordered Plaintiffs to remove illegal preliminary work on the new twin span that Plaintiffs seek to construct adjacent to the current Ambassador Bridge span.[13] (*Id.*)

---

[13] DIBC has since attempted to remove that state court decision to the U.S. District Court for the Eastern District of Michigan. *MDOT v. DIBC*, No. 2:10-CV-12234-PJD-MKM. MDOT's motion to remand is pending.

# ARGUMENT

## I.  This Court lacks subject-matter jurisdiction because Canada is immune from Plaintiffs' claims under 28 U.S.C. § 1604.

All of Plaintiffs' claims against Canada should be dismissed under Federal Rule of Civil Procedure 12(b)(1) because this Court lacks subject-matter jurisdiction.  The Foreign Sovereign Immunity Act ("FSIA") is the "sole basis for obtaining jurisdiction over a foreign state in [U.S.] courts."  28 U.S.C. §§ 1330(a), 1602–1611; *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) (citing *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 433–35 (1989)). Under the FSIA, "a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified [statutory] exception applies, a federal court lacks subject-matter juris-diction over a claim against a foreign state."  *Nelson*, 507 U.S. at 355; *see also Strategic Techs PTE, Ltd. v. Republic of China (Taiwan)*, 2007 WL 1378492, at *2 (D.D.C. May 10, 2007) (Collyer, J.).  "The plaintiff bears the burden of producing evidence to show that the foreign sov-ereign defendant does not enjoy immunity and that one or more of the nine exemptions to FSIA constitutes a waiver of the defendant's sovereign immunity thereby conferring federal court jurisdiction over the plaintiff's claims."  *Youming Jin v. Ministry of State Sec.*, 475 F. Supp. 2d 54, 61 (D.D.C. 2007) (citing 28 U.S.C. § 1602; *Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38, 42 (D.D.C. 2000)).  Plaintiffs cannot carry their burden in this case.

Because subject-matter jurisdiction focuses on a court's power to hear a claim, this Court must give Plaintiffs' factual allegations closer scrutiny when resolving a motion under Federal Rule of Civil Procedure 12(b)(1) than is required for a Rule 12(b)(6) motion for failure to state a claim.  *Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003), *cited in Strategic Techs. PTE*, 2007 WL 1378492, at *2.  Plaintiffs allege as their sole basis for jurisdiction here the "commercial activities" exception under FSIA.  (Compl. ¶ 21.)  Under that exception, a

foreign state is subject to the jurisdiction of a U.S. court only if the action is "*based upon*" (1) "a commercial activity carried on in the United States by the foreign state," (2) "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere," or (3) "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2) (emphasis added). Stated differently, a plaintiff's claim must be (1) based on a commercial activity, and (2) the commercial activity must have a sufficient nexus with the United States. *Strategic Techs.*, 2007 WL 1378492, at *4 (citing *Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1288 (3d Cir. 1993)). Plaintiffs' claims are neither based on commercial activity nor have a sufficient nexus to the United States to invoke FSIA jurisdiction.

## A.   The Court lacks jurisdiction over Count I because it is based on Canada's sovereign, non-commercial decision to locate an international border crossing near the Ambassador Bridge.

Count I against Canada is not based on a commercial activity, but on Canada's sovereign decisions and actions regarding the development of a second international crossing between the United States and Canada connecting the State of Michigan and the Province of Ontario. These constitute quintessentially sovereign acts under the FSIA.

Two important principles guide the FSIA analysis. First, the basis of the claim consists of "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Nelson*, 507 U.S. at 357. The Court must therefore look beyond artful pleading to discern the "'gravam[e]n' of the claims advanced by the plaintiff" and ask whether "the allegations truly sound[] in commercial activity." *O'Bryan v. Holy See*, 556 F.3d 361, 380 (6th Cir. 2009). "If a transaction is partially commercial and partially sovereign in nature and the cause of action is based on sovereign activities involved in the transaction, the commercial activity excep-

tion to FSIA does not apply and the sovereign is immune from suit." *Youming Jin*, 475 F. Supp. 2d at 62.

Second, "the commercial character of an act is to be determined by reference to its 'nature' rather than its 'purpose.'" *Nelson*, 507 U.S. at 360–61. Thus, Canada's motives are irrelevant. Rather, the issue is whether Canada's actions are of the kind traditionally performed by governments or "are the type of actions by which a private party engages in 'trade and traffic or commerce.'" *Id.* (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992)).

Count I is not based on commercial activity but on Canada's decision to develop a second international bridge connecting it to the United States across the Detroit River, and to locate the bridge two miles from the existing Ambassador Bridge. Plaintiffs allege that the "construction of the DRIC bridge *within two miles of the existing DIBC bridge*" will "eliminate the profitability of DIBC's and CTC's rights." (Compl. ¶ 151 (emphasis added).) Plaintiffs explain that these rights include the rights to "operate and maintain, and set and collect tolls on, the Ambassador Bridge." (*Id.* ¶ 152.) Finally, Plaintiffs again assert that constructing the bridge "*within two miles of the Ambassador Bridge*" is "a violation of DIBC's and CTC's rights." (*Id.* ¶ 153 (emphasis added).) Thus, the gravamen of Count I is that establishing an alternative vehicular route across the Detroit River near the Ambassador Bridge will interfere with Plaintiffs' asserted right to profitably operate the Ambassador Bridge by reducing Plaintiffs' toll revenue.[14] (Compl. ¶¶ 151–52.)

---

[14] Though Plaintiffs have artfully pled this claim in terms of "construction," the act of construction is not the basis of their claim. Plaintiffs' legal theory is that the impact on their tolls is a violation of treaty and statute. Neither the act of construction itself nor the presence of an additional span of concrete across the Detroit River impacts their tolls. If the bridge were constructed but never opened to vehicular traffic, there would be no effect on Ambassador Bridge traffic or tolls. Likewise, if the bridge were constructed in Port Huron, where another bridge already exists, Plaintiffs' toll revenue would be unaffected. Thus, it is not the act of construction, but rather Canada's decision to open another traffic route *at this particular location* which Plaintiffs must challenge to succeed under their legal theory.

As a matter of law, this is insufficient to turn Canada's decisions on whether and where to locate a second international bridge from governmental to commercial acts. Decisions and acts regarding the authorization and regulation of bridges have long been regarded by the U.S. courts as sovereign acts. As early as 1878, the U.S. Supreme Court held that "[r]ailroads, turn-pikes, bridges, ferries, are all things of public concern, and the right to erect them is a public right." *County Commissioners v. Chandler*, 96 U.S. 205, 207–08 (1878). As the Supreme Court emphasized at that time, these acts do not lose their fundamentally governmental nature merely because a government authorizes a private entity the right to own or operate a specific bridge: if this right "be conceded to a private individual or corporation, it is conceded as a public franchise; and the right to take toll is granted as a compensation for erecting the work and relieving the public treasury from the burden thereof. Those who have such franchises are agents of the public. They have, it is true, a private interest in the tolls; but the works are public, and subject to public regulation." (*Id.*) The Supreme Court concludes that "[t]hese principles are so elementary in the common law, that we can hardly open our books without seeing them recognized or illustrated. (*Id.*)

Similarly, the Ninth Circuit has held "[t]hat the maintenance of highways, and conse-quently of bridges and ferries connecting the same, by the government or its subdivisions is the exercise of an essential governmental function is so well established that we content ourselves with a reference to a few of the numerous decisions to that effect." *Commissioner of Internal Revenue v. Harlan*, 80 F.2d 660, 661–62 (9th Cir. 1935) (citing *Butler v. Perry*, 240 U.S. 328, 330–31 (1916); *Atkin v. Kansas*, 191 U.S. 207, 221–22 (1903); *United States v. King County, Wash.*, 281 F. 686, 688–90 (9th Cir. 1922), *overruled on other grounds by U.S. v. Washington Toll Bridge Authority*, 307 F.2d 330, 333 (9th Cir. 1962); *Hart v. Bridgeport*, 11 Fed. Cas. 681, 682 (C.C. Conn. 1876)); *see also Wheaton v. Golden Gate Bridge*, 559 F.3d 979, 985 (9th Cir.

2009) ("The District manages a bridge, including the highway that goes over it. It also manages public transportation by bus and ferry. These are governmental functions."); *Foley v. State ex rel. King*, 157 Okla. 202, 203 (1932) ("A bridge is an essential part of the highway. . . . such public road or bridge affects and serves the public at large . . . . [i.e.] the general public interest, state and national."); *Kansas City Bridge Co. v. Alabama State Bridge Corp*., 59 F.2d 48, 49 (5th Cir. Ala. 1932) ("It is well settled that the construction of public roads and bridges is a governmental function.").

In fact, because the construction of bridges, especially across international borders, is a sovereign function, Plaintiffs were only able to construct and operate the Ambassador Bridge pursuant to the enactment of legislation by both governments authorizing Plaintiffs to do so. *See* Act of Mar. 4, 1921, 66th Cong., ch. 167, 41 Stat. 1439 (hereafter the "DIBC Act");[15] Act of May 3, 1921, 11-12 Geo. V. ch. 51 (Can.) (hereafter the "CTC Act");[16] (Compl. ¶¶ 26–30).

Put simply, the decision to establish another international transportation and trade route, and to select its location, is not the type of act that can be engaged in by a private commercial enterprise; it is an exercise of police power to protect and manage trade routes across a nation's border. *See* IBTA § 5 ("International bridges and tunnels are declared to be works for the general advantage of Canada.").[17] Because that is a sovereign act, the commercial-activities exception does not apply, and this Court lacks subject matter jurisdiction over Count I under the FSIA.

---

[15] Attached as Exhibit C.

[16] Attached as Exhibit D.

[17] Authority over surface transportation matters in Canada is ordinarily, by virtue of the *Constitution Act, 1867*, a matter of shared jurisdiction between the legislatures of the province and Parliament (i.e. federal). But, pursuant to paragraph 92(10)(c) of the *Constitution Act, 1867*, Parliament has the authority to declare a matter "for the general advantage of Canada," thereby bringing that matter within the *exclusive* legislative authority of Parliament. In other words, Parliament's use of the phrase in the IBTA demonstrates that international bridge projects like the one proposed here are of paramount federal concern to Canada.

**B.    The Court lacks jurisdiction over the remaining Counts II through VI because they are based on regulatory and legislative acts, which are clearly sovereign and not commercial in nature.**

Counts II through VI suffer the same fate as Count I, for reasons so obvious little discussion is necessary.  Count II is based on Canada's "rapid [regulatory] approval of the DRIC Bridge" and Canada's regulatory delays and denials of approval that prevent improvements to the Ambassador Bridge.  (Compl. ¶ 157.)  Count III states that "Canada has violated DIBC's and CTC's rights under the U.S. and Canadian legislation constituting the Special Agreement and the Boundary Waters Treaty [U.S.–U.K., Jan. 11, 1909, 36 Stat. 2448 (hereafter the "Treaty")],[18] by *enacting* and seeking to apply the IBTA so as to limit rights that DIBC and CTC enjoy by the terms of the Special Agreement . . . ."  (*Id.* ¶ 162 (emphasis added).)  Count IV is based on Canada's alleged failure to exercise its sovereign authority to bar the City of Windsor, Ontario, from *enacting* by-laws that restrict the demolition of structures.  (*Id.* ¶ 165 (emphasis added).)  Count V is based on the exact same activity as Counts I through IV but asserts a different legal theory based on breach of contract.  (*Id.* ¶ 171.)  And finally, Count VI alleges that "Canada's actions in *enacting* the IBTA and *seeking to apply* it to DIBC and CTC violate the 1990 Settlement Agreement."  (*Id.* ¶ 178 (emphasis added).)

These claims are not based on commercial activity.  The streamlining of regulatory processes and alleged delaying of regulatory processes is not a commercial act, nor is the sovereign enactment and enforcement of statutes or bylaws.  Promulgation and management of regulatory processes is a paradigm of sovereign action, not of private parties engaged in commerce.  *See O'Bryan*, 556 F.3d at 380 (holding that the Holy See's promulgation of a policy, and failure to act in accordance with that policy, was not a commercial activity because it was not the type of action taken by a private party engaging in commerce).  The enactment and application

---

[18] Attached as Exhibit E.

of laws, state-wide or local, is likewise a quintessentially sovereign act. *See Grendel's Den, Inc. v. Goodwin*, 662 F.2d 88, 92–93 (1st Cir. 1981) (collecting cases discussing the nondelegation doctrine and the associated first principle that only a sovereign has the authority to enact laws). And only a sovereign has the authoritative control necessary even to be accused of "permitting" a local government to enact a law.  Market participants acting in commerce do not, and cannot, promulgate or control regulatory processes or engage in lawmaking.  Thus, Counts II, III, IV, and VI all fall outside of this Court's narrow jurisdiction under the FSIA.  And Count V fails for all the reasons that Counts I through IV do, as it is based entirely on the same non-commercial activity.

**C.    Plaintiffs' claims do not establish a sufficient nexus to the United States.**

Plaintiffs not only fail to allege "commercial activity" as the basis for their claims, they also fail to allege a sufficient nexus with the United States.

Plaintiffs bear the double burden under the commercial-activities exception to the FSIA to show not only that the Government of Canada engaged in commercial acts, which it did not, but also that the alleged commercial activities caused "something legally significant" giving rise to the claim to occur in the United States. *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1515 (D.C. Cir. 1988).  For instance, a legally significant event might be a bank's refusal to pay on a letter of credit, a transfer of money, or the incurrence of a debt obligation. *Id*.  Financial harm felt in the United States, by contrast, is not enough to establish jurisdiction. *Id*.  Further-more, if the nexus is based on an alleged direct effect in the U.S., that effect must be not only non-trivial but also "follow[] as an immediate consequence of the defendant's activit[ies]" without any intervening element. *Weltover*, 504 U.S. at 617–18.  Plaintiffs have devoted an entire section of their complaint to the nexus issue (Compl. ¶¶ 134–141), but they have nonetheless failed to allege a sufficient nexus under the FSIA.

13

Plaintiffs first allege that "Canada's commercial activity in the United States in connec-tion with the subject matter of this action includes (a) the planned construction, and preparation for construction, of the DRIC Bridge . . . and (b) meetings with FHWA and others and other preparatory activities that have taken place in the United States in connection with the planned construction and operation of the DRIC Bridge."  But these activities, even if they were com-mercial (which they are not),[19] would not establish jurisdiction because they are not the basis for Plaintiffs' claims.  Plaintiffs are not entitled to relief just because the governments of Canada and the United States had some meetings in the United States.  *See Nelson*, 507 U.S. at 357.

Plaintiffs next allege that "Canada's acts within Canada in connection with the commer-cial activity of constructing and operating the DRIC Bridge have direct effects in the United States." (Compl. ¶ 140.)  The first effect, according to Plaintiffs, is "the planned construction of the DRIC Bridge connecting directly to the territory of the United States." (*Id.*)  Again, this is an entirely governmental act.  Moreover, construction planning, again, is not the basis for Plaintiffs' claim; so it is also not a basis for jurisdiction.

The second purported effect is "the prevention of construction of the Ambassador Bridge New Span, connecting to the United States."  Plaintiffs do not identify what specific act causes this effect, but presumably it is Canada's alleged denials and delays of regulatory approval and its local government's bylaws preventing demolition.  As discussed above, those acts are not commercial activity, and they all indisputably occurred strictly within Canadian territory.

The last effect alleged by Plaintiffs is the "resulting actions by FHWA and others in the United States to facilitate the planning and construction of the DRIC bridge, or to prevent the construction of the Ambassador Bridge New Span, in concert with or at the instance of Canada."

---

[19] "When two governments deal directly with each other *as governments,* even when the subject matter may relate to the commercial activities of its citizens or governmental entities . . . those dealings are not akin to that of participants in a marketplace." *Cicippio v. Islamic Republic of Iran,* 30 F.3d 164, 168 (D.C. Cir. 1994).

These actions of the FHWA and others are not the immediate consequence of any act of Canada, but instead are an immediate consequence of the U.S. agencies' own domestic and foreign policy decisions.  *See Weltover*, 504 U.S. at 617.  This is not a direct effect.

Finally, Plaintiffs allege that anything Canada does "affecting traffic or construction at the Canadian end of the Ambassador Bridge or the proposed DRIC Bridge will necessarily have a direct effect on the United States" side of the bridge.  (Compl. ¶ 141.)  But Plaintiffs fail to identify a specific, legally significant occurrence in the U.S. giving rise to a claim.  Even if, *arguendo*, Plaintiffs suffered economic harm as a consequence of these sovereign acts under-taken within Canada , that would not constitute a "direct effect" in the United States sufficient to invoke the commercial activities exception to sovereign immunity.   "A financial loss in the United States, when all the acts giving rise to the claim occurred outside this country, is insuffic-ient to show the 'direct effect' in the United States that FSIA requires."  *BPA Int'l, Inc. v. King-dom of Sweden*, 281 F. Supp. 2d 73, 81 (D.D.C. 2003) (Collyer, J.) (citing *Ge v. Peng*, 201 F. Supp. 2d 14, 24–25 (D.D.C. 2000); *Gregorian v. Izvestia*, 871 F.2d 1515, 1527 (9th Cir. 1989)).

In sum, Plaintiffs have failed to allege a factual basis for their claims that would establish subject-matter jurisdiction under the commercial-activities exception to the FSIA.  Plaintiffs' claims are based on Canada's sovereign acts of (1) locating a new international trade and transportation route from and into Canada near the Ambassador Bridge, (2) regulating construction in Canada of Plaintiffs' proposed second span, and (3) regulating the operation and ownership of the Canadian half of the Ambassador Bridge.   These acts are not commercial, nor do they have a sufficient nexus to the United States for jurisdiction to lie in this Court.

## II.     Plaintiffs' complaint fails to state a claim against Canada on which relief may be granted.

Canada should be dismissed from this lawsuit not only because it is immune, but also because Plaintiffs have failed to state a claim against Canada on which relief may be granted. First, the "act of state" doctrine—a rule of decision which holds that U.S. courts will not place U.S. diplomatic relations in danger by litigating foreign sovereign acts—dictates that Canada automatically prevails on all of Plaintiffs' claims.  Second, Plaintiffs' first five claims lack legal merit on their face, because they are all based on international treaties or U.S. or Canadian statutes that afford no right of action to private litigants.  Hence, all claims against Canada should be dismissed under Federal Rule of Civil Procedure 12(b)(6).

### A.     Plaintiffs' claims should be dismissed because they are not justiciable under the act-of-state doctrine.

In addition to Canada's immunity under the FSIA, Plaintiffs' claims should also be dismissed on the separate ground of the act-of-state doctrine.

The act-of-state doctrine is a longstanding doctrine of prudential justiciability that bars "inquiry into the legality, validity, and propriety of the acts and motivation of foreign sovereigns acting in their governmental roles within their own boundaries."  *Braka v. Bancomer, S.N.C.*, 762 F.2d 222, 225 (2d Cir. 1985) (quoting *Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371, 1380 (5th Cir. 1980)).  Accordingly, the act-of-state doctrine requires that "the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid."  *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 409 (1990).  All of Plaintiffs' claims impermissibly challenge the legality and validity of the Canadian government's legislative, administrative, and executive acts within its own territory.  Because these acts of state are deemed valid and legal under the act-of-state doctrine, Plaintiffs claims should be dismissed.

### 1.    Overview of the act-of-state doctrine

The act-of-state doctrine is based on principles similar to those underlying the immu-

nity doctrine discussed above, but it is broader in its scope and operation.  Like the immunity

doctrine, the act-of-state doctrine was created "to effectuate general notions of comity among

nations and among the respective branches of the Federal Government."  *First Nat'l City Bank v.*

*Banco Nacional de Cuba*, 406 U.S. 759, 762 (1972).  Rather than being jurisdictional, it "is a

judicially accepted limitation on the normal adjudicative processes of the courts, springing from

the thoroughly sound principle that on occasion individual litigants may have to forgo decision

on the merits of their claims because the involvement of the courts in such a decision might

frustrate the conduct of the Nation's foreign policy."  *Id.* at 769.  To avoid international embar-

rassment and interference with the President's constitutional role of resolving political conflicts

and setting foreign policy, "[t]he doctrine precludes any review whatever of the acts of the gov-

ernment of [another] sovereign State done within its own territory."  *Id.* at 763.

But unlike the immunity doctrine, the act-of-state doctrine looks beyond the basis of the

underlying claims.  "[E]ven if the suit is not based specifically on a sovereign act, [this court

must] nevertheless decline to decide the merits of the case if in doing so [it] would need to judge

the validity of the public acts of a sovereign state performed within its own territory."  *Callejo v.*

*Bancomer, S.A.*, 764 F.2d 1101, 1113 (5th Cir. 1985).  The act-of-state doctrine also does not

recognize a "commercial activities" exception.[20]

---

[20] *See, e.g.*, *Glen v. Club Mediterranée, S.A.*, 450 F.3d 1251, 1254 n.2 (11th Cir. 2006) (re-
affirming that "there is no commercial exception to the act of state doctrine") (quoting *Honduras
Aircraft Registry, Ltd. v. Gov't of Hond.*,
129 F.3d 543, 550 (11th Cir. 1997) (reversing the district court for erroneously relying on a
"perceived commercial exception to the act of state doctrine")); *Int'l Ass'n of Machinists &
Aerospace Workers, (IAM) v. Organization of Petroleum Exporting Countries (OPEC)*, 649 F.2d
1354, 1360 (9th Cir. 1981) ("Because the act of state doctrine and the doctrine of sovereign
immunity address different concerns and apply in different circumstances, we find that the act of
state doctrine remains available when such caution is appropriate, regardless of any commercial

Rather, the key question is whether adjudicating the claims will intrude on the nation's exercise of its sovereign prerogatives. *See World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1165 (D.C. Cir. 2002) (holding that the issuance of licenses to remove uranium was a sovereign act because regulating imports and exports is a sovereign prerogative). As explained below, Plaintiffs' claims attempt to do exactly that. Accordingly, they must be dismissed.

> 2. *Plaintiffs' claims directly challenge the Canadian government's acts of state within its own borders and therefore fail to state a claim as a matter of law under the act-of-state doctrine.*

All of Plaintiffs' claims challenge Canada's acts of state within its own borders. An act of state is simply defined: "if the acts are those of a foreign sovereign—including acts of officials purportedly operating in their official capacity—then the act of state doctrine applies." *Republic of Philippines v. Marcos*, 806 F.2d 344, 358–59 (2d Cir. 1986). When a sovereign is performing its "governmental role," *Braka*, 762 F.2d at 225, exercising its sovereign prerogatives, *World Wide Minerals, Ltd.*, 296 F.3d at 1165, performing its executive, administrative, or legislative functions, *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 446 n.3 (1964) (White, J., dissenting), or exercising its "governmental authority," *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897), it is acting in its capacity as sovereign and its acts are deemed valid.

In Count I, Plaintiffs allege that "[t]he acts of Canada and FHWA to construct DRIC Bridge across the Detroit River within two miles of the Ambassador Bridge, without legitimate need, and for the purpose of destroying the economic value of DIBC's and CTC's rights, is [*sic*] a violation of DIBC's and CTC's rights." (Compl. ¶ 153.) This claim attacks the acts of "the foreign sovereign itself," not a public official or a nationalized business where the governmental role arguably may be questionable. Specifically, this claim is a direct attack on Canada's acts to

component of the activity involved."). While such exceptions have been considered, no circuit court and no majority of the U.S. Supreme Court has ever adopted such an exception.

improve its transportation infrastructure by adding an additional international-border crossing, and its selection of a location within the vicinity of the Ambassador Bridge for that crossing.

It is Canada's sovereign prerogative to decide where and under what conditions a bridge will be constructed on Canadian soil. The Governor in Council[21] has ultimate authority to approve construction of an international bridge crossing in Canada, and "[n]o person shall construct or alter an international bridge or tunnel without the approval of the Governor in Council." *See, e.g.*, IBTA § 6. Such decisions are manifestly matters of State and federal prerogative. *See, e.g.*, *City of S. Pasadena v. Goldschmidt*, 637 F.2d 677, 679 (9th Cir. 1981) (recognizing "the sovereign rights of States to determine which [transportation] projects shall be federally financed" and their "authority to select, adopt and determine the location for state highways and to alter or change such locations").

Taking into account the public interests involved, as some courts have,[22] it becomes even more apparent that the bases of Plaintiffs' claims are Canadian acts of state. Indeed, the highest order of sovereign prerogatives are at issue here. Canada's Parliament itself has expressly stated that the construction of an international bridge is a matter of public interest for Canada. In the original CTC Act and in the IBTA which superseded it, Parliament declared that "International bridges and tunnels are declared to be works for the general advantage of Canada." IBTA § 5; *accord* CTC Act § 2. Such works serve the Canadian public, not private, interests, and "[a]n

---

[21] In Canada, the Governor in Council is the Governor General acting on the advice of the federal cabinet. In other words, matters involving the Governor in Council are essentially cabinet-level decisions.

[22] In *Republic of Philippines v. Marcos*, the Ninth Circuit made clear that it did not advocate questioning a sovereign's expressed motives: "That one of the motives behind a particular governmental act may have been selfish, or that it was intended to serve otherwise improper ends, does not make that act any less a pronouncement of the sovereign or render it any less entitled to respect as such from other government." 818 F.2d 1473, 1485 (9th Cir. 1987). Rather, it should simply be understood as indicating that considering the public interests at stake may help in discerning whether the governmental role is being performed.

official pronouncement by a foreign government describing a certain act as governmental is ordinarily conclusive evidence of its official character." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 443 cmt. i (1986).[23]

While Plaintiffs question the authenticity of Canada's motives, the act-of-state doctrine bars such "inquiry into the . . . motivation of foreign sovereigns acting in their governmental roles within their own boundaries." *Braka*, 762 F.2d at 225 (quoting *Arango*, 621 F.2d at 1380). As the Ninth Circuit explained in *Republic of Philippines v. Marcos*:

> *Such inquiries by this court into the authenticity and motivation of the acts of foreign sovereigns would be the very sources of diplomatic friction and complication that the act of state doctrine aims to avert.* . . . . It would greatly weaken the act of state doctrine if parties could put in question the validity of official government acts simply by attacking the motives of the government officials who undertake them.

818 F.2d 1473, 1485 (9th Cir. 1987) (emphasis added).  It makes no difference *why* Canada decides to authorize and support construction of the DRIC Bridge.  "[I]f the acts are those of a foreign sovereign"—and in these claims they unquestionably are—"then the act of state doctrine applies," *Marcos*, 806 F.2d at 358–59 (2d Cir. 1986).

But even if Plaintiffs' allegations of motive were considered, the motives that Plaintiffs have attributed to Canada serve only to demonstrate that Plaintiffs are challenging an act of state within Canada's own borders.  Plaintiffs claim that Canada is motivated by a desire to "take for itself the Canadian half of the Ambassador Bridge and the profitable toll-collection rights that go with it." (Compl. ¶ 3.)  This is not true, but the claim is legally irrelevant in any event, because it would actually be Canada's sovereign prerogative to act for such purpose.  A government's use

---

[23] To question the validity of that legislative pronouncement would itself violate the act-of-state doctrine.  *Cf. Abourezk v. Reagan*, 785 F.2d 1043, 1070 n.4 (D.C. Cir. 1986) ("Under the Act of State doctrine, we might well be precluded from reaching a decision contrary to the assertions contained in [foreign government] affidavits . . . .  A United States court ought not lightly undertake a role in which it must issue a public pronouncement that either the United States or a foreign government is untruthful about an issue of intergovernmental relations.").

of its sovereign power to take over and then engage in what was previously a private commercial enterprise is a "paradigmatic setting for the act of state doctrine." *Dayton v. Czechoslovak Socialist Republic*, 834 F.2d 203, 206 (D.C. Cir. 1987).  In *Dayton*, the plaintiffs claimed they were "entitled to compensation for the nationalization of textile production plants in Czechoslovakia once owned by them or their predecessors-in-interest." *Id.* at 204.  The D.C. Circuit held that, even if the claim fell under an FSIA exception, the act-of-state doctrine barred the plaintiffs' claims because they invited "examination of the validity of a taking by a foreign state." *Id.* at 206.  Plaintiffs' claims, like the claims in *Dayton*, ask this Court to examine the validity of an act of state.  Accordingly, Plaintiffs' claims, like the claims in *Dayton*, should be dismissed.

The same is true of Counts II, III, IV, and VI.  In those counts, Plaintiffs challenge Canada's process for granting regulatory approval to the DRIC Bridge, its denial or delay of regulatory approval for the Ambassador Bridge's New Span, its legislative decision to enact the International Bridges and Tunnels Act, and its "encouraging and permitting" the City of Windsor, Ontario, to enact bylaws restricting demolition of certain structures within the City. (Compl. ¶ 165.)

The legislative and regulatory decisions challenged in these claims unquestionably involve the exercise of legislative and administrative functions unique to the sovereign.  It is black-letter law that "[t]he act of state doctrine applies to acts such as . . . statutes, decrees and proclamations."  RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 443 cmt. i (1986).  There is no act more uniquely sovereign than the enactment and implementation of laws and regulations.  *World Wide Minerals*, 296 F.3d at 1165 (holding Kazakhstan's denial of an export license to be an act of state); *see Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 695 (1976) (opinion of White, J.) (noting there was no evidence of an act of

state such as a "statute, decree, order, or resolution").  These legislative and regulatory decisions reflect the Canadian government again exercising its sovereign prerogative to establish and control use and operation of transportation routes within its own territory.  These are acts of state.

Finally, Count V must also be dismissed.  It simply advances a different legal theory (breach of contract) for why the acts of state challenged in the first four claims are supposedly illegal.  The claim should be dismissed because it is based on an act of state.

### 3.   *Adjudication of Plaintiffs' claims would be a serious insult to the sovereign dignity of Canada and embarrass the Executive Branch of the United States in its conduct of foreign relations with Canada.*

It is apparent from the very nature of this action that adjudicating Plaintiffs' claims would seriously interfere with the U.S. Executive Branch's extensive foreign diplomacy and negotiations with Canada regarding their border generally and specifically with regard to the DRIC project.  Plaintiffs themselves have admitted to this Court that discussion at the highest levels of the Executive Branch were necessary to reach an agreement on the international border crossing. (Pls.' Resp. Opp'n Mot. Transfer Venue at 4–6, Dkt. No. 17, *Latin Ams. for Soc. & Econ. Dev. v. Adm'r of the Fed. Highway Admin*, No. 1:09-CV-897 (D.D.C.).)[24]  The international agreement started as a bi-national partnership studying the transportation needs of both nations, which concluded with selection of DRIC as the joint solution to the national interests of enhancing national security and increasing capacity for international commerce.  (Compl. ¶¶ 82–84.)  For the judiciary of the United States to now step in and question the validity of Canada's choice to implement

---

[24] Attached as Exhibit F.  In that filing, Plaintiff DIBC describes the DRIC as the "product of a cooperative bi-national partnership between the United States and Canada" provoking "involvement by the absolute highest levels of government on both sides of the border," namely the President of the United States and the Canadian Prime Minister and the subsequent "high-level government communication and agreement that was obviously necessary to the implementation of [this sort of] international project."

this bi-national decision within its own borders would be an embarrassment to the U.S. Executive Branch in the conduct of its foreign relations with Canada.

Even worse, were this Court to adjudicate Plaintiffs' claims, it would find itself sitting in judgment on Canadian governmental decisions concerning the location, routing, and ownership of Canada's own transportation infrastructure, not to mention the validity of its laws and its regulatory decisions. Granting Plaintiffs the relief they request would mean dictating to the Canadian government where and under what conditions it may and may not establish a trade and transportation route across its own borders. This is precisely the sort of intrusion on a foreign sovereign's internal affairs that the Supreme Court has warned "would very certainly 'imperil the amicable relations between governments and vex the peace of nations.'" *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 304 (1918), *quoted in Callejo*, 764 F.2d at 1114. In sum, adjudication of Plaintiffs' claims by a U.S. court would be an affront to Canada's dignity as a co-equal sovereign and an intrusion on its governance of its own national affairs, and would seriously threaten the lengthy and congenial cooperation with the United States on this bi-national project.

**B.     Plaintiffs fail to state a claim for violation of the Treaty or of the Ambassador Bridge acts.**

The above doctrines require dismissal of all of Plaintiffs' claims, regardless of their merit. But even a cursory look at Counts I through V reveals that they have no legal merit and should be dismissed as a matter of law in any event pursuant to Federal Rule of Civil Procedure 12(b)(6).

Each of Counts I through IV is based on a "Violation of Treaty and Statute." (Compl. ¶¶ 147–66.) In other words, for these claims to survive, Plaintiffs must demonstrate a valid claim under the Treaty, DIB Act, and/or CTC Act. Count V is based solely on alleged breach of the "Special Agreement," Plaintiffs' shorthand for the DIB Act and the CTC Act. (*Id.* 167–72.) Similarly, for this claim to survive, Plaintiffs must demonstrate a valid claim under the

23

DIBC Act and/or CTC Act.  But the Treaty, DIBC Act, and CTC Act do not provide the neces-

sary substantive foundation for Plaintiffs' first five claims to state a cognizable claim.

1.     *The Treaty cannot be a basis for Counts I through IV.*

The Boundary Waters Treaty is an insufficient basis to support Counts I through IV for

two fundamental reasons.  First, neither the Treaty nor any "treaty" allegedly formed by the

passage of legislation offers Plaintiffs a private right of action.  "International agreements, even

those directly benefiting private persons, generally do not create private rights or provide for a

private cause of action in domestic courts." *McKesson Corp. v. Islamic Republic of Iran*, 539

F.3d 485, 489 (D.C. Cir. 2008) (citing *Medellín v. Texas*, 552 U.S. 491, 506 n.3 (2008)).  Thus,

courts presume that treaties do not create privately enforceable rights in the absence of express

language establishing such rights.  *Medellín,* 552 U.S. at 506 n.3 (citations omitted).  Here, even

cursory review of the Treaty reveals that there is no express or even implied language suggesting

that Canada and the United States have created a private cause of action that citizens of either

country can file against Canada in the U.S. courts.  Indeed, throughout its more than 100-year

history, there is not one reported case where a private cause of action has been brought under it.

Second, even an international agreement that expressly provides for a private right of

action may not serve as a ground for jurisdiction by a U.S. court over a foreign sovereign unless

there is an express waiver of sovereign immunity under FSIA § 1605(a)(1).  *E.g.*, *Argentine*

*Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434–35 (1989) ("the FSIA [is] the sole

basis for obtaining jurisdiction over a foreign state in our courts"); *Haven v. Rzeczpospolita*

*Polska*, 215 F.3d 727, 733–34 (7th Cir. 2000) (treaty between U.S. and Poland did not waive

Poland's sovereign immunity against suit where the treaty did not mention sovereign immunity

nor the availability of a cause of action in U.S. courts).  The Treaty contains no such waiver.

### 2. *The DIBC Act cannot be a basis for Counts I through V.*

The DIBC Act can also be eliminated as a basis for Counts I-V, because it too offers no private right of action against Canada.  "[P]rivate rights of action to enforce federal law must be created by Congress" and "display[] an intent to create not just a private right but also a private remedy." *Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001).  Without Congressional intent to create a private remedy, "a cause of action does not exist and the court may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id.* (numerous citations omitted).  "Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals." *Id.* at 287 (quotation omitted).

The DIBC Act is a U.S. statute that grants DIBC the "consent of Congress . . . to construct, maintain and operate a bridge" and nothing more.  Act of Mar. 4, 1921, 66th Cong., ch. 167, 41 Stat. 1439.  There is no indication of any Congressional intent to create private rights for Plaintiffs or anyone else, much less a private remedy that would give Plaintiffs the right to sue Canada.  Accordingly, the DIBC Act also does not apply here and cannot form a substantive basis for Counts I through V.

### 3. *The CTC Act cannot be a basis for Counts I through V.*

Plaintiffs also fail to state a claim with respect to the CTC Act.  Plaintiffs' claims all depend upon the validity of their assertion that the CTC Act gives CTC the right to *profitably* "operate and maintain, and set and collect tolls on, the Ambassador Bridge *in perpetuity*, including the right to construct a new span to replace an older span."  (Compl. ¶¶ 42, 46, 151–52.)  But the CTC Act, which must be strictly construed, *Multiform Mfg. Co. v. Her Majesty the Queen*, [1990] 2 S.C.R. 425 (Can.) ("When the words used in a statute are clear and unambiguous, no further step is needed to identify the intention of Parliament."), does not say that.  By its

plain language, the CTC Act authorizes CTC only to "maintain and operate a railway and general traffic bridge across the Detroit River" and "charge tolls." The Act offers no rights in perpetuity, no right to profit, and no right to construct a new span. *See* CTC Act § 8(a), (d), (i).

Accordingly, Plaintiffs' claims based on the CTC Act necessarily fail. Count I—Plaintiffs' claim that constructing the DRIC Bridge destroys the profitability of Plaintiffs' rights (Compl. ¶ 153)—fails because the CTC Act grants no right to profit from operating the bridge, much less the right to a noncompetition agreement in perpetuity.

Likewise, Count II—that rapid approval for DRIC Bridge, and alleged delay or denial of regulatory approval for improvements to the Ambassador Bridge, violates Plaintiffs' rights (Compl. ¶ 157)—also fails because (a) construction of the DRIC Bridge does not violate the CTC Act, as just mentioned, and (b) the CTC Act's grant of a right to construct expired decades ago. The original CTC Act provided only that:

> [T]he said bridge shall be commenced within two years after the Governor in Council and the Executive of the United States, or other competent authority therein, have approved of such bridging, and shall be completed within seven years after such commencement, otherwise the powers granted by this Act shall cease and be null and void as respects so much of the undertaking as then remains uncompleted.

CTC Act § 17. The "said bridge" refers to "the bridge, approaches, lands, works and facilities" authorized under the Act. CTC Act § 19. The CTC was granted up to seven years to construct the Ambassador Bridge once construction commenced. Construction necessarily commenced well before November 11, 1929, when the bridge allegedly opened for traffic. (Compl. ¶ 45.) Consequently, those seven years for construction expired a very long time ago. Plaintiffs' interpretation that the CTC Act continues to authorize construction of a new bridge or improved approaches today is contrary to this express language.[25]

---

[25] Plaintiffs argue that because no bridge can last forever, their authorization to maintain the Ambassador Bridge "necessarily includes the right to build a replacement span as needed."

Count III—that the IBTA somehow alters Plaintiffs' rights under the CTC Act to set and collect tolls, transfer their property, change their corporate ownership, or perform necessary and appropriate maintenance on the bridge (Compl. ¶ 162)—fails as well.  First, nothing in the CTC Act suggests a grant of perpetual, unchanging rights.  The authorization was always specifically subject to "such regulations as the Governor in Council prescribes."  CTC Act § 11.  Moreover, the right to set tolls was subject to approval by the Board of Railway Commissioners for Canada, "which Board may revise the same from time to time."  CTC Act § 13.  The Act clearly does not grant Plaintiffs a right to set tolls at their discretion.

Further, accepting the reality that the CTC Act is just another statute, this claim lacks merit.  The IBTA expressly states that "[i]n the event of any inconsistency or conflict between this Act or any regulations made under it and any Act listed in the schedule, this Act and the regulations prevail to the extent of the inconsistency or conflict."  IBTA § 4(1).  Schedule 4 lists the CTC Act as one of the superseded acts.  IBTA, Schedule 4(34).  Do Plaintiffs really believe that one session of Canada's Parliament can create permanent law, binding every successive session in perpetuity, and taking away the right to repeal or modify legislation in the future?  There is no authority for such a notion.  Certainly there is no authority for a U.S. court, at the request of a Canadian corporation, to tell Canada that such is the case.

Count IV—that the bylaws of the City of Windsor impeding construction of a bridge violate their right to construct the New Span—fails for the same reason as Count II:  the CTC Act grants no right to construct a New Span.

---

(Compl. ¶ 68.)  It would be an understatement to say that this interpretation of parliamentary intent stretches the imagination.  More important, it is contrary to the statute's plain language.  The CTC Act authorized CTC to "construct, maintain and operate" the Ambassador Bridge.  To interpret the word "maintain" to include "construct" would make the statute's use of the word construct redundant and pure surplusage.  *See Multiform Mfg. Co. v. Her Majesty the Queen*, [1990] 2 S.C.R. 425 (Can.) (setting out a textualist interpretive technique intended to avoid interpretations that ignore plain and unambiguous legislative language).  That would not be a reasonable interpretation of the CTC Act.

Finally, Plaintiffs' Count V—that the conduct alleged in the first four claims constitutes a breach of contract—fails for all the reasons given above because it is the same claim under a different legal theory.  It also fails because the CTC Act is not a contract; it is merely a legislative grant of limited authority.

## CONCLUSION

Plaintiffs have filed a complaint against a foreign government, alleging harm based on fundamentally sovereign executive, legislative, and regulatory acts.  Such claims present a paradigm case for dismissal under the Foreign Sovereign Immunity Act and the act-of-state doctrine.  In addition, the Treaty and legislative acts that form the basis of Plaintiffs' counts against Canada do not provide a private cause of action nor even the purported "rights" that Plaintiffs allege.  For all of these reasons, Counts I through VI against Her Majesty the Queen in Right of Canada should be dismissed with prejudice.

Dated:  July 6, 2010

/s/ Sarah C. Lindsey
Sarah C. Lindsey (Bar ID 463850)
Eugene E. Smary (*pro hac vice*)
John J. Bursch (*pro hac vice*)
Warner Norcross & Judd LLP
2000 Town Center, Suite 2700
Southfield, Michigan 48075-1318
248.784.5147
fax:  248-603-9747
slindsey@wnj.com

Attorneys for Her Majesty the Queen in Right of Canada

1788053