```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF COLUMBIA

DETROIT INTERNATIONAL      .  Case No. 1:10-CV-00476
                           .  (RMC)
BRIDGE COMPANY,            .
                           .  Washington, D.C.
          Plaintiff,       .  July 17, 2012
                           .
     v.                    .
                           .
THE GOVERNMENT OF CANADA,  .
                           .
          Defendant.       .
. . . . . . . . . . . . . .

                  STATUS CONFERENCE
       BEFORE THE HONORABLE ROSEMARY M. COLLYER
          UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:     Debevoise & Plimpton, LLP
                       By:  CARL MICARELLI, ESQ.
                            PATRICK MORAN, ESQ.
                       919 Third Avenue
                       New York, NY 10022

For the Defendants:    U.S. Department of Justice
                       ENRD
                       By:  MARISSA A. PIROPATO, AUSA
                       P.O. Box 7611
                       Washington, DC 20044-7611
```

_____

                  BOWLES REPORTING SERVICE
                       P.O. BOX 607
              GALES FERRY, CONNECTICUT 06335
                      (860) 464-1083

```
 1         (Proceedings commenced at 2:15 p.m.)
 2             THE CLERK:  Civil Action 10-476, Detroit
 3   International Bridge Company v. Government of Canada,
 4   et al..
 5             For the Plaintiffs, Carl Micarelli and
 6   Patrick Moran.
 7             For the Defense, Marissa Piropato.
 8             THE COURT:  All right everybody, I have my
 9   little fancy speaker thing here.
10             Now, I first have to apologize to you for
11   running late.  I had a sentencing before lunch that ran
12   very late, and so I ran to lunch late, and so I got
13   back late and I should've eaten faster, and I apologize
14   to you.
15             Okay, where are we?  Did the techies talk?
16   Did you resubmit?  Has the Historic Society, or
17   whatever, said okay?  Where are we?
18             This sounds like the Perils of Pauline.
19        (Laughter.)
20             THE COURT:  Go ahead, sir.
21             MR. MICARELLI:  Your Honor, we resubmitted.
22             There has been some talk between the techies,
23   and more importantly, I understand there's a talk this
24   morning between the two sides, at which they made
25   substantial progress.  I have just learned about that
```

1  now, so I think what makes more sense, if it makes
2  sense to Your Honor, is to let Mr. Moran get up, who
3  has been here -- who was at the talks this morning and
4  will -- he'll let you know where things stand.
5              THE COURT:  That makes sense to me.
6              I would note what you all seem to recognize,
7  is that we don't have a court reporter, so if you want
8  to be heard you have to actually come to the
9  microphone, but more importantly, if you want a record,
10 you have to come to the microphone.
11             Go ahead, sir.
12             MR. MORAN:  Thank you, Your Honor.
13             THE COURT:  You're welcome.
14             MR. MORAN:  We did make substantial progress
15 today, and let me put it in context for just a moment.
16             As the Court knows, in 2007, DIBC engaged air
17 quality experts to do air quality testing for this
18 project, and it was approved that -- test results were
19 approved by the EPA and endorsed by Coast Guard, as the
20 lead agency for this environmental assessment that DIBC
21 and Coast Guard share together.
22             A question was raised after that acceptance
23 and after the draft FONSI was signed concerning whether
24 or not the Bridge Plaza in the U.S. had been built in
25 accordance with the plans; that is, in accordance with

1  the layout that was the projected layout for which the
2  environmental air quality methodology was followed.
3  The EPA raised that issue in 2009.
4              So DIBC met with EPA Region 5 headquarters
5  and asked what hot spots -- what they might want done
6  as a follow up.  They  described some hot spots to us
7  as one of two options.  The options were either do the
8  hot spots or wait until the litigation that dealt with
9  the construction of the plaza ironed itself out.
10             Well, we elected Door Number 1 and we redid
11 the analysis with the hot spots, and we conveyed that
12 to EPA and the Coast Guard.  Upon receipt, EPA decided
13 not to review it and just sat on it.
14             So, during the course of --
15             THE COURT:  So they decided to wait and see
16 what happened in the litigation.
17             MR. MORAN:  I beg your pardon?
18             THE COURT:  So the EPA decided to wait and
19 see what happened to the litigation.
20             MR. MORAN:  Apparently so.  After giving us
21 the two options, they chose their other option but
22 didn't tell us.
23             THE COURT:  Well, there are always --
24             MR. MORAN:  Well, the litigation --
25             THE COURT:  You know, there's a left hand and

```
 1  a right hand, and my other right hand.
 2         (Laughter.)
 3            MR. MORAN:  Well put.
 4            To move this thing along, well, we met with
 5  EPA and decided that we would refresh the 2007 report,
 6  as this Court had suggested we do, and we've completed
 7  that.
 8            Now, all three of those environmental air
 9  quality studies were done under a program called
10  "Mobile 6.2."  That is the air quality study that's
11  currently in force and, in fact, as the air quality
12  study protocol that was used to approve the dric
13  bridge.
14            Now, after we turned in our materials last
15  week, EPA has reported to Coast Guard and Coast Guard
16  to us, that EPA hasn't had sufficient time to review
17  those materials, but they're doing so, but EPA
18  mentioned to Coast Guard, "Well, we think" they should
19  have -- "that DIBC should have submitted air quality
20  analysis under a new protocol which doesn't take
21  mandatory effect until December 30th -- December 20th
22  of this year, called MOVES, M-O-V-E-S.
23            We attempted -- Instead of coming back to the
24  Court, we attempted to comply with that, but we find
25  that the baseline material for MOVES is not available
```

```
 1  to us.
 2            Now, our own study material is available, but
 3  what we compare it to in the baseline and the protocol
 4  itself are not available to us, and would delay us
 5  another two months, at best.
 6            So, we met with the Coast Guard today and
 7  essentially asked, after our discussions, could the
 8  Coast Guard at least be agnostic as to whether we use
 9  Mobile 6.2 as was used three times before and by the
10  dric, and go with us with the EPA and see if the EPA
11  won't agree that since the law provides that Mobil 6.2
12  is the standard until the end of the year, and since
13  it's been used so many times, and since this was a
14  refreshment of what was done, that we're all right,
15  because --
16            THE COURT:  Yes, since they're ultra vires.
17            MR. MORAN:  Yes, and whether they're ultra
18  vires.  Thank you.
19            Now, --
20            THE COURT:  Since it has no force and effect
21  of law.
22            MR. MORAN:  That's correct.
23            THE COURT:  I'm sorry.  I was just adding to
24  the weight of the argument.
25            MR. MORAN:  Yes.  My arguments always need
```

1  assistance and I'm glad to have it from the Court.
2              THE COURT: I don't know, but anyway, you can
3  always quote me.
4         (Laughter.)
5              MR. MORAN: Thank you, Your Honor.
6              So just in passing --
7              THE COURT: It isn't like I've heard -- I
8  haven't heard from the EPA, so they clearly have a very
9  sound response.
10             MR. MORAN: Right. Right.
11             Well, so at the end of the day the report
12 card is our 2012 report is a refreshment of what was
13 done in '07, and what was done in '07 was accepted by
14 EPA and endorsed by Coast Guard, and in all of the
15 studies that we've done, all three studies, the air
16 impact doesn't even come close to violation of any
17 standard. So we're quite confident that we should have
18 no problem.
19             That's the background of what I wanted to
20 talk about on the air quality, and then I'm going to
21 describe what I believe was our agreement, and Ms.
22 Piropato will advise me if I'm incorrect.
23             We're going to have -- set up a meeting with
24 the technical advisers for Coast Guard, EPA and the
25 Ambassador Bridge, a non-lawyers meeting of the

1  technical people.
2              Mr. Scott Korpi, who's with us in  the
3  audience today, is our main person on that.  He's from
4  South Florida and he does our designing and our
5  compliance, and he is also, in a belts and suspenders
6  approach, has engaged a subcontractor who specializes
7  in air quality, so that we know we've got the right
8  people from our side.
9              Ms. Piropato has committed she'll have the
10 right people from their side.
11             And Shelley Sugarman, who is now in charge of
12 bridge permitting and approvals, is in the audience
13 today.  We've worked with her before and she's shown
14 her professionalism.  She said she would make sure her
15 correct people are there, and we will all encourage the
16 EPA to be realistic and to follow the law.
17             We've also agreed that the Coast Guard will
18 contact SHPO because they have been in contact with
19 SHPO, and will ask if the issue has been resolved, and
20 the only issue SHPO can have is that we moved our tower
21 slightly back to get off the property that was owned by
22 the City of Detroit.  So the visual impact should be
23 negligible.  I think that the Coast Guard  agrees with
24 us it should be negligible.
25             We've agreed with the Coast Guard that it

```
 1   would be easier for Coast Guard to speak to SHPO
 2   without it being three-party circus, and if SHPO says
 3   fine, we have no problem.  If SHPO does not agree, then
 4   we're going to have a meeting that's set up by Coast
 5   Guard with SHPO and us next week or week after next,
 6   and try and resolve all these things.
 7           It is our great hope, and I speak, I hope,
 8   for the Coast Guard as well as for DIBC, that this
 9   matter with the FONSI can be resolved, the air quality
10   can be resolved in 30 days, and we would ask to have
11   another date set by the Court for a report on that
12   progress.
13           I understand from Ms. Piropato that she will
14   be in another professional engagement on the 13th to
15   the 17th of August, and Mr. Esposito will be tied up
16   from the 20th --
17           MR. ESPOSITO:  Just the twentieth.
18           MR. MORAN:  -- just the twentieth.  So
19   perhaps less than 30 days might work, if that suits the
20   Court's schedule.
21           MS. PIROPATO:  I actually -- fourteen through
22   seventeen.
23           MR. MORAN:  Now, Marissa, have I stated this
24   correctly?
25           MS. PIROPATO:  That's fine.  The only --
```

1       THE COURT:  Wait.  Wait.  Wait.  You really
2  can't be heard --
3       MR. MORAN:  You have to come up.
4       MS. PIROPATO:  Yes, I can come up there?
5       THE COURT:  Yes, please.
6       MR. MORAN:  Sure.
7       THE COURT:  No.  No.  No.  Don't talk until
8  you're here.  I mean, it really makes a difference.
9  You won't get on the record and --
10      MS. PIROPATO:  Uh-huh.
11      THE COURT:  -- it will be as if you weren't
12 here.
13      MS. PIROPATO:  The one qualification I would
14 make is I understood that DIBC was also going to do one
15 last check into whether there would be any way to get
16 the MOVES data so that we can say to the EPA with
17 absolute certainty, it's just -- it's either not good
18 or not there.
19      MR. MORAN:  That is correct.  Mr. Korpi said
20 he would give it one more good college try.  It has
21 been reported by his direct people and by his
22 subcontractor, that they could not work with this
23 MOVES.  It hasn't been used before, is the problem, so
24 there's no baseline of material that they can use or
25 experience they can use, and it's been so long we don't

1  want to be the guinea pig for EPA looking at a new
2  procedure that doesn't come into mandatory effect until
3  December.
4              THE COURT:  That actually sounds fair to me.
5  All right.  That all sounds very good.
6              I haven't heard from Mr. Esposito.
7              What's his temperature these days?
8              MR. MORAN:  Mr. Esposito has decided that he
9  wants to be friendly with everyone.
10             MR. ESPOSITO:  As always.
11         (Laughter.)
12             MR. MORAN:  We paid for a Dale Carnegie for
13 him but he flunked out, Your Honor.  We did all we
14 could do.
15         (Laughter.)
16             THE COURT:  Mr. Esposito has been an
17 excellent representative of his client here, or his
18 agency, or whatever I should properly call it.  All
19 right.
20             So everybody says, "We're still working on
21 this, can we see you in 30 days or so?"  Is the right?
22             MS. PIROPATO:  Yes, Your Honor.
23             THE COURT:  And since you are both in
24 Washington that's okay.
25             Are you gentlemen all willing to come from

1   Detroit again?
2          MR. MORAN:  Yes, we are, and I should say we
3   also, on both sides, welcome any assistance by the
4   Court to move this along.
5          THE COURT:  I don't presently see where I
6   might lay a hand, but if you have an idea, why don't
7   you say it?
8          MR. MORAN:  Ms. Piropato and I talked about
9   whether a consent judgment would be appropriate.  We
10  agreed that we would go on the record of what we have
11  agreed to, and then afterwards she and I would meet to
12  see if there might be an order that could help us with
13  some of the other agencies.
14         THE COURT:  Well, if you want to consider
15  such a thing, I would be more than happy to have you
16  submit it under seal, or informally or something,
17  before you put anything on CM/ECF that you might want
18  to back away from.
19         MR. MORAN:  Excellent.
20         THE COURT:  Did that sound about right, Ms.
21  Piropato?
22         MS. PIROPATO:  May I approach, Your Honor?
23         THE COURT:  Please.
24         THE COURT:  When we're like this you really
25  almost have to stay here and just kinda --

```
 1            MS. PIROPATO:  Yes.
 2            THE COURT:  -- share it with the Court.
 3            MS. PIROPATO:  I told Mr. Moran that we'd be
 4   willing to have on the record, what we informally
 5   agreed to, but that I'm quite certain my management
 6   would not agree to a consent judgment or a consent
 7   order that involves agencies not presently before this
 8   Court, and while we're willing to work with DIBC in
 9   good faith, and I want to be clear about that, we --
10   not only do we think an order was unnecessary, I think
11   on my end I would get pushed back and we would have to
12   object to it.
13            So I, you know, I don't think we need it,
14   Your Honor.  I think we're going to set up the
15   meeting --
16            THE COURT:  Well, I would rather not have to
17   do it, particularly if you guys are making progress.
18            MS. PIROPATO:  We are, Your Honor.
19            THE COURT:  Then, I mean, the issue is -- I
20   mean, we at least have movement, right?
21            MS. PIROPATO:  That's right.
22            THE COURT:  So if -- You are beginning to
23   feel a little better because at least we have some
24   movement, and I think the Coast Guard is doing its best
25   to work with you under the circumstances.
```

1        Let's postpone issues of court orders at
2    least for a month and see if maybe we can consider
3    then, where we are and where the issues are, okay?
4            MS. PIROPATO:  And, you know, the EPA just
5    got the data from DIBC on Thursday.
6            THE COURT:  Right.
7            MS. PIROPATO:  So, you know, hopefully after
8    they've had time to review it, afterwards (phonetic)
9    all techies' meeting, we'll be in a better spot.  That
10   is the mutual expectation of both parties.
11           THE COURT:  That's what I -- we'll do.  Okay.
12           So what we should do, Ms. White, is look for
13   a time.
14           I assume between the seventeenth and the
15   twentieth there must be a weekend; is that right?
16           MR. MORAN:  That's right.
17           THE COURT:  Yes.  So look for a time sometime
18   after August 21 when everybody can be here, depending
19   on --
20           THE CLERK:  Yes, Your Honor.
21           August the 28th at 11:00 o'clock?
22           THE COURT:  Is everyone --
23           MS. PIROPATO:  What day is that?
24           THE COURT:  That is a Tuesday.
25           THE CLERK:  That is a Tuesday.

1      THE COURT:  Tuesday the 28th.
2      MS. PIROPATO:  I'm (inaudible).  I don't have
3 my Blackberry on but I may be leaving, I think, the
4 twenty-seventh, returning -- I'm going away on vacation
5 then, I believe.  So if we could --
6      THE COURT:  Well, that's the traditional
7 Washington thing to do, and that means you're going to
8 miss the only good time in Washington, which is right
9 before Labor Day.
10     MS. PIROPATO:  I know, exactly.
11     THE COURT:  That's ridiculous.
12     Anyway, what about the preceding week, Ms.
13 White?
14     THE CLERK:  That's what I'm looking at, Your
15 Honor.
16     How about the twenty-fourth --
17     MS. PIROPATO:  That would work.
18     THE CLERK:  -- at 11:00 o'clock?
19     MS. PIROPATO:  That would work for me.
20     THE COURT:  Is that time all right for people
21 from Detroit, 11:00 o'clock?
22     MR. MORAN:  We will make it all right, Your
23 Honor.
24     THE COURT:  Okay.  All right, 11:00 o'clock
25 on the twenty-fourth.

1           And in the meantime start your engines, or
2    words to that effect.
3           I'd like to tell you, I rode in a Tesla over
4    the weekend.
5           Does anybody know what a Tesla is?
6           (No audible response.)
7           THE COURT:  It's a 100 percent electric car.
8    You know, they made that little roadster first, but now
9    they're making actual sedans, regular cars.  They're a
10   hundred percent electric.  You should tell EPA about
11   them.  They'll get a great gleam in their eye and
12   they'll suddenly be your friends.  I mean, they're a
13   hundred percent electric.  It was the fastest thing.
14   It picked up and went.  You cannot believe it.  I
15   recommend it to you.  Go look at a Tesla.
16           Anyway, okay.
17           Yes, sir?
18           MR. MORAN:  More of it -- to move this along,
19   Your Honor.  The -- We had talked about an issue that
20   dealt with real estate and ownership or easement
21   rights.  We set that aside for the purposes of the
22   FONSI.
23           I have the -- every hope that our new
24   relationship with the Coast Guard is going to resolve
25   the FONSI quickly.

1       We would like to tell the --
2       THE COURT: And your easement is with
3  Detroit, isn't it, the people who don't have somebody
4  in charge?
5       MR. MORAN: Yes, but we have some particular
6  legal theories that we would like to place before the
7  Court, and just advising the Court that with the
8  Court's okay we would file those in the next few weeks,
9  after we've resolved this issue, and address the Court
10 on those issues.
11      THE COURT: So are you planning to file an
12 amended complaint to join the city of?
13      MR. MORAN: I don't think we need to.
14      First we would address the issue to the
15 Court. I'm sure my friends would have a different
16 position. After that's resolved, we would determine if
17 we would be amending that action.
18      THE COURT: Okay. I'll put a little box
19 around their easement rights and look forward to it
20 with enthusiasm. (Inaudible), Mr. Esposito.
21      MR. MORAN: Can you give me one moment, Your
22 Honor, to confer with Counsel?
23      THE COURT: Yes.
24      MS. PIROPATO: Your Honor, may I approach
25 again?

1   THE COURT: Yes.
2   Mr. Esposito doesn't look like he's smiling.
3   Smile, Mr. Esposito. You and I, we're in this
4   together.
5   MS. PIROPATO: It is our view that any
6   briefing related to that property should include the
7   City of Detroit.
8   THE COURT: Right.
9   MS. PIROPATO: They're a necessary party, so
10  I would hope that in the interests of this proceeding
11  smoothly, if -- I would agree with Your Honor that
12  there should be an amended complaint that would --
13  THE COURT: Well, let's --
14  MS. PIROPATO: -- include the City of
15  Detroit.
16  THE COURT: -- let's see what the issues --
17  Let's see what the legal theory is. It seems to me
18  that it's probably correct that we would need Detroit
19  before I could resolve it, since they're the main ones
20  arguing about it.
21  UNIDENTIFIED SPEAKER: Your Honor, as Mr.
22  Moran suggested, I think it makes sense to address this
23  after the air quality issue is resolved, so why don't
24  we work on that first and then we'll talk, perhaps at
25  the next conference, about how to proceed.

1      THE COURT:  Yes.  We don't need to stir up
2  anxieties before they actually become ripe.  So it's
3  okay, Mr. Esposito, you and I are going to be friends
4  for a long time.
5      (Laughter.)
6      MR. ESPOSITO:  Thank you, Your Honor.
7      THE COURT:  Yes.  You and I -- Pretty soon
8  we're going to be, you know, we're going to be going
9  out to dinner, except we can't do that because you're a
10 party.
11     No, it's very nice to see you gentlemen.  I
12 hope you all understand, the record should be clear
13 this is just a jollity because we're all being jolly
14 (inaudible) here.
15     It was nice to see you all.  I will see you
16 at the end of August.  Have a nice summertime.  Don't
17 die in the heat.
18     MR. MORAN:  Thank, Your Honor.
19     MR. MICARELLI:  Thank you, Your Honor.
20     MR. ESPOSITO:  Thank you, Your Honor.
21   (Proceedings concluded at 2:38 p.m.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


/s/_____          August 2, 2012

STEPHEN C. BOWLES