UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

DETROIT INTERNATIONAL      .    Case No. 1:10-CV-00476
                          .    (RMC)
BRIDGE COMPANY,            .
                          .    Washington, D.C.
          Plaintiff,      .    June 5, 2013
                          .
     v.                   .
                          .
THE GOVERNMENT OF CANADA, .
                          .
ET AL.,                   .
                          .
          Defendants.     .
. . . . . . . . . . . . . .

STATUS CONFERENCE
BEFORE THE HONORABLE ROSEMARY M. COLLYER
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:      Boies, Schiller &
                        Flexner, LLP
                        By:  HAMISH M. HUME, ESQ.
                             SAM KAPLAN, ESQ.
                             CATHLEEN KIERNAN, ESQ.
                        5301 Wisconsin Avenue, N.W.
                        Suite 800
                        Washington, DC 20015


For the Federal
Defendants:             U.S. Department of Justice
                        By:  BRIAN M. COLLINS, AUSA
                        ENRD
                        P.O. Box 7611
                        Washington, DC 20044

_____

BOWLES REPORTING SERVICE
P.O. BOX 607
GALES FERRY, CONNECTICUT 06335
(860) 464-1083

APPEARANCES (CONTINUED):

For the Canadian          Warner, Norcross & Judd, LLP
Defendants:               By:  SCOTT M. WATSON, ESQ.
                          111 Lyon Street, N.W., Ste. 900
                          Grand Rapids, MI 49503

For the Michigan          Michigan Attorney General
Department of             By:  MICHAEL J. DITTENBER, AAG
Transportation:           425 W. Ottawa Street
                          Van Wagoner Building, 4th Flr
                          Lansing, MI 48913

1          (Proceedings commenced at 3:58 p.m.)

2              THE CLERK:  Civil Action 10-476, <u>Detroit</u>

3     <u>International Bridge Company v. Government of Canada,</u>

4     <u>et al.</u>.

5              Counsel, please come forward and identify

6     yourselves for the record.

7              MR. HUME:  Good afternoon, Your Honor.  May

8     it please the Court, this is Hamish Hume from Bois,

9     Schiller and Flexner representing the Detroit

10     International Bridge Company, Canadian Transit Company,

11     the Plaintiffs.

12              If I may briefly, with me at counsel table

13     today are my colleagues, Sam Kaplan and Cathleen

14     Kiernan from Bois, Schiller; and also the general

15     counsel of the IBC, Pat Moroun, and with us today in

16     the courtroom also is one of the owners of the Bridge

17     Company, Mr. Matt Moroun.

18              Should I allow our --

19              THE COURT:  Yes.

20              MR. HUME:  -- colleague from the Defense to

21     introduce themselves?

22              THE COURT:  Please do.

23              MR. HUME:  Thank you.

24              MR. COLLINS:  Good afternoon, Your Honor.

25              Brian Collins with the Department of Justice

1    on behalf of the federal Defendants in this matter.

2            THE COURT:  Mr. Collins, have you been in

3    this case before, sir?

4            MR. COLLINS:  No, I've just recently entered

5    an appearance.

6            Prior counsel, Marissa Piropato, one of my

7    colleagues at Department of Justice, she is on a detail

8    to another division at the moment, and so --

9            THE COURT:  And before her, sir, there was

10   someone else.

11           Can you remember?

12           MR. COLLINS:  I believe it was Peter

13   Whitfield, yes.

14           THE COURT:  Peter Whitfield.  We need to get

15   Peter Whitfield, don't you agree?  We need to get Peter

16   Whitfield back.  Not, sir, that this is any statement

17   about you.  Mr. Whitfield was really into this case.

18           MR. COLLINS:  Okay.

19           THE COURT:  I envy you on your introduction

20   to such a stellar character -- group of characters.

21           And then we also have counsel on the

22   telephone.

23           Would those on the phone identify themselves.

24           MR. WATSON:  Yes, Your Honor.

25           This is Scott Watson with Warner, Norcross &

1    Judd for the Canadian Defendants (inaudible) Canada and

2    (inaudible).

3            MR. DITTENBER:  And, Your Honor, this is Mike

4    Dittenber.  I'm an Assistant Attorney General for the

5    State of Michigan, on behalf of the interested party,

6    Michigan Department of Transportation.

7            THE COURT:  Thank you.

8            Mr. Collins, you did not bring with you,

9    anybody from the Coast Guard because the Coast Guard is

10   not part of to today's dispute.

11           Is that my understandingly?

12           MR. COLLINS:  I believe the Coast Guard is

13   part of the dispute, generally.  I mean, I think the

14   issues we're talking about, we'll address issues that

15   relate to the Coast Guard, as well, but no, I did not

16   bring anybody --

17           THE COURT:  Okay.

18           MR. COLLINS:  -- from the Coast Guard.

19           I do have, from the Department of

20   Transportation, Peter (unintelligible) in the

21   courtroom, as well.

22           THE COURT:  All right.

23           I would tell you there is a man, I'd have to

24   look in the file because I don't see you frequently,

25   perhaps you cannot remember his name from --

1          UNIDENTIFIED SPEAKER:  -- Frank Esposito,

2   Your Honor.

3          THE COURT:  Yes, from the, thank you, the

4   Coast Guard, who also knows a lot about this case and

5   has a lovely disposition and has been a wonderful

6   assistance to the Court.

7          MR. COLLINS:  Thank you, Your Honor.  He's

8   been a wonderful assistance to Defendant's Counsel, as

9   well.

10          THE COURT:  I'm sure he has.  Okay.

11          Now, if I might, Mr., is it Hume?

12          MR. HUME:  Yes, Your Honor, Hamish Hume.

13   It's not the easiest.

14          THE COURT:  What a wonderful name.  Your

15   mother must be very proud of you.  Such a great name.

16      (laughter.)

17          THE COURT:  Okay.

18          Now, Mr. Hume, what is it we're here for, and

19   wait, let me say I apologize to everybody, particularly

20   those sitting on the telephone who must be chewing on

21   their nails.  I was in an argument concerning a

22   discovery dispute in a patent case.  The patent case is

23   probably 13 years old or so.  I just inherited it, and

24   it was only supposed to be about a little issue of the

25   rules but, of course, it grew, and so I neglected to

1    realize you were waiting and I just went on talking to

2    them, and I owe you all my most humble apology.

3            All right, Mr. Hume.

4            MR. HUME:  Your Honor, no problem at all,

5    certainly, from the Bridge Plaintiffs respectively.

6    Enjoyed listening to the argument and we're happy to be

7    here.

8            Let me see if I can briefly summarize, Judge

9    Collyer, what the issues are that bring us here today

10   on the status conference and, of course, Mr. Collins

11   will get up and refine or correct, if necessary.

12           Essentially, there are three issues that we

13   have been discussing, and we have made a good faith

14   effort, I think, on both sides, to talk about these

15   issues over the last few weeks.

16           One is the schedule that should now be in

17   place for the anticipated briefing on all the claims in

18   our current, recently filed Third Amended Complaint,

19   all the claims except for Count Four, the APA claim

20   against the Coast Guard.  That is already being

21   briefed, both the motion to dismiss the cross-motion

22   for summary judgment, and the final brief in that set

23   of briefing will be filed by us June 21st, so I do want

24   to emphasize that at least from our perspective, the

25   APA claim against the Coast Guard is not part of what

1   we're discussing today, will be fully briefed in a

2   couple of weeks, and it's still our view, from the

3   Plaintiffs' side, that that claim, which has always

4   been a part of the case, was never withdrawn, has been

5   part of the case since March 2010.

6           We are eager for a resolution, and we would

7   welcome a hearing and a resolution at the Court's

8   earliest convenience, after it's fully briefed.  So

9   that's not at issue today.

10          On all of the other claims, we have an issue

11  on scheduling, and we have related issues on discovery

12  which Plaintiffs seek and Defendants resist, and on

13  whether -- irrespective of general discovery, whether

14  we are at least entitled to the administrative record

15  from the Department of State on its recent

16  administrative decision to grant an approval to the so-

17  called "Nitc DRIC Bridge", a new international trade

18  crossing bridge, and its related approval of the

19  crossing agreement entered into by the governor of

20  Michigan and the Michigan Department of Transportation

21  and the Michigan Strategic Fund, with the government of

22  Canada, an agreement that was entered into in violation

23  of expressed statutes enacted by the Michigan

24  legislature.

25          Those two actions are challenged separately

1    in our Third Amended Complaint, and that's the reason,

2    regrettably, that we had to file another amendment,

3    because of that activity, that action which took place

4    around April 11th or 12th of this year.

5         So, we want discovery, but at a minimum we

6    want the administrative record on those two decisions,

7    and we have a disagreement about the schedule.

8         Now, all three of these issues, schedule,

9    discovery, administrative record, I think, would be

10   informed by what I hope will be a very brief, if Your

11   Honor will permit, overview of what we're saying in

12   this case, what our claim is, what the procedural

13   posture is that we are in, and why it is, and then I

14   will briefly summarize what it is that we want, and

15   allow counsel for the Government to respond.

16        In essence, Your Honor, the first point I

17   would want to make is we have, from the beginning in

18   this case, had claims that have nothing to do with the

19   APA.  The Detroit International Bridge Company has a

20   statutory franchise based on an express act of Congress

21   in 1921, repeated in subsequent acts, that name us, by

22   name, and say that we have a franchise to build a

23   bridge -- "to construct, maintain and operate the

24   bridge", I should say, are the exact words, between

25   Detroit, Michigan and Windsor, Canada.

1           That statutory franchise gives us a cause of

2    action independent of the APA, to protect the rights in

3    that statute, and it's that claim that we brought

4    originally in March 2010, then withdrew it because the

5    Michigan legislature, we believe, had prohibited this

6    other bridge, Nitc DRIC, and when it looked like the

7    State Department didn't agree with that, we refiled in

8    February of this year.

9           THE COURT:  I promise I remember.

10          MR. HUME:  Okay.

11          THE COURT:  I haven't lost sight of it.  I

12   know you think I have, but I promise I remember.

13          MR. HUME:  No, it's that it's easy to get

14   tangled up in the long procedural history that lies

15   behind us here, so I thought I would summarize it.

16          THE COURT:  Luckily, I've been there all

17   along, but keep going.

18          MR. HUME:  I appreciate that, Your Honor.

19   Okay.

20          THE COURT:  You haven't been there all along.

21   I've been there all along.

22          MR. HUME:  That's right.

23          THE COURT:  Mr. Collins hasn't been there all

24   along.  We have been there all along.

25          Go ahead, sir.

1          MR. HUME:  So, I guess the points I wanted to

2     emphasize is the claims that are brought based on that

3     statute are, number one, not APA claims.

4          Number two, the basic theory at the heart of

5     the Complaint, while there are other claims, is that

6     both the Congress and the State Department have

7     recognized that the congressional statutory franchise

8     held by the Bridge Company includes the right to

9     maintain the bridge, including by replacing it or

10    enlarging it, which means by building the twin span,

11    and that's not just an assertion by us.  Every other

12    new bridge for an international crossing is required by

13    Congress to go and get a permit from the State

14    Department.

15         We went to the State Department in 2005 and

16    said, "Do we need that to build our twin span right

17    next to our existing bridge because we think it's part

18    of our original franchise?", which says in the statute,

19    we have a right to maintain it and there's no

20    termination date.  It may be unusual, but it's a

21    private bridge in perpetuity, that includes the right

22    to maintain, and for 80 years it's served the public,

23    it's never had anyone complain about its fees being

24    unjust or unreasonable, --

25         THE COURT:  Don't go too far.

1          MR. HUME:  -- certainly never had anyone --

2     any authority claim that it's -- hold that it's unjust

3     or unreasonable, --

4          THE COURT:  I agree with that.

5          MR. HUME:  -- stayed open and -- but there is

6     a need now, in the judgment of the owners, to build

7     this twin span as part of the ongoing maintenance of

8     this franchise, and the State Department agreed and

9     said, "You do not need to come and get a permit."

10          THE COURT:  Right.  I remember that.

11          MR. HUME:  Okay.  And that -- I don't think

12     there's any way to read the letter, other than saying,

13     "You have a congressional franchise to build the new

14     span."  It's as if the congressional statute said, "You

15     also have a right to maintain by building a new span,

16     subject to getting a navigational permit from the Coast

17     Guard," which we all agree we need and which we've been

18     trying to get for coming up on a decade now, having

19     first applied in 2004.  Again, that's obviously subject

20     to briefing that's underway.

21          Our core allegation is that there are hostile

22     -- there is some hostility to the existence of a

23     privately-owned, particularly an American privately-

24     owned bridge, between Detroit and Windsor.  Canada, for

25     decades, tried a variety of methods to appropriate that

1   bridge without payment of just compensation.  That was

2   detailed in our Complaint.  That was settled in 1990

3   and 1992 in three (phonetic) different agreements.

4          Subsequent to that, after efforts were made

5   by the Bridge Company to start building this twin span,

6   or start getting approvals, Canada launched a study

7   group with Michigan agencies to look at what other

8   crossings might need to be built between Detroit and

9   Windsor, and made pretty clear through internal emails

10  we discovered through FOIA and through another APA case

11  we brought against the FHWA, include a clear decision

12  they made, irrespective of any environmental need, to

13  eliminate the twin span of the Ambassador Bridge as a

14  possibility, and explicitly said, "We're only

15  interested in a publicly-owned bridge.  We want to end

16  the Morouns' ownership of this private bridge."

17         And, in fact, there's an email that's not in

18  the Coast Guard administrative record, but that is sent

19  to the Coast Guard shortly after this decision, saying,

20  "The Morouns are going to try to build their twin span,

21  even though we've eliminated them from our study group,

22  and that puts pressure on the Coast Guard to stop

23  them."  The email doesn't say, "to stop them", but it

24  does say this puts pressure on the Coast Guard.

25         We've gotten these emails, Your Honor, through

1    FOIA requests, to some degree, and through this APA

2    case we brought against the FHWA in Michigan, but what

3    I'm trying to convey is that the claim is broader than

4    one specific discreet agency action.  It transcends

5    that, and it relates to a concerted set of activity by

6    a number of agencies, some of whom may not even take

7    final agency action, some of which do, and in order to

8    get the documents that are relevant to our claim, we

9    need documents beyond an administrative record, and

10   we're entitled to it because we have a claim based on a

11   statute that is not an APA claim.

12          Now, in terms of the timing of that, we are

13   seeking that discovery now, and that -- I think I have

14   two important explanations for that.

15          One is that these claims have been alleged by

16   us since March 2010, admittedly withdrawn, as you

17   recall, when we thought the Michigan legislature's

18   prohibitions on the Nitc DRIC had mooted the issue, but

19   we refiled them in February, and the only thing we did

20   new in this month -- last month, at the end of May, was

21   to amend an order to address these new State Department

22   actions.

23          The declaratory judgment claims based on the

24   statute are the same that they were in February.  There

25   may have been a few word changes, but the essential

1    claim is the same, and the Defendants have known about

2    those claims for years and they've certainly seen them

3    in their slightly revised version since February, and

4    in our view that means a couple of things.  It means we

5    don't need a lot of time, the amount of time they're

6    requesting to move to dismiss and to respond; and

7    number two, it's time to move forward with the

8    discovery.

9           The general rule is that discovery should

10   begin, you know, we should have a Rule 26 conference

11   within 120 days of the filing of the Complaint, and if

12   you look at the Second Amended Complaint, for which I

13   sort of -- I'm exhorting the Court to do, as a

14   practical matter, even though we did just re-file this

15   amendment, we're at that time now, we're at 120 days to

16   have a Rule 26 conference.  And while I recognize that

17   in many cases the Court's normal practice may be that

18   when a motion to dismiss is filed, that that scheduling

19   conference in discovery may sometimes be postponed

20   unless there's a formal action to stay it, it isn't

21   stayed under the normal rules, and it should proceed,

22   and here's why we're anxious for it to proceed, is that

23   the State Department's approval, which frankly

24   surprised us for a number of reasons, not least of

25   which is the Michigan statutory prohibition against the

1    agreement that was approved, suggests to us that

2    political elements are at work that are going to push

3    forward on this Nitc, no matter what, and we don't know

4    what they may do, and then later try to come into court

5    and say we've already, for example, condemned land, or

6    started construction, or received other Canadian

7    approval, and it is now moot, or it's too late, or at

8    least atmospherically try to make the Court feel like

9    it's too late to do anything to enforce our rights.

10           So we're extremely eager to seek discovery

11   for basically two categories of documents.

12           One is we believe reviewing (phonetic) the

13   agency files, particularly the State Department's,

14   there will be documents that confirm what we allege are

15   our statutory franchise rights.

16           We know the State Department, in its August

17   2005 letter, agreed with us, as stated in the letter,

18   and we would like to see other documents that confirm

19   or show its analysis of our franchise rights.

20           We also know the State Department has

21   approved other bridges in a similar situation, building

22   twin spans, without any need for additional

23   presidential permits and without any interference.

24           THE COURT:  Is anybody saying you have a need

25   for additional permits --

1          MR. HUME:  No.

2          THE COURT:  -- now?

3          MR. HUME:  No, but what we're saying is that

4    there must be some discussion of the nature of our

5    franchise rights, either --

6          THE COURT:  I understand that, but we're --

7    there is nobody, at the moment, saying that the reason

8    you can't do this is because you need additional

9    presidential authorization or congressional approval?

10          MR. HUME:  No, no one is saying that.

11          THE COURT:  Okay.

12          MR. HUME:  No one is saying that.

13          The second category of documents that we're

14    eager to get are what I was alluding to before, which

15    is the communications between the agencies about the

16    overarching project of building of this Nitc DRIC

17    bridge in order to thwart our ability to build the twin

18    span.

19          You know, one thing that maybe I didn't make

20    clear in explaining our claim, is that I don't think

21    it's genuinely disputed, and I think the documents show

22    that no one thinks we need both the Nitc bridge and the

23    new span, the Ambassador Bridge twin span.  At most you

24    need one of those.

25          And so what -- And I would point, as evidence

1    of that, that in their application to the State

2    Department, the Michigan proponents of the Nitc DRIC

3    made no effort to show that it was necessary -- they

4    tried to show it was necessary to track projections

5    that we challenge, but they don't even try to show that

6    it's necessary, in addition to the Ambassador Bridge

7    twin span, which will add lanes of capacity and

8    modernize the entire infrastructure, and which they

9    know we're trying to build and have been trying to

10   build for a year.  We think that alone is a breach of

11   our franchise, that they can go and try to demonstrate

12   necessity, completely ignoring the statutory right we

13   have to build a twin span, and if they go forward with

14   it, they know, and I think the documents we want

15   discovery of will confirm, they know that building

16   their bridge will prevent us from building our twin

17   span, and will prevent us from exercising our franchise

18   rights.

19            THE COURT:  Okay.  Now, the application

20   you're talking about is the application from the State

21   of Michigan?

22            MR. HUME:  Yes.  We need to be very careful

23   to say not the State of Michigan, but the governor,

24   MDOT and MSF, and the reason we say that so precisely

25   is because the legislature has enacted numerous

statutes saying MDOC and MSF, these two agencies, are prohibited from entering an agreement with Canada over the Nitc DRIC, which they did nonetheless, and constitutionally, the governor can't enter that agreement without legislative approval.

So proponents call themselves the "State of Michigan", but it's really the governor, MDOC, and this other agency, MSF, the Michigan Strategic Fund.

THE COURT:  Okay.

Now, are those parties, one or any of them, even if one were to include the State of Michigan, are they bound -- except to the extent that it's federal law as opposed to state law, are they bound by your description of your statutory franchise?

MR. HUME:  They have no right -- I'm not aware of any legal basis on which anyone, let alone a state governmental entity, could interfere with our federal statutory rights.

THE COURT:  Well, people interfere all the time.  They just have to be told, you can't -- "You have to stop doing that."  I mean, interference and the right to interfere, we're talking different things.

Actually, I was talking more a question of privity sort of concept.  The statutory right that you described is one granted by the Federal Government.

1          MR. HUME:  Correct.

2          THE COURT:  Okay.

3          The proponents of the, I'm gonna call it the

4    "new bridge" because I can't --

5          MR. HUME:  Right.  The acronyms are crazy.

6          THE COURT:  The acronym.

7          MR. HUME:  Right.

8          THE COURT:  The proponents of the new bridge

9    are not in privity with that grant.

10         Is that not correct?

11         MR. HUME:  They are not in privity with the

12   original statutory franchise, that is correct.

13         THE COURT:  Okay.  So --

14         MR. HUME:  Just to refine it a little bit,

15   they are in privity with a subsequent, much more recent

16   set of -- project to improve all the highways leading

17   to the Ambassador Bridge, --

18         THE COURT:  Okay.

19         MR. HUME:  -- which the Congress appropriated

20   money for both DOT and MDOT, and they entered the

21   (unintelligible) agreement with the Ambassador Bridge

22   Company, and it's related because that improvement

23   project contemplated the new span, --

24         THE COURT:  Okay.

25         MR. HUME:  -- but in terms of the original

1    franchise that is our principal argument that I've been

2    talking about, that is from the Federal Government to

3    the Bridge Company.  The MDOT is not in privity with

4    it.

5            So what we would be saying is neither they

6    nor any federal agency can interfere with that

7    statutory right.  They can be enjoined from doing so --

8            THE COURT:  Well, but then the question --

9    the reason that I'm asking the question is because then

10   that -- those proponents came to the State Department,

11   and it would be the State Department, as the federal

12   actor, to whom you might expect attention to your

13   franchise rights.

14           MR. HUME:  Yes.

15           THE COURT:  And so, what you would have

16   anticipated, I'm trying to flesh out your theory for

17   myself, is that even if the proponents of the bridge

18   were not in privity and so-called bound by that

19   congressional or federal statement, the Secretary of

20   State is, and should not have authorized them to

21   proceed.

22           MR. HUME:  That's absolutely correct.

23           The only thing I would add is, I may be

24   missing the Court's point, but I don't think it matters

25   that the Michigan entity, they're not in privity,

1   because they still can be enjoined --

2           THE COURT:  No.  No, I agree with that.

3           MR. HUME:  -- provided --  Okay.

4           THE COURT:  I'm sorry, I'm misusing

5   "privity."

6           What I'm saying is that they were not

7   specifically bound by the terms of the federal action

8   that granted the franchise.

9           MR. HUME:  Well, no, I -- that's why it's

10  important to me.  They're not in privity, but they are

11  bound not to violate federal law.

12          THE COURT:  But everybody is bound not to

13  violate federal law.

14          MR. HUME:  That's right.

15          THE COURT:  I agree.  But, I mean, if the law

16  were so clear as to say, "The owners of the Ambassador

17  Bridge are about to build it, shall have a right to own

18  and build this bridge, and maintain it in perpetuity,

19  and no other bridge shall ever be built between Detroit

20  and Windsor, Canada, except by these very same people,"

21  if it were that clear, that would be federal law and it

22  could be enforced, but that wouldn't prevent somebody

23  from trying to get around it.

24          You understand the difference.  It would bind

25  the Federal Government.  That's the law adopted by the

1   Federal Government.  The Federal Government is bound.

2   The State of Michigan would not be bound not to come

3   and say, "Wait, wait, we want to change this law.  We

4   don't like this law.  We think if we build a bridge ten

5   miles down, it's not from Detroit to Windsor."

6        You understand my point?  It's binding

7   because it's federal law, but it's not binding because

8   they weren't named in it, a party to.  There's only

9   binding the way federal law is binding on any state, in

10  other words.

11       MR. HUME:  I think that last proposition is

12  accurate, and for the current purposes, while we're

13  suing a partnership in which MDOT is a partner, we're

14  not naming the Michigan entity themselves.

15       I think one related point is at one point we

16  were asked if we would consent to the governor of

17  Michigan filing an amicus brief in this case.  I think

18  in a way this is a fourth issue that we may want to

19  address today.

20       And our position, Your Honor, just so it's

21  clear, is we do not think he should be able -- the

22  governor should be able to submit -- to litigate the

23  case as an amicus, and hide behind whatever immunity or

24  jurisdictional issues he thinks he may be able to keep

25  from being within the jurisdiction of the Court.

1          If he wanted to intervene, that would be a

2     different matter and we may well consent in that, but

3     we don't agree that he should have a right to litigate

4     as an amicus.

5          THE COURT:  Okay.

6          Well, let me get back.

7          MR. HUME:  But, Your Honor, maybe I can

8     just --

9          THE COURT:  What you really want is you want

10    State Department documents that address your franchise

11    rights, and you want communications between the

12    agencies; that is, between the Federal Government and

13    the State Department, and agencies of the Federal

14    Government and agencies of the State?

15         MR. HUME:  Yes, and agencies of Canada.  In

16    other words --

17         THE COURT:  And agencies of Canada.

18         MR. HUME:  All of whom are members of this

19    partnership and this streamlining agreement, two

20    different agreements that are alleged in our Complaint.

21         One, the streamlining is between the federal

22    and state agencies, and then this partnership agreement

23    is between Canada, federal and state, and

24    communications pursuant to those agreements, pursuant

25    to the streamlining agreement and DRIC partnership

1    study agreement, and -- that relate to either the DRIC

2    or the Ambassador Bridge new span, or both.

3              I actually think it would be a relatively

4    simple set of search terms, to go and gather those

5    emails.

6              THE COURT:  Okay.  Well, that's a different

7    issue.

8              MR. HUME:  Right.

9              THE COURT:  All right.

10             So the argument is whether or not you should

11   be able to propound any of this discovery?

12             MR. HUME:  Correct.

13             THE COURT:  All right.

14             And your discovery, as described to me

15   anyway, would go only to the State Department, or would

16   go to other parts of the Federal Government also

17   (phonetic), to have a Mr. Collins here, so glad to join

18   us --

19             MR. HUME:  Oh, it would all go through Mr.

20   Collins or the lawyers representing Canada, but it

21   would be on all the Defendants.

22             THE COURT:  Okay.  All right.

23             Did you have a second issue beyond discovery?

24   I don't want anymore discovery.

25             MR. HUME:  I think the other two are easily

1   addressed.

2          Irrespective of whether discovery may commence

3   as we're requesting, we think at a minimum we should

4   absolutely be served with the administrative record

5   behind the two State Department approvals in April.

6   Again, either April 11th or 12th, I think it was.  They

7   must have that administrative record.  They received

8   lots of comments which they must have kept organized in

9   the file, and they must have kept organized, their

10  discussions of those comments and their decision making

11  documents and emails, and it should not be difficult to

12  get, and this is -- under our APA case, the law is

13  clear that an APA case should proceed based on the

14  administrative record.

15         So we now have --

16         THE COURT:  Yes, but it's a different APA

17  case.  I mean, your APA case is directed to the Coast

18  Guard, not to the State Department.

19         MR. HUME:  No, but we -- as of the Third

20  Amended Complaint --

21         THE COURT:  Ah.

22         MR. HUME:  -- filed in May, we have these two

23  APA claims against the State Department.

24         THE COURT:  Okay.

25         MR. HUME:  So we would like the

1  administrative record for those two claims.

2          THE COURT:  I got it.

3          MR. HUME:  And we believe it should be

4  possible to produce that in the next two or three

5  weeks, before whatever briefing schedule is

6  established.

7          And if I may, I'll just state for the record,

8  the briefing schedule the Government has proposed and

9  what we've counter-proposed, because they're quite far

10  apart, the Government -- I should say we discussed our

11  Amended Complaint with the Government on May 7.  We

12  said we were going to add the APA claims for the two

13  State Department decisions, and an equal protection

14  claim because we felt that that captured, really,

15  everything that we were already saying, that the

16  Government was discriminating against our new stand,

17  and in favor of the Nitc DRIC, and so we were going to

18  add that.  The -- And then we proposed a schedule.

19          The Government, which was quite aggressive,

20  it was fairly quick, and the Government counter-

21  proposed that they wanted until June 28th to file their

22  motion to dismiss.  That's what they told us on May

23  7th.

24          Now admittedly, we then took two weeks or, I

25  think, 17 days to provide them with all the amendments

1    to our Third Amended Complaint, obtain their consent so

2    we could file it without opposition, and then filed it,

3    but we still think June 28th is a reasonable date

4    because there isn't that much new in the Third Amended

5    Complaint.  It's these two APA claims, which I think

6    Mr. Collins is going to tell you they think they have

7    pure legal arguments to respond to, but we would like

8    to stick with their date of June 28th, or certainly not

9    much long -- beyond that.

10              THE COURT:  Okay.

11              Why don't you just tell me what your dates

12   are.

13              MR. HUME:  My dates are June 21 we would like

14   the administrative record for the State Department

15   decisions.

16              June 28th is the date we would propose for

17   Defendants filing their motions to dismiss.

18              We would respond to that on July 28th, and we

19   currently anticipate that our response would include,

20   as we did with the Coast Guard, a cross-motion for

21   summary judgment on some, I stress only some, of our

22   allegations in our Complaint, some of our claims, and

23   then they would have a consolidated opposition and

24   reply on August 23rd, and we would have a final reply

25   on September 13th.

1            THE COURT:  Okay.

2            MR. HUME:  The final thing before Mr. Collins

3    -- I'll let him tell you his dates, but the biggest --

4    one of the big problems we have with his dates is it's

5    so protracted, not only does it raise this fear that

6    something is going happen that we won't know about,

7    they're going to claim is changed circumstances, but

8    it's also, if we're not going to get discovery, the

9    protected motion to dismiss briefing becomes even more

10   painful for us.

11           THE COURT:  Okay.

12           MR. HUME:  Thank you, Your Honor.

13           THE COURT:  Let me -- Before you sit down, I

14   don't need an explanation or a description, I just need

15   to know if there is any new litigation going on in

16   Michigan?

17           MR. HUME:  Yes, Your Honor.  Thank you for

18   asking that.

19           There is a Complaint, not by the Bridge

20   Company but by a legislator, Representative Durhal,

21   against the governor of Michigan and, I believe, the

22   two agencies, MDOT and MSF, in state court in Michigan,

23   challenging the legality of their entering into this

24   crossing agreement with Canada, since it violates these

25   Michigan statutory prohibitions.

1          THE COURT:  Thank you.

2          MR. HUME:  That is new.  That was filed, I

3     don't know, a month or two ago.  It's in motion

4     practice.

5          THE COURT:  Thank you.

6          Mr. Collins?

7          MR. HUME:  Thank you, Your Honor.

8          THE COURT:  Thank you, sir.

9          Don't start talking 'til you get to the mic,

10    okay?

11         MR. COLLINS:  Thank you, Your Honor.  Good

12    afternoon.

13         THE COURT:  Good afternoon, sir.

14         MR. COLLINS:  I think Mr. Hume did a very

15    good job of sort of laying out kind of basic points of

16    our disagreement.  I think we disagree with some of his

17    characterizations of some of the facts, as they relate

18    to those, but I think as an initial matter, you know,

19    we don't think there's anything fundamentally different

20    about where we are now as opposed to where we were when

21    the last scheduling order was entered on April 5th of

22    2013.

23         Plaintiffs had filed an Amended Complaint.

24    It was fairly significant amendments.  You know, we had

25    agreed to sort of fast track the APA claim against the

1    Coast Guard because that had been sort of already in

2    process for quite a while, and so we -- the parties

3    were able to agree on that, and then we agreed to

4    motion to dismiss briefing and that was it.

5          It was a simple Plaintiff's opening motion to

6    dismiss -- I mean, I'm sorry, Defendants' opening

7    motion to dismiss, Plaintiff's response and Defendants'

8    reply, and it was about 90 days out from when that

9    Second Amended Complaint had actually been filed, that

10   that briefing would start.

11         Now, since that time, the only thing that's

12   changed is Plaintiffs have amended their Complaint yet

13   again, and I think sort of the first issue I have with

14   sort of the Plaintiff's characterization, is the scope

15   of the amendments.  They didn't just add two claims,

16   Your Honor, they added four new counts, and it's over

17   20 pages of additional material altogether, in the

18   Complaint.  So it's a significant new amendment.

19         If it had been just the two State Department,

20   you know, permit claims, then I think we could have

21   agreed to a more expedited schedule, but --

22         THE COURT:  So there are two new claims

23   against the State Department under the APA, and what,

24   one or two equal protection types of claims?

25         MR. COLLINS:  Yes, Your Honor.  There's one

1    that's entitled, "Equal protection claim, U.S.

2    Defendants," and then another that's called, "Judicial

3    review of ultra vires in unlawful action," and that's

4    against the State Department, the Coast Guard, the

5    Federal Highway Administration and the United States.

6             THE COURT:  That's a claim?

7             MR. COLLINS:  Yes.  That's what it's

8    described as, Your Honor.

9             THE COURT:  It sounds like an APA claim,

10   ultra veres action.

11            Yes.

12            MR. HUME:  Your Honor, may I?

13            THE COURT:  No.  No.  You can't interrupt

14   because we don't have a court reporter, so I'm afraid

15   you're going have to just wait your turn.

16            MR. COLLINS:  I don't think they've

17   necessarily alleged a great deal of new facts.  I mean,

18   they're all sort of grounded --

19            THE COURT:  That's okay.  I got the point.

20   You have four new counts, and so now it's going to take

21   you a lot more time.

22            MR. COLLINS:  Yes.

23            THE COURT:  Hah.  All right.  We're going to

24   forget that one.  Forget that one.  The issue is, and

25   let me -- let's cut -- This is the most complicated

case because everybody dresses it up in nice legal

theories when, in fact, the dispute is much more

palpable, real and direct.

          The dispute right now, is over -- it's

doubled.  It used to be over whether they could build

their bridge.  The Coast Guard was appearing to be the

fly in the ointment, so that's why we're focused on the

Coast Guard, and I got to be such good friends with Mr.

Esposito, the -- and my comments about Mr. Esposito

were said in all sincerity.  There was no sarcasm, or

anything, to those comments.

          Now, their concern is building their own

bridge, but also what to do about the actions of the

State Department, and the possibility of actions by

other actors who seem to have political or other goals.

I use the word "political" out of Mr. Hume's mouth,

that was a quote, or other reasons to act that are

(unintelligible) with crossings, or anything like that,

and -- or have tangential things to do with crossings,

but those actors might be able to just move straight

ahead, ignoring what's their argument about federal law

that's not been resolved, what their argument is about

Michigan law that's not been resolved, and ignoring all

those things and just going ahead and entering and

(unintelligible) say, "Oh, so sorry, it's too late,

1    bridge is here.  You don't need to build your bridge.

2    You've lost.  You've been fighting this for 10 years

3    and we finally figured out how to make you lose because

4    we've put mortar (phonetic) on the ground."

5          I'm not saying anybody has any bad

6    intentions.  I'm just saying I can't ignore what this

7    case is really about by getting into the weeds of how

8    the APA works, and this and that.  I've been trying to

9    get this case to a legal decision.  I can't help them

10   with the State of Michigan.  I can't make the City of

11   Detroit operate any better.  I can't say to the mayor

12   of Detroit -- Is there a mayor of Detroit?  I can't say

13   to the mayor of Detroit, "It's time to exercise

14   executive judgment."  I mean, look at the mayor of

15   Detroit, the whole place is falling apart.

16         All I can do is try to decide legal issues

17   that appear in my court that are of value to people,

18   and in this case it means, "What are we going to do

19   here?"

20         Let's look at the State Department's decision

21   because that's -- you've done the Coast Guard issue,

22   right?

23         MR. COLLINS:  Uh-huh.

24         THE COURT:  You're done with that.  That's my

25   problem now, or almost my problem.  So I have no idea

1    what the answer to that is.  That's pure APA, kind of

2    what are we going to do?  Right?  Expertise, all that

3    stuff.  We know all that.  I'll figure that out.

4            What are we going to do about the State

5    Department?  That is really the fly in the ointment

6    right now.

7            Your motion to dismiss, you can't file a

8    motion to dismiss on the State Department, can you?

9            MR. COLLINS:  Well actually, Your Honor,

10   that's one of the biggest ones I think that's at issue

11   for us, because with the State Department, the issue is

12   that is an express delegation of executive authority.

13           THE COURT:  Okay.

14           MR. COLLINS:  And so, our grounds for that is

15   that that is not reviewable under the APA at all, and

16   so that's our --

17           THE COURT:  Even executive authority and

18   direct delegation of congressional action?

19           MR. COLLINS:  Well, it's not -- I --

20           THE COURT:  I mean, I'm not saying it is, I'm

21   just saying that what's alleged to be --

22           MR. COLLINS:  Yes, but if that's -- I mean,

23   in a similar context, yes, that's basically the --

24   where you come down is that the -- and I haven't

25   briefed the issue yet, but --

```
1              THE COURT:  That's only fair to you.
2              MR. COLLINS:  Yes.  If you look -- I mean, in
3    the Department of Energy context, they have a similar
4    process by which they have to issue presidential
5    permits for international projects, and the BBC
6    (phonetic) has issued a decision saying they're not
7    acting to any -- the State Department isn't acting to
8    the congressional delegation of power, it's acting
9    solely on behalf of the president, and it's doing --
10   it's exercising purely presidential prerogatives, and
11   so that makes it unreviewable under the APA because
12   presidential action is not considered agency action
13   under the APA.
14              And so that's going to be one of the things
15   that I think we're going to argue about with
16   Plaintiffs, and I'm sure Plaintiffs have a different
17   view of the law and a different view of the issue here,
18   but from our perspective, we think that's a fundamental
19   question that needs to be addressed before we put the
20   State Department to the effort and expense of compiling
21   an administrative record, something which they don't
22   usually do in this context, because it's not -- they
23   don't think it's APA reviewable, so --
24              THE COURT:  It's interesting, though, that
25   they take comment on it.
```

1          Why did they take comment on it?

2          MR. COLLINS:  I believe to tease out any

3     issues, Your Honor.  I'm not exactly sure why they take

4     comment on it, but I believe they want to tease out if

5     there is some major international issue that might

6     arise.  I don't know.

7          THE COURT:  Well, okay.

8          So what you're suggesting, and I -- it's a

9     really interesting little area where your mind could go

10    and wander around for awhile, isn't it?

11         MR. COLLINS:  Yes.

12         THE COURT:  The difference between

13    presidential/executive action and agency action and

14    those kinds of things.  Yes, that's really great.

15    Quite catching, if you will.

16         So what do we do about the fact that we have

17    all these nice legal issues to litigate, and the

18    possibility that the actors in question, with or

19    without appropriate authority, are just going to run

20    ahead and take care of things so they vote with their

21    feet or with their concrete, more precisely, and this

22    all becomes moot?

23         MR. COLLINS:  Well, I think that's an

24    important consideration for the Court, Your Honor, and

25    I think the thing you have to keep in mind here is the

1    practical reality of these kinds of projects.

2          These are long-term projects.  You can't just

3    put up a bridge overnight.  In some of my other cases I

4    deal with --

5          THE COURT:  Well, that I can tell you I know.

6       (Laughter.)

7          MR. COLLINS:  So, you know, in my other cases

8    I deal with forest timber contracts and things, and you

9    can't cut down trees overnight, you know, and so

10   there's a real concern.

11         Here, you know, the new bridge, the one that

12   Plaintiffs are -- the Nitc, if you will, I'm still

13   trying to get the acronyms down, but the new bridge is

14   -- it hasn't even submitted an application to the Coast

15   Guard for a navigational permit, which I think

16   everybody concedes is a prerequisite --

17         THE COURT:  Oh, might take years.

18         MR. COLLINS:  Yes, it could take quite some

19   time, and so we are not at the point yet, where I think

20   Plaintiff's concerns are well founded, that some

21   imminent, irreversible action is going to take place.

22   We're still at the early stages of that project, in

23   part because, as Your Honor alluded to, there's a brand

24   new Complaint filed against it in Michigan just

25   recently, and there is a whole universe of litigation

1    over this project, that I think will help hold it up

2    for quite some time if they want to.

3              But irrespective of the litigation, the

4    practical reality is that they don't have an

5    application for a Coast Guard navigational permit

6    yet --

7              THE COURT:  But is that the only thing they

8    need?  Do they need to do an EIS?

9              MR. COLLINS:  I don't know the status of the

10   need for review.  I'm not familiar enough with the

11   record yet, Your Honor, to -- I think they would need

12   to do an EIS, I'm just not sure if it's already being

13   done and if that was a subject of prior litigation

14   already.

15             I know there was litigation in Michigan

16   District Court over an environmental impact statement

17   for that bridge, I believe, and it was brought raising

18   environmental justice issues, and I can -- and I'm not

19   sure exactly, if it is -- further environmental review

20   is still required or not on that, but even putting that

21   aside, and Plaintiffs raised the issue of condemnation.

22   That's another issue.

23             They're going to have to acquire the land for

24   the permit to -- for the new bridge, to the extent they

25   don't already have it.

1          So, there are a number of steps that need to

2     take place before this happens, and with regard to the

3     navigational permit, that's something that has a public

4     process, and Plaintiffs have specifically asked us

5     about it.

6          They said, "How are we going to know?", and

7     we have agreed -- Well, (a), there's a public notice

8     that goes out; and (b), we've agreed to give Plaintiffs

9     notice of the navigational permit application when it

10    comes in so, you know, if they want to raise said

11    issue, maybe after the navigational permit application

12    comes again, we'd be happy to revisit it and talk about

13    it.

14         THE COURT:  I'm not quite sure how to

15    respond.  I mean, you're sounding very logical.  The

16    problem is that if the Federal Government wants to, it

17    can just say, "Move ahead."  I mean, it could say to

18    NEPA review, "We have an extraordinary circumstance

19    here and we're not going to do a full NEPA review."

20    There you go.  Done.  Taken care of.

21         They can say to the Coast Guard, "We really

22    need this", and whether they say it out loud or they

23    write a letter, whether they trumpet it from Capitol

24    Hill, they can say to the Coast Guard, "Do this" and it

25    gets done, and people have clearly said in the past,

1    "Don't do this", and things have not gotten done.

2          MR. COLLINS:  Yes, Your Honor, but I think --

3    and that's where the nature of this project comes in.

4    This is not something that the Government can say, "Do

5    it", and then all of the sudden there's nothing anyone

6    can do to stop it.  This project gets a lot of

7    attention.  It's going to require -- They can't just

8    move bulldozers in and all the sudden a bridge goes up.

9    There's going to be opportunity, and I don't think we,

10   as the Federal Government, would want to risk the

11   Court's ire in just trying to move forward --

12         THE COURT:  No.  No.  No.  Wait, I'm sure

13   that the Federal Government --

14         MR. COLLINS:  Well, I certainly wouldn't want

15   to.

16         THE COURT:  Okay.  Well, I appreciate that

17   because you're the one who's going to have to come back

18   and explain, and if you can't, then you're going to

19   have to send one of your predecessors because I know

20   then, that they'll be, you know, quivering in front of

21   me because you can tell that I am a really difficult

22   Judge.

23         MR. COLLINS:  But I think --

24         THE COURT:  Tell me what your proposed

25   schedule is.

1          MR. COLLINS:  Well, our proposed schedule,

2    Your Honor, we wanted to cleanly address the threshold

3    jurisdictional issues first, and get those squared

4    away, and so --

5          THE COURT:  As to what?  Tell me which issues

6    you mean.

7          MR. COLLINS:  As to -- Well, the entirety of

8    Plaintiff's Third Amended Complaint.  Again, I have not

9    sat down and tried to brief each of the issues, but I

10   believe we're going to have every -- some sort of

11   defense to all of the issues they raise because

12   ultimately they arise out of sort of one set of basic

13   actions, and they're different legal theories.

14          So what we would propose is motion to dismiss

15   practice, with Defendant's opening briefs due August

16   30th; Plaintiff's response due, I believe you suggested

17   October 4th; and Defendant's replies due November 22nd.

18          THE COURT:  Well, okay.  If we're going to

19   the motion --

20          MR. COLLINS:  I apologize, Your Honor, but my

21   schedule -- Plaintiff's Counsel just reminded me, the

22   response to the motion to dismiss would be October

23   25th, not October 4th.  (Inaudible).

24       (Pause.)

25          THE COURT:  That's three months.

1          MR. COLLINS:  It is, Your Honor, and in all

2     candor, part of it is for me to be able to get up to

3     speed on the case, since I'm new to it, as well.  I

4     mean, I -- although you -- everyone here has been

5     sitting with this Complaint for quite some time --

6          THE COURT:  "Not I" said the little red head.

7     I've only been sitting with the old case.  Now, this is

8     an entirely new case for me too.  That's all right.

9          Let me -- I mean, I am more concerned for

10    timing than 8/30/13 suggests.  You've got to move that

11    up.  Think about it harder.  Just move that up.

12         MR. COLLINS:  Okay.

13         Could we do August 16th, Your Honor?  Or --

14    (Laughter.)

15         THE COURT:  Give me a chance.  Let me look at

16    August.  August 30th is a Friday.

17    (Pause.)

18         THE COURT:  Your approach to the Third

19    Amended Complaint is really -- because it's everything

20    except the separate matters against the Coast Guard,

21    your approach to the Third Amended Complaint really

22    starts with the issue of executive decisions, right?

23         MR. COLLINS:  Insofar as the State Department

24    is concerned.  I think there are other issues that we

25    would be raising with regard to other panels, in terms

1    of the reviewability of those actions.

2            THE COURT:  Of whose -- Which actions do we

3    mean?

4            MR. COLLINS:  Well, for example, the --

5    whether Plaintiffs have properly invoked the Court's

6    jurisdiction with regard to the Declaratory Judgment

7    Act.  I mean, 1331 is what they base their jurisdiction

8    on, and Plaintiff's stated earlier, those claims don't

9    have anything to do with the APA, insofar as the

10   franchise rights are concerned, but we're not sure

11   there's another waiver of sovereign immunity for those

12   claims.  If it's not the APA, then I don't -- I'm not

13   sure what it is, and so, you know, I'm going to need to

14   figure those issues out, in terms of putting it --

15           THE COURT:  Well, I -- No, I agree with you

16   that although some of it has been briefed, you'll find,

17   if you go deep enough into the file, but once you

18   decide, briefing sovereign immunity is no big deal.

19   You must have sovereign immunity briefs on your

20   computers going back to '02.  I mean, even I can brief

21   sovereign immunity.  I just say "United States"

22   because, you know, no, but, I mean --

23           MR. COLLINS:  Well, but here we're faced with

24   a -- it's a very creative Complaint, Your Honor.  They

25   -- The --

1          THE COURT:  Well, they've been working at it

2    for years.

3          MR. COLLINS:  Yes.  I mean, it is -- there is

4    a lot to address, to tease out here, and so that's

5    where I think the complexity comes in, and why it's not

6    just your standard sort of sovereign immunity brief,

7    and we have issues -- I mean, part of their exclusive

8    -- as I read their Complaint, part of their claim that

9    this franchise right is exclusive is based on an

10   inference from Canadian common law, that in Canada

11   franchise rights are exclusive so, by implication,

12   Congress must have meant that (unintelligible)

13   franchise right is exclusive, and I don't -- I think

14   that those kinds of issues, we need to address at the

15   motion to dismiss stage, to figure out if that's really

16   the case or not, before we get into discovery and

17   before (inaudible).

18          THE COURT:  8/16.

19          MR. COLLINS:  Okay.

20          THE COURT:  How's that?  All right.

21          If the motion to dismiss is due on 8/16, then

22   the Plaintiffs get approximately a month, which is what

23   you negotiated the last time.  That would bring us to

24   -- No, you got two months --

25          MR. COLLINS:  Yes, they got more than that,

1    Your Honor.

2              THE COURT:  Goodness gracious.

3              Well, if they get two months, you should get

4    three months.  I'm sorry.

5              MR. COLLINS:  Okay.

6              THE COURT:  They get two months to respond.

7    Sorry, Mr. Hume.  I'll take your schedule: 8/30, 10/25,

8    11/22.

9              I think that the question of jurisdiction

10   here, Mr. Hume, is not only important and substantive,

11   I mean, it's not an easy question, it's a serious legal

12   issue of, you can sit down, of jurisdiction, because of

13   the nature of the arguments the Government wants to

14   make, the issue of executive power, and is the State

15   Department acting as an agency or are they acting as

16   the Executive, and are they acting pursuant to

17   congressional authority, or are they acting as the

18   second branch of Government, et cetera.

19             I can appreciate that not only do you want

20   two months to answer, but Government Counsel will need

21   time to develop those answers -- Hold on.

22             But then the issue of the declaratory

23   judgment, that's also very interesting, and not an easy

24   sovereign immunity argument, either for them to make or

25   you to respond to.  Let me be frank.

1          You know, we all know the easy law that says,

2     "Oh, the Declaratory Judgment Act is not, by itself, a

3     grant of authority.  You have to have another grant of

4     authority in order to" -- and, of course, you say,

5     "Well, our other grant of authority is the statute that

6     grants us the franchise, and if we couldn't enforce the

7     statute that grants us the franchise, the grant of the

8     franchise would be useless", and so this is the way the

9     argument is going to go.  You can appreciate this, Mr.

10    Collins.

11          But none that is something you can pick up

12    out of a preexisting Horn Book or anything.  This is

13    really good lawyering that's going to be required, and

14    I know you're all up to it, that's not the issue, but

15    good lawyering takes thinking, not just a little legal

16    research and drafting, but serious thinking, and you

17    will be advantaged, but more than you, forgive me, I

18    will be advantaged if you give serious thinking to

19    this.  So that's what we're going to do.

20          Now, as to discovery in the meantime, I know

21    that you proffered this as, "We really need discovery,

22    and if we're not going to have discovery we should have

23    a shorter motion to dismiss period of time, and if

24    we're going to have a long motion to dismiss period of

25    time, we really should have discovery."

```
 1              If I don't have jurisdiction, we can't have

 2     discovery.  I know -- I don't know.  I think I have

 3     jurisdiction over what's already in front of me, the

 4     APA case on Coast Guard because it seems to me that's

 5     action denied, if not final agency action, and so

 6     that's not the issue, the issue is these claims raised

 7     in the Third Amended Complaint.

 8              I think I need to get your briefs on it, and

 9     I think I need to at least get smart enough myself on

10     it, that I can tell you which direction I think I'm

11     going at that time we have oral argument, so you don't

12     waste your time.

13              I mean, --

14              MR. COLLINS:  Fair enough, Your Honor.

15     The --

16              THE COURT:  Your client has been waiting for

17     me to make a dispositive decision on something for

18     years.

19              Is this a fair statement, sir?

20              UNIDENTIFIED SPEAKER:  With respect

21     (inaudible).

22              THE COURT:  I said it, so you don't even have

23     to say, "With respect."

24              For years he has been hoping that sooner or

25     later I'm going to figure out how to put this dispute
```

1    into a box that I can put a lid on, and I haven't

2    achieved that yet.

3            MR. HUME:  Your Honor, if I may just -- this

4    is Hamish Hume again, for the Bridge Company

5    Plaintiffs.

6            I fully hear the Court and I'm not going to

7    try to argue with the directives.  I just would ask

8    that the -- there is well-established precedent, and I

9    apologize that I failed to make this in my opening

10   presentation, that when a Defendant makes an argument

11   that the Court has no jurisdiction under 12(b)(1), that

12   the Plaintiff is entitled to take discovery into those

13   jurisdictional facts, --

14           THE COURT:  Yes.

15           MR. HUME:  -- and go beyond the Complaint,

16   and so we would ask -- and actually, we specifically

17   addressed that with the Canadian lawyers because we

18   knew they were going to make a sovereign immunity

19   claim, and there's cases allowing limited, limited

20   jurisdictional discovery.

21           THE COURT:  Purely jurisdictional discovery.

22           If you wish, I -- it's not possible at this

23   hour, for you to describe with sufficient specificity,

24   Mr. Collins to respond and me to decide, with

25   sufficient specificity, as to whether or not limited

1   jurisdictional discovery should be admitted -- allowed,

2   but you are absolutely correct that if you sit down and

3   think about it, and say, "Well, you know, if we could

4   have discovery into X, Y and Z, that would assist us in

5   making the jurisdictional arguments," then I would be

6   happy to hear it and Mr. Collins can object.

7               MR. HUME:  Thank you, Your Honor.

8               The only other point was that the

9   administrative record in every APA case, even if the

10  Defendant is going to say, "This case should be

11  dismissed, there's no jurisdiction," there is no

12  precedent for you -- for the Defendant not to produce

13  the administrative record which, quite frankly, --

14              THE COURT:  But they're saying it's not an

15  APA case.  You see, that's --

16              MR. HUME:  No.  No.  No.  Your Honor, we have

17  both.  We have declaratory judgment claims based on our

18  statutory right, and we have APA claims against the

19  State Department and, of course, the previous one

20  against Coast Guard --

21              THE COURT:  Well, I appreciate that you have

22  APA claims against the State Department, but Mr.

23  Collins' legal position is that the APA does not govern

24  the action of the president, and that -- Am I right?

25  And that when the State Department was acting vis-a-vis

1    this decision process, it was acting with Executive

2    authority from the president directly, not is an

3    agency, and that's the problem.

4         Now, I think that Mr. Collins -- I think I

5    could direct the Government to ensure that the papers

6    that would otherwise make up an administrative record

7    not be disbursed, lost, thrown away, or otherwise not

8    maintained thoroughly, so that if there comes a time

9    when we need an administrative record, it will be

10   possible to put an entire administrative record

11   together, but in order to do that, you're going to need

12   to satisfy the legal proposition that in taking some,

13   all, whatever, of these actions, and it may be

14   different for different actions, that the State

15   Department was acting as an agency of the Government,

16   and not as the president, or by presidential authority

17   by the executive.

18        MR. HUME:  Your Honor, with respect, the

19   statute is clear that there are two approvals, and the

20   second one is delegated only to the State Department,

21   not to the president, and it's inconceivable that that

22   is president action, and we're probably entitled to the

23   administrative record under FOIA, but we've had FOIA

24   requests with them for three years --

25        THE COURT:  Oh, --

 1          MR. HUME:  -- and they have the second

 2    largest backlog of FOIA requests --

 3          THE COURT:  Okay.

 4          MR. HUME:  -- in the Government.

 5          THE COURT:  Okay, listen, why don't you -- I

 6    hate to ask you to do this and I hate to ask your

 7    client for you to do this, but it is five of five and

 8    my staff needs to leave.  There are sick children.

 9    They need to leave at 5:00 o'clock sharp.  I didn't

10    warn you of that, my apologies, but they do.  So we're

11    going to stop.

12          Write it down very, very briefly.  I don't

13    need a long brief.  I have enjoyed the arguments but

14    short brief, and then you can respond.  The point he

15    makes is a very good one, that there is a presidential

16    decision and there is an agency or a departmental

17    decision, and if there is a claim as to the second,

18    that may be an APA claim, even if we had the

19    president's own signature on the first one, okay?

20          MR. HUME:  Thank you, Your Honor.

21          THE COURT:  Now, do I got that?  Do I have

22    that, excuse me?

23          MR. HUME:  Yes.

24          THE COURT:  I got that.  Good.

25          Thank you everybody.  I apologize for this

1    abrupt end to this hearing and, as usual, I am very
2    glad to have such excellent lawyers in front of me.
3           Thank you.
4           MR. HUME:  Thank you, Your Honor.
5       (Proceedings concluded at 3:57 p.m.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings

in the above-entitled matter.


/s/_____          July 24, 2013

STEPHEN C. BOWLES