UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
_____

DETROIT INTERNATIONAL BRIDGE
COMPANY and THE CANADIAN TRANSIT
COMPANY,

    Plaintiffs,

v.

THE GOVERNMENT OF CANADA,

WINDSOR-DETROIT BRIDGE AUTHORITY,

THE UNITED STATES DEPARTMENT OF
STATE, *et al.*,

    Defendants.
_____/

Civil Action No. 10-cv-00476 (RMC)

Hon. Rosemary M. Collyer

**ORAL HEARING
REQUESTED**

# JOINT MOTION TO DISMISS
# AND STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT
# BY HER MAJESTY THE QUEEN IN RIGHT OF CANADA AND
# THE WINDSOR-DETROIT BRIDGE AUTHORITY

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 2

Facts ............................................................................................................................ 2

    *History of the Ambassador Bridge* ....................................................................2

    *History of the DRIC* ..........................................................................................2

Procedural Posture ...................................................................................................... 3

Related-Litigation History ........................................................................................... 4

ARGUMENT ............................................................................................................... 7

    I.      This Court lacks subject matter jurisdiction because the Canadian
            Defendants are immune from suit under FSIA. .....................................................7

            A.      Both Canada and the WDBA are foreign states that are
                    presumptively immune from suit under FSIA. ...........................................9

            B.      FSIA's commercial activities exception does not apply. ..........................10

            C.      The Canadian Defendants have not waived jurisdiction under
                    FSIA. .......................................................................................................21

    II.     Even if this Court has jurisdiction under FSIA, the Court should stay these
            proceedings in deference to parallel proceedings that plaintiffs are
            pursuing against the Canadian Defendants in Canada. .........................................23

CONCLUSION ............................................................................................................ 24

# TABLE OF AUTHORITIES

Page

## Federal Statutes

28 U.S.C. § 1332(c), (e) ................................................................................................. 11

28 U.S.C. § 1603(a)-(b) ................................................................................................. 12

28 U.S.C. § 1603(b) ....................................................................................................... 11

28 U.S.C. § 1605(a)(2) ................................................................................................... 13

28 U.S.C. §§ 1330(a), 1602-1611 ................................................................................... 7

28 U.S.C. §§ 1602-1611 .................................................................................................. 1

28 U.S.C. §§ 1603(a), 1604 .......................................................................................... 10

Act of Mar. 4, 1921, 66th Cong., ch. 167, 41 Stat. 1439 ............................................... 2

## Federal Cases

*Abdulla v. Univ. Ark. Little Rock*,
   No. 13-20 (RMC), 2013 WL 1092867, (D.D.C. Mar. 18, 2013) ............................................ 26

*AgroComplect v. Republic of Iraq*,
   524 F. Supp. 2d 16 (D.D.C. 2007) .......................................................................................... 9

*BPA Int'l, Inc. v. Kingdom of Sweden*,
   281 F. Supp. 2d 73 (D.D.C. 2003) ........................................................................................ 24

*Brinco Mining LTD. v. Federal Ins. Co.*,
   552 F. Supp. 1233 (D.D.C. 1982) ......................................................................................... 29

*Bryks v. Canadian Broadcasting Corp.*,
   906 F. Supp. 204 (S.D.N.Y. 1995) ........................................................................................ 12

*California v. Central Pac. Railroad Co.*, 127 U.S. 1, 40-41 (1888) ............................................ 20

*Cicippio v. Islamic Republic of Iran*,
   30 F.3d 164 (D.C. Cir. 1994) ................................................................................................ 15

*City of S. Pasadena v. Goldschmidt*,
   637 F.2d 677 (9th Cir. 1981) ................................................................................................ 19

*Creighton Ltd. v. Government of Qatar*,
   181 F.3d 118 (D.C. Cir. 1999) ........................................................................................ 26, 27

*Crist v. Republic of Turkey*,
   995 F. Supp. 5 (D.D.C. 1998) .......................................................................... 26

*Doe v. Holy See*,
   557 F.3d 1066 (9th Cir. 2009) ........................................................................... 9

*Does I through III v. District of Columbia*,
   238 F. Supp. 2d 212 (D.D.C. 2002) .................................................................. 5

*Dole Food Co. v. Patrickson*, 251 F.3d 795, 806 (9th Cir. 2001), aff'd in part, dismissed in part
   538 U.S. 468 (2003) ........................................................................................... 8

*El Hadad v. United Arab Emirates*,
   496 F.3d 658 (D.C. Cir. 2007) .......................................................................... 15

*Fed. Ins. Co. v. Richard I. Rubin & Co.*,
   12 F.3d 1270 (3d Cir. 1993) ....................................................................... 13, 18

*First Merchants Collection Corp. v. Republic of Argentina*,
   190 F. Supp. 2d 1336 (S.D. Fla. 2002) ............................................................ 19

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
   905 F.2d 438 (D.C. Cir. 1990) ..................................................................... 26, 27

*Ge v. Peng*,
   201 F. Supp. 2d 14 (D.D.C. 2000) .................................................................... 24

*Goodman Holdings v. Rafidain Bank*,
   26 F.3d 1143 (D.C. Cir. 1994) .................................................................... 13, 14

*Gregorian v. Izvestia*,
   871 F.2d 1515 (9th Cir. 1989) .......................................................................... 24

*Grendel's Den, Inc. v. Goodwin*,
   662 F.2d 88 (1st Cir. 1981) ............................................................................... 21

*Groeneveld Transp. Efficiency v. Eisses*,
   297 F. App'x 508, 2008 WL 4659844 (6th Cir. 2008).................................... 29

*HTC Corp. v. IPCom GmbH & Co., KG*,
   671 F. Supp. 2d 146 n.3 (D.D.C. 2009) ............................................................. 5

*In re Papandreou*,
   139 F.3d 247 (D.C. Cir. 1998) ........................................................................... 8

*Jackson-Shaw v. Jacksonville Aviation Authority*, 510 F.Supp.2d 691, 719-20 (M.D. Fla. 2007)
   .......................................................................................................................... 20

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*,
   115 F.3d 1020 (D.C. Cir. 1997) ................................................................... 16, 18

*Kensington Int'l, Ltd. v. Itoua*,
   505 F.3d 147 (2d Cir. 2007) ............................................................................. 14

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
   376 F.3d 1123 (D.C. Cir. 2004) ......................................................................... 9

*Latin Ams. for Soc. & Econ. Dev. v. Adm'r of the Fed. Highway Admin.*, Case No. 2:10-CV-82
   (E.D. Mich.) ........................................................................................................ 5

*Lotes Co., LTD., v. Hon Hai Precision Industry Co. LTD.*,
   2013 WL 2099227 (S.D.N.Y. May 14, 2013) ...................................................... 23

*MDOT v. DIBC*, Case No. 2:10-CV-12234-PJD-MIM ................................................... 5

*MDOT v. DIBC*, No. 2:10-CV-13767 (E.D. Mich) ........................................................ 5

*Mendenhall v. Saudi Aramco*,
   991 F. Supp. 856 (S.D. Tex. 1998) .................................................................... 27

*Mwani v. Bin Laden*,
   417 F.3d 1 (D.C. Cir. 2005) ................................................................. 10, 14, 22

*Nat'l Treasury Emp. Union v. United States*,
   101 F.3d 1423 (D.C. Cir. 1996) ......................................................................... 9

*O'Bryan v. Holy See*,
   556 F.3d 361 (6th Cir. 2009) ................................................................ 14, 16, 21

*Peterson v. Royal Kingdom of Saudi Arabia*,
   416 F.3d 83 (D.C. Cir. 2005) ............................................................................. 7

*Pexcor Mf'g Co., v. Uponor AB*,
   920 F. Supp. 2d 151 (D.D.C. 2013) ................................................................... 28

*Proprietors of the Charles River Bridge v. Proprietors of the Warren Bridge*, 36 U.S. 420 (1800)
   ........................................................................................................................ 19

*Raccoon Recovery, LLC v. Navoi Mining & Metallurgical Kombinat*,
   244 F. Supp. 2d 1130 (D. Colo. 2002) ............................................................... 27

*Republic of Argentina v. Weltover*,
   504 U.S. 607 (1992) ..................................................................................... 15, 23

*Republic of Austria v. Altmann*,
   541 U.S. 677 (2004) ........................................................................................... 8

*Rong v. Liaoning Province Government*,
   452 F.3d 883 (D.C. Cir. 2006) ........................................................................... 9

*Saudi Arabia v. Nelson,*
  507 U.S. 349 (1993) ................................................................. 8, 13, 14, 17, 18, 23

*Strategic Techs. PTE, Ltd. v. Republic of China* (*Taiwan*), No. 05-2311 (RMC), 2007 WL
  1378492, at *2 (D.D.C. May 10, 2007) ........................................................ 8

*Upton v. Empire of Iran,*
  459 F. Supp. 264 (D.D.C. 1978) .............................................................. 15, 23

*USX Corp. v. Adriatic Ins. Co.,*
  345 F.3d 190 (3d Cir. 2003) .......................................................................... 8

*Velasquez v. General Consulate of Mexico,* No. C-92-3745-EFL, 1993 WL 69493 (N.D. Cal.
  Mar. 4, 1993) .............................................................................................. 19

*Wolf v. F.R.G.,,*
  95 F.3d 536 (7th Cir. 1996) ........................................................................ 21

*Youming Jin v. Ministry of State Sec.,*
  475 F. Supp. 2d 54 (D.D.C. 2007) ........................................................ 15, 18

*Youming Jin v. Ministry of State Sec.,*
  557 F. Supp. 2d 131 (D.D.C. 2008) ............................................................ 14

*Zedan v. Kingdom of Saudi Arabia,*
  849 F.2d 1511 (D.C. Cir. 1988) ...................................................... 15, 16, 22, 23

## State Cases

*Mich. Dep't of Transp. v. Detroit Int'l Bridge Co.,*
  No. 09-015581-CK (Mich. 3d Cir. Ct. Feb. 1, 2010) .................................... 5

## Canadian Statutes

Act of May 3, 1921, 11-12 Geo. V. ch. 57 (Can.) ........................................ 2

Financial Administration Act, R.S.C. 1985, c. F-11 § 83, sched. III (Can.) ................................ 11

## Canadian Cases

*CTC v. Attorney General of Canada,* CV-12-446428 (Ontario Superior Court of Justice) ..... 6, 28

*CTC v. Minister of Transport,* 2011 F.C. 515 (Can.) ................................................... 6

*CTC v. Minister of Transport,* 2012 F.C.A 70 (Can.) ................................................... 6

## Other Authorities

*The Foreign Sovereign Immunities Act of 1976, Robert B. von Mehren,* 17 Colum. J. Transnat'l
  L. 33, (1978) .............................................................................................. 21

*What Are Crown Corporations and Why Do They Exist?*, Kazi Stastna, CBC News (Apr. 1, 2012) ................................................................................................................................. 12

Defendants Her Majesty the Queen in Right of Canada ("Canada") and the Windsor-Detroit Bridge Authority ("WDBA," jointly the "Canadian Defendants") respectfully move to dismiss Plaintiffs' claims against the Canadian Defendants under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602–1611.

# INTRODUCTION

Plaintiffs—one of which is a Canadian corporation—allege that actions taken by the Canadian Defendants in Canada violate rights that Plaintiffs obtained under Canadian law. Plaintiffs' claims raise issues of Canadian law that are already pending in a Canadian court sitting in Ontario, which is the appropriate forum for resolution of these Canadian law issues. To the extent that Plaintiffs are entitled to any relief against the Canadian Defendants, that relief is available in Canada.

In contrast, Plaintiffs are not entitled to seek relief against the Canadian Defendants in this Court. Plaintiffs' Third Amended Complaint alleges that the Canadian Defendants have engaged in numerous activities that sound "commercial" but that are in fact legitimate sovereign acts. Although Plaintiffs' latest complaint goes on at great length (including over eighty pages of background facts), the only claims against the Canadian Defendants are in Counts II and III, both of which claim a violation of Plaintiffs' alleged "exclusive franchise." Careful examination of these claims shows that, as to Canada, they are based on the following sovereign acts:

- Canada selecting and approving the location of a second international toll bridge for transportation and trade in the Windsor-Detroit region "in the immediate vicinity" of the Ambassador Bridge. (Second Claim, 3d Am. Compl. ¶¶ 302, 305, 311–312.)

- Canada and the United States allegedly accelerating regulatory review and approval of the NITC/DRIC and delaying regulatory review and approval of Plaintiffs' proposed new span adjacent to the Ambassador Bridge. (Third Claim, 3d Am. Compl. ¶¶ 322–323.)

Only a nation-state can approve the location of an international border crossing and the regulatory review process.  Those acts—the acts on which Plaintiffs' claims are based—are sovereign acts under FSIA.  And under FSIA, claims based on sovereign acts may not be brought against the Canadian Defendants in a U.S. court.  Accordingly, Plaintiffs' claims against the Canadian Defendants should be dismissed.

# BACKGROUND

## Facts

The following summary of relevant facts is presented as alleged by Plaintiffs in their Third Amended Complaint.

### *History of the Ambassador Bridge*

The Ambassador Bridge is currently the only general traffic bridge spanning the Detroit River between Windsor, Ontario, and Detroit, Michigan.  It carries more than a quarter of all commercial traffic between Canada and the United States.  (3d Am. Compl. ¶ 3.)

Predecessor entities of Plaintiff Detroit International Bridge Company ("DIBC") con-structed the Ambassador Bridge under legislative authorizations from the United States[1] and Canada,[2] and the Bridge has carried traffic between Windsor and Detroit since 1929.  (3d Am. Compl. ¶¶ 23, 71.)

### *History of the DRIC*

Since 2000, Canada—through Transport Canada[3]—has worked with the Ministry of Transportation of Ontario,[4] the Michigan Department of Transportation, and the U.S.

---

[1] Act of Mar. 4, 1921, 66th Cong., ch. 167, 41 Stat. 1439 (with amendments, "U.S. Act").

[2] Act of May 3, 1921, 11-12 Geo. V. ch. 57 (Can.)  (with amendments, "Canadian Act").

[3] Transport Canada is the ministry within the Canadian government responsible for transpor-tation regulations, policies, and services.  It is Canada's equivalent of the U.S. Department of Transportation.

Department of Transportation through the Federal Highway Administration (collectively, the "Cooperating Parties")[5] to study and develop plans to meet anticipated transportation needs in the Detroit-Windsor region.  (3d Am. Compl. ¶ 181.)

The Cooperating Parties undertook a coordinated environmental assessment process in the United States and Canada to identify a preferred location for a new crossing to improve traffic flow and commerce over the Detroit-Windsor border.  (*Id.* ¶¶ 181, 191.)  The Cooperating Parties ultimately selected a location that was within close proximity to the Ambassador Bridge—less than two miles from the Ambassador Bridge on the Canadian side.  (*Id.* ¶ 210.)  At present, construction of the NITC/DRIC has not yet begun, nor have any decisions been made as to who will ultimately construct or operate the new bridge.

## Procedural Posture

This case has already been pending for over three years, and this is the third time that Canada has filed a motion to dismiss under FSIA.  Plaintiffs filed their original Complaint on March 22, 2010.  (Docket No. 1.)  Canada filed its first motion to dismiss under FSIA on July 6, 2010.  (Docket No. 20.)  Plaintiffs then filed their First Amended Complaint on June 6, 2011.  (Docket No. 45.)  In response, Canada filed a renewed FSIA motion on June 24, 2011.  (Docket No. 46.)  The Court set a hearing on the renewed FSIA motion for November 30, 2011.  On the day before the hearing, Plaintiffs voluntarily dismissed their claims against Canada.  (Docket No. 52.)  On November 9, 2012, Plaintiffs filed a motion for leave to file a Second Amended

---

[4] The Ministry of Transportation of Ontario, or MTO, is the Ontario provincial government ministry responsible for transport infrastructure and regulation in Ontario.

[5] The Cooperating Parties have sometimes been referred to for convenience in earlier pleadings as a "Border Partnership," although no legal entity involving those parties exists.  We expect that the Michigan Department of Transportation will file a brief as an interested party addressing Plaintiffs' erroneous legal allegation that the Cooperating Parties are a partnership as a matter of law.

Complaint (Docket No. 65), which again raised claims against Canada.  The Court granted that motion on February 11, 2013.  The Second Amended Complaint, which includes essentially the same claims against Canada as the original Complaint and the First Amended Complaint, was filed on the same day.  (Docket No. 83.)

Canada was prepared to file a motion to dismiss Plaintiffs' Second Amended Complaint. But before it did so Plaintiffs filed a Third Amended Complaint (Docket No. 104), which again re-pleads essentially the same claims against the Canadian Defendants.  The Canadian Defendants now move to dismiss the Third Amended Complaint.

## Related-Litigation History

This case is just one piece of a much larger effort by Plaintiffs to block the DRIC and preserve their monopoly profits on general cross-border bridge traffic in the Windsor-Detroit corridor.  At last count, Plaintiffs and entities related to Plaintiffs have been or are involved in eighteen legal challenges to the DRIC or the alleged denial of permits to allow Plaintiffs to construct a new bridge adjacent to the Ambassador Bridge.  In fact, Plaintiffs are currently pursuing duplicative claims against Canada in this Court, in Canadian courts, and before a NAFTA arbitration tribunal.

Actions filed by Plaintiffs involve allegations related to the claims in the instant case:[6]

- Plaintiffs have already lost a lawsuit in Michigan Circuit Court involving the Michigan Department of Transportation.[7]  In that litigation, the state court ordered Plaintiffs to remove illegal preliminary work for a new span that Plaintiff DIBC

---

[6] A court may take judicial notice of court documents and other public records.  *HTC Corp. v. IPCom GmbH & Co., KG*, 671 F. Supp. 2d 146, 151 n.3 (D.D.C. 2009); *Does I through III v. District of Columbia*, 238 F. Supp. 2d 212, 216–17 (D.D.C. 2002) (taking judicial notice of court documents in a motion for judgment on the pleadings without converting that motion to one for summary judgment).

[7] Order, *Mich. Dep't of Transp. v. Detroit Int'l Bridge Co.*, No. 09-015581-CK (Mich. 3d Cir. Ct. Feb. 1, 2010).

began constructing adjacent to the current Ambassador Bridge span. DIBC removed that state court action to the U.S. District Court for the Eastern District of Michigan.[8] The action was remanded; remand was appealed; DIBC removed the case again; the action was remanded again.[9]  During that time DIBC did not comply with the Michigan Circuit Court's order.  Even after the entry of a contempt order and the brief imprisonment of a DIBC official, DIBC still did not fully comply with the order. A DIBC official and Ambassador Bridge owner Mr. Moroun were again held in contempt and briefly imprisoned for the continued failure to comply with the court's order.  The Circuit Court ultimately entered an order transferring control of the project to MDOT.  The Circuit Court's order, upheld on appeal to the Michigan Court of Appeals and Michigan Supreme Court, permits MDOT to demolish structures and take other actions necessary to complete the Gateway Project.  Pursuant to that order, MDOT completed the construction, and the court ordered that DIBC must pay for MDOT's work.

- In May 2009, Plaintiffs and six organizations filed a lawsuit in this Court against various U.S. government defendants.[10]  That suit alleged defects in the U.S. environmental review process for DRIC.  After venue was transferred to the U.S. District Court for the Eastern District of Michigan, Judge Cohn ultimately affirmed the environmental review.  The plaintiffs have appealed that decision to the U.S. Court of Appeals for the Sixth Circuit.[11]

- On December 31, 2009, Plaintiffs filed an application for judicial review before the Federal Court of Canada seeking, among other things, an order that the decision by Canadian authorities under the *Canadian Environmental Assessment Act* relating to the DRIC was invalid or unlawful.[12]  That decision by Canadian authorities determined that the DRIC is not likely to cause significant environmental effects that could not be mitigated, and is one step in the Canadian Government's approval process.  Many of the allegations made in Plaintiffs' application for judicial review are the same as the allegations in this case.  On May 4, 2011, the Federal Court of Canada upheld that environmental decision and dismissed the application as "without any merit."[13]An appeal was heard and dismissed from the bench by Canada's Federal

---

[8]  *MDOT v. DIBC*, Case No. 2:10-CV-12234-PJD-MIM .

[9] Op. & Order of Remand, *MDOT v. DIBC*, No. 2:10-CV-13767 (E.D. Mich). Nov. 29, 2010 ("Considering this Court's more than thirty-three years as a judicial officer, DIBC may be entitled to its recognition as the party who has devised the most creative schemes and maneuvers to delay compliance with a court order.").

[10] *Latin Ams. for Soc. & Econ. Dev. v. Adm'r of the Fed. Highway Admin.,* originally filed in the U.S. District Court for the District of Columbia as Case No. 1:09-CV-897.

[11] Docket Number 12-1556.

[12] Docket Numbers T-2189-09, and T-2192-09.

[13] *CTC v. Minister of Transport*, 2011 F.C. 515 (Can.) ("The Court concludes, after four days of hearing and considering thousands of pages of evidence, that both applications are without any merit and must be dismissed.").

Court of Appeal on March 1, 2012.[14]  CTC did not file Leave to Appeal to the Supreme Court of Canada, their final avenue of appeal.

- On January 25, 2010, Plaintiff DIBC delivered a Notice of Intent to file a claim in arbitration against Canada under Chapter Eleven of NAFTA.  On March 23, 2010, Plaintiff DIBC delivered a second Notice of Intent to file Arbitration against Canada under NAFTA and the United Nations Commission on International Trade Law Arbitration Rules.  On April 29, 2011, Plaintiff DIBC served its Notice of Arbitration, and on January 15, 2013, Plaintiff DIBC served an Amended Notice of Arbitration. The allegations against Canada in the Amended Notice of Arbitration are with respect to the governmental actions at issue in this case.  The NAFTA arbitration is currently underway.

- On February 15, 2012, Plaintiff CTC filed an action in the Ontario Superior Court of Justice against Canada.[15]  CTC amended its claim on February 19, 2013.  CTC's allegations in this action again are with respect to the same governmental actions at issue in its Third Amended Complaint.  As in the present case, in the Ontario action CTC seeks, among other things, (1) declaratory relief that CTC was granted a perpetual and exclusive right to own, operate and collect tolls from an international border crossing in the vicinity of the Ambassador Bridge; and (2) declarations related to its alleged right to own, operate, and construct an international toll bridge, including the right to construct and maintain a second span to the existing Ambassador Bridge, over the Detroit River.  This case is actively being litigated.

Plaintiffs clearly know how, and where, to bring claims against the Canadian Defendants. They apparently are not content with bringing claims in Canadian courts and international tribunals, however, so they are trying to raise essentially identical claims against the Canadian Defendants in this Court.  The Canadian Defendants are subject to suit on these claims in Canada (an indisputably appropriate forum to resolve the issues of Canadian law presented by Plaintiffs' Third Amended Complaint).  But because the Canadian Defendants are immune from suit on these claims in the United States, Plaintiffs' claims against the Canadian Defendants should be dismissed.

---

[14] *CTC v. Minister of Transport*, 2012 F.C.A 70 (Can.).

[15] *CTC v. Attorney General of Canada*, CV-12-446428 (Ontario Superior Court of Justice).

# ARGUMENT

## I.     This Court lacks subject matter jurisdiction because the Canadian Defendants are immune from suit under FSIA.

This Court should dismiss Plaintiffs' claims against the Canadian Defendants for lack of subject matter jurisdiction.  "In the United States, there is only one way for a court to obtain jurisdiction over a foreign state and it is not a particularly generous one—the FSIA."  *Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83, 86 (D.C. Cir. 2005); 28 U.S.C. §§ 1330(a), 1602–1611.  Under FSIA, "a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified [statutory] exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state."  *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *see also Strategic Techs. PTE, Ltd. v. Republic of China* (*Taiwan*), No. 05-2311 (RMC), 2007 WL 1378492, at *2 (D.D.C. May 10, 2007).

"A primary purpose of the FSIA is to make it difficult for private litigants to bring foreign governments into court, thereby affronting them."  *USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 207 (3d Cir. 2003) (citing *Dole Food Co. v. Patrickson*, 251 F.3d 795, 806 (9th Cir. 2001), *aff'd in part, dismissed in part* 538 U.S. 468 (2003) Sovereign immunity under FSIA is not an "ordinary privilege" constituting a defense to liability.  *In re Papandreou*, 139 F.3d 247, 251 (D.C. Cir. 1998).  It provides complete immunity from trial and the burdens of litigation, including cost, delay, discovery, and other disruptions.  *See id.*  To preserve the full scope of that immunity, it is critical that the issue be determined at the earliest possible point in litigation.  *Republic of Austria v. Altmann*, 541 U.S. 677, 691 (2004); *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1127 (D.C. Cir. 2004).

This motion presents a facial challenge to Plaintiffs' Third Amended Complaint under FSIA.  "Where a defendant makes a facial challenge [to a Complaint under FSIA], 'the [C]ourt

must accept as true the allegations in the Complaint and consider the factual allegations in the

light most favorable to the non-moving party, . . . just as it would on a motion to dismiss under

Rule 12(b)(6)." *AgroComplect v. Republic of Iraq*, 524 F. Supp. 2d 16, 21 (D.D.C. 2007)

(alteration in original).  However, "there is a difference between accepting a plaintiff's

allegations of fact as true and accepting as correct the conclusions plaintiff would draw from

such facts." *Nat'l Treasury Emp. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996).

For example, in the FSIA context a defendant making a facial motion accepts as true a plaintiff's

underlying allegations of fact, but the defendant is not required to accept as correct the ultimate

legal conclusion (*i.e.*, establishment of an FSIA exception) that the plaintiff would draw from the

accepted-as-true facts.  *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009); *Rong v. Liaoning

Province Government*, 452 F.3d 883, 888 (D.C. Cir. 2006); *see Mwani v. Bin Laden*, 417 F.3d 1,

16 (D.C. Cir. 2005) (holding that the plaintiff's factual allegations were insufficient as a matter

of law to establish the FSIA exception alleged in the plaintiff's complaint).

      Thus, for the narrow purpose of this motion, the Canadian Defendants do not contest the

underlying facts alleged in the Third Amended Complaint, even though some of the allegations

border on the outrageous.  Rather, for the purpose of this facial motion under FSIA, the Canadian

Defendants submit that even if every factual allegation in Plaintiffs' Third Amended Complaint

were proven true, this Court would lack jurisdiction over Plaintiffs' claims against the Canadian

Defendants as a matter of law.

      Plaintiffs have previously alleged two exceptions under FSIA as potential bases for

overcoming the Canadian Defendants' presumptive immunity from suit: "commercial activities"

and "waiver."  But the facts alleged in Plaintiffs' Third Amended Complaint fail as a matter of

law to establish that these exceptions apply here.  Even if all of the facts in the Third Amended

Complaint were true, they do not show that Plaintiffs' claims are based upon a commercial

activity of the Canadian Defendants, or that any such activities have a sufficient nexus to the

United States.  The facts alleged also do not show that the Canadian Defendants have knowingly

and unambiguously waived their sovereign immunity.  Rather, the facts alleged in Plaintiffs'

Third Amended Complaint affirmatively establish just the opposite—that the commercial

activities and waiver exceptions do not apply in this case.

### A.    Both Canada and the WDBA are foreign states that are presumptively immune from suit under FSIA.

Both Canada and the WDBA are presumptively immune from the Court's jurisdiction

under FSIA.  FSIA applies to "foreign states."  28 U.S.C. §§ 1603(a), 1604.  There is no dispute

that Canada is a foreign state under FSIA.  (3d Am. Compl. ¶ 31.)  The WDBA also qualifies as

a foreign state since it is an "agency or instrumentality" of Canada under FSIA.

FSIA's definition of "foreign state" includes "an agency or instrumentality of a foreign

state."  § 1603(a).  FSIA defines "agency or instrumentality" as "any entity" that is all of the

following:

- "[A] separate legal person, corporate or otherwise";

- "[A]n organ of a foreign state or political subdivision thereof, or a majority of [the

    entity's] shares or other ownership interest is owned by a foreign state or political

    subdivision thereof"; and

- "[N]either a citizen of a State of the United States as defined in [28 U.S.C.

    § 1332(c), (e)], nor created under the laws of any third country."

28 U.S.C. § 1603(b).

As a Canadian Crown corporation wholly owned by Canada and created under the laws

of Canada, the WDBA meets all of the criteria of an "agency or instrumentality" of a foreign

state for FSIA purposes:

- It is a separate corporate person.  In particular, it is a Canadian Crown corporation.  (*See* 3d Am. Compl. ¶ 32.)

- A majority of its ownership interest is owned by a foreign state.  As a Canadian Crown corporation, the WDBA is entirely owned by Canada.  Financial Administration Act, R.S.C. 1985, c. F-11 § 83, sched. III (Can.).

- And it is neither a citizen of a State of the United States nor created under the laws of any third country.  It is a Canadian Crown corporation created under the laws of Canada, not the laws of the United States or a third country.  (*See* 3d Am. Compl. ¶ 32.)

Canadian Crown corporations, regardless of whether they engage in commercial activities, are agencies or instrumentalities of Canada as set out under FSIA.  *See, e.g.*, *Bryks v. Canadian Broadcasting Corp.,* 906 F. Supp. 204, 206 (S.D.N.Y. 1995) (holding that the Canadian Broadcasting Corporation, a Canadian Crown corporation, was a "foreign state" under FSIA).  *See generally* Kazi Stastna, *What Are Crown Corporations and Why Do They Exist?*, CBC News (Apr. 1, 2012) (explaining, among other things, that Crown corporations are "wholly owned by the state").  The WDBA is a Canadian Crown corporation that, as set out above, clearly satisfies all of the elements of an "agency or instrumentality" of Canada.  It is, therefore, a "foreign state" as defined by 28 U.S.C. § 1603(a)–(b).

**B.     FSIA's commercial activities exception does not apply.**

This Court lacks subject matter jurisdiction over Plaintiffs' claims against the Canadian Defendants because those claims are not based on commercial activity and they do not have a sufficient nexus to the United States.  Under the commercial activities exception, a foreign state is subject to the jurisdiction of a U.S. court only if the claims against it are "*based upon*" (1) "a commercial activity carried on in the United States by the foreign state," (2) "an act performed in

10

the United States in connection with a commercial activity of the foreign state elsewhere," or (3) "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2) (emphasis added).  Stated differently, a plaintiff must show commercial activity by the foreign state that has a sufficient nexus with both the United States and the subject matter of the plaintiff's cause of action.  *Strategic Techs.*, 2007 WL 1378492, at *4 (citing *Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1288 (3d Cir. 1993)).

The first step of the commercial activities analysis is to determine the actions on which a plaintiff's claims are based.  To make that determination, courts look to "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case."  *Nelson*, 507 U.S. at 357.  The test is very narrow.  *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1145 (D.C. Cir. 1994).  "Regardless of how the plaintiff phrased his Complaint," in determining whether an action is "based upon" a commercial activity, a court looks to the "'gravam[e]n' of the claims advanced by the plaintiff" and asks whether "the allegations truly sound[] in commercial activity."  *O'Bryan v. Holy See*, 556 F.3d 361, 380 (6th Cir. 2009); *accord Kensington Int'l, Ltd. v. Itoua*, 505 F.3d 147, 156–57 (2d Cir. 2007); *Goodman*, 26 F.3d at 1145– 46.

In determining whether an activity is a "commercial activity," courts look to the activity's nature, rather than its purpose.  The actor's motive is irrelevant.  The test is whether the activity is the type of activity carried on by private participants in the market, or whether it is the type of activity engaged in only by sovereigns.  *Nelson*, 507 U.S. at 359–60; *Mwani v. Bin Laden*, 417 F.3d 1, 17 (D.C. Cir. 2005) ("The key inquiry in determining whether particular conduct constitutes commercial activity is not to ask whether its purpose is to obtain money, but rather whether it is 'the sort of action by which private parties can engage in commerce.'" (quoting

*Nelson*, 507 U.S. at 362)).   Does the activity involve the exercise of a power that can also be exercised by private citizens, or does it involve the exercise of a power that is "peculiar to" a sovereign?  *Youming Jin v. Ministry of State Sec.*, 557 F. Supp. 2d 131, 141 (D.D.C. 2008) (quoting *El Hadad v. United Arab Emirates*, 496 F.3d 658, 664 (D.C. Cir. 2007); *Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 164 (D.C. Cir. 1994)).  "If a transaction is partially commercial and partially sovereign in nature and the cause of action is based on sovereign activities involved in the transaction, the commercial activity exception to FSIA does not apply and the sovereign is immune from suit."  *Youming Jin v. Ministry of State Sec.*, 475 F. Supp. 2d 54, 62 (D.D.C. 2007).

The second step of the commercial activities analysis is to determine whether the activities on which the claim is based have a sufficient nexus to the United States.  At this step, a court asks whether the activity occurred in the United States or, if not, whether the activity's effect in the United States is both nontrivial and one that "follows as an immediate consequence of the defendant's activities," without any intervening element.  *Republic of Argentina v. Weltover*, 504 U.S. 607, 617–18 (1992); *Upton v. Empire of Iran*, 459 F. Supp. 264, 266 (D.D.C. 1978).  Courts do not look to the place where incidental or eventual effects are felt.  *Youming Jin*, 475 F. Supp. 2d at 63 (citing *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1515 (D.C. Cir. 1988)).  Rather, the central question is where the legally significant acts giving rise to the claim occurred.  *Zedan*, 849 F.2d at 1515.

> 1. *This Court lacks jurisdiction over Count II because Plaintiffs' claims in that Count is based on Canada's sovereign act of approving a location for the DRIC.*

Count II is based on Plaintiffs' allegation that Canada's decision to locate an international toll crossing "in the immediate vicinity" of the Ambassador Bridge will violate Plaintiffs' alleged exclusive franchise right.  (3d Am. Compl. ¶¶ 311–312.)  The decision as to whether and where to build an international border crossing is a quintessentially sovereign act.  Accordingly, Plaintiffs' claims based on that sovereign act must be dismissed.

In determining whether the claims in Count II satisfy the commercial activities exception under FSIA, the Court must look beyond the phrasing chosen by Plaintiffs in their Third Amended Complaint.  While, for the purposes of this motion, the Court must take the factual allegations in Plaintiffs' Third Amended Complaint as true, as a legal matter the Court's task is to discern the "'gravam[e]n' of the claims advanced by the plaintiff" and ask whether "the allegations truly sound[] in commercial activity."  *O'Bryan v. Holy See*, 556 F.3d 361, 380 (6th Cir. 2009).

Plaintiffs litter their Third Amended Complaint with terms intended to sound commercial, such as "investment," "construction," "operation," "competition," and "commercial enterprise."  But it is up to the Court to determine the nature of Plaintiffs' claims.  Plaintiffs' frequent use of such "commercial-like" terms simply confuses general commercial issues with the specific sovereign activities upon which their claims are based.  *See Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1030 (D.C. Cir. 1997) (citing *Nelson*, 507 U.S. at 358) (holding that the district court lacked jurisdiction under FSIA because the plaintiffs' claims were based on specific sovereign acts, not on general acts alleged in the Complaint "that may relate in certain respects to commercial activity").

Despite the use of commercial-like terms in the Third Amended Complaint, the only alleged actions on which Plaintiffs base their claims against the Canadian Defendants under Count II are the approval of a new bridge location in Canada. Specifically, with respect to the Canadian Defendants, Plaintiffs' claim is based on Canada's decision to approve the location and construction of a second bridge in Canada at a site where Plaintiffs allege it will unlawfully interfere with their alleged exclusive and perpetual franchise (*i.e.,* monopoly) over the Detroit River between Detroit and Windsor.

Put simply, despite their assertions to the contrary, Plaintiffs do not base their claims against the Canadian Defendants on any of the allegedly "commercial" acts they talk about generally. Plaintiffs allege, for example, that Canada has offered financing to the State of Michigan, met and conferred with government officials in the United States, executed the Crossing Agreement, created the WDBA, entered into a partnership, hired lobbyists, and generally promoted the NITC/DRIC. But Plaintiffs cannot show that these acts are the basis of their claims against the Canadian Defendants. Such actions, in and of themselves, would not entitle Plaintiffs to any relief. *Nelson*, 507 U.S. at 357. Even if the Canadian Defendants were enjoined from offering financing, meeting with United States officials, or promoting or publicizing the NITC/DRIC, this would not change Canada's sovereign decision to approve the location of the NITC/DRIC. And it would not change Canada's sovereign regulatory decisions with respect to Plaintiffs' own proposed new span. Stripped to their essence, Plaintiffs' claims are all based on Canada's approval of a competing toll bridge, an approval that is clearly a sovereign act.

It does not matter whether there is a commercial aspect associated with Canada's sovereign acts, or whether its decision is an activity that is partially commercial and partially sovereign. *See Nelson*, 507 U.S. at 360–61; *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,*

115 F.3d 1020, 1030 (D.C. Cir. 1997); *Youming Jin*, 475 F. Supp. 2d at 62; *Federal Ins. Co. v. Richard I. Rubin & Co., Inc.*, 12 F.3d 1270, 1287 (3d Cir. 1993).  And it does not matter whether or not Canada was motivated, even in part, by a commercial purpose when it made its sovereign decision of where to locate the NITC/DRIC.  The nature of the acts on which Count II are based is the same regardless of Canada's motives.

  The crucial point is that Plaintiffs' claims against the Canadian Defendants in Count II are based on acts that are of the kind performed by governments.  The gravamen of Plaintiffs' claims is that Canada's decision to approve a location for the NITC/DRIC in Canada in close proximity to the Ambassador Bridge will violate their alleged franchise rights.  If the NITC/DRIC were constructed in Port Huron, Michigan, or Buffalo, New York, where other bridges already exist, there would be no cognizable impact to Plaintiffs.  It is Canada's sovereign decision to approve a publicly owned toll bridge in Canada *at this particular location* that Plaintiffs challenge.

  That decision is not the type of act that can be engaged in by a private commercial enterprise.  Governments, not commercial actors engaging in commerce, approve the location of and regulate international border crossings.  The power necessary to undertake such activities is peculiar to a sovereign.  It is an exercise of police power under the sovereign's obligation to protect and manage the trade routes across its border.  *See City of S. Pasadena v. Goldschmidt*, 637 F.2d 677, 679 (9th Cir. 1981) (recognizing "the sovereign rights of States to determine which [transportation] projects shall be federally financed" and their "authority to select, adopt and determine the location for state highways and to alter or change such locations"); *First Merchants Collection Corp. v. Republic of Argentina*, 190 F. Supp. 2d 1336, 1338–39 (S.D. Fla. 2002) (holding that controlling borders by seizing goods thought to be illegally imported is an act of police power and not a commercial activity); *Velasquez v. General Consulate of Mexico*,

No. C-92-3745-EFL, 1993 WL 69493, at \*2 (N.D. Cal. Mar. 4, 1993) ("[T]he control of the entry of goods into a nation . . . is one which only a sovereign can perform and is not of a commercial nature.").  The approval of the location of the Ambassador Bridge proves this rule: "[t]he United States, not DIBC and CTC, chose the location for the Ambassador Bridge."  (3d Am. Compl. ¶ 70.)

A nation's decision to open its borders to an international bridge is an inherently sovereign power.  Indeed, only the sovereign may grant a contractor the right to build an international crossing and only the sovereign may approve the location.  See *Proprietors of the Charles River Bridge v. Proprietors of the Warren Bridge*, 36 U.S. 420, 504 (1800); *California v. Central Pac. Railroad Co.*, 127 U.S. 1, 40-41 (1888); *Jackson-Shaw v. Jacksonville Aviation Authority*, 510 F.Supp.2d 691, 719-20 (M.D. Fla. 2007) (defining "franchise" as "a special privilege conferred . . . by governmental authority to do something that cannot be done of common right"); (3d. Am. Compl. ¶ 70).  Subjecting Canada to suit on its sovereign decision of whether and where to approve the location of a bridge across the Detroit River would impermissibly impair Canada's sovereign ability to grant franchises and to otherwise control its border.

Even accepting all of the factual allegations in the Third Amended Complaint, it is clear as a matter of law that the approval of a location for an international crossing is exclusively an act of sovereign power.  Plaintiffs' claims against the Canadian Defendants in Count II are based on that sovereign act.  Accordingly, this Court lacks subject matter jurisdiction over the claims against the Canadian Defendants in Count II.

> 2.   *The Court lacks jurisdiction over Count III because it is based on legislative and regulatory acts, not commercial acts of the Canadian Defendants.*

Plaintiffs' grievance in Count III is the alleged "accelerat[ion of] the regulatory approvals for the NITC/DRIC and/or . . . delay [of] the regulatory approvals of the New Span."  (3d Am. Compl. ¶ 322.)  To the extent that any of the acts on which Count III is based are alleged to have been taken by the Canadian Defendants, FSIA requires dismissal.

Promulgation of legislation and management of regulatory processes is a paradigm of sovereign action, not of private parties engaged in commerce.  *See O'Bryan*, 556 F.3d at 380 (holding that the Holy See's promulgation of a policy, and failure to act in accordance with that policy, was not a commercial activity because it was not the type of action taken by a private party engaging in commerce); *Wolf v. F.R.G.*, 95 F.3d 536 (7th Cir. 1996) (holding that enacting and administering legislation, entering into international agreements with other sovereigns, and issuing regulations are "sovereign acts, not the kind of ordinary commercial transaction that a private party might undertake").  Enacting and applying laws is clearly a sovereign act.  *Wolf*, 95 F.3d at 543–44; *see Grendel's Den, Inc. v. Goodwin*, 662 F.2d 88, 92–93 (1st Cir. 1981) (collecting cases discussing the nondelegation doctrine and the associated first principle that only a sovereign has the authority to enact laws).

Market participants acting in commerce do not, and cannot, control regulatory processes. Under our legal system, they cannot apply regulations or statutes.  They do not control regulatory processes and do not have the authority to accelerate or delay those processes.  Even under the broadest possible application of the commercial activities exception it is clear that the power to enact and apply law is a power peculiar to a sovereign.  *See* Robert B. von Mehren, *The Foreign Sovereign Immunities Act of 1976*, 17 COLUM. J. TRANSNAT'L L. 33, 49 (1978) ("[A] state acts *jure imperii* when it legislates.")

Plaintiffs' claims in Count III are based on sovereign acts, not commercial acts. Specifically, Plaintiffs' claims in Count III are based on promulgation of legislation and management of regulatory processes in Canada (*i.e.*, acceleration of approval of the DRIC and delay of or refusal to approve the proposed new span to the Ambassador Bridge).  (3d Am. Compl. ¶¶ 322–23.)  Even though Plaintiffs allege that those activities constitute "commercial activity" under FSIA, the Court is not required to accept that legal conclusion.  The Court is required to take as true only the factual allegations in the Third Amended Complaint.  *Mwani*, 417 F.3d at 16.  And because as a matter of law Count III is based on sovereign acts, it should be dismissed as falling outside of this Court's narrow jurisdiction under FSIA.

### 3. *Plaintiffs' claims do not have a sufficient nexus to the United States.*

Plaintiffs bear the double burden under the commercial activities exception to show not only that their claims are based on commercial activities of Canada, which they are not, but also that the alleged commercial activities caused "something legally significant" to occur in the United States.  *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1515 (D.C. Cir. 1988). Plaintiffs have failed to carry that burden.

Plaintiffs allege multiple acts of Canada that occurred or have effects in the United States.  (*E.g.*, 3d Am. Compl. ¶¶ 34–35).  Plaintiffs' allege, for example, that the NITC/DRIC will connect to the United States and that Canada has engaged in meetings and lobbying activities in the United States to promote the DRIC.

The list is long.  But Plaintiffs need more than a long list of acts and effects to satisfy the nexus prong under FSIA.  They need a list that includes acts on which their claims are based or nontrivial impacts that "follow[] as an immediate consequence of the defendant's activities," without any intervening element.  *Weltover*, 504 U.S. at 617–18; *Upton v. Empire of Iran*, 459 F. Supp. 264, 266 (D.D.C. 1978); *cf. Lotes Co., LTD., v. Hon Hai Precision Industry Co. LTD.,*

2013 WL 2099227, *7–10 (S.D.N.Y. May 14, 2013) (concluding that even "taking Plaintiff's allegations as true" the alleged conduct was "connected to the United States only through a long and convoluted series of transactions and manufacturing steps" that did not allege a sufficiently direct harm in the United States, so the Foreign Trade Antitrust Improvements Act barred Plaintiff's Sherman Act claims). There must be a direct, causal relationship between the commercial activity and the substantial, foreseeable direct effects felt in the United States. *Zedan*, 849 F.2d at 1515.

Jurisdiction over Plaintiffs' claims against the Canadian Defendants is not established under FSIA just because the governments of Canada and the United States had meetings in the United States, or because the United States decided to exercise its independent, sovereign authority to make decisions regarding the NITC/DRIC—even if those decisions were based on or influenced by acts of Canada, as Plaintiffs allege. *See Nelson*, 507 U.S. at 357; *Weltover*, 504 U.S. at 617; *Zedan*, 849 F.2d at 1515.

The effects in the United States alleged by Plaintiffs do not follow as an immediate consequence, without any intervening element, of Canada's sovereign decisions on where to locate the NITC/DRIC and how to enact and apply Canadian law. Plaintiffs' allegations of Canadian action and impact in the United States ignore the fact that there are two independent, sovereign decision makers involved. Any effects felt in the United States are contingent on the United States exercising its own authority to regulate its international border with Canada. The acts on which Plaintiffs' claims against Canada are based—Canada's sovereign decisions of where to locate the NITC/DRIC and how to administer its laws—necessarily occurred and apply only in Canada. And there is no direct link between those sovereign decisions in Canada and any impact in the United States: the United States has independent, sovereign authority to make its

own decisions regarding the NITC/DRIC and the Ambassador Bridge, regardless of what Canada has decided under Canadian law in Canada.

And to the extent that Plaintiffs may suffer economic harm as a consequence of Canada's sovereign decisions, that harm would not constitute a "direct effect" in the United States. "A financial loss in the United States, when all the acts actually giving rise to the claim occurred outside this country, is insufficient to show the 'direct effect' in the United States that FSIA requires." *BPA Int'l, Inc. v. Kingdom of Sweden*, 281 F. Supp. 2d 73, 81 (D.D.C. 2003) (citing *Ge v. Peng*, 201 F. Supp. 2d 14, 24–25 (D.D.C. 2000); *Gregorian v. Izvestia*, 871 F.2d 1515, 1527 (9th Cir. 1989)).  There is simply an insufficient nexus between Canada's alleged actions, the alleged acts on which Plaintiffs' claims are based, and any alleged effects that might someday be felt in the United States.

The list of variables that come into play before the NITC/DRIC is constructed and operational, and the number of players who will need to exercise independent decision-making authority, amply demonstrates that there is no direct link for FSIA purposes between the actions of Canada (regulatory approval of a bridge site in Canada and enacting and applying laws) and any alleged effect in the United States.  This Court lacks jurisdiction over these claims because the acts on which these claims are based do not have a sufficient nexus to the United States to satisfy FSIA.  Canada's siting decision and regulatory actions all necessarily occurred in Canada, and there is no direct link between those acts and Plaintiffs' harm as alleged in the Third Amended Complaint.  In this context, Plaintiffs might be entitled to seek relief against the Canadian Defendants in Canada, but they are not entitled to do so in this Court, where there is only an indirect link between the sovereign acts on which Plaintiffs' claims are based and the alleged impacts in the United States.

In sum, it is apparent from the face of their Third Amended Complaint that Plaintiffs have failed to allege a factual basis for their claims that would establish subject matter jurisdiction under the commercial activities exception to FSIA.  Plaintiffs' claims are based on sovereign acts: enacting and applying laws, and selecting a location for a new international trade and transportation route from and into Canada near the Ambassador Bridge.  These sovereign acts are not commercial, and they do not have a sufficient nexus to the United States. Accordingly, this Court lacks subject matter jurisdiction under FSIA's commercial activities exception.

### C.      The Canadian Defendants have not waived jurisdiction under FSIA.

Plaintiffs have not alleged any facts in support of their legal conclusion that the Canadian Defendants have waived sovereign immunity.  Conclusory allegations that a foreign state is engaged in activities that constitute an exception to FSIA are insufficient as a matter of law. *Crist v. Republic of Turkey*, 995 F. Supp. 5, 11 (D.D.C. 1998).  The only allegation with respect to waiver of jurisdiction in Plaintiffs' Third Amended Complaint is a single-sentence paragraph that states that "through its activities in the United States set forth in this Third Amended Complaint, Canada has waived sovereign immunity."  (3d Am. Compl. ¶ 46.)  That conclusory allegation is not enough for Plaintiffs to carry their burden, and the lack of specific allegations with respect to waiver is itself a sufficient reason to hold that the Canadian Defendants have not waived sovereign immunity.[16]

---

[16] The Canadian Defendants accept Plaintiffs' factual allegations as true for the limited purpose of this facial motion to dismiss, but the Canadian Defendants contest the legal conclusions in Plaintiffs' Third Amended Complaint.  *See Abdulla v. Univ. Ark. Little Rock*, No. 13-20 (RMC), 2013 WL 1092867, (D.D.C. Mar. 18, 2013) ("When reviewing a motion to dismiss for lack of jurisdiction under Rule 12(b)(1) . . . the Court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiffs' legal conclusions.").

In fact, it is clear from the record in this case that the Canadian Defendants have not waived sovereign immunity.  Courts in the D.C. Circuit follow the "virtually unanimous" rule of very narrowly construing the implicit-waiver exception under FSIA.  *E.g.*, *Creighton Ltd. v. Government of Qatar*, 181 F.3d 118, 122 (D.C. Cir. 1999); *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 444 (D.C. Cir. 1990).  To be effective, a waiver must be unmistakable and unambiguous.  *Creighton*, 181 F.3d at 123.  It requires an intentional and knowing relinquishment of the legal right at issue.  *Strategic Techs. PTE, Ltd.*, 2007 WL 1378492, at *2 (citing *Creighton*, 181 F.3d at 122); *see also Foremost-McKesson*, 905 F.2d at 444 ("[C]ourts rarely find that a nation has waived its sovereign immunity . . . without strong evidence that this is what the state intended.").  More is required than a reiteration of allegations regarding "commercial activities;" as a matter of law, such commercial activities allegations do not demonstrate an unambiguous and intentional waiver of sovereign immunity under FSIA.  *See Raccoon Recovery, LLC v. Navoi Mining & Metallurgical Kombinat*, 244 F. Supp. 2d 1130, 1139–40 (D. Colo. 2002) (finding that allegations of commercial activities were insufficient to establish waiver); *Mendenhall v. Saudi Aramco*, 991 F. Supp. 856, 858–59 (S.D. Tex. 1998) (holding that the argument that substantial business dealings in the United States establishes waiver "has no basis in law when viewed in light of authority regarding waiver under the FSIA.").

The Third Amended Complaint fails to, and indeed cannot, allege facts that show unmistakably and unambiguously that the Canadian Defendants intentionally and knowingly relinquished their sovereign immunity.  It is a matter of record in this case that Canada, and now WDBA, moved to dismiss this action under FSIA at their earliest opportunity.  Canada and WDBA have never abandoned their entitlement to immunity from this suit, and Plaintiffs' general commercial activities allegations do not establish otherwise.

## II. Even if this Court has jurisdiction under FSIA, the Court should stay these proceedings in deference to parallel proceedings that Plaintiffs are pursuing against the Canadian Defendants in Canada.

Even if the Court found that it has subject matter jurisdiction under FSIA, the Court should abstain from exercising that jurisdiction and stay these proceedings in deference to parallel proceedings that Plaintiffs are pursing against Canada in Canada. Principles of respect for the courts of a sovereign nation, fairness to litigants, and judicial efficiency may at times advise a court to issue a stay of a domestic proceeding. *See, e.g.*, *Pexcor Mf'g Co.*, *v. Uponor AB*, 920 F. Supp. 2d 151, 153 (D.D.C. 2013) (Collyer, J.) (staying patent litigation in favor of Canadian litigation because "a decision in Canada about the parties' rights under a 'nearly identical' patent will likely narrow the issues and probably will resolve this case").

The circumstances of this case counsel strongly in favor of abstention. Plaintiff CTC is a Canadian corporation. Its Third Amended Complaint asks this Court to declare its rights against Canada under Canadian franchise law. (3d Am. Compl. at 113–114 ¶¶ (i), (*l*) (seeking declarations against Canada "under Canadian law")). CTC seeks these declarations from this Court even though CTC is currently advancing similar claims and seeking similar declarations under Canadian law against Canada in Canadian courts. [17]

Canada has a paramount interest in adjudicating this dispute concerning matters of legal and practical significance to the nation of Canada and involving interpretation of Canadian law, in Canada. In addition, the practical difficulties of adjudicating a claim involving issues of Canadian law and enforcing a U.S. judgment secured by a Canadian corporation against the Canadian Defendants in Canada, counsels strongly in favor of abstention. *See Groeneveld Transp. Efficiency v. Eisses*, 297 F. App'x 508, 2008 WL 4659844 (6th Cir. 2008) (affirming

---

[17] *CTC v. Attorney General of Canada*, CV-12-446428 (Ontario Superior Court of Justice).

23

abstention in deference to parallel proceedings in Canada).  The adequacy of the Canadian courts as a judicial forum capable of fairly resolving claims against the Canadian Defendants under Canadian law is beyond dispute and is a further basis for this Court to defer to the judicial proceedings pending in Canada.  *See Brinco Mining LTD. v. Federal Ins. Co.*, 552 F. Supp. 1233, 1240 (D.D.C. 1982) ("[I]f this Court cannot extend comity to Canada, the comity principle has little vitality in our jurisprudence.").

A stay in this case would allow the proceedings in the Ontario Superior Court of Justice to resolve the issues of Canadian law that Plaintiffs have presented to this Court.  It would promote judicial efficiency and avoid the risk of inconsistent declarations on the same issue of Plaintiffs' rights under Canadian law.

## CONCLUSION

For all of the above reasons, Plaintiffs' claims against Her Majesty the Queen in Right of Canada and the Windsor-Detroit Bridge Authority (Counts II–III of the Third Amended Complaint) should be dismissed with prejudice and with costs.

Dated:  August 30, 2013

> */s/ Scott M. Watson*
> Scott M. Watson
> Douglas A. Dozeman
> Eugene E. Smary
> Warner Norcross & Judd LLP
> 111 Lyon St. NW, Suite 900
> Grand Rapids, Michigan 49503
> 616.752.2465
> fax:  616.222.2465
> swatson@wnj.com
> esmary@wnj.com
> ddozeman@wnj.com
>
>
> *Attorneys for Her Majesty the Queen in Right of
> Canada and the Windsor-Detroit Bridge Authority*

9374560

**CERTIFICATE OF SERVICE**

On August 30, 2013, I served a true and correct copy of the Canadian Defendants' Joint Motion to Dismiss and Statement of Points and Authorities in Support by Her Majesty the Queen in Right of Canada and The Windsor-Detroit Bridge Authority on all attorneys of record by sending it by electronic means via the Court's electronic case filing system.

*/s/ Scott M. Watson*
Scott M. Watson