_____
                                        )
**DETROIT INTERNATIONAL**                )
**BRIDGE COMPANY**, *et al.*,            )
                                        )
     **Plaintiffs,**      )
                                        )
    **v.**                       )    **Civil Action No. 10-476 (RMC)**
                                        )
**GOVERNMENT OF CANADA**, *et al.*,      )
                                        )
     **Defendants.**     )
_____ )

## OPINION

The Ambassador Bridge spans the Detroit River between Detroit, Michigan and Windsor, Ontario and carries more than one-quarter of the total commercial traffic between the United States and Canada. The Bridge is privately owned by the Detroit International Bridge Company (DIBC, or Bridge Company) and its wholly-owned subsidiary, the Canadian Transit Company, which collect toll revenue for Bridge maintenance and profit. However, the Ambassador Bridge is more than eighty years old. Its owners want to construct a Twin Span immediately adjacent to the existing Bridge to service customers while maintenance work is performed on the Ambassador Bridge. To their dismay, however, a cross-border partnership of government entities has proposed the construction of a new publicly-owned bridge, which would compete with the Ambassador Bridge and possibly destroy the financial basis for the Twin Span. DIBC applied for a navigational permit from the U.S. Coast Guard approximately ten years ago, before the partnership was formed, but the Coast Guard has refused to process the application pending resolution of a local property rights dispute. DIBC sues the Coast Guard for, *inter alia*, its failure to issue a navigational permit for the Twin Span. The Coast Guard moves to dismiss this claim, and DIBC cross-moves for summary judgment. DIBC also moves to enjoin the Coast

Guard from issuing a navigational permit for the competing government-owned bridge. For the reasons set forth below, the Court will deny Plaintiffs' Motion for a Preliminary Injunction and grant the Coast Guard's Motion to Dismiss Count IV of the Second Amended Complaint.

## I. FACTS

The instant dispute stems from the Coast Guard's refusal to issue a navigational permit for the Twin Span based on DIBC's failure to acquire certain local property rights. DIBC contends that the Coast Guard's refusal to grant a navigational permit constitutes arbitrary and capricious agency action, particularly in light of the Agency's pending approval for the government-owned "New International Trade Crossing/Detroit River International Crossing" (NITC/DRIC) (pronounced Nitsy-Drick) bridge. Specifically, DIBC argues that the Coast Guard's decision to return its application is based on a regulation that either is invalid or has been improperly applied to the Twin Span. Because the Coast Guard is allegedly poised to grant the NITC/DRIC's permit application, DIBC also has moved for preliminary injunctive relief. *See* Mot. for Prelim. Inj. [Dkt. 143].

### A. Statutory Framework for Navigational Permits

A bit of history is necessary to understand the dispute. In a series of Rivers and Harbors Acts in the 19th century, Congress delegated to the War Department[1] the authority to regulate navigable waters in the United States. One of the first of these statutes, enacted in 1880, directed the War Department to remove sunken vessels from waters to ensure their navigability. *See* Act of June 14, 1880, ch. 211, § 4, 21 Stat. 197 (1880). Four years later, Congress

---

[1] Established in 1789, the War Department existed until 1947, when its title was changed to Department of the Army, and it was combined with the Departments of the Navy and Air Force to form the National Military Establishment. *See* Act of July 26, 1947, ch. 343, § 205(a), 61 Stat. 501 (1947) (repealed by Act of Aug. 10, 1956, ch. 1041, § 53, 70A Stat. 641 (1956)). The National Military Establishment was renamed the Department of Defense in 1949. *See* Act of Aug. 10, 1949, ch. 412, 63 Stat. 592 (1949).

authorized the War Department to issue permits for approved bridges over navigable waters.  *See*

Act of July 5, 1884, ch. 229, § 8, 23 Stat. 133, 148 (1884) (empowering Secretary of War to

review bridge proposals for projects that might obstruct navigation).

In 1899, Congress prohibited the construction of any new bridge extending over

navigable waters without prior congressional approval.  *See* Rivers and Harbors Act of 1899

(1899 Act), ch. 425, § 9, 30 Stat. 1121, 1151 (now codified at 33 U.S.C. § 401).[2]  The 1899 Act

provided that:

> [I]t shall not be lawful to construct or commence the construction
> of any bridge, dam, dike, or causeway over or in any port,
> roadstead, haven, harbor, canal, navigable river, or other navigable
> water of the United States until the consent of Congress to the
> building of such structures shall have been obtained and until the
> plans for the same shall have been submitted to and approved by
> the Chief of Engineers and the Secretary of War.

*Id.*  By its terms, the 1899 Act applied to domestic and international bridges.

Notably, the 1899 Act required Congress to approve each and every proposed

bridge over navigable waters during a time of extensive national growth and economic

development.  Congress established a process for the approval of bridge construction plans in

1906.  *See* 1906 Bridge Act, ch. 1130, § 1, 34 Stat. 84 (1906) (now codified at 33 U.S.C. §§ 491–

498).  The 1906 Bridge Act established uniform rules regarding the construction and operation of

congressionally-authorized bridges over navigable waters.  At its core, the 1906 Bridge Act

ordered that bridges authorized by Congress

> shall not be built or commenced until the plans and specifications
> for its construction, together with such drawings of the proposed

---

[2]  The 1899 Act exempted from the requirement of prior congressional approval those
"waterways the navigable portions of which lie wholly within the limits of a single State," for
which approval could be obtained from the State Legislature.  *See* 1899 Act, ch. 425, § 9, 30
Stat. 1121, 1151 (now codified at 33 U.S.C. § 401).  Thus, the 1899 Act was directed at bridges
affecting either interstate or foreign navigation.

construction and such map of the proposed location as may be required for a full understanding of the subject, have been submitted to the Secretary of War and Chief of Engineers for their approval, nor until they shall have approved such plans and specifications and the location of such bridge and accessory works[.]

*Id.*

Thus, in 1906, Congress gave the Secretary of War and Chief of Engineers statutory authority to assess and approve proposed bridge plans. The 1906 Bridge Act was the last congressional enactment concerning international bridges until 1972, long after Congress had approved the Ambassador Bridge in 1921.

In 1946, Congress enacted the General Bridge Act of 1946, currently codified at 33 U.S.C. §§ 525–534. The General Bridge Act of 1946 removed Congress from the process of approving individual *domestic* bridges and authorized all such bridges subject only to approval by the War Department. *See Sisselman v. Smith*, 432 F.2d 750, 753 (3d Cir. 1970) (holding that, with respect to domestic bridges, "[t]he General Bridge Authority Act was clearly intended to end piecemeal Congressional supervision of bridge construction by delegation of Congressional authority to an expert administrative agency"). However, international bridges remained subject only to the 1906 Bridge Act. *See* 33 U.S.C. § 531 (providing that the General Bridge Act of 1946 "shall not be construed to authorize the construction of any bridge which will connect the United States, or any Territory or possession of the United States, with any foreign country").

In its most recent statute on bridges over navigable waters, Congress enacted the International Bridge Act of 1972, 33 U.S.C. §§ 535–535i. By this enactment, Congress removed itself from the business of bridge approvals and gave advance consent to international bridges, subject to compliance with the 1906 Bridge Act, approval by the foreign government and U.S. federal officials, and compliance with all applicable technical requirements. 33 U.S.C. § 535.

Over time, Congress also has shifted the authority to approve bridges over navigable waters to different executive departments and constituent agencies. The War Department initially had been tasked with approving the plans, specifications, and locations of bridges. *See* 1906 Bridge Act, ch. 1130, § 1, 34 Stat. 84 (1906) (now codified at 33 U.S.C. § 491–498). The War Department existed until 1947, when the National Security Act of 1947 changed its title to the Department of the Army. *See* Act July 26, 1947, ch. 343, § 205(a), 61 Stat. 501 (repealed by Act of August 10, 1956, ch.1041, § 53, 70A Stat. 641). Thereafter, the Army Corp of Engineers was charged with reviewing and approving bridge permit applications. *See id.* In 1967, Congress created the Department of Transportation and transferred the Coast Guard to that newly-created Department. 49 U.S.C. § 1655(b) (1970). As part of the Transportation Act, Congress also transferred all authority to review and approve bridge permits from the Army Corps of Engineers to the Coast Guard. *Id.* § 1655(g) (1970). The Coast Guard remained within the Department of Transportation until 2002, when Congress transferred the Coast Guard and its authorities, functions, and personnel to the Department of Homeland Security (DHS). 6 U.S.C. § 468(b), (c). The Coast Guard is now a constituent agency of DHS with exclusive authority over navigational permits for bridges over domestic and international navigable waters. *See* 6 U.S.C. § 468(c).

### B. Regulatory Framework for Navigational Permits

The Coast Guard has inherited rules and promulgated regulations concerning the "[l]ocations and clearances of bridges and causeways over the navigable waters." *See* 33 C.F.R. § 114.01(a)(1). As explained by the Coast Guard:

> The several bridge laws . . . are intended to prevent any interference with navigable waters of the United States . . . except by express permission of the United States. The decision as to whether a bridge permit or a drawbridge operation regulation will be issued or promulgated must rest primarily upon the effect of the

proposed action on navigation to assure that the action provides for the reasonable needs of navigation after full consideration of the effect of the proposed action on the human environment. The Coast Guard is not responsible for any other permits that the applicant may need from other federal, state, or local agencies and issuance of a bridge permit does not affect flood control projects or other governmental programs.

33 C.F.R. § 114.10.

The parties dispute the scope of, and statutory authority for, a Coast Guard regulation entitled "Necessary Primary Authority," most particularly its last sentence:

For bridges constructed by State or municipal agencies, the primary authority will be presumed without proof. If the law of the State requires a license for or approval of the bridge from a constituted State agency, a copy of such license or approval will be required and may be accepted as evidence of the primary authority. If there is no State regulation of bridges in navigable waters, the necessary primary authority may be that granted in the charter of a corporation, or the authority inherent in the ownership of the land on which the structure is placed. The applicant will in such cases be required to furnish an extract from the charter, or a statement of ownership. *Special care will be taken that Federal approval is not granted when there is doubt of the right of the applicant to construct and utilize the bridge.*

33 C.F.R. § 115.05 (emphasis added). Part 115 of Title 33 is titled "Bridge Locations and Clearances; Administrative Procedures." It identifies its statutory authority as the 1899 Act, the 1906 Bridge Act, the General Bridge Act of 1946, and the 1972 International Bridge Act. *See id.* The parties dispute the meaning and scope of 33 C.F.R. § 115.05. While DIBC contends that the regulation applies exclusively to domestic bridges under the 1946 General Bridge Act, *see* Pls. MSJ [Dkt. 96-1] at 4,[3] the Coast Guard responds that it applies to both domestic and international bridges under the 1906 Bridge Act, *see* Fed. Defs. Opp'n to MSJ [Dkt. 106] at 29–33.

---

[3] All page references to the parties' motions correspond to the conventions supplied in briefing, not those supplied by the electronic case-filing (ECF) system.

Regulation 115.05 was not adopted in isolation. The War Department published its predecessor on September 11, 1946:

> For works constructed by State or municipal agencies, the primary authority will be presumed without proof. If the law of the State requires a license for or approval of the work from a constituted State agency, a copy of such license or approval will be required and may be accepted as evidence of the primary authority. If there be no State regulation of structures in navigable waters, the necessary primary authority may be that granted in the charter of a corporation, or the authority inherent in the ownership of the land on which the structure is placed. The applicant will in such cases be required to furnish an extract from the charter, or a statement of ownership. *Especial care will be taken that Federal approval is not granted when there is doubt of the right of the builder to construct and utilize the work.*

33 C.F.R. § 209.345 (1946) (emphasis added). Part 209 of Title 33 was titled "Rules Relating to Administrative Procedure." Regulation 209.120 provided that "the builder of a bridge must file an application . . . . [showing] . . . the waterway and location of the bridge; citation to the act of Congress or the State legislature authorizing the bridge; and be accompanied by a map of the location and plans of the bridge showing these features which affect navigation . . . ." In addition, 33 C.F.R. § 209.330 (1946) explained that:

> (a) The decision as to whether a permit will be issued must rest primarily upon the effect of the proposed work on navigation. However, in cases where the structure is unobjectionable from the standpoint of navigation but when State or local authorities decline to give their consent to the work, it is not usual for the Department actually to issue a permit. This is for the reason that while the instrument merely expresses assent so far as concerns the public rights of navigation, it practically becomes of no value in the event of opposition by State or local authority and may be regarded by such authority as an act of discourtesy. In such cases the applicant is informed that the structure is unobjectionable from the standpoint of navigation and that permit would be issued were the consent of the local authority also forthcoming.

> (b) In cases of conflicting property rights the Department cannot undertake to adjudicate rival claims.

*Id.* Thus, the predecessor War Department rules warned that local opposition might prevent a bridge proponent from acquiring a navigational permit.

In addition to 33 C.F.R. § 115.05, the Coast Guard has imposed other regulatory requirements on the permit application process. For instance, when the Coast Guard receives a navigational permit application, "the District Commander verifies the authority for construction of the bridge, reviews the application and plans for sufficiency, ascertains the views of local authorities and other interested parties, and ensures that the application complies with relevant environmental laws, regulations, and orders." 33 C.F.R. § 115.60(a).

### C. The Ambassador Bridge and Proposed Twin Span

The American Transit Company (ATC), predecessor to DIBC, was established in 1920 to build a suspension bridge between Detroit, Michigan and Ontario, Canada. Congress approved the bridge construction project in 1921 and enacted a statute providing that "the consent of Congress is hereby granted to American Transit Company, its successors and assigns, to construct, maintain, and operate a bridge and approaches thereto across Detroit River at a point suitable to the interests of navigation, within or near the city limits of Detroit, Wayne County, Michigan, in accordance with the provisions of" the 1906 Bridge Act. Act of March 4, 1921, ch. 167, § 1, 41 Stat. 1439 (1921).

In 1927, ATC transferred all of its rights and assets to DIBC, which, in turn, merged into the present-day DIBC in 1979. ATC's corporate charter states that its purpose is to "carry on the construction, operation and development of bridges, tunnels, approaches and accessories thereto, and all allied projects as may be required or as may be hereinafter mentioned." Pls. MSJ on Counts 1, 3, 6, and 7 of Third Am. Compl. [Dkt. 133], Ex. 12 (ATC

Articles of Incorporation) [Dkt. 133-16] at 3.[4]  Canada also enacted legislation to approve

construction of the Ambassador Bridge on the Canadian side of the Detroit River.  *See* Mot. for

Prelim. Inj. [Dkt. 143], Ex. 3 (CTC Act) [Dkt. 143-10] at 3.  Construction of the Ambassador

Bridge was completed in 1929, and the Bridge first opened for traffic on November 11, 1929.

Second Am. Compl. [Dkt. 83] ¶ 69.

According to the Second Amended Complaint, the legislation enacted by Canada

had the effect, under Canadian law, of giving the Canadian Transit Company (CTC) an exclusive

franchise "to operate its facilities and collect tolls or fares and to exclude competition as long as

the [B]ridge remains useful." *Id.* ¶ 77.[5]  The Second Amended Complaint also alleges that

"[e]xclusivity of a toll bridge franchise is breached under Canadian law if a competing bridge

diverts traffic from the franchisee," which means that any new bridge "must be placed at

sufficient distance . . . to avoid competition . . . ." *Id.* ¶ 79.  DIBC further alleges that the statute

granting the Bridge Company the right to "construct, maintain, and operate" its bridge under

U.S. law, *see* Act of Mar. 4, 1921, ch. 167, § 1, 41 Stat. 1439 (1921), contains no termination

date.  From this history, DIBC claims "*a perpetual and exclusive right of franchise* to build,

operate, maintain, and collect tolls on a bridge across the Detroit River . . . ."  Second Am.

Compl. ¶ 63 (emphasis added).

---

[4] Page references to the parties' exhibits are based on the conventions supplied by the ECF
system.

[5]  On April 5, 2013, the Court directed the parties to brief Count IV, *i.e.*, DIBC's Administrative
Procedure Act (APA) claim against the Coast Guard.  *See* Apr. 5, 2013 Scheduling Order
[Dkt. 90] at 2–3.  DIBC filed a Third Amended Complaint on May 29, 2013, "subject to [the]
specific representation with respect to Count Four . . . that the amendments [were] not intended
to raise new issues or claims, but to ensure that the allegations are consistent with the facts as
already alleged in the [Second Amended] [C]omplaint."  Mot. for Leave to File Third Am.
Compl. [Dkt. 104] at 2.  References to the Complaint, therefore, will be to the Second Amended
Complaint.

DIBC owners now desire to build a new span directly alongside the original Ambassador Bridge. Such construction would be completed using only private funds. DIBC contends that most obstacles to construction have been removed, that the approach ramps for the Twin Span have been constructed on the Canadian side, and that it:

> already owns all the land between the ramp and the Detroit River on the Canadian side. And DIBC believes that it will be able to reach agreement with the City of Detroit to purchase an easement, if necessary, to allow the New Span *to pass over the one unowned parcel of land*[6]. . . on the U.S. side after the permits to build the New Span are in place.

Second Am. Compl. ¶ 143 (emphasis added). In other words, DIBC owns all *land* necessary to build the Twin Span, but requires "air rights" over a portion of Riverside Park, Detroit that is closed to the public due to contamination.

Despite its private funding, the Twin Span must be permitted by the Coast Guard under the 1906 Bridge Act to avoid any impermissible impact on the navigable waters between Detroit and Canada. The Twin Span cannot be constructed without a navigational permit. In fact, there does not seem to be any question as to whether the Twin Span will affect navigation, as its abutments would be on land rather than in the Detroit River. *See* DIBC Response to Notice of Supp. Auth. [Dkt. 159] at 8 ("DIBC has changed its design so that no pier will be built on the park, and the bridge will pass 70 feet over the park . . . .").

DIBC applied for a navigational permit for the Twin Span in 2004. The Coast Guard held public hearings and consulted with the Environmental Protection Agency (EPA),

---

[6] The "unowned parcel of land" is owned by the City of Detroit. DIBC's reference merely conveys that the Bridge Company does not own land rights to the relevant portion of Riverside Park.

which expressed concerns about the Twin Span's potential impact on air quality.[7]  Further

analysis and public hearings proceeded thereafter.  The Coast Guard also expressed concern

about DIBC's failure to secure an air rights easement over a portion of Riverside Park.  On

March 6, 2009, the Coast Guard informed DIBC that "the issue of property ownership for the

U.S. bridge piers [would] not delay completion of the NEPA process," but that "the issue must

be resolved prior to any [Coast Guard] permit issuance."  Fed. Defs. Opp'n to Mot. for Prelim.

Inj. [Dkt. 149], Ex. 14 (Mar. 6, 2009 Letter from Coast Guard to DIBC) [Dkt. 149-14] at 4.

       The "air rights" issue is informed by recent Detroit history.  After September 11,

2001, DIBC sought and received approval from the Mayor of Detroit to construct a 150-foot

buffer between the public point of access and the Ambassador Bridge to protect the structure

from potential terrorist activities.  *See id.*, Ex. 15 (Apr. 30, 2009 Letter from City of Detroit to

Coast Guard) [Dkt. 149-15] at 3.  Based on this approval, DIBC constructed a fence

approximately 150 feet from the Bridge, which removed direct public access to a section of a

publicly-owned, yet undeveloped portion of Riverside Park.  Between its need to protect the

Ambassador Bridge and the Mayor's approval, DIBC construed its permission to occupy the

150-foot incursion onto Riverside Park broadly and appears to have assumed that it could readily

place Twin Span abutments there.  This state of affairs did not last.  In *City of Detroit v.

Ambassador Bridge Co.*, No. 08337680 (Mich. 36th Dist. Court, Oct. 2, 2009), *aff'd*,

*Ambassador Bridge Co. v. City of Detroit*, No. 09-026059-AV (Mich. Cir. Ct. Feb. 3, 2012),[8] the

---

[7]  In part, EPA was concerned because of two Bridge-related projects: the Twin Span and the
Detroit River Gateway Project, by which new high-speed roads have connected the Bridge to
highways around Detroit instead of into City streets.  *See* Sept. 7, 2012 Letter to the Court
[Dkt. 64], Ex. 5 (Aug. 23, 2012 Letter from EPA to Coast Guard) [Dkt. 64-5] at 1.

[8] The Michigan State Court decisions are included in the record.  *See* Fed. Defs. MTD, Ex. A
(*Ambassador Bridge Co. v. City of Detroit*) [Dkt. 92-1]; *id.*, Ex. B. (*City of Detroit v.
Ambassador Bridge Co.*) [Dkt. 92-2].

Michigan courts gave the City of Detroit the right to evict DIBC from its space behind the fence

in Riverside Park, finding that DIBC merely held a license from the former Mayor that could be

terminated at any time. DIBC has responded by redesigning the Twin Span abutments so that

they will be located on land wholly owned by DIBC. However, DIBC has not acquired an air

rights easement over Riverside Park, and the City of Detroit has indicated that it is unwilling to

sell such rights to DIBC for purposes of constructing the Twin Span. *See* Prelim. Inj. Ex. 16[9]

(Declaration of Dan Stamper (Stamper Decl.)) ¶ 21 (stating that, on October 22, 2013, "Mr.

Brown [Chief Compliance Officer for the City of Detroit] said there had been an 'instruction'

'from Lansing'[10] to the City of Detroit not to sell DIBC an easement for the Riverside Air Space

and that Lansing . . . would object to any efforts by DIBC to acquire an easement for the

Riverside Air Space"); Stamper Decl., Ex. A (Nov. 7, 2013 Letter from Miller Canfield P.L.C. to

DIBC) ("After careful review of your offer, the City has asked me to inform you that the City

will not transfer any interest in [Riverside Park] to DIBC.").

   On March 2, 2010, the Coast Guard returned DIBC's permit application on the

ground that DIBC did not own all of the necessary property rights. The Coast Guard relied on 33

C.F.R. § 115.05 to support this action.

---

[9] *See also* Prelim. Inj. Exhibit List [Dkt. 160] at 2.

[10] Federal Defendants dispute Mr. Stamper's contention that "Lansing," *i.e.*, government officials
in the Michigan State capital, instructed Mr. Brown and other Detroit officials not to sell an air
rights easement over Riverside Park to DIBC. Fed. Defs. Notice of Supp. Auth. [Dkt. 157] at 2;
*id.*, Ex. 1 (Declaration of Gary Brown (Brown Decl.)) [Dkt. 157-1] ¶ 9 ("I did not ask officials in
Lansing for the State's position on a sale of the Riverside Air Space to DIBC . . . . To my
knowledge there was never an instruction from Lansing not to sell DIBC an easement for the
Riverside Air Space."). This dispute is immaterial to the issues at hand.

### D. Procedural History

This suit was filed on March 22, 2010, against the Coast Guard, the Department of Homeland Security, the Federal Highway Administration (FHWA), and the Government of Canada. *See* Compl. [Dkt. 1] ¶¶ 17–20. As originally filed, the Complaint alleged that the Coast Guard had violated the Administrative Procedure Act (APA), 5 U.S.C. §§ 553, 701–706, by refusing to issue a navigational permit for the Twin Span. Compl. ¶¶ 203–210. Federal Defendants moved to dismiss on July 8, 2010, and DIBC voluntarily dismissed Canada, FHWA, and certain named officials because the Michigan Legislature appeared to have blocked construction of the NITC/DRIC. *See* Nov. 29, 2011 Notice of Voluntary Dismissal [Dkt. 52].

After a period of political maneuvering that DIBC contends violated Michigan law—an allegation that is not part of this lawsuit—NITC/DRIC supporters resumed their efforts to build a publicly-owned bridge. Based on these renewed efforts to construct a government-owned bridge, DIBC filed a Second Amended Complaint on February 11, 2013. *See* Second Am. Compl. [Dkt. 83]. Count IV of the Second Amended Complaint alleges that the Coast Guard was arbitrary and capricious in failing to issue a navigational permit for the Twin Span. *Id.* ¶¶ 305–311. The Coast Guard moved to dismiss Count IV on April 8, 2013, *see* Fed. Defs. MTD [Dkt. 92], and DIBC filed an Opposition and Cross-Motion for Summary Judgment on April 17, 2013, *see* Pls. MSJ [Dkt. 96-1].

On May 29, 2013, DIBC filed its Third Amended Complaint against the U.S. Department of State, the Secretary of State, NITC/DRIC partnership, FHWA, the Administrator of FHWA, the Government of Canada, the Windsor-Detroit Bridge Authority, the Coast Guard, and the Commandant of the Coast Guard. *See* Third Am. Compl. [Dkt. 105] ¶¶ 26–36. The Third Amended Complaint included the same allegations of arbitrary and capricious action by

the Coast Guard.  *See* Third Am. Compl. ¶¶ 325–331.  The motions on Count IV became ripe on June 21, 2013.  *See* Fed. Defs. Opp'n to MSJ [Dkt. 106]; Pls. Reply to MSJ [Dkt. 110].

On March 7, 2014, DIBC filed a Motion for a Preliminary Injunction, which argued that DIBC is likely to succeed on the merits of its claims that (1) the Coast Guard has violated Plaintiffs' statutory right to construct, maintain, and operate a bridge by returning DIBC's application for a navigational permit; (2) the Coast Guard was arbitrary and capricious in its refusal to grant an amendment to DIBC's 1927 navigational permit for the proposed Twin Span; and (3) the Coast Guard is violating DIBC's Equal Protection rights under the U.S. Constitution by favoring a publicly-owned bridge over Plaintiffs' privately-owned Twin Span.

The Court held a preliminary injunction hearing on April 30, 2014, during which the parties argued the merits of the legal principles underlying DIBC's request for injunctive relief.[11]  *See* Apr. 30, 2014 Minute Entry.  The Court continued the preliminary injunction hearing to May 1, 2014, to hear additional evidence and argument concerning DIBC's claims of likelihood of success on the merits and irreparable harm.  *See* May 1, 2014 Minute Entry.  The parties' merits arguments focused primarily on Count IV of the Second Amended Complaint.  DIBC's Motion for a Preliminary Injunction was fully briefed on May 15, 2014.  *See* Mot. for Prelim. Inj. [Dkt. 143]; Fed. Defs. Opp'n to Mot. for Prelim. Inj. [Dkt. 149]; DIBC Reply to Mot. for Prelim. Inj. [Dkt. 151]; Fed. Defs. Notice of Supp. Auth. [Dkt. 157]; DIBC Response to Notice of Supp. Auth. [Dkt. 159].  Because the preliminary injunction hearing included an

---

[11] Counsel for Canada argued that Canada should not be required to brief and argue DIBC's pending motion because Canada is immune from suit under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602 *et seq.*  The Court notified counsel for Canada that the preliminary injunction hearing would be limited to the dispute between DIBC and the U.S. Coast Guard and that this dispute required immediate consideration due to DIBC's request for preliminary injunctive relief.

extensive discussion on the merits of Count IV, the Court resolves both pending motions at this time.

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face. Fed. R. Civ. P. 12(b)(6). A complaint must be sufficient "to give a defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Although a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds for his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face." *Id.* at 570. A court must treat the complaint's factual allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555. But a court need not accept as true legal conclusions set forth in a complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

"Unlike motions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), factual challenges are not permitted under 12(b)(6) and the Court may only consider the facts alleged in the complaint, any documents attached as exhibits thereto, and matters subject to judicial notice in weighing the merits of the motion." *Kursar v. Transp. Sec. Admin.*, 581 F. Supp. 2d 7, 14 (D.D.C. 2008), *aff'd*, 442 F. App'x 565 (D.C. Cir. 2011). When a document is referred to in a complaint and is central to a plaintiff's claim, the court may consider

the document without converting the motion to dismiss into one for summary judgment.
*Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999).

### B. Federal Rule of Civil Procedure 56

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. In addition, if the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted).

### C. Administrative Procedure Act

DIBC alleges that the Coast Guard was arbitrary and capricious in its refusal to grant a navigational permit for the Twin Span based on "opposition from Canadian officials and FHWA rather than the statutory criteria for issuing a permit to build the bridge under the 1906 Bridges Act . . . ." Third. Am. Compl. ¶ 326; *see* Pls. MSJ at 37–54. Plaintiffs claim that the Coast Guard has "refused to process and has returned the Ambassador Bridge's application for a

permit and a FONSI[12] for the . . . New Span for improper reasons."  Third Am. Compl. ¶ 326.

This argument presents two familiar administrative-law inquiries: (1) whether the Coast Guard

acted within the confines of the authority delegated by Congress; and (2) whether there was a

rational basis for its actions.

### 1. The *Chevron* Review Standard

DIBC's argument that the Coast Guard has acted *ultra vires* is premised on three

basic tenets of administrative law.  First, "an agency's power is no greater than that delegated to

it by Congress."  *Lyng v. Payne*, 476 U.S. 926, 937 (1986); *see also Transohio Sav. Bank v. Dir.,*

*Office of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992).  Second, agency actions beyond

delegated authority are *ultra vires* and should be invalidated.  *Transohio*, 967 F.2d at 621.  Third,

courts look to an agency's enabling statute and subsequent legislation to determine whether the

agency has acted within the bounds of its authority.  *Univ. of D.C. Faculty Ass'n/NEA v. D.C.*

*Fin. Responsibility & Mgmt. Assistance Auth.*, 163 F.3d 616, 620–21 (D.C. Cir. 1998)

(explaining that *ultra vires* claims require courts to review the relevant statutory materials to

determine whether "Congress intended the [agency] to have the power that it exercised when it

[acted]").

When reviewing an agency's interpretation of its enabling statute and the laws it

administers, courts are guided by "the principles of *Chevron, U.S.A., Inc. v. Natural Resources*

*Defense Council, Inc.*, 467 U.S. 837 (1984)."  *Mount Royal Joint Venture v. Kempthorne*, 477

F.3d 745, 754 (D.C. Cir. 2007).  *Chevron* sets forth a two-step inquiry.  The initial question is

whether "Congress has directly spoken to the precise question at issue."  *Chevron*, 467 U.S. at

843.  If so, then "that is the end of the matter" because both courts and agencies "must give

---

[12] A FONSI, or "Finding of No Significant Impact," satisfies an agency's documentation
requirements under the National Environmental Protection Act (NEPA), 42 U.S.C. § 4332(2)(C).

effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. To decide whether Congress has addressed the precise question at issue, a reviewing court applies "'the traditional tools of statutory construction.'" *Fin. Planning Ass'n v. SEC*, 482 F.3d 481, 487 (D.C. Cir. 2007) (quoting *Chevron*, 467 U.S. at 843 n.9). It analyzes "the text, structure, and the overall statutory scheme, as well as the problem Congress sought to solve." *Id.* (citing *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 796 (D.C. Cir. 2004); *Sierra Club v. EPA*, 294 F.3d 155, 161 (D.C. Cir. 2002)). When the statute is clear, the text controls and no deference is extended to an agency's interpretation in conflict with the text. *Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 882 (2011).

If the statute is ambiguous or silent on an issue, a court proceeds to the second step of the *Chevron* analysis and determines whether the agency's interpretation is based on a permissible construction of the statute. *Chevron*, 467 U.S. at 843. Under *Chevron* Step 2, a court determines the level of deference due to the agency's interpretation of the law it administers. *See Mount Royal Joint Venture*, 477 F.3d at 754. Where "an agency enunciates its interpretation through notice-and-comment rule-making or formal adjudication, [courts] give the agency's interpretation *Chevron* deference." *Id.* at 754 (citing *United States v. Mead Corp.*, 533 U.S. 218, 230–31 (2001)). That is, an agency's interpretation that is permissible and reasonable receives controlling weight,[13] *id.*, "even if the agency's reading differs from what the court believes is the best statutory interpretation," *see Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005). Such broad deference is particularly warranted when the regulations at issue "concern[] a complex and highly technical regulatory program." *Thomas*

---

[13] An interpretation is permissible and reasonable if it is not arbitrary, capricious, or manifestly contrary to the statute. *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d at 754.

*Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (internal quotation marks and citation omitted).

### 2. Arbitrary and Capricious Review

DIBC contends that the Coast Guard's refusal to process the Twin Span permit application was arbitrary, capricious, and not in accord with the law in violation of § 706(2)(A) of the APA. *See Tourus Records, Inc. v. DEA*, 259 F.3d 731, 736 (D.C. Cir. 2001). The basic legal tenets here are also longstanding and clear. In determining whether an action was arbitrary and capricious, a reviewing court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks and citation omitted). At a minimum, the agency must have considered relevant data and articulated an explanation establishing a "rational connection between the facts found and the choice made." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986) (internal quotation marks and citation omitted); *see also Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result.").

An agency action usually is arbitrary or capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As the Supreme Court has explained, "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the

agency." *Id.* Rather, agency action is normally "entitled to a presumption of regularity."

*Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

### D.  Jurisdiction and Venue

This Court has federal-question jurisdiction under 28 U.S.C. § 1331.  Venue is proper under 28 U.S.C. § 1391(e)(1).

## III.  ANALYSIS

Federal Defendants have moved to dismiss Count IV of the Second Amended Complaint, arguing that DIBC has failed to challenge final agency action.  DIBC opposes and moves for summary judgment, alleging that the Coast Guard's denial of a navigational permit was arbitrary and capricious final agency action or, in the alternative, constitutes agency action unlawfully withheld.

Because DIBC has included Count IV as one of its theories for immediate injunctive relief, *see* Mot. for Prelim. Inj. at 26–31, the Court addresses both the request for preliminary injunctive relief and the merits of Count IV.  As described below, DIBC's request for preliminary injunctive relief will be denied for lack of irreparable harm.  With respect to Count IV, the Court will grant Federal Defendants' Motion to Dismiss and deny DIBC's Motion for Summary Judgment.

### A.  Preliminary Injunction

DIBC contends that immediate judicial intervention is required to preserve the status quo in the "race" between the proposed Twin Span and the proposed government-owned NITC/DRIC.  Pls. Reply to Mot. for Prelim. Inj. [Dkt. 151] at 2 ("If the Coast Guard grants the NITC/DRIC a navigational permit, it will have provided the last federal approval needed for that unlawful bridge, and will have catapulted the NITC/DRIC ahead of the Twin Span in what the

[U.S.] State Department itself described as a 'race' between the two projects."). Federal Defendants oppose DIBC's motion for preliminary injunctive relief, arguing that DIBC's claims are not ripe for review or fail to satisfy the requirements for preliminary injunctive relief. Canada also has expressed its concern that "[DIBC's] Motion actually seeks a declaratory judgment and injunction against Her Majesty the Queen in Right of Canada and the Windsor-Detroit Bridge Authority . . . because an order blocking the [NITC/DRIC] Bridge from any advancement, and a declaratory judgment on any alleged Special Agreement, will affect all Defendants equally." Canada Opp'n to Mot. for Prelim. Inj. [Dkt. 148] at 1.

On April 30, 2014, DIBC offered the testimony of Matthew Moroun, Vice Chairman of both DIBC and CTC. Mr. Moroun testified that if the government constructs the NITC/DRIC bridge, DIBC will not be able to secure funding for the Twin Span project because there is no economic justification for two additional bridges based on current traffic projections. Thus, Mr. Moroun elaborated on his declaration, which stated that, "[b]y preventing DIBC and CTC from building their Twin Span, Defendants are causing DIBC and CTC to suffer harm right now in ways that are difficult to measure but are nonetheless real." Mot. for Prelim. Inj., Declaration of Matthew Moroun (Moroun Decl.) [Dkt. 143-5] ¶ 10.

A district court may grant a preliminary injunction "to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). An injunction is an equitable remedy, so its issuance falls within the sound discretion of the district court. *See Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). To obtain a preliminary injunction, the movant must establish that:

(a) it is likely to succeed on the merits;

(b) it is likely to suffer irreparable harm in the absence of

preliminary relief;

(c) the balance of equities tips in its favor; and

(d) an injunction is in the public interest.

*Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). The D.C. Circuit has further instructed that "the

movant has the burden to show that all four factors . . . weigh in favor of the injunction." *Davis*

*v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009).

Whether DIBC will suffer irreparable harm absent an injunction is an important

issue, particularly because the central purpose of a preliminary injunction is to maintain the

relative positions of the parties pending a final determination on the merits. *See Dist. 50, United*

*Mine Workers v. Int'l Union, United Mine Workers*, 412 F.2d 165, 168 (D.C. Cir. 1969) ("The

usual role of a preliminary injunction is to preserve the status quo pending the outcome of

litigation."). If the Coast Guard grants the NITC/DRIC navigational permit, it would disrupt the

status quo insofar as both bridge proponents are currently awaiting Coast Guard approval. The

parties dispute whether a navigational permit is the last regulatory barrier before construction of

the NITC/DRIC, but the Coast Guard does not seriously dispute its willingness to issue a

navigational permit to the government-owned bridge.

Upon close examination, the Court finds that DIBC's contentions are unduly

speculative and, therefore, insufficient to justify preliminary injunctive relief. DIBC's inability

to obtain private capital if a government bridge is perceived to be ahead of it presents a real and

imminent harm, but the *degree* of this harm is not clear. Mr. Moroun avers that DIBC will suffer

irreparable harm if the Coast Guard "prevents" DIBC from building the Twin Span. *See* Moroun

Decl. ¶ 10. On this record, the Court cannot reliably determine whether the Coast Guard *will*

issue a navigational permit to the NITC/DRIC. The Coast Guard has not issued a decision on the NITC/DRIC permit application, and DIBC knows neither the substance nor the result of any forthcoming recommendation. *See* Mot. for Prelim. Inj., Declaration of Heather King (King Decl.) [Dkt. 143-4] ¶ 7 ("[Coast Guard] Commander Pavilonis explained that it was his understanding that the Cleveland office had finished its review of the NITC/DRIC application, and was 'about to' send *its recommendation* to Coast Guard headquarters." (emphasis added)); *id.* ¶ 8 (stating that Plaintiffs' counsel "believe[s] that the Coast Guard's decision regarding the NITC/DRIC application may be imminent").

Moreover, DIBC offers no evidence that a navigational permit would make the *construction* of the NITC/DRIC inevitable or imminent. Both the Twin Span and the NITC/DRIC are embroiled in significant legislative maneuvering and funding negotiations that must be resolved before construction of their respective bridges can begin. At the preliminary injunction hearing, government counsel represented that Canada will buy the necessary land in Michigan and fund the entire NITC/DRIC project, because of opposition to the expenditure in the Michigan legislature. This alleged financial arrangement could prompt the State of Michigan or its citizens to contest various aspects of the NITC/DRIC project, including whether the State of Michigan can exercise eminent domain to condemn private property when a foreign government acts as purchaser. This concern is heightened by the fact that it is unclear whether Canada or the State of Michigan will pay for a U.S. Customs Plaza for the NITC/DRIC. Future legal or practical issues unrelated to actual construction of the NITC/DRIC are foreseeable, and these issues could lead the Coast Guard to doubt whether the State of Michigan can acquire the necessary property rights. Such doubt and speculation significantly undermine DIBC's claim of irreparable harm.

DIBC occupies a tenuous financial position because of the proposed construction of the NITC/DRIC bridge. DIBC intends to build the Twin Span to divert current traffic and retain toll revenue while the Bridge Company performs restorative work on the Ambassador Bridge. DIBC contends that if it is prevented from building the Twin Span, the Coast Guard will have destroyed DIBC's statutory right to maintain the current Ambassador Bridge. DIBC's argument transcends mere economic harm, as the Bridge Company contends that "[b]y preventing Plaintiffs from improving their bridge crossing for their actual and prospective customers, Defendants are harming Plaintiffs' competitive position in a way that is impossible to measure, but is nonetheless real and irreparable." Mot. for Prelim. Inj. at 38 (citing *Bayer HealthCare, LLC v. U.S. Food & Drug Admin.*, 942 F. Supp. 2d 17, 26 (D.D.C. 2013)).

In *Bayer HealthCare*, the Court found that a drug manufacturer would suffer irreparable harm if a less expensive drug with the same efficacy entered the market. 942 F. Supp. 2d at 25–26. This Court, relying in part on the imminent decline in Bayer's market share, price erosion, loss of customer goodwill, and loss of research and development funding, issued a temporary restraining order vacating FDA's approval of a competing drug product. *Id.* at 27. Unlike *Bayer*, however, the Coast Guard has not engaged in any final agency action that would pose an imminent or immediate threat to DIBC's market share. Even if the Coast Guard were to issue a navigational permit to the NITC/DRIC, it is not certain that DIBC would suffer any immediate harm or impact. DIBC concedes in briefing that irreparable harm would occur upon *construction* of the NITC/DRIC. *See* Mot. for Prelim. Inj. at 24 (noting that construction of the NITC/DRIC will prevent Plaintiffs from exercising their statutory franchise rights). But construction of the NITC/DRIC is by no means imminent or inevitable; instead, the building of the proposed government bridge qualifies as the sort of potential but uncertain injury that

precludes preliminary injunctive relief.  *See Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.

Cir. 1985) ("Injunctive relief 'will not be granted against something merely feared as liable to

occur at some indefinite time.'" (quoting *Connecticut v. Massachusetts*, 282 U.S. 660, 674

(1931))).  Since the movant bears the burden of demonstrating all four factors, *see Davis*, 571

F.3d at 1292, the Court will deny DIBC's Motion for a Preliminary Injunction for lack of

irreparable harm.

### B.  Count IV

Count IV involves a dispute between the parties as to whether DIBC is required to

acquire an air rights easement over Riverside Park before the Coast Guard issues a navigational

permit for the Twin Span.  For purposes of this litigation, the Court attempted to bring the Coast

Guard and DIBC to resolution by ordering DIBC to resubmit its application for a navigational

permit and ordering the Coast Guard to process the application "at least until the Coast Guard

decides whether an Environmental Assessment and Finding of No Significant Impact would

satisfy the National Environmental Protection Act, 42 U.S.C. § 4321, *et seq.*,[14] without respect to

whether or not [DIBC] owns land or air rights" to build the Twin Span.  *See* Order in

Furtherance of Settlement [Dkt. 60] at 1.

In response to the Court's Order, the Coast Guard identified "two obstacles" to

permit issuance: (1) the Michigan State Historical Preservation Office (SHPO) had requested

more information related to the impact of the Twin Span on historic resources, *i.e.*, the eighty-

---

[14] The National Environmental Protection Act (NEPA) requires agencies to prepare a detailed, comprehensive environmental impact statement (EIS) if a proposal constitutes a "major Federal action[ ] significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C). However, an agency may first issue an Environmental Assessment (EA), which is a shorter and less-detailed document, to determine whether an EIS is required.  If, based on the EA, the agency finds that an EIS is not required, the agency may issue a "Finding Of No Significant Impact" (FONSI), which fulfills NEPA's documentation requirements.  *See TOMAC v. Norton*, 433 F.3d 852, 857 (D.C. Cir. 2006).

year-old Ambassador Bridge, and (2) EPA had expressed concerns regarding the Twin Span's air quality impacts. *See* Fed. Defs. Opp'n to EA/FONSI Processing [Dkt. 66] at 4. After working with both agencies, the Coast Guard reported that "both the SHPO and the EPA agreed that an EA/FONSI may be appropriate" and each agency recommended additional public notice and comment. *Id.* EPA has confirmed in writing that the Twin Span "will not cause or contribute to a violation" of the relevant air quality standards, which resolves EPA's outstanding regulatory issues with the Twin Span. Pls. Reply to MSJ, Ex. 16 (Aug. 22, 2012 Letter from EPA to Coast Guard) [Dkt. 110-16] at 2. SHPO also has confirmed in writing that it needed no further consultation and that "the current [Memorandum of Agreement to preserve the Ambassador Bridge] is sufficient to mitigate impacts from the proposed redesign." Fed. Defs. Opp'n to EA/FONSI Processing [Dkt. 66], Ex. A (July 23, 2012 SHPO Email) [Dkt. 66-1] at 2. Accordingly, the Coast Guard found that a FONSI may be appropriate, but recommended a notice and comment period.

Despite the Coast Guard's conclusion that a FONSI would satisfy NEPA and that the Twin Span would not impermissibly impact historic resources, the Agency continued to insist that its regulations bar it from issuing a navigational permit to DIBC because DIBC could not demonstrate that it owns the necessary property interests, *i.e.*, an air rights easement over Riverside Park. Having failed to settle this matter, the parties resumed briefing on legal motions in this case. As discussed below, the Court finds that the Coast Guard's decision to return the Twin Span permit application is ripe for review, but that the Coast Guard has proffered reasonable interpretations of its enabling statutes and 33 C.F.R. § 115.05.

### 1. Ripeness

The Administrative Procedure Act conditions judicial intervention on the issuance of a final agency decision. 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."); *see Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) ("If there was no final agency action here, there is no doubt that appellant would lack a cause of action under the APA."). The Coast Guard argues that it has not issued a final decision on DIBC's permit application, and thus, there has been no action subject to challenge under the APA.

For agency action to be considered "final," two conditions must be satisfied. First, the action "must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal citation omitted). Second, the action "must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* at 178 (quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). Judicial review only extends to administrative actions in which both conditions have been met. *See Ctr. for Auto Safety & Pub. Citizen, Inc., v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 807–11 (D.C. Cir. 2006).

An agency's denial of a permit application can be just as final as a decision granting a permit. "To determine finality, courts must decide 'whether the agency's position is definitive and whether it has a direct and immediate effect on the day-to-day business of the parties challenging the action.'" *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990) (quoting *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435–36 (D.C.

Cir. 1986) (internal alteration and other citation omitted)). "The inquiry seeks to distinguish a tentative agency position from the situation where the agency views its deliberative process as sufficiently final to demand compliance with its announced position." *Id.* (internal quotation marks and citation omitted).

The record shows that the Coast Guard initially treated DIBC's permit application as "complete," *see* Pls. MSJ at 12, but now insists that it was incomplete because the Coast Guard relied on DIBC assurances that the Bridge Company would acquire an air rights easement over Riverside Park. Due to DIBC's failure to acquire an air rights easement, the Coast Guard returned the Bridge Company's "incomplete" application in 2010, and then informed DIBC and the Court in November 2012 that it could not complete its processing of the navigational permit for the same reason.

The Court finds that the Coast Guard's decision to return DIBC's permit application constituted final agency action. While the Coast Guard did not issue a final decision in the binary sense, *i.e.*, a grant or denial of the navigational permit, its decision to return DIBC's permit application cannot be described as interlocutory. Instead, the Coast Guard has decided with finality that DIBC must secure an air rights easement to receive a navigational permit for the Twin Span. This determination has conclusively established the Coast Guard's position that DIBC must purchase an air rights easement over Riverside Park *before* the Agency will issue a navigational permit. Because the Coast Guard's return of DIBC's "incomplete" application imposed a real delay and cost on the Bridge Company, *see* Pls. Prelim. Inj. Hearing Ex. 17 (offering $5,000,000 to the City of Detroit for an air rights easement immediately adjacent to the west side of the Ambassador Bridge), it is a decision "from which legal consequences . . . flow." *Bennett*, 520 U.S. at 178 (internal quotation marks omitted). Thus, the relevant inquiry is not

whether the Coast Guard has finally decided DIBC's permit application, but rather, whether it

has announced a position that requires immediate compliance from DIBC in order to continue

the regulatory process. On this record, there can be no doubt that the Coast Guard has

announced such a position. As a result, Count IV of the Second Amended Complaint is ripe for

judicial review under 5 U.S.C. § 704.

### 2. *Statutory Authority*

On the merits, DIBC contests the Coast Guard's theory that the Agency's

"Necessary Primary Authority" regulation, 33 C.F.R. § 115.05, requires applicants to obtain all

necessary *property* rights before the issuance of a *navigational* permit. First, DIBC argues that

Congress never provided the Coast Guard or its predecessors with statutory authority to impose

additional regulatory burdens on international bridges. In the alternative, DIBC argues that the

Coast Guard's application of 33 C.F.R. § 115.05 to the Twin Span is arbitrary, capricious, or

otherwise not in accordance with law. These arguments prompt a *Chevron* analysis of the Coast

Guard's interpretation of its statutory authority. If the Coast Guard has statutory authority to

adopt regulations on international bridges, the second question is whether the Coast Guard has

proffered a reasonable interpretation of its own regulation. The Court begins with the statutory

inquiry.

As a threshold matter, the parties contest *which statute* provides the basis for 33

C.F.R. § 115.05. While DIBC argues that the "Necessary Primary Authority" regulation was

promulgated under the 1946 General Bridge Act, which applies only to domestic bridges, the

Coast Guard counters that the regulation represented prior practices for *all* bridges and was

published to comply with requirements of the Administrative Procedure Act.

The War Department issued rules governing the navigational permit application process in September 1946.  As stated in its Federal Register notice, the War Department published its rules concerning navigation as required by the Administrative Procedure Act, which had been adopted three months earlier in June 1946:

> Pursuant to the provisions of section 3 of the Administrative Procedure Act of June 11, 1946 (Public Law 404-79th Congress), the following rules describing the organization of that part of the Corps of Engineers, War Department, concerned with the administration of laws for the protection and preservation of navigation and navigable waters of the United States, and rules of practice and procedure and substantive rules adopted in connection therewith, are hereby stated and published for the information of the public[.]

11 Fed. Reg. 177A–806.  Section 3 of the APA required federal agencies to publish their existing rules after the APA became effective on September 11, 1946.  Administrative Procedure Act, ch. 324, § 3, 60 Stat. 238 (1946); *see also* Urban A. Lavery, The Federal Register—Official Publication for Administrative Regulations, Etc., Its Historical Background and Its Present-Day Meaning for The Practicing Lawyer, 7 F.R.D. 625, 626–27 (1948) ("During the calendar year 1946 alone (when the 'Administrative Procedure Act' of that year required re-publication of all existing Agency Rules and Orders) more than 22,000 documents were published in 'The Federal Register.'" (citation omitted)).

The rules published by the War Department "intended to show what the Department requires and how the Department acts in a given type of case."  33 C.F.R. § 209.110 (1946).  Thus, the Part 209 regulations publicized pre-existing rules and practices adopted and followed by the War Department in reviewing applications and approving bridges over navigable waters, including both domestic inter-state bridges and international bridges.

In discussing its Part 209 regulations, the War Department stated that "[a] bridge cannot lawfully be constructed across *any navigable waterway* of the United States until

legislative authority has been obtained and the plans have been approved by the Chief of Engineers and the Secretary of War." 33 C.F.R. § 209.120(a)(1) (1946) (emphasis added). In its section on "General policies on issuance of permits," 33 C.F.R. § 209.330, the War Department advised that "[t]he decision as to whether a permit will be issued must rest primarily upon the effect of the proposed work on navigation," but that "in cases where the structure is unobjectionable from the standpoint of navigation but [] State or local authorities decline to give their consent for the work, it is not usual for the Department actually to issue a permit." *Id.* § 209.330(a). The War Department also warned that "[i]n cases of conflicting property rights the Department cannot undertake to adjudicate rival claims." *Id.* § 209.330(b). There is no indication that the War Department rules distinguished between domestic and international bridges, both of which had been subject to the same approval process under the 1906 Bridge Act.

DIBC argues that the only statute that can be read to authorize a regulation like Regulation 115.05 is the General Bridge Act of 1946, which granted discretion to the War Department to impose any conditions relating to the maintenance and operation of interstate domestic bridge structures. *See* 33 U.S.C. § 525(b). The Court disagrees. While the language of congressional delegation has changed, it is clear that the 1906 Bridge Act contemplated expert oversight and, more importantly, that the War Department had adopted internal practices to carry out its responsibilities under the 1906 Bridge Act, which it formally published as "regulations" after the APA was adopted in 1946. *See* 1906 Bridge Act, ch. 1130, § 1, 34 Stat. 84 (1906) (granting authority to approve plans, specifications, and the proposed location for bridges). While the matter is not entirely free from doubt, the record indicates that the regulations published by the War Department in 1946 represented practices that applied to domestic and international bridges.

The Coast Guard inherited rules governing navigational permit applications from the War Department. *See* 32 Fed. Reg. 5611 (reciting the delegation of authority from the Secretary of Transportation to the Coast Guard and stating that the Coast Guard would continue in effect all prior orders, determinations, rules, and regulations). This delegation of authority listed the statutory authorities by which the Coast Guard would oversee bridges, including the 1906 Bridge Act and the General Bridge Act of 1946. Using its delegated rulemaking authority, the Coast Guard reorganized and revised the prior regulations and published regulations relating to bridge permits at 33 C.F.R. Parts 114 and 115. *Compare* 33 C.F.R. §§ 114.01–115.70 (2013) *with* 33 C.F.R. §§ 209.110–209.520 (1946). Given this statutory history, the Court finds that the "Necessary Primary Authority" regulation was promulgated under the authorities of both the 1906 Bridge Act, which applied to domestic and international bridges, and the 1946 General Bridge Act, which applies only to domestic bridges.[15] As a result, the Court proceeds to a *Chevron* analysis to determine whether 33 C.F.R. § 115.05 is reasonably authorized under that statutory enactment.

DIBC contends that, "[e]ven if Regulation 115.05 was *intended* to implement the War Department's powers to grant navigational permits under the 1906 Bridge Act to Congressionally-approved, international bridges, there is no way to read that statute as authorizing the regulation." Pls. MSJ at 40 (emphasis in original). The Coast Guard insists that 33 C.F.R. § 115.05 is authorized under the Agency's statutory authority to regulate the plans, specifications, and location of bridges.

---

[15] To bolster its authority to issue 33 C.F.R. § 115.05, the Coast Guard erroneously relies on the authority granted to the Commandant to "issue rules, orders, and instructions, not inconsistent with law, relating to the organization, internal administration, and personnel of the Coast Guard." 14 U.S.C. § 632 (1949). This statute allows the Commandant to establish rules for the *internal* operations of the Coast Guard; it does not authorize the Commandant to engage in rulemaking affecting the public or, more directly, with regard to bridges.

The 1906 Bridge Act prohibits the construction of any congressionally-authorized bridge until

> the plans and specifications for its construction, together with such drawings of the proposed construction and such map of the proposed location as may be required for a full understanding of the subject, have been submitted to the Secretary of War and Chief of Engineers for their approval, nor until they shall have approved such plans and specifications and the location of such bridge and accessory works.

1906 Bridge Act, ch. 1130, § 1, 34 Stat. 84 (1906). DIBC argues that this language "says *nothing* about the authority of the agency charged with granting that permit to do *anything* other than assess the 'plans and specifications,' and to ensure that the proposed bridge shall not 'unreasonably obstruct the free navigation of the waters over which it is constructed.'" Pls. MSJ at 41–42 (citing 33 U.S.C. § 491) (emphasis in original). In other words, DIBC contends that the Coast Guard is foreclosed from relying on rules that concern any topic other than navigability. *See id.* at 42 ("There is simply no statutory text in the 1906 Bridge Act that can be read to authorize the agency . . . to [require] that permit applications must demonstrate 'primary authority' as a condition for obtaining a permit under the Act."). The Coast Guard counters that the "primary authority" requirement in 33 C.F.R. § 115.05 falls within the Coast Guard's statutory authority to consider the "location" of bridges.

The statutory text does not unambiguously dictate or foreclose either parties' interpretation. The 1906 Bridge Act provided that even congressionally-authorized bridges were subject to War Department review of the "plans and specifications" and the "proposed location," while also requiring War Department "approval." *See* 1906 Bridge Act, ch. 1130, § 1, 34 Stat. 84 (1906). What the 1906 Bridge Act did not state clearly is whether these matters were designed to interact, such that the plans, specifications, and proposed locations were *factors* for

receiving War Department approval. Moreover, the statute is ambiguous as to how the "proposed location" should be defined. While that term could be read to require notice of a proposed location so that any effect on navigability could be analyzed, it could also be interpreted as requiring a definite location upon which the proponent has a legal right to build so that a navigability assessment is reserved for bridges that are likely to be constructed. The Court finds that the 1906 Bridge Act is ambiguous, particularly on the latter point, and therefore considers whether the "Necessary Primary Authority" regulation is a reasonable interpretation of the Coast Guard's statutory authority.

Where "an agency enunciates its interpretation through notice-and-comment rule-making or formal adjudication, [courts] give the agency's interpretation *Chevron* deference." *Mount Royal Joint Venture*, 477 F.3d at 754 (citing *United States v. Mead Corp.*, 533 U.S. 218, 230–31 (2001)). The "Necessary Primary Authority" regulation was not promulgated through notice-and-comment rulemaking in 1946. However, "particular deference" is owed to "an agency interpretation of 'longstanding' duration." *See Barnhart v. Walton*, 535 U.S. 212, 220 (2002) (quoting *North Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 522 n.12 (1982)). An agency's interpretation that is permissible and reasonable receives controlling weight, *Mount Royal Joint Venture*, 477 F.3d at 754, "even if the agency's reading differs from what the court believes is the best statutory interpretation," *see Nat'l Cable & Telecomm. Ass'n*, 545 U.S. at 980.

The Coast Guard and its predecessor, the War Department, have interpreted the 1906 Bridge Act as authorizing proof of "Necessary Primary Authority" for international and domestic bridge builders. 33 C.F.R. § 115.05 specifically provides that

> [i]f the law of the State requires a license for or approval of the bridge from a constituted State agency, a copy of such license or approval will be required and may be accepted as evidence of the primary authority. If there is no State regulation of bridges in

> navigable waters, the necessary primary authority may be that granted in the charter of a corporation, or the authority inherent in the ownership of the land on which the structure is placed. Special care will be taken that Federal approval is not granted when there is doubt of the right of the applicant to construct and utilize the bridge.

33 C.F.R. § 115.05. In other words, 33 C.F.R. § 115.05 permits the Coast Guard to consider State approval or, in the alternative, some charter or land ownership sufficient to find that the proponent would actually be able to construct a bridge at the proposed location. Regulation 115.05 does not strictly require "Necessary Primary Authority" in the sense of some authority that is tantamount to congressional approval. However, the exercise of judgment and expertise is what Congress contemplated when it charged the War Department with the task of approving individual bridge specifications. *See Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1016 (D.C. Cir. 1999) ("Where . . . Congress enacts an ambiguous provision within a statute entrusted to the agency's expertise, it has 'implicitly delegated to the agency the power to fill those gaps.'" (quoting *Nat'l Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563, 1569 (D.C. Cir. 1987))). The Coast Guard has provided a reasonable interpretation of the 1906 Bridge Act, which allows it to approve the plans, specifications, and location of a proposed bridge. Whether local property rights are considered part of the "plan," "specification," or "location," the 1906 Bridge Act authorizes the Coast Guard to interpret these terms as part of its authority to approve applications for navigational permits. Therefore, the Court concludes that Congress provided the Coast Guard with statutory authority to condition navigational permits on the acquisition of necessary property rights.

### 3. 33 C.F.R. § 115.05

A separate but related inquiry is whether the Coast Guard has advanced a reasonable interpretation of its own regulation. An agency's interpretation of its own regulations

is entitled to deference when it "reflect[s] the agency's fair and considered judgment on the matter in question." *Auer v. Robbins*, 519 U.S. 452, 462 (1997); *accord City of Dania Beach v. FAA*, 628 F.3d 581, 587 (D.C. Cir. 2010) (noting that an agency's interpretation of its regulation is "entitled to deference so long as it reflects the agency's fair and considered judgment on the matter in question, not just its litigating position" (emphasis in original) (internal quotation marks and citation omitted)). DIBC argues that, even if the Coast Guard regulation is authorized by statute, the Coast Guard has been arbitrary and capricious in its application of that regulation to the Twin Span navigational permit. DIBC further contends that the Coast Guard's interpretation of its own regulation as requiring the acquisition of all necessary property rights is inconsistent with the Agency's past practices. The Coast Guard responds that DIBC cannot challenge Regulation 115.05 because the Agency has not issued a final decision on DIBC's navigational permit application. However, as discussed above, the Coast Guard's return of DIBC's permit application constituted final agency action. *See supra* 26–29. Since the Coast Guard's regulation is within the scope of its statutory authority, the Court considers DIBC's as-applied challenge to 33 C.F.R. § 115.05.

DIBC alleges that the Coast Guard has neglected to apply Regulation 115.05 in the same manner to other bridge proposals. Specifically, DIBC alleges that the Coast Guard granted a navigational permit for the Peace Bridge in Buffalo, New York, despite the proponent's failure to hold all necessary property rights and "heated opposition" to the bridge expansion from the City of Buffalo. Pls. MSJ at 51–52. The Coast Guard responds that the Court should disregard the Agency's decision regarding the Peace Bridge because "[e]ach agency decision is unique with its own analysis and administrative record." Fed. Defs. Opp'n to MSJ at 50. The Coast Guard also counters that the Peace Bridge is distinguishable because the

proponents of that bridge—the Buffalo and Fort Erie Public Bridge Authority—was established by the New York state legislature as a public benefit corporation. *Id.* In contrast, DIBC is a private entity with no power of eminent domain. *Id.* at 51; *see also* Fed. Defs. Notice of Supp. Auth. at 5 n.5 ("Plaintiffs no longer possess powers of eminent domain, and they need to satisfy the requirements of 33 C.F.R. § 115.05.").

   The Coast Guard's distinction between public and private entities is persuasive, as it explains why the Coast Guard may express doubt as to a private proponent's right to build a bridge, while appearing to overlook similar deficiencies in government applications. The Coast Guard's distinction between public and private entities also explains the Agency's contrary approach to DIBC's first application for a navigational permit in the 1920's for the Ambassador Bridge. While DIBC contends that its predecessor, ATC, had not obtained all the necessary property rights when the War Department issued a navigational permit for the Ambassador Bridge, at that time, DIBC was treated as a quasi-governmental entity that possessed certain powers of eminent domain. *Detroit Int'l Bridge Co. v. Commodities Export Co.*, 760 N.W. 2d 565, 568–69 (Mich. Ct. App. 2008) (describing a Michigan law that provided that bridge companies had "the power to condemn any and all real estate . . . deemed necessary for the purposes of such corporation") (citing *Detroit Int'l Bridge Co. v. Am. Seed Co.*, 249 Mich. 289, 294 (Mich. Sup. Ct. 1930)); *but see Commodities Export Co. v. Detroit Int'l Bridge Co.*, 695 F.3d 518, 527 n.7 (6th Cir. 2012) (holding that, while DIBC "appears to be in the habit of unilaterally condemning land that it does not own," the Bridge Company must be treated as a private entity lacking authority to condemn land). On this record, the Court finds that the Coast Guard has not applied 33 C.F.R. § 115.05 in an arbitrary and capricious manner. To the contrary, the Coast Guard's application of Regulation 115.05 hinges on a public-private

distinction that concerns an applicant's authority to condemn land to obtain necessary property rights. In the absence of contrary evidence, the Coast Guard reasonably presumes that a State can exercise eminent domain to condemn any private property rights to construct a bridge, whereas private entities must prove property ownership. The Court finds that this is a reasonable interpretation of Regulation 115.05.

It is no great leap from the principles articulated by the War Department in 1946 to the Coast Guard's "Necessary Primary Authority" regulation, which provides that "[s]pecial care will be taken that Federal approval is not granted when there is doubt of the right of the applicant to construct and utilize the bridge." 33 C.F.R. § 115.05. The Court cannot find that the Coast Guard's interpretation of 33 C.F.R. § 115.05 is arbitrary, capricious, or otherwise not in accordance with law. The objections of local authorities to selling land from Riverside Park[16] to DIBC fit within the scope of the War Department's rules under the 1906 Bridge Act. Without an air rights easement over Riverside Park, there is "doubt of the right of [DIBC] to construct" within the meaning of 33 C.F.R. § 115.05. DIBC's exclusive focus on the title of 33 C.F.R. § 115.05—Necessary Primary Authority—ignores the substance of that regulation and its intended effect. The regulation does not require competing primary authority in a sense that would rival congressional authorization. *See* Fed. Defs. Notice of Supp. Auth. at 6 (noting that the Bridge Permit Application Guide "distinguishes between the *legislative authority* required and the *primary authority* required to enable construction of the bridge" (emphasis in original));

---

[16] The Detroit City Council has resolved that the City acquired and improved Riverside Park with grants from the Natural Park Service Land Water Conservation Fund and the Michigan Natural Resources Trust Fund. Therefore, "the State of Michigan and the Federal Government would have to give permission for the sale, and there has to be a substitution of like park land or the Park cannot be sold." *See* Fed. Defs. Opp'n to Mot. for Prelim. Inj., Ex. 15 (Apr. 30, 2009 Letter for City of Detroit to Coast Guard) [Dkt. 149-15] at 4. Whether this status affects "air rights" over Riverside Park is not at issue here.

*see also id.*, Ex. 5 (Coast Guard Bridge Permit Application Guide) [Dkt. 157-5] at 13 (providing that, in certain cases, 33 C.F.R. § 115.05 will be satisfied where the applicant provides "an extract from the charter and evidence of *sufficient real estate interest* to allow construction of the bridge" (emphasis added)).  Moreover, the War Department's predecessor rules cautioned that, "in cases where the structure is unobjectionable from the standpoint of navigation but when State or local authorities decline to give their consent to the work, it is not usual for the Department actually to issue a permit."  33 C.F.R. § 209.330(a).

DIBC further contends that the Coast Guard has been arbitrary and capricious in applying 33 C.F.R. § 115.05 to a congressionally-authorized international bridge.  *See* Pls. MSJ at 49; Pls. Response to Fed. Defs. Notice of Supp. Auth. at 1 (arguing that the Government has failed to show "Regulation 115.05 . . . ever being applied to any international bridge—let alone being applied in a way that required the applicant to show 'primary authority' . . . by demonstrating ownership of every single possible property right or easement that may be needed to build the proposed bridge.").  The Coast Guard responds that, in many cases, the applicant submits proof of property ownership, which resolves the issue of compliance under 33 C.F.R. § 115.05.  However, whenever there is doubt of an applicant's ability to obtain all of the necessary property rights, the Coast Guard contends that it "follows up" to determine how 33 C.F.R. § 115.05 will be satisfied.  DIBC's contention that there is no precedent for the Coast Guard refusing to issue a navigational permit to an international bridge under 33 C.F.R. § 115.05 misses the Coast Guard's central argument, namely, that there has rarely been occasion for the issue to arise because most international bridge proponents either obtain the necessary property rights before permit issuance or have the power of condemnation.  The Coast Guard contends that, where a bridge proponent lacks the necessary property rights, the issues are resolved

through informal processes far short of litigation. Fed. Defs. Notice of Supp. Auth. at 6–7.

DIBC has not presented any facts that cast doubt on the Coast Guard's assertions. The Coast

Guard has not been arbitrary and capricious in its application of 33 C.F.R. § 115.05 to DIBC.

Finally, DIBC argues that, to the extent the Coast Guard can require some

additional primary authority to construct a bridge, that requirement must be satisfied by DIBC's

charter. *See* 33 C.F.R. § 115.05 ("If there be no State regulation of bridges in navigable waters,

*the necessary primary authority may be that granted in the charter of a corporation . . . .*"

(emphasis added)). The Coast Guard has rejected this approach on the ground that "the agency

. . . needs information relating to DIBC's authority to build its proposed bridge *in the location in*

*which it proposes* before it can engage the gears of public process and governmental approval."

Fed. Defs. Opp'n to MSJ at 49 (emphasis added). DIBC offers no explanation as to why the

Coast Guard's insistence on a navigational permit application tied to a specific location is

arbitrary and capricious. As a result, the Court finds that the Coast Guard has proffered a

reasonable explanation as to why DIBC's charter does not satisfy 33 C.F.R. § 115.05. *See Motor*

*Vehicle Mfrs. Ass'n*, 463 U.S. at 43 ("[T]he agency must examine the relevant data and articulate

a satisfactory explanation for its action including a 'rational connection between the facts found

and the choice made.'" (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168

(1962))). The Court concludes that the Coast Guard has proffered a reasonable interpretation of

its own regulation.

## IV. CONCLUSION

For the reasons set forth above, DIBC's Motion for a Preliminary Injunction, Dkt.

143, will be denied for lack of irreparable harm. Federal Defendants' Motion to Dismiss Count

IV, Dkt. 92, will be granted and judgment will be entered in favor of Federal Defendants on

Count IV.  DIBC's Cross-Motion for Summary Judgment on Count IV, Dkt. 96, will be denied.

DIBC's Motion to Take Judicial Notice, Dkt. 114, and Motion for Order Requesting Oral

Argument, Dkt. 121, will be denied as moot.  A memorializing Order accompanies this Opinion.


Date: May 30, 2014                                  _____/s/_____
                                                    ROSEMARY M. COLLYER
                                                    United States District Judge