UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


DETROIT INTERNATIONAL           :
BRIDGE COMPANY,                 :            Docket No. CA 10-476
                                :
            Plaintiff,          :               Washington, D.C.
                                :          Wednesday, April 30, 2014
                                :                  2:15 p.m.
GOVERNMENT OF CANADA, ET AL :
                                :
            Defendants.    :
--------------------------x


          TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
          BEFORE THE HONORABLE ROSEMARY M. COLLYER
               UNITED STATES DISTRICT JUDGE



APPEARANCES:

For the Plaintiff:          HAMIS P.M. HUME, Esquire
                            KATHLEEN KIERNAN, Esquire
                            RORY SKAGGS, Esquire
                            Boies, Schiller & Flexner LLP
                            5301 Wisconsin Avenue, NW
                            Washington, DC  20015

                            PATRICK A. MORAN, Esquire
                            CenTra, Inc.
                            12225 Stephens Road
                            Warren, MI  48089


For the Defendants:         BRIAN M. COLLINS, Esquire
                            U.S. Department of Justice
                            601 D Street, NW
                            Washington, DC  20004

                            DOUGLAS A. DOZEMAN, Esquire
                            SCOTT M. WATSON, Esquire
                            Warner Norcross & Judd LLP
                            900 Fifth Third Center
                            111 Lyon Street, NW
                            Grand Rapids, MI  49503-2487

1   Appearances continued:

2   Court Reporter:          CRYSTAL M. PILGRIM, RPR
                             Official Court Reporter
3                            United States District Court
                             District of Columbia
4                            333 Constitution Avenue, NW
                             Washington, DC  20001

5

6   Proceedings recorded by machine shorthand, transcript produced
    by computer-aided transcription.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          TABLE OF CONTENTS

2                              Direct   Cross   Redirect   Recross

3    On behalf of the Plaintiffs:

4        Matthew T. Moroun

5          By Mr. Hume              9
           By Mr. Collins                   27
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P-R-O-C-E-E-D-I-N-G-S

2         THE DEPUTY CLERK:  Civil action 10-476, Detroit

3   International Bridge Company versus Government of Canada, et

4   al.

5         For the plaintiffs, Hamish Hume, Patrick Moran, Kathleen

6   Kiernan, and Rory Skaggs.

7         For the defense, Brian Collins, Doug Dozeman and Scott

8   Watson.

9         THE COURT:  Good afternoon everybody, it's nice to

10  see you.  I'm sorry that the weather is so lousy in Washington,

11  but you know that your country's Government is happy that

12  you're here.

13        We have a lot to talk about today and I know that the

14  plaintiffs also had a witness they wanted to present.

15        Is that still true?

16        MR. HUME:  Your Honor, good afternoon.  This is

17  Mr. Hume.  It is still true.

18        THE COURT:  All right.  Why don't we call your

19  witness first so that we can get on to the legal arguments.

20        Yes, sir.

21        MR. DOZEMAN:  Your Honor, if I could address the

22  Court first before we get to the motion itself?

23        THE COURT:  Yes, of course.

24        Why don't you come to the mic so we get a good record,

25  sir.

1          MR. DOZEMAN:  Good afternoon, Your Honor, Doug

2    Dozeman on behalf of the Government of Canada.

3          THE COURT:  Yes.

4          MR. DOZEMAN:  I believe before we get started with

5    the preliminary injunction motion, we should at least address

6    the order of the motions first.

7          As we stated in our papers, Canada objects to moving

8    forward with plaintiff's motion for declaratory relief against

9    Canada prior to a decision from this Court on our motion to

10   dismiss under FSIA.

11         FSIA as this Court knows means that the sovereign such

12   as Canada is presumptively immune not only from liability, but

13   from suit which means all of the burdens that are attended to a

14   suit such as responding to motions like this.

15         Certainly we shouldn't be subjected to a dispositive

16   motion prior to this Court making a determination as to whether

17   it even has jurisdiction over Canada in the first place.

18         We have cited case law in our briefs that make that

19   perfectly clear that the order has to be that way.  And the

20   plaintiff has not cited any case law to the contrary.

21         We have yet to get to Canada's FSIA motion not for lack

22   of trying, we have filed a FSIA motion to every iteration of

23   the plaintiff's complaint in this case.

24         THE COURT:  Let me say something, Mr. Dozeman.

25         MR. DOZEMAN:  Yes.

1          THE COURT:  I actually view this and I most

2    particularly view today's proceedings as between the plaintiffs

3    and the United States Government.

4          Their basic complaint has to do with Coast Guard

5    handling of navigation permits both for themselves and for

6    others.  And to be perfectly frank, I was astonished that

7    Canada thought it needed to jump in on this set of issues.

8    Because there would be not an order issued to Canada to effect

9    you even if I granted the PI which is by no means clear.  Even

10   if I granted the PI it would not run to Canada.

11         MR. DOZEMAN:  Well except, Your Honor, they are not

12   asking for relief just with regard to the Coast Guard permit.

13   If that were true, I would agree with you.  But their motion

14   goes on to ask for declaratory relief against all defendants

15   including Canada and for an injunction against all defendants.

16         THE COURT:  Of course they are, but not actually.  So

17   why don't we not worry about Canada right now.

18         I do not mean to be disrespectful to the sovereign

19   country of Canada.  I use to live there.  I have great respect

20   for Canada, for the dominion before and its country now.

21   However, it really isn't on the critical path.

22         If you object to having to participate in litigation

23   just file something that says you don't really need us to argue

24   about this do you?  And I will almost certainly say no, I don't

25   actually need you to argue about this.  I am sorry that you

1    have felt imposed upon to argue about it.

2          I can explain to everybody what has happened to this

3    case, but I don't feel the need to do so, so I'm not going to.

4    At least not in this context today because we have a lot to

5    talk about.

6          I agree with you that before I can either compel

7    anything out of Canada or order Canada to do anything I have to

8    grant, I have to consider and rule on your motion first.  I

9    agree with that.  That is clear as a bell.

10         It's not actually on the critical path of things to be

11   decided.  I mean, Canada is a country, go run the country, be

12   fine, you're okay, don't worry about this.  I know that you're

13   very interested in the alternative bridge which I can,

14   everybody calls it by 15 different initials and so it's very

15   hard for me to keep it in my head, but I know that you have a

16   critical and policy and financial governmental interest, but

17   this is not what this dispute is about right here.

18              MR. DOZEMAN:  Well, as long as we all are on the same

19   page and we understand that this Court is not going to consider

20   or grant declaratory relief or injunctive relief against all

21   defendants which is what the plaintiff is seeking in its motion

22   today, then we're fine.

23              THE COURT:  Okay, thank you.

24         All right now, yes, sir?

25              MR. COLLINS:  Good afternoon, Your Honor, Brian

1   Collins on behalf of defendants.

2           THE COURT:  Hi.

3           MR. COLLINS:  I have just one housekeeping point,

4   Your Honor.

5       I just wanted to check, we didn't get any division of

6   time or sort of limits on how long each party should be going,

7   so I just wanted to --

8           THE COURT:  Well, actually that's because we were

9   going to hear from a witness first.  So let's see how quickly

10  we can get this done and then we can figure that out.

11          MR. COLLINS:  Okay, thank you.

12          THE COURT:  I'm planning to spend the afternoon with

13  all of you if need be.

14          MR. COLLINS:  Okay.

15          THE COURT:  All right, are you willing to call your

16  witness?

17          MR. HUME:  Thank you, Judge Collyer.

18      Again, it's Hamish Hume for the Detroit Bridge Company

19  and we call Matthew Moroun to testify.

20          THE COURT:  All right, Mr. Moroun, if you could come

21  up, please, right here on my left.

22           PLAINTIFF WITNESS MATTHEW T. MOROUN SWORN

23          THE COURT:  Now I said no more than 30 minutes.

24          MR. HUME:  You did, Your Honor, and I'm going to time

25  it and hope to be done in 20.

```
 1              THE COURT:  Okay.

 2              MR. HUME:  Before I begin, we have some demonstrative

 3    exhibits which are mostly for my argument.  I might show one or

 4    two to the witness.

 5              THE COURT:  That's fine.  It's only me, I'm not going

 6    to worry about that sort of thing, just keep going.

 7              MR. HUME:  Okay.

 8              THE COURT:  We don't have a lot of time given all of

 9    the issues to be argued.

10                           DIRECT EXAMINATION

11    BY MR. HUME:

12    Q.   Mr. Moroun, could you state your name for the record?

13    A.   Yes, Matthew Thomas Moroun.

14    Q.   What is your position at the --

15              THE COURT:  Excuse me one second.  Can you spell your

16    last name, please?

17              THE WITNESS:  Yes, M-O-R-O-U-N.

18              THE COURT:  Thank you.

19    BY MR. HUME:

20    Q.   Could you tell the Court your position at the Detroit

21    International Bridge Company?

22    A.   I'm vice chairman.

23    Q.   What are your responsibilities?

24    A.   A great deal.  Ultimately responsible for most every

25    executive decision at the company.
```

1    Q.    How old is the Ambassador Bridge?

2    A.    It's 85 years old, sir.

3    Q.    I would like to show you four documents that have been

4    marked as exhibits in this case.

5          MR. HUME:  Your Honor, we have copies for the Clerk

6    and for opposing counsel.

7          THE COURT:  All right.

8          MR. COLLINS:  Thank you.

9    BY MR. HUME:

10   Q.    Mr. Moroun, you have been handed plaintiff's PI Hearing

11   Exhibits 1 through 4.

12       Could you briefly identify what those documents are for the

13   record?

14   A.    Yes.  The first one is the Ambassador Bridge's traffic,

15   auto truck combined for each year 1999 through 2013.

16       Documents 2, 3, and 4 represent the traffic of the

17   Ambassador Bridge for other years as well as that of our

18   competitor crossings.

19   Q.    What do these documents show regarding traffic levels

20   since 1999?

21   A.    They show a dramatic decline in traffic for more than ten

22   years.

23          MR. HUME:  May I please put on the screen for you to

24   see and the Court to see Plaintiff's Demonstrative Exhibit 9.

25   Slide 9.

1   BY MR. HUME:

2   Q.    Mr. Moroun, have you seen this slide before?

3   A.    I have.

4   Q.    Does this slide represent the decline in traffic at the

5   Ambassador Bridge?

6   A.    Yes, it does.

7   Q.    Mr. Moroun, are you familiar with the Government sponsored

8   bridge known as the NITC/DRIC?

9   A.    Yes, I am.

10  Q.    Are you familiar with the NITC/DRIC's traffic projections?

11  A.    Yes.

12  Q.    Are their projections consistent with the data on this

13  chart?

14  A.    Not at all.  They projected the exact opposite.  They

15  projected fantastic growth for the last ten years and the

16  traffic has gone in the exact opposite direction.

17  Q.    I'd like to show you Exhibits 5 and 6.  PI Hearing

18  Exhibits 5 and 6.

19  A.    I have them.

20  Q.    Let's start with Exhibit 6.  Could you identify Exhibit 6

21  for the record, please?

22  A.    Yes.  It's entitled Detroit River International Crossing

23  Study Travel Demand Forecast, September of 2005.

24  Q.    I'd like to refer you to page 84 of that exhibit.  And

25  specifically to the chart on the top half of page 84.

1   A.    I'm there.

2   Q.    Can you tell me what that exhibit shows in terms of

3   projected traffic on the Ambassador Bridge for the years 2004

4   to 2015?

5   A.    It's predicting traffic growth in the compound annual

6   growth rate as well from '04 to 2015 and it has a 2.6 compound

7   annual growth rate and a 33 percent increase in traffic.

8   Q.    And this, for what kind of traffic is that chart

9   referring?

10  A.    I believe it's --

11  Q.    It's in the title of the exhibit?

12  A.    Passenger car.

13  Q.    Would you view that to be a conservative projection or an

14  optimistic projection or do you have any business judgments on

15  that projection?

16  A.    It would be great if it were true.  It's fantastically

17  optimistic.

18  Q.    I would like to refer you to page 97 of this document,

19  Exhibit 6, PI Hearing Exhibit 6.  And to its chart labeled

20  within as Exhibit 5-20.

21     Do you see that chart?

22  A.    I've got it.

23  Q.    And what does that chart say about projected traffic

24  increases for commercial truck traffic over the Ambassador

25  Bridge for the years 2004 to 2015?

1  A.   They anticipate a traffic growth of 45 percent at a

2  compound annual growth rate of 3.4 percent.

3  Q.   In your business judgment and experience, how would you

4  evaluate those projections?

5  A.   I don't.  There's no business judgment involved, actual

6  traffic has gone the exact opposite direction.

7  Q.   Demonstrative slide 6 -- sorry -- 10, is a slide that's

8  now on the screen.  The same data that was on slide 9 except it

9  includes a red line; do you see that?

10 A.   I do.

11 Q.   Have you seen that document before?

12 A.   Yes, I have.

13 Q.   Can you tell me what the red line represents?

14 A.   The traffic projections that turned out wrong by the

15 Government.

16 Q.   And were those the traffic projections used for the

17 NITC/DRIC components?

18 A.   Yes.

19 Q.   Do you know whether in 2008 when FHWA made it's final

20 decision to grant NEPA approval for the NITC/DRIC, did they

21 change these projections based on the fact that actual traffic

22 had declined?

23 A.   The frustrating thing is in each instance or year gone by

24 of actual traffic data compared to their projections they would

25 only end up continuing to use the same traffic projections.  So

 1  no, they've never changed them.

 2  Q.    What about in 2013, at the end of this chart where their

 3  projections showing traffic over the Ambassador Bridge of well

 4  over 12 million and the actual traffic was under 8 million, did

 5  the State Department at that time when it considered whether to

 6  approve the NITC/DRIC, did either the State Department or the

 7  NITC/DRIC proponents change their traffic projections?

 8  A.    They held to the same traffic projections.

 9  Q.    Please now look at Exhibit 5.  Could you identify Exhibit

10  5 for the record, please?

11  A.    It is entitled Final Environmental Impact Statement

12  Detroit River International Crossing Study, December 2008.

13  Q.    Could I refer you in this document to page 3-60 which I

14  hope has been premarked in at least your copy if not everyone's

15  because it's a big document?

16  A.    All right, all right, I'm there.

17  Q.    And the third bullet point on that page could you review

18  that bullet point and explain in your own words what that

19  bullet point is saying?

20  A.    Okay.  The third bullet point predicts, this is a

21  prediction of the, for the Government Bridge, that the

22  Government Bridge once constructed would take 39 percent of the

23  car traffic from the Ambassador Bridge and 75 percent of the

24  Ambassador Bridge's truck traffic.

25  Q.    Now can you tell Judge Collyer why it is that if traffic

1   levels are declining, why is it that Detroit International

2   Bridge Company wants to build a Twin Span to its bridge?

3   A.   Well, you see, we don't want to build our Twin Span

4   because of traffic.  We want to build our Twin Span because our

5   bridge is 85 years old.

6       When we started in earnest to build the Twin Span the

7   bridge was 75 years old.  We've been at it for ten years.  In

8   those intervening ten years we have faced numerous, very

9   significant maintenance projects, lane closures, and quite

10  expensive repairs that have hurt us both financially and with

11  our customers.

12      So our intent is to build a new Twin Span alongside the

13  existing bridge, close down the existing bridge, completely

14  rehabilitate it and provide a great product to our customers

15  and also improve efficiency at the border.

16      It's an international border, so you have Canadian customs

17  and U.S. customs on both ends of the bridge.  And just like

18  clearing security at an airport, if you can improve the

19  channeling or flow between the bridge and the customs, you can

20  segregate the automobiles from those that maybe are precleared

21  via a nexus program and those that aren't, those trucks that

22  are precleared during a fast program and those that aren't,

23  those trucks carrying livestock versus those carrying empty

24  automotive racks and greatly improve the efficiency as well as

25  take care of the age problem as well.

1  Q.   Let me see if I could show a demonstrative to ask you to

2  explain some of that with a picture as well.

3  A.   Okay.

4  Q.   If we go to demonstrative slide 1.  Is that the Ambassador

5  Bridge?

6  A.   Yes, sir.

7  Q.   Let's look at the next slide, slide 2.

8       Can you explain what that is?

9  A.   That's a rendering of the new span or the Twin Span

10  immediately adjacent to the Ambassador Bridge.

11  Q.   How many lanes will the Twin Span be?

12  A.   Six.

13  Q.   Does that mean three in each direction?

14  A.   Yes.

15  Q.   How many lanes is the existing bridge?

16  A.   It's four lanes.

17  Q.   Two in each direction?

18  A.   Yes, sir.

19  Q.   Can you explain the Court what you meant when you referred

20  to the funneling of traffic and the nexus or fast programs?

21  A.   Right.  So if you're a truck load carrier for instance and

22  maybe you were coming from another state in the union and you

23  were carrying automotive parts and you're fast approved under

24  the Customs Program, but you're stuck in line behind a truck

25  carrying livestock, the fact, the fact that you're fast

1  approved doesn't help you get through customs any faster.

2      If you have a few more lanes that allows you to segregate

3  the traffic and sort it out, you can deliver that traffic to

4  the primary inspection booth to the U.S. and Canadian customs

5  in a way that allows them to deal with all of the same kind in

6  each lane.

7  Q.   Will it benefit your business to be able to have the Twin

8  Span even if traffic is not increased at all?

9  A.   Absolutely.  You know, we hope that in the long term

10  traffic does increase, don't get me wrong about that.  But the

11  reason why we want to build the Twin Span is because our bridge

12  is 85 years old.

13      You have to understand we keep the bridge in good shape,

14  but in order to do that we have to perform significant repairs

15  and those repairs need to be performed when traffic is also on

16  the bridge at the exact same time.

17      So what happens is we'll close one lane and so far, we've

18  only had to close one lane at a time.  And we'll have workmen

19  working in that lane and we'll push traffic over to the other

20  three lanes.  It's like, you know, you can change the oil in a

21  car a lot easier if you put it up on a rack versus trying to

22  change it while you are driving down the highway.

23  Q.   Right.  Let's, let me ask you, let's go back to the

24  NITC/DRIC, what I'm going to call the NITC/DRIC?

25  A.   Okay.

1   Q.   The Government sponsored bridge?

2           THE COURT:  For the record, the NITC/DRIC is capital

3   N-I-T-C hyphen capital D-R-I-C.

4           MR. HUME:  Thank you, Judge.

5           THE COURT:  NITC/DRIC.

6           MR. HUME:  Thank you, Judge.  We have used that

7   formulation because the documents --

8           THE COURT:  You don't have to explain.

9           MR. HUME:  Some of the DRIC and some is NITC, so we

10  went with both.

11  BY MR. HUME:

12  Q.   Could we have slide 7, please?

13      Now Mr. Moroun, do you have an understanding as to where

14  the proposed NITC/DRIC will be built?

15  A.   Yes, I do.

16  Q.   Where is that?

17  A.   The river bends at the point at the Ambassador Bridge in

18  the location that the NITC was on so depending on what side of

19  the river you're on, a mile to two miles away.

20  Q.   What, Mr. Moroun, will the impact of the NITC/DRIC be if

21  it is built on the Detroit International Bridge Company's

22  ability to build the Twin Span?

23  A.   We won't be able to build it.

24  Q.   Why is that?

25  A.   Well, as you saw the traffic declines, it's a toll bridge

1  business.  You need traffic to generate revenue to pay your

2  expenses and make a profit.

3      And there's just not enough traffic and enough business and

4  that's been known for quite some time.  If the Ambassador

5  Bridge is able to build its Twin Span of course there would be

6  no need for the NITC.  If the NITC builds their span, it would

7  be impossible to build the Twin Span of the Ambassador Bridge.

8          THE COURT:  Impossible as a matter of geography or

9  impossible as a matter of financial reality?

10         THE WITNESS:  Financial reality, Judge.

11         THE COURT:  Thank you.

12 BY MR. HUME:

13 Q.   Do you know, Mr. Moroun, under even the optimistic traffic

14 projections of the NITC/DRIC, not adjusting it at all for

15 what's happened in the last nine or ten years, when do their

16 projections show that the existing four lane Ambassador Bridge

17 would reach total capacity?

18 A.   I believe 2035.  The existing, just in perspective, the

19 existing bridge, the roadbed capacity specifically is about 50

20 percent of capacity.

21     The issue with this international crossing and for all

22 international crossings on the northern border is not

23 necessarily number of lanes.  The issue is having a modern

24 facility that can hook into U.S. and Canadian customs on each

25 side.

1  Q.   In your business judgment, Mr. Moroun, based on your

2  understanding of the figures and numbers, the economics of it,

3  even if the NITC/DRIC projections came to be accurate, somehow

4  there was extraordinary growth to catch up with that ascending

5  red line, would it then in your view be possible to

6  economically justify construction of both the NITC/DRIC and the

7  Twin Span?

8  A.   No.  As you pointed out, and I read from their --

9  Q.   Exhibit 5?

10 A.   -- Exhibit 5, the final environmental impact statement,

11 they plan on taking 75 percent of our truck traffic.  Just

12 think about it.  What business can survive after 75 percent of

13 their business goes away?

14 Q.   Let's please show the witness PI Hearing Exhibit 7?

15        THE COURT:  Do you know, sir, if the NITC/DRIC is

16 suppose to be a toll bridge?

17        THE WITNESS:  Yes, it is.

18        THE COURT:  Thank you.

19 BY MR. HUME:

20 Q.   Mr. Moroun, could you identify for the record what Exhibit

21 7 is?

22 A.   O'Keef is a financial expert that our company hired to

23 perform an analysis on the NITC bridge and also it's impact on

24 the Ambassador Bridge, it's ability to build the Twin Span.

25 Q.   What were the conclusions of O'Keef?

1  A.    His conclusions matched my earlier answer that it would be

2  impossible to build a Twin Span if the NITC Bridge was built.

3  Q.    Have you seen any analysis by any of the NITC/DRIC

4  proponents or anyone else that demonstrates any scenario in

5  which there would be sufficient traffic to justify the

6  expenditure on both the NITC/DRIC and the Twin Span?

7  A.    None whatsoever.  They tried to ignore the Twin Span at

8  every turn.

9  Q.    Can you tell the Court roughly how much money the bridge

10  company spends each year in capital improvements and

11  maintenance costs for the Ambassador Bridge?

12  A.    We spent quite a bit through our P and L as preliminary

13  expense maintenance, but as capital expenditures we average

14  lately about 22, 23 million dollars a year in capital

15  expenditures on the existing bridge.

16  Q.    What does that do to your net income?

17  A.    It uses up most of it.

18  Q.    So under the current level of traffic is it financially,

19  what can you say about the financial case for building the Twin

20  Span right now, assuming there is no NITC/DRIC?

21  A.    It works.  And the only way it works with the traffic the

22  way it is, is for us to stop spending those extremely high

23  priced repairs on the existing bridge and take that money and

24  channel it into the new Twin Span.  That's the way we'd do it.

25  Q.    Because if you build the Twin Span what happens to those

1  20 million plus in capital expenditures; do they go up or down?

2  A.   They'd go to zero as soon as we built the new Twin Span.

3      Now after the new Twin Span was built, the common approach

4  with aging infrastructure is to then go back to the old span

5  and attack that by completely rehabilitating it.  But you'd do

6  that when it wasn't under load.  You didn't have traffic on it.

7  So it would be like 25 percent of the cost of repairing it

8  while traffic was on it at the same time.

9  Q.   Now Mr. Moroun, going back to your testimony about the

10 NITC/DRIC's impact on your ability to build the Twin Span, have

11 you ever personally shared that perspective with any Government

12 official?

13 A.   Right, we shared it right from the start.  I think that

14 they, especially folks from federal highway have always known

15 that.

16 Q.   Do you have any specific recollection of any in person

17 discussion with anyone where you told federal highway that?

18 A.   Yes, I do.  My father and I and Mr. Stamper, the president

19 of the bridge, traveled to Lansing and we met in the federal

20 building there with two federal highway officials, Mr. Steele

21 and a Mr. Kirschensteiner I believe lately both are retired.

22 This would have been before they were retired and still active.

23 We met with them in their offices there and I remember

24 specifically talking to them about how important it was that we

25 build the Twin Span and getting their reaction to it.

1  Q.   What was their reaction?

2  A.   Their reaction was plainly we won't ever allow that to

3  happen.

4            THE COURT:  What year was that?

5            MR. COLLINS:  Objection, hearsay.

6            THE COURT:  I don't know if he actually was quoting

7  anybody.

8         What year was that?

9            THE WITNESS:  That was approximately 2004, Your

10  Honor.

11           THE COURT:  Thank you.

12        I'm not going to take that as a quote.

13           THE WITNESS:  And I was paraphrasing as well.

14  BY MR. HUME:

15  Q.   What was your response to what he said?

16  A.   Well, we had a, kind of a fight for awhile and at the end

17  of the fight when everyone was done yelling at one another, the

18  two gentlemen from federal highway said well, maybe we would

19  but the only circumstances --

20           MR. COLLINS:  He's testifying.

21           THE COURT:  Is this a --

22           MR. HUME:  Your Honor, my understanding of the case

23  law is that at a preliminary injunction hearing these kinds of

24  evidentiary objections should go to weight.  So I'm happy for

25  it to be noted but that rules against hearsay are relaxed if

1  almost never apply.

2           THE COURT:  Well, rules against hearsay can be

3  relaxed and there isn't a jury, so we don't have the same

4  concern and it's not a direct quote and so it's merely an

5  attitudinal statement and for that purpose, I will take it

6  only.

7           THE WITNESS:  So the conclusion was that maybe they

8  would allow us to build the Twin Span but only if we agreed

9  that it would be four lanes and we would tear down the old

10 span.

11 BY MR. HUME:

12 Q.   So did they stick to their position that they would block

13 the Twin Span that you proposed?

14 A.   They have consistently.

15 Q.   Can you explain to the Judge what the Ambassador Bridge

16 gateway project is?

17           THE COURT:  I really know.  I mean, I'm sorry,

18 Mr. Moroun, I don't mean to treat you with any disrespect, sir,

19 but we don't have a lot of time.  I really know what the

20 gateway project is, it's all over the papers.  I could even

21 look it up on Goggle if I needed to but I don't.

22           MR. HUME:  Judge, understood.

23      Actually, I thought that we had failed to properly

24 explain the relevance to it so if I could just ask one

25 question.

```
 1  BY MR. HUME:

 2  Q.   What will the impact of the NITC/DRIC be on the

 3  investments made in the gateway project, Mr. Moroun?

 4  A.   It would render them a waste.  You would have a brand new

 5  three hundred and some million dollar project attached to a, an

 6  85 year old bridge that would continue to age.  It would be a

 7  juxta position.

 8  Q.   How much did the bridge company invest in it?

 9  A.   Approximately a hundred and ten million.

10  Q.   And the Federal Government?

11  A.   Two hundred and thirty.

12  Q.   Mr. Moroun, why -- we're here to ask the Court for a

13  preliminary injunction.  Can you explain to the Court why the

14  bridge company will suffer irreparable harm if the Court does

15  not grant a preliminary injunction?

16  A.   Yes.  Well, we're suffering right now, we have been at it

17  for ten years in trying to get our Twin Span built.  We've been

18  blocked at every turn.

19      Our customers which are trucking companies and passenger

20  cars have been treated multiple lane closures.  Some truck load

21  carriers for instance, have been treated --

22           MR. COLLINS:  Again, Your Honor, foundation.

23           THE COURT:  No, no, no.  This fellow has a foundation

24  to talk about what's gone on in the bridge.

25           Go ahead.
```

1              THE WITNESS:  Some of our truck load carrier

2    customers have been treated upwards of ten different lane

3    closures in the same year.  They have been aggravated, they

4    have been delayed.  We have spent four times more than what we

5    should have on repairs and all of that would have been

6    alleviated had we been able to build the Twin Span by now.

7    BY MR. HUME:

8    Q.   What is it in particular about this coast guard navigation

9    permit that will cause irreparable harm?

10   A.   This is the end of the race.  The race they know that

11   we're in and they have decided to make a race.  If they can get

12   all of their approvals and this one is the final one, before we

13   do, they will have won.  It's, everybody knows that if they

14   build the NITC we won't be able to build the Ambassador Bridge

15   Twin Span and vice versa.

16              MR. HUME:  Your Honor, I would like to ask the

17   witness to authenticate one document.

18              THE COURT:  Go right ahead.

19              MR. HUME:  Exhibit 8, please.

20        Your Honor, Exhibit 8 this document is something that we

21   intended to attach to our papers but did not.  I shared it with

22   Mr. Collins yesterday.

23   BY MR. HUME:

24   Q.   Mr. Moroun, could you state for the record what Exhibit,

25   PI Hearing Exhibit 8 is?

```
1   A.   It's a list of deeds that the bridge company acquired in

2   late 1920s for the land necessary to build the Ambassador

3   Bridge.

4   Q.   Were those deeds acquired before or after the bridge

5   company received its navigation permit for the Ambassador

6   Bridge?

7   A.   I believe most of the deeds on this list were acquired

8   after we received the navigation permit from the Secretary of

9   War.

10  Q.   Thank you, Mr. Moroun.

11          MR. HUME:  I have no more questions, Your Honor.

12  Thank you.

13          THE COURT:  I have a question -- well, no, did you

14  wish to cross-examine Mr. Moroun?

15          MR. COLLINS:  I do briefly, Your Honor.

16          THE COURT:  Go right ahead then.

17       Go right ahead when you're ready, sir.

18                      CROSS EXAMINATION

19  BY MR. COLLINS:

20  Q.   Good afternoon, Mr. Moroun?

21  A.   Hello.

22  Q.   I'm Brian Collins, I'm the attorney for the Federal

23  defendants.  I don't think that we've met?

24  A.   Nice to meet you.

25  Q.   I just want to ask you a few brief questions here.
```

1    You testified on direct that the Twin Span of the

2  Ambassador Bridge is not being built to accommodate traffic

3  levels, right?

4  A.   That's correct, sir.

5  Q.   And it's not necessary to replace the existing Ambassador

6  Bridge, right?

7  A.   Yes, it is.

8  Q.   It is necessary?

9  A.   Yes, sir.

10  Q.   Okay, but your view that the existing levels of traffic

11  are sufficient to justify financing of the Twin Span right now?

12  A.   Just barely, but yes.

13  Q.   Okay.  When you say existing levels of traffic you are

14  referring to the most recent number in 2012?  I think it's on

15  the exhibits here for about 7.3 million vehicles?

16  A.   Right.  So the actual traffic, when I say existing

17  traffic, I mean the actual traffic today plus some reasonable

18  amount of growth into the future, right.  I'm not, I guess to

19  be fair to you, I'm not predicting that traffic would stay

20  exactly the same as it is today for the next 50 years.

21  Q.   Okay.

22  A.   I'm predicting some, some minor level of growth and

23  counting on that to be able to afford the Twin Span.

24  Q.   So if traffic stayed flat, the Twin Span wouldn't be

25  economically justified?

1   A.   Well, by that time we will have put the money in and we'll

2   be operating under a loss if it stayed flat, but the bridge

3   would have been built.  We can do it right now based on the

4   existing traffic.

5   Q.   And based on your projections of what increases in traffic

6   there will be?

7   A.   Yes, yes, a conservative estimate.

8   Q.   So what level of traffic would no longer justify the Twin

9   Span?

10  A.   Just about anything significantly less than what it is

11  now, sir.  Just for perspective, we're a little over seven

12  million vehicles a year and our high was about 13 million

13  vehicles a year.

14  Q.   So okay.  Thank you.

15      And so but you don't know what the breaking point is in

16  your view above which traffic levels the Twin Span makes sense

17  and below which it doesn't make sense?

18  A.   I do.

19  Q.   What is that, what is that?

20  A.   Right.  So right now at seven to seven and a half million

21  vehicles per year we can afford to build a Twin Span.  We have

22  been able to afford to build the Twin Span since we applied for

23  the amendment of our navigation permit.  Despite the fact that

24  every year traffic has gone down, we still have the opportunity

25  to do it.

1  Q.   Okay.  And so if traffic levels in the future were, if you

2  were able to maintain traffic levels --

3              THE COURT:  What is the reason for all of this

4  questioning?  Where are you going, what proffer do you want to

5  make?

6              MR. COLLINS:  Well, Your Honor, I think the idea is

7  that, you know, I'm going to get to the projections, but the

8  idea is that the traffic levels are unknown what they're going

9  to be in the future.

10      There's other points I want to make, but when the NITC

11 is built there will be, you know, as plaintiffs have indicated

12 there will be an increase in traffic and the reductions in

13 traffic that the NITC may take from their bridge will still

14 allow them to be profitable.

15             THE COURT:  So it's your proposition that even if the

16 NITC/DRIC takes 75 percent of the truck traffic from the

17 Ambassador Bridge, there would be sufficient increase in

18 traffic to retain the economic viability of the Ambassador

19 Bridge?

20             MR. COLLINS:  Yes, Your Honor.

21             THE COURT:  Is that true?

22             THE WITNESS:  That's fantasy, Your Honor.

23             THE COURT:  I mean, I'm sorry, but I just cut through

24 all of this just to see where we were going and why do you say

25 that?

1          THE WITNESS:  Well, traffic doesn't, doesn't grow

2     like that.  It never has in the entire history of the

3     Ambassador Bridge and the entire history of the border.

4          Traffic has been in chronic decline in the last decade.

5     For traffic to grow that much where it could fill in the crater

6     created by a 75 percent taking in our truck traffic for

7     instance, it would be, you know, we would need like a rocket

8     ship to hook the traffic to it.

9          THE COURT:  Well, tell me this --

10         THE WITNESS:  It's impossible.

11         THE COURT:  -- if you built the new span and they

12    built the NITC/DRIC would they really get 75 percent of your

13    traffic?  Or would you just not be able to build the new span

14    at all?

15         THE WITNESS:  Well, if they built the NITC/DRIC we

16    would not be able to build the new span at all, that would be

17    financially impossible.

18         And they have said continuously, in fact, the project

19    manager for the NITC/DRIC declared that if the new span of the

20    Ambassador Bridge was built there would be no reason to

21    continue the work on the NITC/DRIC.  So it's the same, it's two

22    sides of the same coin.

23         THE COURT:  And you disagree with that as a

24    proposition, sir?

25         MR. COLLINS:  Yes, Your Honor, we do.

```
1                    THE COURT:  Okay.

2                    MR. COLLINS:  May I?

3                    THE COURT:  Yes.

4    BY MR. COLLINS:

5    Q.   So the bridge company expects to borrow money to finance

6    the construction of the Twin Span; is that correct?

7    A.   Yes, in part.  We would have to put some equity in it as

8    well but yes, in part.

9    Q.   So the terms of the financing are also going to effect the

10   economic viability of the Twin Span; isn't that right?

11   A.   The terms probably would not effect the economic

12   viability.

13   Q.   So it doesn't matter if interest rates sky rocket and you

14   have to pay higher buyer cost?

15   A.   Interest rates would effect it.  The terms of the credit

16   conditions wouldn't necessarily effect the viability.

17   Q.   Yes, I am sorry.  I was including interest rates.

18   A.   I'm sorry too then.

19   Q.   So traffic isn't the only factor that goes into

20   determining the economic viability of the Twin Span?

21   A.   No.  It's the entire revenue piece though.  You're right,

22   it's not the only factor.

23   Q.   In fact, you want to build the Twin Span regardless of

24   traffic levels, correct?

25   A.   I want, I have the desire to.  I can't practically do it
```

1    though regardless of traffic levels.

2    Q.   You're familiar with your company's lawsuit challenging

3    the NEPA analysis for the NITC/DRIC that was filed in the

4    Eastern District of Michigan?

5    A.   Yes, I am, sir.

6    Q.   Okay, and you're aware in that case that the Court found

7    that your company used the same traffic projections when it was

8    supporting its NEPA analysis for its Twin Span in 2004?

9    A.   That is not the way it would be, that's not the way --

10   that's not accurate.  It's close, but it's not accurate.

11   Q.   Okay.  Well, how is it not accurate?

12   A.   Right.  So the Government came out with a traffic study

13   that said traffic was going to grow like this, right.  At the

14   same time we needed to file our documents for our own

15   environmental study also to the Government.

16       So preemptively, we did our air test, air quality testing,

17   noise testing, and everything else.  We subjected those tests

18   to the Government's projections so that we could alleviate any

19   concerns from the EPA or anyone else involved in the

20   environmental review that we weren't short cutting the

21   environmental tests when the Government had a traffic study out

22   there that said that traffic could be a lot more than what we

23   thought it was.  So it was to obviate the need to go back and

24   do more tests later.  We just used the same numbers that the

25   Government was predicting.

1  Q.   Okay, but your, are you familiar with the NEPA document

2  that you submitted to the Government?

3  A.   I think they made us submit like three or four different

4  studies.

5  Q.   Okay.  Let's start with the first one in 2004?

6          THE COURT:  What was the year, sir?

7          MR. COLLINS:  2004.

8          THE COURT:  And you want this witness to recall it

9  off the top of his head --

10         MR. COLLINS:  I was asking if he could.  I don't,

11 Your Honor.

12         THE COURT:  -- to distinguish NEPA documents that

13 were submitted a decade ago?  That's hard.

14         MR. COLLINS:  I understand.

15         THE COURT:  You might be a little kinder to the

16 witness.

17 BY MR. COLLINS:

18 Q.   Well, apart from the NEPA, I mean apart from the air

19 quality concerns in the environmental effects of the bridge,

20 it's true isn't it that the Court found that you used the

21 traffic projections for actual projections of traffic on the

22 bridge; isn't that right?

23         THE COURT:  And he just explained that.

24     I'm sorry, sir, I completely understand what his answer

25 was.

1          Go on.  Move on.  That's not, I mean, you're not going

2    to succeed there.  He used the Government's numbers so that he

3    could show even with the Government's numbers that he thought

4    were inflated the bridge would still pass NEPA review period.

5    End of story, keep going, something else.

6               MR. COLLINS:  Then I would like to introduce an

7    exhibit, Your Honor.

8               THE COURT:  You're more than welcome to introduce an

9    exhibit.

10               MR. COLLINS:  Your Honor, this is an exhibit that's

11   in the record.  It's both part of the Coast Guard

12   administrative record CGAR 00382.  It was also filed as Exhibit

13   9 to our response to the preliminary injunction motion.

14               THE COURT:  What is it?

15               MR. COLLINS:  It's the July 14th, 2004 preliminary

16   review permit application for the Ambassador Bridge enhancement

17   project.

18               THE COURT:  Okay.

19               MR. COLLINS:  Okay.  May I approach, Your Honor?

20               THE COURT:  Yes.

21   BY MR. COLLINS:

22   Q.   I would like to refer you to CGAR 000387.

23   A.   Okay.

24   Q.   Do you recognize that document?

25   A.   Yes, I do.

1  Q.   Okay.  If I could refer you to the, I believe it's the

2  last paragraph on that page and the section is titled purpose

3  of the project?

4  A.   I'm there.

5  Q.   Okay.  And in there you state -- well, Detroit Bridge

6  stated that truck traffic was expected to increase by a 120

7  percent over the next 30 years, didn't it?

8  A.   That's not -- see, that's what I'm saying.  You're, you're

9  misconstruing it.

10     If you look ahead of that paragraph to the second to the

11 last sentence of the paragraph above it, it says a study

12 commissioned by the Boarder Transportation Partnership

13 indicated and then it went on and started quoting job numbers

14 and so on.

15     That's the Border Transportation Partnership, that's the

16 Government's traffic study.  So everything that flows in the

17 three or four sentences after that is all about us quoting from

18 the Government's study.

19 Q.   But that's what you submitted as the purpose for your

20 project, right?  I mean, that's the title of that section of

21 the document?

22 A.   Well, if you don't mind, I'd like to read it a little bit

23 before I --

24 Q.   Please, yes?

25 A.   Okay.

1    (Pause.)

2    Sorry to do this to you, but can I see the next page?

3  Q.   Oh, sure?

4  A.   Thank you.

5    (Pause.)

6    Right.  So the purpose of the Ambassador Bridge enhancement

7  project is to build the new Twin Span along the existing

8  Ambassador Bridge and to improve traffic by the customs

9  efficiencies that I talked about later by being able to

10 segregate them and yes, if some time in the future traffic grew

11 beyond the limits of the existing bridge, the new Twin Span

12 would be able to handle it as well.

13   So when we refer to these traffic numbers here in this

14 paragraph we are simply parroting what was in the study

15 commissioned by the Boarder Transportation Partnership.  We are

16 saying to the Coast Guard look, just like we said to the Coast

17 Guard in the EPA for the environment review, look when you are

18 examining our application, you don't need to ask us about

19 whether or not the new span can handle the traffic predicted in

20 the other Government study.  Yes, it will be able to do that as

21 well.

22 Q.   But that paragraph doesn't talk anything about the

23 environmental impacts, correct?

24 A.   No.

25 Q.   It's just talking about the purpose and need for the

1  project?

2  A.    This is the permit application so this isn't about the

3  environment.   This is about the Coast Guard navigation permit.

4  That's what we were after there.

5        So we just, we didn't want the Coast Guard to say hey, have

6  you seen the Government's study that shows how much traffic is

7  going to grow, tell us how the Twin Span is going to be able to

8  handle that.   So we quoted the Government's traffic projections

9  and said yes, we'd be able to handle those too.

10  Q.    Okay.   If the Coast Guard issues or finishes making its

11  decisions on the NITC navigational permit, do you plan to

12  abandon your plans to build the Twin Span?

13  A.    We wouldn't be able to build it, that's for certain.

14  Q.    You wouldn't be able to build it?

15  A.    That's correct.

16  Q.    If the Coast Guard finishes its decision making?

17  A.    It's the last approval.   They've announced that they're

18  already buying the land for the NITC Bridge now.

19  Q.    So, so as soon as, so you're saying that, that there,

20  there will be no change to any conditions of the ground by

21  approval of the permit; isn't that right?   It won't effect the

22  traffic on your bridge will it?

23  A.    Well, look at in 2004 when the Government said that this

24  race had started to see who could get all of their approvals

25  first and we had already filed in 2004 and they didn't file for

1  their navigation permit until last year.  If they get all of

2  their approvals and we still don't have all of our approvals

3  and we have been delayed for the last ten years, we would

4  already have had our Twin Span built.  But now worse than being

5  blocked all of these years, if they get the very last permit

6  they need and they won the race, the Government wins the race,

7  I think, I think things are pretty well lost by then.

8  Q.   Okay, but if the, if the Coast Guard finishes its decision

9  making on the permit, nothing is going to change the traffic

10 levels on the bridge is it?

11 A.   The permit itself won't change the traffic levels on the

12 bridge but neither did the approval of the NEPA and neither did

13 the blocking of our NAV permit.  The significance is this is

14 the last one, this is the cap stone.

15 Q.   How do you know, how do you know that this is the last

16 one?

17 A.   Because, because we're trying to build a Twin Span too and

18 we're familiar with the permit process necessary for it.

19 Q.   So you don't need any Section 404 permits from the Army

20 Corps of Engineers?

21 A.   I don't believe so.

22 Q.   You don't need any other permits besides the navigational

23 permit?

24 A.   The navigational permit is the last permit that the

25 Ambassador Bridge would need to build its Twin Span on the U.S.

1  side.

2  Q.   But you are not, but you don't know what permits are

3  required for the NITC do you?

4  A.   Well, I believe that I do because we're in the bridge

5  business and they're trying to do the exact same thing that we

6  are.

7  Q.   And so you don't believe that for instance, that they need

8  approval from the legislature of Michigan to move forward with

9  that bridge?

10 A.   Oh, we absolutely know that they need approval from the

11 legislature of Michigan and we thought that that, that had

12 stopped them.

13    As a matter of fact, I instructed our lawyers to dismiss

14 three quarters of this case when I saw that they didn't get

15 approval of the legislature of Michigan.  And then they went

16 right on anyways and granted a presidential permit.

17 Q.   But you just said they didn't need anything else.  So they

18 do need at least one thing more, right?

19 A.   They have said they do not need legislative approval and

20 they've got a presidential permit to prove it.

21 Q.   And you're not aware of any, and you don't believe that

22 Canada has any more regulatory approvals on their end as well?

23 A.   For the NITC?

24 Q.   Yes?

25 A.   In fact, Canada passed a special law just for the NITC

1   that says you're all done, go.

2   Q.   And you're, so your position is that there --

3           MR. COLLINS:  Strike that, Your Honor.

4           THE COURT:  Can you summarize what you're trying to

5   do because we're spending a lot of time.  I want to get back to

6   argument on this matter.  We're suppose to be half an hour.

7           MR. COLLINS:  Okay.

8       Just one last point on the gateway project, Your Honor.

9           THE COURT:  I didn't take any questions on the

10  gateway project, so I'm not going to take any from you.

11          MR. COLLINS:  Okay.  He --

12          THE COURT:  I'm not going to take any from you

13  either.

14          MR. COLLINS:  Thank you, Your Honor.

15          THE COURT:  Thank you.

16      Did you need to ask any redirect?

17          MR. HUME:  No, Your Honor.

18          THE COURT:  That was a good answer.

19      Thank you, Mr. Moroun, it's nice to see you.

20          THE WITNESS:  Thank you, Your Honor.

21          THE COURT:  Oh, wait, I had a question.

22      My question is something entirely different.  My

23  question is in all this time, in all this litigation, all of

24  this fighting and all of this and this, the question that I

25  have is why didn't you go buy the air rights?

1        I mean, I know that Detroit is hard, but Detroit needed

2   so much money.  You know, you could have given all of the money

3   you spent -- excuse me -- for your lawyers to Detroit when it

4   was about to go in bankruptcy and maybe they would have given

5   you the air rights.

6        THE WITNESS:  Well, it's been more difficult than it

7   should have been, Your Honor.

8        THE COURT:  Well, that I can tell.

9        THE WITNESS:  We will buy those air rights.  It won't

10  be an issue.

11       THE COURT:  Well, I have heard that, but the problem

12  is you don't have them.

13       THE WITNESS:  That's true.

14       THE COURT:  It's a hiccup, it's a serious hiccup.

15       THE WITNESS:  We don't have them.

16       Could I explain a little bit more?

17       THE COURT:  It's my question so you can keep talking.

18       THE WITNESS:  Okay, good.

19       Your Honor, we believe that the state does have or the

20  city does have a right to get something for those air rights

21  and we will pay them any reasonable amount necessary for them.

22       But we don't believe that the State or in this case the

23  city has the right to absolutely blockade interstate commerce

24  any more other than they would have a right to the put a

25  barricade over the river because they own the river bottom

1  lands as well or any more right that they would have to put a

2  blockade over the Ambassador Bridge.  That's international

3  trade and commerce there and they don't have the right to

4  interfere.

5      Now they do have the right to demand something

6  reasonable and anything reasonable that they demand we'd pay.

7      THE COURT:  Let's assume that your legal position

8  just articulated is one thousand percent correct.

9      THE WITNESS:  Okay.

10      THE COURT:  But you're being stubborn about it.

11      THE WITNESS:  Okay.

12      THE COURT:  And it's causing you all of this ruckus

13  so why don't you just stop being stubborn and go throw a lot of

14  money at them?  Forget reasonable, this is all not reasonable.

15      THE WITNESS:  Okay.

16      THE COURT:  Excuse me, Mr. Hume, excuse me.  I don't

17  mean to be insulting to you or your colleagues or anybody,

18  they're expensive lawyers.

19      THE WITNESS:  They are.

20      THE COURT:  I know they're good but they're

21  expensive.

22      So I keep running into that problem.

23      THE WITNESS:  Judge, you're right.

24      One of the last notes that I got back from the Deputy

25  Mayor of the City of Detroit said that I should come see him as

1    soon as I get my navigation permit.

2            THE COURT:  Well, of course that's only because

3    Detroit and the Coast Guard are going back and forth and back

4    and forth.  I mean, there's a, there's a whole lot going on

5    here.

6            THE WITNESS:  There is.

7            THE COURT:  It's very evident even though I'm sitting

8    at this bench in Washington D.C, that is evident.

9        Thank you, sir.

10           THE WITNESS:  Thank you.

11           THE COURT:  Appreciate your coming.

12       (Witness excused.)

13       All right.  Let me move on to an issue that might

14   explain to Mr. Dozeman part of my response to his argument

15   before.  And it's this, it's a question for the bridge company.

16           Number one, I don't, I think the position of the United

17   States has been in other years as I understand it that even if

18   Canada didn't think that there was a special agreement in

19   place, the United States Government thought there was.  And for

20   purposes of persons in Canada they had to assume there was no

21   special agreement and for purposes of persons in the United

22   States they could assume that there was a special agreement.

23       I mean, it's a really bizarre thing, but it seems to me

24   that back in the beginning that was the way everybody

25   approached the issue of whether there was a special agreement.

1          Which is one of the reasons why I don't think whether I

2     would find a special agreement or not would actually have any

3     particular effect on Canada in the least.  You know, Canada

4     doesn't believe it.  Well, Canada is a sovereign nation, it can

5     make its own decisions.

6          The question is whether the United States Government on

7     this fact pattern has by its actions in the past bound itself

8     in some way.  But more critically than that, assuming arguendo

9     that there's a special agreement, at least for purposes of

10    applying U.S. law against U.S. corporations and the U.S.

11    Government in a U.S. court, not in Canada, assume that there is

12    a special agreement, the Government argues well but that

13    doesn't actually make a whole lot of difference because all the

14    special agreement does is substitute for going to the

15    international something commission, IJC.  I can't think of what

16    the J is.

17               MR. DOZEMAN:  Joint.

18               THE COURT:  What is it?

19               MR. DOZEMAN:  Joint.

20               THE COURT:  Thank you, the International Joint

21    Commission.  Have I read your brief, do you feel good now?  And

22    so it's really never no mind.  It doesn't bear on.

23          Now the response from the bridge company is but it gives

24    us a franchise and then there's an argument that it's an

25    exclusive franchise, but the exclusive concept as I remember

1  from your briefs comes out of the law of Canada and what a

2  franchise means in Canada.  Well, the law in Canada is not

3  going to help us here because if we have to go to, we have to

4  do this under U.S. law.

5      So even if there is a special agreement that was adopted

6  by the two sovereigns, adopting legislation back in 1927 that

7  was contemporaneous and similar, et cetera, even if that were a

8  special agreement and even if one were to conclude that that

9  special agreement existed today, what difference does that make

10 for purposes of the rights of the bridge company to build a

11 Twin Span?

12     And so that's, that's my very first question.

13         MR. HUME:  Understood, Your Honor.  I'm not surprised

14 to hear that question.

15     If you hadn't asked that question, I was going to

16 suggest, I was going to introduce today by saying we have two

17 issues, the preliminary injunction and the special agreement.

18 We think they're related.  The Government doesn't think they're

19 related and we're happy to argue the preliminary injunction on

20 its own based on the statute and then get to the special

21 agreement second.

22         THE COURT:  Okay, wait, wait then.  Hold on.  This is

23 very important.

24     If you think that you can argue the preliminary

25 injunction without reference to the special agreement, that's

1    what we're here for.

2            MR. HUME:  Yes.

3            THE COURT:  We have limited time.  So I'm actually

4    extremely interested in the special agreement, but let's talk

5    about that only if we'll have time later.

6            MR. HUME:  That's fine.  That's how we were

7    proposing.  We absolutely think we have a special agreement.

8        I would just make one quick comment, Your Honor, in

9    response to what you said because you summarized it very well,

10   but we would say Canada, you can't just look at what Canada's

11   foreign ad-ministry person said in 1927.  Canada's legislature

12   enacted that legislation.

13           THE COURT:  Yes, but that goes to the merits and

14   everything.

15           MR. HUME:  It does.

16           THE COURT:  And to be perfectly frank, in many ways I

17   think that it doesn't matter if Canada having adopted the

18   legislation which you have argued is consistent with the terms

19   of the treaty therefore, making for a special agreement.

20       Canada disagrees and the reason for Canada's

21   disagreement at the time was that well, you weren't really

22   going to interfere with the waters anyway so we didn't need a

23   special agreement.

24       That doesn't exactly say it isn't a special agreement.

25   It just says well, we went through the process but we don't

1    really need one.

2              MR. HUME:  Right.

3              THE COURT:  Anyway, put that to the side if you don't

4    need it and argue your other things.

5              MR. HUME:  Absolutely, Your Honor.  Because we

6    absolutely believe we have a franchise, no matter what anyone

7    says about a special agreement, we have a franchise and we'll

8    leave the special agreement 'till later.

9         So I would like to begin, Your Honor, with an outline of

10   the arguments we're making on why we have a likelihood of

11   success on the merits because I think that's what will probably

12   take the bulk of the time.

13             THE COURT:  Okay.

14             MR. HUME:  We have three or four arguments.  I want

15   to make sure that they're clear and distinct and understood at

16   the outset and then address each one.

17        In fact, it may make sense, I proposed this informally

18   to Mr. Collins, it may make sense if the Court wishes for me to

19   argue each one of those and allow the Government to respond.

20             THE COURT:  Well, tell me first what the four are.

21             MR. HUME:  Here, so here they are.  First, the bridge

22   company has a statutory franchise right, right there in the

23   U.S. Code to construct, maintain and operate its bridge and

24   there is no time limit and both Congress and the State

25   Department have said it includes the right and the

1    authorization to build a Twin Span.  That's how you perpetuate

2    the franchise.  And what the NITC is doing is preventing the

3    exercise of that right.

4         So argument number one was supported by what Mr. Moroun

5    said but is also supported by other evidence.  I would like to

6    show the Court of documents from the Government's file showing

7    they know that one bridge precludes the other.  And also their

8    failure to address it in the NITC application in the State

9    Department.  That is one of our arguments.

10        The reason that argument would entitle us to a

11   preliminary injunction is really two things.  First, if we're

12   right, and we believe we are, then it would stop all approvals

13   for the NITC because the NITC approvals violate our franchise.

14        It would also invalidate the State Department's approval

15   and the NITC applicants cannot process their application with

16   the Coast Guard if the State Department approvals are

17   invalidated.  I don't think the other side disagrees with that.

18        But the reason they relied --

19        THE COURT:  They may not disagree with the result,

20   they may disagree with the theory.

21        MR. HUME:  Well, I think that may be right.  That may

22   be right.  I'll let them speak for themselves.

23        But the NITC applicants relied on the State Department

24   approval in seeking the Coast Guard navigation permit.  So any

25   claim that shows that the State Department approval is invalid

1  prevents the Coast Guard from going forward and that's the

2  simple point I was trying to make.

3       So our first argument is the core argument is we have a

4  right to build the Twin Span that is being violated.

5       Second argument is --

6       THE COURT:  Okay, but right and franchise, franchise

7  a particular word.  Why are you using franchise?

8       MR. HUME:  I don't mean a difference whether it's

9  authorization, right, franchise, we think it is a right and I'm

10 happy to get into that.

11      THE COURT:  You're saying it's a matter of a

12 statutory right?

13      MR. HUME:  We have a statutory right.

14      THE COURT:  Okay, okay, go on.

15      MR. HUME:  The second argument is independent of

16 that.  The second argument is that the State Department

17 approvals are both illegal and should be invalidated because

18 they approve an illegal crossing agreement.  That is invalid

19 under state law.  And the State Department, there's a federal

20 question there because the State Department had no authority

21 under the International Bridge Act to do that.  Again, if the

22 State Department approval is invalidated, the Coast Guard can't

23 proceed.

24      Third argument, that the bridge companies -- let me

25 state the third argument this way.  The Coast Guard's treatment

1  of the bridge company's application for a navigation permit

2  cannot be reconciled with the Coast Guard's treatment of the

3  NITC/DRIC application and it's so unequal and so discriminatory

4  we submit that it violates the equal protection clause because

5  it is favoring a Government agency who is acting as a market

6  participant against its private competitor.

7          Those are the three basic arguments.  I think that third

8  one on the Coast Guard's actions really give rise to a couple

9  of different things.  It's actually further evidence of the

10 violation of our franchise right.  It's a violation of the

11 equal protection clause.  We think that we argued that if the

12 Coast Guard were compelled as they should be to give us a

13 navigation permit, we don't think that they could or would go

14 forward with the NITC navigation permit.  I know they disagree

15 with that.

16         So the whole focus on what the Coast Guard has done can

17 have a variety of different legal implications.  The main one

18 that I'm going to talk about today is the equal protection

19 clause.

20         THE COURT:  But when you get to the Coast Guard

21 permit, the equal protection clause argument and the

22 distinction in treatment really boils down to, I think, whether

23 and this is a subject of different motions, whether the Coast

24 Guard can rely on the priority rule that it relies on in which

25 it says that as a private entity as opposed to a Government

1  entity the bridge company has to show full ownership rights and

2  all of the ownership rights that are needed to build a bridge.

3         And then we go back to Riverside Park and all of the

4  rest of that conundrum which is why I asked Mr. Moroun why

5  didn't you just go throw money at the City of Detroit and get

6  rid of this problem?

7         I mean, it's all very well and good to say we can't do

8  that, we will do that once we have our bridge permit, we can do

9  that.  The City of Detroit will talk to us and the bridge

10 people -- I'm sorry -- the Coast Guard says all you have to do

11 is get that land right or air rights, property right, easement

12 and we're ready to go.  Now they don't quite say that because

13 they say they have other issues, but basically that's the

14 issue.

15         MR. HUME:  Basically they said that.

16         Your Honor, one of the things I really hope we will have

17 time to do is to walk through those regulations on primary

18 authority and show why they absolutely cannot defend what the

19 Coast Guard has done.

20         The regulations say that you can have federal or state

21 primary authority.  Federal primary authority is what we have.

22 We have a charter from the Congress that says you can build a

23 bridge and they agreed that authorizes the Twin Span.  There is

24 not a single example that they can cite to you where an

25 international bridge has been required to show the ownership of

1   any land let alone every little easement.  There's no

2   precedence for applying the regulation that way.

3        And so we think that when you look at the regulations

4   and what they have said and what their arguments are, and then

5   compare that to what they are doing with the NITC, you can't

6   reconcile the two.

7            THE COURT:  Okay.

8            MR. HUME:  I think to fully answer the question I

9   need to go through those regulations and show it to you but

10  that's central to that, that whole argument is what the

11  regulations actually say.

12           THE COURT:  Okay.  Now let me ask you this question.

13  Never mind, I won't ask that question.

14       All right, so we've tracked down three points with the

15  sub-point about the regulations under the treatment that the

16  Coast Guard has given to the bridge company versus NITC/DRIC.

17           MR. HUME:  Right.

18           THE COURT:  Okay.  I thought there were four.

19           MR. HUME:  Well, that's because the Coast Guard's

20  treatment --

21           THE COURT:  Uh-huh.

22           MR. HUME:  -- could be considered it's both a

23  violation of equal protection clause so that independently

24  would be a basis.  It's also a violation of our franchise

25  right.

1          THE COURT:  Okay.

2          MR. HUME:  And in fact, if we, and if we were -- it's

3  also just illegal under the APA claim we have.  And we think if

4  the Coast Guard were compelled to give us our permit as we've

5  asked in our summary judgment papers on Count IV, we think that

6  would stop the Coast Guard from issuing a permit to the NITC

7  because there would be no point.

8          THE COURT:  Okay.  So let's go back to the statutory

9  right to construct.  That was your first one.

10          MR. HUME:  Yes, exactly.

11          THE COURT:  I understand the NITC is preventing the

12  exercise of that right.  I understand that part of the

13  argument, Mr. Moroun was quite clear on that.

14      But, and your statutory right to construct comes from

15  the Bridge Act of the -- I'm sorry -- the Bridge Act, there are

16  a thousand bridge acts here.  Never mind.  The Detroit

17  International Bridge Act which was called the ATC Act at the

18  time.

19          MR. HUME:  We're calling it different things which

20  doesn't help.  But we call it the DIBC Act.

21          THE COURT:  Yes, the DIBC Act.  I haven't figured out

22  how, I didn't do NITC/DRIC until I heard it this morning.  I

23  don't know how to say D-I-B-C, DIBC.

24          MR. COLLINS:  DIBC.

25          MR. HUME:  I'm sorry, Your Honor, if you were leading

1  up to a question.

2          THE COURT:  No, no, that's okay.  I know it doesn't

3  have any termination date.

4          MR. HUME:  Doesn't have a termination date and

5  there's really no dispute.  There's no termination date in the

6  CTC Act.

7          THE COURT:  Right.

8          MR. HUME:  There is case law.  Some of this may have

9  been in our brief.  Some of it we may have shared with the

10 Government this morning if it is not.  That says I looked

11 directly to the Court's attention to the second bullet first

12 from the Supreme Court.

13         In the absence of language expressly limiting the estate

14 or right of the company, we think the Court correctly held

15 under the legislation and facts that the right created by the

16 grant of the franchise was perpetual.

17         So we made this point in our briefs.  If there's no

18 termination date it is perpetual.  In order to say there is a

19 termination date, they're the ones who have to violate the

20 Charles River Bridge doctrine and read something extra into the

21 statute.

22         These cases support that and the first bullet point is

23 actually a Law Review article that says a concession in

24 perpetuity, a good example of that is the Ambassador Bridge.

25 So we're not the only ones who think this.

1        But at some level I don't, at some level this point has

2  already been conceded.  Because when Congress passed the 1972

3  Bridge Act, they said this act should not be construed to

4  adversely effect, you know, all of that.  That document and the

5  State Department letter which applies that principal to say you

6  have authorization to build your Twin Span.  You do not need to

7  get a presidential permit.  Those are our two key documents

8  showing they agree we have a right.

9        Now they don't like the word right.  We pointed to the

10  fact that the legislative history in the State Department

11  letter used the words rights to repair, replace and enlarge.

12  It's those rights that the State Department relied on in saying

13  you don't have to get a presidential permit.  So they've used

14  the word rights.

15            THE COURT:  Rights or authority.

16            MR. HUME:  Sorry?

17            THE COURT:  I said rights or authority.

18            MR. HUME:  Yes.

19            THE COURT:  I'm sorry, I have a bad voice because I

20  have a partially paralyzed larynx and I try to talk into my

21  little Beyonce` thing here.

22            MR. HUME:  It's great, Your Honor, I have bad ears,

23  so don't worry.

24            THE COURT:  It doesn't work well all the time, okay.

25            MR. HUME:  I think there may be a little bit of a

1   ships passing in the night on the right.  I want to make an

2   effort to be even more clear than we were in our briefs.

3        The issue, we're not saying we have a right and there's

4   absolutely no regulation that could ever apply and we could

5   build a completely unsafe and reckless bridge, no.  We

6   recognize that laws that would generally apply apply.

7   Navigation rules, possibly environmental rules, safety rules.

8        What we're saying is that the fundamental authorization

9   that since 1899 Congress has said you have to have to build an

10  international bridge you have got to get Congress to say okay.

11  Everyone agrees that they've said okay for our Twin Span.

12       What I think what that translates to, and this is

13  really the punch line, is it means that any executive agency

14  may have authority to apply a particular regulation, navigation

15  for example, but what it does not have is the discretion or

16  authority to make a policy judgment on whether it's a good idea

17  to have a private bridge there, to have a perpetuation with a

18  private bridge.  They're not free to make the ideological

19  judgment or the policy judgment of should we have a private

20  bridge or a Government Bridge.  That decision was made by

21  Congress, and everyone agrees that decision includes the Twin

22  Span.

23       The only way to change that decision is to go back to

24  Congress.  If there's a desire to appropriate it or something

25  they have to go to Congress and get a bill to appropriate it.

1  What they can't do is use whatever regulatory powers they have

2  to try and stop the Twin Span and promote a Government bridge

3  instead.  That is what we are saying.

4       The evidence of that happening is three or four things.

5  You have heard one directly from Mr. Moroun.  Just the

6  practical reality that the NITC will make it impossible to

7  build the Twin Span, so that's the first thing.

8       The second source of evidence is documents from the

9  Government's files that we think concede what we're saying.

10  Concede that the NITC's purpose is to block the Twin Span and

11  that they know one precludes the other.

12       The third thing is that when they applied for their

13  State Department approval they were required to show the

14  necessity of the NITC and to discuss a whole host of things and

15  they went on and on for pages and never once did they address

16  the impact of the Twin Span or the impact of the NITC on the

17  Twin Span and they never even tried to demonstrate the

18  necessity of the NITC if the Twin Span exists.

19       That failure in their administrative record, in their

20  application to the State Department we think that failure alone

21  warrants reversal of the State Department's decision.  They

22  have got to show it's necessary above our Twin Span because we

23  have authorization to build it and we have been trying to build

24  it.

25       The fourth set of evidence is what has happened with the

1  Coast Guard.  So what I would like to do, Your Honor, is maybe

2  show at least a sample of these documents from the Government's

3  file.  As you know, we have tried for discovery.  We've filed

4  for FOIA, we have not gotten what we think we want, but we,

5  what little we've gotten from the administrative record and

6  FOIA proves what we're saying.  And we couldn't go all the way

7  back to 2004.  And I don't remember that we have ever laid out

8  the evidence for you, Judge, in the, quite the way that I had

9  hoped to do right now which is just to go through it

10  chronologically.

11      An FHW e-mail from February of 2004 says Governments

12  meaning who is going to own the new bridge is complicated by

13  the Ambassador Bridge since an announcement to build the new

14  crossing with the firm construction date by the bridge company

15  during the study, that's the DRIC study, puts into question the

16  need to do the study.  If they build, we don't need it.

17      Couple months later they say the bridge company has made

18  a permit application to the Coast Guard.  With that application

19  quote the partnership may find itself with the capacity and

20  other needs that were identified in the PNF being satisfied by

21  the twin bridge.  PNF, Your Honor, is a feasibility study that

22  the DRIC brothers conducted.

23      Later that year, and we have relied on this a lot,

24  Transport Canada which is lame for Blanchard says the senior

25  official of Transport Canada he knows there's no need for both

1  the NITC and the Twin Span.  He knows the NITC will take

2  traffic, a devastating amount of traffic away from the

3  Ambassador Bridge.

4      So he says quote I would suggest that the real option is

5  to buy the interest in both crossings.  In other words, they

6  don't want any private bridge.  And he says quote, we might be

7  in a much stronger position to negotiate a reasonable price if

8  the new crossing, the Government one, is operational and

9  captures a substantial share of the market.  We think that

10 reveals the real intent here.

11     And excuse me.  If we go back to later that year,

12 Mr. Blanchard's e-mail was October of 2004.  December of 2004

13 is an e-mail that we have not brought highlighted as much for

14 the Court which I think is even more devastating and submitted

15 an attachment to our summary judgment brief and quoted in part

16 here.  It says transport Canada official Andrew Shea, December

17 of 2004 who, the order of this is the top block is the

18 beginning e-mail, the first e-mail he sends early in the day

19 reporting to his colleagues.

20     Saying he spoke Friday afternoon with MTO, that's

21 Ministry of Transport Ontario, Fred Leech and MDOT, Michigan

22 Department of Transportation.  They expressed grave concern

23 with the Government's principal below.  And he says that

24 principal quote implicitly precludes the Ambassador Bridge from

25 owning, operating a new or expanded international crossing.

1   This implements what Blanchard was saying, this recognizes what

2   the FHWA was earlier saying which was that there can't be both

3   and we're going to make sure that the new span is Government

4   owned, not owned by DIBC.

5          And the concern expressed by MTO and MDOT as you see

6   later in this first block is that this would fatally flaw the

7   EA process and puts the entire project in jeopardy.  They knew

8   there was something wrong with this.

9          And they confirm later what the principal means is that

10  regardless of where the crossing is located, the incumbent

11  owner, DIBC, will not be controlling the crossing.

12         A second e-mail later in the day is what is block quoted

13  at the bottom.  It's again from Andrew Shea.  He says I spoke

14  with Fred Leech who was one of the people expressing his grave

15  concern.  He says, there's a clarification here.  His concern

16  is location, not who owns the crossing.

17         What that means is he wants all locations to be

18  considered, but he's fine with their being only one possible

19  owner, the Government.  That's what the next sentence says.

20  Quote, he would be fine with some type of wording that says

21  that Ambassador Bridge shall not own the crossing regardless of

22  its location.

23         In other words, they, after this initial alarm they

24  agreed whatever happens the bridge company is not going to own

25  the new crossing.  That means NITC's Government owned and that

1   means no Twin Span.

2        The next year they implement it.  Sorry, this is first,

3   they implement in the summer.  This is first the State

4   Department recognizing that if both the NITC and the new span

5   from the bridge company apply the State Department would have

6   to make a choice.  Of course, you only have to make a choice if

7   one precludes the other which is what this document recognizes.

8        Jim Steele at FHWA admitted in deposition in this case

9   that they made a decision that the new crossing had to be

10  publicly owned.  This is the deposition testimony.  He admitted

11  that he never took into account the bridge company's rights.

12       And here's the document I thought we were at.  Slide 35

13  is the decision document where in November 2005 after those

14  Canadian e-mails, this is all chronological, they made a

15  decision to eliminate consideration of the privately owned Twin

16  Span even though it ranked at the top on the U.S. side in terms

17  of its environmental impacts.

18       And look what this, look what happened just, that

19  elimination was November 10th, 2005.  Sorry to flip back and

20  forth.  In 2005, five days later on November 15th, 2005, the

21  FHWA sends an e-mail to the Coast Guard saying we have

22  eliminated them but this now may come to the fore with the

23  Coast Guard.

24       Should the bridge company still pursue their permit

25  application with you?  Now that the Ambassador twin is no

1  longer being considered in the partnership study, the bridge

2  company is free to pursue their plan on their own.  Quote this

3  puts the pressure on the Coast Guard.

4        You'll forgive us if when we see that we have a

5  suspicious interpretation of what that means.  I hope.  Because

6  we think this is evidence that the fix was in.  That the FHWA

7  was telling the Coast Guard you've got to stop this.  The whole

8  idea is for the new crossing to be Government owned, not

9  privately owned and now they're off being a renegade with you,

10 the Coast Guard, you better get on the same page which is to

11 stop them.

12       And of course, they have, it's nine years later and we

13 still don't have our navigation permit even though there's no

14 navigation problem.

15       There are more documents where the FHWA admits that the

16 construction of the Twin Span would preclude the need for

17 publicly controlled crossing.  There's in the briefing paper

18 that mysteriously asks whether the U.S. Government should take

19 unprecedented steps to ensure a publicly owned crossing and

20 admits the Ambassador Bridge had made a compelling case to the

21 Michigan legislature that FHWA and MDOT had not yet rebutted.

22            THE COURT:  Whose paper is this?

23            MR. HUME:  This is an FHWA briefing paper.

24            THE COURT:  To whom were they briefing, do you know

25 to whom was it directed?

1          MR. HUME:  It's not clear from the face of the

2   document, Your Honor.  It looks like an internal FHWA document

3   nor is it ever quite clear what these unprecedented steps might

4   be.

5          THE COURT:  Okay.

6          MR. HUME:  Of course we have relied on this a lot,

7   the State Department table from 2007 calling this a race.

8   Those are their words, not ours.  We don't think that it should

9   be a race because we think that our authority came first.  But

10  they have made it a race and I guess we have been a little cute

11  with our metaphors but they have sometimes been like a race

12  where the opponent has the referee jersey on.  They're calling

13  the shots.

14         And this evidence, this e-mail, Your Honor, is one that

15  simply shows that FHWA has recognized and called it a pink

16  elephant in the room, that there's not enough traffic to

17  justify what they're doing.

18         What they're going to do with the NITC is going to cost

19  vastly more than the Twin Span.  The Twin Span will be four or

20  five hundred million and the NITC is over a billion.  The

21  traffic level don't justify, this e-mail admits even before the

22  latest round of traffic declines that we are going to need

23  massive subsidies.  It is not going to be self-financing

24  through tolls.  The reason it's more expensive is they will

25  have to create a brand new plaza.  There's already a plaza on

1   both sides with the Ambassador Bridge, and of course, there is

2   already the highway improvement on the U.S. side.  Another

3   document showing their commitment to public ownership.

4        So Your Honor, that's our evidence of sort of what we

5   call our second class of evidence on why there is, why it's

6   clear that the construction of the NITC precludes our exercise

7   of our right to build the Twin Span.

8        Mr. Moroun's testimony, evidence from their files.  The

9   third thing which I mentioned is the NITC application to the

10  State Department.  That one document, that is a category unto

11  itself and a claim unto itself because it ignores the Twin

12  Span.  There's one throw away sentence somewhere but it does

13  not address the Twin Span in any of its analysis.

14       Section 4 of the Bridge Act, the International Bridge

15  Act from 1972 requires a demonstration of a necessity for the

16  bridge.  They submitted an application.  It attempts to show

17  traffic projections and all of the reasons the NITC/DRIC would

18  be good and would be necessary for the national interests and

19  otherwise, but it never says, and it would be needed even if

20  there was a Twin Span.  Never even tries.

21       They know about us, they know we're trying to build it,

22  but they never try to show that they are necessary if we build

23  ours.  They don't even suggest it, not in their proposed map.

24  If you look carefully you'll see the Ambassador Bridge, no Twin

25  Span.  Not in their discussion of the national interest. Not in

1  their discussion of redundancy, nothing about the Twin Span.

2  Not in their discussion of similar facilities.  They mention

3  the old bridge, no mention of the new Twin Span to the

4  Ambassador Bridge.

5       Same, nothing like in their discussion of traffic

6  information.  And not even in their discussion of the estimated

7  impacts of the proposed NITC on other crossings, they just

8  don't discuss it.

9       And when they get to just talking about the old

10  Ambassador Bridge, they admit contrary to what counsel was

11  trying to show before that they don't actually know quote the

12  bottom quote, Michigan does not currently have access to the

13  detail financial data necessary to definitively determine if

14  the viability of either the Detroit Windsor Tunnel or the

15  Ambassador Bridge is threatened by the NITC.

16       So they're not even willing to say that the old bridge

17  can survive if they build the NITC.  They are saying maybe the

18  old bridge won't even survive and they are not even touching

19  the new Twin Span and it may be worth informing the Court that

20  Detroit Windsor Tunnel, one of the Ambassador Bridge's

21  competitors filed for bankruptcy independent of the City of

22  Detroit.  I think it's privately owned and they went bankrupt

23  within the last six months and stated in their bankruptcy

24  papers that one of the reasons was decline in traffic, the same

25  decline you saw earlier.

1          So, Your Honor, that's our main evidence before we get

2     to the Coast Guard.  And that's really the end of argument one.

3          There's some law here that we've cited on slide 52 to

4     show that preventing the exercise of a right is a violation of

5     a right.  You know, violations don't always happen directly,

6     they can happen by delaying someone, by interfering with

7     someone, and what's happening here is the Government is

8     implicitly simply canceling our right to build the Twin Span by

9     promoting this competitor bridge or not competitor bridge but

10    usurping bridge and blocking our application for it on our Twin

11    Span.

12         If there's no question, Your Honor, at this stage on

13    that first argument, my proposal was that I sit down and let

14    the Government respond, but if the Court prefers, I can go and

15    address our second argument.

16              THE COURT:  Wait a minute.

17         (Pause.)

18              MR. HUME:  Which I hope I can present more briefly.

19         The reason why I thought it would be helpful to have the

20    Government respond to each of our arguments in turn is that I

21    think it's the best way of sharpening the issues.  What do they

22    really say about this.

23              THE COURT:  That's okay, we can do it that way.

24         Did you want to come forward, sir?

25              MR. COLLINS:  Sure.

1          THE COURT:  Are you just going to argue right now

2    about whether or not the construction of the NITC/DRIC would

3    interfere with the rights of the Ambassador Bridge owners to

4    build a Twin Span and if the record shows that that has been an

5    intentional action on the part of the U.S. Government?

6          MR. COLLINS:  Okay.  Your Honor, I think the sort of

7    first point here is that the, I'll start with the sort of

8    franchise versus right question that plaintiff's counsel

9    started with.

10          THE COURT:  Okay.

11          MR. COLLINS:  The ATC Act or what they're calling the

12   DIBC Act, that is a statutory grant of congressional authority

13   to construct, operate and maintain a bridge and nothing more.

14          It's, we quibble perhaps with the term right in the way

15   the plaintiffs use it not because we don't believe that there

16   is some statutory grant of consent or that there's some

17   authority as the Court put it that comes from that.  But

18   because of the expansive nature of right that they claim that

19   stems from that.  So they claim that they have a right to build

20   the Twin Span, but that's not any where in the statute, Your

21   Honor.

22          They have a right to maintain the bridge.  They have a

23   right to operate their bridge and build the bridge originally.

24   They have congressional consent to do all of those things

25   subject to a whole host of regulations, rules, laws governing

1   the entire process.

2        Now, there's nothing in that that guarantees that

3   they'll be able to do so profitably.  There was nothing that --

4        THE COURT:  But is it the Government's position now

5   that the right to operate, maintain, whatever, construct the

6   Ambassador Bridge does not also include the right to build the

7   twin bridge?

8        MR. COLLINS:  It includes the right to maintain the

9   bridge but it does not specifically include the right to build

10  a Twin Span in and of itself.

11       THE COURT:  I mean, you know, I hate to say that your

12  clients are wandering all over the world on this.

13       If the act in the 1920s does not include a congressional

14  authorization to build a Twin Span, then they would have needed

15  a presidential approval and the State Department arbiter of all

16  things said you don't need a presidential approval because you

17  already have the right to build the Twin Span from the 1927

18  statute.

19       MR. COLLINS:  Absolutely, Your Honor.  You do have

20  the right to maintain your bridge and what they found is that

21  what they've interpreted that through the 1972 International

22  Bridge Act is that right includes, you know, more than just

23  running trucks up and down the bridge, fixing revets on the

24  bridge.  It also includes, if you want to replace your span,

25  tear it down to replace it, you can do that and it also

1 includes the possibility of building right next to it if you

2 can.

3          THE COURT:  Okay.  So the grant of authority, I'll

4 say authority for present purposes since right rankles, the

5 grant of the congressional authority to build the Ambassador

6 Bridge by recognition in the International Bridge Act in 1972

7 and the State Department subsequently includes congressional

8 authority to build the twin bridge.

9      Do you agree with that, the Twin Span?

10          MR. COLLINS:  Yes.  Congress has given its consent to

11 that particular act without giving, without getting additional

12 approvals, presidential permit.

13          THE COURT:  Okay.  So if they have congressional

14 authority to build the Twin Span, does that connote, this is

15 the argument, does that connote that other entities, private or

16 public, do not have congressional authority to build a bridge

17 that would interfere with the new span?

18          MR. COLLINS:  No, absolutely not, Your Honor.

19          THE COURT:  So that your argument is that yes,

20 Congress gave authority to the bridge company to build the new

21 span, but that new bridge company, private entity, Federal

22 Government, state Government -- Canada is not a dominion

23 anymore, what is it?  Canada, the country, it is not a

24 Republic, what's it called?

25          MR. DOZEMAN:  It's Her Majesty the Queen In Right of

1    Canada, it's the party in front of you.

2            THE COURT:  Yes, that I know.  What I meant was is a

3    country, it doesn't matter.

4        So it doesn't matter.  Any one of these entities can come

5    along and build a bridge let's say, I don't know what the

6    distance is, a quarter of a mile from the Ambassador Bridge

7    which would physically interfere with the ability to build a

8    new span.  Physically, you couldn't get three bridges in that

9    quarter of a mile, would that be okay?

10            MR. COLLINS:  Yes, under the grant of authority that

11   the bridge company received it would, Your Honor and that's

12   where we get into this distinction right is that you're not

13   guaranteed the right to build a Twin Span.  You're guaranteed

14   the right to maintain your bridge.

15        And if you, there are many bridges that do have a clear

16   geographic limit as to where a new bridge can be built next to

17   them.  Congress passed plenty of statutes --

18            THE COURT:  Those are later bridges.

19            MR. COLLINS:  Oh, no, contemporary bridges.

20   Contemporary with this bridge, the Peace Bridge in Niagara had

21   a six mile limit on it as to where bridges could be built and

22   that was back in the twenties as well.

23        So it's not a new thing.  Congress has always known how

24   to make an exclusive grant to put a limit on where other

25   bridges can be built next to your franchise.  They didn't do

1   that here.

2        What they gave was the right to maintain, operate, and

3   construct a bridge.

4        THE COURT:  I understand that language, but don't

5   forget 1972 the International Bridge Act the position of the

6   State Department which means that the 1927 statute included the

7   right to build a new bridge, to build the Twin Span.  Even if

8   it means taking down the Ambassador Bridge because it's gotten

9   too old or not.

10       I mean, you cannot go back to the limiting language and

11  tell me that oh, gee it doesn't really mean they don't have

12  authority.

13       So now what does it mean to have congressional

14  authority?  If I have congressional authority to build a Twin

15  Span what does that mean to you?  It means nothing.

16       MR. COLLINS:  There is no such thing as congressional

17  -- I mean --

18       THE COURT:  Oh, yes, there is congressional

19  authority.  There's clear congressional authority.  The Coast

20  Guard doesn't like it, but there is clear congressional

21  authority.

22       MR. COLLINS:  It's to maintain your bridge right,

23  it's not a guarantee that you can do any sort of specific type

24  construction that you want.  You know, you can't --

25       THE COURT:  You're missing the point.  I hate to tell

1   you this.  You're well beyond that.  Well beyond that.

2        Congress passed authorization in 1927.  Congress

3   expanded that a little bit in the International Bridge Act.

4   The State Department said oh, you don't need presidential

5   authority, you already have all of the authority you need to

6   build a bridge.

7        So these people want to build a bridge and along comes

8   an amalgamate partnership, I'll call it, of Canada and Michigan

9   and Detroit and whoever knows whatever, and the Federal

10  Government through the highway administration and they decide

11  we actually want to have a public bridge.  We don't want these

12  people to build a private bridge.

13       Now that is as clear as the nose on your face is it not?

14  Whether they can or cannot do that, whether that's lawful or

15  unlawful, that's not relevant.  Isn't it true that that's, they

16  didn't want the Ambassador Bridge to have a Twin Span?

17       MR. COLLINS:  It's certainly not true on behalf of

18  United States, Your Honor.

19       You know, I see the documents that plaintiffs have

20  presented.  But no, I don't believe that, you know, you can

21  bind the sovereign nation's decision making authority by the,

22  you know, these e-mails that are put out there from --

23       THE COURT:  The sovereign nation, sir, works through

24  its people.

25       MR. COLLINS:  Well, yes.

1          THE COURT:  You right now are representing and

2    speaking for the sovereign nation.

3          I have the wrong glasses on.  No wonder I can't see very

4    clearly.  Never mind.

5          Why don't you tell me what you think the authority

6    means?  I have the authority to build a Twin Span.  I know I do

7    because the State Department told me I do if I'm the bridge

8    company.  I'm the plaintiff, and I have the authority to build

9    a Twin Span.  So now what does that mean?

10          MR. COLLINS:  It means nothing more than you do not

11    need a further act of Congress in order to make your bridge

12    legal under the 1899, 1906 Bridge Acts.  That's all that it

13    means.  It is not a guarantee of anything.  It just takes out

14    one procedural step in the process that is required to build

15    your bridge.

16          THE COURT:  Okay.

17          MR. COLLINS:  Okay.

18          THE COURT:  So then it doesn't impose the

19    congressional authority to build a Twin Span, doesn't impose

20    any obligation on the executive of any kind except to say

21    you've satisfied the 1899, 1906 Bridge Acts?

22          MR. COLLINS:  Yes, if I'm understanding Your Honor's

23    question, yes.

24          THE COURT:  So then the act of Congress carries with

25    it no obligation for the executive?

1          MR. COLLINS:  No, Your Honor.  An obligation for the

2    executive?  I mean, they have the obligation to review and

3    approve the plans.

4          THE COURT:  Well, yes, I'm sorry.  That's all of the

5    administrative and technical, nobody is arguing about that.

6    Everybody agrees that that has to be done.

7          Let me back up.  In the beginning when the bridge was

8    authorized by Congress and Congress adopted the DIBC Act, or

9    the ATC Act or whatever you want to call it, could the

10   executive at that time have decided we don't want these people

11   to build a bridge because, you know, whatever reason, pick a

12   reason that would be a legitimate reason.  We don't want that

13   to be done.

14         Could the executive, the president, the State

15   Department, the War Department at the time, the War Department

16   have said we're not going to authorize this bridge because we

17   don't think you're responsible bridge builders, we don't think

18   you will operate the bridge in the interest of the country or

19   something like that?

20         MR. COLLINS:  I mean, in terms of executive decision

21   making authority, Your Honor, I think they may have been able

22   to physically make that decision.

23         Now whether it would have been subject to challenge is,

24   you know, arbitrary and capricious, that sort of thing.

25         THE COURT:  See, I'm trying to figure out what

1  authority means.  That's exactly what the question is for.

2          MR. COLLINS:  That's a key point.

3          THE COURT:  If I have congressional authority and I

4  can build a bridge and it's 1927 and there is no bridge in

5  sight and now I'm going to come build a bridge, can the

6  executive, the president through his representatives, stop me

7  from that or can I say well, wait, I have Congressional

8  authority, I can build this bridge?

9          MR. COLLINS:  No because the congressional authority

10 if you're looking at it from the reverse instead of an

11 affirmatively act of the executive but the congressional

12 authority gives you the simple consent of Congress saying hey,

13 if you want to build a bridge, you can do it somewhere in the

14 suitable to the interest of navigation, somewhere in the

15 vicinity of Detroit.  It's not we want you to build a bridge

16 somewhere near Detroit.  It's not you are hereby bestowed with

17 the enable right to forever own the only bridge in the area.

18      It is Congress saying hey, we've passed statutes that

19 says we have to approve these things, so here is your consent.

20 You no longer need us to say anything about this bridge.

21      Now the Supreme Court has said and plaintiffs take issue

22 with it, but the international bridge case makes clear that

23 that congressional authority is not the be all end all.  That

24 congressional consent is still subject to the source of the

25 rights that emanate from the states, the ownership and

1   property, that sort of thing.

2        So it is nothing more than congressional consent saying,

3   because Congress wanted to check and see, you know, we can't

4   just have bridges going up anywhere all across the country.  We

5   need to have some control over this.

6        In fact, they eventually got tired of it as we pointed

7   out in the briefing in Count IV, they eventually divested

8   themselves entirely from the process because it just became too

9   much of a headache.  But that's all it was, was a way to make

10  sure that you have the consent of Congress and Congress can

11  make that judgment.

12       But it's not, there are cases in which Congress

13  specifically says yes, we want you to do this, we want you to

14  charge this amount of tolls, we want you to put the bridge in

15  this area and no one else can compete with you, but that's not

16  what this consent was.

17            THE COURT:  Okay.

18            MR. COLLINS:  Now I think plaintiffs talked a little

19  bit about the perpetual nature of their right.  I think it's a

20  parallel issue.  We don't disagree that there's no end date in

21  the statute.  Plaintiffs take that as that they are forever

22  guaranteed the right to have a profitable, potentially

23  exclusive franchise.

24            THE COURT:  I think you're exaggerating.  They just

25  want to build a bridge.  And if it's not, if it is not, if it's

predictably not profitable, they can't raise the money to build

the bridge.  They don't say that they have a right from

Congress to operate a profitable bridge.  That's an entirely

different matter.

        What they're saying is if the NITC/DRIC gets built or is

about to be built and looks like it's been approved and so it

will be built in the future, we will not be able to raise money

because there's not enough traffic to support three spans,

there's not enough traffic to support two spans, much less

three.

        MR. COLLINS:  Yes, and Your Honor, as plaintiffs have

--

        THE COURT:  That's just a practical thing, that's not

a legal right issue.

        MR. COLLINS:  But it's just a matter of competition

right, Your Honor, because they're competing with a number of

other bridges.  When you hear them talk about it, they say we

compete with the Blue Water Bridge, we compete with the Truck

Ferry, we compete with the tunnel, so there's no difference in

that regard.  There's nothing special about this bridge all of

a sudden that makes it any different in terms of all of the

other bridges that they already admit that they already compete

with.

        THE COURT:  Except that there's no traffic right now.

        MR. COLLINS:  But they say that their travel times

1  are nearly equal to the Blue Water Bridge for long haul trips

2  so they are competing with them if there's not enough traffic.

3  That's just an unfortunate risk of owning the bridge.  They

4  weren't guaranteed when they built the bridge that anybody

5  would use it or that anyone --

6           THE COURT:  But what about the NITC/DRIC?  Why would

7  you build the NITC/DRIC if there's not enough traffic?

8           MR. COLLINS:  Because, Your Honor, traffic has almost

9  nothing to do with the purpose and need for the NITC/DRIC.  The

10 --

11          THE COURT:  Oh, you mean it doesn't matter if anybody

12 uses it?

13          MR. COLLINS:  Well, of course people are going to use

14 it, Your Honor.

15          THE COURT:  I'm sorry, that was unfair.

16          MR. COLLINS:  We have a lot of studies that talk

17 about how much traffic people are going to use.  People are

18 going to use it.

19       But the key point is that the purpose and need for the

20 NITC/DRIC and this is straight from the purpose and need

21 statement that the Eastern District -- this has been challenged

22 and already been upheld in the Eastern District of Michigan is

23 to provide for the safe, efficient and secure movement of

24 people and goods across the border.  To support the economies

25 of Michigan, Ontario and Canada of the United States.  Support

1  the mobility needs of national and civil defense, to protect

2  the homeland.

3       It's needed to address future mobility requirements, to

4  provide new border crossing capacity for long term demand and

5  that's a point that I think is lost on plaintiffs is that, you

6  know, we can't wait until traffic all of a sudden spikes up and

7  decide hey, maybe we need another bridge.  Although that would

8  be great for plaintiffs because they have, you know, a monopoly

9  essentially on this crossing but we have to plan out a long

10 time.

11      So the key is that we're addressing the potential for

12 future traffic increases which our studies show are likely to

13 occur and to provide system connectivity to enhance trade, flow

14 and people of goods.  Plaintiffs have noted that it's a very

15 important trade juncture between Canada and the United States,

16 to improve border operations and processing capabilities and

17 reasonable and secure crossing options in the event of

18 incidents, maintenance, congestion or other disruptions which

19 are some of the other issues that plaintiffs are having right

20 now with their bridge.

21      So it's to address all of those things, Your Honor, and

22 traffic is one part of that but it's by no means --

23           THE COURT:  Okay.  Let me focus you back to the bold

24 statement made by Mr. Hume when he started his argument on this

25 section and then get your sort of bold response if you will.

1           What he said was that the bridge company has a statutory

2     right to construct, maintain, et cetera and build the bridge

3     and a new span and that NITC/DRIC is preventing the exercise of

4     that right.  Because of the disruption to the processing of

5     their application, but more because NITC/DRIC is rushing ahead

6     and will undercut the point of building the new span, the need

7     for the new span.

8           MR. COLLINS:  And again, that's where I think this is

9     an important point, Your Honor.

10          The need for the new span from the United States'

11    perspective is all of these issues and it doesn't undercut the

12    need.  I mean, for example, redundancy that's part of the

13    reason why they wanted the new span to be somewhat further away

14    from the Ambassador Bridge in case something happens if there's

15    a big event that happens.  If you have a Twin Span right next

16    to it, chances are both of them are going to be effected, so

17    this is a little bit further away, that's one issue.

18          The other points are that the, the need for it is, is

19    not it's -- the issue is not that the undercutting the need for

20    the NITC.  As far as the United States is concerned, both

21    crossings are important.  Like you know, even if the Ambassador

22    Bridge gets and the Twin Span first, there's no reason why the

23    NITC wouldn't be built, the State of Michigan still wants to

24    build it, Canada as far as I know still wants to build it.

25          THE COURT:  But the papers and I know that we ran

1  through only a few would suggest that it's either one or the

2  other but not both.  That everybody seems to think that there's

3  just not enough call for people crossing from Detroit or the

4  Detroit area to the Windsor Ontario area on more than two

5  bridges.  And then if you build the NITC you don't build the

6  new span, if you don't build the new span, you don't build the

7  NITC/DRIC.

8          MR. COLLINS:  Respectfully, Your Honor, I think

9  that's just not true.  I think plaintiffs are the only people

10  that believe that because it's economically advantageous to

11  them.

12          These issues, the issues of the purpose and need for

13  this project, the NITC, have little or nothing to do with the

14  direct pure traffic levels, little or nothing.  It is a piece

15  that we are looking at in the future.  But it's one of the most

16  important trade corridors in the United States.  It carries 25

17  percent of the truck commerce between the two, between Canada

18  and the United States.  So it's a critically important juncture

19  and it's necessary to have additional capacity.

20          THE COURT:  Okay.  I think I understand your basic

21  point and I'm glad that you spoke because I didn't before.

22          Thank you.

23          Could I just go to the next one?  I think I, I did not,

24  I did not understand the Government's position but you have

25  made it clear.

1      Thank you.

2          MR. HUME:  Thank you, Your Honor.  I'll move to point

3   number two, although if I could make 30 seconds of points.  I

4   think the question of what authorization means is the key

5   question.

6          The Government says it's just a procedural hurdle.  That

7   means they are saying they can build in the exact same

8   location, forget half a mile away.  They can build in the exact

9   same location if they wanted.  That means they could

10  intentionally build the NITC knowing that it would block us

11  because they want to block us.  That's what he says

12  authorization is.

13         We say authorization means we still have to clear all

14  reasonable non-discriminatory regulations but they can't take

15  direct steps knowing that it's going to block us because they

16  want to block us.  That's the difference.

17         He also said you can build both -- I know you wanted me

18  to move to the second.

19         THE COURT:  No, no, I need to give the Court Reporter

20  a few minutes.  Her hands are hurting, go ahead.

21         MR. HUME:  Understood, I'll finish right now.

22         What he said about being able to build both, it's not on

23  the NITC application or anywhere else.  The NITC proponents

24  have never tried to say that.

25         THE COURT:  Okay, I knew that that was your position.

1        Okay, I'm going to take ten minutes, we'll be back, but

2   I really need to be kind to my Court Reporter.

3        Thank you.

4            MR. HUME:  Thank you.

5        (Recess at 4:08 p.m.)

6        (Proceedings resumed at 4:24 p.m.)

7            THE COURT:  Thank you everybody, and Ms. Pilgrim

8   thanks you too.

9        All right, point number two which was the State

10  Department.

11           MR. HUME:  Yes, Your Honor, thank you.  This is

12  Mr. Hume again for the bridge company.  I think I can be

13  briefer on this argument.

14       I'd like to start, Your Honor, and this is demonstrative

15  slide 68 with the constitutional provision that clearly says

16  that no state shall without consent of Congress enter into any

17  agreement or compact with a foreign power.

18       The International Bridge Act Section 3 as the Court

19  knows purports to give a blanket consent from Congress for a

20  state -- I want to emphasize that word and come back -- to

21  enter into an agreement with Canada, relating to international

22  bridges.  And then delegates to the Secretary of State the

23  final authority to approve such agreement.

24       We say that's a delegation, they say it's a condition on

25  the grant.

1          As the Court knows, we've argued that this provision is

2    unconstitutional because it delegates to the State Department a

3    power that the Constitution explicitly assigns to Congress and

4    it does so without any intelligible principal.

5          I say that now, Your Honor, not because we're pressing

6    that argument, but because I think it lays the foundation for

7    the argument about the importance of state legislative

8    approval.  We're already on constitutional thin ice, we think

9    there's no ice there at all because there's no intelligible

10   principal.

11         And the only reason we're not pressing that, Your Honor,

12   as another grounds for a PI because again, if we're right on

13   this, the State Department's approvals are invalid because

14   they're pursuant to an unconstitutional statute.

15         And we move for summary judgment on that.  We think

16   we're right.  But we recognize the doctrine of constitutional

17   doubt or avoidance rather, constitutional avoidance which would

18   say reach the non-constitutional issues first.  But in some

19   ways this is the cleanest and simplest argument.

20         In any event --

21              THE COURT:  It's the most direct.

22              MR. HUME:  It's very direct, it's very simple.

23   There's a standard that the Supreme Court and D.C. Circuit have

24   articulated.  The only problem is it hasn't happened that often

25   recently.

1          So that's the legal landscape and I won't belabor that

2    unless the Court has questions on it.  But that's the

3    constitutional backdrop to this statute which says that

4    Congress consents if a state enters into an agreement and the

5    Secretary of State can approve such agreement.

6          The second argument that I previewed earlier is does

7    this statute authorize the State Department to approve an

8    agreement entered into by a governor and an executive agency of

9    the state in open defiance and blatant violation of that

10   state's legislation?

11          THE COURT:  Well, does that mean that the governor is

12   an instrumentality of the state?

13          MR. HUME:  Even if he is an instrumentality, first of

14   all, I do not think there's any authority that he's an

15   instrumentality of the state.  But even if he or MDOT were, can

16   this legislation possibly be interpreted to give congressional

17   approval to an illegal agreement, entered into in violation of

18   state law?

19          And our submission is that it absolutely cannot be

20   interpreted that way and therefore, the State Department's

21   approval was unauthorized.

22          THE COURT:  Now state law has changed since then, is

23   that right?

24          MR. HUME:  No, that is not correct.

25          THE COURT:  I thought from the Government's brief

1  that Michigan legislature had adopted an act approving

2  NITC/DRIC.

3          MR. HUME:  We strongly disagree with that.

4          What happened in 2013, from 2010 to 2012, two or three

5  laws were passed each year prohibiting MDOT or MSF, these two

6  agencies from entering into a contract relating to the

7  NITC/DRIC or from spending any money.  Those statutes did not

8  have termination dates.  They are still on the books, they are

9  still the law.  They have never been repealed.  They've never

10 been amended.  So there is existing laws prohibiting MDOT and

11 MSF from entering into an agreement relating to NITC.

12         In 2013, the Michigan legislature enacted a law saying

13 we want a report on what's going on with the DRIC.  We want to

14 know what money has been spent.  We want to know who's done

15 what and what's happening.  We interpret that to mean maybe

16 they got wind of the NITC/DRIC going forward, maybe they even

17 know about the crossing agreement, and they want to know more.

18         They interpret it as an implicit approval.  We don't

19 think the law allows you to say that's an implicit approval,

20 it's most ambiguous and we think, we read it the other way, we

21 think it's a request for information because they want to know

22 what's going on.

23         The reason we don't think the State Department is

24 authorized is not just us saying it.  It's the Government

25 saying it and if we could go to slide 53.

1          The executive branch, the Federal Government and the

2    State Government have acknowledged it repeatedly, but let me

3    give you easier versions to read.  The MDOT report to the

4    Michigan legislature May 1, 2010 reports back on speaking to

5    the State Department about the NITC/DRIC and says quote, the

6    Department of State has indicated that permit conditions

7    include permit approval of the project by the Michigan

8    legislature.  They said the State Department told them they

9    will have to get legislative approval.

10          THE COURT:  What is the date of this document, May?

11          MR. HUME:  May 1, 2010.  Three years later they are

12   back at the State Department with no legislative approval and

13   an actual legislative prohibition and they get the State

14   Department approval anyway.

15          So this shows that both MDOT and the State Department

16   knew that Michigan legislative approval was required.

17          This is another piece of evidence, an affidavit from

18   MDOT in a litigation in Michigan where they said quote, MDOT

19   does not currently have authority to construct the DRIC

20   project.  Legislation would have to be enacted to authorize

21   MDOT to construct the DRIC project.  Again, there's been no

22   legislation authorizing it and there's been legislation

23   prohibiting it, DRIC January 2011.

24          FHWA has also admitted this in the Michigan litigation

25   that Mr. Collins referred to January 2011.  They said quote,

1   the DRIC, a proposed project for the Delray area of Detroit

2   contingent upon, among other things, approval by the Michigan

3   legislature.  So they admit it.

4        And they admit it again in another piece that there's no

5   dispute, quote, there is no dispute that the DRIC may not go

6   forward today without the approval of the state legislature.

7   So FHWA said it, MDOT said it, the United States State

8   Department has said it and yet here we are with no legislative

9   approval but in fact legislative prohibitions.

10        THE COURT:  I know the prohibitions and I apologize

11   that I have not been pulling it up in my mind.

12        What is it that the 2013 statute said?

13        MR. HUME:  Okay.

14        THE COURT:  These I remember.

15        MR. HUME:  These are the prohibitions, I won't

16   belabor them, Your Honor, because we have talked about them in

17   our briefs.

18        But they are repeated and unequivocal and there's the

19   crossing agreement signed in violation of those prohibitions.

20   And here's our case law saying that an illegal agreement is

21   unenforceable and void, so it's not even an agreement that

22   could be approved under the Section 3 of the IBA.

23        Now 2013.  I don't have the exact language although I'm

24   sure one of my colleagues can pull it up.  But it required the

25   executive branch of Michigan, I think MDOT, to provide

1    information to the legislature.  It did not nullify or repeal

2    or remand the prior legislation and here's the law we rely on.

3        Sound principals of statutory construction require that

4    Michigan courts determine the legislature's intent from its

5    words, not its silence.  So there's no, the Court will be

6    familiar with the Federal statutory doctrine of no implied

7    repeal.  I think the same thing applies here, there's no

8    implied repeal of those prohibitions.

9        If the crossing agreement is illegal, the approval of

10   the crossing agreement was illegal and unauthorized.  If the

11   approval of the crossing agreement was unauthorized, the two

12   State Department approvals should be set aside in which case

13   the Coast Guard application can't go forward because it relies

14   on the State Department approvals.  That's argument number two.

15            THE COURT:  Thank you, sir.

16       Mr. Collins, right?

17            MR. COLLINS:  Yes.

18       All right, thank you, Your Honor.

19       I think we're fairly far afield from the preliminary

20   injunction at this point because we're not seeking an

21   injunction against the State Department, they are seeking it

22   against the Coast Guard in terms of the permit.

23            THE COURT:  Right, but the logic, the logic of the

24   plaintiff's position was just laid out.  You can contest the

25   logic but that if the crossing agreement was illegal because

1    not authorized by state law, then other things are illegal

2    including the State Department's approval and therefore, the

3    Coast Guard cannot move forward with the approval of the

4    navigation permit and I should enjoin them from doing so.

5             MR. COLLINS:  Yes, and that's where -- I'm not sure

6    where that last link in the chain comes from, Your Honor.  I

7    definitely want to talk about the State Department crossing

8    agreement.

9             THE COURT:  Why don't we go to the State Department

10   crossing agreement first because that's probably more direct

11   and simple.

12            MR. COLLINS:  Okay.

13            THE COURT:  There was a crossing agreement which

14   would be illegal and understood to be illegal without

15   legislative authority, right?

16            MR. COLLINS:  No.

17            THE COURT:  Oh, no.

18            MR. COLLINS:  No, not.  The crossing agreement would

19   not be understood to be illegal without legislative authority.

20            THE COURT:  Why is that?

21            MR. COLLINS:  Because the governor was authorized to

22   enter into the crossing agreement both by the Michigan

23   Constitution and by the Urban Cooperation Act in Michigan as

24   well.

25            There's also the language that plaintiffs are referring

1  to in these statutes, the 2010, 2011, 2012.  Those are

2  appropriations bills, Your Honor.  That's why they kept passing

3  them every year, they are appropriations boiler plate talking

4  about the funding.  So they weren't prohibiting the governor

5  from entering into the crossing agreement.  They were

6  prohibiting MDOT from expending funds on activities under the

7  --

8          THE COURT:  So who's been spending all of the money

9  on it?  Is this all being spent from the other side of the

10  river?  Has MDOT not spent one penny or hour on this issue?

11          MR. COLLINS:  I can't really speak to what MDOT has

12  or has not spent on it.  I know the executive has been involved

13  in sort of the crossing agreement I believe, but I don't know

14  exactly what MDOT's issues are.

15          THE COURT:  Okay.

16          MR. COLLINS:  But that's not really not an issue for

17  us to I think figure out.

18          THE COURT:  Well, except that, I mean, we all

19  understand that when Congress doesn't want something to happen

20  they just defund it and that stops it in its tracks.  At least

21  under the Anti-deficiency Act it stops it in its tracks, right?

22          MR. COLLINS:  Painfully familiar with it.

23          THE COURT:  You and I understand it.  I'm sure you do

24  too, sir.

25          And I'm assuming without contrary authority at the

1  moment that the similar Michigan legislation would have a

2  similar intention and purpose and effect with or without an

3  Anti-deficiency Act.

4         MR. COLLINS:  Yes, although the recent lawsuit in

5  Michigan State court which we referenced in our response to the

6  preliminary injunction by a Michigan legislator challenging

7  that very issue, was found not to have standing to raise that

8  issue and the case has been dismissed.  There are no other

9  challenges on behalf of anybody that we are aware of to any

10 activities by MDOT on those.

11        THE COURT:  Oh, my goodness, you mean nobody

12 successfully has sued them so they can ignore the law.  Now,

13 now that's not an argument you want to make on behalf of the

14 United States.  That's really kind of uncomfortable isn't it?

15        MR. COLLINS:  That was not my point at all, Your

16 Honor.  I'm sorry for leaving that impression with you.  But it

17 is an illegal as we said because the Michigan State

18 Constitution permits the governor to enter into these types of

19 agreements.

20        THE COURT:  Putting that aside.

21        MR. COLLINS:  Putting that aside.

22        THE COURT:  Okay.

23        MR. COLLINS:  The language of the most recent

24 legislative enactment which is 2013 appropriations bill, it

25 says in Section E where it's asking for reports on money spent

1  relating to the, it says a narrative description of the status

2  of the Detroit River international crossing or renamed

3  successor including efforts undertaken to implement provisions

4  of the crossing agreement executed June 15, 2012 by

5  representatives of the Canadian Government and the State.

6        So the legislature explicitly recognized that the state

7  had entered into the crossing agreement and it in this same

8  appropriations bill it expressly permits MDOT to begin spending

9  money so long as the money is reimbursed from Canada.

10        That's why they're asking for reports on what money is

11  being spent.  They're saying, you know, we realize you're going

12  to go forward with this, we want to know for the last fiscal,

13  for the last fiscal year, we want to know what costs were

14  incurred and then going forward I believe it's every quarter,

15  yeah, every quarter going forward they are to continue

16  reporting.  Because they want to account for the money that

17  they need to recover from Canada to make sure that the money --

18        THE COURT:  So the bar to spending Michigan State

19  funds actually exists?

20        MR. COLLINS:  As long as they're going to be

21  reimbursed by Canada, no.  I mean, they can spend the money but

22  they need to get reimbursed, yes.

23        THE COURT:  What is the date of that legislation?

24        MR. COLLINS:  It is September.  I believe it's

25  September of last, September 2013.  I don't have the exact

1   date.

2                   THE COURT:  Okay.

3           When was the State Department's approval?

4                   MR. COLLINS:  The state approval was in I believe

5   March or April of 2012.

6                   THE COURT:  How do you square those things because in

7   March or April of 2012 whatever MDOT was or was not doing it

8   was under a prohibition to spend any state funds for this,

9   right?

10                  MR. COLLINS:  According -- no, well, I don't think we

11  --

12                  THE COURT:  Okay.  When was the crossing agreement

13  signed?

14                  MR. COLLINS:  The crossing agreement was signed in --

15  well, I don't -- it was approved in 2012.  So it was signed I

16  believe the end of 2011.

17                  THE COURT:  Okay, I mean, it's in the file, so.

18                  MR. COLLINS:  But the point, Your Honor, is that the

19  crossing agreement was a valid agreement by the Michigan

20  governor.

21                  THE COURT:  Right.

22                  MR. COLLINS:  To address that.

23                  THE COURT:  I understand your point.  Thank you.

24                  MR. COLLINS:  Okay.  And then the last piece is the,

25  there's absolutely no connection between the State Department

1  approval and the Coast Guard permit.

2        THE COURT:  Well, that was the other point you wanted

3  to make.  I'm glad you remembered to go back to it.  Yes.

4        The concept as I understood it from Mr. Hume and let me

5  lay it out for you, and if I misunderstood Mr. Hume, I'm sure

6  he'll tell us.  That when the Coast Guard accepted and began

7  processing the permit application from NITC/DRIC, it said it

8  was doing so based on things that had preceded including the

9  approval of the Department of State because of course a

10  presidential authorization is needed before you can build an

11  international bridge without legislation.

12        MR. COLLINS:  Sure, I mean, they looked at --

13        THE COURT:  So I mean, what I mean is it's a

14  condition precedent to the department of, the Coast Guard

15  considering a navigation permit.

16        MR. COLLINS:  No, it's not a condition preceding.

17  It's not a condition of doing it.  It happened in this case

18  they got the State Department approval first and they did it.

19  But the Coast Guard could review the navigation permit without,

20  without addressing the State Department approval.

21        THE COURT:  Oh, be very careful now.  You are going

22  to run afoul of Count IV if you're not careful.

23        The State, I mean, I've had the Coast Guard in here many

24  times telling me well, we can't do this unless this and this

25  and this and the stars have to line up.

1          The last thing we do is the permit, is the navigation

2    permit.  And you have to be, you have to have authorization

3    State or Federal.  And the way you get Federal authorization is

4    you go to the Department of State and you get your

5    presidential authorization, right?

6          MR. COLLINS:  No.  The primary authority, that

7    regulation 11505 is not State or Federal.  The primary

8    authority regulation says if you are a state primary authority

9    is presumed.  If not, you have to show primary authority some

10   other way.  And that's where we get into you have to have the

11   property rights to build and that sort of thing.

12         THE COURT:  But you can't build an international

13   bridge without a presidential approval can you?

14         MR. COLLINS:  No, you can't, but the Coast Guard

15   specifically says your permit is conditioned on receiving the

16   other approvals that are necessary.  So it happened in this

17   case --

18         THE COURT:  How is it then that the Coast Guard can

19   issue a permit conditioned on other approvals but not issue a

20   permit conditioned on land acquisitions?

21         MR. COLLINS:  Because the regulation 11505, that is a

22   piece that specifically they have to look at in order to make

23   their navigation determination, Your Honor.  Because it's tied

24   into the location of the bridge, the orientation of the bridge.

25         THE COURT:  No, that's not, you've answered it much

1  better in the past.  That's not the good answer because that

2  would apply to a state as to anybody else and the answer is no,

3  no, it's because they're private, not because if they were a

4  state we would know that they could condemn land but they're

5  not a state.

6          MR. COLLINS:  Because with the state you know they

7  can get the land where they say they are going to build it.

8  With a private company you don't, so they have to make sure

9  that they have the primary authority of the land in that spot,

10 that's why.

11         THE COURT:  Okay.  I'm carrying you far afield of the

12 argument that you are trying to make which is that the State

13 Department authorization is not connected to the permit process

14 at the U.S. Coast Guard.

15         MR. COLLINS:  No, it's not.

16         THE COURT:  Right, but that's what you were saying,

17 right?

18         MR. COLLINS:  Yes, that's exactly what I was saying,

19 Your Honor.

20         THE COURT:  Okay.

21         MR. COLLINS:  I didn't see any support in plaintiff's

22 brief for that sentence, the proposition that they made.  In

23 this case it's just simply that the State Department did have

24 their approval first.  I think it typically does work that way

25 but it's not required by the Coast Guard in order to process

```
1    the permit.

2              THE COURT:  Okay, but if the argument were that the

3    State Department authorization runs afoul of Michigan law and

4    bear with me for a moment, assume that the stars lined up that

5    way, so the State Department of presidential approval of the

6    bridge was in contradiction to Michigan State law which

7    fore-bad the state agencies from spending money on this bridge,

8    would that render the State Department's approval of the bridge

9    void since it's in contradiction, direct contradiction of state

10   law?

11             MR. COLLINS:  No, I don't believe it would, Your

12   Honor.

13         I think it wouldn't, it would not necessarily render

14   void even if that were the case.  They were simply, the

15   crossing agreement is a separate document from the presidential

16   permit.

17             THE COURT:  I understand.

18             MR. COLLINS:  They are two distinct processes.

19             THE COURT:  But the International Bridge Act which

20   was just up here a minute ago says that Congress authorizes a

21   State or any part of a state to build a bridge between the

22   United States and Canada, et cetera, as long as the Secretary

23   of State approves.

24             MR. COLLINS:  Yes.

25             THE COURT:  Okay, so if the Secretary of State
```

1   approves but the state legislature has said we do not approve,

2   we will not spend any money on this bridge, doesn't that make

3   the Secretary's approval, the Secretary of State's approval in

4   contradiction of the language of the International Bridge Act?

5           MR. COLLINS:  No, because Your Honor, that's, the

6   presidential permit under the, which is the --

7           THE COURT:  Right, right.

8           MR. COLLINS:  -- the part you were just speaking

9   about, that doesn't look at the legality of the crossing

10  agreement that was entered into.

11          The crossing agreement is the foreign compact piece

12  which is a separate provision of the International Bridge Act.

13  This is the, the presidential permit is the president's -- we

14  have these arguments on the motion to dismiss, this is the

15  president's inherit authority as the executive to --

16          THE COURT:  Right.

17          MR. COLLINS:  -- to approve the bridge if it -- and I

18  forget the language of the statute exactly, but the national

19  interest and that sort of thing.

20          So those are two completely distinct which is why they

21  raise them as two different counts in their complaint as well.

22  So they are not tied together, Your Honor.

23          THE COURT:  Mr. Hume has perhaps lost me.  I thought

24  the argument was that the State of Michigan cannot spend any

25  money for this bridge because it's forbidden to spend money on

1    this bridge by it's legislature.  And therefore, it is

2    inappropriate for the State Department to grant presidential

3    authority for Michigan to build a bridge.

4          Isn't that the argument?

5          MR. COLLINS:  I believe that's the argument they're

6    making, yes.

7          THE COURT:  Okay.

8          MR. COLLINS:  But it's not that Michigan was not, the

9    State of Michigan wasn't prohibited from spending money, MDOT

10   was and the crossing agreement was entered into on behalf of

11   the governor and the State of Michigan.  He's the executive, he

12   has the authority to do that.

13         THE COURT:  So you're saying that MDOT was limited in

14   what it could spend but the governor could go right ahead and

15   govern so-to-speak.

16         MR. COLLINS:  Yes, exactly, that's the distinction.

17         THE COURT:  Okay, thank you.

18        All right.

19         MR. HUME:  If I may, Your Honor, very brief rebuttal

20   before moving to point three.

21         THE COURT:  Yes.

22         MR. HUME:  They kind of connect actually, but it

23   seems that the Government's main argument here is an agreement

24   is not illegal if one party could enter it but the other could

25   not.  We don't think it can do that to the crossing agreement

1  because they're all parties to the agreement and they're all

2  involved in it and so we don't think you can pick or choose and

3  make it legal even if one did have authority.

4       But more fundamentally, the Government did not have

5  legal authority.  We addressed this in our briefs.  Mr. Collins

6  relied on the Constitutional provision, Michigan Constitution

7  which is Article III, Section 5 which the Michigan Attorney

8  General has said, this is at page 46, 47 of our reply brief on

9  our summary judgment motion docket, document 145 in the docket.

10      The Attorney General has clearly said that that

11  constitutional provision has a phrase, subject to provisions of

12  general law.  And the Attorney General says that phrase means

13  the Constitution authorizes interstate agreements quote upon

14  the promulgation of legislative authorization.

15      So the Attorney General has quite clearly said the

16  constitutional argument doesn't work because you need

17  legislative approval to enter into the agreements contemplated

18  by that.

19      On the Urban Cooperation Act, again on its face, it

20  applies to agencies and the governor is not an agency under

21  Michigan State law.  So it doesn't apply to the governor and we

22  address that and provide legal authorities at footnote 18 in

23  the comments we submitted to the Coast Guard which are found at

24  docket 143-25.  That's an attachment to our PI motion, docket

25  143-25.  Footnote of that document rebuts the Urban Cooperation

1  Act.

2          THE COURT:  Somebody across the table helped you find

3  these things, right?

4          MR. HUME:  Maybe a little bit.

5          THE COURT:  Okay.  All right.  Keep going.

6          MR. HUME:  Finally, let me address briefly the

7  argument that even if the State Department's approval of the

8  crossing agreement and the NITC application all of it is

9  completely illegal and this Court declares it illegal, they're

10  saying that's okay, the Coast Guard can still go ahead and give

11  the navigation permit.

12          There are a number of things wrong with that other than

13  just it sounds completely untenable, but first of all, the

14  application they submitted relied on the State Department

15  approvals.  So the application itself would have to be redone

16  at a minimum.

17          And why did it rely on the State Department approvals?

18  Because they have to show Federal primary authority.  And how

19  do we know that?  It's in the regulations that they have to

20  show primary authority, but more fundamentally, Your Honor, the

21  navigation permit that the Coast Guard grants is pursuant to

22  the 1906 Bridge Act.  There's no dispute about that.

23          The 1906 Bridge Act first section is found at 33 U.S.C

24  Section 491.  I did this part all by myself.  And it says when

25  after March 23rd, 1906 authority is granted by Congress to any

1  person to construct and maintain a bridge such bridge shall not

2  be built until the plans and specifications, et cetera, et

3  cetera have been submitted to the Secretary of Transportation.

4  Then you get a permit.  And that's now delegated to the Coast

5  Guard.

6       The whole statutory premise for going to the Coast Guard

7  to get a permit is that you have congressional authorization.

8  What congressional authorization does the NITC have when the

9  State Department IBA approvals have been invalidated?  None.

10 The act on its face would not even apply.

11      I think that's all I really had on argument number two

12 unless the Court has questions.

13      So we then move, as I said, it sort of connects right

14 into argument number three which is that this whole episode

15 with the Coast Guard sort of proves everything we've been

16 saying all along.  It proves that they're acting unlawfully and

17 it proves that they are committed to blocking the privately

18 owned Ambassador Bridge Twin Span.

19      I would like to start because there's a lot of good

20 facts and there's a lot of important legal analysis in the

21 regulations on what they have used to block us and why we think

22 it's illegitimate but before I get to that, use slide 100.

23 Because the equal protection argument and I apologize because

24 this isn't the easiest to read.

25      I would like to try to articulate for the Court as best

1    I can what our equal protection argument is.  Let's start with

2    what this slide says.  It's well established from numerous

3    Supreme Court cases that when a governmental entity becomes a

4    market participant and starts competing with private

5    enterprise, the rules change for that governmental entity in a

6    number of respects.

7         It has to be treated like a private entity.  The

8    commerce clause doesn't apply, that's good for them.  They

9    don't get to be exempt from the antitrust laws, that's not so

10   good for them.  They don't get to invoke the Sovereign Acts

11   defense from Windsor.  Sovereign immunity doesn't apply, the

12   active state doctrine doesn't apply.  And these Federalism

13   doctrine of when the Federal Government can compel states to do

14   things changes.

15        So the law recognizes that when a Government entity goes

16   into the market place and acts as a competitor with private

17   enterprise, the rules change.  And really when I say the rules

18   change, what I really mean is that entity should be treated

19   like a market participant, should be treated like a private

20   entity.  That's just a fundamental principal of our system and

21   of numerous Supreme Court decisions.

22        What we're saying is that when that happens, the

23   Government generally, no government, any governmental entity

24   can't then say okay, we're going to now apply regulations in a

25   way that favor the governmental competitor and hurt the private

1  competitor.  It's inconsistent with what these cases are saying

2  at a broad level.  Obviously, they don't address the specific

3  claim.  I'm not aware of a case that does.  But that's what

4  we're saying.

5          What we're saying is if you enter into market

6  competition, you should play by the same rules that the private

7  competitor plays by.  You don't get to favor the Government

8  competitor.  Because it's unfair and it's irrational, that's

9  not the way our system is suppose to work.  That's the legal

10 doctrine for the legal theory behind our equal protection

11 claim.

12         Now let me go back to what's happened.  The big picture

13 of course of what's happened, let's go to slide 71, is that we

14 tried to get a navigation permit in 2004.  And maybe you can

15 show slide 17.

16         Slide 17 shows that they said in 2006 that we completed

17 our application.  They said it at the time in that power point

18 that we cite at the top of the slide and in their briefs to

19 this Court they have been candid enough to say that on July 28,

20 2006 the Coast Guard issued a public notice that DIBC had

21 submitted a completed application.  That was when they were

22 just being -- excuse me -- just processing the application.

23         Now by 2010 they say it's incomplete.  That's what they

24 are now arguing in this litigation that it's actually

25 incomplete after six years.

1        By contrast the NITC applied in October and the Court,

2   the Government has admitted in its briefs that the Coast Guard

3   has treated it as complete and they've been very parsimonious

4   about giving us any promises that they won't be issued very

5   soon, that's why we are here.

6        If they had said look, it's not going to happen for six

7   months then we probably wouldn't be here right now.

8        So that on its face at a big picture level is

9   inconsistent and discriminatory.  In particular because we own

10  a hundred percent of the land that we need to build our bridge

11  and they don't.  And we don't think it's necessary to prove you

12  own the land but we're ahead of them when it comes to that.

13         THE COURT:  But they're the Government and can, even

14  though I understand your argument about market competition when

15  the Government enters into the market place, but they are the

16  Government in other venues anyway and can condemn land to get

17  the land they need to build whatever they want to build.

18       You may have to pay more for it.

19         MR. HUME:  Right.

20         THE COURT:  But they can condemn it.  And I know that

21  the bridge company thought it could too, but it turns out they

22  can't.

23         MR. HUME:  Well, there's actually some murkiness in

24  the law in that.  But I think the more important thing is this.

25  Please show slide 20.

1          They can't invoke power of imminent domain.  I

2   understand the argument.  I don't agree with it but they can't

3   invoke the power of imminent domain.  MDOT is prohibited from

4   spending the money.  The U.S. Government has publicly announced

5   that it's not going to spend any money and Canada has announced

6   it's going to spend the money.

7          Canada doesn't have imminent domain in Michigan.  So if

8   they are going to buy that Michigan land, and that's what they

9   are saying in these news articles, then they are really a

10  market participant with no imminent domain power, they are just

11  like us.

12         So we don't think that the imminent domain argument

13  works even if in theory it could work in other circumstances.

14  In this circumstance they don't get to invoke it.

15         But I really probably jumped too quickly to land.

16  Because the fundamental thing is what does this primary

17  authority regulation mean.

18         Let's now go back to slide 71.  This is a navigation

19  product.  This is not a permit about enforcing land rights or

20  easement rights or air rights or anything else but navigation.

21  And that's clear from the statute.  This is the only statute

22  that authorizes them to restrict us in any way.  They don't

23  have power to enforce other mandates other than navigation.

24         And we're not the only ones that said that.  They've

25  said it.  They have said it in each of these documents.  The

1  Coast Guard's ultimate focus is on navigation issues only.

2  That's what the DRIC cooperating agencies, the collective all

3  of them said.  The FHWA comment said Coast Guard looks only at

4  the navigation clearance issue.  So they've admitted that's

5  really the only issue.

6          And if we go to slide 1, just to belabor the point for a

7  moment, this is why we like this picture.  That bridge has a

8  navigation permit.  Hala Elgaaly who was a Coast Guard and was

9  a witness in this case in the venue depositions said all you

10  need actually is an amendment to your existing permit, an

11  amendment. I'll give a citation for that in a moment.

12          They have actually called -- you don't need a new

13  permit, you need an amendment.  How does that new span create

14  any navigation issues over that?  It doesn't and they have not

15  said otherwise.  There is no navigation issue.

16              THE COURT:  They admitted that.

17              MR. HUME:  They basically have admitted that.

18          So they are basically saying they disagree with my

19  reading of the statute, they disagree with their own e-mails

20  and say the only issue is navigation.  They say, if we go to

21  slide, they say we don't have primary authority.

22          So let's look at the primary authority regulation.  It

23  is slide 83.  This is what they rely on.  And it says, it says

24  there are lots of ways to show primary authority.  It does say

25  states will be presumed without proof to have it.

1          Then it talks about if the law of the state requires a

2    license.  That license would do it.  That sounds like a local

3    bridge where you get a license from the state.  They don't talk

4    about the Federal Government.

5          If there's no state regulation, the necessary primary

6    authority may leave that granted in the charter corporation or

7    the authority inherent in the ownership of land.  Alternative

8    nonexclusive ways of showing it.

9          But they're only talking here about state licensed or

10   potentially state regulated bridges.  They don't seem to

11   address one way or the other well, what happens if you have a

12   congressional statute that says you are authorized to build a

13   bridge.  Are you telling me that's not primary authority?  And

14   their own regulations recognize that there is such a thing as

15   Federal primary authority.

16         If you can please jump to, well, it's slide 84 has it

17   but I would like to show the whole thing.  This is 33 CFR 114,

18   25.  There.

19         Your Honor, they have no answer to this.  This is a

20   regulation that addresses what happens if you build a bridge

21   without a navigation permit?  They say after the fact we'll

22   give you retroactive approval in those cases where the

23   necessary primary authority State or Federal as the case may be

24   validly existed.

25         So this is a different regulation, I want to be clear,

1  but it refers to primary authority and it refers to the concept

2  of Federal primary authority.

3        So their own regulations recognize that there's such a

4  thing as Federal primary authority.  But in all of our briefing

5  they have yet to say what it is.  And they have yet to say why

6  it wouldn't be satisfied by a congressional statute that

7  authorizes you.  That would be classic Federal primary

8  authority.

9        THE COURT:  Well, what they say is that it's inartful

10  but the statute, the regulation that speaks to primary

11  authority also has the last sentence that says and by the way,

12  we're going to be very careful that we don't authorize bridges

13  where people don't have the land rights necessary to build the

14  bridges.

15        MR. HUME:  Right.  And then they just told you, so

16  they rely on that doubt sentence.

17        THE COURT:  Right.

18        MR. HUME:  They just told you but we can give the

19  permit even if you say the State Department was totally illegal

20  when they approved this even if the crossing agreement is

21  illegal.

22        So how much doubt, what does that tell you about how

23  much strongly they believe in the doubt sentence?  They think

24  everything can be illegal but we can still proceed with the

25  navigation permit, that's what they just told you.  That is an

1   unequal application of the doubt sentence.  And there really

2   isn't any doubt, Your Honor.

3        If you can go, please, to slide 85.  The regulation they

4   rely on says it can be in the charter.  Okay.  It says I quote

5   11505, their regulation they rely on, it says if there's no

6   state regulation of bridges, the necessary primary authority

7   may be that granted in the charter of a corporation.

8        Well, the definition of a charter is quote an instrument

9   emanating from the sovereign power in the nature of a grant.

10  We have that.  That's what the DIBC Act is.  It's our charter.

11  It chartered us to build the bridge.  So we had it in our

12  charter.

13       We had primary authority.  We had primary, we have

14  Federal primary authority which the regulations recognize and

15  which they have never explained.  They have also never

16  explained the fact, if we can go to slide 88, that the first

17  time around DIBC received all of its property after it got its

18  navigation permit.  It received the air rights easement from

19  Detroit.  A year later, May of 1928 instead of May of 1927.  It

20  received virtually all of these lands, all of the title.  This

21  was the document that Mr. Moroun authenticated earlier.  This

22  is just a few of the property titles almost all of which come

23  after May of 1927 after we got the navigation permit.

24       The point I want to emphasize is that there's been no

25  change at all in the 1926 Bridge Act from then to now.  No

1    substantive change.

2         It may have changed the Secretary of War, Secretary of

3    Transportation but the statute is the same.  The only thing

4    that they could say is changed is well, we wrote this primary

5    authority regulation in 1946, and we have a dispute about why

6    they wrote that.

7         We say that timing is so clear you wrote it right after

8    the 1946 Bridge Act which said from now on you have blanket

9    approval, Secretary of War, to approve domestic bridges only,

10   domestic bridges.

11        THE COURT:  But the problem, and I know the rest of

12   your argument.

13        The problem with your argument is and it sounds, it's a

14   practical one, it's not a legal argument.  The Bridge Act, the

15   1946 Bridge Act that approved domestic bridges but not

16   international bridges, I just want you to be sure I know where

17   you are.

18        MR. HUME:  That's exactly right.

19        THE COURT:  That was passed in August, August 4th I

20   think.

21        MR. HUME:  Yes.

22        THE COURT:  The regulations were issued in September.

23   Whatever the regulation is called.  I know it's –115.  33 CFR.

24        MR. HUME:  There's the timing, Your Honor, that's

25   right.

1            THE COURT:  August 2 they passed a general Bridge

2   Act.  In September they passed the, they adopted the

3   regulation.

4        I have a hard time thinking that they could have

5   prepared a regulation in that time.  I mean, just as an, and

6   then the beginning to the regulation, in the Federal register

7   which was cited in the Government's brief, references the

8   adoption of the APA which happened in June or something.

9        And so it not only references the APA, but it just seems

10  to me to be very difficult.  Your timing is perfect except it

11  references the APA and it's awful fast for Government action.

12            MR. HUME:  This was right after World War II, they

13  were much more hard working, what do I have to say.

14            THE COURT:  There were fewer laws back then, I have

15  to agree, there were fewer laws.

16            MR. HUME:  Your Honor, I don't have any information

17  to give you.  You obviously already exactly get the point.

18            THE COURT:  But what do you do with the fact that it

19  references the APA?

20            MR. HUME:  But it also references the Bridge Act.  It

21  references both.  We don't know how long that Bridge Act was

22  pending.

23            THE COURT:  It did?

24            MR. HUME:  I believe it references both.

25            THE COURT:  Oh, oh, that would be worth my knowing.

1   I didn't realize that.

2          MR. HUME:  The regulations are promulgated in a whole

3   body of them together.

4          THE COURT:  Right, right.

5          MR. HUME:  The general introduction references all of

6   them.  I will double check that and we can report back.

7          But the other point I would make is I don't know how

8   long either piece of legislation was pending other than the

9   timing.  I don't think either one of us in this dispute have

10  uncovered --

11         THE COURT:  No, and the Government says this is not

12  a, you know, we don't have the legislative history.  You can't

13  blame us for not having a legislative history, we're suppose to

14  not -- am I right, Mr. Collins?  Sorry.

15         MR. HUME:  The point, what I would try to combine is

16  I would admit this timing is not airtight.  We don't know for

17  sure.

18         We think it's implementing the 46 Bridge Act, they say

19  the APA.  But the larger point is what is it in the regulations

20  that says if you have a congressional statute saying you are

21  authorized to build a bridge.  Forget about our statute.

22         THE COURT:  Right.

23         MR. HUME:  Just draft the perfect congressional

24  statute.  Are you telling me that the Coast Guard is going to

25  say well -- show slide 77 -- You can have the best statute and

```
 1    they're going to say no, you need an air right easement over

 2    that.  That's what it looks like, Judge, it's contaminated.

 3              THE COURT:  That's what they are saying.

 4              MR. HUME:  It's contaminated with gas, you're not

 5    allowed to go on there.

 6              THE COURT:  That's because you put the fence.

 7              MR. HUME:  No, because the City of Detroit said don't

 8    go over there because you'll get sick and then you will sue us.

 9              THE COURT:  Oh.

10              MR. HUME:  It is inconceivable that if you had an act

11    of Congress giving you every form of authorization known to

12    man, the Coast Guard would say oh, no, look at Regulation

13    11505.  That's not what primary authority is.

14         The definition of primary authority is --

15              THE COURT:  I agree with that argument.

16         I mean, the answer has to be in figuring out how the War

17    Department and then the Coast Guard because they succeeded each

18    other, how they interpreted and applied the last sentence

19    because it is not at all clear that it applies to international

20    bridges.

21         But it's not really clear that the regulation was

22    adopted only in response to the general Bridge Act.  And the

23    argument that's made by the Government is if you go back into

24    the intricacies of the War Department process, before these

25    regulations were published, you find that somewhere and now I'm
```

1    not going to be able to quote it, I'm just trying to recall the

2    arguments from memory.  I don't want you to think that I

3    haven't worked on this case.

4            MR. HUME:  It's clear you have, Your Honor, we're

5    grateful for that.

6            THE COURT:  Well, if you go back in there, you'll

7    find that the War Department had an approach that was

8    approximately the same.  That is, that the private owner had to

9    show that it controlled the real property necessary to build a

10   bridge.

11        You don't think so?

12            MR. HUME:  I don't think they have a single example

13   of a private bridge owner who had congressional authorization

14   who couldn't get a navigation permit because they hadn't bought

15   their land yet.

16            THE COURT:  For an international bridge.

17            MR. HUME:  For an international bridge, that is the

18   key.

19            THE COURT:  That is the key.

20            MR. HUME:  They keep going back to the domestic

21   bridges.

22            THE COURT:  Believe me, I understand.  So what we're

23   in between is the application of this regulation to

24   international bridges.

25        And the Government doesn't actually have an example

1  where the Coast Guard's current interpretation has applied,

2  this regulation applied to the application here has been

3  applied in other instances.

4       I mean, right, there's no other instance in which this

5  obligation to own every piece of land or easement or anything

6  before you can get a navigation permit has been enforced

7  against an international bridge, at least not that I know of.

8            MR. COLLINS:  Your Honor --

9            MR. HUME:  Not that we know of.

10           MR. COLLINS:  Your Honor, I mean, it has.  It's just

11  never come to this kind of an issue.

12           THE COURT:  Well, if it has, then you should show it

13  to me because I don't, I didn't actually see it in your papers,

14  and I have been trying to pay attention particularly since you

15  filed for a PI.

16       I figured that the PI was half intended to -- to urge

17  the Court to move expeditiously to decide the case.

18       So you think that you have given me, you think you've

19  given me, you think you've given me cites in your briefs in

20  which international bridges in which this interpretation has

21  slowed them down?

22           MR. COLLINS:  No, that's my point.

23           THE COURT:  Can you just come to the mic?

24       Can you stand aside, Mr. Hume.

25       I actually would like to have a record and I think you

1  will too and you'll do better if you speak at the microphone.

2        What I would actually like to do have you answer this

3  question and then if you can, I would like to get back together

4  again tomorrow morning.  I don't know if you can.  You are all

5  flying out of town, 15 other places.

6        Can you do that?

7             MR. COLLINS:  I can personally.

8             THE COURT:  You cannot?

9             MR. COLLINS:  No, I can.

10             THE COURT:  You can.

11        Can you?

12             MR. HUME:  Your Honor, I can certainly make myself

13  available, yes.

14             THE COURT:  There's a lot to this.  Part of my

15  problem is that every time I get a handle on it, it turns out

16  it's just the leg of the elephant and I have forgotten the

17  other three legs and the trunk and the tail and you understand

18  the whole story.

19        So I would appreciate more of your time.  Both of you

20  are doing an excellent job, arguing your points, making clear

21  to me as you have, particularly Mr. Collins.  I think

22  Mr. Hume's arguments have been clear, making clear to me what

23  the arguments are which is very helpful.  And so if you can do

24  that, it would be of great assistance to me.

25             MR. HUME:  Absolutely.

1              MR. COLLINS:  Yes, Your Honor.

2              THE COURT:  And everybody else you are free not to

3    come.  Just, you know, the five of us who care.

4         Anyway, go ahead.

5              MR. COLLINS:  And I did not mean --

6              THE COURT:  And Canada, don't worry.  I'm not going

7    to issue anything about Canada, how's that?

8              MR. DOZEMAN:  It's my job to worry, Your Honor.

9              THE COURT:  That is the perfect thing for you to say,

10   exactly right, sir.

11             MR. COLLINS:  Okay.  So I did not mean to create the

12   impression that we were aware of an issue where a conflict like

13   this had arisen over.

14        But the Coast Guard always requires compliance with it's

15   regulations.  So they were required to obtain the rights to

16   their bridge before they get a navigational permit.  So, if the

17   --

18             THE COURT:  Well, but the point is that this

19   regulation is in theory coming out of the War Department

20   regulations.

21             MR. COLLINS:  Yes.

22             THE COURT:  And the War Department clearly did not

23   require that?

24             MR. COLLINS:  Well --

25             THE COURT:  Clearly.  No, wait.  There's no way that

1   you can back away from that one.

2        If this bridge, Buffalo, whatever it is bridge, no,

3   other bridges, maybe they didn't in some bridges but in all of

4   the bridges that are in front of me, the War Department did not

5   require full control of all of the lands.

6        MR. COLLINS:  Actually, Your Honor, even in this case

7   they did and here's what we found and this, I apologize for

8   this not being in our briefs but we actually just became aware

9   of it.

10       Plaintiff's put up and they have asserted that the

11  Ambassador Bridge did not have all of its easements before the

12  permit was granted.

13       What we just recognized is that the State of Michigan

14  had a statute in 1921 that granted bridge companies the right

15  of imminent domain as a blanket proposition.  So the

16  Ambassador, the American Transit Company when it was

17  incorporated for the purpose of building this bridge actually

18  had the right of imminent domain.  So it would have been

19  considered to have the necessary authority to get its property

20  rights.

21       That statute was later rescinded.  I have got two cases

22  that I can give Your Honor that explain it.  In fact, Detroit

23  International Bridge has litigated this issue and the

24  information is in the cases that have been, they, that they

25  have litigated.  So if you permit me, I can grab the case sites

1   for you.

2          THE COURT:  That will be great if you give me the

3   case cites.  Then let's call it a day.

4      If you're not all exhausted, my Court Reporter is to say

5   nothing of my deputy whose fingers are also busy.

6          MR. COLLINS:  I actually have copies.

7          THE COURT:  That would be great.  If you can give

8   them to Lauren, she's the smart one of the two of us.

9      Everybody thank you, most particularly thank you for

10  those who came and then discovered that you didn't have to.

11         MR. HUME:  This is not argument, but substantive,

12  Your Honor.  We forgot to hand in our demonstrative exhibits.

13     Would we be permitted to provide them to the Clerk?

14         THE COURT:  Yes, that would be great.

15     Have you shown your slide presentation; is that your

16  demonstrative exhibit?

17         MR. HUME:  Yes.

18         THE COURT:  You've shown that all to the Government?

19         MR. HUME:  I gave it to him before the argument, so

20  he has it.

21         THE COURT:  Okay.  Would you take a look at that.  If

22  there's something in there that you object to, just let me

23  know.  You don't have to let me know tomorrow.  We'll take it,

24  he's got it, you can object to it.

25         MR. COLLINS:  Thank you, Your Honor.

1          What time are we reconvening tomorrow?

2             THE COURT:  Nine-thirty, can we do it at nine-thirty?

3             THE DEPUTY CLERK:  Yes, Your Honor.

4             THE COURT:  Nine-thirty.

5          Thank you.

6          Can we do it at ten o'clock, ten o'clock would be better

7     for everybody.

8          Thank you.

9          (Proceedings adjourned at 5:25 p.m.)

10                              -oOo-

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         CERTIFICATE

2          I certify that the foregoing is a true and correct

3    transcript, to the best of my ability, of the above pages, of

4    the stenographic notes provided to me by the United States

5    District Court, of the proceedings taken on the date and time

6    previously stated in the above matter.

7          I further certify that I am neither counsel for, related

8    to, nor employed by any of the parties to the action in which

9    this hearing was taken, and further that I am not financially

10   nor otherwise interested in the outcome of the action.

11

12   _____           _____

13   /s/Crystal M. Pilgrim, RPR          Date: May 13, 2014

14

15

16

17

18

19

20

21

22

23

24

25

'04 [1]   12/6
'till [1]   48/8

--

-------------------------
 1/7
-115 [1]   113/23
-oOo [1]   123/10

/

/s/Crystal [1]   124/12

0

000387 [1]   35/22
00382 [1]   35/12

1

10 [1]   13/7
10-476 [2]   1/3 4/2
100 [1]   104/22
10th [1]   62/19
111 [1]   1/23
114 [1]   110/17
115 [1]   113/23
11505 [4]   97/7 97/21
 112/5 116/13
12 [1]   14/4
120 [1]   36/6
12225 [1]   1/17
13 [2]   29/12 124/12
143-25 [2]   102/24 102/25
145 [1]   102/9
14th [1]   35/15
15 [3]   7/14 94/4 119/5
15th [1]   62/20
17 [2]   106/15 106/16
18 [1]   102/22
1899 [3]   57/9 74/12 74/21
1906 [5]   74/12 74/21
 103/22 103/23 103/25
1920s [2]   27/2 69/13
1921 [1]   121/14
1926 [1]   112/25
1927 [8]   46/6 47/11 69/17
 72/6 73/2 76/4 112/19
 112/23
1928 [1]   112/19
1946 [3]   113/5 113/8
 113/15
1972 [5]   56/2 65/15 69/21
 70/6 72/5
1999 [2]   10/15 10/20

2

2.6 [1]   12/6
20 [4]   8/25 12/20 22/1
 107/25
20001 [1]   2/4
20004 [1]   1/20
20015 [1]   1/15
2004 [15]   12/3 12/25 23/9
 33/8 34/5 34/7 35/15
 38/23 38/25 59/7 59/11
 60/12 60/12 60/17 106/14
2005 [5]   11/23 62/13
 62/19 62/20 62/20
2006 [2]   106/16 106/20
2007 [1]   64/7
2008 [2]   13/19 14/12
2010 [5]   87/4 88/4 88/11

92/1 106/23
2011 [4]   88/23 88/25 92/1
 95/16
2012 [7]   28/14 87/4 92/1
 94/4 95/5 95/7 95/15
2013 [8]   10/15 14/2 87/4
 87/11 89/12 89/23 93/24
 94/25
2014 [2]   1/5 124/12
2015 [3]   12/4 12/6 12/25
2035 [1]   19/18
22 [1]   21/14
23 [1]   21/14
23rd [1]   103/25
2487 [1]   1/24
25 [5]   22/7 82/16 102/24
 102/25 110/18
27 [1]   3/5
28 [1]   106/19
2:15 [1]   1/5

3

3-60 [1]   14/13
3.4 [1]   13/2
30 [4]   1/5 8/23 36/7 83/3
33 [4]   12/7 103/23 110/17
 113/23
333 [1]   2/4
35 [1]   62/12
39 [1]   14/22

4

404 [1]   39/19
45 [1]   13/1
46 [2]   102/8 115/18
47 [1]   102/8
476 [2]   1/3 4/2
48089 [1]   1/18
491 [1]   103/24
49503-2487 [1]   1/24
4:08 [1]   84/5
4:24 [1]   84/6
4th [1]   113/19

5

5-20 [1]   12/20
50 [2]   19/19 28/20
52 [1]   67/3
53 [1]   87/25
5301 [1]   1/15
5:25 [1]   123/9

6

60 [1]   14/13
601 [1]   1/20
68 [1]   84/15

7

7.3 [1]   28/15
71 [2]   106/13 108/18
75 [7]   14/23 15/7 20/11
 20/12 30/16 31/6 31/12
77 [1]   115/25

8

83 [1]   109/23
84 [3]   11/24 11/25 110/16
85 [5]   10/2 15/5 17/12
 25/6 112/3
88 [1]   112/16

900 [1]   1/23
97 [1]   12/18

A

abandon [1]   38/12
ability [5]   18/22 20/24
 22/10 71/7 124/3
able [22]   17/7 18/23 19/5
 26/6 26/14 28/23 29/22
 30/2 31/13 31/16 37/9
 37/12 37/20 38/7 38/9
 38/13 38/14 69/3 75/21
 78/7 83/22 117/1
about [68]   4/13 6/17 6/24
 6/25 7/1 7/5 7/12 7/17
 9/6 12/23 14/2 17/10
 19/19 20/12 21/14 21/19
 22/9 22/24 25/24 26/8
 28/15 29/10 29/12 36/17
 37/9 37/18 37/22 37/25
 38/2 38/3 42/4 43/10 47/5
 48/7 51/18 53/15 65/21
 66/1 66/9 67/22 68/2 75/5
 76/20 77/19 78/6 78/17
 78/20 79/6 79/17 83/22
 85/7 87/17 88/5 89/16
 91/7 92/4 100/9 103/22
 107/4 107/14 108/19 110/1
 110/4 110/9 111/22 113/5
 115/21 120/7
above [5]   29/16 36/11
 58/22 124/3 124/6
absence [1]   55/13
absolutely [13]   17/9
 40/10 42/23 47/7 48/5
 48/6 52/18 57/4 69/19
 70/18 86/19 95/25 119/25
accepted [1]   96/6
access [1]   66/12
accommodate [1]   28/2
According [1]   95/10
account [2]   62/11 94/16
accurate [4]   20/3 33/10
 33/10 33/11
acknowledged [1]   88/2
acquired [3]   27/1 27/4
 27/7
acquisitions [1]   97/20
across [3]   77/4 79/24
 103/2
act [49]   50/21 54/15
 54/15 54/17 54/17 54/20
 54/21 55/6 56/3 56/3
 65/14 65/15 68/11 68/12
 69/13 69/22 70/6 70/11
 72/5 73/3 74/11 74/24
 75/8 75/9 76/11 84/18
 87/1 91/23 92/21 93/3
 99/19 100/4 100/12 102/19
 103/1 103/22 103/23
 104/10 112/10 112/25
 113/8 113/14 113/15 114/2
 114/20 114/21 115/18
 116/10 116/22
acting [2]   51/5 104/16
action [5]   4/2 68/5
 114/11 124/8 124/10
actions [2]   45/7 51/8
active [2]   22/22 105/12

**A** Case 1:10-cv-00476-RMC Document 41-61 Filed 06/13/14

activities [2]  92/6 93/10
acts [5]  54/16 74/12
  74/21 105/10 105/16
actual [8]  13/5 13/21
  13/24 14/4 28/16 28/17
  34/21 88/13
actually [29]  6/1 6/16
  6/25 7/10 8/8 23/6 24/23
  45/2 45/13 47/3 51/9
  53/11 55/23 66/11 73/11
  94/19 101/22 106/24
  107/23 109/10 109/12
  117/25 118/13 118/25
  119/2 121/6 121/8 121/17
  122/6
ad [1]  47/11
ad-ministry [1]  47/11
additional [2]  70/11
  82/19
address [14]  4/21 5/5
  48/16 49/8 58/15 65/13
  67/15 80/3 80/21 95/22
  102/22 103/6 106/2 110/11
addressed [1]  102/5
addresses [1]  110/20
addressing [2]  80/11
  96/20
adjacent [1]  16/10
adjourned [1]  123/9
adjusting [1]  19/14
administration [1]  73/10
administrative [4]  35/12
  58/19 59/5 75/5
admit [5]  66/10 78/22
  89/3 89/4 115/16
admits [3]  63/15 63/20
  64/21
admitted [7]  62/8 62/10
  88/24 107/2 109/4 109/16
  109/17
adopted [6]  46/5 47/17
  75/8 87/1 114/2 116/22
adopting [1]  46/6
adoption [1]  114/8
advantageous [1]  82/10
adversely [1]  56/4
affidavit [1]  88/17
affirmatively [1]  76/11
afford [3]  28/23 29/21
  29/22
afield [2]  90/19 98/11
afoul [2]  96/22 99/3
after [16]  20/12 22/3
  27/4 27/8 36/17 38/4
  61/23 62/13 103/25 106/25
  110/21 112/17 112/23
  112/23 113/7 114/12
afternoon [7]  4/9 4/16
  5/1 7/25 8/12 27/20 60/20
again [11]  8/18 25/22
  50/21 61/13 81/8 84/12
  85/12 88/21 89/4 102/19
  119/4
against [11]  5/8 6/14
  6/15 7/20 23/25 24/2
  45/10 51/6 90/21 90/22
  118/7
age [2]  15/25 25/6
agencies [4]  87/6 99/7

agency [4]  51/5 57/13
  86/8 102/20
aggravated [1]  26/3
aging [1]  22/4
ago [2]  34/13 99/20
agree [8]  6/13 7/6 7/9
  56/8 70/9 108/2 114/15
  116/15
agreed [3]  24/8 52/23
  61/24
agreement [60]  44/18
  44/21 44/22 44/25 45/2
  45/9 45/12 45/14 46/5
  46/8 46/9 46/17 46/21
  46/25 47/4 47/7 47/19
  47/23 47/24 48/7 48/8
  50/18 84/17 84/21 84/23
  86/4 86/5 86/8 86/17
  87/11 87/17 89/19 89/20
  89/21 90/9 90/10 90/11
  90/25 91/8 91/10 91/13
  91/18 91/22 92/5 92/13
  94/4 94/7 95/12 95/14
  95/19 95/19 99/15 100/10
  100/11 101/10 101/23
  101/25 102/1 103/8 111/20
agreements [3]  93/19
  102/13 102/17
agrees [3]  51/11 57/21
  75/6
ahead [11]  25/25 26/18
  27/16 27/17 36/10 81/5
  83/20 101/14 103/10
  107/12 120/4
aided [1]  2/6
air [11]  33/16 33/16
  34/18 41/25 42/5 42/9
  42/20 52/11 108/20 112/18
  116/1
airport [1]  15/18
airtight [1]  115/16
al [2]  1/6 4/4
alarm [1]  61/23
all [102]  4/18 5/13 6/14
  6/15 7/18 7/20 7/24 8/13
  8/15 8/20 9/8 10/7 11/14
  14/16 14/16 17/5 17/8
  19/14 19/21 24/20 26/5
  26/12 30/3 30/24 31/14
  31/16 36/17 38/24 39/1
  39/2 39/5 41/1 41/23
  41/23 41/23 41/24 42/2
  43/12 43/14 44/13 45/13
  49/12 52/2 52/3 52/7
  52/10 53/14 56/4 56/24
  59/6 61/17 62/14 65/17
  68/24 69/12 69/15 73/5
  74/12 75/4 76/23 76/23
  77/4 77/9 78/20 78/21
  80/6 80/21 81/11 83/13
  84/9 85/9 86/14 90/18
  92/8 92/9 92/18 93/15
  101/18 102/1 102/1 103/5
  103/8 103/13 103/24
  104/11 104/16 109/2 109/9
  111/4 112/17 112/20
  112/20 112/22 112/25
  115/5 116/19 119/4 121/3
  121/5 121/11 122/4 122/18
alleviate [1]  33/18

alleviated [1]  26/6
allow [4]  23/2 24/8 30/14
  48/19
allowed [1]  116/5
allows [3]  17/2 17/5
  87/19
almost [4]  6/24 24/1 79/8
  112/22
alone [2]  53/1 58/20
along [4]  37/7 71/5 73/7
  104/16
alongside [1]  15/12
already [13]  38/18 38/25
  39/4 56/2 64/25 65/2
  69/17 73/5 78/22 78/22
  79/22 85/8 114/17
also [22]  4/14 15/15
  17/15 20/23 32/9 33/15
  35/12 49/5 49/7 49/14
  53/24 54/3 69/6 69/24
  69/25 83/17 88/24 91/25
  111/11 112/15 114/20
  122/5
alternative [2]  7/13
  110/7
although [4]  80/7 83/3
  89/23 93/4
always [4]  22/14 67/5
  71/23 120/14
am [7]  6/25 11/9 32/17
  33/5 115/14 124/7 124/9
amalgamate [1]  73/8
Ambassador [56]  10/1
  10/14 10/17 11/5 12/3
  12/24 14/3 14/23 14/24
  16/4 16/10 18/17 19/4
  19/7 19/16 20/24 21/11
  24/15 26/14 27/2 27/5
  28/2 28/5 30/17 30/18
  31/3 31/20 35/16 37/6
  37/8 39/25 43/2 55/24
  59/13 60/3 60/24 61/21
  62/25 63/20 65/1 65/24
  66/4 66/10 66/15 66/20
  68/3 69/6 70/5 71/6 72/8
  73/16 81/14 81/21 104/18
  121/11 121/16
ambiguous [1]  87/20
amended [1]  87/10
amendment [4]  29/23
  109/10 109/11 109/13
American [1]  121/16
among [1]  89/2
amount [4]  28/18 42/21
  60/2 77/14
analysis [6]  20/23 21/3
  33/3 33/8 65/13 104/20
Andrew [2]  60/16 61/13
announced [3]  38/17 108/4
  108/5
announcement [1]  59/13
annual [3]  12/5 12/7 13/2
another [7]  16/22 23/17
  65/2 80/7 85/12 88/17
  89/4
answer [9]  21/1 34/24
  41/18 53/8 98/1 98/2
  110/19 116/16 119/2
answered [1]  97/25
Anti [2]  92/21 93/3
Anti-deficiency [2]  92/21

A Case 1:10-cv-00476-RMC

Document 44 Filed 06/13/14

Anti-deficiency... [1]
93/3
anticipate [1] 13/1
antitrust [1] 105/9
any [57] 5/20 8/5 12/14
17/1 21/3 21/3 21/4 22/11
22/16 22/16 24/18 33/18
38/20 39/19 39/22 40/21
40/22 41/9 41/10 41/12
41/16 42/21 42/24 43/1
45/2 49/24 53/1 55/3
57/13 60/6 65/13 68/20
71/4 72/23 74/20 74/20
78/21 84/16 85/4 85/20
86/14 87/7 93/9 95/8
98/21 99/21 100/2 100/24
103/25 105/23 107/4 108/5
108/22 109/14 112/2
114/16 124/8
anybody [6] 23/7 43/17
79/4 79/11 93/9 98/2
anymore [1] 70/23
anyone [5] 21/4 22/17
33/19 48/6 79/5
anything [11] 7/7 7/7
29/10 37/22 40/17 43/6
74/13 76/20 108/20 118/5
120/7
anyway [5] 47/22 48/3
88/14 107/16 120/4
anyways [1] 40/16
anywhere [2] 77/4 83/23
APA [6] 54/3 114/8 114/9
114/11 114/19 115/19
apart [2] 34/18 34/18
apologize [3] 89/10
104/23 121/7
APPEARANCES [2] 1/12 2/1
applicants [2] 49/15
49/23
application [27] 35/16
37/18 38/2 49/8 49/15
51/1 51/3 58/20 59/18
59/18 62/25 65/9 65/16
67/10 81/5 83/23 90/13
96/7 103/8 103/14 103/15
106/17 106/21 106/22
112/1 117/23 118/2
applied [7] 29/22 58/12
107/1 116/18 118/1 118/2
118/3
applies [4] 56/5 90/7
102/20 116/19
apply [13] 24/1 57/4 57/6
57/6 57/14 62/5 98/2
102/21 104/10 105/8
105/11 105/12 105/24
applying [2] 45/10 53/2
appreciate [2] 44/11
119/19
approach [3] 22/3 35/19
117/7
approached [1] 44/25
appropriate [2] 57/24
57/25
appropriations [4] 92/2
92/3 93/24 94/8
approval [48] 13/20 38/17
38/21 39/12 40/8 40/10

40/15 40/18 49/14 49/24
49/25 50/22 58/13 60/13
69/16 85/8 86/17 86/21
87/18 87/19 88/7 88/9
88/12 88/14 88/16 89/2
89/6 89/9 90/9 90/11 91/2
91/3 95/3 95/4 96/1 96/9
96/18 96/20 97/13 98/24
99/5 99/8 100/3 100/3
102/17 103/7 110/22 113/9
approvals [18] 26/12
38/24 39/2 39/2 40/22
49/12 49/13 49/16 50/17
70/12 85/13 90/12 90/14
97/16 97/19 103/15 103/17
104/9
approve [10] 14/6 50/18
75/3 76/19 84/23 86/5
86/7 100/1 100/17 113/9
approved [7] 16/23 17/1
78/6 89/22 95/15 111/20
113/15
approves [2] 99/23 100/1
approving [1] 87/1
approximately [3] 23/9
25/9 117/8
April [3] 1/5 95/5 95/7
arbiter [1] 69/15
arbitrary [1] 75/24
are [128]
area [5] 76/17 77/15 82/4
82/4 89/1
aren't [2] 15/21 15/22
argue [8] 6/23 6/25 7/1
46/19 46/24 48/4 48/19
68/1
argued [4] 9/9 47/18
51/11 85/1
arguendo [1] 45/8
argues [1] 45/12
arguing [3] 75/5 106/24
119/20
argument [51] 9/3 41/6
44/14 45/24 49/4 49/10
50/3 50/3 50/5 50/15
50/16 50/24 50/25 51/21
53/10 54/13 67/2 67/13
67/15 70/15 70/19 80/24
84/13 85/6 85/7 85/19
86/6 90/14 93/13 98/12
99/2 100/24 101/4 101/5
101/23 102/16 103/7
104/11 104/14 104/23
105/1 107/14 108/2 108/12
113/12 113/13 113/14
116/15 116/23 122/11
122/19
arguments [11] 4/19 48/10
48/14 49/9 51/7 53/4
67/20 100/14 117/2 119/22
119/23
arisen [1] 120/13
Army [1] 39/19
around [1] 112/17
article [2] 55/23 102/7
articles [1] 108/9
articulate [1] 104/25
articulated [2] 43/8
85/24
as [95] 5/7 5/11 5/12
5/14 5/16 6/2 7/9 7/18

7/18 10/4 10/17 10/17
11/18 12/16 12/20 15/24
15/24 15/25 16/2 18/13
18/25 19/8 19/9 20/8
21/12 21/13 22/2 22/2
23/12 23/13 28/20 30/11
31/23 32/7 35/12 36/19
37/12 37/20 38/19 38/19
40/13 40/22 43/1 43/25
44/1 44/17 45/25 51/5
51/12 51/25 51/25 54/4
59/3 60/13 61/5 68/17
71/16 71/21 71/22 72/16
73/13 73/13 77/6 77/21
78/11 81/20 81/20 81/24
81/24 84/18 85/1 85/12
87/18 91/23 93/17 94/9
94/20 94/20 96/4 98/2
99/22 99/22 100/15 100/21
100/21 104/13 104/25
105/16 107/3 110/14
110/23 111/4 114/5 119/21
121/15
ascending [1] 20/4
aside [4] 90/12 93/20
93/21 118/24
ask [11] 6/14 16/1 17/23
24/24 25/12 26/16 27/25
37/18 41/16 53/12 53/13
asked [3] 46/15 52/4 54/5
asking [4] 6/12 34/10
93/25 94/10
asks [1] 63/18
asserted [1] 121/10
assigns [1] 85/3
assistance [1] 119/24
assume [5] 43/7 44/20
44/22 45/11 99/4
assuming [3] 21/20 45/8
92/25
astonished [1] 6/6
ATC [3] 54/17 68/11 75/9
attach [1] 26/21
attached [1] 25/5
attachment [2] 60/15
102/24
attack [1] 22/5
attempts [1] 65/16
attended [1] 5/13
attention [2] 55/11
118/14
attitudinal [1] 24/5
attorney [5] 27/22 102/7
102/10 102/12 102/15
August [3] 113/19 113/19
114/1
authenticate [1] 26/17
authenticated [1] 112/21
authorities [1] 102/22
authority [79] 50/20
52/18 52/21 52/21 56/15
56/17 57/14 57/16 64/9
68/12 68/17 70/3 70/4
70/5 70/8 70/14 70/16
70/20 71/10 72/12 72/14
72/14 72/19 72/19 72/21
73/5 73/5 73/21 74/5 74/6
74/8 74/19 75/21 76/1
76/3 76/8 76/9 76/12
76/23 84/23 86/14 88/19
91/15 91/19 92/25 97/6

**A**

authority... [33]  97/8
97/8 97/9 98/9 100/15
101/3 101/12 102/3 102/5
103/18 103/20 103/25
108/17 109/21 109/22
109/24 110/6 110/7 110/13
110/15 110/23 111/1 111/2
111/4 111/8 111/11 112/6
112/13 112/14 113/5
116/13 116/14 121/19
authorization [21]  49/1
50/9 56/6 57/8 58/23
69/14 73/2 83/4 83/12
83/13 96/10 97/2 97/3
97/5 98/13 99/3 102/14
104/7 104/8 116/11 117/13
authorize [4]  75/16 86/7
88/20 111/12
authorized [6]  75/8 87/24
91/1 91/21 110/12 115/21
authorizes [5]  52/23
99/20 102/13 108/22 111/7
authorizing [1]  88/22
auto [1]  10/15
automobiles [1]  15/20
automotive [2]  15/24
16/23
available [1]  119/13
Avenue [2]  1/15 2/4
average [1]  21/13
avoidance [2]  85/17 85/17
aware [6]  33/6 40/21 93/9
106/3 120/12 121/8
away [8]  18/19 20/13 60/2
65/12 81/13 81/17 83/8
121/1
awful [1]  114/11
awhile [1]  23/16

**B**

back [34]  17/23 22/4 22/9
33/23 41/5 43/24 44/3
44/3 44/24 46/6 52/3 54/8
57/23 59/7 60/11 62/19
71/22 72/10 75/7 80/23
84/1 84/20 88/4 88/12
96/3 106/12 108/18 114/14
115/6 116/23 117/6 117/20
119/3 121/1
backdrop [1]  86/3
bad [3]  56/19 56/22 99/7
bankrupt [1]  66/22
bankruptcy [3]  42/4 66/21
66/23
bar [1]  94/18
barely [1]  28/12
barricade [1]  42/25
based [6]  13/21 20/1 29/3
29/5 46/20 96/8
basic [3]  6/4 51/7 82/20
basically [4]  52/13 52/15
109/17 109/18
basis [1]  53/24
be [149]
bear [2]  45/22 99/4
became [2]  77/8 121/8
because [94]  6/8 7/4 8/8
14/15 15/4 15/4 17/11
18/7 21/25 39/17 39/17

40/4 41/5 42/25 44/2
45/13 46/5 47/9 48/6
48/11 49/13 50/17 50/20
51/4 52/12 53/19 54/7
56/2 56/19 58/22 63/5
64/9 65/11 68/15 68/18
69/16 72/8 74/7 75/11
75/16 76/9 77/3 77/8 78/8
78/16 79/8 80/8 81/4 81/5
82/10 82/21 83/11 83/15
85/2 85/5 85/6 85/9 85/12
85/13 87/21 89/16 90/13
90/20 90/25 91/10 91/21
93/17 94/16 95/6 96/9
97/21 97/23 98/1 98/3
98/3 98/6 100/5 100/25
102/1 102/16 103/18
104/19 104/23 104/23
106/8 107/9 108/16 116/6
116/7 116/8 116/17 116/19
117/14 118/13
becomes [1]  105/3
been [55]  10/3 10/10
14/14 15/7 19/4 22/22
25/16 25/17 25/20 25/21
26/2 26/3 26/4 26/5 26/6
29/3 29/22 31/4 39/3 42/6
42/7 44/17 52/25 55/9
56/2 58/23 64/10 64/11
68/4 75/21 75/23 78/6
79/21 79/22 87/9 87/10
87/14 88/21 88/22 89/11
92/8 92/12 93/8 104/3
104/9 104/15 106/19 107/3
112/24 118/2 118/6 118/14
119/22 121/18 121/24
before [25]  1/9 4/22 5/4
6/20 7/6 9/2 11/2 13/11
22/22 26/12 27/4 36/23
44/15 64/21 66/11 67/1
82/21 96/10 101/20 104/22
121/11 122/19
began [1]  96/6
begin [3]  9/2 48/9 94/8
beginning [4]  44/24 60/18
75/7 114/6
behalf [7]  3/3 5/2 8/1
73/17 93/9 93/13 101/10
behind [2]  16/24 106/10
being [15]  28/2 37/9 39/4
43/10 43/13 50/4 59/20
61/18 63/1 63/9 83/22
92/9 94/11 106/22 121/8
belabor [3]  86/1 89/16
109/6
believe [28]  5/4 12/10
19/18 22/21 27/7 36/1
39/21 40/4 40/7 40/21
42/19 42/22 45/4 48/6
49/12 68/15 73/20 82/10
92/13 94/14 94/24 95/4
95/16 99/11 101/5 111/23
114/24 117/22
bell [1]  7/9
below [2]  29/17 60/23
bench [1]  44/8
bends [1]  18/17
benefit [1]  17/7
besides [1]  39/22
best [4]  67/21 104/25

115/25 124/3
bestowed [1]  76/16
better [4]  63/10 98/1
119/1 123/6
between [8]  6/2 15/19
80/15 82/17 82/17 95/25
99/21 117/23
Beyonce [1]  56/21
beyond [3]  37/11 73/1
73/1
big [4]  14/15 81/15
106/12 107/8
bill [3]  57/25 93/24 94/8
billion [1]  64/20
bills [1]  92/2
bind [1]  73/21
bit [8]  21/12 36/22 42/16
56/25 73/3 77/19 81/17
103/4
bizarre [1]  44/23
blame [1]  115/13
Blanchard [2]  59/24 61/1
Blanchard's [1]  60/12
blanket [3]  84/19 113/8
121/15
blatant [1]  86/9
block [10]  24/12 58/10
60/17 61/6 61/12 83/10
83/11 83/15 83/16 104/21
blockade [2]  42/23 43/2
blocked [2]  25/18 39/5
blocking [3]  39/13 67/10
104/17
Blue [2]  78/18 79/1
Boarder [2]  36/12 37/15
body [1]  115/3
Boies [1]  1/14
boiler [1]  92/3
boils [1]  51/22
bold [2]  80/23 80/25
books [1]  87/8
booth [1]  17/4
border [8]  15/15 15/16
19/22 31/3 36/15 79/24
80/4 80/16
borrow [1]  32/5
both [26]  6/5 15/10 15/17
18/10 20/6 21/6 22/21
35/11 48/24 50/17 53/22
59/25 60/5 61/2 62/4 65/1
81/16 81/20 82/2 83/17
83/22 88/15 91/22 114/21
114/24 119/19
bottom [3]  42/25 61/13
66/12
bought [1]  117/14
bound [1]  45/7
branch [2]  88/1 89/25
brand [2]  25/4 64/25
breaking [1]  29/15
BRIAN [4]  1/19 4/7 7/25
27/22
bridge [262]
Bridge's [3]  10/14 14/24
66/20
bridges [26]  71/8 71/15
71/18 71/19 71/21 71/25
77/4 78/17 78/22 82/5
84/22 110/10 111/12
111/14 112/6 113/9 113/10
113/15 113/16 116/20

**B** Case 1:10-cv-00476-RMC   Document 164   Filed 06/13/14

bridges... [6]  117/21
 117/24 118/20 121/3 121/3
 121/4
brief [9]  27/25 45/21
 55/9 60/15 86/25 98/22
 101/19 102/8 114/7
briefer [1]  84/13
briefing [5]  63/17 63/23
 63/24 77/7 111/4
briefly [4]  10/12 27/15
 67/18 103/6
briefs [10]  5/18 46/1
 55/17 57/2 89/17 102/5
 106/18 107/2 118/19 121/8
broad [1]  106/2
brothers [1]  59/22
brought [1]  60/13
Buffalo [1]  121/2
build [110]  15/2 15/3
 15/4 15/6 15/12 17/11
 18/22 18/23 19/5 19/7
 20/24 21/2 21/25 22/10
 22/25 24/8 26/6 26/14
 26/14 27/2 29/21 29/22
 31/13 31/16 32/23 37/7
 38/12 38/13 38/14 39/17
 39/25 46/10 49/1 50/4
 52/2 52/22 56/6 57/5 57/9
 58/7 58/23 58/23 59/13
 59/16 65/7 65/21 65/22
 66/17 67/8 68/4 68/19
 68/23 69/6 69/9 69/14
 69/17 70/5 70/8 70/14
 70/16 70/20 71/5 71/7
 71/13 72/7 72/7 72/14
 73/6 73/7 73/12 74/6 74/8
 74/14 74/19 75/11 76/4
 76/5 76/8 76/13 76/15
 77/25 78/1 79/7 81/2
 81/24 81/24 82/5 82/5
 82/6 82/6 83/7 83/8 83/10
 83/17 83/22 96/10 97/11
 97/12 98/7 99/21 101/3
 107/10 107/17 107/17
 110/12 110/20 111/13
 112/11 115/21 117/9
builders [1]  75/17
building [5]  21/19 22/20
 70/1 81/6 121/17
builds [1]  19/6
built [23]  18/14 18/21
 21/2 22/2 22/3 25/17 28/2
 29/3 30/11 31/11 31/12
 31/15 31/20 39/4 71/16
 71/21 71/25 78/5 78/6
 78/7 79/4 81/23 104/2
bulk [1]  48/12
bullet [6]  14/17 14/18
 14/19 14/20 55/11 55/22
burdens [1]  5/13
business [10]  12/14 13/3
 13/5 17/7 19/1 19/3 20/1
 20/12 20/13 40/5
busy [1]  122/5
buy [4]  41/25 42/9 60/5
 108/8
buyer [1]  32/14
buying [1]  38/18

CA [1]  1/3
call [10]  4/18 8/15 8/19
 17/24 54/20 65/5 73/8
 75/9 82/3 122/3
called [5]  54/17 64/15
 70/24 109/12 113/23
calling [4]  54/19 64/7
 64/12 68/11
calls [1]  7/14
came [4]  20/3 33/12 64/9
 122/10
can [110]  4/19 7/2 7/6
 7/13 8/10 8/10 9/15 12/2
 13/13 14/25 15/18 15/19
 16/8 16/19 17/3 17/20
 19/24 20/12 21/9 21/19
 24/2 24/15 25/13 26/11
 29/3 29/21 37/2 37/19
 41/4 42/8 42/17 45/4
 46/24 51/16 51/24 52/8
 52/20 52/22 52/24 66/17
 67/6 67/14 67/18 67/23
 69/25 70/2 71/4 71/16
 71/25 72/23 73/14 73/20
 76/4 76/5 76/7 76/8 76/13
 77/10 77/15 83/7 83/8
 83/17 84/12 86/5 86/15
 89/24 90/24 93/12 94/21
 96/10 97/13 97/18 98/7
 101/25 102/2 103/10 105/1
 105/13 106/14 107/13
 107/16 107/20 110/16
 111/18 111/24 111/24
 112/3 112/4 112/16 115/6
 115/25 118/6 118/23
 118/24 119/3 119/4 119/6
 119/7 119/9 119/10 119/11
 119/12 119/23 121/1
 121/22 121/25 122/7
 122/24 123/2 123/6
can't [24]  32/25 45/15
 47/10 50/22 52/7 53/5
 58/1 61/2 72/24 74/3 77/3
 78/1 80/6 83/14 90/13
 92/11 96/24 97/12 97/14
 105/24 107/22 108/1 108/2
 115/12
CANADA [51]  1/6 4/3 5/2
 5/7 5/9 5/12 5/17 6/7 6/8
 6/10 6/15 6/17 6/19 6/20
 7/7 7/7 7/11 40/22 40/25
 44/18 44/20 45/3 45/3
 45/4 45/11 46/1 46/2 46/2
 47/10 47/17 47/20 59/24
 59/25 60/16 70/22 70/23
 71/1 73/8 79/25 80/15
 81/24 82/17 84/21 94/9
 94/17 94/21 99/22 108/5
 108/7 120/6 120/7
Canada's [4]  5/21 47/10
 47/11 47/20
Canadian [5]  15/16 17/4
 19/24 62/14 94/5
canceling [1]  67/8
candid [1]  106/19
cannot [9]  49/15 51/2
 52/18 72/10 73/14 86/19
 91/3 100/24 119/8
cap [1]  39/14

capabilities [1]  80/16
capacity [6]  19/17 19/19
 19/20 59/19 80/4 82/19
 21/10 21/13 21/14 22/1
capricious [1]  75/24
captures [1]  60/9
car [3]  12/12 14/23 17/21
care [2]  15/25 120/3
careful [3]  96/21 96/22
 111/12
carefully [1]  65/24
carrier [2]  16/21 26/1
carriers [1]  25/21
carries [2]  74/24 82/16
carrying [5]  15/23 15/23
 16/23 16/25 98/11
cars [1]  25/20
case [30]  5/18 5/20 5/23
 7/3 10/4 21/19 23/22 33/6
 40/14 42/22 55/8 62/8
 63/20 76/22 81/14 89/20
 90/12 93/8 96/17 97/17
 98/23 99/14 106/3 109/9
 110/23 117/3 118/17 121/6
 121/25 122/3
cases [7]  55/22 77/12
 105/3 106/1 110/22 121/21
 121/24
catch [1]  20/4
category [1]  65/10
cause [1]  26/9
causing [1]  43/12
Center [1]  1/23
CenTra [1]  1/17
central [1]  53/10
certain [1]  38/13
certainly [4]  5/15 6/24
 73/17 119/12
CERTIFICATE [1]  124/1
certify [2]  124/2 124/7
cetera [5]  46/7 81/2
 99/22 104/2 104/3
CFR [2]  110/17 113/23
CGAR [2]  35/12 35/22
chain [1]  91/6
chairman [1]  9/22
challenge [1]  75/23
challenged [1]  79/21
challenges [1]  93/9
challenging [2]  33/2 93/6
chances [1]  81/16
change [13]  13/21 14/7
 17/20 17/22 38/20 39/9
 39/11 57/23 105/5 105/17
 105/18 112/25 113/1
changed [4]  14/1 86/22
 113/2 113/4
changes [1]  105/14
channel [1]  21/24
channeling [1]  15/19
charge [1]  77/14
Charles [1]  55/20
chart [7]  11/13 11/25
 12/8 12/19 12/21 12/23
 14/2
charter [7]  52/22 110/6
 112/4 112/7 112/8 112/10
 112/12
chartered [1]  112/11
check [3]  8/5 77/3 115/6

**C** Case 1:10-cv-00476-RMC

88/25 90/16 102/5 115/14
Document 104 Filed 06/13/14
119/2 121/1

computer-aided [1] 2/6
Page 3 of 21

choice [2]  62/6 62/6
choose [1]  102/2
chronic [1]  31/4
chronological [1]  62/14
chronologically [1]  59/10
Circuit [1]  85/23
circumstance [1]  108/14
circumstances [2]  23/19
 108/13
citation [1]  109/11
cite [2]  52/24 106/18
cited [4]  5/18 5/20 67/3
 114/7
cites [2]  118/19 122/3
city [7]  42/20 42/23
 43/25 52/5 52/9 66/21
 116/7
civil [2]  4/2 80/1
claim [7]  49/25 54/3
 65/11 68/18 68/19 106/3
 106/11
clarification [1]  61/15
class [1]  65/5
classic [1]  111/7
clause [6]  51/4 51/11
 51/19 51/21 53/23 105/8
cleanest [1]  85/19
clear [25]  5/19 6/9 7/9
 48/15 54/13 57/2 64/1
 64/3 65/6 71/15 72/19
 72/20 73/13 76/22 82/25
 83/13 108/21 110/25 113/7
 116/19 116/21 117/4
 119/20 119/22 119/22
clearance [1]  109/4
clearing [1]  15/18
clearly [6]  74/4 84/15
 102/10 102/15 120/22
 120/25
Clerk [2]  10/5 122/13
clients [1]  69/12
close [4]  15/13 17/17
 17/18 33/10
closures [3]  15/9 25/20
 26/3
coast [66]  6/4 6/12 26/8
 35/11 37/16 37/16 38/3
 38/5 38/10 38/16 39/8
 44/3 49/16 49/24 50/1
 50/22 50/25 51/2 51/8
 51/12 51/16 51/20 51/23
 52/10 52/19 53/16 53/19
 54/4 54/6 59/1 59/18
 62/21 62/23 63/3 63/7
 63/10 67/2 72/19 90/13
 90/22 91/3 96/1 96/6
 96/14 96/19 96/23 97/14
 97/18 98/14 98/25 102/23
 103/10 103/21 104/4 104/6
 104/15 106/20 107/2 109/1
 109/3 109/8 115/24 116/12
 116/17 118/1 120/14
Code [1]  48/23
coin [1]  31/22
colleagues [3]  43/17
 60/19 89/24
collective [1]  109/2
COLLINS [12]  1/19 3/5 4/7
 8/1 26/22 27/22 48/18
COLLYER [3]  1/9 8/17
 14/25
COLUMBIA [2]  1/1 2/3
combine [1]  115/15
combined [1]  10/15
come [12]  4/24 8/20 43/25
 62/22 67/24 71/4 76/5
 84/20 112/22 118/11
 118/23 120/3
comes [6]  46/1 54/14
 68/17 73/7 91/6 107/12
coming [3]  16/22 44/11
 120/19
comment [2]  47/8 109/3
comments [1]  102/23
commerce [4]  42/23 43/3
 82/17 105/8
commercial [1]  12/24
commission [2]  45/15
 45/21
commissioned [2]  36/12
 37/15
commitment [1]  65/3
committed [1]  104/17
common [1]  22/3
compact [2]  84/17 100/11
companies [3]  25/19 50/24
 121/14
company [36]  1/3 4/3 8/18
 9/21 9/25 15/2 20/22
 21/10 25/8 25/14 27/1
 27/5 32/5 33/7 44/15
 45/23 46/10 48/22 52/1
 53/16 55/14 59/14 59/17
 61/24 62/5 62/24 63/2
 70/20 70/21 71/11 74/8
 81/1 84/12 98/8 107/21
 121/16
company's [4]  18/21 33/2
 51/1 62/11
compare [1]  53/5
compared [1]  13/24
compel [2]  7/6 105/13
compelled [2]  51/12 54/4
compelling [1]  63/20
compete [5]  77/15 78/18
 78/18 78/19 78/22
competing [3]  78/16 79/2
 105/4
competition [3]  78/15
 106/6 107/14
competitor [9]  10/18 51/6
 67/9 67/9 105/16 105/25
 106/1 106/7 106/8
competitors [1]  66/21
complaint [3]  5/23 6/4
 100/21
complete [1]  107/3
completed [2]  106/16
 106/21
completely [7]  15/13 22/5
 34/24 57/5 100/20 103/9
 103/13
compliance [1]  120/14
complicated [1]  59/12
components [1]  13/17
compound [3]  12/5 12/6
 13/2
computer [1]  2/6
computer-aided [1]  2/6
concede [2]  58/9 58/10
conceded [1]  56/2
concept [3]  45/25 96/4
 111/1
concern [5]  24/4 60/22
 61/5 61/15 61/15
concerned [1]  81/20
concerns [2]  33/19 34/19
concession [1]  55/23
conclude [1]  46/8
conclusion [1]  24/7
conclusions [2]  20/25
 21/1
condemn [3]  98/4 107/16
 107/20
condition [4]  84/24 96/14
 96/16 96/17
conditioned [3]  97/15
 97/19 97/20
conditions [3]  32/16
 38/20 88/6
conducted [1]  59/22
confirm [1]  61/9
conflict [1]  120/12
congestion [1]  80/18
Congress [33]  48/24 52/22
 56/2 57/9 57/10 57/21
 57/24 57/25 70/10 70/20
 71/17 71/23 73/2 73/2
 74/11 74/24 75/8 75/8
 76/12 76/18 77/3 77/10
 77/10 77/12 78/3 84/16
 84/19 85/3 86/4 92/19
 99/20 103/25 116/11
congressional [29]  68/12
 68/24 69/13 70/5 70/7
 70/13 70/16 72/13 72/14
 72/16 72/18 72/19 72/20
 74/19 76/3 76/7 76/9
 76/11 76/23 76/24 77/2
 86/16 104/7 104/8 110/12
 111/6 115/20 115/23
 117/13
connect [1]  101/22
connected [1]  98/13
connection [1]  95/25
connectivity [1]  80/13
connects [1]  104/13
connote [2]  70/14 70/15
consent [11]  68/16 68/24
 70/10 76/12 76/19 76/24
 77/2 77/10 77/16 84/16
 84/19
consents [1]  86/4
conservative [2]  12/13
 29/7
consider [2]  7/8 7/19
consideration [1]  62/15
considered [5]  14/5 53/22
 61/18 63/1 121/19
considering [1]  96/15
consistent [2]  11/12
 47/18
consistently [1]  24/14
Constitution [6]  2/4 85/3
 91/23 93/18 102/6 102/13
constitutional [9]  84/15
 85/8 85/16 85/17 85/18
 86/3 102/6 102/11 102/16
construct [10]  48/23 54/9

construct... [8]  54/14
 68/13 69/5 72/3 81/2
 88/19 88/21 104/1
constructed [1]  14/22
construction [8]  20/6
 32/6 59/14 63/16 65/6
 68/2 72/24 90/3
construed [1]  56/3
contaminated [2]  116/2
 116/4
contemplated [1]  102/17
contemporaneous [1]  46/7
contemporary [2]  71/19
 71/20
CONTENTS [1]  3/1
contest [1]  90/24
context [1]  7/4
contingent [1]  89/2
continue [3]  25/6 31/21
 94/15
continued [1]  2/1
continuing [1]  13/25
continuously [1]  31/18
contract [1]  87/6
contradiction [4]  99/6
 99/9 99/9 100/4
contrary [3]  5/20 66/10
 92/25
contrast [1]  107/1
control [2]  77/5 121/5
controlled [2]  63/17
 117/9
controlling [1]  61/11
conundrum [1]  52/4
cooperating [1]  109/2
Cooperation [3]  91/23
 102/19 102/25
copies [2]  10/5 122/6
copy [1]  14/14
core [1]  50/3
corporation [2]  110/6
 112/7
corporations [1]  45/10
Corps [1]  39/20
correct [8]  28/4 32/6
 32/24 37/23 38/15 43/8
 86/24 124/2
correctly [1]  55/14
corridors [1]  82/16
cost [3]  22/7 32/14 64/18
costs [2]  21/11 94/13
could [47]  4/21 8/20 9/12
 9/20 10/12 11/20 14/9
 14/13 14/17 16/1 18/12
 20/20 24/20 24/24 26/24
 31/5 33/18 33/22 34/10
 35/3 36/1 38/24 42/2
 42/16 44/22 51/13 53/22
 57/4 57/4 71/21 75/9
 75/14 82/23 83/3 83/9
 87/25 89/22 96/19 98/4
 101/14 101/14 101/24
 101/24 107/21 108/13
 113/4 114/4
couldn't [3]  59/6 71/8
 117/14
counsel [4]  10/6 66/10
 68/8 124/7
Count [3]  54/5 77/7 96/22

country's [1]  4/11
counts [1]  100/21
couple [2]  51/8 59/17
course [11]  4/23 6/16
 19/5 44/2 62/6 63/12 64/6
 65/1 79/13 96/9 106/13
court [46]  1/1 2/2 2/2
 2/3 4/22 5/9 5/11 5/16
 7/19 9/20 10/24 16/19
 21/9 25/12 25/13 25/14
 33/6 34/20 45/11 48/18
 49/6 55/12 55/14 60/14
 66/19 67/14 68/17 76/21
 83/19 84/2 84/18 85/1
 85/23 86/2 90/5 93/5
 103/9 104/12 104/25 105/3
 105/21 106/19 107/1
 118/17 122/4 124/5
Court's [1]  55/11
courts [1]  90/4
crater [1]  31/5
create [3]  64/25 109/13
 120/11
created [2]  31/6 55/15
credit [1]  32/15
critical [3]  6/21 7/10
 7/16
critically [1]  45/8 82/18
cross [3]  3/2 27/14 27/18
cross-examine [1]  27/14
crossing [46]  11/22 14/12
 19/21 50/18 59/14 60/8
 60/25 61/10 61/11 61/16
 61/21 61/25 62/9 63/8
 63/17 63/19 80/4 80/9
 80/17 82/3 87/17 89/19
 90/9 90/10 90/11 90/25
 91/7 91/10 91/13 91/18
 91/22 92/5 92/13 94/2
 94/4 94/7 95/12 95/14
 95/19 99/15 100/9 100/11
 101/10 101/25 103/8
 111/20
crossings [5]  10/18 19/22
 60/5 66/7 81/21
CRYSTAL [2]  2/2 124/12
CTC [1]  55/6
current [2]  21/18 118/1
currently [1]  66/12 88/19
customers [4]  15/11 15/14
 25/19 26/2
customs [8]  15/16 15/17
 15/19 16/24 17/1 17/4
 19/24 37/8
cut [1]  30/23
cute [1]  64/10
cutting [1]  33/20

D

D-I-B-C [1]  54/23
D-R-I-C [1]  18/3
D.C [3]  1/4 44/8 85/23
data [4]  11/12 13/8 13/24
 66/13
date [12]  55/3 55/4 55/5
 55/18 55/19 59/14 77/20
 88/10 94/23 95/1 124/5

day [3]  60/18 61/12 122/3
days [1]  62/20
DC [3]  1/15 1/20 2/4
deal [2]  9/24 17/5
decade [2]  31/4 34/13
December [3]  14/12 60/12
 60/16
decide [3]  73/10 80/7
 118/17
decided [3]  7/11 26/11
 75/10
decision [15]  5/9 9/25
 13/20 38/16 39/8 57/20
 57/21 57/23 58/21 62/9
 62/13 62/15 73/21 75/20
 75/22
decisions [3]  38/11 45/5
 105/21
declaratory [3]  5/8 6/14
 7/20
declared [1]  31/19
declares [1]  103/9
decline [5]  10/21 11/4
 31/4 66/24 66/25
declined [1]  13/22
declines [2]  18/25 64/22
declining [1]  15/1
deeds [3]  27/1 27/4 27/7
defend [1]  52/18
defendants [7]  1/7 1/19
 6/14 6/15 7/21 8/1 27/23
defense [3]  4/7 80/1
 105/11
defiance [1]  86/9
deficiency [2]  92/21 93/3
definitely [1]  91/7
definition [2]  112/8
 116/14
definitively [1]  66/13
defund [1]  92/20
delayed [2]  26/4 39/3
delaying [1]  67/6
delegated [1]  104/4
delegates [2]  84/22 85/2
delegation [1]  84/24
deliver [1]  17/3
Delray [1]  89/1
demand [4]  11/23 43/5
 43/6 80/4
demonstrate [1]  58/17
demonstrates [1]  21/4
demonstration [1]  65/15
demonstrative [8]  9/2
 10/24 13/7 16/1 16/4
 84/14 122/12 122/16
department [67]  1/19 14/5
 14/6 48/25 49/9 49/16
 49/23 49/25 50/16 50/19
 50/20 50/22 56/5 56/10
 56/12 58/16 58/20 60/22
 62/4 62/5 64/7 65/10
 69/15 70/7 72/6 73/4 74/7
 75/15 75/15 75/15 84/10
 85/2 86/7 87/23 88/5 88/6
 88/8 88/12 88/14 88/15
 89/8 90/12 90/14 90/21
 91/7 91/9 95/25 96/9
 96/14 96/18 96/20 97/4
 98/13 98/23 99/3 99/5

D

department... [11] 101/2 103/14 103/17 104/9 111/19 116/17 116/24 117/7 120/19 120/22 121/4
Department's [8] 49/14 58/21 85/13 86/20 91/2 95/3 99/8 103/7
depending [1] 18/18
deposition [2] 62/8 62/10
depositions [1] 109/9
deputy [2] 43/24 122/5
description [1] 94/1
desire [2] 32/25 57/24
Despite [1] 29/23
detail [1] 66/13
determination [2] 5/16 97/23
determine [2] 66/13 90/4
determining [1] 32/20
DETROIT [30] 1/3 4/2 8/18 9/20 11/22 14/12 15/1 18/21 36/5 42/1 42/1 42/3 43/25 44/3 52/5 52/9 54/16 66/14 66/20 66/22 73/9 76/15 76/16 82/3 82/4 89/1 94/2 112/19 116/7 121/22
devastating [2] 60/2 60/14
DIBC [11] 54/20 54/21 54/23 54/24 61/4 61/11 68/12 75/8 106/20 112/10 112/17
did [31] 8/24 13/20 14/4 14/6 24/12 25/8 26/21 27/13 33/16 39/12 39/12 41/16 58/15 67/24 82/23 82/24 87/7 90/1 96/18 98/23 102/3 102/4 103/17 103/24 114/23 120/5 120/11 120/22 121/4 121/7 121/11
didn't [21] 8/5 22/6 36/7 38/5 38/25 40/14 40/17 41/9 41/25 44/18 47/22 52/5 54/22 71/25 73/16 82/21 98/21 115/1 118/13 121/3 122/10
difference [5] 45/13 46/9 50/8 78/19 83/16
different [12] 7/14 26/2 34/3 41/22 51/9 51/17 51/23 54/19 78/4 78/21 100/21 110/25
difficult [2] 42/6 114/10
direct [10] 3/2 9/10 24/4 28/1 82/14 83/15 85/21 85/22 91/10 99/9
directed [1] 63/25
direction [4] 11/16 13/6 16/13 16/17
directly [3] 55/11 58/5 67/5
disagree [8] 31/23 49/19 49/20 51/14 77/20 87/3 109/18 109/19
disagreement [1] 47/21
disagrees [2] 47/20 49/17
discovered [1] 122/10
discovery [1] 59/3
discretion [1] 57/15
discriminatory [3] 51/3 83/14 107/9
discuss [2] 58/14 66/8
discussion [6] 22/17 65/25 66/1 66/2 66/5 66/6
dismiss [3] 5/10 40/13 100/14
dismissed [1] 93/8
dispositive [1] 5/15
dispute [7] 7/17 55/5 89/5 89/5 103/22 113/5 115/9
disrespect [1] 24/18
disrespectful [1] 6/18
disruption [1] 81/4
disruptions [1] 80/18
distance [1] 71/6
distinct [3] 48/15 99/18 100/20
distinction [3] 51/22 71/12 101/16
distinguish [1] 34/12
DISTRICT [9] 1/1 1/1 1/10 2/3 2/3 33/4 79/21 79/22 124/5
divested [1] 77/7
division [1] 8/5
do [102] 6/4 6/18 6/24 7/3 7/7 10/19 12/14 12/21 13/9 13/10 13/19 17/14 18/13 18/15 19/13 19/15 20/15 21/16 21/24 22/1 22/5 22/16 22/18 26/13 27/15 29/3 29/18 29/25 30/4 30/24 31/25 32/25 33/24 35/24 35/25 37/2 37/20 38/11 39/15 39/15 40/3 40/4 40/5 40/18 40/19 41/5 43/5 45/21 46/4 50/21 52/7 52/8 52/8 52/10 52/17 54/22 56/6 58/1 59/1 59/9 59/16 63/24 64/18 67/21 67/23 68/24 69/3 69/19 69/25 70/9 70/16 71/15 71/25 72/23 73/14 74/6 74/7 74/10 76/13 77/13 79/9 82/13 86/14 92/23 95/6 96/24 97/1 100/1 101/12 101/25 103/19 105/13 110/2 114/13 114/18 114/18 119/1 119/2 119/6 119/23 123/2 123/6
docket [5] 1/3 102/9 102/9 102/24 102/24
doctrine [6] 55/20 85/16 90/6 105/12 105/13 106/10
document [22] 12/18 13/11 14/13 14/15 26/17 26/20 34/1 35/24 36/21 56/4 62/7 62/12 62/13 64/2 64/2 65/3 65/10 88/10 99/15 102/9 102/25 112/21
documents [14] 10/3 10/12 10/16 10/19 18/7 33/14 34/12 49/6 56/7 58/8 59/2 63/15 73/19 108/25
does [34] 11/4 11/6 12/23 16/13 17/10 21/16 25/14 42/19 42/20 45/14 46/9 47/15 57/15 65/12 66/12 69/6 69/9 69/13 70/14 70/15 72/13 72/15 74/9 85/4 86/6 86/11 88/19 98/24 104/8 106/3 108/16 109/13 109/24 111/22
doesn't [35] 17/1 29/17 31/1 31/1 32/13 37/22 45/4 45/13 45/22 46/18 47/17 47/24 54/20 55/2 55/4 56/24 71/3 71/4 72/11 72/20 74/18 74/19 79/11 81/11 92/19 100/2 100/9 102/16 102/21 105/8 105/11 105/12 108/7 109/14 117/25
doing [8] 49/2 53/5 64/17 91/4 95/7 96/8 96/17 119/20
dollar [1] 25/5
dollars [1] 21/14
domain [7] 108/1 108/3 108/7 108/10 108/12 121/15 121/18
domestic [4] 113/9 113/10 113/15 117/20
dominion [2] 6/20 70/22
don't [118] 4/18 4/24 6/17 6/23 6/24 7/3 7/12 9/8 13/5 15/3 17/10 18/8 23/6 24/3 24/18 24/19 24/21 27/23 29/15 34/10 36/22 37/18 39/2 39/19 39/21 39/22 40/2 40/7 40/21 42/12 42/15 42/22 43/3 43/13 43/16 44/16 45/1 47/25 48/3 49/17 50/8 51/13 52/12 54/23 56/1 56/9 56/13 56/23 59/7 59/16 60/6 63/13 64/8 64/21 65/23 66/8 66/11 67/5 68/15 69/16 71/5 72/4 72/11 73/4 73/11 73/20 74/5 75/10 75/12 75/17 75/17 77/20 78/2 82/5 82/6 82/6 87/18 87/23 89/23 91/9 92/13 94/25 95/10 95/15 98/8 99/11 101/25 102/2 105/9 105/10 106/2 106/7 107/11 107/11 108/2 108/12 108/14 108/22 109/12 109/21 110/3 110/10 111/12 111/13 114/16 114/21 115/7 115/9 115/12 115/16 116/7 117/2 117/11 117/12 118/13 119/4 120/6 122/23
done [9] 8/10 8/25 23/17 41/1 51/16 52/19 75/6 75/13 87/14
double [1] 115/6
doubt [6] 85/17 111/16 111/22 111/23 112/1 112/2
Doug [2] 4/7 5/1
DOUGLAS [1] 1/21
down [12] 15/13 17/22 22/1 24/9 29/24 51/22 53/14 67/13 69/23 69/25 72/8 118/21

**D** Case 1:10-cv-00476-RMC

**DOZEMAN [5]** 1/21 4/7 5/2 5/24 44/14
**draft [1]** 115/23
**dramatic [1]** 10/21
**DRIC [53]** 11/8 13/17 13/20 14/6 14/7 17/24 17/24 18/2 18/5 18/9 18/14 18/20 19/14 20/3 20/6 20/15 21/3 21/6 21/20 25/2 30/16 31/12 31/15 31/19 31/21 33/3 51/3 53/16 54/22 59/15 59/22 65/17 68/2 78/5 79/6 79/7 79/9 79/20 81/3 81/5 82/7 82/7 87/7 87/13 87/16 88/5 88/19 88/21 88/23 89/1 89/5 96/7 109/2
**DRIC's [2]** 11/10 22/10
**driving [1]** 17/22
**during [2]** 15/22 59/15

**E**

**e-mail [9]** 59/11 60/12 60/13 60/18 60/18 61/12 62/21 64/14 64/21
**e-mails [3]** 62/14 73/22 109/19
**EA [1]** 61/7
**each [14]** 8/6 10/15 13/23 16/13 16/17 17/6 19/24 21/10 48/16 48/19 67/20 87/5 108/25 116/17
**earlier [5]** 21/1 61/2 66/25 86/6 112/21
**early [1]** 60/18
**earnest [1]** 15/6
**ears [1]** 56/22
**easement [6]** 52/11 53/1 108/20 112/18 116/1 118/5
**easements [1]** 121/11
**easier [2]** 17/21 88/3
**easiest [1]** 104/24
**Eastern [3]** 33/4 79/21 79/22
**economic [4]** 30/18 32/10 32/11 32/20
**economically [3]** 20/6 28/25 82/10
**economics [1]** 20/2
**economies [1]** 79/24
**effect [9]** 6/8 32/9 32/11 32/15 32/16 38/21 45/3 56/4 93/2
**effected [1]** 81/16
**effects [1]** 34/19
**efficiencies [1]** 37/9
**efficiency [2]** 15/15 15/24
**efficient [1]** 79/23
**effort [1]** 57/2
**efforts [1]** 94/3
**either [7]** 7/6 14/6 41/13 66/14 82/1 115/8 115/9
**elephant [2]** 64/16 119/16
**Elgaaly [1]** 109/8
**eliminate [1]** 62/15
**eliminated [1]** 62/22
**elimination [1]** 62/19

**else [10]** 21/4 33/12 33/18 35/16 40/17 97/13/14
**Elsa [1]** 1/6 97/9 97/13/14
**83/23 98/2 108/20 120/2**
**emanate [1]** 76/25
**emanating [1]** 112/9
**emphasize [2]** 84/20 112/24
**employed [1]** 124/8
**empty [1]** 15/23
**enable [1]** 76/17
**enacted [3]** 47/12 87/12 88/20
**enactment [1]** 93/24
**end [10]** 13/25 14/2 23/16 26/10 35/5 40/22 67/2 76/23 77/20 95/16
**ends [1]** 15/17
**enforce [1]** 108/23
**enforced [1]** 118/6
**enforcing [1]** 108/19
**Engineers [1]** 39/20
**enhance [1]** 80/13
**enhancement [2]** 35/16 37/6
**enjoin [1]** 91/4
**enlarge [1]** 56/11
**enough [9]** 19/3 19/3 64/16 78/8 78/9 79/2 79/7 82/3 106/19
**ensure [1]** 63/19
**enter [7]** 84/16 84/21 91/22 93/18 101/24 102/17 106/5
**entered [5]** 86/8 86/17 94/7 100/10 101/10
**entering [3]** 87/6 87/11 92/5
**enterprise [2]** 105/5 105/17
**enters [2]** 86/4 107/15
**entire [5]** 31/2 31/3 32/21 61/7 69/1
**entirely [3]** 41/22 77/8 78/3
**entities [2]** 70/15 71/4
**entitle [1]** 49/10
**entitled [2]** 11/22 14/11
**entity [10]** 51/25 52/1 70/21 105/3 105/5 105/7 105/15 105/18 105/20 105/23
**environment [2]** 37/17 38/3
**environmental [9]** 14/11 20/10 33/15 33/20 33/21 34/19 37/23 57/7 62/17
**EPA [2]** 33/19 37/17
**episode [1]** 104/14
**equal [9]** 51/4 51/11 51/18 51/21 53/23 79/1 104/23 105/1 106/10
**equity [1]** 32/7
**especially [1]** 22/14
**Esquire [5]** 1/13 1/13 1/14 1/16 1/19 1/21 1/22
**essentially [1]** 80/9
**established [1]** 105/2
**estate [1]** 55/13
**estimate [1]** 29/7
**estimated [1]** 66/6
**et [7]** 1/6 4/3 46/7 81/2

**99/22 104/2 104/2**
**evaluate [1]** 13/4
**even [42]** 5/17 6/9 6/9 17/8 19/13 20/3 24/20 30/15 35/3 44/7 44/17 46/5 46/7 46/8 57/2 58/17 60/14 62/16 63/13 64/21 65/19 65/20 65/23 66/6 66/16 66/18 66/18 72/7 81/21 86/13 86/15 87/16 89/21 99/14 102/3 103/7 104/10 107/13 108/13 111/19 111/20 121/6
**event [3]** 80/17 81/15 85/20
**eventually [2]** 77/6 77/7
**ever [5]** 22/11 23/2 57/4 59/7 64/3
**every [12]** 5/22 9/24 21/8 25/18 29/24 53/1 92/3 94/14 94/15 116/11 118/5 119/15
**everybody [11]** 4/9 7/2 7/14 26/13 44/24 75/6 82/2 84/7 120/2 122/9 123/7
**everyone [3]** 23/17 57/11 57/21
**everyone's [1]** 14/14
**everything [5]** 33/17 36/16 47/14 104/15 111/24
**evidence [13]** 49/5 51/9 58/4 58/8 58/25 59/8 63/6 64/14 65/4 65/5 65/8 67/1 88/17
**evident [2]** 44/7 44/8
**evidentiary [1]** 23/24
**exact [9]** 11/14 11/16 13/6 17/16 40/5 83/7 83/8 89/23 94/25
**exactly [11]** 28/20 47/24 54/10 76/1 92/14 98/18 100/18 101/16 113/18 114/17 120/10
**exaggerating [1]** 77/24
**EXAMINATION [2]** 9/10 27/18
**examine [1]** 27/14
**examining [1]** 37/18
**example [6]** 52/24 55/24 57/15 81/12 117/12 117/25
**excellent [1]** 119/20
**except [6]** 6/11 13/8 74/20 78/24 92/18 114/10
**exclusive [4]** 45/25 45/25 71/24 77/23
**excuse [6]** 9/15 42/3 43/16 43/16 60/11 106/22
**excused [1]** 44/12
**executed [1]** 94/4
**executive [16]** 9/25 57/13 74/20 74/25 75/2 75/10 75/14 75/20 76/6 76/11 86/8 88/1 89/25 92/12 100/15 101/11
**exempt [1]** 105/9
**exercise [5]** 49/3 54/12 65/6 67/4 81/3
**exhausted [1]** 122/4
**exhibit [24]** 10/24 11/20 11/20 11/24 12/2 12/11

**E** Case 1:10-cv-00476-RMC

exhibit... [18]   12/19
12/19 12/20 14/9 14/9
20/9 20/10 20/14 20/20
26/19 26/20 26/24 26/25
35/7 35/9 35/10 35/12
122/16
exhibits [7]   9/3 10/4
10/11 11/17 11/18 28/15
122/12
existed [2]   46/9 110/24
existing [17]   15/13 15/13
16/15 19/16 19/18 19/19
21/15 21/23 28/5 28/10
28/13 28/16 29/4 37/7
37/11 87/10 109/10
exists [2]   58/18 94/19
expanded [2]   60/25 73/3
expansive [1]   68/18
expected [1]   36/6
expects [1]   32/5
expeditiously [1]   118/17
expending [1]   92/6
expenditure [1]   21/6
expenditures [3]   21/13
21/15 22/1
expense [1]   21/13
expenses [1]   19/2
expensive [4]   15/10 43/18
43/21 64/24
experience [1]   13/3
expert [1]   20/22
explain [12]   7/2 14/18
16/2 16/8 16/19 18/8
24/15 24/24 25/13 42/16
44/14 121/22
explained [3]   34/23
112/15 112/16
explicitly [2]   85/3 94/6
expressed [2]   60/22 61/5
expressing [1]   61/14
expressly [2]   55/13 94/8
extra [1]   55/20
extraordinary [1]   20/4
extremely [2]   21/22 47/4

**F**

face [5]   64/1 73/13
102/19 104/10 107/8
faced [1]   15/8
facilities [1]   66/2
facility [1]   19/24
fact [18]   13/21 16/25
16/25 29/23 31/18 32/23
40/13 40/25 45/7 48/17
54/2 56/10 77/6 89/9
110/21 112/16 114/18
121/22
factor [2]   32/19 32/22
facts [2]   55/15 104/20
failed [1]   24/23
failure [3]   49/8 58/19
58/20
fair [1]   28/19
fairly [1]   90/19
familiar [7]   11/7 11/10
33/2 34/1 39/18 90/6
92/22
fantastic [1]   11/15
fantastically [1]   12/16

fantasy [1]   30/22
far [3]   19/17 81/20 81/24
90/19 98/11
fast [5]   15/22 16/20
16/23 16/25 114/11
faster [1]   17/1
fatally [1]   61/6
father [1]   22/18
favor [2]   105/25 106/7
favoring [1]   51/5
feasibility [1]   59/21
February [1]   59/11
federal [27]   22/14 22/17
22/19 22/20 23/18 25/10
27/22 50/19 52/20 52/21
70/21 73/9 88/1 90/6 97/3
97/3 97/7 103/18 105/13
110/4 110/15 110/23 111/2
111/4 111/7 112/14 114/6
Federalism [1]   105/12
feel [2]   7/3 45/21
fellow [1]   25/23
felt [1]   7/1
fence [1]   116/6
Ferry [1]   78/19
few [5]   17/2 27/25 82/1
83/20 112/22
fewer [2]   114/14 114/15
FHW [1]   59/11
FHWA [13]   13/19 61/2 62/8
62/21 63/6 63/15 63/21
63/23 64/2 64/15 88/24
89/7 109/3
Fifth [1]   1/23
fight [2]   23/16 23/17
fighting [1]   41/24
figure [3]   8/10 75/25
92/17
figured [2]   54/21 118/16
figures [1]   20/2
figuring [1]   116/16
file [6]   6/23 33/14 38/25
49/6 59/3 95/17
filed [7]   5/22 33/3 35/12
38/25 59/3 66/21 118/15
files [2]   58/9 65/8
fill [1]   31/5
final [5]   13/19 14/11
20/10 26/12 84/23
Finally [1]   103/6
finance [1]   32/5
financial [6]   7/16 19/9
19/10 20/22 21/19 66/13
financially [4]   15/10
21/18 31/17 124/9
financing [3]   28/11 32/9
64/23
find [5]   45/2 59/19 103/2
116/25 117/7
fine [6]   7/12 7/22 9/5
47/6 61/18 61/20
fingers [1]   122/5
finish [1]   83/21
finishes [3]   38/10 38/16
39/8
firm [1]   59/14
first [34]   4/19 4/22 5/6
5/17 7/8 8/9 10/14 34/5
38/25 46/12 48/20 48/21
49/11 50/3 54/9 55/11
55/22 58/7 60/18 61/6

62/2 62/3 64/9 67/13 68/7
81/22 83/18 88/13 91/10
96/18 98/24 103/13 103/23
112/16
fiscal [2]   94/12 94/13
five [3]   62/20 64/20
120/3
fix [1]   63/6
fixing [1]   69/23
flat [2]   28/24 29/2
flaw [1]   61/6
Flexner [1]   1/14
flip [1]   62/19
flow [2]   15/19 80/13
flows [1]   36/16
flying [1]   119/5
focus [3]   51/16 80/23
109/1
FOIA [2]   59/4 59/6
folks [1]   22/14
footnote [2]   102/22
102/25
forbidden [1]   100/25
fore [2]   62/22 99/7
fore-bad [1]   99/7
Forecast [1]   11/23
foregoing [1]   124/2
foreign [3]   47/11 84/17
100/11
forever [2]   76/17 77/21
forget [5]   43/14 72/5
83/8 100/18 115/21
forgive [1]   63/4
forgot [1]   122/12
forgotten [1]   119/16
form [1]   116/11
formulation [1]   18/7
forth [3]   44/3 44/4 62/20
forward [12]   5/8 40/8
50/1 51/14 67/24 87/16
89/6 90/13 91/3 94/12
94/14 94/15
found [7]   33/6 34/20
69/20 93/7 102/23 103/23
121/7
foundation [3]   25/22
25/23 85/6
four [12]   10/3 16/16
19/16 24/9 26/4 34/3
36/17 48/14 48/20 53/18
58/4 64/19
fourth [1]   58/25
franchise [18]   45/24
45/25 46/2 48/6 48/7
48/22 49/2 49/13 50/6
50/6 50/7 50/9 51/10
53/24 55/16 68/8 71/25
77/23
frank [2]   6/6 47/16
Fred [2]   60/21 61/14
free [3]   57/18 63/2 120/2
Friday [1]   60/20
front [2]   71/1 121/4
frustrating [1]   11/23
FSIA [4]   5/10 5/11 5/21
5/22
full [2]   52/1 121/5
fully [1]   53/8
fundamental [3]   57/8
105/20 108/16
fundamentally [2]   102/4

**F**
fundamentally... [1]
  103/20
funding [1]  92/4
funds [3]  92/6 94/19 95/8
funneling [1]  16/20
further [6]  51/9 74/11
  81/13 81/17 124/7 124/9
future [8]  28/18 30/1
  30/9 37/10 78/7 80/3
  80/12 82/15

**G**
gas [1]  116/4
gateway [5]  24/16 24/20
  25/3 41/8 41/10
gave [3]  70/20 72/2
  122/19
gee [1]  72/11
general [8]  102/8 102/10
  102/12 102/12 102/15
  114/1 115/5 116/22
generally [2]  57/6 105/23
generate [1]  19/1
gentlemen [1]  23/18
geographic [1]  71/16
geography [1]  19/8
get [60]  4/19 4/22 4/24
  5/4 5/21 8/5 8/10 17/1
  17/10 25/17 26/11 30/7
  31/12 38/24 39/1 39/5
  40/14 41/5 42/20 44/1
  46/20 50/10 51/20 52/5
  52/11 56/7 56/13 57/10
  57/25 63/10 66/9 67/1
  71/8 71/12 80/25 88/9
  88/13 94/22 97/3 97/4
  97/10 98/7 104/4 104/7
  104/22 105/9 105/10 106/7
  106/14 107/16 108/14
  110/3 114/17 116/8 117/14
  118/6 119/3 119/15 120/16
  121/19
gets [2]  78/5 81/22
getting [2]  22/25 70/11
give [15]  51/8 51/12 54/4
  83/19 84/19 86/16 88/3
  103/10 109/11 110/22
  111/18 114/17 121/22
  122/2 122/7
given [8]  9/8 42/2 42/4
  53/16 70/10 118/18 118/19
  118/19
gives [2]  45/23 76/12
giving [3]  70/11 107/4
  116/11
glad [2]  82/21 96/3
glasses [1]  74/3
go [55]  7/11 16/4 17/23
  22/1 22/2 22/4 23/24
  25/25 26/18 27/16 27/17
  33/23 35/1 41/1 41/25
  42/4 43/13 46/3 50/14
  51/13 52/3 52/5 52/12
  53/9 54/8 57/23 57/25
  59/6 59/9 60/11 67/14
  72/10 82/23 83/20 87/25
  89/5 90/13 91/9 94/12
  96/3 97/4 101/14 103/10
  106/12 106/13 108/18
  109/6 109/20 112/3 112/16
  116/4 116/8 116/23 117/6
  120/4
goes [5]  6/14 20/13 32/19
  47/13 105/15
Goggle [1]  24/21
going [71]  7/3 7/19 8/6
  8/9 8/24 9/5 9/6 17/24
  22/9 23/12 30/4 30/7 30/8
  30/24 32/9 33/13 35/1
  35/5 38/7 38/7 39/9 41/10
  41/12 44/3 44/4 45/14
  46/3 46/15 46/16 47/22
  50/1 51/18 59/12 61/3
  61/24 64/18 64/18 64/22
  64/23 68/1 75/16 76/5
  77/4 79/13 79/17 79/18
  81/16 83/15 84/1 87/13
  87/16 87/22 94/11 94/14
  94/15 94/20 96/21 98/7
  103/5 104/6 105/24 107/6
  108/5 108/6 108/8 111/12
  115/24 116/1 117/1 117/20
  120/6
gone [5]  11/16 13/6 13/23
  25/24 29/24
good [19]  4/9 4/16 4/24
  5/1 7/25 17/13 27/20
  41/18 42/18 43/20 45/21
  52/7 55/24 57/16 65/18
  98/1 104/19 105/8 105/10
goodness [1]  93/11
goods [2]  79/24 80/14
got [13]  12/22 40/20
  43/24 57/10 58/22 63/7
  77/6 87/16 96/18 112/17
  112/23 121/21 122/24
gotten [3]  59/4 59/5 72/8
govern [1]  101/15
governing [1]  68/25
government [66]  1/6 4/3
  4/11 5/2 6/3 11/7 13/15
  14/21 14/22 18/1 22/11
  25/10 33/12 33/15 33/21
  33/25 34/2 37/20 38/23
  39/6 44/19 45/6 45/11
  45/12 46/18 48/19 51/5
  51/25 55/10 57/20 58/2
  60/8 61/3 61/19 61/25
  63/8 63/18 67/7 67/14
  67/20 68/5 70/22 70/22
  73/10 83/6 87/24 88/1
  88/2 94/5 102/4 105/13
  105/15 105/23 105/23
  106/7 107/2 107/13 107/15
  107/16 108/4 110/4 114/11
  115/11 116/23 117/25
  122/18
Government's [16]  33/18
  35/2 35/3 36/16 36/18
  38/6 38/8 49/6 58/9 59/2
  60/23 69/4 82/24 86/25
  101/23 114/7
governmental [5]  7/16
  105/3 105/5 105/23 105/25
Governments [1]  59/11
governor [10]  86/8 86/11
  91/21 92/4 93/18 95/20
  101/11 101/14 102/20
  102/21
grab [1]  121/25

Grand [1]  1/24
grande [14]  7/7 7/20 13/20
  25/15 55/16 68/12 68/16
  70/3 70/5 71/10 71/24
  84/25 101/2 112/9
granted [8]  6/9 6/10
  40/16 103/25 110/6 112/7
  121/12 121/14
grants [1]  103/21
grateful [1]  117/5
grave [2]  60/22 61/14
great [10]  6/19 9/24
  12/16 15/14 56/22 80/8
  119/24 122/2 122/7 122/14
greatly [1]  15/24
grew [1]  37/10
ground [1]  38/20
grounds [1]  85/12
grow [4]  31/1 31/5 33/13
  38/7
growth [9]  11/15 12/5
  12/6 12/7 13/1 13/2 20/4
  28/18 28/22
guarantee [2]  72/23 74/13
guaranteed [4]  71/13
  71/13 77/22 79/4
guarantees [1]  69/2
guard [60]  6/4 6/12 26/8
  35/11 37/16 37/17 38/3
  38/5 38/10 38/16 39/8
  44/3 49/16 49/24 50/1
  50/22 51/12 51/16 51/20
  51/24 52/10 52/19 53/16
  54/4 54/6 59/1 59/18
  62/21 62/23 63/3 63/7
  63/10 67/2 72/20 90/13
  90/22 91/3 96/1 96/6
  96/14 96/19 96/23 97/14
  97/18 98/14 98/25 102/23
  103/10 103/21 104/5 104/6
  104/15 106/20 107/2 109/3
  109/8 115/24 116/12
  116/17 120/14
Guard's [6]  50/25 51/2
  51/8 53/19 109/1 118/1
guess [2]  28/18 64/10

**H**
had [36]  4/14 13/22 17/18
  23/16 24/23 26/6 33/21
  38/24 38/25 39/4 40/11
  41/21 44/20 50/20 59/8
  62/9 63/20 63/21 71/20
  87/1 94/7 96/8 96/23
  104/11 106/20 107/6
  112/11 112/13 112/13
  116/10 117/7 117/8 117/13
  120/13 121/14 121/18
hadn't [2]  46/15 117/14
Hala [1]  109/8
half [5]  11/25 29/20 41/6
  83/8 118/16
HAMIS [1]  1/13
Hamish [2]  4/5 8/18
hand [1]  122/12
handed [1]  10/10
handle [5]  37/12 37/19
  38/8 38/9 119/15
handling [1]  6/5
hands [1]  83/20
happen [5]  23/3 67/5 67/6

happen... [2]   92/19 107/6
happened [11]   7/2 19/15
 58/25 62/18 85/24 87/4
 96/17 97/16 106/12 106/13
 114/8
happening [3]   58/4 67/7
 87/15
happens [8]   17/17 21/25
 61/24 81/14 81/15 105/22
 110/11 110/20
happy [4]   4/11 23/24
 46/19 50/10
hard [5]   7/15 34/13 42/1
 114/4 114/13
harm [2]   25/14 26/9
has [74]   5/17 5/19 5/20
 6/4 7/2 11/16 12/6 13/6
 14/14 25/23 29/24 31/2
 31/4 40/22 42/23 44/17
 45/7 48/22 51/16 52/1
 52/19 52/25 53/16 56/1
 57/9 58/25 59/17 64/12
 64/15 68/4 70/10 71/23
 75/6 76/21 79/8 79/21
 81/1 86/2 86/22 87/14
 88/6 88/24 89/8 92/10
 92/11 92/12 92/12 93/8
 93/12 100/1 100/23 101/12
 102/8 102/10 102/11
 102/15 104/12 105/7 107/2
 107/3 108/4 108/5 109/7
 110/16 111/11 116/16
 118/1 118/2 118/6 118/10
 118/12 118/20 121/23
 122/20
hasn't [1]   85/24
hate [2]   69/11 72/25
haul [1]   79/1
have [285]
haven't [2]   54/21 117/3
having [5]   6/22 19/23
 47/17 80/19 115/13
he [30]   23/6 23/15 34/10
 34/23 35/2 35/3 35/3
 41/11 59/25 60/1 60/4
 60/6 60/18 60/20 60/23
 61/13 61/15 61/17 61/20
 62/10 62/11 80/24 81/1
 83/11 83/17 83/22 86/13
 86/15 101/11 122/20
he'll [1]   96/6
he's [5]   23/20 61/18
 86/14 101/11 122/24
head [2]   7/15 34/9
headache [1]   77/9
hear [3]   8/9 46/14 78/17
heard [3]   42/11 54/22
 58/5
hearing [8]   1/9 10/10
 11/17 12/19 20/14 23/23
 26/25 124/9
hearsay [3]   23/5 23/25
 24/2
held [2]   14/8 55/14
Hello [1]   27/21
help [3]   17/1 46/3 54/20
helped [1]   103/2
helpful [2]   67/19 119/23
Her [2]   70/25 83/20

here [31]   4/12 7/17 8/21
 25/12 27/23 28/13 36/13
 44/5 46/3 47/1 48/21
 48/21 54/16 56/21 60/10
 60/16 61/15 67/3 67/7
 68/7 72/1 76/19 89/8 90/7
 96/23 99/20 101/23 107/5
 107/7 110/9 118/2
here's [4]   62/12 89/20
 90/2 121/7
hereby [1]   76/16
hey [4]   38/5 76/12 76/18
 80/7
Hi [1]   8/2
hiccup [2]   42/14 42/14
high [2]   21/22 29/12
higher [1]   32/14
highlighted [1]   60/13
highway [7]   17/22 22/14
 22/17 22/20 23/18 65/2
 73/10
him [2]   43/25 122/19
hired [1]   20/22
his [9]   21/1 34/9 34/24
 44/14 60/19 61/14 61/15
 76/6 80/24
history [5]   31/2 31/3
 56/10 115/12 115/13
Hold [1]   46/22
homeland [1]   80/2
Honor [92]   4/16 4/21 5/1
 6/11 7/25 8/4 8/24 10/5
 23/10 23/22 25/22 26/16
 26/20 27/11 27/15 30/6
 30/20 30/22 31/25 34/11
 35/7 35/10 35/19 41/3
 41/8 41/14 41/17 41/20
 42/7 42/19 46/13 47/8
 48/5 48/9 52/16 54/25
 56/22 59/1 59/21 64/2
 64/14 65/4 67/1 67/12
 68/6 68/21 69/19 70/18
 71/11 73/18 75/1 75/21
 78/11 78/16 79/8 79/14
 80/21 81/9 82/8 83/2
 84/11 84/14 85/5 85/11
 89/16 90/18 91/6 92/2
 93/16 95/18 97/23 98/19
 99/12 100/5 100/22 101/19
 103/20 110/19 112/2
 113/24 114/16 117/4 118/8
 118/10 119/12 120/1 120/8
 121/6 121/22 122/12
 122/25 123/3
Honor's [1]   74/22
HONORABLE [1]   1/9
hook [2]   19/24 31/8
hope [6]   8/25 14/14 17/9
 52/16 63/5 67/18
hoped [1]   59/9
host [2]   58/14 68/25
hour [2]   41/6 92/10
housekeeping [1]   8/3
how [30]   8/6 8/9 10/1
 13/3 16/11 16/15 21/9
 22/24 25/8 33/11 38/6
 38/7 39/15 39/15 47/6
 49/1 54/22 54/23 71/23
 79/17 95/6 97/18 103/18
 109/13 111/22 111/22
 114/21 115/7 116/16

how... [1]   120/7
However [1]   6/21
huh [1]   53/21
HUME [12]   1/13 3/5 4/5
 4/17 8/18 43/16 80/24
 84/12 96/4 96/5 100/23
 118/24
Hume's [1]   119/22
hundred [5]   25/5 25/9
 25/11 64/20 107/10
hurdle [1]   83/6
hurt [2]   15/10 105/25
hurting [1]   83/20
hyphen [1]   18/3

I

I'd [4]   11/17 11/24 36/22
 84/14
I'll [7]   49/22 68/7 70/3
 73/8 83/2 83/21 109/11
I'm [55]   4/10 7/3 8/12
 8/24 9/5 9/22 12/1 14/16
 17/24 23/12 23/24 24/17
 27/22 27/22 28/18 28/19
 28/22 30/7 30/23 32/18
 34/24 36/4 36/8 41/10
 41/12 44/7 46/13 47/3
 50/9 51/18 52/10 54/15
 54/25 56/19 74/7 74/8
 74/22 75/4 75/25 76/5
 79/15 82/21 84/1 89/23
 91/5 92/23 92/25 93/16
 96/3 96/5 98/11 106/3
 116/25 117/1 120/6
I've [2]   12/22 96/23
IBA [2]   89/22 104/9
ice [2]   85/8 85/9
idea [4]   30/6 30/8 57/16
 63/8
identified [1]   59/20
identify [4]   10/12 11/20
 14/9 20/20
ideological [1]   57/18
ignore [2]   21/7 93/12
ignores [1]   65/11
II [1]   114/12
III [1]   102/7
IJC [1]   45/15
illegal [19]   50/17 50/18
 54/3 86/17 89/20 90/9
 90/10 90/25 91/1 91/14
 91/14 91/19 93/17 101/24
 103/9 103/9 111/19 111/21
 111/24
illegitimate [1]   104/22
immediately [1]   16/10
imminent [7]   108/1 108/3
 108/7 108/10 108/12
 121/15 121/18
immune [1]   5/12
immunity [1]   105/11
impact [8]   14/11 18/20
 20/10 20/23 22/10 25/2
 58/16 58/16
impacts [3]   37/23 62/17
 66/7
implement [3]   62/2 62/3
 94/3
implementing [1]   115/18
implements [1]   61/1

**I** Case 1:10-cv-00476-RMC
implications [1]   51/17
implicit [2]   87/18 87/19
implicitly [2]   60/24 67/8
implied [2]   90/6 90/8
importance [1]   85/7
important [9]   22/24 46/23
  80/15 81/9 81/21 82/16
  82/18 104/20 107/24
impose [2]   74/18 74/19
imposed [1]   7/1
impossible [7]   19/7 19/8
  19/9 21/2 31/10 31/17
  58/6
impression [2]   93/16
  120/12
improve [5]   15/15 15/18
  15/24 37/8 80/16
improvement [1]   65/2
improvements [1]   21/10
inappropriate [1]   101/2
inartful [1]   111/9
Inc [1]   1/17
incidents [1]   80/18
include [4]   69/6 69/9
  69/13 88/7
included [1]   72/6
includes [8]   13/9 48/25
  57/21 69/8 69/22 69/24
  70/1 70/7
including [5]   6/15 32/17
  91/2 94/3 96/8
income [1]   21/16
incomplete [2]   106/23
  106/25
inconceivable [1]   116/10
inconsistent [2]   106/1
  107/9
incorporated [1]   121/17
increase [5]   12/7 17/10
  30/12 30/17 36/6
increased [1]   17/8
increases [3]   12/24 29/5
  80/12
incumbent [1]   61/10
incurred [1]   94/14
independent [2]   50/15
  66/21
independently [1]   53/23
indicated [3]   30/11 36/13
  88/6
inflated [1]   35/4
informally [1]   48/17
information [5]   66/6
  87/21 90/1 114/16 121/24
informing [1]   66/19
infrastructure [1]   22/4
inherent [1]   110/7
inherit [1]   100/15
initial [1]   61/23
initials [1]   7/14
injunction [14]   1/9 5/5
  6/15 23/23 25/13 25/15
  35/13 46/17 46/19 46/25
  49/11 90/20 90/21 93/6
injunctive [1]   7/20
inspection [1]   17/4
instance [6]   13/23 16/21
  25/21 31/7 40/7 118/4
instances [1]   118/3

instead [3]   58/3 76/10
  112/19
instructed [1]   40/13
instrument [1]   112/8
instrumentality [3]   86/12
  86/13 86/15
insulting [1]   43/17
intelligible [2]   85/4
  85/9
intended [2]   26/21 118/16
intent [3]   15/12 60/10
  90/4
intention [1]   93/2
intentional [1]   68/5
intentionally [1]   83/10
interest [9]   7/16 32/13
  32/15 32/17 60/5 65/25
  75/18 76/14 100/19
interested [3]   7/13 47/4
  124/10
interests [1]   65/18
interfere [5]   43/4 47/22
  68/3 70/17 71/7
interfering [1]   67/6
internal [1]   64/2
international [40]   1/3
  4/3 9/21 11/22 14/12 15/1
  15/16 18/21 19/21 19/22
  43/2 45/15 45/20 50/21
  52/25 54/17 57/10 65/25
  65/14 69/21 70/6 72/5
  73/3 76/22 84/18 84/21
  94/2 96/11 97/12 99/19
  100/4 100/12 113/16
  116/19 117/16 117/17
  117/24 118/7 118/20
  121/23
interpret [2]   87/15 87/18
interpretation [3]   63/5
  118/1 118/20
interpreted [4]   69/21
  86/16 86/20 116/18
interstate [2]   42/23
  102/13
intervening [1]   15/8
intricacies [1]   116/24
introduce [3]   35/6 35/8
  46/16
introduction [1]   115/5
invalid [3]   49/25 50/18
  85/13
invalidate [1]   49/14
invalidated [4]   49/17
  50/17 50/22 104/24
invest [1]   25/8
investments [1]   25/3
invoke [4]   105/10 108/1
  108/3 108/14
involved [4]   13/5 33/19
  92/12 102/2
irrational [1]   106/8
irreparable [2]   25/14
  26/9
is [392]
isn't [14]   6/21 24/3
  32/10 32/19 34/20 34/22
  38/2 38/21 47/24 73/15
  93/14 101/4 104/24 112/2
issue [26]   19/21 19/23
  42/10 44/13 44/25 52/14
  57/3 76/21 77/20 78/14

81/17 81/19 92/10 92/16
  93/9 93/8 97/19 97/19
  109/4 109/5 109/15 109/20
  118/11 120/7 120/12
  121/23
issued [4]   6/8 106/20
  107/4 113/22
issues [14]   6/7 9/9 38/10
  46/17 52/13 67/21 80/19
  81/11 82/12 82/12 85/18
  92/14 109/1 109/14
issuing [1]   54/6
it [379]
it's [154]
iteration [1]   5/22
its [34]   6/20 7/21 12/19
  15/2 19/5 27/5 33/8 33/8
  38/10 38/16 39/8 39/25
  45/5 45/7 46/20 48/23
  51/6 61/22 62/17 65/13
  70/10 73/24 90/4 90/5
  92/20 92/21 102/19 104/10
  107/2 107/8 112/17 112/17
  121/11 121/19
itself [8]   4/22 39/11
  45/7 59/19 65/11 65/11
  69/10 103/15
**IV** [3]   54/5 77/7 96/22

**J**

January [2]   88/23 88/25
jeopardy [1]   61/7
jersey [1]   64/12
Jim [1]   62/8
job [3]   36/13 119/20
  120/8
Joint [3]   45/17 45/19
  45/20
Judd [1]   1/22
JUDGE [11]   1/10 8/17
  14/25 18/4 18/6 19/10
  24/15 24/22 43/23 59/8
  116/2
judgment [11]   13/3 13/5
  20/1 54/5 57/16 57/19
  57/19 60/15 77/11 85/15
  102/9
judgments [1]   12/14
July [2]   35/15 106/19
jump [2]   6/7 110/16
jumped [1]   108/15
juncture [2]   80/15 82/18
June [2]   94/4 114/8
jurisdiction [1]   5/17
jury [1]   24/3
just [79]   6/12 6/23 8/3
  8/5 8/7 9/6 15/17 19/3
  19/18 20/11 24/24 27/25
  28/12 29/10 29/11 30/23
  30/24 31/13 33/24 34/23
  37/16 37/25 38/5 40/17
  40/25 41/8 43/8 43/13
  47/8 47/10 47/25 52/5
  54/3 58/5 59/9 62/18 66/7
  66/9 68/1 69/22 74/13
  77/4 77/8 77/24 78/13
  78/15 79/3 82/3 82/9
  82/23 83/6 87/24 90/24
  92/20 98/23 99/20 100/8
  103/13 105/20 106/22
  106/22 108/10 109/6

just... [16]   111/15
111/18 111/25 112/22
113/16 114/5 114/9 115/23
117/1 118/10 118/23
119/16 120/3 121/8 121/13
122/22
Justice [1]   1/19
justified [1]   28/25
justify [6]   20/6 21/5
28/11 29/8 64/17 64/21
juxta [1]   25/7

**K**

KATHLEEN [2]   1/13 4/5
keep [8]   7/15 9/6 17/13
35/5 42/17 43/22 103/5
117/20
kept [1]   92/2
key [7]   56/7 76/2 79/19
80/11 83/4 117/18 117/19
KIERNAN [2]   1/13 4/6
kind [8]   12/8 17/5 23/16
74/20 84/2 93/14 101/22
118/11
kinder [1]   34/15
kinds [1]   23/23
Kirschensteiner [1]   22/21
knew [3]   61/7 83/25 88/16
know [83]   4/11 4/13 7/12
7/15 13/19 17/9 17/20
19/13 20/15 23/6 24/17
24/19 26/10 29/15 30/7
30/11 31/7 39/15 39/15
40/2 40/10 42/1 42/2
43/20 45/3 49/7 51/14
54/23 55/2 56/4 58/11
59/3 63/24 65/21 65/21
66/11 67/5 69/11 69/22
71/2 71/5 72/24 73/19
73/20 73/22 74/6 75/11
75/24 77/3 80/6 80/8
81/21 81/24 81/25 83/17
87/14 87/14 87/17 87/17
87/21 89/10 92/12 92/13
94/11 94/12 94/13 98/4
98/6 103/19 107/20 113/11
113/16 113/23 114/21
115/7 115/12 115/16 118/7
118/9 119/4 120/3 122/23
122/23
knowing [3]   83/10 83/15
114/25
known [5]   11/8 19/4 22/14
71/23 116/11
knows [7]   5/11 26/13
59/25 60/1 73/9 84/19
85/1

**L**

labeled [1]   12/19
lack [1]   5/21
laid [2]   59/7 90/24
lame [1]   59/24
land [19]   27/2 38/18
52/11 53/1 97/20 98/4
98/7 98/9 107/10 107/12
107/16 107/17 108/8
108/15 108/19 110/7
111/13 117/15 118/5

lands [3] 43/1 112/20
121/7
landscape [1]   86/1
lane [8]   15/9 17/6 17/17
17/18 17/19 19/16 25/20
26/2
lanes [7]   16/11 16/15
16/16 17/2 17/20 19/23
24/9
language [8]   55/13 72/4
72/10 89/23 91/25 93/23
100/4 100/18
Lansing [1]   22/19
larger [1]   115/19
larynx [1]   56/20
last [24]   9/16 11/15
19/15 31/4 36/2 36/11
38/17 39/1 39/3 39/5
39/14 39/15 39/24 41/8
43/24 66/23 91/6 94/12
94/13 94/25 95/24 97/1
111/11 116/18
late [1]   27/2
lately [2]   21/14 22/21
later [16]   33/24 37/9
47/5 48/8 59/17 59/23
60/11 61/6 61/9 61/12
62/20 63/12 71/18 88/11
112/19 121/21
latest [1]   64/22
Lauren [1]   122/8
law [29]   5/18 5/20 23/23
40/25 45/10 46/1 46/2
46/4 50/19 55/8 55/23
67/3 86/18 86/22 87/9
87/12 87/19 89/20 90/2
91/1 93/12 99/3 99/6
99/10 102/12 102/21
105/15 107/24 110/1
lawful [1]   73/14
laws [7]   57/6 68/25 87/5
87/10 105/9 114/14 114/15
lawsuit [2]   33/2 93/4
lawyers [3]   40/13 42/3
43/18
lay [1]   96/5
lays [1]   85/6
leading [1]   54/25
least [9]   5/5 7/4 14/14
40/18 45/3 45/9 59/2
92/20 118/7
leave [2]   48/8 110/6
leaving [1]   93/16
Leech [2]   60/21 61/14
left [1]   8/21
leg [1]   119/16
legal [13]   4/19 43/7
51/17 74/12 78/14 86/1
102/3 102/5 102/22 104/20
106/9 106/10 113/14
legality [1]   100/9
legislation [14]   46/6
47/12 47/18 55/15 86/10
86/16 88/20 88/22 88/22
90/2 93/1 94/23 96/11
115/8
legislative [16]   40/19
56/10 85/7 88/9 88/12
88/13 88/16 89/8 89/9
91/15 91/19 93/24 102/14
102/17 115/12 115/13

legislater [1]   93/6
legislature [13]   40/8
40/11 40/15 47/11 63/21
87/1 87/12 88/4 88/8 89/3
89/6 90/1 94/6 100/1
101/1
legislature's [1]   90/4
legitimate [1]   75/12
legs [1]   119/17
less [2]   29/10 78/9
let [17]   5/24 16/1 17/23
44/13 49/22 50/24 53/1
53/12 67/13 75/7 80/23
88/2 96/4 103/6 106/12
122/22 122/23
let's [16]   8/9 11/20 16/7
17/23 17/23 20/14 34/5
43/7 47/4 54/8 71/5 105/1
106/13 108/18 109/22
122/3
letter [2]   56/5 56/11
level [8]   21/18 28/22
29/8 56/1 56/1 64/21
106/2 107/8
levels [14]   10/19 15/1
28/3 28/10 28/13 29/16
30/1 30/2 30/8 32/24 33/1
39/10 39/11 82/14
liability [1]   5/12
license [3]   110/2 110/2
110/3
licensed [1]   110/9
like [43]   5/14 10/3 11/17
11/24 12/18 15/17 17/20
22/7 26/16 31/2 31/7
33/13 34/3 35/6 35/22
36/22 37/16 48/9 49/5
56/9 59/1 64/2 64/11 66/5
72/20 75/19 78/6 81/21
84/14 104/19 104/25 105/7
105/19 105/19 108/11
109/7 110/2 110/17 116/2
118/25 119/2 119/3 120/12
likelihood [1]   48/10
likely [1]   80/12
limit [4]   48/24 71/16
71/21 71/24
limited [2]   47/3 101/13
limiting [2]   55/13 72/10
limits [2]   8/6 37/11
line [6]   13/9 13/13 16/24
20/5 57/13 96/25
lined [1]   99/4
link [1]   91/6
list [2]   27/1 27/7
litigated [2]   121/23
121/25
litigation [5]   6/22 41/23
88/18 88/24 106/24
little [15]   29/11 34/15
36/22 42/16 53/1 56/21
56/25 59/5 64/10 73/3
77/18 81/17 82/13 82/14
103/4
live [1]   6/19
livestock [2]   15/23 16/25
LLP [2]   1/14 1/22
load [4]   16/21 22/6 25/20
26/1
local [1]   110/2
located [1]   61/10

**L** Case 1:10-cv-00476-RMC

location [6]   18/18 61/16
 61/22 83/8 83/9 97/24
locations [1]   61/17
logic [3]   90/23 90/23
 90/25
long [11]   7/18 8/6 17/9
 79/1 80/4 80/9 94/9 94/20
 99/22 114/21 115/8
longer [3]   29/8 63/1
 76/20
look [18]   14/9 16/7 24/21
 36/10 37/16 37/17 38/23
 47/10 53/3 62/18 62/18
 65/24 97/22 100/9 107/6
 109/22 116/12 122/21
looked [2]   55/10 96/12
looking [2]   76/10 82/15
looks [4]   64/2 78/6 109/3
 116/2
loss [1]   29/2
lost [3]   39/7 80/5 100/23
lot [16]   4/13 7/4 9/8
 17/21 24/19 33/22 41/5
 43/13 44/4 45/13 59/23
 64/6 79/16 104/19 104/20
 119/14
lots [1]   109/24
lousy [1]   4/10
Lyon [1]   1/23

**M**

M-O-R-O-U-N [1]   9/17
machine [1]   2/6
made [14]   13/19 25/3 34/3
 55/17 57/20 59/17 62/9
 62/14 63/20 64/10 80/24
 82/25 98/22 116/23
mail [9]   59/11 60/12
 60/13 60/18 60/18 61/12
 62/21 64/14 64/21
mails [3]   62/14 73/22
 109/19
main [3]   51/17 67/1
 101/23
maintain [12]   30/2 48/23
 68/13 68/22 69/5 69/8
 69/20 71/14 72/2 72/22
 81/2 104/1
maintenance [4]   15/9
 21/11 21/13 80/18
Majesty [1]   70/25
make [37]   5/18 19/2 26/11
 29/17 30/5 30/10 45/5
 45/13 46/9 47/8 48/15
 48/17 48/18 50/2 57/1
 57/16 57/18 58/6 61/3
 62/6 62/6 71/24 74/11
 75/22 77/9 77/11 83/3
 93/13 94/17 96/3 97/22
 98/8 98/12 100/2 102/3
 115/7 119/12
makes [3]   29/16 76/22
 78/21
making [11]   5/16 38/10
 38/16 39/9 47/19 48/10
 73/21 75/21 101/6 119/20
 119/22
man [1]   116/12
manager [1]   31/19

mandates [1]   108/23
many [5]   16/11 16/15
 47/16 71/15 96/23
map [1]   65/23
March [3]   95/5 95/7
 103/25
marked [1]   10/4
market [9]   51/5 60/9
 105/4 105/16 105/19 106/5
 107/14 107/15 108/10
massive [1]   64/23
matched [1]   21/1
matter [14]   19/8 19/9
 32/13 40/13 41/6 47/17
 48/6 50/11 71/3 71/4 78/4
 78/15 79/11 124/6
Matthew [4]   3/4 8/19 8/22
 9/13
may [32]   10/23 30/13 32/2
 35/19 48/17 48/18 49/19
 49/20 49/21 49/21 55/8
 55/9 56/25 57/14 59/19
 62/22 66/19 75/21 88/4
 88/10 88/11 89/5 101/19
 107/18 110/6 110/23 112/7
 112/19 112/19 112/23
 113/2 124/12
maybe [13]   15/20 16/22
 23/18 24/7 42/4 59/1
 66/17 80/7 87/15 87/16
 103/4 106/14 121/3
Mayor [1]   43/25
MDOT [22]   60/21 61/5
 63/21 86/15 87/5 87/10
 88/3 88/15 88/18 88/18
 88/21 89/7 89/25 92/6
 92/10 92/11 93/10 94/8
 95/7 101/9 101/13 108/3
MDOT's [1]   92/14
me [52]   5/24 7/15 9/5
 9/15 12/2 13/13 16/1
 17/10 17/23 31/9 42/3
 43/16 43/16 44/13 44/23
 48/18 48/20 50/24 53/12
 60/11 72/11 74/5 74/7
 75/7 76/6 80/23 83/17
 88/2 96/4 96/24 99/4
 100/23 103/6 106/12
 106/22 110/13 114/10
 115/24 117/22 118/13
 118/18 118/19 118/19
 119/21 119/22 119/24
 121/4 121/25 122/2 122/22
 122/23 124/4
mean [45]   6/18 7/11 16/13
 24/17 24/18 28/17 30/23
 34/18 35/1 36/20 42/1
 43/17 44/4 44/23 50/8
 52/7 69/11 72/10 72/11
 72/13 72/15 72/17 74/9
 75/2 75/20 79/11 81/12
 86/11 87/15 92/18 93/11
 94/21 95/17 96/12 96/13
 96/13 96/23 105/18 108/17
 114/5 116/16 118/4 118/10
 120/5 120/11
meaning [1]   59/12
means [23]   5/11 5/13 6/9
 46/2 57/13 61/9 61/17
 61/25 62/1 63/5 72/6 72/8
 72/15 74/6 74/10 74/13

76/1 80/22 83/4 83/7 83/9
 83/25 102/12
meant [2]   16/19 71/2
meet [1]   27/24
memory [1]   117/2
mention [2]   66/2 66/3
mentioned [1]   65/9
merely [1]   24/4
merits [2]   47/13 48/11
met [3]   22/19 22/23 27/23
metaphors [1]   64/11
MI [1]   1/18 1/24
mic [2]   4/24 118/23
Michigan [42]   33/4 40/8
 40/11 40/15 60/21 63/21
 66/12 73/8 79/22 79/25
 81/23 87/1 87/12 88/4
 88/7 88/16 88/18 88/24
 89/2 89/25 90/4 91/22
 91/23 93/1 93/5 93/6
 93/17 94/18 95/19 99/3
 99/6 100/24 101/3 101/8
 101/9 101/11 102/6 102/7
 102/21 108/7 108/8 121/13
microphone [1]   119/1
might [5]   9/3 34/15 44/13
 60/6 64/3
mile [5]   18/19 71/6 71/9
 71/21 83/8
miles [1]   18/19
million [11]   14/4 14/4
 21/14 22/1 25/5 25/9
 28/15 29/12 29/12 29/20
 64/20
mind [6]   36/22 45/22
 53/13 54/16 74/4 89/11
minimum [1]   103/16
ministry [2]   47/11 60/21
minor [1]   28/22
minute [2]   67/16 99/20
minutes [3]   8/23 83/20
 84/1
misconstruing [1]   36/9
missing [1]   72/25
misunderstood [1]   96/5
mobility [2]   80/1 80/3
modern [1]   19/23
moment [4]   93/1 99/4
 109/7 109/11
money [28]   21/9 21/23
 29/1 32/5 42/2 42/2 43/14
 52/5 78/1 78/7 87/7 87/14
 92/8 93/25 94/9 94/9
 94/10 94/16 94/17 94/21
 99/7 100/2 100/25 100/25
 101/9 108/4 108/5 108/6
monopoly [1]   80/8
months [3]   59/17 66/23
 107/7
MORAN [2]   1/16 4/5
more [35]   8/23 10/21 17/2
 26/4 27/11 33/22 33/24
 35/8 40/18 40/22 42/6
 42/16 42/24 43/1 45/8
 57/2 60/14 63/15 64/19
 64/24 67/18 68/13 69/22
 74/10 77/2 81/5 82/4
 87/17 91/10 102/4 103/20
 107/18 107/24 114/13
 119/19
morning [3]   54/22 55/10

**M** Case 1:10-cv-00476-RMC

morning... [1] 119/4
Moroun [28] 3/4 8/19 8/20
8/22 9/12 9/13 10/10 11/2
11/7 18/13 18/20 19/13
20/1 20/20 22/9 24/18
25/3 25/12 26/24 27/10
27/14 27/20 41/19 49/4
52/4 54/13 58/5 112/21
Moroun's [1] 65/8
most [10] 6/1 9/24 21/17
27/7 28/14 82/15 85/21
87/20 93/23 122/9
mostly [1] 9/3
motion [14] 4/22 5/5 5/8
5/9 5/16 5/21 5/22 6/13
7/8 7/21 35/13 100/14
102/9 102/24
motions [3] 5/6 5/14
51/23
move [9] 35/1 40/8 44/13
83/2 83/18 85/15 91/3
104/13 118/17
movement [1] 79/23
moving [2] 5/7 101/20
Mr [6] 3/5 3/5 5/24 10/10
22/21 25/3
Mr. [43] 4/17 8/20 9/12
11/2 11/7 18/13 18/20
19/13 20/1 20/20 22/9
22/18 22/20 24/18 25/12
26/22 26/24 27/10 27/14
27/20 41/19 43/16 44/14
48/18 49/4 52/4 54/13
58/5 60/12 65/8 80/24
84/12 88/25 90/16 96/4
96/5 100/23 102/5 112/21
115/14 118/24 119/21
119/22
Mr. Blanchard's [1] 60/12
Mr. Collins [7] 26/22
48/18 88/25 90/16 102/5
115/14 119/21
Mr. Dozeman [1] 44/14
Mr. Hume [8] 4/17 43/16
80/24 84/12 96/4 96/5
100/23 118/24
Mr. Hume's [1] 119/22
Mr. Moroun [22] 8/20 9/12
11/2 11/7 18/13 18/20
19/13 20/1 20/20 22/9
24/18 25/12 26/24 27/10
27/14 27/20 41/19 49/4
52/4 54/13 58/5 112/21
Mr. Moroun's [1] 65/8
Mr. Stamper [1] 22/18
Mr. Steele [1] 22/20
Ms [1] 84/7
MSF [2] 87/5 87/11
MTO [2] 60/20 61/5
much [14] 21/9 25/8 31/5
38/6 42/2 60/7 60/13 77/9
78/9 79/17 97/25 111/22
111/23 114/13
multiple [1] 25/20
murkiness [1] 107/23
my [27] 7/15 8/21 9/3
21/1 22/18 23/22 41/22
41/22 42/17 44/1 44/14
46/12 56/20 67/13 84/2

89/11 89/24 93/11 93/15
102/16 114/4 118/22
109/16 114/25 118/22 118/13/14
119/14 120/8 122/4 122/5
124/3
myself [2] 103/24 119/12
mysteriously [1] 63/18

**N**

N-I-T-C [1] 18/3
name [2] 9/12 9/16
narrative [1] 94/1
nation [3] 45/4 73/23
74/2
nation's [1] 73/21
national [4] 65/18 65/25
80/1 100/18
nature [3] 68/18 77/19
112/9
NAV [1] 39/13
navigation [40] 6/5 26/8
27/5 27/8 29/23 38/3 39/1
44/1 49/24 51/1 51/13
51/14 57/7 57/14 63/13
63/14 76/14 91/4 96/15
96/19 97/1 97/23 103/11
103/21 106/14 108/18
108/20 108/23 109/1 109/4
109/8 109/14 109/15
109/20 110/21 111/25
112/18 112/23 117/14
118/6
navigational [4] 38/11
39/22 39/24 120/16
near [1] 76/16
nearly [1] 79/1
necessarily [3] 19/23
32/16 99/13
necessary [18] 27/2 28/5
28/8 39/18 42/21 58/22
65/18 65/22 66/13 82/19
97/16 107/11 110/5 110/23
111/13 112/6 117/9 121/19
necessity [3] 58/14 58/18
65/15
need [58] 6/23 6/25 7/3
8/13 17/15 19/1 19/6 31/7
33/23 37/18 37/25 39/6
39/19 39/22 39/25 40/7
40/10 40/17 40/18 40/19
41/16 47/22 48/1 48/4
53/9 56/6 59/16 59/16
59/25 63/16 64/22 69/16
73/4 73/5 74/11 76/20
77/5 79/9 79/19 79/20
80/7 81/6 81/10 81/12
81/18 81/19 82/12 83/19
84/2 94/17 94/22 102/16
107/10 107/17 109/10
109/12 109/13 116/1
needed [9] 6/7 24/21
33/14 42/1 52/2 65/19
69/14 80/3 96/10
needs [1] 59/20 80/1
negotiate [1] 60/7
neither [3] 39/12 39/12
124/7
NEPA [8] 13/20 33/3 33/8
34/1 34/12 34/18 35/4
39/12
net [1] 21/16
never [19] 14/1 24/1 31/2

45/22 53/13 54/16 58/15
58/25 62/11 63/19 65/20
65/22 74/4 83/24 87/9
87/9 112/15 112/15 118/11
new [42] 15/12 16/9 21/24
22/2 22/3 25/4 31/11
31/13 31/16 31/19 37/7
37/11 37/19 59/12 59/13
60/8 60/25 61/3 61/25
62/4 62/9 63/8 64/25 66/3
66/19 70/17 70/20 70/21
71/8 71/16 71/23 72/7
80/4 81/3 81/6 81/7 81/10
81/13 82/6 82/6 109/12
109/13
news [1] 108/9
next [11] 16/7 28/20 36/7
37/2 61/19 62/2 70/1
71/16 71/25 81/15 82/23
nexus [2] 15/21 16/20
Niagara [1] 71/20
nice [3] 4/9 27/24 41/19
night [1] 57/1
nine [5] 19/15 63/12
123/2 123/2 123/4
nine-thirty [3] 123/2
123/2 123/4
NITC [94] 11/8 11/10
13/17 13/20 14/6 14/7
17/24 17/24 18/2 18/5
18/9 18/14 18/18 18/20
19/6 19/6 19/14 20/3 20/6
20/15 20/23 21/2 21/3
21/6 21/20 22/10 25/2
26/14 30/10 30/13 30/16
31/12 31/15 31/19 31/21
33/3 38/11 38/18 40/3
40/23 40/25 49/2 49/8
49/13 49/15 49/15 49/23
51/3 51/14 53/5 53/16
54/6 54/11 54/22 58/6
58/14 58/16 58/18 60/1
60/1 62/4 64/18 64/20
65/6 65/9 65/17 66/7
66/15 66/17 68/2 78/5
79/6 79/7 79/9 79/20 81/3
81/5 81/20 81/23 82/5
82/7 82/13 83/10 83/23
83/23 87/2 87/7 87/11
87/16 88/5 96/7 103/8
104/8 107/1
NITC's [2] 58/10 61/25
NITC/DRIC [43] 11/8 13/17
13/20 14/6 14/7 17/24
17/24 18/2 18/5 18/14
18/20 19/14 20/3 20/6
20/15 21/3 21/6 21/20
25/2 30/16 31/12 31/15
31/19 31/21 33/3 51/3
53/16 54/22 65/17 68/2
78/5 79/6 79/7 79/9 79/20
81/3 81/5 82/7 87/2 87/7
87/16 88/5 96/7
NITC/DRIC's [2] 11/10
22/10
no [106] 1/3 6/9 6/24
8/23 13/5 14/1 19/6 20/8
21/20 25/23 25/23 25/23
27/11 27/13 29/8 31/20
32/21 37/24 38/20 41/17
44/20 45/22 48/6 48/24

no... [82]   50/20 53/1
54/7 55/2 55/2 55/5 55/5
55/17 57/4 57/5 59/25
62/1 62/25 63/13 65/24
66/3 67/12 70/18 71/19
72/16 73/20 74/3 74/25
75/1 76/4 76/9 76/20
77/15 77/20 78/19 78/24
80/22 81/22 83/19 83/19
84/16 85/9 85/9 86/24
88/12 88/21 89/4 89/5
89/8 90/5 90/6 90/7 91/16
91/17 91/18 93/8 94/21
95/10 95/25 96/16 97/6
97/14 97/25 98/2 98/3
98/15 99/11 100/5 103/22
105/23 108/10 109/15
110/5 110/19 112/5 112/24
112/25 115/11 116/1 116/7
116/12 118/4 118/22 119/9
120/25 120/25 121/2
nobody [2]   75/5 93/11
noise [1]   33/17
non [2]   83/14 85/18
non-constitutional [1]
85/18
non-discriminatory [1]
83/14
None [2]   21/7 104/9
nonexclusive [1]   110/8
Norcross [1]   1/22
northern [1]   19/22
nose [1]   73/13
not [210]
noted [2]   23/25 80/14
notes [2]   43/24 124/4
nothing [14]   39/9 66/1
66/5 68/13 69/2 69/3
72/15 74/10 77/2 78/20
79/9 82/13 82/14 122/5
notice [1]   106/20
November [3]   62/13 62/19
62/20
now [59]   6/17 6/20 7/24
8/23 13/8 14/9 14/25
18/13 21/20 22/3 22/9
25/16 26/6 28/11 29/3
29/11 29/20 38/18 39/4
43/5 45/21 45/23 52/12
53/12 56/9 59/9 62/22
62/25 63/9 68/1 69/2 69/4
72/13 73/13 74/1 74/9
75/23 76/5 76/21 77/18
78/24 80/20 83/21 85/5
86/22 89/23 93/12 93/13
96/21 104/4 105/24 106/12
106/23 106/24 107/7
108/18 112/25 113/8
116/25
nullify [1]   90/1
number [12]   19/23 28/14
44/16 49/4 78/16 83/3
84/9 90/14 103/12 104/11
104/14 105/6
numbers [6]   20/2 33/24
35/2 35/3 36/13 37/13
numerous [3]   15/8 105/2
105/21
NW [4]   1/15 1/20 1/23 2/4

o'clock [2]   123/6 123/6
o'Keef [2]   20/22 20/25
object [3]   6/22 122/22
122/24
Objection [1]   23/5
objections [1]   23/24
objects [1]   5/7
obligation [5]   74/20
74/25 75/1 75/2 118/5
obtain [1]   120/15
obviate [1]   33/23
obviously [2]   106/2
114/17
occur [1]   80/13
October [2]   60/12 107/1
off [2]   34/9 63/9
offices [1]   22/23
official [4]   2/2 22/12
59/25 60/16
officials [1]   22/20
often [1]   85/24
oh [15]   37/3 40/10 41/21
71/19 72/11 72/18 73/4
79/11 91/17 93/11 96/21
114/25 114/25 116/9
116/12
oil [1]   17/20
okay [81]   7/12 7/23 8/11
8/14 9/1 9/7 14/20 16/3
17/25 28/10 28/13 28/21
29/14 30/1 32/1 33/6
33/11 34/1 34/5 35/18
35/19 35/23 36/1 36/5
36/25 38/10 39/8 41/7
41/11 42/18 43/9 43/11
43/15 46/22 48/13 50/6
50/14 50/14 53/7 53/12
53/18 54/1 54/8 55/2
56/24 57/10 57/11 64/5
67/23 68/6 68/10 70/3
70/13 71/9 74/16 74/17
77/17 80/23 82/20 83/25
84/1 89/13 91/12 92/15
93/22 95/2 95/12 95/17
95/24 98/11 98/20 99/2
99/25 101/7 101/17 103/5
103/10 105/24 112/4
120/11 122/21
old [13]   10/1 10/2 15/5
15/7 17/12 22/4 24/9 25/6
66/3 66/9 66/16 66/18
72/9
once [3]   14/22 52/8 58/15
one [61]   8/3 9/3 9/15
10/14 17/17 17/18 23/17
24/24 26/12 26/12 26/17
34/5 39/14 39/16 40/18
41/8 43/8 43/24 44/16
45/1 46/8 47/8 48/1 48/16
48/19 49/4 49/7 49/9 51/8
51/17 52/16 54/9 58/5
58/11 60/8 61/14 61/18
62/7 64/14 65/10 65/12
66/20 66/24 67/2 71/4
74/14 77/15 80/22 81/17
82/1 82/15 82/23 89/24
92/10 101/24 102/3 110/11
113/14 115/9 121/1 122/8
ones [3]   55/19 55/25

17/18 21/21 23/19 24/6
24/8 32/19 32/22 44/2
47/5 55/25 57/23 61/18
62/6 76/17 82/1 82/9
85/11 85/24 108/21 108/24
109/1 109/3 109/5 109/20
110/9 113/3 113/9 114/9
116/22
Ontario [3]   60/21 79/25
82/4
ooo [1]   123/10
open [1]   86/9
operate [7]   48/23 68/13
68/23 69/5 72/2 75/18
78/3
operating [2]   29/2 60/25
operational [1]   60/8
operations [1]   80/16
opponent [1]   64/12
opportunity [1]   29/24
opposed [1]   51/25
opposing [1]   10/6
opposite [3]   11/14 11/16
13/6
optimistic [3]   12/14
12/17 19/13
option [1]   60/4
options [1]   80/17
order [10]   5/6 5/19 6/8
7/7 17/14 55/18 60/17
74/11 97/22 98/25
orientation [1]   97/24
originally [1]   68/23
other [50]   10/17 17/19
30/10 37/20 39/22 42/24
44/17 48/4 49/5 49/7
49/17 52/13 58/11 59/20
60/5 61/23 62/7 66/7
70/15 71/24 78/17 78/22
80/18 80/19 81/18 82/2
87/20 89/2 91/1 92/9 93/8
96/2 97/10 97/16 97/19
101/24 103/12 107/16
108/13 108/23 108/23
110/11 115/7 115/8 116/18
118/3 118/4 119/5 119/17
121/3
others [1]   6/6
otherwise [3]   65/19
109/15 124/10
our [79]   5/7 5/9 5/18
10/17 15/3 15/4 15/4
15/11 15/12 15/14 17/11
20/11 20/22 21/12 25/17
25/19 26/1 26/21 29/12
29/23 31/6 33/14 33/14
33/16 35/13 37/18 39/2
39/4 39/13 40/13 49/9
49/13 50/3 51/10 52/8
53/24 54/4 54/5 55/9
55/17 56/7 57/2 57/11
58/22 60/15 63/13 64/9
64/11 65/4 65/5 65/6 65/7
67/1 67/8 67/10 67/10
67/15 67/20 80/12 86/19
89/17 89/20 93/5 102/5
102/8 102/9 102/24 105/1
105/20 106/9 106/10
106/17 107/10 111/4

our... [5]  112/10 112/11
115/21 121/8 122/12
ours [2]  64/8 65/23
out [23]  7/7 8/10 13/14
17/3 20/8 33/12 33/21
46/1 54/21 59/7 73/22
74/13 75/25 77/7 80/9
90/24 92/17 96/5 107/21
116/16 119/5 119/15
120/19
outcome [1]  124/10
outline [1]  48/9
outset [1]  48/16
over [17]  5/17 12/24 14/3
14/4 17/19 24/20 29/11
36/7 42/25 43/2 64/20
69/12 77/5 109/14 116/1
116/8 120/13
own [16]  14/18 33/14
42/25 45/5 46/20 59/12
61/21 61/24 63/2 76/17
107/9 107/12 109/19
110/14 111/3 118/5
owned [10]  61/4 61/4
61/25 62/10 62/15 63/8
63/9 63/19 66/22 104/18
owner [4]  61/11 61/19
117/8 117/13
owners [1]  68/3
ownership [6]  52/1 52/2
52/25 65/3 76/25 110/7
owning [2]  60/25 79/3
owns [1]  61/16

P

P-R-O-C-E-E-D-I-N-G-S [1]
4/1
p.m [5]  1/5 1/13 84/5
84/6 123/9
page [10]  7/19 11/24
11/25 12/18 14/13 14/17
36/2 37/2 63/10 102/8
pages [2]  58/15 124/3
Painfully [1]  92/22
paper [3]  63/17 63/22
63/23
papers [7]  5/7 24/20
26/21 54/5 66/24 81/25
118/13
paragraph [5]  36/2 36/10
36/11 37/14 37/22
parallel [1]  77/20
paralyzed [1]  56/20
paraphrasing [1]  23/13
Park [1]  52/3
parroting [1]  37/14
parsimonious [1]  107/3
part [13]  32/7 32/8 35/11
44/14 54/12 60/15 68/5
80/22 81/12 99/21 100/8
103/24 119/14
partially [1]  56/20
participant [4]  51/6
105/4 105/19 108/10
participate [1]  6/22
particular [6]  26/8 45/3
50/7 57/14 70/11 107/9
particularly [4]  6/2
118/14 119/21 122/9

parties [2]  102/1 124/8
partnership [6]  36/12
36/15 37/15 59/19 63/1
73/8
parts [1]  16/23
party [3]  8/6 71/1 101/24
pass [1]  35/4
passed [9]  40/25 56/2
71/17 73/2 76/18 87/5
113/19 114/1 114/2
passenger [2]  12/12 25/19
passing [2]  57/1 92/2
past [2]  45/7 98/1
path [2]  6/21 7/10
PATRICK [2]  1/16 4/5
pattern [1]  45/7
Pause [3]  37/1 37/5 67/17
pay [6]  19/1 32/14 42/21
43/6 107/18 118/14
Peace [1]  71/20
pending [2]  114/22 115/8
penny [1]  92/10
people [14]  52/10 61/14
73/7 73/12 73/24 75/10
79/13 79/17 79/17 79/24
80/14 82/3 82/9 111/13
per [1]  29/21
percent [16]  12/7 13/1
13/2 14/22 14/23 19/20
20/11 20/12 22/7 30/16
31/6 31/12 36/7 43/8
82/17 107/10
perfect [3]  114/10 115/23
120/9
perfectly [3]  5/19 6/6
47/16
perform [2]  17/14 20/23
performed [1]  17/15
perhaps [2]  68/14 100/23
period [1]  35/4
permit [73]  6/12 26/9
27/5 27/8 29/23 35/16
38/2 38/3 38/11 38/21
39/1 39/5 39/9 39/11
39/13 39/18 39/23 39/24
39/24 40/16 40/20 44/1
49/24 51/1 51/13 51/14
51/21 52/8 54/4 54/6 56/7
56/13 59/18 62/24 63/13
70/12 88/6 88/7 90/22
91/4 96/1 96/7 96/15
96/19 97/1 97/2 97/15
97/19 97/20 98/13 99/1
99/16 100/6 100/13 103/11
103/21 104/4 104/7 106/14
108/19 109/8 109/10
109/13 110/21 111/19
111/25 112/18 112/23
117/14 118/6 120/16
121/12 121/25
permits [6]  6/5 39/19
39/22 40/2 93/18 94/8
permitted [1]  122/13
perpetual [3]  55/16 55/18
77/19
perpetuate [1]  49/1
perpetuation [1]  57/17
perpetuity [1]  55/24
person [3]  22/16 47/11
104/1
personally [2]  22/11

119/7
persons [2]  44/20 44/21
perspective [4]  19/18
22/11 29/11 81/11
phrase [2]  102/11 102/12
75/22
physically [3]  71/7 71/8
PI [11]  6/9 6/10 10/10
11/17 12/19 20/14 26/25
85/12 102/24 118/15
118/16
pick [2]  75/11 102/2
picture [4]  16/2 106/12
107/8 109/7
piece [9]  32/21 82/14
88/17 89/4 95/24 97/22
100/11 115/8 118/5
PILGRIM [3]  2/2 84/7
124/12
pink [1]  64/15
place [4]  5/17 44/19
105/16 107/15
places [1]  119/5
plainly [1]  23/2
plaintiff [6]  1/4 1/13
5/20 7/21 8/22 74/8
plaintiff's [8]  5/8 5/23
10/10 10/24 68/8 90/24
98/21 121/10
plaintiffs [17]  3/3 4/5
4/14 6/2 30/11 68/15
73/19 76/21 77/18 77/21
78/11 80/5 80/8 80/14
80/19 82/9 91/25
plan [4]  20/11 38/11 63/2
80/9
planning [1]  8/12
plans [3]  38/12 75/3
104/2
plate [1]  92/3
play [1]  106/6
plays [1]  106/7
plaza [2]  64/25 64/25
please [13]  8/21 9/16
10/23 11/21 14/9 14/10
18/12 20/14 26/19 36/24
107/25 110/16 112/3
plenty [1]  71/17
plus [2]  22/1 28/17
PNF [2]  59/20 59/21
point [39]  8/3 14/17
14/18 14/19 14/20 18/17
29/15 41/8 50/2 53/15
54/7 55/17 55/22 56/1
68/7 72/25 76/2 79/19
80/5 81/6 81/9 82/21 83/2
84/9 90/20 93/15 95/18
95/23 96/2 101/20 106/17
109/6 112/24 114/17 115/7
115/15 115/19 118/22
120/18
pointed [3]  20/8 56/9
77/6
points [5]  30/10 53/14
81/18 83/3 119/20
policy [3]  7/16 57/16
57/19
position [13]  9/14 9/20
24/12 25/7 41/2 43/7
44/16 60/7 69/4 72/5
82/24 83/25 90/24

**P** Case 1:10-cv-00476-RMC Document 115-14 Filed 06/13/14

possibility [1]   70/1
possible [2]   20/5 61/18
possibly [2]   57/7 86/16
potential [1]   80/11
potentially [2]   77/22
  110/10
power [8]   84/17 85/3
  106/17 108/1 108/3 108/10
  108/23 112/9
powers [1]   58/1
practical [3]   58/6 78/13
  113/14
practically [1]   32/25
preceded [1]   96/8
precedence [1]   53/2
precedent [1]   96/14
preceding [1]   96/16
precleared [2]   15/20
  15/22
preclude [1]   63/16
precludes [5]   49/7 58/11
  60/24 62/7 65/6
predictably [1]   78/1
predicted [1]   37/19
predicting [4]   12/5 28/19
  28/22 33/25
prediction [1]   14/21
predicts [1]   14/20
preemptively [1]   33/16
prefers [1]   67/14
preliminary [14]   1/9 5/5
  21/12 23/23 25/13 25/15
  35/13 35/15 46/17 46/19
  46/24 49/11 90/19 93/6
premarked [1]   14/14
premise [1]   104/6
prepared [1]   114/5
present [3]   4/14 67/18
  70/4
presentation [1]   122/15
presented [1]   73/20
president [3]   22/18 75/14
  76/6
president's [2]   100/13
  100/15
presidential [16]   40/16
  40/20 56/7 56/13 69/15
  69/16 70/12 73/4 96/10
  97/5 97/13 99/5 99/15
  100/6 100/13 101/2
pressing [2]   85/5 85/11
pressure [1]   63/3
presumed [2]   97/9 109/25
presumptively [1]   5/12
pretty [1]   39/7
preventing [4]   49/2 54/11
  67/4 81/3
prevents [1]   50/1
previewed [1]   86/6
previously [1]   124/6
price [1]   60/7
priced [1]   21/23
primary [31]   17/4 52/17
  52/21 52/21 97/6 97/7
  97/8 97/9 98/9 103/18
  103/20 108/16 109/21
  109/22 109/24 110/5
  110/13 110/15 110/23
  111/1 111/2 111/4 111/7

111/10 112/6 112/13
  112/14 112/14 113/4
  116/13 116/14
principal [7]   56/5 60/23
  60/24 61/9 85/4 85/10
  105/20
principals [1]   90/3
prior [3]   5/9 5/16 90/2
priority [1]   51/24
private [19]   51/6 51/25
  57/17 57/18 57/19 60/6
  70/15 70/21 73/12 98/3
  98/8 105/4 105/7 105/16
  105/19 105/25 106/6 117/8
  117/13
privately [4]   62/15 63/9
  66/22 104/17
probably [5]   32/11 48/11
  91/10 107/7 108/15
problem [9]   15/25 42/11
  43/22 52/6 63/14 85/24
  113/11 113/13 119/15
procedural [2]   74/14 83/6
proceed [2]   50/23 111/24
proceedings [5]   2/6 6/2
  84/6 123/9 124/5
process [10]   39/18 47/25
  49/15 61/7 69/1 74/14
  77/8 98/13 98/25 116/24
processes [1]   99/18
processing [4]   80/16 81/4
  96/7 106/22
produced [1]   2/6
product [2]   15/14 108/19
proffer [1]   30/4
profit [1]   19/2
profitable [4]   30/14
  77/22 78/1 78/3
profitably [1]   69/3
program [3]   15/21 15/22
  16/24
programs [1]   16/20
prohibited [2]   101/9
  108/3
prohibiting [5]   87/5
  87/10 88/23 92/4 92/6
prohibition [2]   88/13
  95/8
prohibitions [5]   89/9
  89/10 89/15 89/19 90/8
project [18]   24/16 24/20
  25/3 25/5 31/18 35/17
  36/3 36/20 37/7 38/1 41/8
  41/10 61/7 82/13 88/7
  88/20 88/21 89/1
projected [4]   11/14 11/15
  12/3 12/23
projection [3]   12/13
  12/14 12/15
projections [22]   11/10
  11/12 13/4 13/14 13/16
  13/21 13/24 13/25 14/3
  14/7 14/8 19/14 19/16
  20/3 29/5 30/7 33/7 33/18
  34/21 34/21 38/8 65/17
projects [1]   15/9
promises [1]   107/4
promote [1]   58/2
promoting [1]   67/9
promulgated [1]   115/2
promulgation [1]   102/14

proof [1]   109/25
property [7]   52/11 77/1
  97/11 112/17 112/22 117/9
  121/19
proponents [3]   14/7 21/4
  83/23
proposal [1]   67/13
proposed [6]   18/14 24/13
  48/17 65/23 66/7 89/1
proposing [1]   47/7
proposition [4]   30/15
  31/24 98/22 121/15
protect [1]   80/1
protection [8]   51/4 51/11
  51/18 51/21 53/23 104/23
  105/1 106/10
prove [2]   40/20 107/11
proves [4]   59/6 104/15
  104/16 104/17
provide [7]   15/14 79/23
  80/4 80/13 89/25 102/22
  122/13
provided [1]   124/4
provision [4]   84/15 85/1
  100/12 102/6 102/11
provisions [2]   94/3
  102/11
public [4]   65/3 70/16
  73/11 106/20
publicly [4]   62/10 63/17
  63/19 108/4
published [1]   116/25
pull [1]   89/24
pulling [1]   89/11
punch [1]   57/13
pure [1]   82/14
purports [1]   84/19
purpose [12]   24/5 36/2
  36/19 37/6 37/25 58/10
  79/9 79/19 79/20 82/12
  93/2 121/17
purposes [5]   44/20 44/21
  45/9 46/10 70/4
pursuant [2]   85/14 103/21
pursue [2]   62/24 63/2
push [1]   17/19
put [13]   10/23 17/21 29/1
  32/7 42/24 43/1 48/3
  68/17 71/24 73/22 77/14
  116/6 121/10
puts [3]   59/15 61/7 63/3
Putting [2]   93/20 93/21

**Q**

quality [2]   33/16 34/19
quarter [4]   71/6 71/9
  94/14 94/15
quarters [1]   40/14
Queen [1]   70/25
question [25]   24/25 27/13
  41/21 41/22 41/23 41/24
  42/17 44/15 45/6 46/12
  46/14 46/15 50/20 53/8
  53/12 53/13 55/1 59/15
  67/12 68/8 74/23 76/1
  83/4 83/5 119/3
questioning [1]   30/4
questions [5]   27/11 27/25
  41/9 86/2 104/12
quibble [1]   68/14

**Q**

quick [1]   47/8
quickly [2]   8/9 108/15
quite [8]   15/9 19/4 21/12
 52/12 54/13 59/8 64/3
 102/15
quote [18]   23/12 24/4
 59/19 60/4 60/6 60/24
 61/20 63/2 66/11 66/12
 88/5 88/18 88/25 89/5
 102/13 112/4 112/8 117/1
quoted [3]   38/8 60/15
 61/12
quoting [3]   23/6 36/13
 36/17

**R**

race [10]   26/10 26/10
 26/11 38/24 39/6 39/6
 64/7 64/9 64/10 64/11
rack [1]   17/21
racks [1]   15/24
raise [4]   78/1 78/7 93/7
 100/21
ran [1]   81/25
ranked [1]   62/16
rankles [1]   70/4
Rapids [1]   1/24
rate [3]   12/6 12/7 13/2
rates [3]   32/13 32/15
 32/17
rather [1]   85/17
reach [2]   19/17 85/18
reaction [2]   22/25 23/1
 23/2
read [7]   20/8 36/22 45/21
 55/20 87/20 88/3 104/24
reading [1]   109/19
ready [2]   27/17 52/12
real [3]   60/4 60/10 117/9
reality [1]   19/9 19/10
 58/6
realize [2]   94/11 115/1
really [30]   6/21 6/23
 24/17 24/19 31/12 44/23
 45/22 47/21 48/1 49/11
 51/8 51/22 52/16 55/5
 57/13 67/2 67/22 72/11
 84/2 92/11 92/16 93/14
 104/11 105/17 105/18
 108/9 108/15 109/5 112/1
 116/21
reason [15]   17/11 30/3
 31/20 47/20 49/10 49/18
 64/24 67/19 75/11 75/12
 75/12 81/13 81/22 85/11
 87/23
reasonable [9]   28/17
 42/21 43/6 43/6 43/14
 43/14 60/7 80/17 83/14
reasons [3]   45/1 65/17
 66/24
rebuts [1]   102/25
rebuttal [1]   101/19
rebutted [1]   63/21
recall [2]   34/8 117/1
received [6]   27/5 27/8
 71/11 112/17 112/18
 112/20
receiving [1]   97/15

recent [3]   28/14 93/4
 93/23
recently [1]   85/25
Recess [1]   84/5
reckless [1]   57/5
recognition [1]   70/6
recognize [6]   35/24 57/6
 85/16 110/14 111/3 112/14
recognized [3]   64/15 94/6
 121/13
recognizes [3]   61/1 62/7
 105/15
recognizing [1]   62/4
recollection [1]   22/16
reconcile [1]   53/6
reconciled [1]   51/2
reconvening [1]   123/1
record [14]   4/24 9/12
 10/13 11/21 14/10 18/2
 20/20 26/24 35/11 35/12
 58/19 59/5 68/4 118/25
recorded [1]   2/6
recover [1]   94/17
Recross [1]   3/2
red [3]   13/9 13/13 20/5
redirect [2]   3/2 41/16
redone [1]   103/15
reductions [1]   30/12
redundancy [2]   66/1 81/12
refer [6]   11/24 12/18
 14/13 35/22 36/1 37/13
referee [1]   64/12
reference [1]   46/25
referenced [1]   93/5
references [8]   114/7
 114/9 114/11 114/19
 114/20 114/21 114/24
 115/5
referred [2]   16/19 88/25
referring [3]   12/9 28/14
 91/25
refers [2]   111/1 111/1
regard [2]   6/12 78/20
regarding [1]   10/19
regardless [4]   32/23 33/1
 61/10 61/21
register [1]   114/6
regulated [1]   110/10
regulation [25]   53/2 57/4
 57/14 97/7 97/8 97/21
 108/17 109/22 110/5
 110/20 110/25 111/10
 112/3 112/5 112/6 113/5
 113/23 114/3 114/5 114/6
 116/12 116/21 117/23
 118/2 120/19
regulations [20]   52/17
 52/20 53/3 53/9 53/11
 53/15 68/25 83/14 103/19
 104/21 105/24 110/14
 111/3 112/14 113/22 115/2
 115/19 116/25 120/15
 120/20
regulatory [2]   40/22 58/1
rehabilitate [1]   15/14
rehabilitating [1]   22/5
reimbursed [3]   94/9 94/21
 94/22
related [3]   46/18 46/19
 124/7
relating [4]   84/21 87/6

relaxed [2]   23/25 24/3
relevance [1]   24/24
relevant [1]   73/15
relied [7]   49/18 49/23
 56/12 59/23 64/6 102/6
 103/14
relief [5]   5/8 6/12 6/14
 7/20 7/20
relies [2]   51/24 90/13
rely [7]   51/24 90/2
 103/17 109/23 111/16
 112/4 112/5
remand [1]   90/2
remember [4]   22/23 45/25
 59/7 89/14
remembered [1]   96/3
renamed [1]   94/2
render [3]   25/4 99/8
 99/13
rendering [1]   16/9
renegade [1]   63/9
repair [1]   56/11
repairing [1]   22/7
repairs [5]   15/10 17/14
 17/15 21/23 26/5
repeal [3]   90/1 90/7 90/8
repealed [1]   87/9
repeated [1]   89/18
repeatedly [1]   88/2
replace [4]   28/5 56/11
 69/24 69/25
reply [1]   102/8
report [3]   87/13 88/3
 115/6
Reporter [5]   2/2 2/2
 83/19 84/2 122/4
reporting [2]   60/19 94/16
reports [3]   88/4 93/25
 94/10
represent [2]   10/16 11/4
representatives [2]   76/6
 94/5
representing [1]   74/1
represents [1]   13/13
Republic [1]   70/24
request [1]   87/21
require [3]   90/3 120/23
 121/5
required [8]   40/3 52/25
 58/13 74/14 88/16 89/24
 98/25 120/15
requirements [1]   80/3
requires [3]   65/15 110/1
 120/14
rescinded [1]   121/21
respect [1]   6/19
Respectfully [1]   82/8
respects [1]   105/6
respond [3]   48/19 67/14
 67/20
responding [1]   5/14
response [8]   23/15 35/13
 44/14 45/23 47/9 80/25
 93/5 116/22
responsibilities [1]   9/23
responsible [2]   9/24
 75/17
rest [2]   52/4 113/11
restrict [1]   108/22
result [1]   49/19

**R** Case 1:10-cv-00476-RMC

resumed [1]   84/6
retain [1]   30/18
retired [2]   22/21 22/22
retroactive [1]   110/22
reveals [1]   60/10
revenue [2]   19/1 32/21
reversal [1]   58/21
reverse [1]   76/10
revets [1]   69/23
review [8]   14/17 33/20
 35/4 35/16 37/17 55/23
 75/2 96/19
rid [1]   52/6
right [155]
rights [24]   41/25 42/5
 42/9 42/20 46/10 52/1
 52/2 52/11 56/11 56/12
 56/14 56/15 56/17 62/11
 68/3 76/25 97/11 108/19
 108/20 108/20 111/13
 112/18 120/15 121/20
rise [1]   51/8
risk [1]   79/3
river [9]   11/22 14/12
 18/17 18/19 42/25 42/25
 55/20 92/10 94/2
Riverside [1]   52/3
Road [1]   1/17
roadbed [1]   19/19
rocket [2]   31/7 32/13
room [1]   64/16
RORY [2]   1/14 4/6
ROSEMARY [1]   1/9
roughly [1]   21/9
round [1]   64/22
RPR [2]   2/2 124/12
ruckus [1]   43/12
rule [2]   7/8 51/24
rules [10]   23/25 24/2
 57/7 57/7 57/7 68/25
 105/5 105/17 105/17 106/6
run [3]   6/10 7/11 96/22
running [2]   43/22 69/23
runs [1]   99/3
rushing [1]   81/5

**S**

safe [1]   79/23
safety [1]   57/7
said [55]   8/23 23/15
 23/18 31/18 33/13 33/22
 37/16 38/9 38/23 40/17
 40/19 43/25 47/9 47/11
 48/25 49/5 52/15 53/4
 56/3 56/17 57/9 57/11
 69/16 73/4 75/16 76/21
 81/1 83/17 83/22 88/8
 88/18 88/25 89/7 89/7
 89/8 89/12 93/17 96/7
 100/1 102/8 102/10 102/15
 104/13 106/16 106/17
 107/6 108/24 108/25
 108/25 109/3 109/3 109/9
 109/15 113/8 116/7
same [26]   7/18 13/8 13/25
 14/8 17/5 17/16 22/8 24/3
 26/3 28/20 31/21 31/22
 33/7 33/14 33/24 40/5
 63/10 66/5 66/24 83/7

sample [1]   59/2
satisfied [3]   59/20 74/21
 111/6
saw [3]   18/25 40/14 66/25
say [61]   5/24 6/24 12/23
 21/19 28/13 28/16 30/24
 38/5 47/10 47/24 52/7
 52/12 52/13 52/20 53/11
 54/23 55/18 56/5 57/10
 59/17 66/16 67/22 69/11
 70/4 71/5 74/20 76/7
 76/20 78/2 78/17 78/25
 83/13 83/24 84/24 84/24
 85/5 85/18 87/19 98/7
 105/17 105/24 106/19
 106/23 109/20 109/20
 109/21 109/24 110/21
 111/5 111/5 111/9 111/19
 113/4 113/7 114/13 115/18
 115/25 116/1 116/12 120/9
 122/4
saying [40]   14/19 36/8
 37/16 38/19 46/16 50/11
 56/12 57/3 57/8 58/3 58/9
 59/6 60/20 61/1 61/2
 62/21 66/17 76/12 76/18
 77/2 78/5 83/7 87/12
 87/24 87/25 89/20 94/11
 98/16 98/18 101/13 103/10
 104/16 105/22 106/1 106/4
 106/5 108/9 109/18 115/20
 116/3
says [45]   6/23 36/11 41/1
 47/25 48/7 51/25 52/10
 52/22 55/10 55/23 59/11
 59/24 60/4 60/6 60/16
 60/23 61/13 61/15 61/19
 61/20 65/19 76/19 77/13
 83/6 83/11 84/15 86/3
 88/5 93/25 94/1 97/8
 97/15 99/20 102/12 103/24
 105/2 109/23 109/23
 110/12 111/11 112/4 112/4
 112/5 115/11 115/20
scenario [1]   21/4
Schiller [1]   1/14
SCOTT [2]   1/22 4/7
screen [2]   10/23 13/8
second [13]   9/15 36/10
 46/21 50/5 50/15 50/16
 55/11 58/8 61/12 65/5
 67/15 83/18 86/6
seconds [1]   83/3
Secretary [10]   27/8 84/22
 86/5 99/22 99/25 100/3
 104/3 113/2 113/2 113/9
Secretary's [1]   100/3
section [11]   36/2 36/20
 39/19 65/14 80/25 84/18
 89/22 93/25 102/7 103/23
 103/24
secure [2]   79/23 80/17
security [1]   15/18
see [23]   4/10 8/9 10/24
 10/24 12/21 13/9 15/3
 16/1 30/24 36/8 37/2
 38/24 41/19 43/25 61/5
 63/4 65/24 73/19 74/3
 75/25 77/3 98/21 118/13

seem [1]   110/10
seems [4]   44/23 82/2
 101/23 114/9
seen [4]   11/2 13/11 21/3
 38/6
segregate [3]   15/20 17/2
 37/10
self [1]   64/23
self-financing [1]   64/23
sends [2]   60/18 62/21
senior [1]   59/24
sense [4]   29/16 29/17
 48/17 48/18
sentence [9]   36/11 61/19
 65/12 98/22 111/11 111/16
 111/23 112/1 116/18
sentences [1]   36/17
separate [2]   99/15 100/12
September [6]   11/23 94/24
 94/25 94/25 113/22 114/2
serious [1]   42/14
set [3]   6/7 58/25 90/12
seven [3]   29/11 29/20
 29/20
shall [3]   61/21 84/16
 104/1
shape [1]   17/13
share [1]   60/9
shared [4]   22/11 22/13
 26/21 55/9
sharpening [1]   67/21
she's [1]   122/8
Shea [2]   60/16 61/13
ship [1]   31/8
ships [1]   57/1
short [1]   33/20
shorthand [1]   2/6
shots [1]   64/13
should [19]   5/5 8/6 23/24
 26/5 42/7 43/25 50/17
 51/12 56/3 57/19 62/24
 63/18 64/8 90/12 91/4
 105/18 105/19 106/6
 118/12
shouldn't [1]   5/15
show [3]   9/3 10/3 10/19
 10/21 11/17 16/1 19/16
 20/14 35/3 49/6 52/1
 52/18 52/25 53/9 58/13
 58/22 59/2 65/16 65/22
 66/11 67/4 80/12 97/9
 103/18 103/20 106/15
 107/25 109/24 110/17
 115/25 117/9 118/12
showing [5]   14/3 49/6
 56/8 65/3 110/8
shown [2]   122/15 122/18
shows [7]   12/2 38/6 49/25
 64/15 68/4 88/15 106/16
sick [1]   116/8
side [8]   18/18 19/25 40/1
 48/3 49/17 62/16 65/2
 92/9
sides [2]   31/22 65/1
sight [1]   76/5
signed [4]   89/19 95/13
 95/14 95/15
significance [1]   39/13
significant [2]   15/9

S Case 1:10-cv-00476-RMC

significant... [1]   17/14
significantly [1]   29/10
silence [1]   90/5
similar [4]   46/7 66/2
  93/1 93/2
simple [4]   50/2 76/12
  85/22 91/11
simplest [1]   85/19
simply [5]   37/14 64/15
  67/8 98/23 99/14
since [8]   10/20 29/22
  57/9 59/13 70/4 86/22
  99/9 118/14
single [2]   52/24 117/12
sir [22]   4/20 4/25 7/24
  10/2 16/6 16/18 20/15
  24/18 27/17 28/4 28/9
  29/11 31/24 33/5 34/6
  34/24 44/9 67/24 73/23
  90/15 92/24 120/10
sit [1]   67/13
sites [1]   121/25
sitting [1]   44/7
six [5]   16/12 66/23 71/21
  106/25 107/6
SKAGGS [2]   1/14 4/6
sky [1]   32/13
slide [30]   10/25 11/2
  11/4 13/7 13/7 13/8 16/4
  16/7 16/7 18/12 62/12
  67/3 84/15 87/25 104/22
  105/2 106/13 106/15
  106/16 106/18 107/25
  108/18 109/6 109/21
  109/23 110/16 112/3
  112/16 115/25 122/15
slowed [1]   118/21
smart [1]   122/8
so [170]
so-to-speak [1]   101/15
some [28]   9/2 16/2 18/9
  18/9 19/4 25/5 25/20 26/1
  28/17 28/22 28/22 32/7
  37/10 45/8 55/8 55/9 56/1
  56/1 61/20 67/3 68/16
  68/16 77/5 80/19 85/18
  97/9 107/23 121/3
Somebody [1]   103/2
somehow [1]   20/3
someone [2]   67/6 67/7
something [16]   5/24 6/23
  26/20 35/5 41/22 42/20
  43/5 45/15 55/20 57/24
  61/8 75/19 81/14 92/19
  114/8 122/22
sometimes [1]   64/11
somewhat [1]   81/13
somewhere [5]   65/12 76/13
  76/14 76/16 116/25
soon [4]   22/2 38/19 44/1
  107/5
sorry [20]   4/10 6/25 13/7
  24/17 30/23 32/17 32/18
  34/24 37/2 52/10 54/15
  54/25 56/16 56/19 62/2
  62/19 75/4 79/15 93/16
  115/14
sort [15]   8/6 9/6 17/3
  65/4 68/6 68/7 72/23

75/24 77/1 80/25 92/13
  97/11 100/19 104/13
  104/15
Sound [1]   90/3
sounds [3]   103/13 110/2
  113/13
source [2]   58/8 76/24
sovereign [9]   5/11 6/18
  45/4 73/21 73/23 74/2
  105/10 105/11 112/9
sovereigns [1]   46/6
span [119]   15/2 15/3 15/4
  15/6 15/12 16/9 16/9
  16/11 17/8 17/11 18/22
  19/5 19/6 19/7 20/7 20/24
  21/2 21/6 21/7 21/20
  21/24 21/25 22/2 22/3
  22/4 22/10 22/25 24/8
  24/10 24/13 25/17 26/6
  26/15 28/1 28/11 28/23
  28/24 29/9 29/16 29/21
  29/22 31/11 31/13 31/16
  31/19 32/6 32/10 32/20
  32/23 33/8 37/7 37/11
  37/19 38/7 38/12 39/4
  39/17 39/25 46/11 49/1
  50/4 52/23 56/6 57/11
  57/22 58/2 58/7 58/10
  58/16 58/17 58/18 58/22
  60/1 61/3 62/1 62/4 62/16
  63/16 64/19 64/19 65/7
  65/12 65/13 65/20 65/25
  66/1 66/3 66/19 67/8
  67/11 68/4 68/20 69/10
  69/14 69/17 69/24 70/9
  70/14 70/17 70/21 71/8
  71/13 72/7 72/15 73/16
  74/6 74/9 74/19 81/3 81/6
  81/7 81/10 81/13 81/15
  81/22 82/6 82/6 104/18
  109/13
spans [2]   78/8 78/9
speak [4]   49/22 92/11
  101/15 119/1
speaking [3]   74/2 88/4
  100/8
speaks [1]   111/10
special [23]   40/25 44/18
  44/21 44/22 44/25 45/2
  45/9 45/12 45/14 46/5
  46/8 46/9 46/17 46/20
  46/25 47/4 47/7 47/19
  47/23 47/24 48/7 48/8
  78/20
specific [3]   22/16 72/23
  106/2
specifically [7]   11/25
  19/19 22/24 69/9 77/13
  97/15 97/22
specifications [1]   104/2
spell [1]   9/15
spend [9]   8/12 94/21 95/8
  100/2 100/24 100/25
  101/14 108/5 108/6
spending [9]   21/22 41/5
  87/7 92/8 94/8 94/18 99/7
  101/9 108/4
spends [1]   21/10
spent [9]   21/12 26/4 42/3
  87/14 92/9 92/10 92/12
  93/25 94/11

spikes [1]   80/6
spoke [3]   60/20 61/13
  82/21
sponsored [2]   11/7 18/1
spot [1]   98/9
square [1]   95/6
stage [1]   67/12
Stamper [1]   22/18
stand [1]   118/24
standard [1]   85/23
standing [1]   93/7
stars [2]   96/25 99/4
start [7]   11/20 22/13
  34/5 68/7 84/14 104/19
  105/1
started [6]   5/4 15/6
  36/13 38/24 68/9 80/24
starts [1]   105/4
state [125]
state's [2]   86/10 100/3
stated [4]   5/7 36/6 66/23
  124/6
statement [5]   14/11 20/10
  24/5 79/21 80/24
states [21]   1/1 1/10 2/3
  6/3 44/17 44/19 44/22
  45/6 73/18 76/25 79/25
  80/15 81/20 82/16 82/18
  89/7 93/14 99/22 105/13
  109/25 124/4
States' [1]   81/10
status [1]   94/1
statute [24]   46/20 55/21
  68/20 69/18 72/6 77/21
  85/14 86/3 86/7 89/12
  100/18 108/21 108/21
  109/19 110/12 111/6
  111/10 113/3 115/20
  115/21 115/24 115/25
  121/14 121/21
statutes [4]   71/17 76/18
  87/7 92/1
statutory [11]   48/22
  50/12 50/13 54/8 54/14
  68/12 68/16 81/1 90/3
  90/6 104/6
stay [1]   28/19
stayed [2]   28/24 29/2
Steele [2]   22/20 62/8
stems [1]   68/19
stenographic [1]   124/4
step [1]   74/14
Stephens [1]   1/17
steps [3]   63/19 64/3
  83/15
stick [1]   24/12
still [17]   4/15 4/17
  22/22 29/24 30/13 35/4
  39/2 62/24 63/13 76/24
  81/23 81/24 83/13 87/8
  87/9 103/10 111/24
stone [1]   39/14
stop [8]   21/22 43/13
  49/12 54/6 58/2 63/7
  63/11 76/6
stopped [1]   40/12
stops [2]   92/20 92/21
story [2]   35/5 119/18
straight [1]   79/20
Street [2]   1/20 1/23
Strike [1]   41/3

S Case 1:10-cv-00476-RMC    Document 164   Filed 06/13/14

stronger [1]   60/7
strongly [2]   87/3 111/23
stubborn [2]   43/10 43/13
stuck [1]   16/24
studies [3]   34/4 79/16
  80/12
study [16]   11/23 14/12
  33/12 33/15 33/21 36/11
  36/16 36/18 37/14 37/20
  38/6 59/15 59/15 59/16
  59/21 63/1
sub [1]   53/15
sub-point [1]   53/15
subject [5]   51/23 68/25
  75/23 76/24 102/11
subjected [2]   5/15 33/17
submission [1]   86/19
submit [2]   34/3 51/4
submitted [9]   34/2 34/13
  36/19 60/14 65/16 102/23
  103/14 104/3 106/21
subsequently [1]   70/7
subsidies [1]   64/23
substantial [1]   60/9
substantive [2]   113/1
  122/11
substitute [1]   45/14
succeed [1]   35/2
succeeded [1]   116/17
success [1]   48/11
successfully [1]   93/12
successor [1]   94/3
such [8]   5/11 5/14 72/16
  84/23 86/5 104/1 110/14
  111/3
sudden [2]   78/21 80/6
sue [1]   116/8
sued [1]   93/12
suffer [1]   25/14
suffering [1]   25/16
sufficient [3]   21/5 28/11
  30/17
suggest [4]   46/16 60/4
  65/23 82/1
suit [2]   5/13 5/14
suitable [1]   76/14
summarize [1]   41/4
summarized [1]   47/9
summary [4]   54/5 60/15
  85/15 102/9
summer [1]   62/3
support [6]   55/22 78/8
  78/9 79/24 79/25 98/21
supported [2]   49/4 49/5
supporting [1]   33/8
suppose [4]   20/16 41/6
  106/9 115/13
Supreme [5]   55/12 76/21
  85/23 105/3 105/21
sure [14]   37/3 48/15 61/3
  67/25 77/10 89/24 91/5
  92/23 94/17 96/5 96/12
  98/8 113/16 115/17
surprised [1]   46/13
survive [3]   20/12 66/17
  66/18
suspicious [1]   63/5
SWORN [1]   8/22
system [3]   80/13 105/20

106/9
T
table [3]   3/1 64/7 103/2
tail [1]   119/17
take [18]   14/22 15/25
  21/23 23/12 24/5 30/13
  41/9 41/10 41/12 48/12
  60/1 63/18 76/21 77/21
  83/14 84/1 122/21 122/23
taken [2]   124/5 124/9
takes [2]   30/16 74/13
taking [3]   20/11 31/6
  72/8
talk [12]   4/13 7/5 25/24
  37/22 47/4 51/18 52/9
  56/20 78/17 79/16 91/7
  110/3
talked [3]   37/9 77/18
  89/16
talking [6]   22/24 37/25
  42/17 66/9 92/3 110/9
talks [1]   110/1
tear [2]   24/9 69/25
technical [1]   75/5
tell [14]   9/20 12/2 13/13
  14/25 21/9 31/9 38/7 42/8
  48/20 72/11 72/25 74/5
  96/6 111/22
telling [4]   63/7 96/24
  110/13 115/24
ten [12]   10/21 11/15 15/7
  15/8 19/15 25/9 25/17
  26/2 39/3 84/1 123/6
  123/6
term [3]   17/9 68/14 80/4
termination [6]   55/3 55/4
  55/5 55/18 55/19 87/8
terms [9]   12/2 32/9 32/11
  32/15 47/18 62/16 75/20
  78/21 90/22
test [1]   33/16
testified [1]   28/1
testify [1]   8/19
testifying [1]   23/20
testimony [3]   22/9 62/10
  65/8
testing [2]   33/16 33/17
tests [3]   33/17 33/21
  33/24
than [19]   8/23 10/21 26/4
  29/10 33/22 35/8 39/4
  42/6 42/24 45/8 57/2
  64/19 69/22 74/10 77/2
  82/4 103/12 108/23 115/8
thank [37]   7/23 8/11 8/17
  9/18 10/8 18/4 18/6 19/11
  20/18 23/11 27/10 27/12
  29/14 37/4 41/14 41/15
  41/19 41/20 44/9 44/10
  45/20 82/22 83/1 83/2
  84/3 84/4 84/7 84/11
  90/15 90/18 95/23 101/17
  122/9 122/9 122/25 123/5
  123/8
thanks [1]   84/8
that [702]
that's [115]   8/8 9/5 13/7
  16/9 19/4 21/24 28/4
  30/22 33/9 33/10 34/13
  35/1 35/10 36/8 36/8

36/15 36/15 36/19 36/20
38/9 38/13 38/15 42/13
43/2 44/2 46/12 46/12
46/25 47/6 47/6 48/11
49/1 50/1 52/13 53/10
53/19 55/2 58/7 59/15
60/20 61/19 65/4 67/1
67/2 67/23 68/20 71/11
73/14 73/15 73/15 74/12
75/4 76/1 76/2 77/9 77/15
78/3 78/13 78/13 79/3
80/5 81/8 81/12 81/17
82/9 83/11 83/16 84/24
86/1 86/2 87/19 90/14
91/5 91/10 92/2 92/16
93/13 93/14 94/10 97/10
97/25 98/1 98/10 98/16
98/18 100/5 101/5 101/16
102/24 103/10 104/4
104/11 105/8 105/9 105/20
106/3 106/8 106/9 106/23
107/5 108/8 108/21 109/2
109/4 110/13 111/25
112/10 113/18 113/24
116/2 116/3 116/6 116/13
116/23 118/22
their [56]   6/4 6/13 11/12
  13/24 14/2 14/7 19/6
  19/15 20/8 20/13 22/23
  22/25 23/1 23/2 24/12
  26/12 30/13 38/24 39/1
  39/2 40/22 49/7 49/15
  53/4 58/12 58/19 58/19
  61/18 62/24 63/2 63/2
  64/8 65/3 65/8 65/23
  65/25 66/1 66/2 66/5 66/6
  66/23 68/23 77/19 78/25
  80/20 81/5 97/23 98/24
  100/21 106/18 109/19
  110/14 111/3 112/5 117/15
  120/16
them [39]   11/19 14/1 17/5
  22/23 22/24 25/4 30/14
  37/10 40/12 42/12 42/15
  42/21 42/21 43/14 49/22
  62/22 63/11 71/17 78/17
  79/2 81/16 82/11 88/8
  89/16 89/16 91/4 92/3
  93/12 100/21 105/8 105/10
  107/12 108/22 109/3 115/3
  115/6 118/21 122/8 122/13
themselves [3]   6/5 49/22
  77/8
then [44]   7/22 8/10 20/5
  22/4 27/16 32/18 35/6
  36/13 39/7 40/15 45/24
  46/20 46/22 48/16 49/12
  52/3 53/4 69/14 74/18
  74/24 80/25 82/5 84/22
  86/22 91/1 94/14 95/24
  97/18 104/4 104/13 105/24
  107/7 108/9 110/1 111/15
  112/25 114/6 114/14 116/8
  116/17 118/12 119/3 122/3
  122/10
theory [4]   49/20 106/10
  108/13 120/19
there [76]   6/8 6/19 12/1
  14/16 19/5 20/4 21/5
  21/20 22/20 22/23 24/3
  29/6 30/11 30/12 30/17

there... [61]   31/20 33/20
35/2 36/4 36/5 38/4 38/19
38/20 41/2 43/3 44/6
44/18 44/19 44/20 44/22
44/25 45/11 46/5 48/22
48/24 50/20 52/23 53/18
54/7 54/15 55/8 55/18
56/25 57/17 61/2 61/8
63/15 65/1 65/5 65/20
68/15 69/3 71/15 72/16
72/18 72/20 73/22 76/4
77/12 85/9 87/10 89/5
91/13 93/8 103/12 109/15
109/24 110/14 110/18
112/1 114/14 114/15 116/5
116/8 117/6 122/22
there's [62]   13/5 19/3
30/10 44/4 44/4 45/9
45/24 50/19 53/1 55/5
55/5 55/17 57/3 57/24
59/25 61/15 63/13 63/17
64/16 64/25 65/12 67/3
67/12 68/16 69/2 72/19
77/20 78/8 78/9 78/19
78/20 78/24 79/2 79/7
81/14 81/22 82/2 85/9
85/9 85/23 86/14 88/21
88/22 89/4 89/18 90/5
90/7 91/25 95/25 103/22
104/19 104/20 107/23
110/5 111/3 112/5 112/24
113/24 118/4 119/14
120/25 122/22
therefore [4]   47/19 86/20
91/2 101/1
these [29]   10/19 13/21
23/23 37/13 39/5 55/22
59/2 64/3 71/4 73/7 73/11
73/22 75/10 76/19 81/11
82/12 87/5 89/14 89/15
92/1 93/18 100/14 103/3
105/12 106/1 108/9 108/25
112/20 116/24
they [287]
They'd [1]   22/2
they'll [1]   69/3
they're [33]   30/8 38/17
40/5 43/18 43/20 43/20
46/18 46/18 48/15 55/19
57/18 63/9 64/12 64/17
64/18 66/16 68/11 78/5
78/16 85/14 94/10 94/11
94/20 98/3 98/4 101/5
102/1 102/1 103/9 104/16
107/13 110/9 116/1
they've [10]   14/1 38/17
40/20 56/13 57/11 69/21
87/9 107/3 108/24 109/4
thin [1]   85/8
thing [25]   9/6 13/23 40/5
40/18 44/23 56/21 58/7
58/12 65/9 71/23 72/16
75/24 77/1 78/13 90/7
97/1 97/11 100/19 107/24
108/16 110/14 110/17
111/4 113/3 120/9
things [20]   7/10 39/7
48/4 49/11 51/9 52/16
54/19 58/4 58/14 68/24

69/16 76/10 80/21 89/2
91/1 93/6 96/8 103/3
103/12 105/14
think [94]   20/12 22/13
27/23 28/14 30/6 34/3
39/7 39/7 44/16 44/18
45/1 45/15 46/18 46/18
46/24 47/7 47/17 48/11
49/17 49/21 50/9 51/7
51/11 51/13 51/22 53/3
53/8 54/3 54/5 55/14
55/25 56/25 57/12 58/9
58/20 59/4 60/9 60/14
63/6 64/8 64/9 66/22
67/21 68/6 74/5 75/17
75/17 75/21 77/18 77/19
77/24 80/5 81/8 82/2 82/8
82/9 82/20 82/23 83/4
84/12 85/6 85/8 85/15
86/14 87/19 87/20 87/21
87/23 89/25 90/7 90/19
92/17 95/10 98/24 99/13
101/25 102/2 104/11
104/21 107/11 107/24
108/12 111/23 113/20
115/9 115/18 117/2 117/11
117/12 118/18 118/18
118/19 118/25 119/21
thinking [1]   114/4
third [8]   1/23 14/17
14/20 50/24 50/25 51/7
58/12 65/9
thirty [4]   25/11 123/2
123/2 123/4
this [209]
Thomas [1]   9/13
those [38]   10/12 13/4
13/16 15/8 15/20 15/21
15/21 15/22 15/23 15/23
17/15 21/22 21/25 27/4
33/17 38/9 42/9 42/20
48/19 51/7 52/17 53/9
56/7 56/12 62/13 64/8
68/24 71/18 80/21 87/7
89/19 90/8 92/1 93/10
95/6 100/20 110/22 122/10
though [6]   32/21 33/1
44/7 62/16 63/13 107/14
thought [12]   6/7 24/23
33/23 35/3 40/11 44/19
53/18 62/12 67/19 86/25
100/23 107/21
thousand [2]   43/8 54/16
threatened [1]   66/15
three [18]   16/13 17/20
25/5 34/3 36/17 40/14
48/14 51/7 53/14 58/4
71/8 78/8 78/10 87/4
88/11 101/20 104/14
119/17
through [15]   10/11 10/15
17/1 21/12 30/23 47/25
52/17 53/9 59/9 64/24
69/21 73/10 73/23 76/6
82/1
throw [3]   43/13 52/5
65/12
tied [2]   97/23 100/22
time [33]   8/6 8/24 9/8
14/5 17/16 17/18 19/4
22/8 24/19 29/1 33/14

37/10 41/5 41/23 47/3
47/9 47/21 48/12 48/24
52/17 54/18 56/24 75/10
75/15 80/10 106/17 112/17
114/4 114/5 119/15 119/19
123/1 124/5
times [3]   26/4 78/25
96/24
timing [5]   113/7 113/24
114/10 115/9 115/16
tired [1]   77/6
title [3]   12/11 36/20
112/20
titled [1]   36/2
titles [1]   112/22
today [9]   4/13 7/4 7/22
28/17 28/20 46/9 46/16
51/18 89/6
today's [1]   6/2
together [3]   100/22 115/3
119/3
told [6]   22/17 74/7 88/8
111/15 111/18 111/25
toll [2]   18/25 20/16
tolls [2]   64/24 77/14
tomorrow [3]   119/4 122/23
123/1
too [10]   32/18 38/9 39/17
72/9 77/8 84/8 92/24
107/21 108/15 119/1
took [1]   62/11
top [5]   11/25 34/9 60/17
62/16 106/18
total [1]   19/17
totally [1]   111/19
touching [1]   66/18
town [1]   119/5
tracked [1]   53/14
tracks [2]   92/20 92/21
trade [4]   43/3 80/13
80/15 82/16
traffic [111]   10/14 10/16
10/19 10/21 11/4 11/10
11/16 12/3 12/5 12/7 12/8
12/23 12/24 13/1 13/6
13/14 13/16 13/21 13/24
13/25 14/3 14/4 14/7 14/8
14/23 14/24 14/25 15/4
16/20 17/3 17/3 17/8
17/10 17/15 17/19 18/25
19/1 19/3 19/13 20/11
21/5 21/18 21/21 22/6
22/8 28/2 28/10 28/13
28/16 28/17 28/17 28/19
28/24 29/4 29/5 29/8
29/16 29/24 30/1 30/2
30/8 30/12 30/13 30/16
30/18 31/1 31/4 31/5 31/6
31/8 31/13 32/19 32/24
33/1 33/7 33/12 33/13
33/21 33/22 34/21 34/21
36/6 36/16 37/8 37/10
37/13 37/19 38/6 38/8
38/22 39/9 39/11 60/2
60/2 64/16 64/21 64/22
65/17 66/5 66/24 78/8
78/9 78/24 79/2 79/7 79/8
79/17 80/6 80/12 80/22
82/14
transcript [3]   1/9 2/6
124/3

T Case 1:10-cv-00476-RMC

transcription [1]  2/6
Transit [1]  121/16
translates [1]  57/12
transport [4]  59/24 59/25
60/16 60/21
Transportation [6]  36/12
36/15 37/15 60/22 104/3
113/3
travel [2]  11/23 78/25
traveled [1]  22/19
treat [1]  24/18
treated [7]  25/20 25/21
26/2 105/7 105/18 105/19
107/3
treatment [5]  50/25 51/2
51/22 53/15 53/20
treaty [1]  47/19
tried [5]  21/7 58/17 59/3
83/24 106/14
tries [1]  65/20
trips [1]  79/1
truck [13]  10/15 12/24
14/24 16/21 16/24 20/11
25/20 26/1 30/16 31/6
36/6 78/18 82/17
trucking [1]  25/19
trucks [3]  15/21 15/23
69/23
true [11]  4/15 4/17 6/13
12/16 30/21 34/20 42/13
73/15 73/17 82/9 124/2
trunk [1]  119/17
try [5]  56/20 58/2 65/22
104/25 115/15
trying [14]  5/22 17/21
25/17 39/17 40/5 41/4
50/2 58/23 65/21 66/11
75/25 98/12 117/1 118/14
tunnel [3]  66/14 66/20
78/19
turn [3]  21/8 25/18 67/20
turned [1]  13/14
turns [2]  107/21 119/15
twenties [1]  71/22
twin [100]  15/2 15/3 15/4
15/6 15/12 16/9 16/11
17/7 17/11 18/22 19/5
19/7 20/7 20/24 21/2 21/6
21/7 21/19 21/24 21/25
22/2 22/3 22/10 22/25
24/8 24/13 25/17 26/6
26/15 28/1 28/11 28/23
28/24 29/8 29/16 29/21
29/22 32/6 32/10 32/20
32/23 33/8 37/7 37/11
38/7 38/12 39/4 39/17
39/25 46/11 49/1 50/4
52/23 56/6 57/11 57/21
58/2 58/7 58/10 58/16
58/17 58/18 58/22 59/21
60/1 62/1 62/15 62/25
63/16 64/19 64/19 65/7
65/11 65/13 65/20 65/24
66/1 66/3 66/19 67/8
67/10 68/4 68/20 69/7
69/19 69/14 69/17 70/8
70/9 70/14 71/13 72/7
72/14 73/16 74/6 74/9
74/19 81/15 81/22 104/18

two [27]  8/4 16/17 18/19
22/20 23/18 23/10 91/21
46/6 46/16 49/11 53/6
56/7 78/9 82/4 82/17 83/3
84/9 87/4 87/5 90/11
90/14 99/18 100/20 100/21
104/11 121/21 122/8
type [2]  61/20 72/23
types [1]  93/18
typically [1]  98/24

U

U.S [17]  1/19 15/17 17/4
19/24 39/25 45/10 45/10
45/10 45/11 46/4 48/23
62/16 63/18 65/2 68/5
98/14 108/4
U.S.C [1]  103/23
uh [1]  53/21
Uh-huh [1]  53/21
ultimate [1]  109/1
Ultimately [1]  9/24
unauthorized [3]  86/21
90/10 90/11
uncomfortable [1]  93/14
unconstitutional [2]  85/2
85/14
uncovered [1]  115/10
under [21]  5/10 14/4
16/23 19/13 21/18 22/6
29/2 46/4 50/19 50/21
53/15 54/3 55/15 71/10
74/12 89/22 92/6 92/21
95/8 100/6 102/20
undercut [2]  81/6 81/11
undercutting [1]  81/19
understand [18]  7/19
17/13 34/14 34/24 44/17
54/11 54/12 72/4 82/20
82/24 92/19 92/23 95/23
99/17 107/14 108/2 117/22
119/17
understanding [4]  18/13
20/2 23/22 74/22
understood [7]  24/22
46/13 48/15 83/21 91/14
91/19 96/4
undertaken [1]  94/3
unenforceable [1]  89/21
unequal [1]  51/3 112/1
unequivocal [1]  89/18
unfair [2]  79/15 106/8
unfortunate [1]  79/3
union [1]  16/22
UNITED [19]  1/1 1/10 2/3
6/3 44/16 44/19 44/21
45/6 73/18 79/25 80/15
81/10 81/20 82/16 82/18
89/7 93/14 99/22 124/4
unknown [1]  30/8
unlawful [1]  73/15
unlawfully [1]  104/16
unless [3]  86/2 96/24
104/12
unprecedented [2]  63/19
64/3
unsafe [1]  57/5
untenable [1]  103/13
until [4]  39/1 54/22 80/6
104/2
unto [2]  65/10 65/11

up [18]  8/21 13/25 17/21
20/4 21/17 22/1 24/21
55/1 69/23 75/7 77/4 80/6
89/11 89/24 96/25 99/4
99/20 121/10
upheld [1]  79/22
upon [3]  7/1 89/2 102/13
upwards [1]  26/2
Urban [3]  91/23 102/19
102/25
urge [1]  118/16
us [34]  6/23 15/10 21/22
24/8 34/3 36/17 37/18
38/7 45/24 46/3 49/10
51/12 52/9 54/4 63/4
65/21 76/20 83/10 83/11
83/15 83/16 87/24 92/17
96/6 104/21 107/4 108/11
108/22 112/11 115/9
115/13 116/8 120/3 122/8
use [9]  6/19 13/25 58/1
68/15 79/5 79/13 79/17
79/18 104/22
used [9]  13/16 18/6 33/7
33/24 34/20 35/2 56/11
56/13 104/21
uses [2]  21/17 79/12
using [1]  50/7
usurping [1]  67/10

V

valid [1]  95/19
validly [1]  110/24
variety [1]  51/17
vastly [1]  64/19
vehicles [4]  28/15 29/12
29/13 29/21
venue [1]  109/9
venues [1]  107/16
versa [1]  26/15
versions [1]  88/3
versus [5]  4/3 15/23
17/21 53/16 68/8
very [21]  7/13 7/14 15/8
39/5 44/7 46/12 46/23
47/9 52/7 74/3 80/14
85/22 85/22 93/7 96/21
101/19 107/3 107/4 111/12
114/10 119/23
via [1]  15/21
viability [6]  30/18 32/10
32/12 32/16 32/20 66/14
vice [2]  9/22 26/15
vicinity [1]  76/15
view [6]  6/1 6/2 12/13
20/5 28/10 29/16
violate [2]  49/13 55/19
violated [1]  50/4
violates [1]  51/4
violation [8]  51/10 51/10
53/23 53/24 67/4 86/9
86/17 89/19
violations [1]  67/5
virtually [1]  112/20
voice [1]  56/19
void [3]  89/21 99/9 99/14

W

wait [7]  41/21 46/22
46/22 67/16 76/7 80/6
120/25

**W** Case 1:10-cv-00476-RMC

walk [1]   52/17
wandering [1]   69/12
want [50]   15/3 15/4 17/11
 27/25 30/4 30/10 32/23
 32/25 34/8 38/5 41/5
 48/14 57/1 59/4 60/6
 67/24 69/24 72/24 73/7
 73/11 73/11 73/16 75/9
 75/10 75/12 76/13 76/15
 77/13 77/13 77/14 77/25
 83/11 83/16 84/20 87/13
 87/13 87/14 87/17 87/21
 91/7 92/19 93/13 94/12
 94/13 94/16 107/17 110/25
 112/24 113/16 117/2
wanted [8]   4/14 8/5 8/7
 77/3 81/13 83/9 83/17
 96/2
wants [4]   15/2 61/17
 81/23 81/24
war [12]   27/9 75/15 75/15
 113/2 113/9 114/12 116/16
 116/24 117/7 120/19
 120/22 121/4
Warner [1]   1/22
warrants [1]   58/21
Warren [1]   1/18
was [129]
Washington [6]   1/4 1/15
 1/20 2/4 4/10 44/8
wasn't [2]   22/6 101/9
waste [1]   25/4
water [2]   78/18 79/1
waters [1]   47/22
WATSON [2]   1/22 4/8
way [30]   5/19 17/5 21/21
 21/22 21/24 33/9 33/9
 44/24 45/8 50/25 53/2
 57/23 59/6 59/8 67/21
 67/23 68/14 77/9 86/20
 87/20 97/3 97/10 98/24
 99/5 105/25 106/9 108/22
 110/11 111/11 120/25
ways [4]   47/16 85/19
 109/24 110/8
we [297]
we'd [3]   21/24 38/9 43/6
we'll [9]   17/17 17/18
 17/19 29/1 47/5 48/7 84/1
 110/21 122/23
we're [42]   7/22 25/12
 25/16 26/11 29/11 39/17
 39/18 40/4 41/5 41/6
 46/19 47/1 48/10 49/11
 52/12 54/19 55/25 57/3
 57/8 58/9 59/6 61/3 65/21
 75/16 80/11 85/5 85/8
 85/11 85/12 85/16 90/19
 90/20 105/22 105/24 106/4
 106/5 107/12 108/24
 111/12 115/13 117/4
 117/22
we've [12]   15/7 17/17
 25/17 27/23 53/14 54/4
 59/3 59/5 67/3 76/18 85/1
 104/15
weather [1]   4/10
Wednesday [1]   1/5
weight [1]   23/24

welcome [1]   35/8
well [76]   6/11 7/18 8/8
 10/17 12/6 14/3 15/3
 15/24 15/25 16/2 18/25
 23/13 23/16 23/18 24/2
 25/16 27/13 29/1 30/6
 31/1 31/9 31/15 32/8
 33/11 34/18 36/5 36/22
 37/12 37/21 38/23 39/7
 40/4 40/22 42/6 42/8
 42/11 43/1 44/2 45/4
 45/12 46/2 47/9 47/21
 47/25 48/20 49/21 52/7
 53/19 56/24 71/22 73/1
 73/1 73/25 75/4 76/7
 79/13 86/11 91/24 92/18
 95/10 95/15 96/2 96/24
 100/21 105/2 107/23
 110/11 110/16 111/9 112/8
 113/4 115/25 117/6 118/12
 120/18 120/24
went [6]   18/10 36/13
 40/15 47/25 58/15 66/22
were [47]   6/13 8/8 12/16
 13/16 16/22 16/23 20/25
 22/22 27/4 27/7 30/1 30/2
 30/24 34/13 35/4 38/4
 46/7 46/8 47/6 51/12
 53/18 54/2 54/4 54/25
 57/2 58/13 59/20 62/12
 63/24 86/15 87/5 92/5
 94/13 98/3 98/16 99/2
 99/14 99/14 100/8 106/21
 113/22 114/13 114/14
 114/15 116/25 120/12
 120/15
weren't [4]   33/20 47/21
 79/4 92/4
what [170]
what's [9]   19/15 25/24
 67/7 70/24 87/13 87/15
 87/22 106/12 106/13
whatever [10]   58/1 61/24
 69/5 73/9 75/9 75/11 95/7
 107/17 113/23 121/2
whatsoever [1]   21/7
when [45]   13/19 14/5 15/6
 16/19 17/15 19/15 22/6
 23/17 27/17 28/13 28/16
 30/10 33/7 33/21 37/13
 37/17 38/23 40/14 42/3
 51/20 53/3 56/2 58/12
 63/4 66/9 75/7 78/17 79/4
 80/24 92/19 95/3 95/12
 96/6 103/24 104/8 105/3
 105/13 105/15 105/17
 105/22 106/21 107/12
 107/14 111/20 121/16
where [30]   14/2 18/13
 18/16 22/17 30/4 30/24
 31/5 52/24 61/10 62/13
 63/15 64/12 68/20 71/12
 71/16 71/21 71/24 81/8
 88/18 91/5 91/6 93/25
 97/10 98/7 110/3 110/22
 111/13 113/16 118/1
 120/12
whether [16]   5/16 13/19
 14/5 37/19 44/25 45/1
 45/6 50/8 51/22 51/23
 57/16 63/18 68/2 73/14

73/14 75/23
whether's [3]   5/1 5/1
which [58]   5/13 6/9 7/13
 7/21 9/3 14/13 21/5 25/19
 29/16 29/17 45/1 47/18
 51/24 52/4 54/17 54/19
 56/5 59/9 59/24 60/14
 61/2 62/7 63/23 66/12
 67/18 71/7 72/6 77/12
 80/12 80/18 84/9 85/17
 86/3 90/12 91/13 93/5
 93/24 98/12 99/6 99/19
 100/6 100/12 100/20 102/7
 102/7 102/23 104/14
 112/14 112/15 112/22
 113/8 114/7 114/8 118/4
 118/20 118/20 119/23
 124/8
while [2]   17/22 22/8
who [13]   38/24 51/5 55/19
 55/25 59/12 60/17 61/14
 61/16 109/8 117/13 117/14
 120/3 122/10
who's [2]   87/14 92/8
whoever [1]   73/9
whole [12]   44/4 45/13
 51/16 53/10 58/14 63/7
 68/25 104/6 104/14 110/17
 115/2 119/18
whom [2]   63/24 63/25
whose [2]   63/22 122/5
why [37]   4/18 4/24 6/17
 14/25 15/1 17/11 18/24
 25/12 25/13 30/24 41/25
 43/13 45/1 48/10 50/7
 52/4 52/4 52/18 65/5 65/5
 67/19 74/5 79/6 81/13
 81/22 91/9 91/20 92/2
 94/10 98/10 100/20 103/17
 104/21 107/5 109/7 111/5
 113/5
will [42]   6/24 16/11 17/7
 18/14 18/20 24/5 25/2
 25/14 26/9 26/13 29/1
 29/6 30/11 30/12 30/13
 37/20 38/20 38/22 42/9
 42/21 48/11 52/8 52/9
 52/16 58/6 60/1 61/11
 64/19 64/24 75/18 78/7
 78/7 80/25 81/6 88/9 90/5
 100/2 109/25 115/6 116/8
 119/1 122/2
willing [2]   8/15 66/16
wind [1]   87/16
Windsor [4]   66/14 66/20
 82/4 105/11
wins [1]   39/6
Wisconsin [1]   1/15
wish [1]   27/14
wishes [1]   48/18
within [2]   12/20 66/23
without [16]   46/25 70/11
 70/11 84/16 85/4 89/6
 91/14 91/19 92/25 93/2
 96/11 96/19 96/20 97/13
 109/25 110/21
witness [12]   4/14 4/19
 8/9 8/16 8/22 9/4 20/14
 26/17 34/8 34/16 44/12
 109/9
won [2]   26/13 39/6
won't [11]   18/23 23/2

won't... [9]  26/14 38/21
39/11 42/9 53/13 66/18
86/1 89/15 107/4
wonder [1]  74/3
word [4]  50/7 56/9 56/14
84/20
wording [1]  61/20
words [6]  14/18 56/11
60/5 61/23 64/8 90/5
work [6]  31/21 56/24
98/24 102/16 106/9 108/13
worked [1]  117/3
working [2]  17/19 114/13
workmen [1]  17/18
works [4]  21/21 21/21
73/23 108/13
world [2]  69/12 114/12
worry [6]  6/17 7/12 9/6
56/23 120/6 120/8
worse [1]  39/4
worth [2]  66/19 114/25
would [123]  6/8 6/10 6/13
10/3 12/13 12/16 12/18
13/3 13/24 14/22 19/5
19/6 19/17 20/5 21/1 21/5
22/7 22/22 23/18 24/8
24/9 24/9 24/12 25/4 25/4
25/6 25/6 26/5 26/16
28/19 29/3 29/8 30/17
31/7 31/7 31/12 31/13
31/16 31/16 31/20 32/7
32/11 32/15 33/9 35/4
35/6 35/22 37/12 39/3
39/25 42/4 42/24 43/1
45/2 45/2 47/8 47/10 48/9
49/5 49/10 49/12 49/14
51/13 53/24 54/6 54/7
57/6 59/1 60/4 61/6 61/20
62/5 63/16 65/17 65/18
65/19 67/19 68/2 69/14
70/17 71/7 71/9 71/11
75/12 75/23 79/5 79/6
80/7 82/1 83/10 85/17
88/20 91/14 91/18 93/1
98/2 98/4 99/8 99/11
99/13 103/15 104/10
104/19 104/25 110/2
110/17 111/7 114/25 115/7
115/15 115/16 116/12
118/25 119/2 119/3 119/19
119/24 121/18 122/7
122/13 122/14 122/21
123/6
wouldn't [8]  28/24 32/16
38/13 38/14 81/23 99/13
107/7 111/6
wrong [5]  13/14 17/10
61/8 74/3 103/12
wrote [3]  113/4 113/6
113/7

Y

yeah [1]  94/15
year [21]  10/15 13/23
21/10 21/14 23/4 23/8
25/6 26/3 29/12 29/13
29/21 29/24 34/6 39/1
59/23 60/11 62/2 87/5
92/3 94/13 112/19

years [21]  10/2 10/17
10/22 11/16 11/17 11/23
15/5 15/7 15/7 15/8 17/12
19/15 25/17 28/20 36/7
39/3 39/5 44/17 63/12
88/11 106/25
yelling [1]  23/17
yes [74]  4/20 4/23 5/3
5/25 7/24 9/13 9/17 10/14
11/6 11/9 11/11 11/22
13/12 13/18 16/6 16/14
16/18 18/15 20/17 22/18
25/16 28/7 28/9 28/12
29/7 29/7 30/20 31/25
32/3 32/7 32/8 32/17 33/5
35/20 35/25 36/24 37/10
37/20 38/9 40/24 47/2
47/13 54/10 54/21 56/18
70/10 70/19 71/2 71/10
72/18 73/25 74/22 74/23
75/4 77/13 78/11 84/11
90/17 91/5 93/4 94/22
96/3 98/18 99/24 101/6
101/16 101/21 113/21
119/13 120/1 120/21
122/14 122/17 123/3
yesterday [1]  26/22
yet [6]  5/21 63/21 89/8
111/5 111/5 117/15
you [416]
you'd [1]  22/5
you'll [5]  63/4 65/24
116/8 117/6 119/1
you're [36]  4/12 7/12
7/12 16/21 16/23 16/24
16/25 18/19 27/17 32/21
33/2 33/6 35/1 35/8 36/8
36/8 38/19 40/21 41/1
41/2 41/4 43/10 43/23
50/11 71/12 71/13 72/25
73/1 75/17 76/10 77/24
94/11 96/22 101/13 116/4
122/4
you've [6]  63/7 74/21
97/25 118/18 118/19
122/18
your [164]

Z

zero [1]  22/2