**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____ )
DETROIT INTERNATIONAL                       )
BRIDGE COMPANY, *et al.*,                    )
                                            )
      **Plaintiffs,**                )
                                            )
      **v.**                         )      **Civil Action No. 10-476 (RMC)**
                                            )
GOVERNMENT OF CANADA, *et al.*,              )
                                            )
      **Defendants.**                )
_____ )

## OPINION

The Ambassador Bridge spans the Detroit River between Detroit, Michigan and Windsor, Ontario and carries more than one-quarter of the total commercial traffic between the United States and Canada. The Bridge is privately owned by the Detroit International Bridge Company (DIBC) and its wholly-owned subsidiary, the Canadian Transit Company (CTC). However, the Ambassador Bridge is more than eighty years old. Its owners want to construct an adjacent twin spin (New Span) to serve customers while major work is performed on the Ambassador Bridge. To their dismay, however, a cross-border partnership of government entities has proposed the construction of a new publicly-owned bridge, the New International Transit Crossing/Detroit River International Crossing (NITC/DRIC), which would compete with the Ambassador Bridge and destroy the financial basis for the New Span.

Plaintiffs sue Federal Defendants for allegedly violating Plaintiffs' exclusive franchise right to own and operate a bridge between Detroit and Windsor and violating Plaintiffs' franchise right to build the New Span by promoting the publicly-owned NITC/DRIC and

preventing progress on the New Span for over a decade.  The Court already dismissed Count 4 of the Third Amended Complaint, which alleged that the United States Coast Guard violated the Administrative Procedure Act, 5 U.S.C. §§ 701-06, by intentionally delaying and failing to issue a navigational permit for the New Span.  Federal Defendants move to dismiss the remaining eight counts.  For the reasons below, the Court will grant in part and deny in part Federal Defendants' Motion to Dismiss.

## I.  FACTS[1]

### A.  The Ambassador Bridge

In 1909, the United States and the United Kingdom of Great Britain and Ireland, which at that time was responsible for Canada's foreign affairs, signed and ratified a treaty addressing, among other things, the construction of bridges and other impediments to navigation across the waters separating the United States and Canada.  *See* Boundary Waters Treaty, U.S.-Gr. Brit. (for Can.), Jan. 11, 1909, 36 Stat. 2448 (Boundary Waters Treaty).  The Boundary Waters Treaty governs the construction of new bridges over the boundary waters between the United States and Canada.  3rd Am. Compl. [Dkt. 105] ¶ 56.  The Treaty authorizes the construction of new bridges pursuant to "special agreements" and specifies that "concurrent or reciprocal" legislation by the United States Congress and the Canadian Parliament would constitute such a "special agreement."  *Id*. (citing Boundary Waters Treaty Art. XIII).  Except when authorized by such a "special agreement," any new uses, obstructions, or diversions of boundary waters require approval by an International Joint Commission.  *Id*. (citing Boundary Waters Treaty Art. III).

---

[1] The facts are taken from Plaintiffs' Third Amended Complaint, which are accepted as true for purposes of the motion to dismiss.  *See, e.g., Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The American Transit Company (ATC), predecessor to DIBC, was established in 1920 to build a suspension bridge between Detroit and Ontario, Canada.  3rd Am. Compl. ¶ 23. For clarity's sake (and because the difference is irrelevant), this Opinion refers to ATC and DIBC as DIBC, irrespective of time period.  In 1921, the U.S. Congress and the Canadian Parliament separately passed legislation granting DIBC and CTC, respectively, rights to construct, operate, and collect tolls on an international bridge between Detroit and Windsor.  *Id.* ¶ 57.  The U.S. statute was passed on March 4, 1921 and reads as follows:

> CHAP. 167.—An Act [t]o authorize the construction and maintenance of a bridge across Detroit River within or near the city limits of Detroit, Michigan.
>
> *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled.* That the consent of Congress is hereby granted to American Transit Company, its successors and assigns, to construct, maintain, and operate a bridge and approaches thereto across Detroit River at a point suitable to the interests of navigation, within or near the city limits of Detroit, Wayne County, Michigan, in accordance with the provisions of the Act entitled "An Act to regulate the construction of bridges over navigable waters," approved March 23, 1906: *Provided*, That before the construction of the said bridge shall be begun all proper and requisite authority therefor shall be obtained from the Government of the Dominion of Canada.
>
> SEC. 2. That this Act shall be null and void if actual construction of the bridge herein authorized be not commenced within three years and completed within seven years from the date of approval hereof.
>
> SEC. 3. That the right to alter, amend, or repeal this Act is hereby expressly reserved.
>
> Approved, March 4, 1921.

Act of March 4, 1921, 66th Cong., ch. 167, § 1, 41 Stat. 1439 (1921) (DIBC Act).[2]  Soon

thereafter, on May 3, 1921, the Canadian Parliament enacted a similar statute, which provided in

relevant part that CTC could:

> construct, maintain and operate a railway and general traffic bridge
> across the Detroit river from some convenient point, at or near
> Windsor in the province of Ontario, to the opposite side of the river
> in the state of Michigan, and may lay, maintain and use tracks on
> the said bridge for the passage of steam, electric or other locomotive
> engines, railway trains, and rolling stock, with all necessary
> approaches, terminal facilities, machinery and appurtenances
> required for the said bridge.

Act of May 3, 1921, 11-12 Geo. V ch. 57 (Can.) (CTC Act).[3]  The "effectiveness of the [DIBC]

Act was expressly conditioned on the passage of reciprocal legislation by Canada, and the

effectiveness of the [CTC] Act was expressly conditioned on the passage of reciprocal legislation

by the U.S. Congress."  3rd Am. Compl. ¶ 58.

In 1927, ATC transferred all of its rights and assets to DIBC, which, in turn,

merged into the present-day DIBC in 1979.  *Id.* ¶ 23.  CTC is and has been a wholly-owned

subsidiary of DIBC since 1927.  *Id.* ¶ 25.  By letter in 1927, the United States Department of

State (USDS or State) advised DIBC that because the DIBC Act and CTC Act constituted a

---

[2] In subsequent statutes, Congress extended the time in which DIBC could construct the Bridge.
*See* Act of April 17, 1924, 68th Cong., ch. 125, 43 Stat. 103 [Dkt. 133-18]; Act of Mar. 3, 1925,
69th Cong., 43 Stat. 1128 [Dkt. 133-19]; Act of May 13, 1926, 69th Cong., ch. 292, 44 Stat. 535
[Dkt. 133-20].  The 1926 Act also granted DIBC "[t]he right to sell, assign, transfer, and
mortgage all the rights, powers, and privileges conferred by this Act."  44 Stat. 535.  The Court
will refer to all three of these acts and the original 1921 Act collectively as the DIBC Act.

[3] The Canadian Parliament subsequently amended the CTC Act in ways not germane to this
lawsuit.  *See* Act of Mar. 31, 1927, 17 Geo. V. ch. 81 (Can.).  The Court will refer to this
amendment and the original 1921 CTC Act collectively as the CTC Act.

"special agreement" under the Boundary Waters Treaty, the construction of the Ambassador

Bridge would not require the approval of the International Joint Commission.  *Id.* ¶ 60.[4]

DIBC "raised money by selling bonds, acquired the necessary land, and

constructed the Ambassador Bridge and its accompanying facilities."  *Id.* ¶ 68.  The Bridge first

opened for traffic on November 11, 1929.  *Id.* ¶ 71.  Since then, DIBC has invested "hundreds of

millions of dollars into building, maintaining, operating, and upgrading the Ambassador Bridge."

*Id.* ¶ 74.  The principal value of Plaintiffs' right to own and operate the Ambassador Bridge

stems from the right to collect tolls from vehicles.  *Id.* ¶ 75.  The U.S. Congress designated the

Ambassador Bridge as part of the national highway system in 1995.  *Id.* ¶ 132.  Since 1998,

Congress "authorized and appropriated more than $230 million for the U.S. part of the

Ambassador Bridge Gateway Project, which was a highway expansion to connect the

Ambassador Bridge directly to the Interstate Highway and State Highway Systems in Michigan."

*Id.* ¶ 132.

### B.  1972 International Bridge Act

Interstate and international bridge construction in this country has been a direct

concern of the U.S. Congress since the mid-19[th] century.  *See Detroit Int'l Bridge Co. v. Gov't of*

*Canada*, 53 F. Supp. 3d 1, 6 (D.D.C. 2014) *judgment entered*, 53 F. Supp. 3d 28 (D.D.C. 2015).

Congress forewent its role in approving interstate bridges in 1946 but retained its right to

approve international bridges (between the United States and Canada or Mexico) until it enacted

the International Bridge Act of 1972, 33 U.S.C. §§ 535-535i (IBA).  *Id.* at 7.  The IBA for the

first time granted congressional consent for the construction, maintenance, and operation of

---

[4] Federal Defendants now maintain that the DIBC and CTC Acts do not constitute a special
agreement.  *See* Reply at 31.

international bridges without specific congressional legislation.  The IBA requires that the

foreign country consent, the proposed bridge comply with the 1906 Bridge Act, Act of Mar. 23,

1906, ch. 1130, 34 Stat. 84, and the proposed bridge obtain a set of Executive Branch approvals.

33 U.S.C. § 535.  Specifically, the IBA allows:

> a State . . . to enter into agreements (1) with the Government of
> Canada, a Canadian Province, or a subdivision or instrumentality of
> either, in the case of a bridge connecting the United States and
> Canada . . . for the construction, operation, and maintenance of such
> bridge in accordance with the applicable provisions of this
> subchapter.  The effectiveness of such agreement shall be
> conditioned on its approval by the Secretary of State.

33 U.S.C. § 535a.  Notably, the IBA requires presidential approval for an international bridge

and provides that "[i]n the course of determining whether to grant such approval, the President

shall secure the advice and recommendation of . . . the heads of such departments and agencies

of the Federal Government as he deems appropriate to determine the necessity of such bridge."

*Id*. § 535b.  The legislative history of the statute makes clear that it is "not [to] be construed to

adversely affect the rights of those operating bridges previously authorized by Congress to

repair, replace or enlarge existing bridges."  3rd Am. Compl. ¶ 142 (quoting H.R. Rep. No. 92-

1303).

### C.  Plans to Build the New Span to the Ambassador Bridge

The Ambassador Bridge is more than 80 years old and Plaintiffs have determined

the desirability of "building a second span . . . directly alongside the original span to ensure the

continued operation of the bridge."  3rd Am. Compl. ¶ 137.  Plaintiffs have spent more than a

decade attempting to obtain federal permits needed to build the New Span, which would

"upgrade the existing facility, reduce costly and disruptive maintenance required for the existing

facility, and substantially improve the efficiency with which traffic can be funneled into

specialized lanes in the customs plazas on either side of the border."  *Id*. ¶ 6.  "Plaintiffs have

spent over $500 million of their own funds to acquire the land for the New Span and on other expenditures related to the New Span," such as additional road construction from the bridge to major highways in the United States and Canada.  *Id*. ¶ 146.  Most obstacles to construction have been removed and Plaintiffs recently notified the parties and the Court that, on July 28, 2015, the Detroit City Council approved DIBC's acquisition of the real property and air rights over a section of the undeveloped Riverside Park.[5]  The lack of such rights had caused the U.S. Coast Guard (USCG) previously to deny a navigation permit to DIBC.  *See Detroit Int'l Bridge Co.*, 53 F. Supp. 3d at 11-12.  The New Span will be constructed entirely with private funds.  3rd Am. Compl. ¶ 147.

### D.  Plans to Build the NITC/DRIC

In late 2000, Transport Canada (part of the Canadian Ministry of Transport, Infrastructure, and Communities), the provincial Ontario Ministry of Transportation, the U.S. Federal Highway Administration (FHWA), and the Michigan Department of Transportation (MDOT) formed the Ontario-Michigan Border Transportation Partnership, which later was renamed the Detroit River International Crossing (DRIC) Partnership, to study transportation needs between Ontario and Michigan.  *Id*. ¶ 181.  In the beginning, the group focused on the potential construction of the New Span and completion of the Canadian portion of the Ambassador Bridge Gateway Project.  *Id*. ¶ 182.  Canada later proposed building a new publicly-owned bridge between Detroit and Windsor.  *Id*. ¶ 183.  Members of the DRIC Partnership entered into various contractual agreements to further their purpose.  *Id*. ¶ 184.  A working group of the DRIC Partnership considered fifteen potential crossing sites across the Detroit River for a new bridge, only one of which, designated as location X12, was the twinning of the Ambassador

---

[5] To date, the record does not include a notice of settlement of the land swap.

Bridge.  *Id.* ¶¶ 191-192.  Location X12 would have been "consistent with the construction and ownership of the Ambassador Bridge New Span as proposed by plaintiffs."  *Id.* ¶ 194.  Canada, however, favored a public bridge.  *Id.* ¶ 195.  Plaintiffs allege that Canada had a "long-term goal of acquiring control of plaintiffs' franchise by building a new bridge and preventing plaintiffs from competing;"[6] they allege that Canada acted specifically to eliminate location X12 from consideration.  *Id.* ¶¶ 197-205.  Ultimately, the DRIC Partnership eliminated the twinning of the Ambassador Bridge as an alternative for further evaluation.  *See id.* ¶¶ 197-206.

On June 5, 2012, the Canadian Government, the Governor of Michigan, MDOT, and the Michigan Strategic Fund (MSF)[7] agreed to a "Crossing Agreement" to build the Detroit River International Crossing/New International Trade Crossing (NITC/DRIC), a new bridge between Detroit and Windsor that is to be located fewer than two miles from the Ambassador Bridge.  *Id.* ¶¶ 7, 32.  The Crossing Agreement "provides a framework for a Crossing Authority established by Canada to design, construct, finance, operate, and maintain a new International Crossing between Canada and Michigan."  *Id.* ¶ 255.[8]

Studies estimate that "up to 75% of the Ambassador Bridge's truck traffic and up to 39% of its passenger traffic will be diverted to the NITC/DRIC."  *Id.* ¶ 8.  In 2006, FHWA recognized that the New Span was likely to "preclude the need for another publicly controlled

---

[6]  Plaintiffs allege that Canada has long wanted to obtain ownership of the Ambassador Bridge to their detriment, by means fair or foul.  *See, e.g.,* 3rd Am. Compl. ¶¶ 12, 13.  Having referred Plaintiffs' lawsuit against Canada to Canadian courts, this Court expresses no view of the matter.

[7]  MSF is a public corporation established by the Michigan Strategic Fund Act (Act 270 of 1984), M.C.L. §§ 125.2001, *et seq.*, to promote economic development and create jobs in Michigan.

[8]  It has been agreed that Canada will provide funding for the acquisition of land in Michigan, planning, construction, and operation of the new NITC/DRIC, through a loan to the State in the amount of US$550 million.  *See* 3rd Am. Compl. ¶¶ 42, 212.

crossing for 30 years." *Id.* ¶ 221.  In 2007, USDS officials warned the Secretary of State that "[t]he intense political machinations of the Windsor border crossing chess game continue.  The race is on to see whether the DIBC can complete its twin span before the bi-national DRIC project is ready." *Id.* ¶ 217.  Plaintiffs allege that NITC/DRIC threatens to destroy the economic viability of the Ambassador Bridge, or, at a minimum, the economic viability of the New Span and that Federal Defendants intend these results. *Id.* ¶ 8.

### E.  Regulatory Approvals for the New Span and NITC/DRIC

The Third Amended Complaint alleges that the Federal Defendants "have engaged in a consistent and repeated pattern of conduct that discriminates against the privately-owned New Span in favor of the government-owned NITC/DRIC, which the Federal Defendants have sought to promote while attempting to slow down and prevent the construction of the New Span." *Id.* ¶ 278.  Most of the relevant allegations concerning Federal Defendants' actions pertain to disparate treatment of applications for regulatory approvals required for the construction of the New Span and NITC/DRIC.

First, Plaintiffs complain State's issuance of a Presidential Permit to build NITC/DRIC.  DIBC does not require a Presidential Permit to build the New Span.  By letter dated August 3, 2005, USDS agreed with DIBC that "the replacement or expansion of existing bridges authorized by Congress prior to passage of the 1972 International Bridge Act did not require a Presidential Permit." *Id.* ¶¶ 144, 319; *see also* USDS Letter [Dkt. 133-7].  Since "DIBC is only seeking to expand (or twin) the operation of the bridge . . . DIBC does not require a Presidential permit." *Id.* ¶ 144 (quoting USDS letter).

However, both the New Span and NITC/DRIC must pass environmental evaluations and receive a navigation permit from USCG under the 1906 Bridge Act.  Act of Mar.

23, 1906, ch. 1130, 34 Stat. 84; *see* 3rd Am. Compl. ¶ 148.[9]  Federal regulatory approvals for the

NITC/DRIC, a public project, are subject to an interagency "streamlining agreement."  *Id.* ¶ 165.

FHWA granted expedited environmental approval for the NITC/DRIC and released the

NITC/DRIC Final Environmental Impact Statement on November 26, 2008 "in about half the

time needed for similar projects of this size."  *Id.* ¶ 165 (quoting FHWA).  The Governor of

Michigan applied to USDS for a Presidential Permit for NITC/DRIC and approval of the

Crossing Agreement on June 21, 2012.  *See* Notice of Receipt of Application for Presidential

Permit for the Construction of a New International Trade Crossing, 77 Fed. Reg. No. 133 (July

11, 2012).  In response to NITC/DRIC's Presidential Permit Application, Plaintiffs "submitted a

Comment on August 9, 2012 and a Supplemental Comment on September 10, 2012 to the State

Department, both of which explained to the State Department that it should promptly reject the

NITC/DRIC Application for a number of reasons, including that the NITC/DRIC Application

sought approval of an agreement illegally executed by the Governor, MDOT, and MSF."  *Id.*

¶ 261.  Despite Plaintiffs' comments, USDS published a notice in the Federal Register on April

18, 2013 that it had issued a Presidential Permit to the NITC/DRIC.  *See* Issuance of a

Presidential Permit to the State of Michigan, 78 Fed. Reg. No. 75 (April 18, 2013).  The Notice

did not mention any approval of the Crossing Agreement.  Upon inquiry from Plaintiffs' counsel,

"lawyers for the United States provided a letter . . . dated April 12, 2013, purportedly sent by the

---

[9] Obtaining environmental approvals for the New Span has been a complicated and extremely slow process.  Plaintiffs litigated before this Court the refusal of USCG to issue a navigation permit to the New Span and the Court granted summary judgment (on Count 4) in favor of USCG.  *See Detroit Int'l Bridge Co. v. Gov't of Canada*, 53 F. Supp. 3d 1 (D.D.C. 2014), *judgment entered*, 53 F. Supp. 3d 28 (D.D.C. 2015).  That decision is now on appeal.  *See* Notice of Appeal [Dkt. 204]; *see also Detroit Int'l Bridge Co. v. Gov't of Canada*, No. 15-5086 (D.C. Cir. filed Mar. 27, 2015).

State Department to legal counsel for the Governor of Michigan, reporting that the State Department had granted approval of the Crossing Agreement." *Id.* ¶ 17.

### F.  Procedural History

This suit was filed on March 22, 2010.  It initially named as defendants the USCG, the Department of Homeland Security, FHWA, and the Government of Canada.  *See* Compl. [Dkt. 1] ¶¶ 17–20.  Federal Defendants moved to dismiss on July 8, 2010, and Plaintiffs voluntarily dismissed Canada, FHWA, and certain named officials on November 29, 2011 because the Michigan Legislature appeared to have blocked construction of the NITC/DRIC. *See* Nov. 29, 2011 Notice of Voluntary Dismissal [Dkt. 52].

After a period of political maneuvering that Plaintiffs contended violated Michigan law—an allegation that is not part of this lawsuit—NITC/DRIC supporters resumed their efforts to build a publicly-owned bridge.  Based on these renewed efforts to construct a public bridge, Plaintiffs filed a Second Amended Complaint on February 11, 2013.  *See* Second Am. Compl. [Dkt. 83].

On May 29, 2013, Plaintiffs filed a Third Amended Complaint against USDS; the Secretary of State, in his official capacity; NITC/DRIC Partnership; FHWA and the Administrator of FHWA, in his official capacity; the Government of Canada;[10] the Windsor-Detroit Bridge Authority, an agency of Canada; USCG; and the Commandant of the Coast Guard, in his official capacity.  *See* 3rd Am. Compl. [Dkt. 105] ¶¶ 26–36.  With the exception of

---

[10] The case against Her Majesty the Queen in Right of Canada and the Windsor-Detroit Bridge Authority has been stayed pending a final decision in *CTC v. Attorney General of Canada*, Court File No. CV-12-446428, filed in the Ontario Superior Court of Justice, and any appeals.  *See* Op. [Dkt. 197]; Order [Dkt. 198].

Count 4, previously decided, and those directed against Canadian entities, the Third Amended Complaint sets forth eight Counts variously against the Federal Defendants:

- Count 1—Violation of the foreign compact clause, U.S. Const., art. I, § 10, cl. 3 (USDS and Secretary of State);

- Count 2—Declaratory judgment as to Plaintiffs' franchise rights (All Defendants);

- Count 3—Declaratory judgment as to DIBC's franchise right to build the New Span (All Defendants);

- Count 5—Declaratory judgment as to uncompensated taking of private property (All Defendants);

- Count 6—APA claim**s** based on issuance of Presidential Permit (USDS);

- Count 7—APA claim**s** based on approval of Crossing Agreement (USDS);

- Count 8—Judicial Review of ultra vires and unlawful action (USDS; USCG; FHWA; United States); and

- Count 9—Equal Protection claim (All Defendants).

*See* 3rd Am. Compl. ¶¶ 289-324; 332-373.

Federal Defendants move to dismiss these eight counts from the Third Amended Complaint.[11]  The motion is ripe for decision.

## II.  LEGAL STANDARDS

### A.  Standard under Fed. R. Civ. P. 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a complaint, or any portion thereof, for lack of subject matter jurisdiction.  Fed. R. Civ. P.

---

[11] Plaintiffs' Motion for Partial Summary Judgment on Counts 1, 3, 6 and 7 of the Third Amended Complaint, Dkt. 133, is pending before the Court.

12(b)(1).  No action of the parties can confer subject matter jurisdiction on a federal court because subject matter jurisdiction is both a statutory requirement and an Article III requirement. *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003).  The party claiming subject matter jurisdiction bears the burden of demonstrating that such jurisdiction exists.  *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008); *see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (noting that federal courts are courts of limited jurisdiction and "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction") (internal citations omitted).

When reviewing a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), a court must review the complaint liberally, granting the plaintiff the benefit of all inferences that can be derived from the facts alleged.  *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004). Nevertheless, "the court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions."  *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006).  A court may consider materials outside the pleadings to determine its jurisdiction.  *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005); *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003).  A court has "broad discretion to consider relevant and competent evidence" to resolve factual issues raised by a Rule 12(b)(1) motion.  *Finca Santa Elena, Inc. v. U.S. Army Corps of Engineers*, 873 F. Supp. 2d 363, 368 (D.D.C. 2012) (citing 5B Charles Wright & Arthur Miller, Fed. Prac. & Pro., Civil § 1350 (3d ed. 2004)); *see also Macharia v. United States*, 238 F. Supp. 2d 13, 20 (D.D.C. 2002), *aff'd*, 334 F.3d 61 (2003) (in reviewing a factual challenge to the truthfulness of the allegations in a complaint, a court may examine testimony and affidavits).  In these circumstances, consideration of documents outside

the pleadings does not convert the motion to dismiss into one for summary judgment. *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 21 (D.D.C. 2003).

### B. Standard under Fed. R. Civ. P. 12(b)(6)

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face. Fed. R. Civ. P. 12(b)(6). A complaint must be sufficient "to give a defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Although a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face." *Id.* at 570. A court must treat the complaint's factual allegations as true, "even if doubtful in fact." *Id.* at 555. But a court need not accept as true legal conclusions set forth in a complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007). Federal Rule of Evidence 201 provides that a court may judicially notice a fact that is not subject to "reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A court may take judicial notice of facts contained in public records of other proceedings, *see Chao*, 508 F.3d at 1059; *Settles v. U.S. Parole Commission*, 429 F.3d 1098, 1107 (D.C. Cir. 2005); *Covad*

*Communications Co. v. Bell Atlantic Co.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005), and of

historical, political, or statistical facts, and any other facts that are verifiable with certainty, *see*

*Mintz v. FDIC*, 729 F. Supp. 2d 276, 278 n.5 (D.D.C. 2010).  Also, a court generally may take

judicial notice of materials published in the Federal Register.  *Banner Health v. Sebelius*, 797 F.

Supp. 2d 97, 112 (D.C. Cir. 2011); 44 U.S.C. § 1507 ("The contents of the Federal Register shall

be judicially noticed . . . .").  Further, judicial notice may be taken of public records and

government documents available from reliable sources.  *Hamilton v. Paulson*, 542 F. Supp. 2d

37, 52 n.15 (D.D.C. 2008), *rev'd on other grounds*, 666 F.3d 1344 (D.C. Cir. 2012); *see D.C.*

*Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1257-58 (D.C. Cir. 1971) (noting that

congressional documents and speeches made on the floor of the House of Representatives are

part of the public record); *Wash. Legal Found. v. U.S. Sentencing Comm'n*, 89 F.3d 897, 905

(D.C. Cir. 1996) (common law right of access to "public records" includes access to government

documents "created and kept for the purpose of memorializing or recording an official action,

decision, statement, or other matter of legal significance, broadly conceived").  In addition, a

court may take judicial notice of a formal *position* of the U.S. Government.  *See Simpson v.*

*Socialist People's Libyan Arab Jamahiriya*, 362 F. Supp. 2d 168, 178 n.5 (D.D.C. 2005) (taking

judicial notice of State Department's annual publication, Patterns of Global Terrorism, as a

reflection of the formal and official position of U.S. Government), *aff'd*, 470 F.3d 356, 362 (D.C.

Cir. 2006).

### III.  ANALYSIS

#### A.  Count 1

Count 1 alleges that the Crossing Agreement is invalid because it violates the

foreign compact clause of the United States Constitution, which provides: "No state shall,

without the consent of Congress . . . enter into any agreement or compact with any other state, or

with a foreign power." U.S. Const., art. I, § 10, cl. 3. At issue here is Section 3 of the IBA:

> The consent of Congress is hereby granted for a State . . . to enter
> into agreements (1) with the Government of Canada, a Canadian
> Province, or a subdivision or instrumentality of either, in the case of
> a bridge connecting the United States and Canada . . . for the
> construction, operation, and maintenance of such bridge in
> accordance with the applicable provisions of this subchapter. The
> effectiveness of such agreement shall be conditioned on its approval
> by the Secretary of State.

33 U.S.C. § 535a. Plaintiffs allege that the IBA delegated Congress' power under Article I,

Section 10, clause 3 to USDS without "an intelligible principle for the State Department to apply

in deciding whether to approve an agreement entered into between a State and a foreign

country." 3rd Am. Compl. ¶ 292. Absent such a guiding principle, the IBA is allegedly only "an

unconstitutional delegation of that Congressional power and responsibility." *Id*. ¶ 294. As a

result, Plaintiffs urge the Court to declare the Crossing Agreement, between agents of the State

of Michigan and the Government of Canada, "invalid, void, and unenforceable" because it "may

not lawfully be approved by the Secretary of State and has not been approved by Congress as

required by Article I, § 10, clause 3." *Id*. ¶¶ 296-97.

Federal Defendants move to dismiss Count 1 on two grounds. First, Federal

Defendants argue that the IBA does not unconstitutionally delegate congressional power because

Congress gave advance consent to agreements relating to international bridges, thereby

exercising its Article 1, Section 10 power. Second, Federal Defendants argue that even if there is

a congressional delegation of power to State, the IBA has satisfied constitutional requirements by

providing an intelligible principle to guide the Secretary's actions. Mot. to Dismiss [Dkt. 126] at

8.

There is no doubt that Congress may delegate its legislative power to the Executive Branch so long as it sets forth "an intelligible principle to which the person or body authorized to [act] is directed to conform." *TOMAC v. Norton*, 433 F.3d 852, 866 (D.C. Cir. 2006) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001)).  The Supreme Court has emphasized that "the general policy and boundaries of a delegation 'need not be tested in isolation' . . . [as] the statutory language may derive content from the 'purpose of the Act, its factual background and the statutory context.'"  *TOMAC*, 433 F.3d at 866 (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 104 (1946)).

The IBA conditions agreements for international bridges with Mexico or Canada on USDS approval.[12]  *See* 33 U.S.C. § 535a ("The effectiveness of such agreement shall be conditioned on its approval by the Secretary of State.").  Federal Defendants argue that the IBA does not delegate congressional power to USDS because only the *effectiveness* of agreements between a U.S. state and a foreign nation is conditioned on its approval.  This argument is "wordplay that seeks to elevate form over substance."  Opp'n [Dkt. 134] at 136.  The IBA delegated congressional authority to the Secretary of State because the Constitution otherwise requires congressional action for each and every international bridge, as before passage of the IBA in 1972.[13]  However, the Court finds that because USDS approval of a proposed international bridge is governed by an intelligible principle, there has been no improper delegation of legislative authority.

---

[12] Congressional approval, discussed here, is distinct from a Presidential permit.  *See infra* at p. 44.

[13] *See* U.S. Const., Art. I, § 8, cl. 3; Rivers and Harbors Act of 1899, 33 U.S.C. § 401 ("It shall not be lawful to construct or commence the construction of any bridge . . . over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained . . . .").

In reviewing international bridge agreements, USDS is guided by its traditional role in setting and managing U.S. foreign policy and foreign relations.  There can be little doubt that a new bridge crossing between the U.S. and one of its immediate neighbors would affect foreign relations.  How a proposed bridge between a U.S. state and Canada or Mexico might affect U.S. foreign policy is the grist of USDS's mill.  The legislative history of the IBA confirms this conclusion.  In passing the IBA, Congress specifically incorporated a memorandum from a Legal Adviser at USDS, to the effect:

> In the past, bridge agreements have been concluded . . . and have not been reviewed by anyone at the federal level for *impact on foreign policy*. We believe such a review would be in the national interest, and further believe that the Secretary of State would be the appropriate person to consider such a review.

Reply [Dkt. 138], Ex. 2, at 12 (H.R. REP. NO. 92-1303) (emphasis added).  Noting that this statement was supplied by USDS and did not originate in Congress, Plaintiffs contend that "the intelligible principle cannot come from the very agency that received the delegation."  Opp'n at 143 (citing *Whitman*, 531 U.S. at 472 ("We have never suggested that an agency can cure an unlawful delegation of legislative power by adopting in its discretion a limiting construction of the statute."))  However, the Legal Advisor's memorandum did not post-date congressional action but guided Congress's deliberations and was expressly adopted and included by Congress as it passed the IBA.  Thus, USDS did not "adopt[] in its discretion a limiting construction of the statute" after passage of a law without a defining principle, *Whitman*, 531 U.S. at 472; rather, Congress adopted State's advice and provided the necessary guidance in the IBA itself.

The Supreme Court has noted with approval that this Court, like many others, does not feel "qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law."  *Id*. at 474–75 (citation omitted).  Indeed, in the context of foreign affairs, "Congress—in giving the Executive authority

over matters of foreign affairs—must of necessity paint with a brush broader than that it customarily wields in the domestic area." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965). Because Congress' delegation of power in the IBA to USDS was governed by an intelligible principle, the Court will dismiss Count 1 for failure to state a claim.

### B. Counts 2 and 3

Count 2 alleges that Plaintiffs "have an exclusive statutory and contractual franchise right in both the United States and Canada to construct, maintain, and operate an international bridge between Detroit and Windsor." 3rd Am. Compl. ¶ 305. Plaintiffs seek declaratory and injunctive relief. *See id.* ¶¶ 312-13.[14] Count 3 alleges that the United States has

---

[14] Plaintiffs seek a declaratory judgment that

> (a) plaintiffs possess a statutory and contractual franchise right to operate an international bridge between Detroit and Windsor under concurrent and reciprocal United States and Canadian legislation that constitutes a Special Agreement under the 1909 Boundary Waters Treaty; (b) that franchise right is exclusive of all contiguous and injurious competition in the form of any other bridge between Detroit and Windsor; (c) in the alternative, and at a minimum, that franchise right is exclusive of any other bridge being built between Detroit and Windsor unless and until the United States Congress and the Canadian Parliament enact concurrent or reciprocal legislation constituting a special agreement under the 1909 Boundary Waters Treaty that grants a franchise right to another entity to construct, maintain, and operate an additional international bridge between Detroit and Windsor; (d) that franchise right is a perpetual right that prohibits the government as grantor from building a bridge that would divert toll revenues from DIBC, especially given that DIBC has taken reasonable steps to build a new bridge span itself between Detroit and Windsor; (e) the United States Congress and the Canadian Parliament have never enacted such additional concurrent or reciprocal legislation constituting a special agreement under the 1909 Boundary Waters Treaty; (f) the 1972 IBA cannot be construed to authorize any approval of another bridge between Detroit and Windsor; and (g) therefore no entity other than plaintiffs may construct, maintain, and operate an international bridge between Detroit and Windsor.

recognized Plaintiffs' statutory and contractual right to build the New Span and that such right is being violated by the planned construction of the NITC/DRIC. *Id.* ¶¶ 320-22.  Again, Plaintiffs seek declaratory and injunctive relief. *See id.* ¶¶ 323-24.[15]  Federal Defendants move to dismiss Counts 2 and 3 of the Third Amended Complaint for failure to identify a valid cause of action. Even if Plaintiffs have alleged a valid cause of action, Federal Defendants contend that Counts 2 and 3 must be dismissed for failure to state a claim.  The Court finds that the DIBC Act creates a cause of action, but will dismiss Counts 2 and 3 because they fail to state a claim.

### 1. Plaintiffs Have a Valid Cause of Action

A plaintiff must have a private cause of action under federal law to pursue relief in federal court. *See Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001) ("[P]rivate rights of action to enforce federal law must be created by Congress."); *see also Touche Ross & Co. v.*

---

3rd Am. Compl. ¶ 312.  Plaintiffs also "seek injunctive relief enjoining all defendants from taking any action that infringes upon plaintiffs' exclusive statutory and contractual franchise rights under their Special Agreement." *Id.* ¶ 313.

[15] Plaintiffs seek a declaratory judgment that

> (a) plaintiffs possess a statutory and contractual franchise right to build the New Span; (b) the agencies and officers of the United States and Canada may not frustrate or defeat plaintiffs' franchise right to build the New Span and are preempted from doing so; (c) the agencies and officers of the United States and Canada may not discriminate in favor of the NITC/DRIC over the New Span, and may not accelerate the regulatory approvals for the NITC/DRIC and/or delay the regulatory approvals for the New Span; (d) in addition to complying with all of plaintiffs' franchise rights as outlined in Count Two, and irrespective of the exclusive nature of those rights as claimed in Count Two, the agencies and officers of the United States and Canada may not approve the NITC/DRIC unless they are able to demonstrate that the NITC/DRIC is necessary even after construction by plaintiffs of the New Span.

3rd Am. Comp. ¶ 323.  Plaintiffs also "seek injunctive relief to protect and enforce their franchise right to build the New Span." *Id.* ¶ 324.

*Redlington*, 442 U.S. 560, 568 (1979) ("[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person.").[16]  Plaintiffs offer three bases for their claim: the Declaratory Judgment Act; their statutory and contractual rights vis-à-vis the Government; and the DIBC Act.

Contrary to Plaintiffs' argument, the Declaratory Judgment Act, 28 U.S.C. § 2201, does not provide a cause of action to support Counts 2 and 3, although it does authorize a form of relief for properly-pled actions. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950); *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011).  To the extent *Committee of the Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008), relied on an exception to this rule, the exception applies only when constitutional rights are at stake, which is not the case here. *Id.* at 81 (holding that "where the Constitution is the source of the right allegedly violated, no other source of a right—or independent cause of action—need be identified").

The Court also finds that Plaintiffs' argument that the DIBC Act "created a [binding] contract between Plaintiffs, the Government, and Canada" is without merit.  Opp'n at 73.[17]  "For many decades," the Supreme Court "has maintained that absent some clear indication

---

[16] In a suit against the federal government, a plaintiff must also identify a source of jurisdiction and an applicable waiver of sovereign immunity. *See Lehman v. Nakshian*, 453 U.S. 156, 160 (1981) ("[T]he United States, as sovereign, is immune from suit save as it consents to be sued and the terms of its consent to be sued in any court define that court's jurisdiction to entertain that suit.").  Federal Defendants admit that the APA provides the applicable waiver of sovereign immunity. *See* Mot. to Dismiss at 15 n.5; *see also Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("The APA's waiver of sovereign immunity applies to any suit whether under the APA or not.").  This Court has general federal question jurisdiction under 28 U.S.C. § 1331.

[17] *See* 3rd Am. Compl. ¶ 72 ("The Special Agreement, and each of the U.S. Act and the Canadian Act that make up the Special Agreement, constituted  both a statutory right and a contractual offer to plaintiffs. The construction and opening of the Ambassador Bridge constituted acceptance of that contractual offer through performance.  This offer and acceptance formed a

that the legislature intends to bind itself contractually, the presumption is that 'a law is not

intended to create private contractual or vested rights but merely declares a policy to be pursued

until the legislature shall ordain otherwise.'" *Nat'l R.R. Passenger Corp. v. Atchison Topeka &*

*Santa Fe Ry. Co.*, 470 U.S. 451, 465-66 (1985) (quoting *Dodge v. Bd. of Educ.*, 302 U.S. 74, 79

(1937) and citing *Rector of Christ Church v. Cnty. of Philadelphia*, 65 U.S. 300, 302 (1861)

("Such an interpretation is not to be favored[.]")).  The DIBC Act is devoid of any indication that

Congress intended to create an enforceable contract with DIBC.  Most particularly missing from

the DIBC Act is any mutuality of obligation between the alleged contracting parties.  Although

Congress granted DIBC the right to "construct, maintain, and operate a bridge" in the vicinity of

Detroit, DIBC was not obligated to do so.  *See* DIBC Act § 1.  Equally compelling is Section 3

of the DIBC Act, which states that "the right to alter, amend, or repeal this Act is hereby

expressly reserved" to Congress.  *Id*. § 3.

      The question of whether Congress created a private right of action in the DIBC

Act itself is more complicated.  Given the silence of the DIBC Act, if any such action exists, it

must be implied.  Legislative intent is the touchstone for determining whether a statute contains

an implied private right of action:

> The judicial task is to interpret the statute Congress has passed to
> determine whether it displays an intent to create not just a private
> right but also a private remedy.  *Statutory intent on this latter point
> is determinative.*  Without it, a cause of action does not exist and
> courts may not create one, no matter how desirable that might be as
> a policy matter, or how compatible with the statute.

*Sandoval*, 532 U.S. at 286-87 (internal citations omitted) (emphasis added).  "To determine

whether Congress intended to afford a private remedy against the Government," the Court

---

binding contract among all four of the United States, Canada, DIBC, and CTC, in addition to the
statutory right.").

"look[s] to *Cort v. Ash,* 422 U.S. 66, 78 (1975), and 'the long line of cases stemming' from that

decision." *El Paso Natural Gas Co. v. United States*, 750 F.3d 863, 889 (D.C. Cir. 2014) (citing

*Tax Analysts v. IRS*, 214 F.3d 179, 185 (D.C. Cir. 2000)).  In *Cort v. Ash*, the Supreme Court

identified four factors to consider in determining whether Congress intended to provide an

implied right of action:

> (1) whether the plaintiff is one of the class for whose benefit the
> statute was enacted; (2) whether some indication exists of legislative
> intent, explicit or implicit, either to create or to deny a private
> remedy; (3) whether implying a private right of action is consistent
> with the underlying purposes of the legislative scheme; and
> (4) whether the cause of action is one traditionally relegated to state
> law, such that it would be inappropriate for the court to infer a cause
> of action based solely on federal law.

*Tax Analysts*, 214 F.3d at 185–86 (citing *Cort*, 422 U.S. at 78).[18]  The Court considers each

factor in turn.

### a. The DIBC Act Was Enacted Solely in Plaintiffs' Favor

The fact that no private entity aside from Plaintiffs is identified in or protected by

the DIBC Act supports Plaintiffs' argument that the DIBC Act creates a private right of action.

The DIBC Act expressly grants "American Transit Company, its successors and assigns" the

right "to construct, maintain, and operate a bridge" between Detroit and Windsor.  *See* DIBC Act

§ 1.  The 1926 Amendment to the DIBC Act explicitly refers to "the rights, powers, and

privileges conferred by" the Act on DIBC.  Act of May 13, 1926, 69th Cong., ch. 292, 44 Stat.

---

[18] Federal Defendants maintain that the determinative inquiry is whether Congress intended to
*create* a private cause of action and that the Court should disregard the *Cort v. Ash* factors.  They
cite the concurring opinion of Justices Antonin Scalia and Sandra Day O'Connor in *Thompson v.
Thompson*, 484 U.S. 174, 189 (1988) (Scalia, J., concurring) (stating the Court "effectively
overruled the *Cort v. Ash* analysis in *Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979)").
The D.C. Circuit has determined that the *Cort v. Ash* factors continue as reliable factors for
determining congressional intent.  *See El Paso Natural Gas*, 750 F.3d at 889.

535 [Dkt. 133-20].  Federal Defendants concede that the DIBC Act "may be read to provide

some private rights."  Mot. to Dismiss at 20; *see also* Reply at 21 (DIBC "was permitted to build,

operate and maintain a bridge, in a specific location and of a specific design subject to the

Secretary of War's approval, and nothing more.").  This factor weighs strongly in favor of

finding a private cause of action.

### b.   There is an Implied Indication of Legislative Intent to Create a Private Right of Action

Plaintiffs recognize that the DIBC Act does not expressly provide any private

remedy.  *See* Opp'n at 70 ("[T]he statute expressly confers rights and confers no other means

(public or private) for enforcing those rights.").  Federal Defendants argue that the silence of the

DIBC Act and accompanying legislative histories "with regard to private remedies" is "fatal to

Plaintiffs' alleged cause of action under the Supreme Court's reasoning in *Sandoval*."  Mot. to

Dismiss at 20.  Federal Defendants maintain that Congress has the capacity to enforce the rights

granted to Plaintiffs in the DIBC Act and therefore "it was not necessary to give [DIBC] any

private right of action."  Reply at 21.  In response, Plaintiffs emphasize that Congress could not

have intended ATC and its successors to take on the expense and risk of building an international

bridge without any ability to protect its rights.

Here, where Congress has conferred private rights on a specifically named entity,

there is a reason to infer a private remedy in its favor to protect those rights against

encroachment.  The Supreme Court has counseled that "the right- or duty-creating language of

the statute has generally been the most accurate indicator of the propriety of implication of a

cause of action."  *Cannon v. Univ. of Chicago*, 441 U.S. 677, 693 n.13 (1979); see also *Sandoval*,

532 U.S. at 290 (noting that "language making the would-be plaintiff 'a member of the class for

whose benefit the statute was enacted'" suggests congressional intent to create a private right of

action).  Contrary to Federal Defendants' claim, Congress' "prerogative as to whether or not *another* bridge could be built," Reply at 21 (emphasis added), does not bear on the question of whether DIBC may enforce *its* rights to build, operate and maintain the Ambassador Bridge or the New Span between Detroit and Canada.  Further, the fact that Congress did not expressly provide an alternate remedial scheme in the DIBC Act weighs in favor of implying a private cause of action here.

### c.   A Private Right of Action is Consistent with the Statutory Scheme

Federal Defendants argue that recognizing a private cause of action in the DIBC Act would be contrary to Congress' limited purpose in enacting the Act.  They assert that Congress granted authority only to ATC's building, operating, and maintaining a bridge between Detroit and Windsor but "retained the United States' sovereign authority over international bridges in the interest of regulating commerce and navigation, and expressly reserved the right to alter, amend, or repeal all four statutes in their entirety."  Mot. to Dismiss at 20.  In other words, by retaining such authority over international bridges, Congress is the only needed "gatekeeper" to monitor the construction, operation and maintenance of international bridges without help from Plaintiffs.  Finally, Federal Defendants perceive a comprehensive "remedial" scheme in the various 19th Century Bridge Acts and Rivers and Harbors Act, codified at 33 U.S.C. §§ 401-67, which suggests that Congress did not intend to create a private right of action.  Plaintiffs retort that a private cause of action under the DIBC Act is consistent with the legislation because the "purpose of the Act was to incentivize the construction of an important bridge at great expense to the bridge companies, and the ability to enforce those rights would have been crucial to doing so."  Opp'n at 71.

Whether Congress has reserved its rights to amend, repeal or alter the DIBC Act is not relevant to the immediate question because Congress has not done any of those things. Congress' reserved authority to revoke rights granted to Plaintiffs under the DIBC Act does not evince Congressional intent to preclude a private right of action to enforce such rights while they stand.

Federal Defendants present an unduly expansive view of what constitutes the relevant legislative scheme.  They first zero in on the DIBC Act and argue that Congress had a limited purpose in enacting it: "Those acts were intended to give nothing more than Congress' 'consent' to ATC to build, operate and maintain a bridge in the general vicinity of Detroit."  Mot. to Dismiss at 20.  Federal Defendants then situate the DIBC Act within the broader "legislative scheme governing bridges at the time the [DIBC Act] was enacted" and argue that a private cause of action is not consistent with the "comprehensive remedial scheme Congress provided in the various Bridge Acts and Rivers and Harbors Acts."  Reply at 18, 22.  For example, Federal Defendants note that Congress provided that "[i]t shall not be lawful to construct or commence the construction of any bridge . . . over or in any . . . navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained."  33 U.S.C. § 401.  Congress also established criminal penalties including fines and prison time for anyone who violated Section 401 and granted the Attorney General authority to institute proceedings to require the removal of any structures that did not have congressional authorization.  *See* 33 U.S.C. § 406.

Assuming the Court should consider the DIBC Act in the broader context of prior statutes governing navigable waterways, it still finds that a private right of action is consistent with the "legislative scheme."  Federal Defendants' argument conflates Congress' authority to

prevent the construction of a new bridge by different owners with Plaintiffs' rights to enforce their existing right to construct, operate, and maintain the specific bridge authorized by the DIBC Act.  Federal Defendants argue that "[t]here was no need for Congress to create a private right of action to prevent the construction of a bridge that would interfere with ATC's right to construct, operate, and maintain its bridge."  Reply at 18.  But whether Plaintiffs can sue to prevent such interference implicates the *scope* of Plaintiffs' rights under the DIBC Act, *i.e.*, whether Plaintiffs have an exclusive franchise right.  This question bears on whether Plaintiffs have stated a claim for relief—not whether the DIBC Act contains a private right of action.  Congress' authority over the construction of *new* international bridges and ability to penalize anyone who builds *unauthorized* bridges does not speak to the narrower question of whether Congress intended a private right of action for Plaintiffs in the DIBC Act, which, as Federal Defendants acknowledge, expressly grants DIBC the right to build and maintain a bridge in the vicinity of Detroit.

> ### d.  The Cause of Action is Not an Area Traditionally Relegated to State Law

The fourth *Cort* factor is not applicable here, because the cause of action at issue is not "one traditionally relegated to state law, in an area basically the concern of the states." *Cort*, 422 U.S. at 78.

Having considered the *Cort* factors and whether Congress intended to afford a private remedy, the Court concludes that the DIBC Act implicitly confers a private right of action on Plaintiffs.

> ### 2.  Plaintiffs Have Failed to State a Claim in Counts 2 and 3

Although the Court concludes that Plaintiffs *can* sue, it finds that Counts 2 and 3 fail to state a claim on which relief can be granted.  Plaintiffs overplay their hand.  They describe an exclusive bridge franchise with which the federal government cannot interfere in perpetuity.

They fail to address the corollary: that DIBC would be bound for all time to operate the

Ambassador Bridge.  Such an idea is obviously not what the DIBC Act intended:  it granted a

time-constrained right to build (extended more than once), but it did not require DIBC to build or

operate a bridge *in fact*.  *See* DIBC Act § 1.[19]

Both Counts 2 and 3 concern the nature of Plaintiffs' rights under the DIBC Act.

"Public grants are to be construed strictly. . . . [I]n grants by the public, nothing passes by

implication."  *Proprietors of Charles River Bridge v. Proprietors of Warren Bridge*, 36 U.S. 420,

421 (1837).  Congress

> is the constitutional protector of foreign and inter-state commerce
> . . . and all grants of special privileges, affecting so important a
> branch of governmental power, ought certainly to be strictly
> construed.  Nothing will be presumed to have been surrendered
> unless it was manifestly so intended.  Every doubt should be
> resolved in favor of the government.

*Newport & C. Bridge Co. v. U. S.*, 105 U.S. 470, 480 (1881).  It is an "elementary principle" that

"[e]xclusive rights to public franchises are not favored.  If granted, they will be protected, but

they will never be presumed."  *Wright v. Nagle*, 101 U.S. 791, 796 (1879).

### a.  Count 2

Count 2 alleges that "plaintiffs have an exclusive statutory and contractual

franchise right in both the United States and Canada to construct, maintain, and operate an

international bridge between Detroit and Windsor."  3rd Am. Compl. ¶ 305.  Plaintiffs allege that

their exclusive franchise right arises from "concurrent and reciprocal" legislation by the United

States Congress and the Canadian Parliament that constituted a "special agreement" under the

---

[19] Nonetheless, once DIBC spent the monies to design, build and operate the Bridge, it may be
entitled to sue to prevent (or receive compensation for) an effort by the United States to force it
to relinquish the Bridge or, perhaps, to lessen its value.  Some of Plaintiffs' arguments sound in
such a theory, but they are a far distance in legal analysis from the alleged exclusive franchise.

Boundary Waters Treaty. *Id.* ¶ 302. Notably, Plaintiffs rely on Canadian law for this argument. They contend that because their franchise rights are exclusive under Canadian law and the Special Agreement is reciprocal in nature, Plaintiffs must also have an exclusive franchise right in the United States, which is, after all, the other end of the Bridge. *Id.* ¶ 303-05. Plaintiffs allege that Defendants have violated their exclusive franchise rights by planning construction of the NITC/DRIC just two miles away from the Ambassador Bridge. *Id*. ¶ 311. Federal Defendants move to dismiss Count 2 on the grounds that Congress did not grant Plaintiffs an exclusive franchise right under the terms of the DIBC Act.

 The scope of Plaintiffs' rights is defined by the terms of the DIBC Act. *Charles River Bridge*, 36 U.S. at 421. By its plain terms, the DIBC Act grants Plaintiffs the right to "construct, maintain, and operate a bridge . . . across Detroit River . . . within or near the city limits of Detroit." DIBC Act § 1. The DIBC Act contains no express or implied grant of exclusivity or perpetuity. *Charles River Bridge* long ago cautioned that the government should never be presumed to have relinquished its powers:

> The object and the end of all government is, to promote the happiness and prosperity of the community by which it is established; and it can never be assumed, that the government intended to diminish its power of accomplishing the end for which it was created; and in a country like ours, free, active and enterprising, continually advancing in numbers and wealth, new channels of communication are daily found necessary both for travel and trade; and are essential to the comfort, convenience and prosperity of the people. A state ought never to be presumed to surrender this power; because, like the taxing power, the whole community have an interest in preserving it undiminished; and when a corporation alleges, that a state has surrendered, for seventy years, its power of improvement and public accommodation, in a great and important line of travel, along which a vast number of its citizens must daily pass, the community have a right to insist, in the language of this court, 'that its abandonment ought not to be presumed, in a case in which the deliberate purpose of the state to abandon it does not appear.'

*Charles River Bridge*, 36 U.S. at 422.[20]  Here, too, the federal government's legitimate interest in promoting trade and travel between Michigan and Canada cannot be denied.  Any limitation on Congress's power to authorize construction of another bridge across the Detroit River must be evident in the DIBC Act by an express grant of exclusivity to Plaintiffs.  The Court finds no such evidence.  *See State of Oklahoma ex rel. King v. Handy*, 71 F.2d 697, 699 (10th Cir. 1934) ("Had it been intended, in granting the franchise, to exclude the sovereign from the privilege of constructing and operating a bridge, or to limit its prerogative with respect thereto, that purpose could have been expressed in apt language.  Failure to employ language to that effect forces the conclusion that such intent did not attend the granting of the franchise.").

Instead of relying on the congressional grant in the DIBC Act, however, Plaintiffs turn to Canadian law as the source of their exclusive franchise rights in the United States. Plaintiffs insist that the DIBC Act and the Canadian CTC Act create a "special agreement" under Article XIII of the Boundary Waters Treaty and reason that "the definition of the franchise rights created by that special agreement depends upon both U.S. law and Canadian law."  Opp'n at 81. Because Canadian law provides that a bridge franchise is exclusive, *id*., Plaintiffs conclude that the "same level of exclusivity and freedom from interference must exist on both sides of the border."  *Id*. at 82.  The Court fails to see the logic in this argument.  Even if a "special

---

[20] Plaintiffs seek to distinguish *Charles River Bridge* on its facts, but the principle enunciated in that case—"in grants by the public, nothing passes by implication," 36 U.S. at 421—is not fact-dependent.  The Supreme Court recognized the vitality of this stand-alone principle by invoking substantially similar principles in *Wright v. Nagle*, 101 U.S. 791, 796 (1879) ("Exclusive rights to public franchises are not favored. If granted, they will be protected, but they will never be presumed. Every statute which takes away from a legislature its power will always be construed most strongly in favor of the State.") and *Newport & C. Bridge Co. v. U. S.*, 105 U.S. 470, 480 (1881) ("[A]ll grants of special privileges, affecting so important a branch of governmental power, ought certainly to be strictly construed. Nothing will be presumed to have been surrendered unless it was manifestly so intended.").  No decision in the subsequent 134 years has undercut the long-standing principle.

agreement" were created, it does not follow that the rights granted to Plaintiffs by Congress could be expanded by the Canadian Parliament.  Plaintiffs' argument also fails to address how Congress could have agreed, or when it did agree, to an extra-statutory limitation on its authority by the later-enacted CTC Act in Canada.  To be sure, Congress required Plaintiffs to obtain Canada's consent for the bridge before it began construction.  But this condition on its grant of authority did not include any agreement to be limited by Parliament's actions in Canada.  The argument fails because public grants are to be strictly construed; exclusive franchise rights cannot be implied; franchise rights in perpetuity offend U.S. sovereign authority, if not Canadian; and, in any event, exclusive franchise rights are contrary to the express terms of the DIBC Act.  *See Charles River Bridge*, 36 U.S. at 546; *Newport & C. Bridge Co.*, 105 U.S. at 480 (1881); *Wright*, 101 U.S. at 796.[21]  This Court cannot rely on Canadian law to imply exclusive franchise rights in the United States.

Plaintiffs also complain that they "undertook to devote enormous resources, and assumed huge risk" to build the Ambassador Bridge and contend that it would have been "madness" for them to do so "if the Government were free to abrogate the benefits of owning and operating the bridge at any time after it was constructed."  Opp'n at 84 (relying on *United States v. Winstar Corp.*, 518 U.S. 839, 910 (1996)).  Plaintiffs have indeed undertaken the risk that the Government might seek to build another bridge in the area.  Without an express grant of exclusivity from Congress, the DIBC Act provides no protection from such risk.  *See Winstar,*

---

[21] Plaintiffs also maintain that the "special agreement" is a treaty and should be "construed liberally to give effect to the purpose which animates it."  Opp'n at 82 (quoting *United States v. Stuart*, 489 U.S. 353, 368 (1989)).  Without ruling on that issue, the Court cannot agree that "the more liberal understanding of Plaintiffs' rights *under Canadian law* should prevail," Opp'n at 82 (emphasis added), because the argument conflicts with cited Supreme Court precedent and would include rights contrary to the plain language of the DIBC Act.  Whether Canada has bound itself not to compete with the Ambassador Bridge is a subject of litigation in Canada.

518 U.S. at 878 (reaffirming collective holding of *Charles River Bridge* and other Supreme

Court precedent that an ambiguous term of a grant will not be construed as a conveyance or

surrender of sovereign power). The fact that the competing NITC/DRIC may diminish the value

of the Ambassador Bridge or impair the economic viability of building the New Span does not

support Plaintiffs' franchise claim. *See Mississippi Power Co. v. City of Aberdeen*, 95 F.2d 990,

992 (5th Cir. 1938) (When the city conveyed its electric plant and distributing system to

Mississippi Power Company and there was "no covenant that the city will never again construct

an electric distribution system," the "city unquestionably could grant a franchise to another

corporation to enter into competition with the Mississippi Power Company" or "may enter itself

into such competition if it so desires. No law, no contract, prevents."). Moreover, Plaintiffs'

reliance on *Winstar* depends on its claim that the DIBC Act constituted a contract between

Plaintiffs and the Federal Government. The Court has rejected this argument already. The Court

will dismiss Count 2 for failure to state a claim on which relief can be granted.

### b. Count 3

Count 3 alleges that Plaintiffs' statutory and contractual right to build the New

Span is violated by the planning and construction of the NITC/DRIC. *See* 3rd Am. Compl.

¶¶ 320-22. Federal Defendants do not dispute that Plaintiffs have the right under the DIBC Act

to expand or replace the Ambassador Bridge by building the New Span. They move to Dismiss

Count 3 for failure to state a claim on the theory that Plaintiffs' lack of an exclusive right to the

Detroit-Windsor crossing means that Plaintiffs' right to build the New Span is not contravened

by the planned construction of the NITC/DRIC.

Without a government grant of perpetual exclusivity, Count 3 is reduced to a

complaint about unfair increased competition and reduced profit margins. Thus, the viability of

Count 3 depends on arguments that have already been considered and rejected—that the NITC/DRIC will violate Plaintiffs' exclusive right to own and operate the only bridge between Detroit and Windsor and render the construction of the New Span economically infeasible.  As discussed above, the planned construction of the NITC/DRIC does not violate Plaintiffs' right to build the New Span even if it threatens the business rationale for doing so.  Therefore, Count 3 will be dismissed for failure to state a claim.

### C.  Count 5

Plaintiffs seek a declaratory judgment that Federal Defendants' actions "in supporting the construction of the NITC/DRIC, and in preventing plaintiffs from exercising their right to build the New Span, constitute a taking of plaintiffs' private property rights without payment of just compensation" in violation of the Fifth Amendment.  3rd Am. Comp. at 115; *see also id.* ¶¶ 334-35, 338-39.  Although Count 5 alleges that Federal Defendants' actions "will destroy and appropriate the economic value of plaintiffs' franchise rights *without payment of just compensation to plaintiffs*," Plaintiffs seek no monetary relief.  *Id.* ¶335 (emphasis added).  Federal Defendants move to dismiss Count 5 for lack of jurisdiction, arguing that Plaintiffs are barred from seeking equitable relief in this Court because the Tucker Act, 28 U.S.C. § 1491, requires them to seek relief in the Court of Federal Claims.  Because there is no applicable exception to Tucker Act jurisdiction here, the Court will dismiss Count 5 for lack of jurisdiction.

"Normally a taking[s] claim against the federal government must be brought as a suit for money damages (*i.e.*, the 'just compensation' that the Constitution assures) under the Tucker Act in the Court of Federal Claims, 28 U.S.C. § 1491, or, for amounts not exceeding $10,000, under the Little Tucker Act in district court."  *Student Loan Mktg. Ass'n v. Riley*, 104 F.3d 397, 401 (D.C. Cir. 1997), *on reh'g* (Mar. 11, 1997).  Takings claims against the federal government are "premature until a property owner has availed itself of the process provided by

the Tucker Act." *Railway Labor Executives' Ass'n v. United States*, 987 F.2d. 806, 816 (quoting

*Williamson Co. Regional Planning Commission v. Hamilton,* 473 U.S. 172, 195 (1985)).  A

Tucker Act remedy is available unless (1) Congress has expressly withdrawn Tucker Act

jurisdiction, *see Preseault v. ICC*, 494 U.S. 1, 12 (1990); or (2) the challenged government

action requires a person or entity to make a direct transfer of money to the government, *see*

*Eastern Enterprises v. Apfel,* 524 U.S. 498, 521 (1998); *see also In Re Chateauguay Corp.*, 53

F.3d 478, 493 (2d Cir. 1995) ("We hold that where the challenged statute requires a person or

entity to pay money to the government, it must be presumed that Congress had no intention of

providing compensation for the deprivation through the Tucker Act.  Common sense dictates

such a presumption.").

      Plaintiffs' takings claim falls squarely within the scope of the Tucker Act.

Neither exception to the Tucker Act is available here: a Tucker Act remedy has not been

withdrawn and Plaintiffs have not been required to make a monetary payment to the government.

Plaintiffs do not claim otherwise.  Rather, they presents two theories in support of district court

jurisdiction.  First, Plaintiffs argue that Federal Defendants' "taking" is unconstitutional because

they are attempting to transfer Plaintiffs' private property to a "competing commercial venture."

Opp'n at 96-97 (citing 3rd Am. Compl. ¶ 339).  They note that such a private taking can be

enjoined without regard to whether compensation is provided.  Opp'n at 97.  Second, Plaintiffs

argue that *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59 (1978) sanctions the

declaratory judgment sought in this case.  Plaintiffs read *Duke Power* to hold that a plaintiff may

bring a takings claim to district court under the Declaratory Judgment Act when the plaintiff

seeks "'declaratory judgment' that the governmental action in question 'does not provide

advance assurance of adequate compensation in the event of a taking.'"  Opp'n at 97 (quoting *Duke Power*, 438 U.S. at 70 n.15).

Federal Defendants retort that Plaintiffs subvert the clear mandate of Tucker Act jurisdiction here.  They contend that Plaintiffs have not alleged an unconstitutional taking because the NITC/DRIC project is a public project, evidenced by the fact that it is a joint venture between the State of Michigan and Canada and will be a publically accessible bridge.  Federal Defendants reject Plaintiffs' reading of *Duke Power* and contend that *Duke Power* merely expanded the scope of remedies available to plaintiffs threatened with a government action where potentially uncompensable damages will be sustained.  Reply at 36 (citing *Duke Power*, 438 U.S. at 70 n.15) ("[T]he Declaratory Judgment Act . . . expands the scope of available remedies.  Here it allows individuals threatened with a taking to seek a declaration of the constitutionality of the disputed governmental action before potentially uncompensable damages are sustained.").  Because Plaintiffs have not alleged that an uncompensable taking is threatened, Federal Defendants argue that Plaintiffs must comply with the "well-settled rule in the D.C. Circuit that as long as Tucker Act jurisdiction is available, the plaintiff is barred from suing in district court."  *Id*. at 38 (citing *Student Loan Mktg Ass'n*, 104 F.3d at 401).

Plaintiffs are correct about the unconstitutionality of a taking for private purposes: "it has long been accepted that the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation."  *Kelo v. City of New London, Conn.*, 545 U.S. 469, 477 (2005).  However, a "State may transfer property from one private party to another if future 'use by the public' is the purpose of the taking[]."  *Id.* Thus, the purpose of a "taking" determines whether a use is public or private.  *Id.* at 482.

Plaintiffs allege that Federal Defendants are taking Plaintiffs' property to convey it "to other parties engaged in a competing commercial venture." 3rd Am. Compl. ¶ 339. The argument misses the mark because it does not contradict the public purpose of the NITC/DRIC. The NITC/DRIC will be an international bridge accessible to the general public, owned and operated by sovereign actors, not private entities. While it is true that private businesses operate bridges, it is at least as common, if not more so, for public entities to own and operate them. The fact that the NITC/DRIC, if completed, will be a competitor for traffic that previously crossed the Ambassador Bridge does not turn the current sovereign actions of U.S. government entities into *private* commercial ventures. Because the alleged taking is not *per se* unconstitutional, *i.e.*, one for private purposes, Plaintiffs must seek a Tucker Act remedy in the Court of Federal Claims. *See Student Loan Mktg. Ass'n*, 104 F.3d at 401.

Plaintiffs' reliance on *Duke Power* is misplaced. In *Duke Power*, individuals who lived near federally licensed private nuclear power plants challenged the constitutionality of the Price-Anderson Act, 42 U.S.C. § 2210, which capped the financial liability of nuclear power companies in the event of a nuclear accident. *Duke Power*, 438 U.S. at 65-66, 68. The *Duke Power* plaintiffs argued that Price-Anderson effected a taking because the liability limit in the statute would never be sufficient to compensate victims in the event of a true nuclear disaster. *See id.* at 71 n.15. The residents did not "seek[] compensation for a taking, . . . but . . . request[ed] a declaratory judgment that since the Price-Anderson Act does not provide advance assurance of adequate compensation in the event of a taking, it is unconstitutional." *Id.* The Supreme Court found that the Declaratory Judgment Act allowed the claim to be brought in district court because the Price-Anderson Act "allows individuals threatened with a taking to

seek a declaration of the constitutionality of the disputed governmental action before potentially *uncompensable* damages are sustained." *Id.* (emphasis added).

Duke Power does not authorize the declaratory judgment sought by Plaintiffs. Plaintiffs have not alleged an uncompensable taking or that there is no assurance of adequate compensation in the event of a future taking. *Duke Power* affords no path to plead around the Tucker Act in these circumstances. Because Tucker Act jurisdiction is available in the U.S. Court of Federal Claims, Plaintiffs may not sue for equitable relief in this Court. *See Sallie Mae,* 104 F.3d at 401. Court 5 will be dismissed.

### D. Counts 6 and 7

Count 6 alleges that the "State Department's decision to grant a Presidential permit for the NITC/DRIC was contrary to law, arbitrary and capricious, in excess of statutory authority, and otherwise in violation of the standards set forth" in the APA. 3rd Am. Compl. ¶ 341. Count 7 alleges that USDS's approval of the Crossing Agreement violated the standards set forth in the APA. *See id.* ¶¶ 353-362.

#### 1. Plaintiffs' Standing

Federal Defendants move to dismiss Counts 6 and 7 on the grounds that Plaintiffs lack standing, leaving the Court without subject matter jurisdiction. Federal Defendants argue that Plaintiffs have failed to articulate Article III standing, that is, that they have suffered an injury, caused by Federal Defendants, that can be redressed by a court order.

A plaintiff's standing under Article III of the United States Constitution must be determined to establish the jurisdiction of a federal court to hear the case and reach the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998); *Grand Council of the Crees v. FERC*, 198 F.3d 950, 954 (D.C. Cir. 2000). Standing is an "irreducible constitutional minimum." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To have Article III

standing, a plaintiff must establish: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000) (citing *Defenders of Wildlife*, 504 U.S. at 560-61). The injury alleged cannot be conjectural, hypothetical, remote, speculative or abstract. *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996). An alleged future injury must be imminent and "to shift[] injury from 'conjectural' to 'imminent,' the petitioners must show that there is a substantial . . . probability of injury." *Chamber of Commerce of U.S. v. Envtl. Prot. Agency*, 642 F.3d 192, 200 (D.C. Cir. 2011) (internal quotation marks and citation omitted).

"[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (quoting *Defenders of Wildlife*, 504 U.S. at 562). Because the "judicial power" conferred by Article III does not exist "to review the legality of governmental conduct in a vacuum," a plaintiff must "demonstrate 'a personal stake in the outcome of the controversy' in order to 'justify exercise of the court's remedial powers on his behalf.'" *Coal. for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1279 (D.C. Cir. 2012) (quoting *Warth v. Seldin,* 422 U.S. 490, 498–99 (1975)). Notably, under the doctrine of competitor standing, courts recognize that "economic actors suffer an injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition against them." *Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 2011-12

(D.C. Cir. 2013) (quoting *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (internal

quotation marks omitted).

Federal Defendants first argue that Plaintiffs have not alleged an injury sufficient

to support Article III standing.  They contend that "[n]othing about the State Department's

issuance of the Presidential Permit for the NITC nor its approval of the Crossing Agreement will

affect Plaintiffs' rights to continue operating their existing bridge."  Mot. to Dismiss at 35-36.

Plaintiffs insist that USDS approvals at issue are necessary to construct the NITC/DRIC, which

will divert a "substantial percentage" of toll traffic from the Ambassador Bridge and destroy the

economic viability of the New Span.  *See* Opp'n at 60 (citing 3rd Am. Compl. ¶¶ 7-8).

By focusing on Plaintiffs' franchise rights, Federal Defendants ignore the main

thrust of Plaintiffs' position, which is that the NITC/DRIC will have a debilitating economic

impact on Plaintiffs' existing business.  *See* 3rd Am. Compl. ¶ 8.  While the Court has concluded

DIBC Act does not grant Plaintiffs' exclusivity, the Third Amended Complaint offers more than

a sufficient basis to support the allegations that the construction and operation of the

NITC/DRIC, less than two miles from the Ambassador Bridge, will work an immediate

economic injury on Plaintiffs.

Based on federal estimates, Plaintiffs allege a future loss of traffic and toll

revenues due to NITC/DRIC that rise well beyond pure speculation.  NITC/DRIC is a fully-

authorized project that is moving full steam ahead.  Plaintiffs cite "[s]tudies published by Canada

and its United States partners that support construction of the NITC/DRIC estimate that up to

75% of the Ambassador Bridge's truck traffic and up to 39% of its passenger traffic will be

diverted to the NITC/DRIC."  3rd Am. Compl. ¶ 8.  Additionally, "[t]raffic levels in the

Southeast Michigan and Southwest Ontario . . . are not sufficient to support" both the

NITC/DRIC and the Ambassador Bridge.  *Id.* ¶ 217.  Plaintiffs also allege that USDS officials have acknowledged that "[t]he financial feasibility of constructing a new separate bridge will be undermined if Ambassador Bridge owners construct a new six-lane twin span; particularly if, as now seems likely, the existing four-lane bridge span can be refurbished and kept in operation for many years to come."  *Id.*  Plaintiffs have cited sufficient relevant facts to show that the construction of NITC/DRIC will result in the kind of injury recognized by the competitor standing doctrine.  *See Bhd. of Teamsters*, 724 F.3d at 2011-12.  Plaintiffs need not wait until the competitive injury occurs to bring suit.  *See Louisiana Energy & Power Auth. v. F.E.R.C.*, 141 F.3d 364, 367 (D.C. Cir. 1998) (where agencies lift regulatory restrictions on competitors or allow increased competition, litigants need not wait until increased competition occurs); *see also Adams v. Watson*, 10 F.3d 915, 921 (1st Cir. 1993) ("While the project is not yet completed, and hence specific proof of competitive injury is not possible, it could hardly be thought that administrative action likely to cause harm cannot be challenged until it is too late.") (citation and alterations omitted).

Federal Defendants contend that the chain of causation between USDS approvals for the NITC/DRIC and the diversion of toll revenues from DIBC "involves far too many links and depends on the actions of numerous third parties."  Mot. to Dismiss at 35 n.16.  To the contrary, the Court finds that Plaintiffs' injury is "fairly traceable to the challenged action[s]" of USDS because the NITC/DRIC cannot be built without USDS approval.  *Friends of the Earth, Inc.*, 528 U.S. at 180-81.

As to Count 7 only (Plaintiffs' APA claim based on approval of the Crossing Agreement by USDS), Federal Defendants maintain that Plaintiffs cannot establish redressability—the third element of standing.  Federal Defendants argue that the Presidential

Permit would survive even if the Crossing Agreement were invalidated because the Crossing

Agreement is not a precondition to building a bridge under the IBA.  Plaintiffs respond that

construction of the NITC/DRIC requires both a Presidential Permit *and* approval of the Crossing

Agreement.  Plaintiffs also note that the NITC/DRIC Presidential Permit Application specifically

relied on the Crossing Agreement.

The NITC/DRIC Presidential Permit Application and pure logic support

Plaintiffs' argument.  Construction of a costly infrastructure project requiring cross-border

cooperation could not move forward if the international agreement governing the project were

invalidated.  The vital importance of the Crossing Agreement is identified in the NITC/DRIC

Presidential Permit Application.  The Crossing Agreement is necessary to:

- Establish the framework for the design, construction, operation and maintenance of the NITC.
- Create a mechanism for oversight of the Crossing Authority's responsibilities for the design, construction, operation and maintenance of the NITC.
- Establish standards for the process of selecting the private Concessionaire and for the terms of the P-3 Agreement.
- Set parameters for the recoupment by Canada of the funds it has advanced for the NITC.
- Confirm the commitment to address Record of Decision (ROD) Green Sheet obligations (see Appendix A) and any other mitigations or enhancements agreed to by the owners.
- Limit the liability of the parties.
- Establish the framework for the equitable distribution of excess toll revenue following recoupment by Canada of the funds it has advanced.

NITC/DRIC Presidential Permit Application [Dkt. 133-41] at 2.  A structure chart in the

application illustrated that the Crossing Agreement is the only common link between the State of

Michigan, the Michigan Department of Transportation, the Michigan Strategic Fund, the

International Authority (consisting of 3 members each from Michigan and Canada), Canada and

the Crossing Authority.  *Id*. at 3.  The Crossing Agreement obligates Canada to establish the

Crossing Authority, which is given the authority to fund and coordinate the acquisition and leasing of land *in the United States* for the NITC/DRIC. *See* Opp'n, Ex. 38 (the Crossing Agreement) [Dkt. 133-42] at 14, 20, 24. USDS could hardly, if at all, justify its approval of the Presidential Permit in the absence of a formal agreement between the parties seeking to build the NITC/DRIC.

Even if the Crossing Agreement were not a formal requirement for construction of the NITC/DRIC, the Court concludes that invalidation of this particular Crossing Agreement would inevitably undermine and slow the planned construction of the NITC/DRIC, thereby providing a remedy to Plaintiffs and giving them standing. The Court concludes that Plaintiffs have standing to bring Counts 6 and 7 of the Third Amended Complaint.

### 2.   Whether USDS Action is Reviewable Under the APA

Federal Defendants also move to dismiss Counts 6 and 7 because USDS's actions are not reviewable under the APA.

### a.   Issuance of the Presidential Permit

Federal Defendants argue that USDS's issuance of the Presidential Permit for the NITC/DRIC constitutes unreviewable presidential action and is not final agency action subject to APA review. Federal Defendants reason that State derived its authority to issue the permit from Executive Order 11423, which invokes the President's inherent constitutional power to regulate foreign powers. The APA provides for judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The issue here is whether the "final" action that Plaintiffs challenge—the Secretary of State's grant of a Presidential Permit—is that of an "agency" so that review is available under the APA. While not an easy question, the Court concludes that the issuance of the Presidential Permit was "Presidential" action and is not reviewable under the APA.

The APA defines "agency" as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include (A) the Congress; (B) the courts of the United States; (C) the governments of the territories or possessions of the United States; (D) the government of the District of Columbia." 5 U.S.C. § 701(b)(1). The President of the United States is also not an "agency" for purposes of APA review:

> The President is not explicitly excluded from the APA's purview, but he is not explicitly included, either. Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA. We would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion. . . . As the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements.

*Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992) (internal citations omitted). Therefore, presidential actions "are not reviewable for abuse of discretion under the APA." *Id*. at 801.

Executive Order No. 11,423 (E.O. 11423) delegates to USDS the President's authority to issue permits for bridges if USDS finds that issuance of the permit to the applicant "would serve the national interest." Executive Order No. 11,423, as amended. 33 Fed. Reg. 11741 (August 16, 1968) § 1(d).[22] In determining whether to issue a permit, the Secretary of State, as an agent of the President, must consult with the Secretary of the Treasury, the Secretary of Defense, the Attorney General, and the Secretary of Transportation. *Id*. § 1(c). If any of those departments or agencies disagrees with the proposed decision by USDS, USDS is directed to refer the application to the President for "his consideration and final decision." *Id*. § 1(f). In the

---

[22] E.O. 11423 granted the authority to grant or deny permits for various types of border crossing facilities, including bridges to the Secretary of State.

absence of a disagreement, USDS makes the final decision to "issue or deny the permit in accordance with his proposed determination." *Id.* All permits issued under E.O. 11423 "remain in effect in accordance with their terms unless and until modified, amended, suspended, or revoked by the President." *Id.* § 3.

In arguing that USDS's issuance of the Presidential Permit was agency and not presidential action, Plaintiffs assert that the President's authority to approve international bridges stems from Congress under the IBA and not from the President's inherent constitutional authority. *See* Opp'n at 48. This position conflates permitting for international bridges—the focus of Count 6—and approval for such bridges. To be sure, the IBA requires Presidential approval for the construction, maintenance, and operation of international bridges, but the IBA says nothing about permits. *See* 33 U.S.C. § 535b. It is only E.O. 11423 that sets forth the procedures for the President's issuance of bridge permits. In addition, E.O. 11423 was published four years before the IBA was enacted. *Compare* 33 Fed. Reg. 11741 (Aug. 20 1968) *with* 33 U.S.C. § 535 (86 Stat. 731, Sept. 26, 1972). The fact that Congress has enacted statues[23] governing bridges over navigable waters does not undermine the President's authority to control international border crossings in connection with his inherent constitutional authority over foreign relations. According to the plain terms of E.O. 11423, the President issued the Order "by virtue of the authority vested in me as President of the United States and Commander in Chief of the Armed Forces of the United States and in conformity with the provisions of Section 301 of Title 3, United States Code." *Id.* The only statute that E.O. 11423 references is 3 U.S.C. § 301,

---

[23] *See* Rivers and Harbors Act of 1899 (1899 Act), ch. 425, § 9, 30 Stat. 1121, 1151 (now codified at 33 U.S.C. § 401); 1906 Bridge Act, ch. 1130, § 1, 34 Stat. 84 (1906) (now codified at 33 U.S.C. §§ 491–498); General Bridge Act of 1946, currently codified at 33 U.S.C. §§ 525–534.

which authorizes the President to delegate to agencies or executive branch officials the

performance of "any function which is vested in the President by law."  3 U.S.C. § 301.  Such

delegations are "revocable at any time by the President in whole or in part."  *Id.*

Here, the "State Department stands in the President's shoes by exercising the

President's inherent discretionary power under the Constitution to issue cross-border permits."

*Natural Res. Def. Council, Inc. v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 109 (D.D.C. 2009)

(*NRDC*) (holding that State Department's issuance of a permit for a cross-border oil pipeline

between the United States and Canada pursuant to Executive Order No. 13,337, 69 Fed. Reg.

25299 (Apr. 30, 2004) (E.O. 13337),[24] was a presidential action unreviewable under the APA).

In other words, USDS acts as an agent or delegee of the President when it issues bridge permits

consistent with the directives of E.O. 11423.  Thus, "to challenge the issuance of a presidential

permit, whether by the President himself or by USDS as the President's delegee, is to challenge a

presidential act, which is not reviewable under the APA."  *NRDC*, 658 F. Supp. 2d 105 at 111.

*See also Sisseton-Wahpeton Oyate v. U.S. Dep't of State*, 659 F. Supp. 2d 1071, 1082 (D.S.D.

2009) ("The President is free to delegate some of his powers to the heads of executive

departments, as he has done here, and those delegation actions that are carried out create a

presumption of being as those of the President.").

Plaintiffs make too much about Section 1(f) of the E.O. 11423, which authorizes

USDS to issue or deny a permit so long as no official with whom the Secretary is required to

consult disagrees with the Secretary's determination.  *See* Opp'n at 53.  This clarifying section of

the order does not alter the fundamental character of USDS action taken pursuant to E.O. 11423:

---

[24] E.O. 13337 amended E.O. 11423 to "expedite reviews of permits as necessary to accelerate the
completion of energy production and transmission projects."  69 Fed. Reg. 25299.

even when no official disagrees with the Secretary's determination, USDS acts as the agent of the President in issuing bridge permits.  Plaintiffs are mistaken when they contend that the President is removed from the process and plays no role in determining whether a bridge permit is warranted.  *Id.*  Under E.O. 11423, the President retains the power to modify, amend, suspend, or revoke any permit issued by USDS.  *See* E.O. 11423 § 3.  This supports the view that the President considers the issuance of presidential permits to be presidential action.  *See NRDC*, 658 F. Supp. 2d at 111 ("That the President chose to retain ultimate authority to settle any interagency dispute signals his belief that the issuance of presidential permits is ultimately a presidential action.").  The President's final authority also means that "[n]o permit can issue without, at the very least, the President's acquiescence and the President's acquiescence is itself an exercise of discretion that constitutes unreviewable presidential action."  *Id.*  The President's retention of these powers also confirms that the President is not "required to adhere to the policy decisions" of USDS.  *See Franklin*, 505 U.S. at 799.

Lastly, the Court notes that permitting judicial review would "run afoul of the separation of powers' principle," particularly because the "President and his delegee here are acting pursuant to the President's inherent foreign affairs power, not pursuant to any enabling statute."  *NRDC*, 658 F. Supp. 2d at 111.  If the Court concluded that APA review were available here, the President would be obligated to decide each application for an international bridge permit personally in order to preserve the limitations on judicial review of presidential action. For the reasons above, the Court concludes that USDS's issuance of a Presidential Permit

constituted presidential action which is unreviewable under the APA.[25]  Count 6 will be

dismissed.

### b.  The Crossing Agreement is Subject to Judicial Review

Federal Defendants urge the Court to find that the Crossing Agreement is not

subject to judicial review because USDS approval of the agreement was committed to agency

discretion by law.  Mot. to Dismiss at 41 (citing *Legal Assistance for Vietnamese Asylum Seekers*

*v. Dep't of State, Bureau of Consular Affairs*, 104 F.3d 1349, 1353 (D.C. Cir. 1997); *Jensen v.*

*Nat'l Marine Fisheries Serv.*, 512 F.2d 1189, 1191 (9th Cir. 1975); 5 U.S.C. § 701(a)(2) (the

APA applies except to the extent that "agency action is committed to agency discretion by

law")).  Federal Defendants contend that the IBA gives USDS broad discretion to determine

whether to approve an international bridge agreement because it involves "complex concerns

regarding foreign relations, diplomacy, and national interest."  *Id*. at 42 (citing 33 U.S.C.

---

[25] Among Plaintiffs' numerous allegations that USDS acted contrary to law by issuing the Presidential Permit for the NITC/DRIC is that USDS failed to "fulfill[] its obligations to conduct an independent environmental analysis and assessment of purpose and need under [National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.* (NEPA)]."  3rd Am. Compl. ¶ 348. Plaintiffs argue that USDS's issuance of the Presidential Permit is subject to review for compliance with NEPA even if its actions are otherwise unreviewable.  *See* Opp'n at 77.  Federal Defendants argue that Plaintiffs lack standing to raise a NEPA challenge.  *See* Mot. to Dismiss at 46.  In response, Plaintiffs rely on *Latin Americans for Soc. & Eco. Dev. v. Adm'r of the Fed. Highway Admin.*, 858 F. Supp. 2d 839 (E.D. Mich. 2012) to support their position that they have standing.  *Latin Americans* held that DIBC had standing to challenge NITC/DRIC under NEPA because "of the alleged adverse effect on air quality and noise in the Delray area where the Bridge Company does business."  858 F. Supp. 2d at 850.  There are no comparable allegations in the Third Amended Complaint.  Plaintiffs do not have standing to challenge State Department's compliance with NEPA because they have not alleged any environmental injury at all.  *See ANR Pipeline Co. v. FERC*, 205 F.3d 403, 408 (D.C. Cir. 2000) (finding plaintiff lacked standing to bring a NEPA challenge because it failed to allege any environmental injury). Plaintiffs' interest in challenging competition from the NITC/DRIC is a purely economic interest, and economic concerns are "not within the zone of interests protected by NEPA."  *ANR Pipeline*, 205 F.3d at 408.

§ 535a).  According to Federal Defendants, the Court lacks a clear standard to apply in

determining whether State Department's actions were consistent with U.S. foreign policy.  *Id.*

The Third Amended Complaint alleges, *inter alia*, that the "State Department's

approval of the Crossing Agreement was in violation of the standards set forth in 5 U.S.C

§ 706(2) because it approved an agreement that was entered into in violation of Michigan law."

3rd Am. Compl.  ¶ 357.  Although "courts have been wary of second-guessing executive branch

decision involving complicated foreign policy matters," *Legal Assistance for Vietnamese Asylum*

*Seekers*, 104 F.3d at 1353, it is surely within the province of this Court to determine whether

USDS acted in contravention of the standards set forth in 5 U.S.C § 706(2) by approving an

agreement that violates state law.[26]  Such a decision would not touch on foreign policy matters.

Federal Defendants also argue that "the APA does not borrow state law or permit

state law to be used as a basis for seeking injunctive or declaratory relief against the United

States."  Reply at 53 (quoting *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 854

(D.C. Cir. 2010)).  *El-Shifa* is inapt because those plaintiffs were "alleging a purported *state*

common-law cause of action against the United States."  607 F.3d at 854.  Here, Plaintiffs are

not asserting a state-law claim against the United States.  Rather, Plaintiffs allege USDS acted in

contravention of the standards set forth in the APA, at 5 U.S.C § 706(2), by approving an

---

[26] Even though the Governor of Michigan applied to USDS for a Presidential Permit for the NITC/DRIC and sought approval from USDS for the Crossing Agreement on the same day, USDS's separately issued the Presidential Permit and approved the Crossing Agreement. USDS's notice in the Federal Register that it had issued the Presidential Permit was silent as to the Crossing Agreement.  *See* Issuance of a Presidential Permit to the State of Michigan, 78 Fed. Reg. No. 75 (April 18, 2013).  USDS only confirmed by letter to the Governor of Michigan that it had granted approval of the Crossing Agreement.  *See* 3rd Am. Compl. ¶ 17.  Federal Defendants do not argue that USDS's approval of the Crossing Agreement is unreviewable presidential action.

agreement for which its Michigan signatories had no authority under Michigan law.[27]  For the reasons stated above, Federal Defendants' motion to dismiss will be denied as to Count 7.

### E.  Count 8

Count 8 alleges that "the State Department and/or the United States have acted contrary to law and in excess of statutory authority by issuing [the NITC/DRIC] the Presidential Permit and by approving the Crossing Agreement."  3rd Am. Compl. ¶ 367.  Federal Defendants move to dismiss Count 8 for lack of jurisdiction on the grounds that the doctrine of non-statutory review cannot be invoked in the absence of any violation of "any unambiguous, mandatory statutory command, or any clear ultra vires action by a federal agency, as required by that doctrine."  Reply at 58.  Because the Court has statutory jurisdiction under the APA to review State Department's approval of the Crossing Agreement, it will only determine the availability of non-statutory review as it pertains to the Presidential Permit.  For the reasons below, the Court concludes that non-statutory review is not available.

Under the doctrine of non-statutory review, "[i]f a plaintiff is unable to bring his case predicated on either a specific or a general statutory review provision, he may still be able to institute a non-statutory review action."  *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).  The Supreme Court created this "extremely limited" doctrine in *Leedom v. Kyne*, 358 U.S. 184 (1958).  *See Griffith v. Fed. Labor Relations Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988) ("The *Leedom v. Kyne* exception is intended to be of extremely limited scope.").  Judicial review of agency action is permitted when the agency acts "in excess of

---

[27]  Michigan Governor Richard D. Snyder has filed a brief *amicus curiae* to support the authority of State actors.  *See* Amicus Brief [Dkt. 219].  At the point of a motion to dismiss, however, the Court gives credence to properly-pled facts in a complaint, "even if doubtful in fact."  *Twombly*, 550 U.S. at 555.

delegated powers" or "contrary to a specific prohibition" of a statute that was "clear and mandatory."  *Kyne*, 358 U.S. at 188; *see also Harmon v. Brucker*, 355 U.S. 579, 581-82 (1958) ("Generally, judicial relief is available to one who has been injured by an act of a government official which is in excess of his express or implied powers.").  The D.C. Circuit has stressed that "review may be had only when the agency's error is patently a misconstruction of the Act . . . or when the agency has disregarded a specific and unambiguous statutory directive . . . or when the agency has violated some specific command of a statute."  *Griffith*, 842 F.2d at 493 (internal citations and quotation marks omitted).[28]  If the doctrine of non-statutory review does not apply, a court should dismiss the claim for lack of jurisdiction.  *Id*. at 494.

Plaintiffs argue that: (1) the Presidential Permit was illegal because its issuance depended on the illegal Crossing Agreement; (2) issuance of the Presidential Permit violated standards set forth in the IBA; (3) issuance of the Presidential Permit violated Plaintiffs' franchise rights and the Boundary Waters Treaty; and (4) issuance of the Presidential Permit violated NEPA.  None of these four alleged illegalities is sufficient to trigger non-statutory review.

Plaintiffs cannot invoke non-statutory review to challenge the Presidential Permit based on the alleged illegality of the Crossing Agreement.  Plaintiffs argue that the "IBA does not give the State Department the power to approve illegal 'agreements,' and therefore did not give it the power to approve the Crossing Agreement, which was illegal."  Opp'n at 111.  At first

---

[28] Plaintiffs urge this Court to adopt a less stringent standard for determining the availability of non-statutory review where Congress has not specifically precluded review, claiming that "the question is simply whether the challenged actions are *ultra vires* or otherwise illegal, not whether they are 'patently' so."  Opp'n at 134.  Plaintiffs cite no authority for this proposition and the Court declines to adopt it when evaluating actions deemed, in this instance, to be those of the President.

blush, this argument appears to invoke non-statutory review based on an excess of delegated

powers theory.  Upon deeper inspection, however, Plaintiffs request judicial review of a USDS

action simply because it was not explicitly guided by statute.  But this would invite judicial

review of *any* discretionary action by an agency or department and would impermissibly broaden

the "extremely limited" scope of non-statutory review.  Moreover, Plaintiffs have not identified

any federal statute that clearly limits State's approval, on the President's behalf, of bridge

permits to those that are supported by governance agreements that are valid under state law.

   Plaintiffs' second argument also falls short.  Plaintiffs maintain that the IBA

obligates USDS to determine whether the NITC/DRIC was necessary and that the law includes

the "clear admonition that the IBA cannot be interpreted to 'adversely affect the rights of those

operating bridges previously authorized by the Congress to repair, replace, or enlarge existing

bridges.'"  Opp'n at 89 (citing H.R. REP. NO. 92-1303 at 3-4).  As an initial matter, the Court

finds that the legislative history of the IBA, cited by Plaintiffs, cannot support non-statutory

review because the "specific and unambiguous statutory directive" or "specific command" must

be in the language of the statute itself.  *Griffith*, 842 F.2d at 493.  As to a necessity

determination, the Court turns to the relevant portion of the IBA:

> No bridge may be constructed, maintained, and operated as provided
> in section 535 of this title unless the President has given his approval
> thereto. In the course of determining whether to grant such approval,
> *the President shall secure the advice and recommendations of*
> (1) . . .
> (2) *the heads of such departments and agencies of the Federal*
> *Government as he deems appropriate to determine the necessity for*
> *such bridge*.

33 U.S.C. § 535b (emphasis added).

   Plaintiffs read this language to mandate that a determination of necessity be made,

while giving discretion as to which agency the President might turn for advice and

recommendation.  Federal Defendants read the clause to contain only permissive language that

the President secure counsel from such agencies as he deems appropriate.  Further, Federal

Defendants argue that, at best, Section 535b is subject to different interpretations and therefore

cannot support a claim for non-statutory review because "non-statutory review must be based on

a statute or regulation that is subject to only one reasonable interpretation."  *Id*. at 67 (citing *Int'l*

*Ass'n of Machinists & Aerospace Workers, Dist. Lodge 166, AFL-CIO v. Griffin*, 590 F. Supp.

2d 171, 178 (D.D.C. 2008)).

   The legislative history of the IBA reveals that Congress considered it important

that the President consult with appropriate executive departments and agencies before approving

a new international bridge: "Section 4 imposes the further requirement that, prior to the

construction of an international bridge, a presidential permit be obtained. Such a permit is not to

be issued until the advice and recommendations of interested executive departments and agencies

are obtained."  H.R. REP. NO. 92-1303 at 4.  "The approval of the President is required by

section 4.  This approval is to be based on the advice and recommendations of . . . the heads of

appropriate Federal departments and agencies."  S. Rep. 92-1112, 1972 USCCAN 3399, 3400.

While Federal Defendants' position is better supported by the record, both parties endorse

reasonable but contrary interpretations of the IBA.  For that reason, the Court cannot conclude

that USDS has disregarded a "clear and mandatory" provision of the IBA, as required by *Kynes*.

*See Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256,

1264 (D.C. Cir. 2006) (finding that it cannot conclude that agency violated a "specific and

unambiguous statutory directive" where both parties "have raised compelling arguments

regarding the proper interpretation of the disputed statutory provisions").

Plaintiffs' third argument fails as well.  The Court need not exercise non-statutory review over Plaintiffs' claim that the issuance of the Presidential Permit violated their franchise rights because the Court already has concluded that there was no such violation.  The doctrine of non-statutory review will not afford Plaintiffs a path to check State's compliance with the Boundary Waters Treaty.  The Boundary Waters Treaty does not confer a private right of action and "judicial courts have nothing to do, and can give no redress" for alleged violations of a treaty.  *Canadian Transportation Co. v. United States*, 663 F.2d 1081, 1092-93 (D.C. Cir. 1980).

Plaintiffs' fourth argument based on USDS's compliance with NEPA does not support non-statutory review because Plaintiffs lack standing to raise a NEPA challenge, as explained above.

Plaintiffs cannot meet the standards required to invoke non-statutory review because they have not cited an instance where Federal Defendants have acted in excess of delegated powers or contrary to specific statutory prohibitions as required by *Leedom v. Kyne*, 358 U.S. at 188.  For these reasons, Count 8 will be dismissed for lack of jurisdiction.

### F.  Count 9

Count 9 alleges that Federal Defendants violated the Equal Protection Clause by using the regulatory approvals process to discriminate against the "privately-owned New Span in favor of the government-owned NITC/DRIC, which the Federal Defendants have sought to promote while attempting to slow down and prevent the construction of the New Span."  3rd Am. Compl. ¶ 278.  Specifically, Count 9 alleges that Federal Defendants have engaged in a range of discriminatory actions, including: (1) a concerted effort to build the NITC/DRIC and to prevent the building of the New Span; (2) USCG's refusal to grant a navigational permit for the New Span; (3) FHWA's acceleration of NEPA approvals for the NITC/DRIC while USCG dragged its feet on Plaintiffs' application; and (4) USDS's decision to issue the NITC/DRIC a Presidential

Permit.  *Id*.  Plaintiffs argue that they are similarly situated to the NITC/DRIC proponents because (1) "both are seeking to build a bridge less than two miles away from one another in an area that can only economically justify one of those projects" and (2) "both must obtain regulatory approvals from the federal government to build their bridges."  Opp'n at 98 (citing 3rd Am. Compl. ¶¶ 7, 217-228).  Federal Defendants move to dismiss Count 9 for failure to state a claim on the grounds that Plaintiffs are not similarly situated to the proponents of the NITC/DRIC and have not been subject to differential treatment.

A plaintiff who is not a member of a suspect class may establish a violation of the Equal Protection Clause as a "class-of-one" by demonstrating that the plaintiff has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  "The threshold inquiry in evaluating an equal protection claim is, therefore, to determine whether a person is similarly situated to those persons who allegedly received favorable treatment."  *Women Prisoners of Dist. of Columbia Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 924 (D.C. Cir. 1996) (internal citation and quotations omitted).  Importantly, this requirement "serves to distinguish claims to the treatment that was afforded others, which can be cognizable under principles of equal protection, from bare complaints of governmental unfairness, which cannot."  *Quezada v. Marshall*, 915 F. Supp. 2d 129, 135 (D.D.C. 2013).

As an initial matter, Plaintiffs and the proponents of the NITC/DRIC are not subject to all of the same regulatory approvals from the federal government to build their respective bridges.  Plaintiffs cite State's issuance of a Presidential Permit to the NITC/DRIC as a source of unequal treatment, but Plaintiffs are not required to obtain a Presidential Permit.  On this point, Plaintiffs cannot show differential treatment.  *See Women Prisoners*, 93 F.3d at 924

(equal protection requires plaintiff to be "similarly situated to those persons who allegedly received favorable treatment").

Similarly, Plaintiffs' complaint about USCG's refusal to grant a navigational permit for the New Span is a non-starter because the Court determined that USCG did not act improperly by denying Plaintiffs a navigation permit.  *See Detroit Int'l Bridge Co. v. Gov't of Canada*, 53 F. Supp. 3d 1 (D.D.C. 2014), *judgment entered*, 53 F. Supp. 3d 28 (D.D.C. 2015).  Thus, the Court finds that there were was a rational basis for any purported difference in treatment by USCG.  *See Vill. of Willowbrook*, 528 U.S. at 64.  Moreover, the proponents of the NITC/DRIC have not yet submitted an application for a navigation permit to USCG.  *See* Mot. to Dismiss at 53.  There is simply no way to compare USCG treatment of Plaintiffs and the NITC/DRIC proponents with respect to the permitting process when the NITC/DRIC proponents have not even started that process.  Although Plaintiffs claim that the "two projects . . . have been subject to very different treatment," the allegations on which they rely do not mention the NITC/DRIC proponents, much less articulate how USCG has afforded them more favorable treatment.  Opp'n at 99 (citing 3rd Am. Compl. ¶¶ 152-53, 156).  Undeterred, Plaintiffs insist that there is significance to the contemporaneous denial of their navigation permit by USCG and USDS's approval of a Presidential Permit to the NITC/DRIC.  Opp'n at 99.  The fact that two independent federal agencies have granted or denied entirely distinct regulatory approvals at a similar point in time does not establish a viable equal protection claim.

Both the New Span and the NITC/DRIC are subject to NEPA review.  Plaintiffs allege that the "Coast Guard's treatment of the alleged environmental impacts of the Ambassador Bridge New Span contrasts sharply with FHWA's treatment of the environmental impacts of its own project, the NITC/DRIC."  3rd Am. Compl. ¶ 165.  Plaintiffs argue that the "Coast Guard . . .

subjected Plaintiffs' New Span to years of unnecessary environmental review even though its environmental impact will be insignificant to nonexistent given that it will be constructed directly alongside the [existing span] and will connect to the existing Ambassador Bridge plaza." Opp'n at 99. Plaintiffs maintain that this treatment "contrasts sharply" with FHWA's review of the NITC/DRIC, which was subject to an interagency "streamlining agreement" designed to expedite review. *Id.*; 3rd Am. Compl. ¶ 165 ("FHWA granted expedited environmental approval for the NITC/DRIC."). While Plaintiffs' allegations reveal frustration at being subject to a lengthy and complicated environmental review, the Court finds insufficient basis to conclude that Plaintiffs were treated differently with respect to the NEPA approval process where two independent federal agencies conducted separate environmental reviews. In addition, the New Span and the NITC/DRIC, although proximately located, are not identical projects and, therefore, pose unique issues. Plaintiffs' lay opinion that the environmental impact of the New Span "will be insignificant to nonexistent," 3rd Am. Compl. ¶ 150, does not support the claim that USCG has subjected Plaintiffs to an improperly long NEPA review. Plaintiffs cannot state a claim for an equal protection violation when the results and intermediary steps of the environmental review for one bridge project do not mirror the process for another, particularly when the review was conducted by a different federal agency. *Women Prisoners*, 93 F.3d at 924 ("dissimilar treatment of dissimilarly situated persons does not violate equal protection") (internal citation and alteration omitted).

The heart of Plaintiffs' argument is that Federal Defendants have discriminated against "Plaintiffs' privately-owned New Span in favor of the Government-owned NITC/DRIC" in order to delay the construction of the New Span. Opp'n at 102. The Court has parsed Plaintiffs' arguments and finds insufficient factual allegations of differential treatment by the

individual Federal Defendants to support this claim.  Plaintiffs' claim that the "regulatory approval for the Twin Span should have been straightforward given that the Twin Span does not require an IBA Bridge Permit and does not pose any navigational or environmental problems," Opp'n at 101 (citing 3rd Am. Compl. ¶¶ 150, 153), is a conclusory lay opinion, *Twombly*, 550 U.S. at 555, and contrary to this Court's dismissal of Count 4 against USCG.  Although Plaintiffs point the finger at Federal Defendants, the primary delay facing the New Span has been Plaintiffs' failure or inability to acquire air rights over Riverside Park.  *See* 3rd Am. Compl. ¶ 170 (acknowledging that Plaintiffs need to acquire air rights over land owned by the City of Detroit). Even though the Coast Guard denied Plaintiffs' application for a navigation permit in 2009 for this reason, Plaintiffs and the City of Detroit only agreed to swap land to secure the necessary air rights over Riverside Park for Plaintiffs as of July 2015.  For the reasons above, the Court will dismiss Count 9.

## IV.  CONCLUSION

For the reasons set forth above, Federal Defendants' Motion to Dismiss, Dkt. 126, will be granted in part and denied in part.  Counts 1, 2, 3, 5, 6, 8, and 9 will be dismissed.  Count 7 remains.  Plaintiffs' Motion for Partial Summary Judgment, Dkt. 133, will be denied in part as moot as to Counts 1, 3, and 6.  A memorializing Order accompanies this Opinion.

Date: September 30, 2015

_____
/s/
ROSEMARY M. COLLYER
United States District Judge