UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
DETROIT INTERNATIONAL                )
BRIDGE COMPANY, *et al.*,                )
                                                    )
        Plaintiffs,                             )
                                                    )
        v.                                         )        Civil Action No. 10-476 (RMC)
                                                    )
GOVERNMENT OF CANADA, *et al.*,     )
                                                    )
        Defendants.                          )
_____)

OPINION ON MOTION FOR PARTIAL RECONSIDERATION

        Plaintiffs Detroit International Bridge Company and its wholly-owned subsidiary,

the Canadian Transit Company (collectively DIBC), seek partial reconsideration of the Court's

September 30, 2015 Opinion and Order dismissing Counts 1, 2, 3, 5, 6, 8, and 9 of DIBC's Third

Amended Complaint (TAC), Dkt. 105.  *See* Mot. for Reconsideration [Dkt. 233].[1]  Specifically,

DIBC asks the Court to reconsider its dismissal of Counts 2, 3, 6, and 9.  Federal Defendants

timely opposed the motion, *see* Dkt. 242, and DIBC replied, *see* Dkt. 258.

        The facts of this case are well known.[2]  In 1921, U.S. Congress enacted a federal

statute granting DIBC the rights "to construct, maintain, and operate" an international bridge

_____

[1] Count 4 was dismissed on April 7, 2016 pursuant to the D.C. Circuit's April 4, 2016 Mandate.
*See* April 7, 2016 Order [Dkt. 255].  Only Count 7 remains.  *See* Sept. 30, 2015 Order [Dkt.
223].

[2] For a complete and detailed recitation of the facts, which are taken from TAC and are accepted
as true at this stage, *see* September 30, 2015 Mem. Op. [Dkt. 222] (Mem. Op.), *available at
Detroit Int'l Bridge Co. v. Gov't of Canada*, No. 10-cv-476 (RMC), 2015 WL 5726601 at *1-6
(D.D.C. Sept. 30, 2015).

between Detroit Michigan and Windsor Ontario.  *See* Act of March 4, 1921, 66th Cong., ch. 167, § 1, 41 Stat. 1439 (1921) (DIBC Act).[3]  The Canadian Parliament passed similar legislation.  *See* Act of May 3, 1921, 11-12 Geo. V ch. 57 (Can.) (CTC Act).  Pursuant to this authority, DIBC built the Ambassador Bridge over the Detroit River.  DIBC wants to build an adjacent Twin Span to provide a modern bridge crossing while it repairs and upgrades the 87-year-old Ambassador Bridge.  The financial viability of the Twin Span, which in turn allegedly affects the existence of the Ambassador Bridge, has been threatened by the proposed construction of a new publicly-owned bridge, the New International Transit Crossing/Detroit River International Crossing (NITC/DRIC).[4]  DIBC contends that the NITC/DRIC will take away a substantial percentage of the commercial traffic between the United States and Canada from the Ambassador Bridge.  DIBC has raised a plethora of arguments and claims against Federal Defendants to vindicate its right to build the Twin Span and prevent the construction of the NITC/DRIC.  For the reasons that follow, the Court amends and expands upon some of its findings and analysis, but holds that Counts 2, 3, 6, and 9 must remain dismissed.  DIBC's Motion for Partial Reconsideration will be denied.

## I.  LEGAL STANDARD

Federal Rule of Civil Procedure 54(b) governs a motion for reconsideration of interlocutory orders.  Rule 54(b) provides that "any order or other decision, however designated,

---

[3] The American Transit Company (ATC), DIBC's predecessor, was the recipient of the rights granted in 1921.  ATC transferred its rights and assets to DIBC in 1927 and CTC has been a wholly-owned subsidiary of DIBC since 1927.  For clarity's sake (and because the difference is irrelevant), the Court refers to ATC and DIBC as DIBC, irrespective of time period.

[4] It was announced earlier this year that the NITC/DRIC would be officially named the Gordie Howe International Bridge.  The Court will continue to refer to the new crossing as NITC/DRIC for the sake of consistency with the Court's prior opinions and the parties' briefing in this case.

that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the

parties. . . may be revised at any time before the entry of judgment adjudicating all the claims

and all the parties' rights and liabilities."  Fed. R. Civ. P. 54(b).  Relief under Rule 54(b) is

available "as justice requires."  *DL v. District of Columbia*, 274 F.R.D. 320, 324 (D.D.C. 2011).

To determine what "justice requires," courts examine the relevant circumstances.  *Cobell v.

Norton*, 355 F. Supp. 2d 531, 539 (D.D.C. 2005).  Relevant circumstances include whether the

court has "'patently misunderstood a party, has made a decision outside the adversarial issues

presented to the Court by the parties, has made an error not of reasoning, but of apprehension, or

where a controlling or significant change in the law or facts [has occurred] since the submission

of the issue to the Court.'"  *Ficken v. Golden*, 696 F. Supp. 2d 21, 35 (D.D.C. 2010) (quoting

*Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004)) (alterations in original).  "[A]sking 'what

justice requires' amounts to determining, within the Court's discretion, whether reconsideration

is necessary under the relevant circumstances."  *Cobell*, 224 F.R.D. at 272.

## II.  ANALYSIS

DIBC asks the Court to reconsider the dismissal of Counts 2, 3, 6, and 9.

Specifically, DIBC argues, *inter alia*, that: (1) Federal Defendants violated DIBC's right to

maintain and operate the Ambassador Bridge and build the Twin Span; (2) Federal Defendants

violated the constitutional doctrine of separation of powers because Congress has supported the

Ambassador Bridge and its Twin Span; (3) the issuance of the NITC/DRIC Presidential permit is

reviewable under the Administrative Procedure Act (APA), 5 U.S.C. § 706; and (4) Federal

Defendants violated the Equal Protection Clause of the U.S. Constitution because they

discriminated against DIBC's Twin Span and in favor of the NITC/DRIC.  Federal Defendants

oppose DIBC's motion arguing that "there is nothing in Plaintiffs' Motion that amounts to

anything more than a re-packaging of arguments they previously made or should have made."

Opp'n [Dkt. 242] at 2.

DIBC concedes that "[i]n its zeal to assert every argument in defense of the

Ambassador Bridge, [it] may have 'overplay[ed its] hand.'"  Mot. for Reconsideration at 1

(quoting Mem. Op. at 27).  DIBC now seeks reconsideration of a "subset of those dismissed

claims" because it may not have articulated some of them "as clearly as [it] should have . . . ."

*Id*.  The problem with DIBC's arguments is not lack of clarity.  Rather, the Court disagrees with

most of DIBC's legal conclusions.

### A.   Count 2 – Statutory and Contractual Rights under DIBC Act

In the DIBC Act of 1921, Congress authorized DIBC "to construct, maintain, and

operate a bridge and approaches thereto across Detroit River at a point suitable to the interests of

navigation, within or near the city limits of Detroit, Wayne County, Michigan . . . ."  DIBC Act

§1.  In light of this language, the Court rejected DIBC's argument that the DIBC Act conferred

"an exclusive statutory and contractual franchise right."  Mem. Op. [Dkt. 222] at 27-32.  The

Court reasoned that Congress granted DIBC "a time-constrained right to build" a bridge in the

vicinity of Detroit but by its plain terms "did not require DIBC to build or operate a bridge *in*

*fact*."  *Id.* at 28 (citing DIBC Act § 1) (emphasis in original).  Moreover, the Court noted that

"the government should never be presumed to have relinquished its powers" and held that there

was nothing in the language of the DIBC Act that could support an express or implied grant of

exclusivity.  *Id.* at 29 (citing *Proprietors of Charles River Bridge v. Proprietors of Warren*

*Bridge*, 36 U.S. 420, 422 (1837)).  On reconsideration, DIBC raises two arguments with respect

to Count 2.

4

### 1. Congressional Authorization Argument

DIBC argues that this Court failed to address its alternative claim in Count 2 — namely, that even if Congress did not "relinquish its powers" when it enacted the DIBC Act, DIBC still prevails because it has "the *only* franchise for a bridge between Detroit and Canada 'unless and until' Congress and the Canadian Parliament expressly authorize a second such bridge."  Mot. for Reconsideration at 17 (quoting TAC ¶ 312(c)) (emphasis added); *see also* Reply [Dkt. 258] at 10 (arguing that "only Congress can authorize a bridge that interferes with the Ambassador Bridge . . . .").  But this "alternative" claim is not new and has been thoroughly considered.  The argument that DIBC has "the only franchise" for a bridge in that area of the Detroit River necessarily presupposes that the DIBC Act contained an implied grant of perpetual exclusivity.  The language of the statute does not support this claim, *see* DIBC Act §1, and the Court has already rejected the argument.  *See* Mem. Op. at 27-32.

The crux of DIBC's position is that Federal Defendants violated its franchise rights under the DIBC Act because Congress "never enacted a law that specifically authorize[d] the NITC/DRIC."  Mot. for Reconsideration at 17.  Trying to conceal its dependence on a grant of exclusivity that never took place, DIBC relies on the fact that *Charles River Bridge* "involved two commensurate acts by the same sovereign legislature, each with equal specificity as to what that sovereign was authorizing."  *Id.*  According to DIBC, the facts in *Charles River Bridge* require Congress to authorize the NITC/DRIC.  The argument is a red herring.  DIBC does not explain why this factual distinction is relevant, let alone dispositive.[5]  Further, Congress did not

---

[5] This Court previously rejected DIBC's attempt to distinguish *Charles River Bridge* factually on the basis that "the principle enunciated in that case — 'in grants by the public, nothing passes by implication,' 36 U.S. at 421 — is not fact-dependent."  Mem. Op. at 30 n.20.

have to authorize directly the construction of the NITC/DRIC because, in 1972, Congress

consented to "the construction, maintenance, and operation of [all] international bridges" so long

as the "foreign country consent[s], the proposed bridge compl[ies] with the 1906 Bridge Act, Act

of Mar. 23, 1906, ch. 1130, 34 Stat. 84, and the proposed bridge obtain[s] a set of Executive

Branch Approvals."  Mem. Op. at 5-6 (citing International Bridge Act of 1972 (IBA), 33 U.S.C.

§ 535 *et seq.*).

The IBA governs the proposed construction of the NITC/DRIC and to require

additional congressional action, as DIBC suggests, directly contravenes Congress's clear intent

in 1972 to remove itself from the individual approval of international bridges.  *See* S. Rep. No.

92-1112, at 1 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3399, 3399 (1972 S. Rep.) ("The

philosophy of the bill, which will relieve the Congress of what has become a routine burden,

follows that of the General Bridge Act of 1946 [33 U.S.C. § 525], from which so-called

international bridges were exempted."); *see also Sisselman v. Smith*, 432 F.2d 750, 753 (3d Cir.

1970) (holding that the General Bridge Act of 1946 "was clearly intended to end piecemeal

Congressional supervision of [domestic] bridge construction by delegation of Congressional

authority to an expert administrative agency").  Moreover, since there was no expressed or

implied grant of exclusivity in favor of DIBC in 1921, Congress did not have "to alter, amend, or

revoke" the DIBC Act for a new bridge between Detroit and Canada to be built pursuant to the

IBA.  DIBC Act § 3.  Precisely because there was no grant of exclusivity, the fact that the new

bridge might be built so close to the Ambassador Bridge does not state a cause of action.

Consequently, DIBC's "alternative" claim fails.

### 2.   Separation of Powers Argument

DIBC also argues that Count 2 "encompasses a *pure constitutional claim* that the Executive Branch is violating the Separation of Powers through its approvals of the NITC/DRIC."  Mot. for Reconsideration at 19 (emphasis in original).  DIBC claims that the Court failed to address this "constitutional claim" in its September 30, 2015 Opinion and that it should consider it now.  However, such a claim is nowhere to be found in Count 2, TAC, or DIBC's prior briefing.  Count 2 focuses only on the alleged "violation of [DIBC]'s statutory and contractual franchise rights" under the DIBC Act.  TAC ¶ 299; *see id.* ¶¶ 305, 308, 311-12. Count 2 does not mention "separation of powers" and does not make any direct or indirect references to the U.S. Constitution.

"Judges are not expected to be mindreaders.  Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or forever hold its peace."  *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir. 1990).  DIBC never articulated a separation of powers argument in Count 2 and "arguments that should have been previously raised, but are only raised for the first time in a motion for reconsideration, will not be entertained by this Court."  *James v. England*, 226 F.R.D. 2, 7 (D.D.C. 2004).  Count 2 will remain dismissed.[6]

### B.  Count 3 – Right to Build Twin Span

The Court dismissed Count 3 for failure to state a claim on the basis that the proposed construction of the NITC/DRIC did not violate DIBC's right to build the Twin Span

---

[6] This untimely argument also lacks merit.  The DIBC Act and congressional support for the Twin Span do not give rise to a separation of powers violation.  While DIBC argues that Federal Defendants' actions in this case have violated Congress's will as expressed in the DIBC Act of 1921, DIBC's insistence on congressional approval of the NITC/DRIC runs counter to Congressional intent as expressed in the IBA.

because DIBC lacked an exclusive right to the Detroit-Windsor crossing.  DIBC argues that the Court erred in dismissing Count 3 because "Count 3 was based solely on Plaintiffs' statutory right to 'operate and maintain' the Ambassador Bridge without any time limit, and was pled as an alternative to any theory of exclusivity."  Mot. for Reconsideration at 12.  DIBC contends that "[t]he Court should reconsider its dismissal of Count 3 because the plain text of the DIBC Act unmistakably provides a right to maintain and operate the Ambassador Bridge in perpetuity."  Mot. for Reconsideration at 12.

Federal Defendants do not dispute that the DIBC Act granted "perpetual consent" to DIBC to "maintain and operate" the Ambassador Bridge and that this right includes expanding or replacing the Ambassador Bridge by building the Twin Span.  *See* Opp'n at 10; *see also* Mem. Op. at 32-33.  The Court never held or found anything to the contrary.  It indicated that "Congress granted DIBC the right to 'construct, maintain, and operate a bridge' in the vicinity of Detroit," Mem. Op. at 21 (quoting DIBC Act §1); *see also id.* at 23, 29.[7]  However, these undisputed premises do not warrant the legal conclusion advanced by DIBC — namely, that the proposed construction of the NITC/DRIC violated DIBC's right to "maintain and operate" the Ambassador Bridge.

The crux of DIBC's position is articulated in the Motion for Reconsideration: "Plaintiffs are entitled to discovery to show that the NITC/DRIC is the functional equivalent of the Plaintiffs' Twin Span, and hence violates Plaintiffs' right to build their Twin Span."  Mot. for Reconsideration at 16.  Specifically, DIBC contends that the Court overlooked several allegations supporting Count 3: (1) Federal Defendants accelerated the approvals for the

---

[7] Congress retains the "right to alter, amend, or repeal" the DIBC Act.  DIBC Act § 3.

NITC/DRIC at the expense of DIBC, while delaying the regulatory approvals for the Twin Span; and (2) Federal Defendants "promoted and approved the NITC/DRIC without giving any consideration at all to whether it was necessary given [DIBC's] expressed desire and constant effort to build the[] Twin Span." *Id.* at 14 (citations omitted); *see* TAC ¶ 19 (alleging that DIBC has "the right build the New Span to the Ambassador Bridge and any government action by defendants that seeks to favor the NITC/DRIC over the New Span to prevent plaintiffs from exercising their right to build the New Span is a breach of plaintiffs' franchise rights . . . .").

These allegations do not support the claim that Federal Defendants have violated DIBC's right to maintain and operate the Ambassador Bridge.  If anything, these allegations merely support a claim that Federal Defendants violated DIBC's desire to maintain a profitable business.  "[T]he planned construction of the NITC/DRIC does not violate [DIBC's] right to build the New Span even if threatens the business rationale for doing so."  Mem. Op. at 33. DIBC can still maintain and operate the Ambassador Bridge — particularly since "[t]he economic justification for the New Span is . . . not found in increased traffic levels, but instead in reduced maintenance costs and enhanced efficiency in the transit process through customs." TAC ¶ 6 (alleging that "the New Span would be a desirable upgrade and modernization to the Ambassador Bridge").  Also, DIBC can still build a Twin Span, even if doing so would not be economically feasible.  It follows that the premise that NITC/DRIC is the functional equivalent of the Twin Span and that "so long as the NITC/DRIC was built first, it would be impossible for Plaintiffs to build their Twin Span" shows that Federal Defendants' actions merely threatened the financial viability of the Twin Span.  Mot. for Reconsideration at 14-15 (citing TAC ¶¶ 217-

21, 343).  Promoting the NITC/DRIC did not actually prevent DIBC from exercising any of its rights under the DIBC Act of 1921.[8]

DIBC fails to recognize the inescapable reality that its interpretation of the DIBC Act presupposes a grant of exclusivity that Congress did not provide.  Absent a grant of exclusivity, DIBC's "complaint about unfair increased competition and reduced profit margins" fails to state a claim regarding the alleged violation of statutory rights conferred in the DIBC Act.  Mem. Op. at 32.  Count 3 will remain dismissed.

## C. Count 6 – APA Challenge to Presidential Permit for the NITC/DRIC

Count 6 alleged that the decision of the U.S. Department of State (USDS) "to grant a Presidential permit for the NITC/DRIC was contrary to law, arbitrary and capricious, in excess of statutory authority, and otherwise in violation of the standards set forth in 5 U.S.C. § 706(2)."  TAC ¶ 341.  Count 6 was dismissed for lack of jurisdiction on the basis that issuance of a Presidential Permit for the NITC/DRIC was "not final agency action subject to APA review."  Mem. Op. at 42.  Specifically, the Court held that the issuance of the Presidential Permit was an exercise of presidential authority and that "permitting judicial review [in the instant case] would run afoul of the separation of powers principle . . . ."  *Id.* at 46 (internal quotation marks and citation omitted).

---

[8] The Court also notes that some of DIBC's allegations and arguments were rejected previously when this Court ruled that the Coast Guard did not act improperly when it denied DIBC a navigation permit in 2009.  *See Detroit Int'l Bridge Co. v. Gov't of Canada*, 53 F. Supp. 3d 1 (D.D.C.2014).  Although this decision was vacated pursuant to joint stipulation of dismissal before the D.C. Circuit, *see* April 7, 2016 Order [Dkt. 255], the Court's reasoning shows that since a navigation permit from the Coast Guard was a necessary precursor to any construction, and the permit was only issued in March 2016, the alleged delays by Federal Defendants would be irrelevant to this claim.

DIBC urges the Court "to reconsider its holding that it had no jurisdiction to review the State Department's approval of the NITC/DRIC application under Section 4 of the IBA[, 33 U.S.C. § 535(b)]."  Mot. for Reconsideration at 21.  It adds, "[r]eversing this jurisdictional holding will enable the Court to reach Plaintiffs' strong claims that the State Department's approval was both contrary to law and arbitrary and capricious." *Id.*  DIBC advances four arguments for reconsideration of the dismissal of Count 6: (1) presidential approval and presidential permits for international bridges are the same thing; (2) issuance of the Presidential Permit by USDS was not an exercise of the President's inherent constitutional authority; (3) the Presidential Permit is reviewable under the APA because USDS exercised power delegated to the President by Congress; and (4) the issuance of the Presidential Permit by USDS, even if an exercise of inherent presidential authority, was final agency action reviewable under the APA.  Federal Defendants oppose each of these arguments and ask the Court to deny DIBC's motion.

Upon consideration of the parties' present arguments and further study on the underlying legal issues in Count 6, the Court amends certain findings of its earlier Opinion and expands on its earlier analysis.  Its conclusion is the same but for different reasons.  Given the complexity of the multiple issues in DIBC's APA claim, it is important to review carefully the historical evolution of the legal framework governing the construction and maintenance of international bridges.

### 1. Historical Background: From the Rivers and Harbors Act of 1899 to the International Bridge Act of 1972

Congress has long asserted its authority to approve or disapprove bridges over navigable waters, both domestic and international, pursuant to its authority to regulate

commerce. *See* U.S. Const. art. I, § 8, cl. 3; *Charles River Bridge*, 36 U.S. at 420-22. It formalized its authority in the Rivers and Harbors Act of 1899 (1899 Act) which required, *inter alia*, congressional authorization for the construction of any bridge across or over navigable waters of the United States. *See* 33 U.S.C. § 401. Not long thereafter, Congress passed the Bridge Act of 1906 to regulate the construction and maintenance of such bridges, thereby reiterating that persons interested in building a bridge (international or domestic) must have first obtained the consent of Congress. *See* 33 U.S.C. §§ 491-498. In 1909, the United States ratified the Boundary Waters Treaty, which authorized the construction of new bridges over the boundary waters between the United States and Canada subject to certain criteria, such as government approval through "special agreements" (*i.e.*, "concurrent or reciprocal" legislation by U.S. Congress and the Canadian Parliament). *See* Boundary Waters Treaty, U.S.-Gr. Brit. (for Can.), Jan. 11, 1909, 36 Stat. 2448.

In 1946, Congress passed the General Bridge Act of 1946, 33 U.S.C. §§ 525-533, to amend the Bridge Act of 1906 and provide its consent "for the construction, maintenance, and operation of bridges and approaches thereto over the navigable waters of the United States" (*i.e.*, domestic bridges). 33 U.S.C. § 525(a). The statute expressly stated that this consent did not extend to the "construction of any bridge which will connect the United States . . . with any foreign country" (*i.e.*, international bridges). 33 U.S.C. § 531. The goal of the later General Bridge Act of 1946 was "to end piecemeal Congressional supervision of bridge construction [within the United States] by delegation of Congressional authority to an expert administrative agency." *Sisselman*, 432 F.2d at 753.

In the early 1960s, Congressional leaders decided that approval of each international bridge had become too burdensome. As a result, "the Committee on Foreign

Relations [began] to explore other means of authorizing the construction of international

bridges." 1972 S. Rep. at 3399. The Committee produced an omnibus bill in "consultation with

the executive departments," which the U.S. Senate first passed in 1964 and again in 1965 and in

1967, but "was not finally enacted by the House" on any occasion. *Id.* Since no action was

taken on the bill, "[o]n September 15, 1971, the executive branch submitted a new draft of

legislation," which was enacted and became the International Bridge Act of 1972 (IBA). *Id.* at

3399-3400.

    While the Executive Branch worked on the new draft and Congress worked on its

passage, on August 16, 1968, President Lyndon B. Johnson issued Executive Order 11,423, titled

"Providing for the Performance of Certain Functions Heretofore Performed by the President with

Respect to Certain Facilities Constructed and Maintained on the Borders of the United States."

Exec. Order No. 11423, 3 C.F.R. 742 (1966-1970), as amended 33 Fed. Reg. 11741 (August 16,

1968) (E.O. 11423). E.O. 11423 stated that the "proper conduct of the foreign relations of the

United States requires that executive permission be obtained for the construction and

maintenance at the borders of the United States of facilities connecting the United States with a

foreign country" and that, in the past, "such executive permission has from time to time been

sought and granted in the form of Presidential permits for the construction, connection,

operation, and maintenance . . . of such border crossing facilities as water supply and oil

pipelines, aerial tramways and cable cars, submarine cables, and lines for the transmission of

electric energy." *Id.* Notably absent from this list were international bridges, which pursuant to

the Bridge Act of 1906 still required congressional authorization.

    E.O. 11423 designated and empowered the Secretary of State "to receive all

applications for permits for the construction, connection, operation, or maintenance" of border

crossing facilities — specifically, (i) "facilities for the exportation or importation of petroleum, petroleum products, coal, [or] minerals" (*i.e.*, pipelines and conveyor belts); (ii) "facilities for the exportation or importation of water or sewage;" (iii) "facilities for the transportation of persons or things, or both" (*i.e.*, monorails, aerial cable cars, and aerial tramways); and (iv) "*bridges, to the extent that congressional authorization is not required.*" *Id.*, § 1(a) (emphasis added). Congressional delegation of the authorization for the construction of international bridges came four years later with the IBA's passage.

Congress passed the International Bridge Act of 1972 (IBA), 33 U.S.C. § 535 *et seq.*, to remove itself from the individual evaluation and approval of international bridges. In the IBA, Congress gave its advance consent to the construction, maintenance, and operation of any international bridge "subject to the approval of the proper authorities of the foreign country concerned [*i.e.*, Mexico or Canada], the provisions of the 1906 Bridge Act, and the provisions of the [IBA]." 1972 S. Rep. at 3400; *see also* 33 U.S.C. § 535. Two important provisions of the IBA are relevant to the instant case. The first provision authorizes a "State or a subdivision or instrumentality thereof to enter into agreements" to build bridges between itself and Canada or Mexico and conditions "the effectiveness of such agreement . . . on its approval by the Secretary of State." 33 U.S.C. § 535(a).[9] The second provision provides:

> No bridge may be constructed, maintained, and operated as provided in section 535 of this title unless the President has given his approval thereto. In the course of determining whether to grant such approval, the President shall secure the advice and recommendations of (1) the United States section of the International Boundary and Water Commission, United States and

---

[9] This provision relates to DIBC's challenge to the approval of the NITC/DRIC Crossing Agreement. *See* TAC Count 7. The Court has held that the Crossing Agreement is subject to judicial review under the APA and the parties' briefs on Count 7 are pending. *See* Mem. Op. at 47-49.

> Mexico, in the case of a bridge connecting the United States and Mexico, and (2) the heads of such departments and agencies of the Federal Government as he deems appropriate to determine the necessity for such bridge.

33 U.S.C. § 535(b).  While the first provision relates to the approval of crossing agreements by USDS between a State and a foreign country, the second provision relates to the President's approval of an international bridge.  These two provisions are both prerequisites for the construction of any new international bridge.

Finally, E.O. 11423 prescribed the procedures for the issuance of presidential permits.  With respect to applications for the construction of bridges, E.O. 11423 orders that "the Secretary of State shall request the views of the Secretary of the Treasury, the Secretary of Defense, the Attorney General, and the Secretary of Transportation" and "may consult with such other department and agency heads and with such state and local government officials as he [or she] deems appropriate with respect to each application."  E.O. 11423, § 1(b)-(c).  After this consultation, the Secretary of State shall determine whether "the issuance of a permit to the applicant would serve the national interest" and notify the officials of the proposed determination.  *Id.*, § 1(d)-(e).  If U.S. officials who are required to be consulted agree with the proposed determination by USDS, the "Secretary of State shall issue or deny the permit in accordance with his proposed determination . . . ."  *Id.*, § 1(f).  To the extent a U.S. official disagrees with the proposed determination and "requests the Secretary [of State] to refer the application to the President . . . , the Secretary of State shall refer the application together with statements of the views of the several officials involved, to the President for his [or her] consideration and final decision."  *Id.*

## 2.   The Relationship between E.O. 11423 and the IBA

DIBC makes two arguments that implicate this Court's earlier analysis of the relationship between E.O. 11423 and the IBA: (1) presidential approvals under § 535(b) and presidential permits for international bridges under E.O. 11423 are the same thing; and (2) the issuance of the NITC/DRIC Presidential Permit by USDS was not an exercise of the President's inherent constitutional authority.   Federal Defendants reject these arguments and defend the findings and rationale of the Court's September 30, 2015 Memorandum Opinion.   The Court will address each of DIBC's arguments in turn.

First, the Court's Memorandum Opinion mentioned in passing that DIBC's "position conflates permitting for international bridges — the focus of Count 6 — and approval for such bridges." Mem. Op. at 44.   The Court added that while "E.O. 11423 . . . sets forth the procedures for the President's issuance of bridge permits," the IBA "says nothing about permits" and instead "requires Presidential approval" of international bridges. *Id.* DIBC contends that the Court erred in making this distinction.   Mot. for Reconsideration at 26-29.   To the extent that a presidential permit is different from a presidential approval, DIBC points out that NITC/DRIC would be unlawful because it only received a presidential permit under E.O. 11423 and not a presidential approval under § 535(b).   *Id.* at 28.   On reconsideration, the Court agrees with DIBC that "permitting" and "approval" of international bridges are one and the same.[10]   Simply put, while E.O. 11423 and the IBA use different words, the issuance of presidential permits by USDS is rooted in the IBA's requirement that international bridges must be approved by the President.

---

[10] Presidential approval of an international bridge under § 535(b), *see* TAC Count 6, should not be confused with approval of the Crossing Agreement by USDS under § 535(a), *see* TAC Count 7.

In *Presidio Bridge Company v. Secretary of State*, Judge Suttle in the Western District of Texas examined the close relationship between the two documents and concluded that E.O. 11423 "must be read as a related document to the 1972 Act." 486 F. Supp. 288, 292 (W.D. Tex. 1978), *aff'd*, 612 F.2d 578 (5th Cir. 1980). E.O. 11423 "was designed to cover border areas — areas that, at the time the Order was drafted [*i.e.*, 1968], were still within the scope of Congressional domain." *Id.* at 295.[11] Specifically, with respect to international bridges over navigable waters, it was clear that express congressional authorization was required pursuant to the General Bridge Act of 1906.

The court in *Presidio Bridge* faced the same dilemma presented by Count 6 of the instant case: If "[t]here were no bridges under this provision where Congressional authorization was not needed," why would the President authorize the Secretary of State to consider permits for the construction of "bridges, to the extent that congressional authorization is not required"? *Id.*; E.O. 11423 § 1(a). "The most logical explanation for the symbiotic reading of the two documents" and the answer to the dilemma is:

> [H]istory, and the words of the documents themselves, show[] that, after four years of work in drafting a bill, the President issued an Executive Order anticipating its final passage; passage was not forthcoming for another three years; but the bill that was ultimately produced was the product of the same arm of the government that issued the Order, and was passed by a Congress that was well aware

---

[11] DIBC mentions in passing that "[E.O.] 11423 may have conveyed approval power over bridges built over land, over roads, or over non-navigable waters . . . ." Mot. for Reconsideration at 23. The text of the order and its underlying history offer no support for this interpretation. Unlike the construction of pipelines and other types of border-crossing facilities, the construction of international bridges had been the exclusive realm of Congress. Congress authorized the construction of bridges *over navigable waters* pursuant to its power to regulate foreign commerce and commerce between States. *See* U.S. Const., Art. I, § 8, cl. 3. Since E.O. 11423 was issued in expectation of the IBA's passage, the logical conclusion would be that E.O. 11423 also covered international bridges over navigable waters. *See Presidio Bridge*, 486 F. Supp. at 295-96.

> of both the provisions in that Order and the reason for its existence.
> The two documents are thus compatible with, and companions to,
> one another.

*Presidio Bridge*, 486 F. Supp. at 295-96.  Since E.O. 11423 was issued in expectation of the

IBA's passage — a historical fact conceded by the parties in their briefs, *see* Mot. for

Reconsideration at 28 and Opp'n at 15 — the Executive Order simply meant to prescribe certain

procedures for presidential approval of international bridges.  It follows that there is no

distinction between "presidential permit" and "presidential approval" and E.O. 11423 simply

entrusted to the Secretary of State a function assigned to the President by Congress in the IBA.

*See Presidio Bridge*, 486 F. Supp. at 296 ("In this respect, the Secretary is also fulfilling an

express function assigned him by the 1972 Act . . . [I]f the prerequisites detailed in [E.O.] 11423

are satisfied, the permit has presidential approval as contemplated by § 535b . . . .").

This point leads to DIBC's second argument: the issuance of the Presidential

Permit for NITC/DRIC was not an exercise of the President's inherent constitutional authority,

but, rather, an exercise of Congressional authority delegated to the President in the IBA.  On

reconsideration, the Court reorients and expands its earlier analysis.

The construction of international bridges over navigable waters is an example of

"a zone of twilight in which [the President] and Congress may have concurrent authority"

pursuant to the President's inherent constitutional authority over foreign affairs and Congress's

power to regulate commerce.  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637

(1952) (Jackson, J., concurring).  However, since Congress regularly passed legislation

regulating the construction of bridges in the 19th and 20th centuries, construction of bridges

(domestic or international) over navigable waters is not an area in which "congressional inertia,

indifference, or quiescence may sometimes, at least as a practical matter, enable, if not invite,

18

measures on independent presidential responsibility." *Id.* Fully cognizant that congressional authorization was required for the construction of international bridges, even after the passage of the General Bridge Act of 1946, the President refused to act independently in 1968. By issuing E.O. 11423 in expectation of the IBA's passage, President Johnson anticipated congressional action but did not act in its absence. Thus, E.O. 11423 only authorized the Secretary of State to consider permits for the construction of "bridges, *to the extent that congressional authorization is not required*." E.O. 11423 § 1(a) (emphasis added). When Congress passed the IBA, it granted such authorization and removed itself from the business of approving international bridges on an individual basis. *See* 33 U.S.C. § 535; 1972 S. Rep. at 3399. Since the enactment of the IBA in 1972, the President's authority over the construction of international bridges has been "at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown*, 343 U.S. at 635 (1952) (Jackson, J., concurring).

    Historical practice, the language of E.O. 11423 ("to the extent that congressional authorization is not required"), and the reliance of USDS on the IBA when approving NITC/DRIC's permit application demonstrate that USDS did not exercise only the President's inherent constitutional authority when it issued the Presidential Permit. *See, e.g.*, 77 Fed. Reg. 40937 (publishing its notice of NITC/DRIC's permit application in the Federal Register as required by E.O. 11423 § 2(a) and stating that USDS's "jurisdiction with respect to this application is based upon [E.O. 11423 and the IBA]"); Mot. for Reconsideration, Ex. 23 [Dkt. 233- 25] (Record of Decision) at 2 (citing the IBA's requirement that international bridges must be approved by the President).

19

### 3.  The APA and Presidential Action

DIBC contends that "once the aura of 'the President's inherent constitutional authority' is removed, the analysis under the APA is quite straightforward and unassailable." Mot. for Reconsideration at 31.  It is not that straightforward.  The relevant legal issue in Count 6 does not turn on whether USDS was acting pursuant to the President's Article II powers.  Rather, the threshold question is whether a challenged action constituted presidential action.  Presidential action entails any exercise of discretionary authority retained by the President.  Such discretionary authority could be vested in the President by virtue of Article II of the U.S. Constitution or by an Act of Congress.  In the instant case, the Court must first determine whether USDS exercised authority committed to the President when it issued the NITC/DRIC Presidential Permit.

The APA provides for judicial review of "*final agency action* for which there is no adequate remedy in court."  5 U.S.C. § 704 (emphasis added).  Section 706(2) authorizes a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions" under certain circumstances.  As a preliminary matter, courts must decide whether the challenged action, finding, or conclusion constituted "final agency action."  5 U.S.C. § 704.  Undoubtedly, the issuance of the NITC/DRIC Presidential Permit by USDS was "final" because it "mark[ed] the consummation of the agency's decisionmaking process" and had "legal consequences" to the parties.  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks and citations omitted).  The question here is whether the issuance of the NITC/DRIC permit was "agency action" for purposes of the APA.

The President of the United States is not an "agency" under the APA.  *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992).  *Franklin* involved a challenge to an

automatic reapportionment statute, in which Congress directed: (1) the Secretary of Commerce to report to the President the tabulation of total population by States, *see* 13 U.S.C. § 141(b); (2) the President to transmit to Congress the results from the decennial census and calculate the number of representatives, *see* 2 U.S.C. § 2a(a); and (3) the Clerk of the House of Representatives to apportion the number of representatives, *see* 2 U.S.C. § 2a(b).  *See id.* at 792. The Supreme Court held that the report from the Secretary of Commerce to the President was not "final" because it "ha[d] no direct effect on reapportionment until the President t[ook] affirmative steps to calculate and transmit the apportionment to Congress."  *Id.* at 799.  It also found that the President's duties were "not merely ceremonial or ministerial" and that "[o]ut of respect for the separation of powers and the unique constitutional position of the President," his action of transmitting the results to Congress was not reviewable under the APA — most particularly in the absence of an express statement by Congress to the contrary.  *Id.* at 800-01.

The Supreme Court reiterated this proposition two years later in *Dalton v. Specter*, 511 U.S. 462 (1994).  *Dalton* involved the Defense Base Closure and Realignment Act of 1990, in which Congress directed the Secretary of Defense to submit recommendations regarding the closure and realignment of military bases to both Congress and the Defense Base Closure and Realignment Commission (BRAC Commission).  *See id.* at 464-65.  The statute then directed: (1) the BRAC Commission to submit a report to the President with its own recommendations; and (2) the President to either reject or approve the report within two weeks of receiving it.  *See id.* at 465.  If the President approved the BRAC report and Congress did not enact a joint resolution of disapproval, the Secretary of Defense was required to carry out the closures recommended by the BRAC Commission and approved by the President.  *See id.*  The Court held that the BRAC report was "not final and therefore not subject to review" because it

had no direct effect on any military bases absent presidential action.  *Id.* at 469.  Moreover, since the President was not an "agency," his decision to reject or approve the BRAC report was not subject to judicial review under the APA.  *Id.*

        The President's actions in *Franklin* and *Dalton* were not exercises of the President's inherent constitutional authority.  Instead, both cases involved "final" exercises of authority vested in the President by Congress.  Even so, the *ratio decidendi* of these two cases indicates that the source of the President's authority is irrelevant and the determinative consideration is whether the action involved a discretionary (as opposed to a ministerial or ceremonial) exercise of authority committed to the President by the Constitution or by Congress.  *Franklin* and *Dalton* emphasized the importance of the President's role in two statutory frameworks devised by Congress, as well as the discretionary nature of the presidential actions being challenged.  *See Dalton*, 511 U.S. at 470 (noting the "importance of [the President's] role in the base closure process" because "[w]ithout the President's approval, no bases [would be] closed under the Act" and the statute did "not by its terms circumscribe the President's discretion to approve or disapprove [BRAC's] report"); *Franklin*, 505 U.S. at 800 ("That the final act is that of the President is important to the integrity of the process and bolsters our conclusion that his duties are not merely ceremonial or ministerial.").  In both cases, Congress did not require the President "to adhere to the policy decisions" of an agency.  *Franklin*, 505 U.S. at 799.

        Under such circumstances, the APA is not available to review presidential actions — *i.e.*, actions involving the exercise of discretionary authority vested in the President by law. *See, e.g.*, *Franklin*, 505 U.S. at 800-01 ("We would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion."); *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir.

2002) (noting that the Supreme Court "has directly addressed the nature of review of discretionary Presidential decisionmaking, . . . has highlighted the separation of powers concerns that inhere in such circumstances and has cautioned that these concerns bar review for abuse of discretion altogether"); *Public Citizen v. U.S. Trade Representative,* 5.3d 549, 553 (D.C. Cir. 1993) (holding that since the challenged action "is the submission of NAFTA to Congress by the President" and "the Trade Acts vest the President the discretion to renegotiate NAFTA before submitting it," his actions cannot be reviewed under the APA).

In the IBA, Congress gave the President broad discretionary authority to approve the construction and maintenance of international bridges — an authority much broader than those at issue in *Franklin* and *Dalton*.  With respect to bridges between the United States and Canada, the only limitation imposed on the President is to "secure the advice and recommendations of . . . the heads of such departments and agencies of the Federal Government *as he deems appropriate* to determine the necessity for such bridge."  33 U.S.C. § 535(b) (emphasis added).  The President is free to decide which executive officials to consult, whether to reject the officials' advice and recommendation altogether, determine how to assess the bridge's necessity, and whether to consider any additional factors.  There is nothing ministerial or ceremonial about the President's duties.  Precisely because Congress wanted to remove itself from the approval of each international bridge, it chose not to limit the President's discretion and not require the President "to adhere to the policy decisions" of any agency.  *Franklin*, 505 U.S. at 799.  This conscious decision is evidenced by the text and legislative history of the IBA and demonstrates why the separation of powers interests at stake in *Franklin* and *Dalton* apply with equal force here.

23

The instant matter, however, presents an additional complication absent in *Franklin* and *Dalton* because it involves the actions of a delegee.  The President designated and empowered the Secretary of State to issue presidential permits under certain circumstances. Specifically, E.O. 11423 "provides Presidential approval of international bridges in certain cases where the Secretary of State has gathered the necessary information and has concluded — *without disagreement* from the various departments within the executive branch — that approval is warranted."  *Presidio Bridge*, 486 F. Supp. at 296 (emphasis in original).  If there is disagreement from the various departments, E.O. 11423 requires that the President make the final decision.  There was no disagreement in this case and, therefore, USDS issued the NITC/DRIC Presidential Permit in conformity with E.O. 11423.  In so doing, USDS exercised discretionary authority committed to the President by law.  The question remains whether a final decision, in order to be presidential and unreviewable under the APA, must be directly made by the President and not by a delegee.  *Franklin* and *Dalton*, while relevant, do not answer this question.

Several cases have concluded that an agency's action on behalf of the President, involving discretionary authority committed to the President, is "presidential" and unreviewable under the APA.  Multiple courts, including one in this district, have held that the issuance of presidential permits by USDS for cross-border oil pipelines pursuant to E.O. 13337 (which amended E.O. 11423 in 2004) was unreviewable presidential action.  *See, e.g.*, *White Earth Nation v. Kerry*, No. CV 14-4726 (MJD/LIB), 2015 WL 8483278, at *6-7 (D. Minn. Dec. 9, 2015) (finding that USDS letters interpreting the scope of a presidential permit, just like the issuance of a permit, were not "an agency action reviewable under the APA" because USDS "was carrying out the directives of the President as set forth in [E.O.] 13337 . . . ."); *Sisseton-*

*Wahpeton Oyate v. U.S. Dep't of State*, 659 F. Supp. 2d 1071, 1082 (D.S.D. 2009) (holding that USDS actions with respect to a presidential permit were "presidential in nature" and thus unreviewable under APA because "[t]he President is free to delegate some of his powers to the heads of executive departments, as he has done here, and those delegation actions that are carried out create a presumption of being as those of the President"); *Natural Resources Defense Council v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 109 (D.D.C. 2009) (*NRDC*) (holding that a USDS decision to issue a presidential permit was unreviewable presidential action because USDS was acting on behalf of the President and in accordance with his directives).

Since *White Earth*, *Sisseton-Wahpeton*, and *NRDC* involved permitting for international oil pipelines, an area in which Congress had never chosen to intervene, it was clear that the actions of USDS derived from the President's inherent constitutional authority over foreign affairs.  DIBC argues that because the cited cases involved USDS authority derived solely from the Constitution and not from Congress, they are inapplicable.  To the contrary, the source of the President's authority (*i.e.*, the Constitution or a federal statute) is not relevant so long as the authority being exercised is: (1) discretionary (as opposed to ministerial or ceremonial); and (2) specifically vested in the President.  *NRDC* made this clear when it stated,

> Unlike ministerial or ceremonial authority, the President's exercise of significant discretionary authority over agency decisions constitutes presidential action, which is shielded from judicial review under the APA out of concern for the separation of powers . . . Whether the President carries out the final action himself and the manner in which he does so are considerations that certainly bear on whether the President's duties are ministerial or discretionary, but there is no reason to think that these considerations alone are determinative . . . *The determinative consideration is whether "the President's authority to direct the [agency] in making policy judgments" is curtailed in any way or whether the President "is required to adhere to the policy decisions" of the agency.*

658 F. Supp. 2d at 110-11 (quoting *Franklin*, 505 U.S. at 799) (emphasis added).  The import of *White Earth*, *Sisseton-Wahpeton*, and *NRDC* is that the authority of USDS was both discretionary and vested in the President.  The Court finds these cases to be applicable, relevant, and instructive.  The issuance of the NITC/DRIC permit by USDS also involved the exercise of discretionary authority committed to the President.  As a result, it was presidential in nature.

DIBC then asserts that it is "not aware of any case in which an action by an agency exercising a power delegated by Congress was held to be something other than agency action reviewable under the APA."  Mot. for Reconsideration at 30.  However, at least two post-*Franklin* cases stand for this proposition.  In *Tulare County v. Bush*, a court from this district dismissed, *inter alia*, an APA challenge to the President's designation of the Sequoia National Forest in California as a national Monument pursuant to the Antiquities Act of 1906, 16 U.S.C. §§ 431-433, as well as a challenge to the Forest Service's management of the Monument pursuant a presidential proclamation and directives.  185 F. Supp. 2d 18, 21 (D.D.C. 2001), *aff'd on other grounds*, 306 F.3d 1138, 1143 (D.C. Cir. 2002).[12]

The *Tulare County* district court reasoned that the "Forest Service [was] merely carrying out directives of the President, and the APA does not apply to presidential action."  *Tulare County*, 185 F. Supp. 2d at 28 (citations omitted).  The "action in question [was] an extension of the President's action."  *Id.* at 29.  It then rejected the argument that the delegation to an agency of discretionary authority vested in the President by Congress rendered the actions

---

[12] The D.C. Circuit affirmed the district court's dismissal of the challenge to the Forest Service's management on other grounds.  The Circuit thought it unnecessary to reach the question of whether the agency's actions were presidential in nature because it found that the plaintiffs failed to "identify these foresters' acts with sufficient specificity to state a claim."  *Tulare County*, 306 F.3d at 1143.

reviewable under the APA: "[a]ny argument suggesting that this action is agency action would suggest the absurd notion that all presidential actions must be carried out by the President him or herself in order to receive the deference Congress has chosen to give to presidential action." *Id.* at 28-29 (refusing "to give the term 'presidential action' such a confusing and illogical interpretation").

In *Ancient Coin Collectors Guild v. U.S. Customs and Border Protection*, a district court dismissed an APA challenge to the seizure of 23 ancient Chinese and Cypriot coins by USDS and the ensuing promulgation of import restrictions on such coins because it was unreviewable presidential action. 801 F. Supp. 2d 383 (D. Md. 2011), *aff'd*, 698 F.3d 171 (4th Cir. 2012).[13] In that case, the Convention on Cultural Property Implementation Act of 1983 (CPIA), 19 U.S.C. § 2601 *et seq.*, "assigned to the President various responsibilities," which "the President ha[d] since delegated . . . to the Assistant Secretary [of State for Educational and Cultural Affairs]." *Id.* at 401. As a result, "[USDS] and the Assistant Secretary's authority to impose import restrictions on Cypriot and Chinese coins . . . derive[d] from the President's authority under the CPIA." *Id.* at 402. The *Ancient Coin* court relied on the separation of powers concerns articulated in *Franklin* and the reasoning of cases like *NRDC*, *Sisseton-Wahpeton*, and *Tulare County* to hold that the actions of USDS were presidential in nature and unreviewable. *Id.* at 401-04.

---

[13] The Fourth Circuit affirmed the district court's decision in full. In the alternative, the Circuit rejected the plaintiffs' APA challenge on the merits. *See Ancient Coin*, 698 F.3d at 184 ("Even were we to assume that State was fully subject to the APA, none of its actions were remotely arbitrary or capricious.").

Just like USDS's actions in *White Earth*, *Sisseton-Wahpeton*, *NRDC*, and *Ancient Coin* and the Forest Service's actions in *Tulare County*, the issuance of the NITC/DRIC Presidential Permit by the USDS pursuant to E.O. 11423 and the IBA was unreviewable presidential action because it involved an exercise of discretionary authority committed to the President by law (*i.e.*, Article II of the Constitution and the IBA).[14]

DIBC argues in passing that these decisions, even if applicable, cannot be squared with the text of the APA:

> The plain text of the APA carves out some exceptions to the definition of an 'agency' (such as 'Congress,' the 'courts,' the 'governments of the territories or possessions,' etc.), but it does not carve out agencies taking actions pursuant to a power delegated to them by the President (regardless of whether that power was 'the President's inherent constitutional authority' or instead, as here, was a Congressional power that Congress assigned to the President who assigned to the agency.

Mot. for Reconsideration at 30.  But, the Supreme Court in *Franklin* excluded the President from the statute due to the APA's textual silence and separation of powers concerns implicated by a review of an exercise of discretionary presidential authority.  505 U.S. at 800-01 ("As the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements.").  Thus, the determinative consideration is not whether the actions were "actually taken by the President personally," *see* Reply at 18, but whether

---

[14] DIBC argues that "there is substantial case law supporting the view that even when an agency implements 'inherent' Executive authority, that 'agency action' is still 'agency action' that is reviewable under the APA."  Mot. for Reconsideration at 36.  In support, DIBC cites only two district court decisions that held that the issuance of presidential permits by USDS for cross-border oil pipelines was reviewable agency action under the APA.  *See Protect Our Communities Found. v. Chu*, Case No. 12-3062, 2014 WL 1289444 (S.D. Ca. Mar. 27, 2014), *appeal docketed*, No. 14-55840 (9th Cir. May 23, 2014); *Sierra Club v. Clinton*, 689 F. Supp. 2d 1147 (D. Minn. 2010).  The Court found no additional support for DIBC's claim, and it is not persuaded by the reasoning in these two decisions.

separation of powers concerns articulated in *Franklin* and *Dalton* apply.  *See NRDC*, 658 F.

Supp. 2d at 110 ("The Supreme Court distinguished reviewable agency action from

unreviewable agency action by the nature of the President's authority over agency decisions, not

by whether or how the President exercised that authority.").

       Contrary to DIBC's position, it is not a question of whether the President's

discretion derives from the Constitution or from congressional delegation.  *See Dalton*, 511 U.S.

at 475-76 ("[W]e do not believe the result [concerning the reviewability of presidential action]

should be any different when the President's discretion derives from a valid statute" or "from the

Constitution.") (citations omitted); *see also Mountain States*, 306 F.3d at 1136 (explaining that

separation of powers concerns vary depending on the limits imposed on a President's discretion).

Separation of powers concerns exist whenever the President's discretion is at stake.

       There is nothing ceremonial or ministerial about the duties assigned to the

President in the IBA.  E.O. 11423's "division of responsibilities [was] merely a device for

managing the President's decision-making process."  *NRDC*, 658 F. Supp. 2d at 111.  "That the

President chose to retain ultimate authority to settle any interagency dispute signals his belief

that the issuance of presidential permits is ultimately a presidential action."  *Id.*  "No permit can

issue without, at the very least, the President's acquiescence, and *the President's acquiescence is

itself an exercise of discretion that constitutes unreviewable presidential action*."  *Id.* (emphasis

added); *see also* E.O. 11423 § 3.

       Moreover, USDS acted on behalf of the President in the realm of foreign affairs.

And, "[a]lthough agencies, such as the State Department here, occupy a different 'constitutional

position' than does the President, when those agencies act on behalf of the President, the

separation of powers concerns ordinarily apply with full force — especially in an area as

sensitive and complex as foreign affairs." *Ancient Coin*, 891 F. Supp. 2d at 403.  The decision to build a new international bridge between Detroit and Canada — that is, the determination of whether the NITC/DRIC would serve the national interest — "does not occur in a foreign policy vacuum." *Id.* at 404.  This may be especially true in this case given the tension between DIBC and the Government of Canada.  *See generally* TAC.  Due to the separation of powers at stake here and the absence of an express statement by Congress concerning the availability of judicial review, the Court hesitates to subject the issuance of a presidential permit to an international bridge to the APA.

Finally, DIBC's insistence that only the President can ever exercise presidential discretionary authority would create unnecessary complications.  It would be impracticable to expect the President to make these decisions personally because that is simply not how government works.  When the President retains final authority pursuant to the Constitution or a valid statute, such as here, presidential acquiescence constitutes an exercise of discretion that gives effect to the delegee's actions.  The President, not the delegee, remains responsible. "[J]udicial review of permitting decisions that the President has delegated to the State Department would impose an unconstitutional burden on his power to delegate that the APA does not require, let alone contemplate." *NRDC*, 658 F. Supp. at 112.  A contrary holding "would create an asymmetry between presidential permits that are reviewed by the President because of interagency disagreement and those that are issued solely by the State Department" — an outcome that "would surely frustrate the President's discretion to enact his preferred decision-making process." *Id.*

Finally, an unreviewable presidential action must involve the exercise of discretionary authority vested in the President; an agency acting on behalf of the President is not

sufficient by itself.  Since the Constitution vests the powers of the Executive Branch in one

unitary chief executive officer, *i.e.*, the President, an agency always acts on behalf of the

President.  Nonetheless, there is a difference between actions involving discretionary authority

delegated by Congress to the President and actions involving authority delegated by Congress to

an agency.  Courts lack jurisdiction to review an APA challenge in the former circumstances,

regardless of whether the President or the agency takes the final action.  However, "[w]hen the

challenge is to an action delegated to an agency head but directed by the President, a different

situation obtains: then, the President effectively has stepped into the shoes of an agency head,

and the review provisions usually applicable to that agency's action should govern."  Elena

Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2351 (2001).  "Nothing in

*Franklin*'s interpretation of the APA or in its — or any other case's — underlying discussion of

separation of powers issues is to the contrary."  *Id.*[15]

        In this case, Congress has long since delegated authority to approve international

bridges to the President but not USDS.  Had Congress intended to ensure the reviewability of

permit approvals, it could have delegated the authority directly to Department and not to the

President.  Congress knew how to do this, which is why it directly delegated to USDS the

authority to approve crossing agreements under § 535(a), but not the authority to approve

international bridges under § 535(b).  *See* Kagan, *supra* at 2351. (noting that "outside, no less

---

[15] Justice Kagan, then Visiting Professor at Harvard Law School, wrote that agency action
pursuant to a direct delegation by Congress is reviewable, even if ordered by the President.
Kagan, *supra* at 2350-51.  In other words, the President's intervention does not insulate an
agency action from judicial review when the authority was delegated by Congress directly to the
agency.  The same rationale does not apply when Congress commits authority to the full
discretion of the President because separation of powers concerns are not implicated to the same
degree.  *See id.*; *see also Mountain States*, 306 F.3d at 1136.

than inside, the APA framework, the question of congressional intent with respect to reviewability looks very different when the delegation is bounded one to an agency official" as opposed to the President).

By delegating the authority to the President, as opposed to USDS, Congress recognized the importance of the President's role in the process and made a conscious decision to defer to the President's discretion and decision-making "given the foreign policy considerations inherent in deciding whether to [approve the construction and maintenance of a new international bridge]." *Ancient Coin*, 801 F. Supp. 2d at 404 ("Furthermore, by lodging primary responsibility for imposing cultural property import restrictions with the President, rather than with an agency, Congress likely recognized these separation-of-powers concerns.").

To the extent that there is a concern "that an agency could theoretically shield itself from judicial review under the APA for any action by arguing that it was 'Presidential,' no matter how far removed from the decision the President actually was," *see Protect Our Communities*, 2014 WL 1289444, at *6, Congress is fully capable of preventing such a result. "[B]road delegations often follow inevitably from both the complexity of modern government and the difficulty of collective bodies in reaching agreements on specifics." Kagan, *supra* at 2352. Nonetheless, "enhanced presidential control of administration may make Congress deliberate more carefully about the necessity of broad delegations — and even more, may make Congress hesitate before resorting to broad delegations as a mechanism for punting on difficult decisions." *Id.* Count 6 shall remain dismissed for lack of jurisdiction.

### 4. Alternative Reasons to Sustain Dismissal of Count 6

The APA does not apply when the challenged "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). In the instant case, Congress delegated broad

authority to the President to approve international bridges, *see* 33 U.S.C. § 535(b), and the President empowered the Secretary of State with this authority, *see* E.O. 11423.  The President imposed procedures that the Secretary of State must follow before any approval of permit applications.  *See* E.O. 11423 § 1 (ordering the Secretary of State to receive permit applications, request the views of certain executive officials, notify these officials of a proposed determination, and refer to the President any disagreements).  Aside from these limitations, E.O. 11423 vested the Secretary of State with discretionary authority to determine whether a proposed bridge would serve the national interest and, if so, to issue a permit.  *See, e.g.*, *id.* § 1(d) ("If the Secretary of State finds, after consideration of the views obtained [from the consulted officials] . . . that issuance of a permit to the applicant would serve the national interest, he shall prepare a permit, in such form and with such terms and conditions as the national interest *may in his judgment* require . . . .") (emphasis added); *id.* § 2(b)  (authorizing the Secretary to "issue such further rules and regulations, and to prescribe such further procedures, *as he may from time to time deem necessary or desirable* for the exercise of the authority conferred upon him by this order")  (emphasis added).  The President entrusted these specific duties to the Secretary of State and did not define the circumstances in which the construction of an international bridge would be in the "national interest."  *Id.*, § 1(d).  E.O. 11423 chose to rely on the Secretary of State's "judgment" due to the Secretary's expertise in the realm of foreign affairs.  *See id.*

In granting the NITC/DRIC Presidential Permit, USDS exercised authority committed to its discretion by the President in E.O. 11423.  Excluding this type of action from APA review is particularly necessary since it involved agency action on behalf of the President in the realm of foreign affairs.  Congress acknowledged this reality when it gave advance consent to the construction of bridges and required the President's approval while fully aware of the

language of E.O. 11423. *See* Mem. Op. at 18 (citing Dkt. 138, Ex. 2, at 12 (H.R. Rep. No. 92-1303)).

Given the broad discretion afforded to the President in the IBA and to the Secretary of State in E.O. 11423, this Court cannot review the issuance of the NITC/DRIC Presidential Permit under the APA's arbitrary and capricious standard. There is simply "no law to apply." *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*, 104 F.3d 1349, 1353 (D.C. Cir. 1997) ("[A]gency action is deemed to be committed to agency discretion when 'statutes are drawn in such broad terms that in a given case there is no law to apply.'") (quotation omitted). Even if there were law to apply, the action of USDS on presidential delegation in the realm of foreign affairs and national interest would necessarily implicate the "Executive's determinations . . . [and] judgments on questions of foreign policy and national interest," which "are not subjects fit for judicial involvement." *Dist. No. 1, Pac. Coast Dist., Marine Engineers' Beneficial Ass'n v. Mar. Admin.*, 215 F.3d 37, 42 (D.C. Cir. 2000); *see also Nat'l Fed'n of Fed. Employees v. United States*, 905 F.2d 400, 405 (D.C. Cir. 1990) ("[T]he problem is not that the Act is devoid of criteria . . . [it] sets forth nine specific criteria to be considered in making base closing decisions. Rather the rub is that the subject matter of those criteria is not 'judicially manageable.'"). Therefore, even if the issuance of the NITC/DRIC Presidential Permit were not presidential in nature, it would not be reviewable under the APA because it was an action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see, e.g.*, *Ancient Coin*, 698 F.3d at 183; *Jensen v. Nat'l Marine Fisheries Serv.*, 512 F.2d 1189, 1191 (9th Cir. 1975); *NRDC*, 658 F. Supp. 2d at 112 n.7.[16]

---

[16] This alternative holding does not contradict this Court's earlier finding that DIBC's challenge to USDS's approval of the Crossing Agreement, *see* Count 7 of TAC, is reviewable under the

34

DIBC also alleges that the issuance of the NITC/DRIC Presidential Permit was contrary to law in violation of the APA.  Specifically, it argues that the IBA required the President to "determine the necessity of [the proposed] bridge," *see* 33 U.S.C. § 535(b), and the President only ordered USDS to determine whether the issuance of the permit "would serve the national interest," *see* E.O. 11423 § 1(d).  TAC ¶¶ 344-45.  The IBA does not direct USDS to make a necessity determination.  Instead, the congressional directive in § 535(b) is addressed to the President and the President's interpretation of the IBA, as evidenced in E.O. 11423, is not subject to judicial review under the APA.  *See Franklin*, 505 U.S. at 800-01.

USDS did consider the "purpose and *need* for the [NITC/DRIC]."  Record of Decision [Dkt. 233-25] at 7 (emphasis added); *see id.* at 7-9.  USDS explained in its unopposed proposed determination: "The stated purpose of the NITC project is to support the regional, state, provincial, and national economies of both countries while addressing the civil and national defense and homeland security needs of the busiest commercial corridor between the U.S. and Canada." *Id.* at 7.[17]

Moreover, the Court fails to see why the President could not define "necessity" in broad terms or devise a standard that encompasses "necessity."  The President was tasked with "giv[ing] his [or her] approval" to the construction of new international bridges and, "[i]n the course of determining whether to grant such approval," the President is required to consult any

---

APA.  The Court found that DIBC's challenge in Count 7 that USDS "'approved an agreement that was entered into in violation of Michigan law' . . . [wa]s surely within the province of this Court . . . [because it] would not touch on foreign policy matters."  Mem. Op. at 48 (quoting TAC ¶ 357).  Such is not the case here.

[17] DIBC submitted USDS's Record of Decision as one of its exhibits in support of its Motion for Reconsideration.

agency heads "he [or she] deems appropriate to determine the necessity for such bridge."  33

U.S.C. § 535(b).  The term "necessity" is never defined in the IBA and the legislative history

does not shed any light on this matter.[18]  It follows from this textual silence that Congress

entrusted the President in the IBA to define the term, determine what factors to consider in

approving a proposed bridge, who to consult, and how to consult them.

DIBC continuously refers to "necessity" in terms of economic viability and

feasibility.  *See* TAC ¶ 343 (alleging "there is no need for a new bridge crossing between Detroit

and Windsor" in light of DIBC's plans and ability to serve the demand for cross-border traffic).

DIBC argues on reconsideration that "even though the IBA calls for the Government to assess the

'necessity' of any new bridge such as the NITC/DRIC, the perfunctory necessity determination

conducted for the NITC/DRIC *totally ignored* the most important factor of all: the Plaintiffs'

desire to build their Twin Span, which would render the NITC/DRIC completely unnecessary."  Mot. for

Reconsideration at 15 (emphasis in original).  Hidden in this argument is DIBC's exclusivity

proposition — that the Government could not approve any other bridge in the area that could

compete with the Ambassador Bridge and frustrate DIBC's plans.

The argument posits a narrow definition of necessity that is unsupported by the

text or legislative history.  The term "necessity" may encompass many different interests and

definitions.  It is the President's prerogative to define "necessity" and whether to do so in broad

or narrow terms.  The President chose a broad standard— "that issuance of a permit to the

---

[18] In fact, the legislative history of the IBA omits any references to the term "necessity."  *See, e.g.*, H. Rep. 92-1303 at 4 ("Section 4 [of the IBA] imposes the further requirement that, prior to the construction of an international bridge, a presidential permit be obtained.  Such a permit is not to be issued until the advice and recommendations of interested executive departments and agencies are obtained."); 1972 S. Rep. at 3400 ("The approval of the President is required by section 4.  This approval is to be based on the advice and recommendations of . . . the heads of appropriate Federal departments and agencies.").

applicant would serve national interest." E.O. 11423, § 1(d).  In light of the facts that the IBA

"was the product of the same arm of the government that issued [E.O. 11423], and was passed by

a Congress that was well aware of . . . the provisions in that Order and the reason for its

existence," it follows that "the two documents are thus compatible with, and companions to, one

another" and the President intended a broad standard to be applied under the authority delegated

by Congress in the IBA.  *Presidio Bridge*, 486 F. Supp. at 296 ("[I]f the prerequisites detailed in

Executive Order 11423 are satisfied, the permit has presidential approval as contemplated by §

535(b) . . . .").[19]  Given the broad discretion provided to the President in § 535(b) and the

historical relationship between the IBA and E.O. 11423, the Court concludes that the issuance of

the NITC/DRIC Presidential Permit by USDS was not contrary to law.

Finally, with respect to the remaining allegations giving rise to Count 6, DIBC

alleges, *inter alia*, that the NITC/DRIC Presidential Permit violated the APA because the

proposed construction of the NITC/DRIC would destroy any statutory, treaty, or franchise rights

that DIBC may have with respect to the Ambassador Bridge and the proposed Twin Span.  *See*

TAC ¶¶ 342-50.  The claims that the proposed construction of the NITC/DRIC affects these

rights have been dismissed.  Count 6 will remain dismissed.

---

[19] Although DIBC did not move to reconsider the Court's dismissal of Count 8, the Court notes that this "contrary to law" analysis reinforces the Court's earlier decision with respect to DIBC's *ultra vires* challenge to the NITC/DRIC permit.  It cannot be said that the President's decision to utilize the "national interest" standard and that USDS's reliance on the standard "patently" misconstrued the IBA.  *Griffith v. Fed Labor Relations Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988).  "How the President chooses to exercise the discretion Congress has granted him [*i.e.*, how to define 'necessity' and what to consider when approving international bridges under § 535(b)] is not a matter for our review."  *Dalton*, 511 U.S. at 476 (citations omitted).  While DIBC argues that the permitting process must be subject to some kind of judicial review, "[t]he judicial power of the United States conferred by Article III of the Constitution is upheld just as surely by withholding judicial relief where Congress has permissibly foreclosed it, as it is by granting such relief where authorized by the Constitution or by statute."  *Id.* at 477.

### D.  Count 9 – Equal Protection Clause

DIBC seeks reconsideration of the dismissal of Count 9 for two reasons: (1) the Court "relied on a factual finding that was inaccurate;" and (2) "it is not clear that the Court considered the central legal proposition on which Plaintiffs are relying."  Mot. for Reconsideration at 36.  It is true that the Court briefly mentioned in its September 30, 2015 Memorandum Opinion that "the proponents of the NITC/DRIC have not yet submitted an application for a navigation permit to the [Coast Guard]."  Mem. Op. at 55.  That statement did not recognize that the Coast Guard received the NITC/DRIC application for a navigation permit in October 2013 and issued a permit to NITC/DRIC on May 30, 2014.  *See* Mot. for Reconsideration, Ex. 26 [Dkt. 233-28] (NITC/DRIC Navigation Permit); *see also* Opp'n at 22-23 n.11 (recognizing Federal Defendants' "oversight in failing to go back and specifically correct the statement" once counsel "became aware of the submission of the Coast Guard permit" application).  This factual error is not sufficient for the Court to reconsider its dismissal.

The Court did not rely exclusively on this factual finding when it dismissed DIBC's equal protection claim.  The Court also noted the insufficiency of DIBC's factual allegations to support a claim of differential treatment.  *See* Mem. Op. at 55 (stating that "the allegations on which [DIBC] rel[ies] do not mention the NITC/DRIC proponents, much less articulate how [the Coast Guard] has afforded them more favorable treatment."); *see also id.* at 56-57.  In an attempt to cure the insufficiency of TAC's allegations, DIBC now points to "doubts" that should have precluded the Coast Guard from issuing the NITC/DRIC navigation permit — *e.g.*, the legality of the NITC/DRIC, the legality of the Crossing Agreement, the questionable exercise of eminent domain in Michigan, and the economic infeasibility of having a public bridge close to the Ambassador Bridge and the proposed Twin Span.  *See* Mot. for

38

Reconsideration at 37-38.  However, none of these "doubts" is relevant to the Coast Guard's regulations regarding navigation permits.  Moreover, unlike DIBC's proposed Twin Span, the NITC/DRIC did not face the same obstacle precluding issuance of a navigation permit, which was DIBC's failure to secure necessary property rights to build the Twin Span — specifically, air rights over land owned by the City of Detroit.[20]  Consequently, DIBC was not similarly situated to the NITC/DRIC proponents with respect to the Coast Guard's regulatory approvals and, thus, DIBC's allegations do not support an equal protection claim.  *See Women Prisoners of Dist. of Columbia Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 924 (D.C. Cir. 1996) ("The threshold inquiry in evaluating an equal protection claim, is therefore, to determine whether a person is similarly situated to those persons who allegedly received favorable treatment.").

DIBC argues that the Court ignored the "central legal proposition" of its Equal Protection claim: "when a government entity decides to enter the marketplace and compete with the private sector, then any government entity that acts as a regulator of that marketplace must treat the government-participant the same as it treats the private-sector participants."  Mot. for Reconsideration at 38-39.[21]  This argument does not overcome the Court's finding that

---

[20] This Court ruled that the Coast Guard did not act improperly when it denied DIBC a navigation permit in 2009.  *See Detroit Int'l Bridge Co. v. Gov't of Canada*, 53 F. Supp. 3d 1 (D.D.C. 2014), *judgment entered*, 53 F. Supp. 3d 28 (D.D.C. 2015).  As a result, the Court dismissed Count 4.  *See id.*  The parties appealed the Court's judgment.  On March 2016, eight months after DIBC and the City of Detroit agreed to a land swap to secure the necessary property rights, the Coast Guard issued a navigation permit to DIBC.  Pursuant to a joint stipulation of dismissal, the D.C. Circuit dismissed the appeal as moot and ordered the Court to vacate its judgment and dismiss Count 4.  The Court has followed the Circuit's Order.  *See* April 7, 2016 Order [Dkt. 255].

[21] DIBC cites several cases, none of which involved equal protection claims, to support this proposition.  *See* Mot. for Reconsideration at 39; *see* Not. of Suppl. Authority [Dkt. 265].  The Court also notes that the entity acting as a regulator of the marketplace in this case (*i.e.*, the Federal Government) is not acting as a market participant; rather, it is the State of Michigan and

NITC/DRIC's proponents and DIBC were not similarly situated and that TAC's allegations were insufficient to show differential treatment.  *See* Mem. Op. at 54-57.  Both bridges involve independent proposals that were subject to different regulatory approvals and different requirements.  *See id.* at 54-55.  In some instances, different agencies reviewed the proposed projects.  *See id.* at 55.  Aside from general allegations concerning Federal Defendants' efforts to expedite review of the NITC/DRIC and delay the Twin Span approvals, the TAC is devoid of allegations showing that both bridges faced similar obstacles and were treated differently.  *See id.* at 57 ("Plaintiff's claim that the regulatory approval for the Twin Span should have been straightforward given that the Twin Span does not require an IBA Bridge Permit and does not pose any navigational or environmental problems . . . is a conclusory law opinion, [*Bell Atlantic Corp. v.*] *Twombly*, 550 U.S. 544, 555 (2007), and contrary to this Court's dismissal of Count 4 against [the Coast Guard].") (internal quotation marks and quotation omitted).  DIBC's legal proposition cannot transform its "bare complaints of governmental unfairness" into a cognizable equal protection claim.  *Quezada v. Marshall*, 915 F. Supp. 2d 129, 135 (D.D.C. 2013).

Finally, it is well-established that "[t]he state has broad authority and discretion in the regulation of economic affairs."  *Llewllyn v. Crothers,* 765 F.2d 769, 775 (9th Cir. 1985) (Kennedy, J.) (citing *Williamson v. Lee Optical of Oklahoma, Inc* ., 348 U.S. 483 (1955)).  This proposition is particularly forceful in a "class-of-one" case such as this one, in which DIBC is not a member of a suspect class and must allege sufficient facts to show that it was "intentionally treated differently from others similarly situated *and* that there [was] no rational basis for the

---

Canada, two completely separate entities, which are entering the market and competing with DIBC.

difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (emphasis added).  This is a heavy burden that DIBC has not overcome.

   Mere disagreement with the wisdom of the proffered reasons, *see* Record of Decision at 7-9 and TAC ¶¶ 216-241, is not sufficient to support a claim that Federal Defendants actions were not rationally related to a legitimate governmental purpose.  *See Romer v. Evans,* 517 U.S. 620, 632 (1996) (citations omitted)  ("In the ordinary case, a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous.").  The prospect that NITC/DRIC, unlike DIBC's Twin Span, would further U.S.-Canada relations could be, alone, a rational justification.  *See* Record of Decision at 7 (explaining how NITC/DRIC could improve relations with Canada); *see also* TAC ¶ 13 (alleging that Canada has expressed a "longstanding desire . . .  to eliminate private ownership of the Detroit-Windsor bridge crossing . . . .").  The promotion of national security, creation of additional jobs, and competition for cross-border traffic are additional reasons for the alleged differential treatment.  *See Giacalone v. Wehner*, 387 F.Supp.2d 383, 385-385 (S.D.N.Y.2005) (quoting *Heller v. Doe,* 509 U.S. 312, 320-321 (1993)) ("The burden is on the plaintiff to disprove every conceivable basis which might support the classification, 'whether or not the basis has a foundation in the record.'").  No equal protection claim was properly stated.  Count 9 will remain dismissed.

### III. CONCLUSION

   For the foregoing reasons, the Court will deny DIBC's Motion for Partial Reconsideration [Dkt. 233].  Although the Court has amended and expanded upon some of the reasoning and findings articulated in its previous Memorandum Opinion, the Court's September 30, 2015 Order will be left undisturbed and Counts 2, 3, 6, and 9 will remain dismissed.

Date: May 26, 2016

_____
           /s/
ROSEMARY M. COLLYER
United States District Judge