## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
**DETROIT INTERNATIONAL** )
**BRIDGE COMPANY,** *et al.*, )
)
   **Plaintiffs,** )
)
   **v.** )   **Civil Action No. 10-476 (RMC)**
)
**GOVERNMENT OF CANADA,** *et al.*, )
)
   **Defendants.** )
_____ )

## OPINION

   During the past six and a half years, Detroit International Bridge Company and its

wholly-owned subsidiary, the Canadian Transit Company (collectively DIBC), have litigated this

case to prevent the proposed construction of a new publicly-owned bridge between Detroit

Michigan and Windsor Ontario.  The new bridge, known as the New International Transit

Crossing/Detroit River International Crossing (NITC/DRIC), could take away a substantial

percentage of the traffic between the United States and Canada from DIBC's Ambassador

Bridge.[1]  It could also threaten the financial viability of DIBC's plans to build an adjacent Twin

Span to provide a modern bridge crossing while DIBC repairs and modernizes the Ambassador

Bridge.

   This Court has previously dismissed all but one of the claims in the Third

Amended Complaint (TAC), Dkt. 105.  *See* May 26, 2016 Mem. Op. and Order [Dkts. 269 &

---

[1] It was announced recently that the NITC/DRIC would be officially named the Gordie Howe International Bridge. The Court will continue to refer to the new crossing as NITC/DRIC for the sake of consistency with the prior opinions and the parties' briefing in this case.

1

270] (amending some of the Court's previous reasoning and findings, but denying DIBC's

motion to reconsider the dismissal of Counts 2, 3, 6, and 9); April 7, 2016 Order [Dkt. 255]

(dismissing Count 4 pursuant to the D.C. Circuit's April 4, 2016 Mandate); September 30, 2015

Mem. Op. and Order [Dkt. 222 & 223] (dismissing Counts 1, 2, 3, 5, 6, 8, and 9).

Only Count 7 remains.  It alleges that the U.S. Department of State (USDS)

violated the Administrative Procedure Act (APA), 5 U.S.C. § 706(2), when it approved the

NITC/DRIC Crossing Agreement.  The parties have cross-moved for summary judgment and the

merits of Count 7 are now before the Court.[2]  For the reasons that follow, the Court will grant the

Federal Defendants' Motion for Summary Judgment on Count 7 and deny DIBC's Cross Motion

for Summary Judgment.

## I. BACKGROUND[3]

At the very heart of Count 7 is the Crossing Agreement between Michigan and

Canada to "design, construct, finance, operate, and maintain" the NITC/DRIC, which is to be

located two miles from the Ambassador Bridge over the Detroit River.  *See* Admin. Record [Dkt.

226] at STATEDEPT-AR0000110.  The International Bridge Act of 1972 (IBA), 33 U.S.C.

§ 535 *et seq*., provides in relevant part that:

> The consent of Congress is hereby granted for a State or a
> subdivision or instrumentality thereof to enter into agreements —

---

[2] The merits are fully briefed and ripe for resolution.  *See* Defs. Mot. for Summ. J. [Dkt. 227]
(Defs. Mot.); Pls. Opp'n & Cross-Mot. for Summ. J. [Dkt. 230] (Pls. Mot.); Defs. Opp'n &
Reply [Dkt. 238] (Defs. Opp'n); Pls. Reply [Dkt. 264].

[3] For a complete and detailed recitation of the facts, *see Detroit Int'l Bridge Co. v. Gov't of
Canada*, 133 F. Supp. 70, 77-83 (D.D.C. 2015), *amended on denial of reconsideration*, No. 10-
cv-476 (RMC), 2016 WL 3030226 (D.D.C. May 26, 2016).

(1) with the Government of Canada, a Canadian Province, or a subdivision or instrumentality of either, in the case of a bridge connecting the United States and Canada, or

(2) with the Government of Mexico, a Mexican State, or a subdivision or instrumentality of either, in the case of a bridge connecting the United States and Mexico,

for the construction, operation, and maintenance of such bridge in accordance with the applicable provisions of this subchapter. *The effectiveness of such agreement shall be conditioned on its approval by the Secretary of State.*

33 U.S.C. § 535(a) (emphasis added). Pursuant to this section of the IBA, the Government of Canada, the Governor of Michigan, the Michigan Department of Transportation (MDOT), and the Michigan Strategic Fund (MSF) executed the Crossing Agreement. In June 2012, the Governor of Michigan submitted an application to USDS for a Presidential Permit to build the NITC/DRIC, as required by the IBA. *See* Admin. Record [Dkt. 226] at STATEDEPT-AR0000001 and AR0000109-162.[4] The Governor also sought approval of the Crossing Agreement by USDS. *See id.*

On July 11, 2012, USDS published a notice in the Federal Register soliciting comments on the permit application, which included the Crossing Agreement. *See* Notice of Receipt of Application for Presidential Permit for the Construction of a New International Trade Crossing, 77 Fed. Reg. No. 40937 (July 11, 2012). The public comment period ran until

---

[4] Until the IBA in 1972, Congress alone approved the construction of an international bridge. In that statute, Congress authorized the President to approve new international bridges subject to various conditions. *See* 33 U.S.C. § 535(b). The President, in turn, designated and empowered the Secretary of State to issue presidential permits approving such bridges under certain circumstances, *see* Exec. Order No. 11,423, 3 C.F.R. 742 (1966-1970), as amended 33 Fed. Reg. 11741 (August 16, 1968). For a complete discussion of the relationship between the IBA and E.O. 11423, *see Detroit Int'l Bridge Co. v. Gov't of Canada*, No. 10-cv-476 (RMC), 2016 WL 3030226 at *6-9 (D.D.C. May 26, 2016).

September 10, 2012 and USDS received over 14,000 comments. *See* STATEDEPT-AR0000363 and AR0000225. DIBC "submitted a Comment on August 9, 2012 and a Supplemental Comment on September 10, 2012 . . . both of which explained to the State Department that it should promptly reject the NITC/DRIC Application for a number of reasons, including that . . . [it] sought approval of an agreement illegally executed by the Governor, MDOT, and MSF." TAC ¶ 261; *see also* STATEDEPT-AR0012008-32; AR0025102-05. Other commenters, including some Michigan legislators, also questioned the validity of the Crossing Agreement on the basis that MDOT, MSF, and the Governor lacked the necessary authority under state law to execute the Agreement. *See, e.g.*, STATEDEPT-AR0028367; AR0028564; AR0028443; AR0028637; AR0028625; AR0028539; AR 0028504; AR0000461-77; AR0000492-94; AR0015045-47.[5]

> In light of these comments, USDS requested the "views of the Michigan State Attorney General" regarding whether "the Governor, MDOT or MSF require authorization or approval of the Michigan State legislature to execute the Crossing Agreement, to bring it into effect, or to implement it." STATEDEPT-AR0000363. USDS also asked whether there were "any additional legislative authorizations or approvals required for the planning, construction, or operation of the NITC." *Id.* USDS received responses that stated, among other things, that "the Attorney General ha[d] concluded that no further legislative action [was] required to execute the

---

[5] DIBC contends that USDS "failed to give proper notice" of the Governor's request to approve the Crossing Agreement because the notice in the Federal Register "mentioned only the application for the Presidential Permit, and omitted any reference to the application for approval of the (illegal) Crossing Agreement." Pls. Mot. at 11 (citing 77 Fed. Reg. 40937). To the contrary, the Crossing Agreement was clearly part of the permit application and, as evidenced by the number of comments on the Agreement's validity, the notice intended to, and did, solicit comments on both the issuance of the Presidential Permit and approval of the Crossing Agreement.

Crossing Agreement, bring it into effect or implement it" and "no further legislative approvals [were] necessary for the planning, construction, or operation of the NITC." STATEDEPT-AR0000365; *see also* STATEDEPT-AR0000380-383 (letters from Carol Isaacs and George Elworth of the Michigan Attorney General's Office providing additional information). DIBC characterizes the letters as "conclusory, self-serving, and completely without analysis." Pls. Mot. at 13. DIBC disagrees with the interpretation of Michigan law provided by the Offices of the Governor and the Attorney General concerning the validity of the Crossing Agreement. [6]

On March 25, 2013, USDS signed a Record of Decision supporting its approval of the Crossing Agreement and, on April 12, 2013, notified the Governor of Michigan that the Agreement had been approved. *See* STATEDEPT-AR0000222; AR 0000385. On April 18, 2013, USDS published a notice in the Federal Register that it had issued a Presidential Permit to build the NITC/DRIC. *See* Issuance of a Presidential Permit to the State of Michigan, 78 Fed. Reg. 23253 (April 18, 2013).

On September 30, 2015, this Court rejected Federal Defendants' arguments that DIBC lacked standing to challenge approval of the Crossing Agreement by USDS and that the approval was unreviewable agency action under the APA. *See* September 30, 2015 Mem. Op. [Dkt. 222]. As a result, the Court denied Federal Defendants' Motion to Dismiss Count 7. *See* September 30, 2015 Order [Dkt. 223].

On summary judgment, the sole question is whether approval of the Crossing Agreement by USDS violated the APA. *See* TAC Count 7 at 106 (titled, "APA Claims Based on Approval of Crossing Agreement – State Department Defendants"). Count 7 alleges that USDS

---

[6] The Governor of Michigan has filed a Motion for Leave to file an Amicus Brief, defending the validity of the Crossing Agreement, which the Court will grant in an accompanying Order.

violated the APA because "it approved an agreement that was entered into in violation of

Michigan law." TAC ¶ 357.[7]  Specifically, Count 7 alleges that, since the Crossing Agreement

was illegal under Michigan Law, its approval by USDS was "contrary to law" because approving

unlawful agreements violates the U.S. Constitution and the IBA.  *Id.*  Count 7 also alleges in

passing that, the "approval of the [illegal] Crossing Agreement [was] also arbitrary and

capricious and in violation of the other standards set forth in 5 U.S.C. § 706(2)."  *Id.*  The parties

disagree as to the applicable standard of review, as well as the nature of the APA claim.

## II. LEGAL STANDARD

### A.  APA Claims in Count 7

The APA provides in relevant part that:

> To the extent necessary to decision and when presented, the
> reviewing court shall decide all relevant questions of law, interpret
> constitutional and statutory provisions, and determine the meaning
> or applicability of the terms of an agency action. The reviewing
> court shall —
> . . .
>
> > (2) hold unlawful and set aside agency action, findings, and
> > conclusions found to be—
> >
> > > (A) arbitrary, capricious, an abuse of discretion, or
> > > otherwise not in accordance with law;
> > > (B) contrary to constitutional right, power, privilege,
> > > or immunity;

---

[7] Count 7 also alleges that approval of the Crossing Agreement by USDS resulted from an unconstitutional delegation of power in the IBA; violated the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*; and infringed DIBC's statutory, contractual, treaty, and franchise rights with respect to the Ambassador Bridge and the Twin Span.  *See* TAC ¶¶ 353-56; 358-60. These allegations constitute variations of DIBC's other claims, which have been dismissed.  To the extent that any of these allegations were not previously dismissed, DIBC has forfeited them because DIBC focused only on the question of Michigan law vis-à-vis the Crossing Agreement and failed to respond to the Federal Defendants' arguments regarding these other allegations. *See Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), *aff'd,* 98 Fed. App'x. 8 (D.C. Cir. 2004).

(C) in excess of statutory jurisdiction, authority, or
limitations, or short of statutory right;

(D) without observance of procedure required by
law;

(E) unsupported by substantial evidence in a case
subject to sections 556 and 557 of this title or
otherwise reviewed on the record of an agency
hearing provided by statute; or

(F) unwarranted by the facts to the extent that the
facts are subject to trial de novo by the reviewing
court.

In making the foregoing determinations, the court shall review the
whole record or those parts of it cited by a party, and due account
shall be taken of the rule of prejudicial error.

5 U.S.C. § 706(2).

Count 7 alleges that the approval of the Crossing Agreement was arbitrary and
capricious and contrary to the U.S. Constitution and the IBA.  *See* TAC ¶ 357.  In its Motion for
Summary Judgment, Federal Defendants rely on the APA's "highly deferential standard," under
which a court "may set aside [the agency's] action 'only if it is arbitrary, capricious, an abuse of
discretion, or otherwise not in accordance with law.'"  *Zevallos v. Obama*, 793 F.3d 106, 112
(D.C. Cir. 2015) (quoting § 706(2)(A)) (internal quotation marks and citations omitted); *see also*
Defs. Mot. at 6.  Federal Defendants do not address the standard of review of actions that are
alleged to be unlawful, as contrary to the Constitution or a federal statute (*i.e.*, 706(2)(B)-(C)).
*See* Defs. Mot. at 6.

For its part, DIBC argues that the relevant issue in Count 7 is not "whether the
State Department acted reasonably in reviewing the legality of the Crossing Agreement," which
is the focus of arbitrary and capricious review under § 706(2)(A).  Pls. Mot. at 4.  Rather, DIBC
posits that the relevant question should be whether the State Department violated the U.S.

Constitution and the IBA when it approved an agreement that was invalid under Michigan law. *Id.* at 4, 13-16.  DIBC contends that "[t]his case presents a pure question of law that this Court can and must address on a *de novo* basis."  *Id.* at 4.  As a result, DIBC relegates the arbitrary and capricious review of the approval by USDS to an alternative claim.  *See id.* at 4 ("[E]ven if the Court did limit itself to an inquiry into whether the State acted reasonably in reviewing the legality of the Crossing Agreement (which the Court should not do), the Court would have to conclude that it did not."); *see also id.* at 41-45.

      The Court agrees that Count 7 focuses mainly on an *ultra vires* claim involving a pure legal question subject to *de novo* review, *i.e.*, whether approval of the Crossing Agreement by USDS violated the U.S. Constitution and the IBA.  Count 7 also presents an alternative claim subject to deferential review under the APA, *i.e.*, whether approval of the Crossing Agreement by USDS was arbitrary or capricious.  Both claims stem directly from DIBC's allegations, *see* TAC ¶ 357, and the parties' briefs.

### B.  Standard of Review

      Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  "In a case involving review of a final agency action under the Administrative Procedure Act, however, the standard set forth in Rule 56[ ] does not apply because of the limited role of a court in reviewing the administrative record."  *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006) (internal citation omitted); *see also Charter Operators of Alaska v. Blank*, 844 F. Supp. 2d 122, 126-27 (D.D.C. 2012).  Under the APA, the agency's role is to resolve factual issues to reach a decision supported by the

administrative record, while "'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'"  *Sierra Club*, 459 F. Supp. 2d at 90 (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769-70 (9th Cir. 1985)).  "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Id.* (citing *Richards v. INS*, 554 F. 2d 1173, 1177 & n. 28 (D.C. Cir. 1977)).

Count 7 presents two familiar administrative-law inquiries: (1) whether USDS acted within the confines of the authority delegated to it by Congress; and (2) whether there was a rational basis for the approval of the Crossing Agreement.

DIBC's argument that USDS acted *ultra vires* is premised on three basic tenets of administrative law.  First, "an agency's power is no greater than that delegated to it by Congress."  *Lyng v. Payne*, 476 U.S. 926, 937 (1986); *see also Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992).  Second, agency actions beyond delegated authority are *ultra vires* and should be invalidated.  *Transohio*, 967 F.2d at 621.  Third, courts look to an agency's enabling statute and subsequent legislation to determine whether the agency has acted within the bounds of its authority.  *Univ. of D.C. Faculty Ass'n/NEA v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 163 F.3d 616, 620-21 (D.C. Cir. 1998) (explaining that *ultra vires* claims require courts to review the relevant statutory materials to determine whether "Congress intended the [agency] to have the power that it exercised when it [acted]").

When reviewing an agency's interpretation of its enabling statute and the laws it administers, courts are generally guided by "the principles of *Chevron, U.S.A., Inc. v. Natural*

*Resources Defense Council, Inc.*, 467 U.S. 837 (1984)." *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 754 (D.C. Cir. 2007).  However, where there is no established agency interpretation of the relevant statute, no form of deference, whether under the principles of *Chevron* or *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), applies.  *See Shieldalloy Metallurgical Corp. v. Nuclear Regulatory Comm'n*, 768 F.3d 1205, 1206 (D.C. Cir. 2014).  USDS has not articulated a formal or informal interpretation of the IBA and therefore its compliance with the IBA shall be reviewed *de novo*.[8]  The same standard of review applies to DIBC's claim that USDS violated the U.S. Constitution.  *See Poett v. United States*, 657 F. Supp. 2d 230, 241 (D.D.C. 2009) ("'A reviewing court owes no deference to the agency's pronouncement on a constitutional question,' and must instead make 'an independent assessment of a citizen's claim of constitutional right when reviewing agency decision-making.'") (quoting *Lead Indus. Assoc. v. EPA*, 637 F.2d 1130, 1173-74 (D.C. Cir. 1980)).

   Finally, in determining whether an action was arbitrary or capricious, a reviewing court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks and citation omitted).  At a minimum, the agency must have considered relevant data and articulated an explanation establishing a "rational connection between the facts found and the choice made." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986) (internal quotation marks and citation omitted); *see also Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency

---

[8] Federal Defendants do not contend that any deference is owed to their post-hoc litigating position concerning the IBA.

action not be arbitrary or capricious includes a requirement that the agency adequately explain its result.").

> An agency action usually is arbitrary or capricious if:
>
> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  As the Supreme Court has explained, "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  *Id*.  Rather, agency action is normally "entitled to a presumption of regularity." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

## III.  ANALYSIS

### A.  *Ultra Vires* Claim under the APA

The crux of DIBC's position is that USDS acted unlawfully and in excess of its constitutional and statutory authorities in approving an agreement that was invalid under Michigan law.  In order for DIBC to prevail, the Court must find that: (1) the Crossing Agreement was executed in violation of Michigan law; *and* (2) the U.S. Constitution and/or the IBA did not authorize USDS to approve an illegal Crossing Agreement.  *See* Pls. Mot. at 18.  It follows that the illegality of the Crossing Agreement under Michigan law is an independent and necessary condition for DIBC to be entitled to summary judgment on Count 7.  *See* Pls. Mot. at 1 ("Federal law does not authorize the Department of State to approve an agreement that purports

to be between a State and a foreign government, but in fact is executed by State officials acting in direct violation of unambiguous State law.").  This fact highlights a fatal flaw in DIBC's argument that was not raised by the parties, but which the Court has a duty to raise on its own — DIBC failed to join the State of Michigan, which is a necessary and indispensable party under Rule 19 of the Federal Rules of Civil Procedure for a just adjudication of the *ultra vires* claim. *See Kickapoo Tribe of Indians in Kansas v. Babbitt*, 43 F.3d 1491, 1495 n.3 (D.C. Cir. 1995) (*Kickapoo II*) ("[T]his court has a duty to raise *sua sponte* the issue of whether the State of Kansas is an indispensable party.") (citing *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 106, 111 (1968); *Wichita & Affiliated Tribes of Okla. V. Hodel*, 788 F.2d 765, 772 n.6 (D.C. Cir. 1986); *Weisberg v. United States Dep't of Justice*, 631 F.2d 824, 826-30 & n.40 (D.C. Cir. 1980)).

### 1.  The State of Michigan is a Necessary and Indispensable Party

Federal Rule of Civil Procedure 19 establishes a three-prong test for the dismissal of claims for failure to join an indispensable party: "whether a party is indispensable for a just adjudication requires a determination regarding whether the absent party is necessary to the litigation; if so, whether the absent party can be joined in the litigation; and if joinder is infeasible, whether the lawsuit can nevertheless proceed 'in equity and good conscience.'" *Kickapoo II*, 43 F.3d at 1494 (quoting Fed. R. Civ. P. 19) (citing *Western Md. Ry. Co. v. Harbor Ins. Co.*, 910 F.2d 960, 961 (D.C. Cir. 1990)).  Rule 19 clearly articulates the factors to be considered as part of this three-prong test.

The Court agrees with DIBC that the decisions under the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701-21, are highly relevant and instructive to this case.[9] One of the analogous IGRA decisions cited by DIBC and discussed in the briefs is *Kickapoo Tribe of Indians v. Babbitt*, 827 F. Supp. 37 (D.D.C. 1993) (*Kickapoo I*), *rev'd*, *Kickapoo II*, 43 F.3d at 1493.   In *Kickapoo I*, an Indian tribe filed a lawsuit against the Secretary of Interior seeking, among other things, a declaration that the Tribal-State Compact between the State of Kansas and the Tribe was valid and properly approved by Interior under IGRA.   The district court assumed that the State of Kansas was a necessary party under Rule 19(a)(1)(B), but decided that it was not indispensable under Rule 19(b).   *Id.* at 40-43.   As a result, the district court found that "in equity and good conscience the action should proceed . . . ."   *Id.* at 43 (quoting Fed. R. Civ. P. 19(b)).   The district court then found that, although the compact was "approved" by the Secretary of Interior under IGRA, the compact was void because the Governor of Kansas did not have the statutory or constitutional authority to execute the compact and bind the State of Kansas.   *See id.* at 46.[10]   Simply put, the court found Interior's approval had no effect on the compact because it was void.

---

[9] The IBA authorizes a State to enter into agreements to build bridges between itself and Canada or Mexico and conditions the effectiveness of such agreements on the approval of the Secretary of State.  33 U.S.C. § 535(a).  Similarly, IGRA authorizes Indian tribes and States to enter into Tribal-State compacts to regulate gambling on Indian reservations and conditions the effectiveness of such compacts on the approval of the Secretary of the Interior.  25 U.S.C. § 2710(d)(8)(D).

[10] "[B]efore the parties in [*Kickapoo I*] began to brief their cross-motions for summary judgment, the Supreme Court of Kansas ruled that while the Governor possessed the power to negotiate a compact with the Kickapoo Tribe, she did not have the power to sign the resulting compact." *Kickapoo I*, 827 F. Supp. at 40 (citing *Kansas v. Finney*, 251 Kan. 559 (1992)).  Relying on this decision by the Supreme Court of Kansas, the district court held that the compact was invalid under Kansas law and, thus, insufficient for purposes of IGRA.

The D.C. Circuit reversed and held "that the district court abused its discretion in ruling that Kansas was not an indispensable party in the Tribe's lawsuit against the Secretary and that the trial could proceed in its absence." *Kickapoo II*, 43 F.3d at 1495. The Circuit "reach[ed] this conclusion based on the nature of the issue before the district court in light of the immunity of the absent party and the district court's reliance on inappropriate factors [*i.e.*, the Rule 19(b) factors]." *Id.* Accordingly, the Circuit did not reach the merits of the claim and "remand[ed] the case to the district court with instructions to vacate the entry of judgment for the Secretary and to dismiss the complaint without prejudice." *Id.* at 1500.

Admittedly, unlike the Kickapoo Tribe, DIBC is not seeking a straight declaration concerning the validity of the Crossing Agreement. DIBC asks the Court to set aside the USDS approval of the Crossing Agreement because the Constitution and IBA do not allow USDS to approve an agreement that is invalid under state law. While this subtle distinction might be relevant to the merits of Count 7, it does not affect the Rule 19 analysis. Since DIBC's allegation requires a finding that the Crossing Agreement was executed in violation of Michigan law, Rule 19 poses an insurmountable obstacle to DIBC's claim. *See, e.g.*, *Kickapoo II*, 43 F.3d at 1500; *Dewberry v. Kulongoski*, 406 F. Supp. 2d 1136, 1146-50 (D. Or. 2005) (dismissing lawsuit because the Confederated Tribes were entitled to sovereign immunity and were necessary and indispensable parties to the plaintiffs' IGRA claim that a gaming compact was invalid under Oregon law).

The Court finds that the State of Michigan is a necessary party to the resolution of Count 7 because the State undoubtedly has "an interest" in the validity of the Crossing Agreement with Canada and Michigan's absence "may as a practical matter impair or impede [its] ability to protect the interest." Fed. R. Civ. P. 12(a)(1)(B); *see, e.g.*, *Kickapoo II*, 43 F.3d at

1495 (holding that "Kansas is a necessary party under Rule 19(a)" because "[c]learly, . . . the State of Kansas has an interest in the validity of a compact to which it is a party, and this interest would be directly affected by the relief that the Tribe seeks") (citations omitted); *Kickapoo I*, 827 F. Supp. at 41 n.7.

   The Court recognizes that DIBC does not seek any relief from the State of Michigan.  This fact alone, however, is not relevant to the question of whether proceeding in the State's absence would impair or impede Michigan's ability to protect its interest in the validity of the Crossing Agreement.  "It is the party's *claim* of a protectable interest that makes its presence necessary," and, in the instant case, a disposition of the Crossing Agreement's validity in Michigan's absence "would impede if not impair the [State's] ability to protect [its] claimed interests negotiated under the [Agreement]." *Dewberry*, 406 F. Supp. 2d at 1147 (quoting *American Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1024 (9th Cir. 2002) (emphasis in original)).  Similarly, although Canada and the Federal Defendants have an interest in protecting the Crossing Agreement's validity, the State of Michigan is still necessary.  Otherwise, "one seeking to nullify an agreement could simply sue one of the signatories and then argue that the remaining signatories were not necessary because the existing defendant would 'adequately represent' their interest in defending the contract." *Id.* (quoting *Wilbur v. Locke*, 423 F.3d 1101, 1113-14 (9th Cir. 2005)).  Rule 19 provides that "all parties to a contract are necessary in litigation seeking to 'decimate' that contract." *Id.*  It follows that "[a]s a necessary party, [Michigan] should have been joined in the litigation if such joinder was feasible." *Kickapoo II*, 43 F.3d at 1495 (citations omitted).

   Joinder of the State of Michigan in this litigation is not feasible because the State enjoys sovereign immunity from suit under the Eleventh Amendment of the U.S. Constitution.

*See* U.S. Const. amend. XI; *Kickapoo II*, 43 F.3d at 1495-96.  Michigan's immunity would not

be an issue if there were an "unmistakably clear" abrogation of the State's immunity by

Congress or an "express and unequivocal" waiver of its immunity by Michigan, thereby allowing

the State to be sued in federal court.  *Kickapoo II*, 43 F.3d at 1496 (citing *Dellmuth v. Muth*, 491

U.S. 223, 228 (1989); *Ford Motor Co. v. Dep't of Treasury of Ind.*, 323 U.S. 459, 467-68

(1945)).  However, just as the sovereign immunity of Kansas in *Kickapoo II* and that of the

Confederated Tribes in *Dewberry* was not abrogated or waived, Michigan's immunity here was

neither abrogated by Congress in the IBA nor waived by explicit authorization in State law.  *See

id.*; *see also Dewberry*, 406 F. Supp. 2d at 1148.[11]

The final question then is "whether, in equity and good conscience, the action

should proceed among the existing parties or should be dismissed" because Michigan is an

absent indispensable party.  Fed. R. Civ. P. 19(b).  This analysis generally requires a

consideration of four factors: (1) prejudice to the absent or existing parties; (2) possibility to

lessen or avoid said prejudice; (3) adequacy of the remedy in the party's absence; and (4) the

existence of an adequate remedy in the event of a dismissal.  *See id.*  The district court in

*Kickapoo I* considered these four factors in a virtually identical situation to conclude that Kansas

was not an indispensable party.  The D.C. Circuit reversed and stated, "this court has observed

that 'there is very little room for balancing of other factors' set out in Rule 19(b) where a

necessary party under Rule 19(a) is immune from suit because immunity may be viewed as one

of those interests 'compelling by themselves.'"  *Kickapoo II*, 43 F.3d at 1496 (quoting *Wichita &*

---

[11] The Court recognizes that DIBC alleges that the Governor and Michigan agencies unlawfully executed the Crossing Agreement so that it is not a contract with the State itself.  That aside, there is no doubt that the State of Michigan has a vital interest (in favor or against) in a new bridge to Canada.  Without an appearance by the State, that interest cannot be affected.

*Affiliated Tribes*, 788 F.2d at 777 n.13 (citation omitted)) (citing *Enter. Mgm't Consultants, Inc. v. U.S. ex rel. Hodel*, 883 F.2d 890, 894 (10th Cir. 1989); *Adams v. Bell*, 711 F.2d 161, 171 n.42 (D.C. Cir. 1983 (en banc), *cert. denied*, 465 U.S. 1021 (1984); 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2D*, § 1617, at 257 (2d ed. 1986)).  Since Michigan is both necessary and immune from suit, the Court faces a "more circumscribed inquiry" under Rule 19(b).  *Kickapoo II*, 43 F.3d at 1497.

With respect to the first factor, insofar as it focuses on prejudice to Michigan, the inquiry is the same as that under Rule 19(a)(1)(B) "regarding whether continuing the action will impair the absent party's ability to protect its interest."  *Id.* (citations omitted); *see also Dewberry*, 406 F. Supp. 2d at 1148.  Since Michigan is a necessary party with a protectable interest in the Crossing Agreement, there is no question but that it would be prejudiced by a judgment rendered in its absence.  The fact that the Governor of Michigan has filed an Amicus Brief defending the validity of the Crossing Agreement under Michigan law does not eviscerate or mitigate the prejudice to the State of Michigan.  *See Kickapoo II*, 43 F.3d at 1498.  The State of Michigan's failure to intervene in this case "is not a component of the prejudice analysis where intervention would require the absent party to waive sovereign immunity."[12]  *Id.*  The Court finds that a judgment in favor of DIBC in the absence of Michigan would prejudice the State's interest in the Crossing Agreement.

---

[12] DIBC erroneously opposed the Governor's Motion for Leave to file an Amicus Brief on the basis that, among other reasons, the Governor "has had ample opportunity to intervene in this case but has elected not to do so" and "instead . . . claim[s] immunity from suit."  Pls. Opp'n to Gov. Am. Br. [Dkt. 239] at 1.

The second factor also weighs in favor of dismissal.  Given the relief sought by DIBC — which would require a conclusion that the Crossing Agreement is invalid under Michigan law — and the sovereign immunity of the State of Michigan, "there is no way the court can avoid the prejudice" that would result from invalidating the Agreement in Michigan's absence.  *Kickapoo II*, 43 F.3d at 1498 (quoting *Kickapoo I*, 827 F. Supp. at 42); *Dewberry*, 406 F. Supp. 2d at 1148 (finding that "it [was] impossible to lessen or avoid prejudice to the Tribes" because the plaintiffs sought to nullify the relevant compact).

In light of these two factors, the Court will dismiss DIBC's claim for failure to join an indispensable party.  *Kickapoo II*, 43 F.3d at 1498 ("Under the first and second prongs of [the Rule 19(b) evaluation], when the relief requested *must*, to satisfy plaintiffs' claims, be in derogation of the rights of a person not before the court, that person is an indispensable party.") (quoting *Adams*, 711 F.2d at 171 n.42) (emphasis in original).[13]

Finally, the Court finds that the public interest exception to Rule 19 is inapplicable in this case.  This exception allows a court to find that a necessary party is not indispensable whenever the plaintiff seeks to vindicate a public right.  Some of the factors that courts may consider when deciding whether to apply the exception are: (1) whether the litigation seeks to address a matter of transcending importance or public concern; (2) whether the joinder

---

[13] The Court notes that the third and fourth Rule 19(b) factors do not support a contrary result. For the same reasons articulated above, the Court finds that an adequate remedy cannot be rendered in this case in Michigan's absence.  Moreover, while it is unclear if DIBC can obtain an adequate remedy in another forum, such as a Michigan court, the State remains "necessary" here. "[E]ven if [DIBC] lack[s] an adequate remedy by which to vindicate its statutory rights, absence of an alternative remedy alone does not dictate retention of jurisdiction under Rule 19." *See Kickapoo II*, 43 F.3d at 1499 (citing *Wichita & Affiliated Tribes*, 788 F.2d at 777) (other citation omitted); *see also Dewberry*, 406 F. Supp. 2d at 1148.

of numerous parties would be necessary; and (3) whether the litigation would destroy the legal entitlements or rights of the absent parties.  *See Kickapoo II*, 43 F.3d at 1500 (citing *Sierra Club v. Watt*, 608 F. Supp. 305, 324 (E.D. Cal. 1985); *National Wildlife Fed'n v. Burford*, 676 F. Supp. 271, 276 (D.D.C. 1985), *aff'd*, 835 F.2d 305 (D.C. Cir. 1987)); *see also Dewberry*, 406 F. Supp. 2d at 1148-49 (citing *Kescoli v. Babbitt*, 101 F.3d 1304, 1311 (9th Cir. 1996)) (other citations omitted).

   This case does not "appear to implicate a matter of transcending importance of the type that has preciously prompted courts to apply the exception," "does not require the joining of an infeasibly large number of parties," and would invalidate the rights negotiated in the Crossing Agreement.  *Kickapoo II*, 43 F.3d at 1500 (citing *National Wildlife Fed'n*, 676 F. Supp. at 276) (other citations omitted).  The Court will not apply the exception in light of Michigan's immunity.  Michigan's "indispensability as a party in [DIBC's] lawsuit is hardly a formality; not only its contractual rights [under the Crossing Agreement] are at issue but its fiscal interests are also potentially at stake."  *Id.* (citation omitted).  In conclusion, Michigan is a necessary and indispensable party to DIBC's *ultra vires* claim.  Without it, DIBC cannot prevail on Count 7.

### 2. USDS did not exceed its constitutional and statutory authority in approving the Crossing Agreement

   Although Michigan's indispensability is dispositive, the Court finds that, after six years of litigation, "the interests of judicial economy support the discussion and resolution of all stated grounds for relief to avoid the necessity of remand after appeal."  *Dewberry*, 406 F. Supp. 2d at 1142.  Even if the State of Michigan were not a necessary and indispensable party under Rule 19 or even if DIBC were to join the absent party and avoid the aforementioned immunity

issues, judgment on the merits is appropriate because DIBC's *ultra vires* claim under the APA

against USDS fails as a matter of law.  *See id.* at 1142, 1157.

To recapitulate, DIBC has hewn a very narrow road in a deep forest: it does not

seek an overt declaration that the Crossing Agreement is invalid under Michigan law, but

challenges the USDS approval of the Crossing Agreement on the basis that the Constitution

and/or the IBA do not authorize approval of invalid agreements.  Accordingly, the legality of the

approval by USDS is the proper focus of Count 7.  *See* TAC ¶¶ 353-60; *see also id.* ¶ 361 ("For

the reasons detailed above, *the actions and decisions of the State Department* approving the

Crossing Agreement" violated the APA) (emphasis added).  Moreover, the actions of MDOT,

MSF, and the Governor under Michigan law are relevant only to the extent that they affect the

legality of the Crossing Agreement's approval by USDS.  *See* Pls. Mot. at 17 ("The question is

whether federal law authorized the State Department to approve an agreement that purports to be

an agreement between a State and a foreign country but in fact was executed by State officials

acting in violation of State law.").  For the reasons that follow, the Court finds that DIBC's *ultra*

*vires* claim lacks merit even if the Crossing Agreement were executed in violation of Michigan

law.

### i.  Compact Clause of the U.S. Constitution

DIBC first argues that USDS violated the Compact Clause of the U.S.

Constitution when it approved the Crossing Agreement.  The Compact Clause provides in

relevant part: "No State shall, without the Consent of Congress, . . . enter into any Agreement or

Compact with another State, or with a foreign Power . . . ."  U.S. Const. art. I, § 10, cl. 3.[14]

---

[14] The Compact Clause refers to both interstate and foreign compacts.

DIBC points out that a state official acting in violation of state law is not acting as "the State" and, therefore, cannot enter into an "Agreement" for purposes of the Compact Clause. *See* Pls. Mot. at 19-20; Pls. Reply at 7. Assuming this is true, it does not suffice. DIBC conflates two independent constitutional requirements: the legality of the "Agreement" and the legality of the "Consent of Congress."

DIBC contends that the Compact Clause places a limitation on the authority of both the States and the Congress. This reading of the constitutional text is untenable and misunderstands the underlying purpose of Congress's consent to interstate and foreign agreements. The Compact Clause is one of many provisions in Article I, section 10 of the Constitution in which the several States agreed to limit their sovereign powers in favor of a new federal government. *See* U.S. Const. art. I, § 10 ("No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit . . . ."). The Compact Clause limits the authority of States (not Congress) to enter into agreements and conditions the effectiveness of such agreements on the consent of Congress.

The validity of an "Agreement" and its effect are two separate questions. *See Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 110-11 (1938) (acknowledging the Court's "jurisdiction to determine the *validity* and *effect*" of an interstate compact) (emphasis added). To the extent that no "Agreement" was "entered into" by a State, such "Agreement" may be invalid without regard to whether Congress consented. Similarly, Congress does not violate the Constitution simply because it consents to an "Agreement" that was unlawfully executed and not "entered into" by a State. The history of the Compact Clause

and the Supreme Court's interpretation of the Clause in the context of interstate compacts support these conclusions.[15]

The Compact Clause and the "Consent of Congress" requirement have their origin in boundary disputes among the thirteen pre-independence colonies and the British Crown's approval of inter-colonial agreements settling such disputes. *See* Herbert N. Naujoks, *Compacts and Agreements Between States and Between States and a Foreign Power*, 36 Marq. L. Rev. 219, 222 (1953). The newly independent and sovereign States voluntarily transferred this authority to the First Congress in Article VI of the Articles of Confederation, and then incorporated similar language into the United States Constitution in the form of the Compact Clause. *See* U.S. Const. art. I, § 10, cl. 3; Naujoks, *supra* at 223-25; *see also* Felix Frankfurter & James M. Landis, *The Compact Clause of the Constitution*, 34 Yale L. J. 685 (1925).

*Rhode Island v. Massachusetts* discussed the effect of congressional consent with respect to an interstate compact settling boundary disputes. 37 U.S. 657, 725 (1838). The Supreme Court stated:

> By this surrender of the power, which before the adoption of the constitution was vested in every state, of settling these contested boundaries, as in the plenitude of their sovereignty they might; they could settle them neither by war, or in peace, by treaty, compact or agreement, without the permission of the new legislative power which the states brought into existence by their respective and several grants in conventions of the people. If congress consented, then the states were in this respect restored to their original inherent sovereignty; such consent being the sole limitation imposed by the constitution, when given, left the states as they were before, as held by this Court in *Poole v. Fleeger*, [36 U.S. 185 (1837)]; whereby their compacts became of binding force, and finally settled the

---

[15] The Constitution does not distinguish between interstate and foreign compacts, at least with respect to the relevant issue in this case — whether approval of an invalid agreement that requires the "Consent of Congress" violates the U.S. Constitution.

boundary between them; operating with the same effect as a treaty
between sovereign powers.

*Rhode Island*, 37 U.S. at 725.  In other words, the States surrendered certain sovereign powers to

Congress, such as the ability to fix their disputed boundaries and to enter into agreements and

compacts to collaborate on different matters.  The States agreed that such agreements and

compacts would be binding or effective only when Congress transfers the authority back to the

States.

While the effectiveness of an "Agreement" presupposes its validity — contrary to

DIBC's position — the Constitution does not require Congress to determine the validity of a

compact under state or foreign law before it provides its consent.  "The Constitution does not

state when the consent of Congress shall be given, whether it shall precede or may follow the

compact made, or whether it shall be express or may be implied."  *Virginia v. Tennessee*, 148

U.S. 503, 521 (1893).  Rather, the mode or form of consent is left to the discretion of Congress.

Since Congress can consent to compacts in advance, *see Cuyler v. Adams*, 449 U.S. 433, 441 &

n. 9 (1981), it must be that the Constitution does not require Congress to consider the validity of

a compact under state law before acting.

Moreover, the Supreme Court has consistently treated the validity of an

agreement under state law as a separate requirement under the Compact Clause and, in doing so,

has never indicated that Congress exceeds its constitutional authority when it exercises its

discretion and provides consent to an agreement that turned out to be unlawfully executed under

state or foreign law.  *See, e.g.*, *Dyer v. Sims*, 341 U.S. 22, 30 (1951) (holding that the West

Virginia Constitution authorized the State Legislature "to enter into a compact which involves

delegation of power to an interstate agency and an agreement to appropriate funds for the

23

administrative expenses of the agency"); *Hinderlider*, 304 U.S. at 102-05 (holding that the

Legislature of Colorado did not exceed its constitutional authority under the State Constitution

when it entered into an interstate compact affecting the water rights of Colorado citizens).  In

*Dyer* and *Hinderlider*, the Supreme Court addressed the validity of the compacts at issue and, in

doing so, did not consider the fact that Congress had consented to both compacts.

      The role of Congress under the Compact Clause serves a limited purpose.  The

Supreme Court clarified this interpretation by adopting a functionalist approach to interpreting

the Compact Clause.   The Court "has used federalism as a guiding principle to issue

increasingly narrow interpretations of Congress's power."  Duncan B. Hollis, *The Elusive*

*Foreign Compact*, 73 Mo. L. Rev. 1071, 1086 (2008).  Not only has the Supreme Court ruled

that Congress retains full discretion to determine the mode or form of consent it gives to a

compact, but also has held that congressional consent is required only when a "Compact

enhances state power *quoad* the National Government."  *U.S. Steel Corp. v. Multistate Tax*

*Comm'n*, 434 U.S. 452, 473 (1978); *see also Virginia*, 148 U.S. at 519 (stating that the Compact

Clause applies to those compacts involving "the formation of any combination tending to the

increase of political power in the states, which may encroach upon or interfere with the just

supremacy of the United States").

      In other words, only those compacts that "encroach upon or interfere" with the

supremacy of the Federal Government fall within the scope of the Compact Clause.  *Cuyler*, 449

U.S. at 440 ("Congressional consent is not required for interstate agreements that fall outside the

scope of the Compact Clause.") (citing *Multistate Tax Comm'n*, 434 U.S. at 468; *Virginia*, 148

U.S. at 519; *New Hampshire v. Maine*, 426 U.S. 363, 369-70 (1976)).  For purposes of this case,

the Court finds that an international crossing agreement closely implicates the Federal

Government's powers over foreign affairs and foreign commerce and, thus, requires congressional consent under the Compact Clause. *See* 33 U.S.C. § 535(a); *see also Detroit Int'l Bridge Co.*, 2016 WL 3030226 at *5-9 (discussing the "historical evolution of the legal framework governing the construction and maintenance of international bridges").[16]

The Supreme Court has also instructed that judicial review under the *Multistate Tax Commission* test — whether a compact increases the political power of the states and encroaches on the supremacy of the United States — does not apply where Congress has given its consent and the subject matter of a compact is an appropriate subject for congressional legislation. *See Cuyler*, 449 U.S. at 440. In other words, when Congress consents to a compact, it is merely exercising its political judgment that the compact does not impinge on the supremacy of the United States. *See id.*; *see also* Laurence H. Tribe, *American Constitutional Law* 523 (2d ed. 1988) ("*Cuyler* . . . stands for the proposition that, if Congress enacts some kind of consent legislation, the Court will defer to Congress' political judgment that the compact is good for the nation and simply ignore the *Multistate Tax Commission* test.").

In the case of foreign bridges, the purpose for which congressional consent was initially required may have extended to various considerations, such as ensuring the unity and supremacy of the federal government, protecting the territorial integrity of the United States from foreign influence, and safeguarding the President's ability to speak with one voice on behalf of the country. *See, e.g.*, *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 (2000) (noting

---

[16] The Court does not need to decide whether foreign compacts, unlike interstate compacts, invariably encroach on federal authority and the supremacy of the United States. *See* Hollis, *supra* at 1088-89 & n.72 (explaining some of the different views among legal scholars and commentators regarding the "Consent of Congress" requirement in the context of foreign compacts).

that state laws may "compromise the very capacity of the President to speak for the Nation with one voice in dealing with other governments"); *Cuyler*, 449 U.S. at 440; *Virginia*, 148 U.S. at 519; *Holmes v. Jennison*, 39 U.S. (14 Pet.) 540, 573-74 (1840) (Taney, C.J., plurality opinion) ("The framers . . . manifestly believed that any intercourse between a state and a foreign nation was dangerous to the Union; that it would open a door of which foreign powers would avail themselves to obtain influence in separate states.").

Another way to understand the narrow purpose of the "Consent of Congress" requirement is that the Framers intended Congress (or the courts, in the absence of congressional consent) to determine whether the proposed arrangement is an impermissible treaty, alliance, or confederation, or a valid agreement or compact under the Compact Clause.  As one commentator has stated,

> A treaty between states would in itself be destructive of national sovereignty. A compact or agreement, however, would not necessarily be destructive of national sovereignty although it might involve issues affecting the entire nation. So it is that, while Congress cannot authorize the state to enter into any treaty, alliance, or confederation, agreements between the states may be made, and *to protect the national interests* it is provided that the consent of Congress must be obtained.

William J. Donovan, *State Compacts as a Method of Settling Problems Common to Several States*, 80 U. Pa. L. Rev. 5 (1931) (emphasis added); *see also* Naujoks, *supra* at 231-233 (discussing the difference between compacts and treaties).  It follows that congressional consent serves a limited purpose that does not include ensuring that states or foreign countries comply with their respective laws when executing an agreement.  While an agreement may be void and

26

invalid because it was unlawfully executed under state law, which this Court does not decide, the approval of such an agreement does not violate the Constitution.[17]

### ii. The International Bridge Act of 1972

In 1972, Congress authorized states to enter into agreements with Canada or Mexico to construct international bridges, but conditioned the effectiveness of such agreements on the approval by the Secretary of State. *See* 33 U.S.C. § 535(a). In essence, Congress delegated in whole, or in part, to USDS its constitutional authority to consent to foreign compacts. DIBC properly relies on various decisions interpreting the highly similar Indian Gaming Regulatory Act (IGRA) for guidance on this matter. The problem is that these cases directly undermine DIBC's position and reinforce the Court's analysis of the *ultra vires* claim.

IGRA provides a regulatory framework for gaming activities on Indian lands, which are "conducted in conformance with a Tribal-State compact *entered into* by the Indian tribe and the State . . . ." 25 U.S.C. § 2710(d)(1)(B), (C) (emphasis added). The effectiveness of such a compact is conditioned on the "approval by the Secretary [of the Interior]" and the

---

[17] Count 7 also alleges that the approval of the Crossing Agreement violates the non-delegation doctrine, the Tenth Amendment, and the Guarantee Clause set forth in Article IV, section 4 of the U.S. Constitution. TAC ¶ 3757. The non-delegation argument was already rejected by the Court. *See Detroit Int'l Bridge Co.*, 133 F. Supp. 3d at 85-87. DIBC does not explain how the approval would violate the Tenth Amendment and, therefore, forfeited the claim. With respect to the Guarantee Clause argument, DIBC only mentions in passing that a foreign compact executed in violation of state law "does not reflect the action of a 'State' within the meaning of the Constitution, since it is inconsistent with the fundamental precept that each State must have a 'republican form of government.'" Pls. Mot. at 21-22 (quoting U.S. Const. art. IV, § 4). "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir. 1990). In any event, since congressional consent may not cure the invalidity of an agreement, it cannot be said that approval by Congress violates the constitutional obligation of the United States "to guarantee to every State in this Union a Republican Form of Government . . . ." U.S. Const. art. IV, § 4.

publication of the "notice of approval . . . in the Federal Register."  25 U.S.C. § 2710(d)(3)(B).

The IBA contains virtually identical language.  It authorizes states "to *enter into* agreements"

with Canada or Mexico for the construction of international bridges and conditions "the

effectiveness of such agreement . . . on its approval by the Secretary of State."  33 U.S.C.

§ 535(a) (emphasis added).

        Courts have held that IGRA contains two independent substantive requirements:

(1) "a compact 'entered into' by [a] tribe and [a] state [*i.e.*, validity of the compact] (2) which is

in 'effect' [*i.e.*, effectiveness of the compact]."  *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546,

1552-53 (10th Cir. 1997) (quoting 25 U.S.C. § 2710(d)(1)(C)); *see also Rhode Island v.*

*Narragansett Indian Tribe*, No. Civ.A. 94-0619-T, 1995 WL 17017347, at *1-3 (D.R.I. Feb. 3,

1995) (*Narrangansett I*); *Kickapoo I*, 827 F. Supp. at 43-46.  The IBA also contains these two

separate, substantive requirements.  *See* 33 U.S.C. § 535(a).  The Court agrees that "state law

determines the procedures by which a state may validly enter into a compact" authorized under

the IBA.  *Pueblo of Santa Ana*, 104 F.3d at 1553; *see also Dewberry*, 406 F. Supp. 2d at 1154-56

(holding that Tribal-State Compact was valid under Oregon law); *Narragansett Indian Tribe of*

*Rhode Island v. Rhode Island*, Nos. Civ.A. 94-0618-T, 94-0619-T, and 95-0034, 1996 WL

97856, at *1-3 (D.R.I. Feb. 13, 1996) (*Narrangansett II*) (adopting decision by Supreme Court of

Rhode Island that Tribal-State Compact was invalid under Rhode Island law); *Willis v. Fordice*,

850 F. Supp. 523, 532 (S.D. Miss. 1994) (holding that Tribal-State Compact was valid under

Mississippi law); *Kickapoo I*, 827 F. Supp. at 46 (holding that Tribal-State Compact was invalid

under Kansas law).

28

DIBC does not seek declaratory relief that the Crossing Agreement was unlawfully executed under Michigan law.[18]  Rather, DIBC asks the Court to invalidate the USDS approval of the Crossing Agreement because the IBA does not provide for the approval of agreements unlawfully executed under state law.  In order for DIBC to prevail, the IBA must have required USDS to examine whether the Crossing Agreement was validly executed under Michigan law.  *See* Pls. Mot. at 22 ("Thus, by its plain terms, the IBA does not authorize the State Department to approve . . . an illegal nullity executed by State officials acting *ultra vires* and in direct violation of express statutes enacted by the State legislature.").  The argument "misapprehends the nature and effect of approval by the Secretary," *see Narrangansett I*, 1995 WL 17017347, at *2, and overlooks the fact that "the validity of a compact under state law is a separate requirement from Secretarial approval," *see Pueblo of Santa Ana*, 104 F.3d at 1557.

In the same way that the purpose of congressional consent under the Compact Clause does not encompass a duty to ensure that states act in conformity with their own laws, the IBA cannot be read to require a similar obligation.  The IGRA cases support this conclusion. Under IGRA,

---

[18] The Court agrees with DIBC that the validity of the Crossing Agreement poses a federal question because it involves a determination of whether the Agreement is "sufficient for purposes of [the IBA.]"  *Kickapoo I*, 827 F. Supp. at 44-45 (finding "that the determination of the validity of a Tribal-State compact, signed by the Governor of Kansas apparently without lawful authority under the Kansas constitution, is a federal question") (citing *Dyer*, 341 U.S. at 22) (other citations omitted).  However, declaratory relief in this case would raise additional issues, particularly in the absence of an express or implied right of action under the IBA.  *Cf.* 25 U.S.C. §§ 2710, 2711, 2714 (providing a right of action in favor of tribes, states, and the federal government for certain violations of IGRA); *Hein v. Capitan Grande Band of Diegueno Mission Indians*, 201 F.3d 1256, 1260 (9th Cir. 2000) (finding there is no general private right of action under IGRA).  Since declaratory relief was not sought in this case and the State of Michigan was not joined as a party, the Court will not resolve these issues.

> The manifest purpose of [Interior's approval] is to insure that the gambling activity authorized by the proposed compacts is consistent with federal law and that the compacts are in the best interests of Indian tribes.   Nothing in IGRA even suggests that Congress intended that the Secretary determine who is authorized to execute such compacts on behalf of states.

*Narrangansett I*, 1995 WL 17017347, at *2; *see also Pueblo of Santa Ana*, 104 F.3d at 1557

("We agree with the Tribes that Congress did not intend to force the Secretary to make extensive

inquiry into state law to determine whether the person or entity signing the compact for the state

in fact had the authority to do so."); *Kickapoo I*, 827 F. Supp. at 44 (holding that "[r]egardless of

whether the governor had the authority to bind the state, the [Secretary] had an obligation to

approve or disapprove of the compact within forty-five days . . . ."). The same reasoning applies

to the Secretary of State's approval under the IBA. It follows that "[c]ompact approval by the

Secretary cannot be invalidated on the basis of a governor's *ultra vires* action, because a contrary

rule would compel the Secretary to consider state law before approving any compact." *Langley*

*v. Edwards*, 872 F. Supp. 1531, 1535 (W.D. La. 1995), *aff'd sub nom.*, *Langley v. Dardenne*, 77

F.3d 479 (5th Cir. 1996) (citing *United States v. Brown,* 334 F. Supp. 536, 540 (D. Neb. 1971)).

DIBC's argument that USDS was required to determine whether the Crossing

Agreement was lawfully executed under Michigan law is contrary to congressional intent in the

IBA. The IBA's text does not support DIBC and the legislative history clearly depicts the

limited purpose of Secretarial approval of crossing agreements, *i.e.*, to evaluate an agreement's

effect on U.S. foreign policy. This Court has already noted that "[i]n reviewing international

bridge agreements, USDS is guided by its traditional role in setting and managing U.S. foreign

policy and foreign relations." *Detroit Int'l Bridge Co.*, 133 F. Supp. 3d at 86. Congress

acknowledged this role when it enacted the IBA and "incorporated a memorandum from a Legal

Adviser at USDS," which stated in relevant part:

> In the past, bridge agreements have been concluded . . . and have not
> been reviewed by anyone at the federal level for *impact on foreign*
> *policy*. We believe such a review would be in the national interest,
> and further believe that the Secretary of State would be the
> appropriate person to consider such a review.

*Id.* (emphasis added) (citation omitted).  The IBA assigned to the Secretary of State the same

duty that the States entrusted to Congress in the Compact Clause — to protect the national

interest and the authority of the Federal Government.

      While the Secretary's approval cannot cure any potential irregularities of the

Crossing Agreement under Michigan law, DIBC's exclusive focus on invalidating the approval

is unsuccessful.  Neither the Constitution nor the IBA requires the Secretary to determine the

validity of the Crossing Agreement under Michigan law.  Thus, USDS did not exceed its

authority when it approved the Crossing Agreement.  DIBC lacks a "substantive right . . . to

challenge the approval on the basis of alleged state law irregularities."  *Langley*, 872 F. Supp. at

1533.  Federal Defendants are entitled to summary judgment on the *ultra vires* claim.

      **B.  Arbitrary or Capricious Claim**

      DIBC has made clear on multiple occasions that Count 7 presents a pure legal

question concerning whether USDS exceeded its authority under the Constitution and the IBA

when it approved the Crossing Agreement.  Thus, its briefs mainly focus on its *ultra vires* claim

and only briefly assert its arbitrary or capricious claim.  *Compare* Pls. Mot. at 16-41 and Pls.

Reply at 6-23 (addressing the merits of the *ultra vires* claim) *with* Pls. Mot. at 41-45 and Pls.

Reply at 23-25 (addressing the merits of the arbitrary or capricious claim).  Ultimately, in its

arbitrary or capricious claim, DIBC asks the Court to invalidate the approval of the Crossing

Agreement by USDS because it: (1) "entirely fails to consider an important aspect of the problem;" (2) relies on an "explanation that runs counter to the evidence before the agency;" or (3) is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Pls. Mot. at 41 (quoting *State Farm*, 463 U.S. at 43); *see also* 5 U.S.C. § 706(2)(A). Federal Defendants argue that USDS was not required to "determine for itself the validity of the Agreement under state law" and that it was reasonable for USDS "to rely on opinions of the offices of Michigan's Governor and Attorney General confirming the legality of the Crossing Agreement" under Michigan law. Defs Mot. at 1-2.

The APA's standard for arbitrary and capricious review requires a court to "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285 (1974); *Overton Park,* 401 U.S. at 416). Similarly, an agency decision may be arbitrary or capricious "if the agency has relied on factors which Congress has not intended it to consider." *Id.* Count 7 does not claim that USDS considered factors that the Congress did not intend for it to consider. DIBC does not challenge the foreign policy analysis of USDS.[19] Rather, Count 7 seeks to invalidate the approval of the Crossing Agreement on the basis that USDS failed to consider properly a factor that Congress did not identify for consideration: the legality of the Crossing Agreement under Michigan law.

---

[19] After "considering the crossing agreement's impact on foreign policy," USDS concluded that the Crossing Agreement would be approved because "[t]he project will advance the U.S. relationship with Canada . . . increase capacity and provide additional redundancy for personal and commercial vehicular traffic at this critical border crossing area, promote cross-border trade and commerce, serve as a net creator of jobs, and support the United States' civil and national defense priorities."  STATEDEPT-AR0000332.

In these circumstances and with the relevant law in mind, as discussed above, this argument finds no support in the APA.  Whether USDS failed to consider a relevant factor that Congress intended it to consider or "overlooked 'an important aspect of the problem' . . . turns on what a relevant substantive statute makes 'important.'"  *Oregon Natural Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996).  "In law, unlike religion or philosophy, there is nothing which is necessarily important or relevant."  *Id.*  When deciding whether an agency action was arbitrary or capricious, courts must determine the scope of the duty imposed on the agency by Congress in the relevant substantive statute.  *See State Farm*, 463 U.S. at 43.  When Congress passed the IBA, it did not direct USDS to analyze complex issues of state or foreign law.  Instead, USDS was tasked with reviewing an agreement's "impact on foreign policy" and the "national interest."  *Detroit Int'l Bridge Co.*, 133 F. Supp. 3d at 86.  The validity of the Crossing Agreement under Michigan law was not a factor required to be considered as part of the duties entrusted to USDS in the IBA.

Even *assuming arguendo* that USDS failed to consider properly this "factor" or "part of the problem," USDS did not act arbitrarily or capriciously.  USDS acted reasonably when: (1) it requested the views of Michigan's Attorney General concerning the Crossing Agreement's legality under Michigan law; and (2) relied on opinions of the Offices of Michigan's Governor and Attorney General confirming the Agreement's legality.  DIBC contends that the relevant issue subject to APA review is whether USDS reasonably interpreted Michigan law to conclude that the Crossing Agreement was lawfully executed.  Further, it argues that because USDS has no expertise in Michigan law and seeks no deference as to its interpretation of Michigan law, "the issue before the Court is purely a legal one on which no deference is owed."  Pls. Mot. at 44.  The argument misses the point.

33

USDS did not interpret Michigan law.  The Record of Decision clearly shows that USDS did not analyze any questions of state law on its own, but rather, deferred to the interpretation of Michigan officials:

> As the federal agency responsible for United States foreign relations and implementation of certain matters of federal law related to foreign relations, the Department of State has no expertise in matters of Michigan law.  The Department of State therefore *relies on the statement of Michigan law* by the Michigan Attorney General. Accordingly the Department of State concludes for *present purposes* that the State of Michigan properly entered into the Crossing Agreement and has the necessary authorities to bring it into effect and to implement it, without additional authorization or approval by the Michigan legislature.

STATEDEPT-AR0000226 (emphasis added).  Contrary to DIBC's assertions, the Agency's decision to defer to the Office of the Attorney General of Michigan on a matter of Michigan law, as opposed to applying its own interpretation of state law, is the proper subject of APA review in this case.

DIBC cites *Cellwave Telephone Services L.P. v. FCC*, 30 F.3d 1533, 1536 (D.C. Cir. 1994) to support its position, but that decision bolsters a different result.  In *Cellwave*, the Federal Communications Commission (FCC) dismissed the applications of various partnerships to operate and build cellular telephone systems in rural service areas.  *Id.* at 1533.  The order of dismissal relied in part on the Agency's own interpretation of Delaware law.  *See id.* at 1535.  No Delaware court had interpreted the relevant question and there were no opinion letters or memoranda to rely on.  As a result, the Agency "set out to predict how the Delaware courts would decide the issue, much as a federal court might do in order to apply state law." *Id.* at 1536 (citations omitted).  The D.C. Circuit noted that the FCC did not have to interpret Delaware law to dismiss the applications.  *See id.*  However, since it chose to do so and the task of interpreting

34

Delaware law was unrelated to its expertise, the Circuit proceeded to review FCC's interpretation of Delaware law *de novo* "as it is when the agency has decided an issue of federal law." *Id.* at 1536-37.

Unlike the FCC in *Cellwave*, USDS opted not to venture outside its own area of expertise. Instead of interpreting Michigan law, it requested the views of the Attorney General of Michigan and deferred to those views. Therefore, DIBC invites the Court to review *de novo* an interpretation of a state law question by Michigan officials, not USDS. The Court declines this invitation because the APA provides only for review of actions by federal agencies. 5 U.S.C. § 706. The relevant question remains whether USDS violated the APA by refusing to interpret the Michigan law question itself and relying on the interpretation of the Offices of the Governor and Attorney General of Michigan.

USDS's action in this case is entitled to deference under the APA. *See Cellwave*, 30 F.3d at 1536 ("Presumably the agency's choice to proceed in this way is also entitled to deference; we needn't say, however, for the appellants do not challenge it."). The Court finds that the decision by USDS to rely on the opinion of the office tasked with enforcing Michigan law cannot be described as unreasonable, arbitrary, capricious, or an abuse of discretion. *See Ohio Envt'l. Council v. E.P.A.*, 593 F.2d 24, 28 (6th Cir. 1979) ("Even less substantial is the claim that it was arbitrary and capricious for the Administrator of U.S. EPA to accept an opinion of the office of the Attorney General of Ohio on a matter of Ohio law."); *see also Bank N. Shore v. FDIC*, 743 F.2d 1178, 1185 (7th Cir. 1984) (noting that "FDIC was under no obligation to investigate whether the [state banking agency] complied with state law").

DIBC makes too much of the fact that three opinion letters of the Offices of the Governor and Michigan Attorney General were allegedly "conclusory" and "facially devoid of

35

reasoning or authority." Pls. Reply at 24. Admittedly, unlike the parties' briefs in this litigation and the Governor's Amicus Brief, these letters did not articulate extensive reasoning of the Michigan law question. Nonetheless, the Court cannot say that it was improper for USDS to rely on these letters. The Governor's Legal Counsel, the Chief Deputy Attorney General, and the Assistant Attorney General produced three letters that, while succinct, specifically addressed the questions raised by USDS. *See* STATEDEPT-AR0000365-66 (October 22, 2012 Letter from Michael Gadola, Governor's Legal Counsel); AR0000380-81 (October 18, 2012 Letter from Carol Isaacs, Chief Deputy AG); AR0000382-83 (June 14, 2012 Letter from George Elworth, Assistant AG).

The Court offers no opinion as to whether the Crossing Agreement was lawfully executed under Michigan law. Ultimately, Count 7 challenges the approval of the Crossing Agreement by USDS and the Court cannot say that the Agency's decision to rely on the opinions of the Offices of the Governor and the Attorney General of Michigan on a matter of Michigan law was arbitrary, capricious, or an abuse of discretion. *See Cellwave*, 30 F.3d at 1536; *Ohio Envt'l Council*, 593 F.2d at 28.

DIBC also mentions in passing that USDS originally "told the Michigan parties that legislative authorization was required" and then "reversed course in 2013" when it approved the Crossing Agreement. Pls. Reply at 25. DIBC contends that "nothing in the record explains this about-face" and, thus, the approval must be set aside as invalid. *Id.* However, it is unclear in the record that USDS actually took the position that legislative authorization was a necessary (not merely sufficient) condition for the NITC/DRIC to be built and the Crossing Agreement to

be approved.[20]  It could be that USDS merely assumed that the Michigan legislature could authorize the project.

In addition, to the extent that USDS originally may have suggested that legislative authorization was required, it never articulated a formal policy or position to that effect.  It also did not adopt a longstanding policy that "engendered serious reliance interests" on the part of DIBC.  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  Agencies are generally required to provide good reasons for a change in policy that undermines "rules that are still on the books," *see id.*, or deviates from a "longstanding position" provoking serious reliance, *see Encino Motorcars, LLC v. Navarro*, 579 U.S. —, No. 15-415, slip op. at 9-12 (June 20, 2016).  USDS did not issue, amend, or repeal a rule (legislative or interpretive) when it allegedly indicated that legislative authorization was required.  *See Encino Motorcars*, No. 15-415, slip op. at 10-12.  Finally, even if the alleged change of mind is subject to arbitrary and capricious review, the three letters relied upon by USDS in the Record of Decision constitute "good reasons for the new policy."  *Fox Television*, 556 U.S. at 515.

---

[20] DIBC relies exclusively on two sentences in the extensive administrative record to support its position.  *See* STATEDEPT-SUPP AR000037 (MDOT 2010 Report to Michigan Legislature) ("The Department of State has indicated that permit conditions include approval of the project by the Michigan legislature."); STATEDEPT-SUPP AR000058 (USDS Wire Regarding Canadian Prime Minister's Visit to D.C.) ("The issue is now before the Michigan legislature which must approve a public/private partnership to build the project.").  The first document is a statement by MDOT (not USDS) regarding the status of the NITC/DRIC project and the second document is a confidential wire confirming the status of the project.  Neither document articulates an official or clear position by USDS concerning who has the authority under Michigan law to execute the Crossing Agreement.  Also, the Court fails to see how a confidential wire to the President could create any serious reliance interest on the part of DIBC.  Other documents cited by DIBC to show that USDS worked to evade the requirement of legislative authorization, *see* Pls. Mot. at 44-45, do not support a contrary holding.

In conclusion, the approval of the Crossing Agreement was neither arbitrary, capricious, an abuse of discretion, nor unlawful.  Judgment will be entered on Count 7 in favor of the Federal Defendants.

## IV.  CONCLUSION

For the foregoing reasons, the Court will grant the Federal Defendants' Motion for Summary Judgment [Dkt. 227] and deny DIBC's Cross Motion for Summary Judgment [Dkt. 229].

A memorializing Order accompanies this Opinion.


Date: June 21, 2016

_____
/s/
ROSEMARY M. COLLYER
United States District Judge
